## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JICARILLA APACHE NATION ) | |
| ) | |
| Plaintiff, ) | No. 1:07-cv-00803-RLJ |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| ) | |
| Defendant ) | |
| _____) | |

### NOTICE OF SUPPLEMENT TO THE ADMINISTRATIVE RECORD

The attached document was inadvertently left out of the administrative record filed with this Court on November 13, 2007. Defendant provides it now as a supplement to that administrative record.

Dated this 17th day of January, 2008.

                Respectfully submitted,

                /s/ Ruth Ann Storey
                RUTH ANN STOREY
                Natural Resources Section
                Environment and Natural Resources Division
                United States Department of Justice
                P. O. Box 663
                Washington, D. C. 20044-0663
                Telephone: (202) 305-0493
                ruth.ann.storey@usdoj.gov

Of Counsel:

Stephen L. Simpson
Assistant Solicitor for Trust Responsibility
Division of Indian Affairs
Office of the Solicitor



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

**MAR 2 8 2007**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

| | |
|---|---|
| Mr. Charles A. Breer<br>Davis, Graham & Stubbs L.L.P.<br>370 Seventeenth St., Suite 4700<br>Post Office Box 185<br>Denver, Colorado 80202 | Re: MMS-98-0131-IND<br>Vastar Resources, Inc. |
| Mr. Jason E. Doughty, Attorney<br>Exxon Company, U.S.A.<br>P.O. Box 2180, Suite 1748<br>Houston, Texas 77252-2180 | Re: MMS-98-0134-IND<br>Exxon Company, U.S.A. |
| Ms. Constance L. Rogers<br>Holme Roberts & Owen, L.L.P.<br>1700 Lincoln Street, Suite 4100<br>Denver, Colorado 80203 | Re: MMS-98-0141-IND<br>Burlington Resources Oil<br>& Gas Company L.P. |
| Ms. Stevia M. Walther<br>Liskow & Lewis<br>701 Poydras Street, Suite 5000<br>New Orleans, Louisiana 70139-5099 | Re: MMS-99-0084-IND<br>MMS-99-0106-IND<br>Union Texas Petroleum Corporation<br>Unicon Producing Company |
| Mr. Bill Burton<br>Baker Botts L.L.P.<br>98 San Jacinto Boulevard<br>1500 San Jacinto Center<br>Austin, Texas 78701 | Re: MMS-99-0085-IND<br>Southern Union Exploration<br>Company |
| Ms. Katherine Ellsworth<br>Holland & Hart<br>P.O. Box 68<br>25 S. Willow Street, Suite 200<br>Jackson, Wyoming 83001-0068 | Re: MMS-99-0088-IND<br>Williams Production Company |

2

Mr. D. W. Lomax, U.S. Royalty Unit  Re: MMS-99-0125-IND
Exxon Mobil Corporation  MMS-99-0061-IND
Upstream Business Services  Mobil Exploration & Producing
P.O. Box 2024  U.S. Inc.
Houston, Texas 77252-2024

## Appeals Granted; One Order Modified

By this decision, I am granting all of the above appeals with the exception of the appeal of Mobil Exploration & Producing U.S. Inc., MMS-99-0061-IND, wherein we are modifying the order being appealed.

The above-named parties appealed under 30 C.F.R. Part 290 from Minerals Management Service (MMS), Royalty Management Program, now Minerals Revenue Management (MRM), orders which directed each, as royalty payors, to calculate, report and pay additional royalties for all Jicarilla Apache Tribal (Tribe or Tribal) oil and gas leases for the period January 1984 through June 1995 using dual accounting and major portion calculations.

Because the above-docketed appeals involve the same issues and the same time period, they are consolidated herein. By this decision, we are also disposing of the dual accounting issues that remain pending in the appeal of Mobil Exploration & Producing U.S. Inc. (Mobil) in MMS-99-0061-IND.

By order dated December 29, 1998, as amended on August 13, 1999, Mobil was directed to perform dual accounting on all of its Indian leases covering the period March 1988 through August 1996. That order was appealed by Mobil and docketed as MMS-99-0061-IND.

The record next shows that MRM issued a second order dated April 19, 1999, directing Mobil to perform dual accounting as well as major portion calculations, specific to its Jicarilla Apache Tribal leases for the overlapping period of January 1984 through June 1995. That order was appealed and docketed as MMS-99-0125-IND.

By decision dated March 13, 2003, the Deputy Commissioner of Indian Affairs granted part of the appeal in MMS-99-0061-IND with respect to the other Indian leases, but directed that the portion of that order and appeal relating to the Jicarilla Apache Tribal leases be consolidated and reserved for decision in the Mobil appeal in MMS-99-0125-IND being addressed herein.

### Statement of Facts

During the time period at issue, the above-named parties were royalty payors for Jicarilla Apache Tribal oil and gas leases which contain a provision requiring that the value of production for royalty purposes be based upon the greater of (1) the price received by the lessee, or (2) the highest price paid for a major portion of like-quality production. The leases also require the

3

lessee to perform a dual accounting, i.e., calculate and pay royalties on the greater of the unprocessed gas value, the processed gas value, or the lessee's gross proceeds.

MRM directed the above-named parties to: (1) calculate the value of their unprocessed gas using their gross proceeds (if an arm's-length sale at the wellhead), or the higher of the appropriate benchmark (if a non-arm's-length sale at the wellhead), compare that value with the value based on the major portion price provided by MRM, and use the higher value; (2) perform a new dual accounting that would take into account the major portion price(s); (3) compare the values they reported to MRM on their Report of Sales and Royalty Remittance (Form MMS-2014) to the values determined under the MRM order; and (4) pay any additional royalty amount due. The above-named parties filed timely appeals of those orders.

## Background

The Jicarilla Apache tribal oil and gas leases provide in section (c), Rental and Royalty, that value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leased lands are situated. Similar language appears in the regulations at 25 C.F.R. § 211.13(a) (1987) and at 30 C.F.R. § 206.152(a)(3)(i)(1991). Thus, the lease term and the regulations are consistent, and the provisions of 30 C.F.R. § 206.150(b), concerning the primacy of lease terms where they differ from regulations, is inapplicable.

The regulations at 30 C.F.R. § 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion <u>MMS will, where practicable, compare the value determined in accordance with this section with the major portion</u>. The value to be used in determining the value of production for royalty purposes shall be the higher of those two values. (Emphasis added.)

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest price paid or offered at the time of production for the major portion of gas production from the same field. <u>The major portion will be calculated using like-quality lease products sold under arm's-length contracts</u> from the same field (or, if necessary to obtain a reasonable sample, from the same area) <u>for each month</u>. All such sales will be arrayed from highest

> price to lowest price (at the bottom). <u>The major portion is that price at which 50 percent (by volume) plus 1 mcf of the gas (starting from the bottom) is sold.</u> (Emphasis added.)[1]

Similar regulations for processed gas are at 30 C.F.R. §§ 206.153(a)(3)(i) and 206.153(a)(3)(ii) (1991).

Here, the MRM researched sources and found that no usable databases existed that contained 100 percent of the gas sales for leases located in the Jicarilla Apache Reservation (Reservation). Nor did any available databases contain reliable information regarding Natural Gas Policy Act (NGPA) categories of wells, or whether sales were arm's-length or non-arm's-length. Further, available databases could not be relied upon to reflect, on a monthly basis, all of the corrections in prices and volumes resulting from the agency's audits. Since the Tribe's royalty-in-kind (RIK) sales represented actual arm's-length sales for leases located within the Reservation and distinguished between NGPA categories, MRM determined that the RIK sales provided the best available data to calculate major portion values for leases on the Reservation.

The price that the Tribe received for the RIK portion of the lease production represented the Tribe's one-eighth or one-sixth royalty. In evaluating the RIK data, MRM extrapolated the price received for the Tribe's royalty to the entire eight-eighths and/or six-sixths of the sales volume and assumed that the value of the RIK was representative of the prices received for the other portion of gas sold from the Reservation. Using the prices paid under RIK contracts, the MRM calculated the major portion by the NGPA categories for all gas production in the Reservation for the applicable time periods. MRM concluded that this method of calculating the major portion price for gas sales for Jicarilla Apache Tribal leases best met the requirement in the leases that value be calculated based on the "highest price paid or offered . . . for the major portion of the . . . gas."

## Issues

1. Is the MRM's major portion calculation contrary to the regulations and the lease terms?

2. May the Appellants be required to perform a new dual accounting for the subject leases based on the major portion prices calculated by MRM?

---

[1] There is no definition of "major portion" in the lease terms, so there can be no conflict between the lease terms and the regulations on this point.

5

Analysis

## I. MRM'S MAJOR PORTION METHODOLOGY IS CONTRARY TO MMS'S REGULATIONS

Summary

The MMS royalty valuation regulations, at 30 C.F.R. § 206.152(a)(3)(i) (1991), state that "MMS will, where practicable, compare the value determined in accordance with this section with the major portion." (Emphasis added.) The practicability of performing a major portion analysis depends, in a very large measure, upon the availability of data concerning arm's-length sales of lease production in the field or area. See Burlington Resources Oil and Gas Co., 151 IBLA 144, 159 (1999).

In the instant case, the Appellants argue that the sales data needed to perform a major portion analysis for the Appellants' lease production in a manner consistent with MMS's major portion regulations was not available and that, as a result, the MRM departed from established procedures in performing that analysis.

In support of this argument, the Appellants make the following points:

1. In the absence of information regarding third-party arm's-length sales in the field/area, MMS agreed to use the Tribe's sales data to calculate the major portion price. Those sales, which were of the Tribe's one-eighth or one-sixth royalty share of production from Tribal leases, represented far less than the required 50 percent (by volume) plus one mcf of production from the relevant field/area.

2. In an effort to overcome its inability to obtain sales data for an actual major portion of lease sales from the field/area, MMS inferred that the prices obtained by the Tribe for its RIK portion of the lease production were the same as the prices obtained by other producers/sellers for the remaining portion of the gas (seven-eighths or five-sixths) and extrapolated the Tribe's prices to that gas. However, the regulations call for the use of actual sales, not extrapolations.

3. MMS's methodology did not establish a major portion price for like-quality gas. MMS's attempt to extrapolate or attribute prices received by the Tribe to third party producers in the field/area is, in any case, fatally flawed because it fails to consider the fact that not all producers were legally entitled to the same NPGA maximum lawful prices, e.g., the difference in legal entitlement between "small producers" and "large producers." Also, MMS failed to consider the gas' physical differences.

4. In arbitrarily defining the relevant "area" for determining major portion as the boundaries of the Tribe's Reservation instead of using the field(s) where the Appellants' leases are located, MMS improperly disregarded the aforementioned regulations.

5. MMS also disregarded the regulations by failing to establish a major portion price on a monthly basis.

I agree with the Appellants.

While the Secretary has considerable discretion in establishing the value for royalty purposes of production from Federal and Indian oil and gas leases, see, e.g., United States v. Ohio Oil Co., 163 F.2d 633 (10th Cir. 1947), the Secretary must follow the regulations which have the force and effect of law, are binding on all officials of the Department, and may not be waived. Vitarelli v. Seaton, 359 U.S. 535 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954); Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621 (1950); McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); 515 Assocs. v. City of Newark, 424 F. Supp. 984 (D.N.J. 1977); Wisenak, Inc., 87 IBLA 67 (1985); Wilfred Plomis, 34 IBLA 222 (1978).

Because MRM's major portion methodology does not comply with MMS's regulations, the decision in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555, 1567 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), adopted as majority opinion as modified en banc, 782 F.2d 855 (10th Cir. 1986), does not support that major portion methodology. The court stated:

> When the Secretary is acting in his [trustee] role rather than solely as a regulator and is faced with a decision for which there is more than one "reasonable" choice as that term is used in administrative law, he must choose the alternative that is in the best interests of the Indian tribe.

The court in Supron ruled that the Secretary's method of implementing MMS regulations was reasonable (and in the best interest of the Tribe) and upheld it. In this case, as shown below, the MRM "major portion" methodology for the Jicarilla Apache Reservation was not a reasonable method to use to implement the regulations.

Based on my review of the record, I agree that MRM did not have sufficient sales data to be able to perform a major portion analysis using this methodology for the Jicarilla Apache Tribal leases in a manner consistent with the regulations.

MRM's Major Portion Methodology Relied on Less than 50 Percent of the Arm's-Length Sales and Improperly Extrapolated that Price to the Remaining Production

The record shows that the vast majority of gas produced from the Jicarilla Apache Reservation was sold, or disposed of, pursuant to non-arm's-length transactions. Since the regulations require MRM to look solely to arm's-length transactions, MRM was, of necessity, forced to limit its review to a smaller universe of sales. The record indicates that the RIK volumes constituted substantially less than the 50 percent threshold of the arm's-length sales required by the

7

regulations. See 30 C.F.R. § 206.152 (1991). Insofar as this is so, MRM's methodology cannot be said to be in compliance with the requirements of the regulations.

The MRM attempted to resolve this problem by extrapolating the price received for the Tribe's RIK sales volumes to the remaining seven-eighths or five-sixths of the gas volumes that were retained by the lessees. However, MRM has produced no evidence to show that the Tribe's RIK sales were, in fact, representative of prices received by all oil and gas operators on the Reservation. And even if MRM's extrapolations were correct, the regulations do not authorize MRM to make such extrapolations as part of its major portion methodology.

Although MMS possesses considerable discretion in determining value for royalty purposes, such discretion is tempered by the standard of reasonableness. Anadarko Petroleum Corp., 122 IBLA 141, 149 (1992), citing Marathon Oil v. United States Petroleum Corp., 604 F. Supp. 1375, 1382 (D. Ark. 1985), aff'd, 807 F.2d 759 (8th Cir. 1986). MMS cannot ignore part of its regulations (e.g., the 50 percent threshold noted above). APWU v. Potter, 343 F.3d 619, 626 (2d Cir. 2003) ("[A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that [a text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") (quoting Silverman v. Eastrich Multiple Investor Fund, 51 F.3d 28, 31 (3d Cir. 1995)).

On the contrary, it is well established that an agency must follow its own regulations. McAlpine v. United States, 112 F.3d 1429, 1433 (10th Cir. 1997) (citing Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 642 (10th Cir. 1990) ("The failure of an agency to follow its own regulations is challengeable under the [Administrative Procedure Act (APA)].") (citing Service v. Dulles, 354 U.S. 363 (1957)); Community Action of Laramie v. Bowen, 866 F.2d 347, 352 (10th Cir. 1989) ("Because a valid legislative rule or substantive regulation is binding to the same extent as a statute [citation omitted], [the agency's] failure to follow its own regulations likewise may be challenged under the APA."); Sampson v. Chater, 103 F.3d 918, 922 (9th Cir. 1996) (suggesting that it is an abuse of discretion to find an agency's position substantially justified when the agency violates its own regulations); and Cornella v. Schweiker, 728 F.2d 978, 985 (8th Cir. 1984) ("It was not reasonable for the Secretary to ignore her own regulations."). See also, Burlington Resources Oil and Gas Co., 151 IBLA 144 (1999), and Phillips Petroleum Co., 152 IBLA 109 (2000) (striking down MRM major portion methodologies for other Indian lands because they did not comply with the regulations).

The United States' trust responsibility does not require a different result. The trust responsibility is defined by statutes and regulations. Cobell v. Norton, 240 F.3d 1081, 1098-99 (D.C. Cir. 2000), citing, Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1482 (D.C. Cir. 1995) and United States v. Mitchell, 463 U.S. 206, 224 (1983) ("Mitchell II"). The Secretary is not required to ignore or to go beyond the major portion regulations in determining value for royalty purposes. Pawnee v. United States, 830 F.2d 187, 192 (Fed. Cir. 1987). In fact, the Supron court first found that the Secretary's dual accounting methodology complied with the regulations

(and was therefore reasonable) before it assessed whether that methodology was in the best interests of the tribe. Supron, 728 F.2d at 1568-69.[2]

Thus, while the Secretary, when acting in a fiduciary capacity (and when confronted with several alternatives), must choose the alternative that is in the best interests of the Indian tribe, the scope of that choice is necessarily limited to those alternatives that are "reasonable" and are consistent with the requirements of the regulations.

Based on the foregoing, I conclude that MRM's major portion methodology for the Tribal leases does not meet the requirements of the regulations and is therefore not a reasonable method to use to implement the regulations. As a result, the subject orders, as they relate to major portion, cannot be sustained.

Analysis – Like Quality

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) state, in pertinent part, that: "The major portion will be calculated using like-quality lease products sold under arm's-length contracts from the same field . . . for each month." (Emphasis added.) Like-quality means not only the same chemical and physical characteristics, but also the same legal characteristics, e.g., the same NGPA price category where the pricing is subject to Federal regulation. 30 C.F.R. § 206.151 (1991).

The Appellants contend that in performing this major portion analysis, MRM lumped together gas produced from many different formations without consideration of their physical differences, including coal bed gas containing high levels of carbon dioxide.

The available information supports a finding that MRM did, in fact, include in its analysis production of different qualities from different locations, e.g., the analysis included gas from different formations with Btu content ranging from an average low of 1117 in the Pictured Cliffs formation to a high of 1212 in the Dakota formation as well as coalbed gas produced from the Fruitland formation which has high levels of carbon dioxide. See, e.g., the June 18, 1999, statement of reasons filed by Union Texas Petroleum Company in MMS-99-0084-IND at page 23.

The MMS has not expressly denied that these differences were present. Insofar as this is so, the

---

[2] Furthermore, the statutory authority for these leases, the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-g, does not require use of the MRM major portion methodology. In Supron, the Tenth Circuit opined that certain portions of the legislative history of the IMLA led it to the conclusion that Congress intended Indian mineral owners to receive the greatest return from their property in the short term. Supron, 728 F.2d at 1565. The Supreme Court has cautioned that the language relied upon by the Tenth Circuit should not be given "talismanic effect," Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 179 (1989), and, in an opinion in March 2003, stated that the purpose of the statute was to provide Indians with a profitable source of revenue and to remove obstacles to leasing Indian land for mineral development. United States v. Navajo Nation, 537 U.S. 488, 511, n. 16 (2003). Providing Indians with a profitable source of revenue does not require using an illegal methodology, which could also be an obstacle to leasing the land.

9

above allegations stand unchallenged on the record.

The Appellants also argue that MMS failed to distinguish between processed and unprocessed gas, noting that the MMS Payor Handbook states that the major portion price for processed residue gas and gas plant products must be calculated separately.

The MRM acknowledges in its October 17, 2001, field report that it did not perform a major portion price calculation for gas plant products. Rather, MMS adopted the Mt. Belvieu spot price as the major portion price for gas plant products based on two contracts in two months for production located somewhere in the San Juan Basin. See MMS field report dated October 17, 2001, at page 24. This does not comply with MMS's established methodology as announced in its Payor Handbook. More importantly, it does not comply with MMS's regulations for determining the major portion price for processed gas. 30 C.F.R. § 206.153(a)(3)(ii) (1991).

Based on the foregoing, I conclude that MRM did not, in every instance, rely on like qualities of gas when performing the subject major portion analysis, and did not, therefore, fully satisfy that requirement of the regulations. I further conclude that this deficiency was one that was likely to occur given MRM's decision to broaden the geographical scope of its major portion analysis by defining the relevant "area" as the entire Jicarilla Apache Reservation.

Analysis – Definition of Field or Area

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) state that major portion shall be based on the arm's-length price received for a majority of like-quality lease products from the same field or area. (Emphasis added.)

The Appellants argue that in arbitrarily defining the relevant "area" for determining major portion as the boundaries of the Reservation instead of using the field where the Appellants' leases are located, MMS improperly disregarded the aforementioned regulation.

It is not disputed that most of the Jicarilla Apache Reservation is located in Rio Arriba County, New Mexico. A small portion of the Reservation extends into Sandoval County, New Mexico. The Reservation lies along the eastern edge of the San Juan Basin, and natural gas produced on the Reservation comes from the Pictured Cliffs Formation, the Mesaverde Group, the Gallup, Tocito, and fractured Mancos Formations, and the Dakota and Dakota-Morrison Formations. Coalbed methane is produced from the Fruitland Formation.

While the regulations at 30 C.F.R. § 206.151 (1991) state that, for major portion purposes, the "field" may be designated by the State oil and gas regulatory agency, the State of New Mexico defines natural gas resources in terms of pools rather than fields. The State of New Mexico Oil and Gas Commission has identified thirty pools that overlay or are within the boundaries of the Reservation.

MRM states that in several cases multiple pools overlay one another and/or extend outside the

Reservation boundary. See the MMS report entitled "Methodology for Major Portion and Dual Accounting Analysis, Jicarilla Apache Tribal Leases" at page 4. For purposes of the major portion analysis, the MRM defined the "field" as the Reservation boundary, thereby encompassing and aggregating all of the above-referenced formations (and associated pools).

Because the purpose of the major portion analysis was to derive a major portion value for all gas produced from the Jicarilla Apache Reservation (and perhaps because MRM price records do not distinguish by "field" for Reservation gas), the MRM included in its analysis all of the pools that were situated within the Reservation in whole or in part.

While it is understandable the MRM might, for reasons of administrative efficiency, prefer to derive a single major portion value for all the production from all of the leases on the entire Jicarilla Apache Reservation, it is not what the subject regulations contemplated.

Rather, a close reading of the regulations indicates that great emphasis was placed on fairness, i.e., to ensure that a major portion analysis – if it were to be conducted -- would compare like-quality production that was similarly situated. Thus, the pertinent regulations stipulate that, whenever possible, the production to be compared shall come from the same field as the lease production at issue, and that MRM would disregard the field and consider production from a larger geographic unit, i.e., the "area," only where necessary to obtain a reasonable sample.

And even where MRM, within its discretion, elects to consider the broader "area," it is still bound by the regulatory definition of "area" found at 30 C.F.R. § 206.151 (1991) which states that an area is "a geographic region . . . in which oil and/or gas lease products have similar quality, economic, and physical characteristics."

Thus, even if we assume, arguendo, that the "field" did not provide a "reasonable sample" and that MRM was justified in considering the broader "area," it does not follow that MRM may expand the scope of its search to include thirty separate pools from many different formations, including coalbed methane, absent a showing of similarity of characteristics – something that is conspicuously absent here.

Based on the foregoing, I agree with the Appellants that MRM did not properly define the "field"/"area" in performing the subject major portion analysis.

Analysis – Sales Values Calculated on a Monthly Basis

The regulations at 30 C.F.R. § 206.152(a)(3) (1991) require that major portion be based on sales "for each month," i.e., calculated on a monthly basis. The Appellants argue that the one-time settlement values used by MMS do not satisfy that requirement. The Appellants further argue that MMS has compounded that problem by using the one-time settlement payments to calculate a "total annual settlement value" for the years 1989 through June 1995.

The Appellants observe that the reason that the regulations call for major portion to be calculated

on a monthly basis is that prices fluctuate seasonally, e.g., there is less demand for natural gas for home heating during the summer months, and states that it would be unfair to require lessees to pay royalties based on unrealistically high prices for summer months when prices are historically low due to reduced demand.

As an example, the Appellants further note that in considering the methodology for Southern Ute major portion, MMS had concluded that it could not use the State of Colorado's information data base because sales were reported on a quarterly rather than a monthly basis.

I agree with the Appellants that, consistent with the regulations, MRM should have calculated major portion values on a monthly, rather than annual, basis.

## II.   THE APPELLANTS ARE NOT REQUIRED TO DUAL ACCOUNT USING THE MAJOR PORTION PRICE IN MRM'S ORDER

It is not disputed that the Jicarilla Apache Tribal leases, by their terms, require dual accounting. See Section 3(c) of the lease form entitled "Rental and Royalty."

Based on a review of sample months, MRM concluded that the Appellants' dual accounting calculations were based on prices less than the major portion prices determined by MRM. As a result of this finding, MRM directed the Appellants, in the subject orders, to perform a new dual accounting using the major portion prices that MRM had established.

However, since I have determined, for the reasons stated herein, that MRM's major portion calculations are not sustainable, that portion of the MRM order which directs the Appellants to dual account based on the MRM-calculated major portion price cannot be sustained. But the fact that an Appellant is not required to use major portion prices in its dual accounting does not relieve it of its duty to otherwise perform dual accounting in accordance with the lease terms and the regulations.

In Mobil Exploration & Producing U.S. Inc., MMS-99-0061-IND (March 13, 2003), 25 Gower Federal Service, Royalty Valuation and Management, Rocky Mountain Mineral Law Foundation (Gower), Mobil argued that MMS's December 29, 1998, order to Mobil to perform dual accounting for all of Mobil's Indian leases did, with respect to Mobil's Jicarilla Apache Tribal leases, duplicate and/or significantly overlap MMS's subsequent April 16, 1999, order. (Note: Mobil's appeal of MMS's April 16, 1999, order was docketed as MMS-99-0125-IND.)

Upon review, MMS agreed with Mobil and concluded that the portion of Mobil's appeal docketed as MMS-99-0061-IND, which dealt with Mobil's Jicarilla Apache Tribal leases, should be merged with Mobil's appeal of MMS's April 16, 1999, order (MMS-99-0125-IND) and addressed in a separate, supplemental decision. As stated above, Mobil has a clear obligation under the terms of its Tribal lease(s) to perform dual accounting. See section 3(c) of the lease form entitled "Rental and Royalty." See also, Jicarilla Apache Tribe v. Supron Energy Corporation, 782 F.2d 855 (10th Cir. 1986), cert. denied, 479 U.S. 970 (1986).

<u>Conclusions and Order</u>

For the reasons stated above, MMS's April 16, 1999, order (Mobil Exploration & Production U.S. Inc. (Mobil), Docket Number MMS-99-0125-IND as consolidated with MMS's order dated December 19, 1998, Docket Number MMS-99-0061-IND), is hereby modified to direct Mobil to perform dual accounting in a manner consistent with MMS regulations and directives, but without reference to the major portion price(s) referenced herein.  <u>See</u> 30 C.F.R. § 206.155 (1994).  <u>See</u> <u>also</u>, <u>Amoco Production Company</u>, 143 IBLA 45 (1998), and <u>Jicarilla Apache Tribe v. Supron Energy Corp.</u>, 782 F.2d 855 (10th Cir. 1986), <u>cert.</u> <u>denied</u>, 479 U.S. 970 (1986).

The remaining appeals, including MMS-99-0125-IND, are hereby granted with respect to MMS's orders that the Appellants calculate and pay additional royalties based on the major portion price derived by MMS.  However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with necessary information can be merged with other available date to meet the regulatory requirements that MMS has established.  <u>See</u> <u>Phillips Petroleum Co.</u>, 152 IBLA 109, 117 (2000).  Likewise, this decision is rendered without prejudice to MMS's right to require dual accounting using proper major portion prices.

Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department.  <u>Blue Star, Inc.</u>, 41 IBLA 333 (1979); <u>Marathon Oil Co.</u>, 108 IBLA 177 (1989).

Sincerely,

*[signature]*

Carl J. Artman
Assistant Secretary - Indian Affairs