# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JICARILLA APACHE NATION, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )  Civil Action No. 07-cv803 (RJL) |
| | ) |
| U.S. DEPARTMENT OF THE INTERIOR, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF JICARILLA APACHE NATION'S MOTION FOR SUMMARY
## JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT THEREOF

Jill Elise Grant (D.C. Bar No. 358306)
Jenny J. Dumas
NORDHAUS LAW FIRM, LLP
1401 K Street, NW, Suite 801
Washington, DC 20005
telephone:  (202) 530-1270
facsimile:   (202) 530-1920
*Counsel for the Jicarilla Apache Nation*

Dated: January 22, 2008

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    THE DEPARTMENT IN *VASTAR* FAILED TO EXPLAIN ITS DEPARTURE FROM AGENCY PRECEDENT AND SO ITS DECISION SHOULD BE VACATED AS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    THE *VASTAR* DECISION SHOULD BE VACATED BECAUSE IT IS PREMISED ON A MAJOR PORTION METHODOLOGY THAT IS INCONSISTENT WITH THE JICARILLA LEASES AND SO IS CONTRARY TO THE DEPARTMENT'S OWN REGULATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    III.    THE *VASTAR* DECISION SHOULD BE VACATED BECAUSE IT IS CONTRARY TO THE DEPARTMENT'S FIDUCIARY DUTY TO PROTECT THE INTERESTS OF THE JICARILLA APACHE NATION. . . . . . . . . . . . . . . . . . 19

    IV.    IN LIGHT OF THE INHERENT FLAWS IN *VASTAR* AND THE DEPARTMENT'S TRUST RESPONSIBILITIES, THE COURT SHOULD DIRECT THE DEPARTMENT TO ENFORCE THE UNDERLYING MMS ORDERS TO PERFORM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        A.    The Inherent Flaws in *Vastar* and the Federal Trust Responsibility Warrant an Order Directing the Department to Enforce the Jicarilla Leases. . . . . 24

        B.    The Department Correctly Decided in the *Bayless* Decisions that the MMS Orders to Perform Were Based on a Reasonable Interpretation of the Jicarilla Leases and Should be Enforced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            1.    The *Bayless* decisions correctly found that the 1988 MMS major portion regulations were inconsistent with the Jicarilla leases, and that the leases take precedence to the extent of the inconsistency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            2.    The *Bayless* decisions correctly upheld the use of Jicarilla sales data to calculate major portion prices. . . . . . . . . . . . . . . . . . . . . . . . . . 28

            3.    The *Bayless* decisions correctly upheld the designation of the Reservation as the "field" or "area." . . . . . . . . . . . . . . . . . . . . . . 35

    V.    ALTERNATIVELY, THIS COURT SHOULD DIRECT THE DEPARTMENT TO DEVELOP A NEW MAJOR PORTION METHODOLOGY FOR THE JICARILLA APACHE RESERVATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF AUTHORITIES

*Cases and authorities chiefly relied upon are marked with an asterisk.

## CASES

*American Gas Assoc. v. FERC*, 912 F.2d 1496, (D.C. Cir. 1990), *cert. denied sub nom. City of Willcox v. FERC,* 498 U.S. 1084 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Arizona Public Service Co. v. EPA*, 211 F.3d 1280 (D.C. Cir. 2000), *cert. denied sub nom. Michigan v. EPA*, 532 U.S. 970 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Atchison, Topeka and Santa Fe R.R. v. Witchita Bd. of Trade,* 412 U.S. 800 (1973) . . . 13, 24, 25

*B.P. America Production Co. v. Burton*, 127 S.Ct. 638 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bryan v. Itasca County*, 426 U.S. 373 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burlington Resources Oil & Gas Co. v. U.S. Dept. of the Interior,* 21 F. Supp. 2d 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Bush-Quayle '92 Primary Committee v. Fed. Election Comm'n*, 104 F.3d 448 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*California Co. v. Udall*, 296 F.2d 384 (D.C. Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cherokee Nation v. Babbitt*, 944 F. Supp. 974 (D.D.C. 1996), *reversed on other grounds*, 117 F.3d 1489 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 966 F.2d 583 (10th Cir. 1992) . . . 21, 27

*Cobell v. Norton,* 240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 27

*Columbia Broadcasting Sys. v. FCC,* 454 F.2d 1018 (D.C. Cir. 1971) . . . . . . . . . . 13, 14, 25, 26

*Gonzales v. Thomas*, 547 U.S. 183 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir 1970), *cert. denied,* 403 U.S. 923 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

*Greyhound Corp. v. ICC*, 551 F.2d 414 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

iii

*Hatch v. FERC*, 654 F.2d 825 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . 20, 21

*\*Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555 (Seymour, J., dissenting), *adopted as opinion of en banc court*, 782 F.2d 855 (10th Cir. 1986), *modified*, 793 F.2d 1171, *cert. denied*, 479 U.S. 970 (1986) ("*Supron*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20-24, 27

*Kerr-McGee Corp. v. Navajo Tribe*, 471 U.S. 195 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27

*\*Kreis v. Sec'y of the Air Force*, 406 F.3d 684 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . 13, 25, 26

*Marathon Oil Co. v. United States*, 604 F. Supp. 1375 (D. Alaska 1985), *aff'd*, 807 F.2d 759 (9th Cir. 1986), *cert. denied*, 107 S. Ct. 1593 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Maryland People's Counsel v. FERC*, 761 F.2d 768 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . 33

*Mobil Oil Exploration & Prod. S.E., Inc. v. United Distribution Co.*, 498 U.S. 211 (1991) . . . 33

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Morton v. Ruiz*, 415 U.S. 199 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*National Ass'n of Home Builders*, 127 S.Ct. 2518 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*National Black Media Coalition v. Federal Communications Comm'n*, 775 F.2d 342 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*\*Nat'l Federation of Fed. Employees v. Federal Labor Relations Authority*, 412 F.3d 119 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25, 26

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505 (1991) . . . . . . 1

*OXY USA, Inc. v. Babbit*, 268 F.3d 1001, 1013 (10 Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 41

*Pawnee v. United States*, 830 F.2d 87 (Fed. Cir. 1987), *cert. denied*, 486 U.S. 1032 (1988) . . . 38

*Piney Woods Country Life School v. Shell*, 539 F. Supp. 957 (S.D. Miss. 1982), *aff'd in part and rev'd in part on other grounds*, 726 F.2d 225 (5ᵗʰ Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 32

*Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Prenalta Corp. v. Colo. Interstate Gas*, 944 F.2d 677 (10th Cir. 1991) . . . . . . . . . . . . . . . 32-34

iv

*Pueblo of Santa Ana v. U.S.*, 214 F.3d 1338 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Railroad Comm'n v. Graford Oil Corp.*, 557 S.W. 2d 946 (Tex. 1977) . . . . . . . . . . . . . . . . . 36

*Railroad Comm'n v. Rio Grande Valley Gas Co.*, 405 S.W.2d 304 (Tex. 1966) . . . . . . . . . . . 36

*\*Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13-16

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Seagull Energy E & P, Inc. v. Railroad Com'n of Texas*, 99 S.W.3d 232 (Tex. App. 2003) . . . 36

*\*Seminole Nation v. United States,* 316 U.S. 286 (1942) . . . . . . . . . . . . . . . 3, 19, 21, 22, 26, 27

*Service v. Dulles,* 354 U.S. 363 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Shoshone Indian Tribe v. United States,* 56 Fed. Cl. 639 (2003) . . . . . . . . . . . . . . . . . . 23, 24, 38

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Three Affiliated Tribes v. Wold Engineering,* 476 U.S. 877 (1986) . . . . . . . . . . . . . . . . . . . . . . . 1

*Transcontinental Gas Pipe Line v. State O&G Bd. of Miss.,* 474 U.S. 409, (1986) . . . . . . . . . 33

*U.S. v. Mead*, 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir.1996) . . . . . . . . . . . . . . . . . . . . 32, 33

*United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954) . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*") . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Navajo Nation*, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

*United States v. Testan*, 424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Vitarelli v. Seaton,* 359 U.S. 535 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Westar Energy, Inc. v. FERC*, 473 F.3d 1239 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) . . . . . . . . . . 1

*Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006). . . . . . 14, 15

*Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54 (D.C. Cir. 1999) . . . . . . . . . . . . 13

**ADMINISTRATIVE DECISIONS**

*Anadarko,* 122 IBLA 147 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Burlington Resources Oil & Gas Co. L.P.,* MMS-RVD-OG:98-0275 (June 10, 1998) . . 2, 22-24

*\*Burlington Resources Oil & Gas Co.*, 151 IBLA 144 (1999) ("*Burlington IBLA*") . . . . . *passim*

*\*Dugan Production Corp.*, MMS-98-0139-IND (December 22, 2000) ("*Dugan*") . . . . . . *passim*

*Exxon Co., U.S.A.,* MMS-RVD-OG:98-0229 (May 27, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*\*Merrion Oil & Gas Corp.*, MMS-98-0228-IND (December 22, 2000) ("*Merrion*") . . . . *passim*

*Mobil Exploration & Producing U.S. Inc,* MMS-RVD-OG:99-0092 (April 16, 1999) . . . . 2, 33

Order No. 528, Mechanism for Passthrough of Pipeline Take-or-Pay Buyout and Buydown Costs, 53 FERC ¶ 61,163 (1990), *order on reh'g*, 54 FERC ¶ 61,095, *reh'g denied*, 55 FERC ¶ 61,372 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Phillips Petroleum Co.,* 152 IBLA 109 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 29, 38, 39

*\*Robert L. Bayless*, MMS-98-0132-IND (December 22, 2000) ("*Bayless*") . . . . . . . . . . . *passim*

*Southern Exploration Co.,* MMS-RVD-OG:99-0049 (Feb. 19, 1999) . . . . . . . . . . . . . . . . . . . . 2

*Unicon Producing Co.,* 99-0091 (March 25, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Union Texas Petroleum Corp.,* MMS-RVD-OG:99-0050 (Feb. 19, 1999) . . . . . . . . . . . . . . . . 2

*Vastar Resources, Inc.*, MMS-98-0131-IND, *et al*. (March 28, 2007) ("*Vastar*") . . . . . . . *passim*

*Vastar Resources, Inc.,* MMS-RVD-OG:98-0230 (May 27, 1998) . . . . . . . . . . . . . . . . . . . . . . . 2

*Williams Production Co.,* MMS-RVD-OG:99-052 (Feb. 23, 1999) . . . . . . . . . . . . . . . . . . . . . . 2

**STATUTES**

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701- 706 . . . . . . . . . . . . . . . . . . . . . . . 1, 13

*Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1701. . 4, 20, 21, 26, 38

IMLA, 25 U.S.C. § 396(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a - 396g . . . . . . . . . . 3, 20, 23

Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717-717w (2000) . . . . . . . . . . . . . . . . . . . 32

Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301-3432 (2000) . . . . . . . . . . . . . 30

NMSA 1978, § 70-2-33(c) (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**REGULATIONS**

25 C.F.R. § 171.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25 C.F.R. part 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*25 C.F.R. § 211.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 17,30

25 C.F.R. § 211.41(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

30 C.F.R. part 290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

30 C.F.R. § 206.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 30

*30 C.F.R. § 206.150(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 10, 17, 19

30 C.F.R. § 206.150(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

30 C.F.R. § 206.150(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

30 C.F.R. § 206.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

30 C.F.R. § 206.152(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

30 C.F.R. § 206.152(a)(3)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 35

30 C.F.R. § 206.153(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

*30 C.F.R. § 206.170(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 12, 19

30 C.F.R. § 206.170(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

30 C.F.R. § 206.171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

30 C.F.R. § 206.172(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

30 C.F.R. § 206.173(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

30 C.F.R. § 206.174(a)(4)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

30 C.F.R. § 210(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

## OTHER AUTHORITIES

Amendments to Gas Valuation Regulations for Indian Leases, 61 Fed. Reg. 49894 (September 23, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 30

Amendments to Gas Valuation Regulations for Indian Leases, 64 Fed. Reg. 43506 (August 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 30, 37

Arbaugh, *Take or Pay Clauses: Pandora's Box Reopened?,* 5 E. Min. L. Inst. 11-1 (1984) . . . 33

Convention with the Jicarilla Apache, December 10, 1873 . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D. Getches, D. Rosenfelt & C. Wilkenson, Federal Indian Law 135-36 (1979) . . . . . . . . . . . . 19

Edmund L. Andrews, *As Profits Soar, Companies Pay U.S. Less for Gas Rights*, New York Times, January 23, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Final Report on an Audit of the Minerals Management Service Audit Offices, OIG 2003-I-0023 (March 31, 2003), available at http://www.doioig.gov . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IG Audit Report No. C-IN-MMS-0006-2006 (December 2006) . . . . . . . . . . . . . . . . . . . . . . . . 40

Local Civ. R. 7(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Report of the Commission, Fiscal Accountability of the Nation's Energy Resources (Jan. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Reporting Amendments, 71 Fed. Reg. 38545 (July 7, 2006) . . . . . . . . . . . . . . . . . . . . . 39, 40

Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230 (January 15, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

Richard J. Pierce, Jr., *Natural Gas Regulation*, 68 Va. L. Rev. 63 (1982) . . . . . . . . . . . . . . 32, 33

Richard J. Pierce, Jr., *Reconstituting the Natural Gas Industry from Wellhead to Burnertip,* 9 ENERGY L.J. 1 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

**PLAINTIFF JICARILLA APACHE NATION'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF**

**INTRODUCTION**

The Jicarilla Apache Nation ("Jicarilla") is filing this motion for summary judgment to

obtain judicial review of final agency action pursuant to the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701- 706.[1] Jicarilla seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, setting

aside the decision of the Department of the Interior ("Department") in *Vastar Resources, Inc.*, MMS-

98-0131-IND, *et al.* (March 28, 2007) ("*Vastar*") (SUPP001-012), as arbitrary, capricious, an abuse

of discretion, and otherwise not in accordance with law because of, *inter alia*, the Department's

failure to explain its departure from agency precedent. *See* 5 U.S.C. § 706.

Agency precedent was established as early as 1998, when the Minerals Management Service

("MMS") issued 39 virtually identical agency Orders to Perform to companies producing natural

gas on the Jicarilla Apache Reservation; was confirmed by final decisions of the Department

upholding three of those orders on December 22, 2000, *see Robert L. Bayless*, MMS-98-0132-IND

---

[1] Since this action is an appeal of a final administrative decision, the parties agree that the undisputed material facts in this action are the same as the administrative record, which was filed by the Department of the Interior on November 13, 2007 and supplemented on January 17, 2008. The portions of the administrative record relied upon in the memoranda filed in this case will be attached as a Joint Appendix, pursuant to Local Civ. R. 7(n).

The Jicarilla Apache Nation does not waive its tribal sovereign immunity by filing this administrative appeal. It is a well-settled principle that Indian tribes, as sovereign entities, "possess[] . . . common-law immunity from suit." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978); *accord, Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505 (1991); *Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877 (1986); *Cherokee Nation v. Babbitt*, 944 F. Supp. 974, 985 (D.D.C. 1996), *reversed on other grounds*, 117 F.3d 1489 (D.C. Cir. 1997); *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 771 (D.C. Cir. 1986). Moreover, any waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo,* 436 U.S. at 58, quoting *United States v. Testan*, 424 U.S. 392, 399 (1976); *accord, Cherokee Nation,* 117 F.3d at 1498; *Wichita and Affiliated Tribes*, 788 F.2d at 773.

1

("*Bayless*"), *Dugan Production Corp.*, MMS-98-0139-IND ("*Dugan*"), and *Merrion Oil & Gas Corp.*, MMS-98-0228-IND ("*Merrion*") (collectively, the "*Bayless* decisions"); and remained in effect until the Department's *Vastar* decision on appeal here, which overturned the *Bayless* decisions without even referencing them.[2]

In addition, Jicarilla seeks injunctive relief, pursuant to 28 U.S.C. § 2202, requiring the Department to enforce the eight MMS Orders to Perform underlying the *Vastar* decision. In the alternative, Jicarilla requests the Court to direct the Department to develop a new methodology to enforce the Jicarilla Apache Nation's mineral leases.[3]

The principle of administrative law at issue in this appeal is straightforward: an agency may not depart from established precedent without explanation. *E.g., Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003). The established precedent at issue here involves facts that are more complex, however, and so warrants some explanation. Also, the fiduciary obligations that federal agencies owe to Indian tribes impose stricter standards on those agencies when they are acting in their trust capacity than when they are acting solely under general principles of administrative law. This case therefore involves an additional level of analysis beyond that generally applicable in an administrative appeal.

_____

[2] The *Bayless* decisions and the underlying Field Reports and Orders to Perform are included for the convenience of the Court as attachments to this Memorandum and are referred to herein as "Att. 1-7."

[3] The MMS Orders to Perform at issue in the *Vastar* decision are *Vastar Resources, Inc.,* MMS-RVD-OG:98-0230 (May 27, 1998) (JIC000063); *Exxon Co., U.S.A.,* MMS-RVD-OG:98-0229 (May 27, 1998) (JIC003419); *Burlington Resources Oil & Gas Co. L.P.,* MMS-RVD-OG:98-0275 (June 10, 1998) (JIC000880); *Union Texas Petroleum Corp.,* MMS-RVD-OG:99-0050 (Feb. 19, 1999) (JIC002519); *Unicon Producing Co.,* 99-0091 (March 25, 1999) (JIC002728); *Southern Exploration Co.,* MMS-RVD-OG:99-0049 (Feb. 19, 1999) (JIC001973); *Williams Production Co.,* MMS-RVD-OG:99-052 (Feb. 23, 1999) (JIC000596); and *Mobil Exploration & Producing U.S. Inc,* MMS-RVD-OG:99-0092 (April 16, 1999) (JIC001638).

## STATEMENT OF FACTS

### The Jicarilla Mineral Leases

*Vastar*, the *Bayless* decisions, and the underlying MMS Orders to Perform involve the calculation of royalties due to Jicarilla for natural gas produced from the Jicarilla Apache Reservation, located in northwest New Mexico. The Jicarilla Apache Nation, a federally recognized Indian tribe, is the lessor of the gas pursuant to various mineral leases drafted, issued, and approved by the Department through the MMS and the Bureau of Indian Affairs ("BIA"). *See* Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a - 396g. The Jicarilla leases all are entered on BIA Standard Lease Form 5-157 ("Lease"), JIC001372-75. Under the leases, Jicarilla is entitled to royalties of 1/8 or 1/6 of the value of the gas, Lease ¶ 3(c), and, in exchange, the lessees are granted "the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the . . . natural gas deposits" on the leased portion of the Reservation, Lease ¶ 1; make unilateral production and marketing decisions regarding the sale of the gas, *see, e.g., Piney Woods Country Life School v. Shell*, 539 F. Supp. 957, 973 (S.D. Miss. 1982), *aff'd in part and rev'd in part on other grounds*, 726 F.2d 225 (5th Cir. 1984); and retain the remaining 5/6 or 7/8 of the proceeds from these sales. Royalties from oil and gas production account for about half of all the revenues that Jicarilla uses to provide essential government services on the Reservation, including police, tribal courts, health care, elder care, and education.

The United States and its agencies are required to manage tribal resources, including oil and gas, consistent with the United States' trust responsibility to federally recognized Indian tribes such as the Jicarilla Apache Nation. *E.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) (the United States has a "moral obligation of the highest responsibility and trust" to Indian tribes and its "conduct, as disclosed in the acts of those who represent it in dealings with Indians, should

therefore be judged by the most exacting fiduciary standards"); *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1567 (Seymour, J., dissenting), *adopted as opinion of en banc court*, 782 F.2d 855 (10th Cir. 1986), *modified,* 793 F.2d 1171, *cert. denied,* 479 U.S. 970 (1986) ("*Supron*") (Secretary of the Interior must act as a fiduciary in the administration of tribal oil and gas reserves); Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1701(a)(4) (the "Secretary should aggressively carry out his trust responsibility in the administration of Indian oil and gas.").

Pursuant to this trust responsibility, the Department is responsible, largely through the MMS, for administering Jicarilla's gas leases and ensuring that the correct amount of royalties is paid to Jicarilla under the terms of those leases. *See, e.g.*, 25 U.S.C. § 396(b) (stating that all Indian mineral leasing activities are subject to the Department's regulations); 30 U.S.C. § 1701(b)(4) (FOGRMA enacted to "fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources"); 25 C.F.R. part 211 (2007) (BIA mineral leasing regulations for Indian trust lands are intended to ensure that Indian mineral resources are "developed in a manner that maximizes their best economic interests"); 30 C.F.R. § 206.170(e) (1999) (Indian gas regulations are "intended to ensure that the trust responsibilities of the United States with respect to the administration of Indian oil and gas leases are discharged in accordance with the requirements of the governing mineral lease laws, treaties, and lease terms.").

**The Major Portion Provision of the Lease**

One of the Department's responsibilities under tribal leases involves calculating the "value" on which royalties are based. This value is not defined in the lease, but instead is left to the Secretary of the Interior's discretion, which must be exercised consistent with the criteria stated in the lease and the Department's trust responsibility to tribes.

The Jicarilla leases contain a provision, called the "major portion" provision, that provides as follows:

> 'value' for the purposes hereof [the calculation of royalties] may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered . . . at the time of the production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated.

Lease ¶ 3(c). This is the provision at issue in the MMS Orders to Perform, the *Bayless* decisions, and *Vastar*.

**The Major Portion Regulations**

Throughout the period at issue in this case, both the BIA and the MMS had regulations pertaining to major portion.[4] Between 1984 and 1987, the BIA major portion regulations mirrored the major portion provision in the Jicarilla leases. *Compare* 25 C.F.R. § 211.13(a) (1984-1987) *with* Lease ¶ 3(c). The BIA regulations did not address major portion between 1988 and 1990, but in 1991 the BIA reissued 25 C.F.R. § 211.13(a), which again mirrored the lease terms, *compare* 25 C.F.R. § 211.13(a) (1991-96) *with* Lease ¶ 3(c), until it was removed altogether in 1997, *compare* 25 C.F.R. § 211.13(a) (1991-1996) *with* 25 C.F.R. § 211.41(c) (1997-2007).

Prior to 1988, the MMS regulations also were consistent with Lease ¶ 3(c). The regulations provided:

> In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

---

[4] The MMS Orders to Perform covered the period January 1984-June 1995. The BIA and the MMS each had major portion regulations through 1996. After 1996, the BIA continued to have regulations governing tribal mineral leases, but the specifics of royalty valuation were left to MMS. *See* 25 C.F.R. § 211.41(c) (1997-2007).

30 C.F.R. § 206.103 (1987).

In 1988, however, MMS promulgated new regulations for the calculation of major portion prices, effective March 1, 1988. Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230 (January 15, 1988), *codified at* 30 C.F.R. §§ 206.152(a)(3), 206.153(a)(3), *recodified* at 30 C.F.R. §§ 206.172(a)(3), 206.173(a)(3) (1997). The first sentence of subparagraph (a)(3)(ii) of the 1988 regulations was similar to Lease ¶ 3(c), but the next sentence was substantially different. Rather than basing the value of production on the "*highest* price paid or offered" for the "*major portion*" of gas, the 1988 regulations based the value of production for royalty purposes on a volume-weighted *median* price for the *majority* of gas sold, as follows:

> The major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month. All such sales will be arrayed from the highest price to the lowest price (at the bottom). *The major portion is that price at which 50 percent (by volume) plus 1 mcf of gas (starting from the bottom) is sold.*

30 C.F.R. § 206.152(a)(3)(ii) (1988) (emphasis added).

The Department's own regulations, in effect from the beginning of the audit period and continuing through the present, mandate that:

> "[i]f the specific provisions of any . . . oil and gas lease subject to the requirements of this subpart are inconsistent with any regulation in this subpart, then the *lease . . . shall govern to the extent of that inconsistency.*"

30 C.F.R. § 206.150(b) (1988), *recodified at* 30 C.F.R. § 206.170(b) (1999) (emphasis added). Because the 1988 MMS regulations were inconsistent with the Lease, the Lease provisions continued to apply even after MMS issued the 1988 regulations.

In 1999 (effective January 1, 2000), MMS entirely revised the major portion regulations "to ensure that Indian lessors receive maximum revenues from their mineral resources as required by the unique terms of Indian leases and MMS's trust responsibility to the Indian lessor." Amendments

6

to Gas Valuation Regulations for Indian Leases, 64 Fed. Reg. 43506 (August 10, 1999); *see also id*.

at 43510; Amendments to Gas Valuation Regulations for Indian Leases, 61 Fed. Reg. 49894

(September 23, 1996).  In its Notice of Proposed Rulemaking, MMS recognized that:

> Indian lessors have criticized MMS since the publication of the definition of the major
> portion value in 1988.  They have argued that the definition of major portion in the 1988
> regulation does not adequately represent the lease terms on the highest price paid or offered
> for a major portion of production. . . . The [Indian Gas Valuation Negotiated Rulemaking]
> Committee agreed that the price at which 25 percent or more of the gas is sold is a
> reasonable compromise on the term *major*.

61 Fed. Reg. at 49899.  Accordingly, unlike the 1988 "majority" major portion formula, under the

revised regulations "[t]he major portion value is that price at which 25 percent (by volume) of the

gas (starting from the highest) is sold."  30 C.F.R. § 206.174(a)(4)(iii); 64 Fed. Reg. at 43515,

43520.

### The MMS Orders to Perform

Most of the Jicarilla leases were executed in the 1950s, but for many years the Department

postponed determining major portion prices on those and other Indian leases.  *See* 30 C.F.R. §

206.150(c) (1988) ("All royalty payments made to MMS or to any Tribe or allottee are subject to

audit and adjustment.").  Finally, in the 1990s, MMS began to calculate major portion prices and

issue major portion orders.  *See Burlington Resources Oil & Gas Co.*, 151 IBLA 144, 156 (1999)

("*Burlington IBLA*") (containing brief history of major portion orders).  During that period, MMS

calculated major portion prices for the Southern Ute Tribe, *see Burlington IBLA*; for Indian allottees

in Oklahoma, *see Phillips Petroleum Co.,* 152 IBLA 109 (2000); and for the Jicarilla Apache Nation,

among others.[5]

---

[5] The *Burlington IBLA* and *Phillips* decisions are attached for the convenience of the Court
as Att. 8 and 9, respectively.

MMS calculated major portion prices for Jicarilla pursuant to a methodology that MMS developed specifically for gas produced from the Jicarilla Apache Reservation ("Jicarilla major portion methodology"). *See, e.g.,* Orders to Perform in *Vastar*, JIC000063, JIC003419, JIC000880, JIC002519, JIC002728, JIC001973, JIC000596, JIC001638; *see also, e.g.,* major portion methodology in *Burlington Resources Oil & Gas Co., L.P.,* JIC000970-988. The Jicarilla major portion methodology was not based on the 1988 MMS regulations because MMS found that the regulations, which used the median/majority formula, were inconsistent with the Jicarilla leases, which required the highest prices for a major portion. *Id.* The Jicarilla major portion methodology was based on Lease ¶ 3(c). It was calculated using available arm's-length sales data from the Jicarilla Apache Reservation rather than with the MMS Auditing and Financial System ("AFS") database, because the Department had found the AFS database to be inadequate, *Burlington IBLA* (Att. 8). Use of the Jicarilla major portion methodology generated substantially more revenue for the tribe than the median/majority formula of the 1988 MMS regulations would have generated.

Between 1998 and 1999, MMS issued 39 virtually identical major portion Orders to Perform to companies producing gas on the Jicarilla Apache Reservation, including the companies involved in the *Bayless* decisions, *see, e.g.,* Att. 4 and Att. 5, and the companies involved in *Vastar*, *see* JIC000976, JIC003444, JIC001426, JIC002178, JIC002848, JIC002366, JIC000139, JIC000663; *see also* JIC000985, JIC003453, JIC001438, JIC002187, JIC002857, JIC000148, JIC000671 (listing the 39 companies). These Orders directed the companies to use the Jicarilla major portion methodology to: (1) value the gas they produced from the Jicarilla Apache Reservation from January 1984 through June 1995 (thus spanning two sets of MMS regulations); (2) determine whether any additional royalties were owed to Jicarilla based on this value; and (3) pay those additional royalties, if any, to Jicarilla. All of the major portion orders stated, consistent with the MMS regulations, that

8

"In carrying out the trust responsibility of the United States in the administration of Indian oil and gas leases, the Minerals Management Service (MMS) has long recognized the primacy of the lease terms." *E.g.,* JIC000063, JIC003419, JIC000880, JIC002519, JIC002728, JIC001973, JIC000596, JIC001638.

Some of the companies complied with the orders and paid additional royalties, and some settled with MMS and Jicarilla. Many companies appealed the major portion orders pursuant to 30 C.F.R. part 290 (1999), including the three lessees subject to the *Bayless* decisions as well as the eight lessees subject to *Vastar.*

### The *Bayless* Decisions

The appeals brought by the *Bayless* companies were the first appeals of the MMS major portion Orders, and were addressed first by the Department. The companies claimed that the Jicarilla major portion methodology was inconsistent with MMS regulations and so was invalid. *See Bayless* (Att. 1); *Merrion* (Att. 2); *Dugan* (Att. 3). The Department disagreed, issuing three final decisions on December 22, 2000 upholding the Jicarilla major portion methodology. All three decisions found that:

> where, as here, the method in the regulations does not arrive at the highest price paid or offered [the requirement in the Jicarilla leases] but rather at a volume-weighted median price based on data that are not appropriate for the Reservation . . . , the regulations themselves provide that the lease terms take precedence over the MMS regulations. 30 C.F.R. 206.150(b) (1995); 30 C.F.R. 206.170(b) (1999).

*Bayless* at 5-6 (Att. 1 at 5-6); *Merrion* at 5 (Att. 2 at 5); *Dugan* at 5-6 (Att. 3 at 5-6). With regard to the specifics of the methodology, the Department found, *inter alia*, that Jicarilla's sales of its own gas represented 25% of arm's length sales from the reservation, and 25% qualifies as a "major portion" under the leases, *Bayless* at 4; *Dugan* at 5; *Merrion* at 4-5; that since many of the prices Jicarilla received were based on Natural Gas Policy Act regulated prices, they were necessarily the

same prices as other sellers received, *Bayless* at 4; *Dugan* at 6 n. 4; *Merrion* at 5; and that the Department has an obligation to maximize tribal revenues and the major portion methodology that MMS developed for the Jicarilla Apache Reservation did so and was a reasonable interpretation of the leases, *Bayless* at 5; *Dugan* at 5-6 and 7-8; *Merrion* at 6.

The *Bayless* decisions remained the Department's position on the Jicarilla major portion methodology for more than six years.  Following those decisions, at least five more companies settled with the Department and Jicarilla by paying additional royalties.  In addition, MMS issued field reports recommending that the Department deny the pending appeals of the *Vastar* companies. JIC000839, JIC003264, JIC001166, JIC001880, JIC002660, JIC002373, JIC000010, JIC000551.

### The *Vastar* Decision

In March 2007, despite the existing *Bayless* decisions and MMS field reports to the contrary, the Department issued the *Vastar* decision granting the remaining appeals.  The *Vastar* decision acknowledged that the lease terms govern when they differ from the regulations.  It also noted that the Jicarilla leases contained a major portion provision which required that value "for royalty purposes . . . be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the lease lands are situated."  SUPP003, referencing Lease ¶ 3(c).  However, the Department stated, without discussion, that since "similar language" appears in 25 C.F.R. § 211.13(a) (1987) and 30 C.F.R. § 206.152(a)(3)(ii) (1991), "the lease term and the regulations are consistent, and the provisions of 30 C.F.R. § 206.150(b), concerning the primacy of lease terms where they differ from regulations, is [sic] inapplicable."  SUPP003.[6]

---

[6] The Department appears to have been referring to the first sentence in § 206.152(a)(3)(ii) of the 1988 regulations, which was consistent with Lease ¶ 3(c), and completely ignored the second (continued...)

Nowhere in the *Vastar* decision did the Department discuss that there are major substantive differences between Lease ¶ 3(c) and the 1988 MMS regulations. Nor did the Department discuss its reasons for deviating from the *Bayless* decisions or the MMS field reports; in fact, the Department reached the opposite conclusion from the *Bayless* decisions on virtually all points without even mentioning the *Bayless* decisions. Thus, the Department found in *Vastar* that it did not have sufficient sales data to perform a major portion analysis for Jicarilla, *id.* at 6, SUPP006; that there was no evidence that the Jicarilla RIK sales were representative of prices received by oil and gas operators on the reservation, *id.* at 7, SUPP007; and that the methodology at issue was not a reasonable interpretation of the regulations, *id.* at 8, SUPP008. The Department did not address whether the methodology was a reasonable interpretation of the Jicarilla leases.

The Department's change in position was not based on any new facts or law, as evidenced by comparing the virtually identical MMS Field Reports found in *Bayless* and *Merrion* (*see* Att. 4-5) to those found in the *Vastar* administrative record, *see* JIC000839, JIC003264, JIC001166, JIC001880, JIC002660, JIC002373, JIC000398, JIC000551. Rather, it was a wholesale and unexplained departure from established agency precedent.

## SUMMARY OF ARGUMENT

The Department's decision in *Vastar* is arbitrary, capricious, an abuse of discretion, and contrary to law because it represents a change in agency policy and precedent made without any justification for the change. This defect alone justifies reversal.

In addition, the new policy announced in *Vastar* is invalid because it relies on the 1988 MMS major portion regulations, which are inconsistent with the Jicarilla lease terms. The leases call for

---

[6](...continued)
sentence which was inconsistent with the first sentence and with Lease ¶ 3(c). *See* page 6, above.

royalties to be paid based on the *highest* price paid or offered for the *major portion* of gas, whereas the 1988 regulations base royalties on a volume-weighted *median* price for the *majority* of gas sold. MMS's own regulations provide that when the regulations are inconsistent with lease terms, the lease terms govern to the extent of the inconsistency.  30 C.F.R. § 206.170(b).  Further, the 1988 MMS regulations were not even in effect from January 1984 - February 29, 1988, which covers the first part of the audit period at issue here.

Finally, the *Vastar* decision constitutes a breach of the Department's fiduciary duty to protect the interests of Indian tribes.  The Department has a trust obligation to vigorously enforce the major portion provision of the Jicarilla leases and to maximize tribal revenues, which it failed to fulfill. Rather than adhering to its original interpretation of the Jicarilla leases and relevant regulations, an interpretation that was in Jicarilla's best interests, the Department in *Vastar* adopted a new interpretation that was not.

In most cases where an agency fails to explain its departure from precedent, remand to the agency is the proper remedy.  Here, however, because the *Vastar* decision is inherently flawed as well as contrary to the Department's trust responsibilities, it can not be rescued with an explanation. Thus, this Court should not merely vacate *Vastar* but should also order the Department to enforce the existing Orders to Perform, which are valid orders of the Department pursuant to the *Bayless* decisions.

Alternatively, the Court should remand to MMS to develop a new major portion methodology for the Jicarilla Apache Reservation.  MMS may not simply declare that there is inadequate data to develop a methodology, especially when MMS controls the data that are reported, as that would violate its trust responsibility.

**ARGUMENT**

12

I.    **THE DEPARTMENT IN *VASTAR* FAILED TO EXPLAIN ITS DEPARTURE FROM AGENCY PRECEDENT AND SO ITS DECISION SHOULD BE VACATED AS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW.**

As the D.C. Circuit has explained, reasoned decision-making is "the cornerstone requirement" of administrative law, without which "administrative litigants and the public generally would be set adrift on a potential sea of unconscious preference and irrelevant prejudice." *Columbia Broadcasting Sys. v. FCC,* 454 F.2d 1018, 1025 (D.C. Cir. 1971). There is a well-settled presumption that for an agency to engage in reasoned decision-making it must follow its own precedent and treat like cases alike. *E.g.*, *Atchison, Topeka and Santa Fe R.R. v. Wichita Bd. of Trade,* 412 U.S. 800, 807-8 (1973); *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 65 (D.C. Cir. 1999); *Greyhound Corp. v. ICC*, 551 F.2d 414, 416 (D.C. Cir. 1977) ("This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviations from them."). Accordingly, unless different treatment is adequately explained, an agency's decision not to treat like cases alike is arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706; *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241-1243 (D.C. Cir. 2007); *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("It is axiomatic that [a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.") (internal quotation marks omitted; alteration in original).

The courts recognize that "[a]gencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored,'" *Ramaprakash*, 346 F.3d at 1124-25 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir 1970), *cert. denied,* 403 U.S. 923 (1971)). Thus, "[a]n agency's failure to come to

grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" *Ramaprakash*, 346 F.3d at 1125 (quoting *Columbia Broadcasting Sys.,* 454 F.2d at 1027). *Accord, Nat'l Federation of Fed. Employees v. Federal Labor Relations Authority*, 412 F.3d 119, 120 (D.C. Cir. 2005) (overturning agency decision that "completely ignore[d]" prior contrary precedent); *Greyhound Corp.*, 551 F.2d at 416 (remanding to agency when decision did not contain "even a passing reference to previous decisions in which the agency employed a different standard and reached substantially different results"); *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981) (remanding decision for failure of "explicit recognition. . . that the standard has been changed, or any attempt to forthrightly distinguish or outrightly reject apparently inconsistent precedent").

It is not enough, moreover, for an agency simply to explain its current decision; the agency also must squarely address its prior contrary precedent. Thus, in *Bush-Quayle '92 Primary Committee v. Fed. Election Comm'n*, 104 F.3d 448, 454 (D.C. Cir. 1997), the D.C. Circuit rejected an agency's decision because it "'glosses over' precedent and is essentially a bare assertion that the two cases are different" (citing *Greater Boston*, 444 F.2d at 852 ("if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." )). *See also Columbia Broadcasting,* 454 F.2d at 1027 (vacating decision that "relegated its 'discussion' of [conflicting precedent] to a mere citation in a footnote.").

This requirement is especially important when, as here, the subsequent decision involves the very same controversy that was at issue in the prior adjudication. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006). In *Williams*, FERC concluded in 2001 that a particular section of pipeline was beyond FERC's jurisdiction because it performed a gathering function, rather than a transmitting one. *Id.* at 326. In 2005, FERC issued another order reaching

14

the opposite conclusion with regard to the same section of pipeline. *Id.* FERC attempted to explain its change of course by arguing that it did not know, at the time of the first case, that the pipeline was downstream of a transmission facility, and that the presence of an upstream transmission facility determines the classification of a downstream one. *Id.* at 327.

The D.C. Circuit found this rationale insufficient because, in a prior case, FERC had expressly held that an upstream facility would not, by itself, affect the classification of a downstream one. *Id.* FERC had made no attempt to square its new policy ruling with its earlier, directly contrary precedent. *Id.* The court explained that: "FERC had to acknowledge the need to reconsider its precedent, announce its definitive adoption of the principles, and explain their impact on the existing . . . [law]." *Id.* at 329. Because it failed to do so, its decision was vacated as arbitrary, capricious, and contrary to law. Moreover, the court rejected the post hoc justifications for the change made by agency counsel, stating that "[a]rbitrary and capricious review demands evidence of reasoned decisionmaking *at the agency level*; agency rationales developed for the first time during litigation do not serve as adequate substitutes." *Id.* at 326 (internal quotes omitted, emphasis in original); *see also id.* at 329, 330.

In *Vastar*, the Department failed to meet the standards for reasoned decision-making explained above. Instead, the Department issued a decision that was directly contrary to the *Bayless* decisions without even mentioning those prior inconsistent decisions, let alone "coming to grips" with them, *see Ramaprakash,* 346 F.3d at 1125, or providing a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *see Greater Boston,* 444 F.2d at 852.

Because the Department departed from its own precedent without explanation, moreover, its decision in *Vastar* is not entitled to deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837

(1984).  As the D.C. Circuit held in *Bush-Quayle*, where the Federal Election Commission departed from its own precedent,

> Our *Chevron* analysis does not dispose of this claim.  An agency interpretation that would otherwise be permissible is, nevertheless, prohibited when the agency has failed to explain its departure from prior precedent.

104 F.3d at 453.  *See also U.S. v. Mead*, 533 U.S. 218, 228 (2001) ("'The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'") (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); alteration in original).

In *Vastar*, the Department not only failed to treat similar cases similarly, it reached *opposite* results in *functionally identical* cases.  The Department in *Vastar* overturned MMS major portion Orders to Perform that were essentially identical to those it upheld in the *Bayless* decisions, without even a citation to the *Bayless* decisions.  Moreover, the Department in *Vastar* reached conclusions opposite those in the *Bayless* decisions on virtually every point along the way, including the consistency of the MMS regulations with the Jicarilla leases; the adequacy of the Jicarilla sales data; the definition of the "field" or "area" on which the major portion prices were based; and the definition of the term "major" portion itself.  *Compare Vastar with* the *Bayless* decisions; *see* Statement of Facts at 9-11.  Further, the Department engaged in this "complete about-face," *see Ramaprakash,* 346 F.3d at 1126, without acknowledging or discussing the change in its interpretations and policy.  Pursuant to fundamental principles of administrative law, the Department's decision in *Vastar* is arbitrary, capricious, and contrary to law and should be vacated.[7]

---

[7]  It may be that the Department changed its course on account of the change in administration that occurred between the *Bayless* decisions and the *Vastar* case.  Change of

(continued...)

## II.    THE *VASTAR* DECISION SHOULD BE VACATED BECAUSE IT IS PREMISED ON A MAJOR PORTION METHODOLOGY THAT IS INCONSISTENT WITH THE JICARILLA LEASES AND SO IS CONTRARY TO THE DEPARTMENT'S OWN REGULATIONS.

The Department vacated the Orders to Perform in *Vastar* because they required production companies to value gas for royalty purposes based on the Jicarilla major portion methodology rather than according to the 1988 MMS major portion regulations.  The Department acknowledged that major portion must be calculated pursuant to the Jicarilla leases, *Vastar* at 2, SUPP002,  and noted that the Jicarilla leases provide for value to be calculated "on the basis of the the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leases are situated," *Vastar* at 3, SUPP003.  The Department stated, however, that "[s]imilar language appears in the regulations," *id*., referring specifically to the BIA regulations at 25 C.F.R. § 211.13(a) (1987) and the 1988 version of the MMS regulations at 30 C.F.R. §§ 206.152(a)(3) and 206.153(a)(3).  Based on this alleged similarity, the Department concluded that "the lease term and the regulations are consistent, and the provisions of 30 C.F.R. § 206.150(b), concerning the primacy of lease terms where they differ from regulations, is inapplicable."  *Vastar* at 3, SUPP003.[8]

In fact, although the Department cited both the BIA and the 1988 MMS major portion regulations, the Department analyzed the Jicarilla major portion methodology solely in terms of the

---

[7](...continued)
administration, however, even if explained at the agency level, is not a sufficient justification for changing established agency policy.  *See generally*, *National Black Media Coalition v. Federal Communications Comm'n*, 775 F.2d 342, 356 n.17 (D.C. Cir. 1985) ("[A]n agency may not repudiate precedent simply to conform with a shifting political mood.").


[8] As noted above at 5-6 and n.4, the 1988 MMS major portion regulations were in effect from March 1, 1988 through 1999, covering only a portion of the audit period at issue in the Orders to Perform.

1988 MMS regulations. This distinction is significant because the BIA regulations contained the same language as the Jicarilla leases, while the MMS regulations did not. The MMS 1988 regulations not only were inconsistent with Lease ¶ 3(c), but also described a major portion methodology that generated substantially less revenue for tribes than that in the Lease or the BIA regulations.

As the Department itself acknowledged, the Jicarilla leases "contain a provision requiring that the value of production for royalty purposes be based upon the greater of (1) the price received by the lessee, or (2) the highest price paid for a major portion of like-quality production." *Vastar* at 2, SUPP002; *see* Lease ¶ 3(c) ("the highest price paid or offered . . . at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated"). The MMS major portion regulations from 1988 - 1999 do not result in a price that is the "highest price paid or offered" for a "major portion" of gas, as required by Lease ¶ 3(c); rather, they result in a volume-weighted *median* price for the *majority* of gas sold, as the Department recognized in *Burlington IBLA*, 151 IBLA at 153 (Att. 8) (the regulations "used a volume-weighted mean"), and so are inconsistent with the Jicarilla leases. *Bayless* at 5-6; *Merrion* at 5; *Dugan* at 5-6 (Att. 1-3) ("the method in the regulations does not arrive at the highest price paid or offered but rather at a volume-weighted median price").

The Department's own regulations, at 30 C.F.R. § 206.150(b) (1988), *recodified at* 30 C.F.R. § 206.170(b), mandate that "[i]f the specific provisions of any . . . oil and gas lease subject to the requirements of this subpart are inconsistent with any regulation in this subpart, then the lease . . . shall govern to the extent of that inconsistency." As the Department pointed out in *Vastar*, "an agency must follow its own regulations." *Id.* at 7, SUPP007; *see, e.g., Vitarelli v. Seaton,* 359 U.S.

535 (1959); *Service v. Dulles,* 354 U.S. 363 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954). Thus, the Department was obliged to follow Lease ¶ 3(c) in calculating major portion prices for the Jicarilla Apache Reservation. Its failure to do so in *Vastar* renders that opinion invalid.

In addition, the MMS regulations covering the first part of the audit period did not contain the same methodology or requirements as the 1988 MMS regulations. As discussed in the Statement of Facts at 5, the MMS regulations prior to March 1, 1988 (the effective date of the 1988 revisions) were consistent with Lease ¶ 3(c). The Department's stated rationale for overturning the Jicarilla major portion methodology, even if valid, does not therefore apply to the period from January 1984 through February 1988.

## III.    THE *VASTAR* DECISION SHOULD BE VACATED BECAUSE IT IS CONTRARY TO THE DEPARTMENT'S FIDUCIARY DUTY TO PROTECT THE INTERESTS OF THE JICARILLA APACHE NATION.

The federal government is a trustee for Indian tribes and has a concomitant fiduciary obligation to act in the best interest of its Indian beneficiaries. *See generally*, *Seminole*, 316 U.S. at 296-97 (recognizing United States' "moral obligation of the highest responsibility and trust" to Indian tribes and explaining that federal "conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards"). As the Tenth Circuit has explained:

> The Supreme Court has implicitly recognized that stricter standards apply to federal agencies when administering Indian programs. *See Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); D. Getches, D. Rosenfelt & C. Wilkenson, Federal Indian Law 135-36 (1979). When the Secretary [of the Interior] is acting in his fiduciary role rather than solely as a regulator and is faced with a decision for which there is more than one 'reasonable' choice as that term is used in administrative law, he must choose the alternative that is in the best interests of the Indian tribe. In short, he cannot escape his role as trustee by donning the mantle of

administrator, a principle recently made explicit by this court in *Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324 (10th Cir. 1982).

*Supron,* 728 F.2d at 1567; *see also Cobell v. Norton,* 240 F.3d 1081, 1099 (D.C. Cir. 2001) (discussing the trust relationship generally, and quoting *Supron*); *Burlington Resources Oil & Gas Co. v. U.S. Dept. of the Interior,* 21 F. Supp. 2d 1, 5 (D.D.C. 1998) ("Secretary's decision must be both 'reasonable,' i.e., not 'arbitrary and capricious,' *and* to optimum advantage of the trust beneficiary.").

The Department acts in a fiduciary capacity when it administers oil and gas resources on Indian lands. One of the purposes of both the Indian Mineral Leasing Act and FOGRMA is to ensure that the Department's trust responsibility with regard to Indian mineral resources is faithfully carried out. *See, e.g.*, S. Rep. No 75-985 (1937) at 2, H.R. Rep. No. 75-1872 (1938) at 2; *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) (leasing procedures in IMLA intended to protect Indians); *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 372-73 (1968) (government has "trust obligations" under the IMLA); FOGRMA, 30 U.S.C. § 1701(b) ("It is the purpose of this chapter . . . (4) to fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources").

The Department has recognized many times over its trust responsibilities in the administration of Indian oil and gas leases. *See, e.g.,* 30 C.F.R. § 206.150(d) (1984-96), § 206.170(e) (1997-present) (acknowledging "the trust responsibilities of the United States with respect to the administration of Indian oil and gas leases"); *Burlington IBLA*, 151 IBLA at 156, 158 (Att. 8) (referring to MMS's obligation to obtain the highest royalty for Indian oil and gas, pursuant to the trust responsibility); Dear Payor letters, Orders to Perform, and Field Reports, *see, e.g.,*

JIC000839, JIC003264, JIC001166, JIC001880, JIC002660, JIC002373, JIC000398, JIC000551. In fact, the Department recognized the trust responsibility in *Vastar*. *Vastar* at 7-8, SUPP007-008.

Not only does the Department have a duty to protect Indian mineral resources, but it has a duty to maximize revenues produced from such resources. *E.g.*, *Kerr-McGee Corp. v. Navajo Tribe*, 471 U.S. 195, 200 (1985) (IMLA intended to "maximize tribal revenues from reservation lands"); *Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 966 F.2d 583, 589 (10th Cir. 1992) ("As a fiduciary for the Indian, the Secretary is responsible for overseeing the economic interests of Indian lessors, and has a duty to maximize lease revenues"); *Supron*, 728 F.2d at 1569 ("Interior's trust responsibilities require it to apply whichever accounting method . . . yields the Tribe the greatest royalties."); *see also B.P. America Production Co.* v. Burton, 127 S.Ct. 638, 648 (2006) (recognizing "Congress' exhortation that the Secretary of the Interior 'aggressively carry out his trust responsibility in the administration of Indian oil and gas'") (quoting FOGRMA, 30 U.S.C. § 1701(a)(4)). Even the Department has stated that it must "attempt to get the highest royalty for Indian oil and gas as required by the Federal Government's trust responsibility." *Burlington IBLA*, 151 IBLA at 156 (citing *Seminole*).

Consistent with these principles, the court in *Supron* held that when the Department is presented with two reasonable alternatives for computing gas royalties, it has a trust obligation to choose that alternative which produces the greatest revenue for the Indian tribe. *Supron*, 728 F.2d at 1569. The D.C. Circuit found likewise in *Cobell*, 240 F.3d at 1099, as did this Court in *Burlington Resources*, 21 F. Supp. 2d at 5 ("in other words . . . the Secretary's decision must be both 'reasonable,' i.e., not 'arbitrary and capricious,' *and* to optimum advantage of the [Indian] trust beneficiary."). *See also Andrus*, 687 F.2d at 1332 (statutes and regulations are to be interpreted "liberally in favor of the Indians for whose protection these provisions were promulgated"); *accord*

*Arizona Public Service Co. v. EPA*, 211 F.3d 1280, 1293 (D.C. Cir. 2000), *cert. denied sub nom.*

*Michigan v. EPA*, 532 U.S. 970 (2001) (citing *Montana*, 471 U.S. at 766; *Bryan v. Itasca County*,

426 U.S. 373, 392 (1976); *Pueblo of Santa Ana v. U.S.*, 214 F.3d 1338, 1342 (Fed. Cir. 2000)).

In *Vastar*, the Department mouthed its fiduciary obligation to "choose the alternative that

is in the best interests of the Indian tribe," *id.* at 8, SUPP008, but failed to fulfill it. Instead of

adhering to its original, established, and well-supported interpretation of the relevant leases and

regulations—an interpretation that protected the interests of the Jicarilla Apache Nation—the

Department adopted a new interpretation that is not in the tribe's best interests and does not

maximize revenues from Jicarilla's mineral resources. Even assuming *arguendo* that the

Department's new interpretation is valid under the Jicarilla leases, the Department had a trust

obligation, under *Seminole*, *Supron*, *Burlington*, and the other cases cited above, to choose the

original interpretation. Instead, the Department rejected that established interpretation without

explanation and left Jicarilla without any means of enforcing the major portion provision of its oil

and gas leases.

The Supreme Court's decision in *United States v. Navajo Nation*, 537 U.S. 488 (2003), does

not change the law on this issue. In *Navajo*, the Court addressed the narrow question of whether the

Navajo Nation could bring a breach of trust action for money damages against the federal

government in the Court of Federal Claims based on the federal government's approval of a coal

lease entered into by the Navajo Nation but allegedly not in the best interest of the tribe. 537 U.S.

at 493. In other words, the Supreme Court examined whether a breach of the federal government's

trust obligations in approving the coal lease would be "money-mandating." In addressing this

question, the Court explained that while many statutes impose trust obligations on the federal

government vis á vis Indian tribes, such obligations will not support an action for money damages

unless the relevant laws assign the federal government "'full responsibility to manage Indian resources and land for the benefit of the Indians.'" *Id.* at 505 (quoting *United States v. Mitchell*, 463 U.S. 206, 224 (1983) ("*Mitchell II*")). The Court concluded that the money-mandating standard had not been satisfied in that particular case. *Navajo*, 537 U.S. at 506.

The *Navajo* decision is inapposite for two reasons. First, Jicarilla is not attempting in this administrative appeal to establish a "money-mandating" duty as described in *Mitchell II* and *Navajo*. Jicarilla is relying instead on the fiduciary duty discussed in *Supron* and *Burlington,* which was not established in the context of a claim for damages against the United States. *Supron*, 728 F.2d at 1565 n.3 (noting separate case in Court of Federal Claims against United States for damages). The question whether the degree of federal managerial responsibility over Indian resources is sufficient to bring a breach of trust claim for money damages is, therefore, irrelevant to this appeal.

Second, in *Navajo* the Court analyzed the federal government's role in the approval of coal leases, not in the calculation of royalties on natural gas. The Court specifically noted that its decision applied only to coal and that oil and gas issues might dictate different results. *Navajo*, 537 U.S. at 508 n.11 ("We rule only on the government's role in the coal leasing process under the IMLA. As earlier recounted . . . both the IMLA and its implementing regulations address oil and gas leases in considerably more detail than coal leases. Whether the Secretary has fiduciary or other obligations, enforceable in an action for money damages, with respect to oil and gas leases is not before us.") . *See also id.* at 494-95. The court in *Shoshone Indian Tribe v. United States,* 56 Fed. Cl. 639 (2003), relied on this very distinction in holding that the United States' fiduciary duty to ensure that tribes receive full value for their oil and gas is money-mandating. The court distinguished *Navajo* precisely because it involved coal leases rather than oil and gas. *Id*. at 645-46. The court also found that the issue of the value on which royalty was to be paid was "more closely

23

involved with the statutory and regulatory framework than the ex parte communications complained of in *Navajo Nation*." *Id*. at 646.[9]

For both of these reasons, the *Navajo* decision does not relieve the Department of its duty, as established by *Supron, Burlington*, and the other cases cited above, to act in the best interests of Indian tribes in choosing among reasonable alternative methodologies governing calculation of Indian gas royalties. The Department in the *Bayless* decisions found the Jicarilla major portion methodology to be a reasonable interpretation of the Jicarilla leases that was in the best interests of the Tribe. Even assuming that the Department's interpretation in *Vastar* also was reasonable–a point that Jicarilla does not concede–the Department's failure in *Vastar* to choose the interpretation that was in Jicarilla's best interests justifies reversal of that decision.

## IV.  IN LIGHT OF THE INHERENT FLAWS IN *VASTAR* AND THE DEPARTMENT'S TRUST RESPONSIBILITIES, THE COURT SHOULD DIRECT THE DEPARTMENT TO ENFORCE THE UNDERLYING MMS ORDERS TO PERFORM.

### A.  The Inherent Flaws in *Vastar* and the Federal Trust Responsibility Warrant an Order Directing the Department to Enforce the Jicarilla Leases.

When an agency decision is inconsistent with agency precedent, the typical remedy is to remand to the agency for an explanation. *See, e.g.*, *National Ass'n of Home Builders*, 127 S.Ct. 2518, 2529 (2007) (had agency action been deemed arbitrary and capricious, "the proper course would have been to remand to the agency for clarification of its reasons"); *Atchison*, 412 U.S. at 822 (1973) ("we require the agency to justify its departure from its prior decisions so that we may understand what policies it is pursuing. If a reviewing court cannot discern those policies, it may remand the case to the agency for clarification and further justification of the departure from

---

[9] The court did not rule on whether the federal government has a duty to maximize tribal revenues because the tribal plaintiffs conceded that point, *Shoshone,* 56 Fed. Cl. at 644, 648.

precedent."); *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (*per curium*) ("a judicial judgment cannot be made to do service for an administrative judgment. . . [r]ather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). *See also Hatch v. FERC,* 654 F.2d at 837 (where the agency's change in policy is consistent with its governing statute, failure to explain the departure from precedent is a mere oversight that remand for an explanation will cure).

The cases cited above represent instances of procedural error rather than abuses of discretion. A simple remand was therefore appropriate in those cases, because courts will "distinguish[ ] between blatantly lawless action and mere procedural error" when determining whether to intervene, *Atchison*, 412 U.S. at 822. A court is not limited to a remand, however, when an agency decision is inherently flawed in a manner that further explanation cannot cure, such as when the agency's decision is contrary to the agency's own rules, *see, e.g., Kreis v. Secretary of the Air Force*; unsupported by the administrative record, *see, e.g., Columbia Broadcasting*; or inconsistent with the governing statutory scheme, *see, e.g., Nat'l Federation of Fed. Employees*. In those instances, a remand with further specific instructions is warranted.

In *Kreis*, for example, the D.C. Circuit reversed and remanded with specific instructions for the agency to consider certain evidence because, the court found, the agency's refusal to consider the evidence was contrary to an agency regulation, as well as to agency precedent. 406 F.3d at 686-88. In *Columbia Broadcasting System*, the D.C. Circuit vacated an agency order mandating television reply time for the Republican National Committee, effectively directing the agency to determine that a reply was not required. 454 F.2d at 1035. The court concluded that specific relief was justified because the agency's decision was contrary to established precedent, unsupported by the record, and "marked . . . by a succession of factual distortions and shifting justifications." *Id.*

Finally, in *Nat'l Federation of Fed. Employees,* the D.C. Circuit reversed an agency decision and remanded with instructions to reach a particular result when the agency decision not only failed to address well-established agency precedent but also reached a decision contrary to the intent of the relevant statutory scheme. 412 F.3d at 124-25.

The Department's decision in *Vastar*, like the decisions at issue in *Kreis*, *Columbia Broadcasting*, and *Nat'l Federation of Fed. Employees*, suffers not just from a failure to address agency precedent but from inherent flaws in its rationale. As explained in more detail in other sections of this memorandum, the Department's *Vastar* decision is contrary to agency regulations (*see* section II), as in *Kreis*; "marked . . . by a succession of factual distortions and shifting justifications," (*see* Statement of Facts at 9-11; *see also* section IV(B)), as in *Columbia Broadcasting*; and contrary to the purposes of the relevant statutory scheme (*see* section III), as in *Nat'l Federation of Fed. Employees*. Accordingly, the *Vastar* decision should be vacated and this case should be remanded with specific instructions to the Department to enforce the underlying MMS Orders to Perform consistent with the Department's previous *Bayless* decisions.

Moreover, because of the Department's fiduciary obligation to "aggressively carry out [its] trust responsibility in the administration of Indian oil and gas," FOGRMA, 30 U.S.C. § 1701(a)(4), a remand with specific instructions is even more appropriate in this case than it was in *Kreis*, *Columbia Broadcasting*, and *Nat'l Federation of Fed. Emplyees.* As explained in detail in section III, as a trustee for Indian tribes the federal government has a fiduciary obligation to act in the best interest of its Indian beneficiaries. *E.g. Seminole*, 316 U.S. at 296-97 (federal "conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should . . . be judged by the most exacting fiduciary standards"). In the administrative context, this means that the federal government, when "faced with a decision for which there is more than one 'reasonable' choice . .

. must choose the alternative that is in the best interests of the Indian tribe." *Supron*, 728 F.2d at 1567. *Accord Cobell,* 240 F.3d at 1099 ("This [trust] duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries as 'stricter standards apply,'" quoting *Supron*.).

The Department also has an obligation to maximize tribal oil and gas revenues. *E.g.*, *Kerr-McGee Corp.*, 471 U.S. at 200 (IMLA intended to "maximize tribal revenues from reservation lands"); *Cheyenne-Arapaho*, 966 F.2d at 589 (recognizing "duty to maximize lease revenues"); *Supron*, 728 F.2d at 1569 (requiring the Department "to apply whichever accounting method . . . yields the Tribe the greatest royalties."); *Burlington IBLA*, 151 IBLA at 156 (Department must "attempt to get the highest royalty for Indian oil and gas as required by the Federal Government's trust responsibility") (citing *Seminole*).

These trust obligations are best satisfied by enforcing the underlying Orders to Perform, thus carrying out the Department's fiduciary responsibility to enforce tribal leases and maximize tribal revenues. The Court should therefore vacate *Vastar* and remand to the Department with specific instructions to enforce the MMS major portion Orders to Perform, consistent with the *Bayless* decisions.

**B.    The Department Correctly Decided in the *Bayless* Decisions that the MMS Orders to Perform Were Based on a Reasonable Interpretation of the Jicarilla Leases and Should be Enforced.**

The Department's *Bayless* decisions, which upheld the MMS major portion Orders to Perform, were reasonable interpretations of the applicable facts, regulations, and statutory scheme. And unlike in *Vastar*, in the *Bayless* decisions the Department acted consistently with its fiduciary obligation to the Jicarilla Apache Nation. It is therefore appropriate for the Court to direct the

Department to enforce the MMS major portion Orders to Perform at issue in this case, consistent with the Department's *Bayless* decisions.

> 1.    **The *Bayless* decisions correctly found that the 1988 MMS major portion regulations were inconsistent with the Jicarilla leases, and that the leases take precedence to the extent of the inconsistency.**

In the *Bayless* decisions, the Department found that, contrary to Lease ¶ 3(c), "the [major portion] method in the [1988 MMS] regulations does not arrive at the highest price paid or offered but rather at a volume-weighted median price based on data that are not appropriate for the Reservation." *Bayless* at 5, *Merrion* at 5, *Dugan* at 5-6 (Att. 1-3). The Department held, therefore, that MMS was correct to base its Orders to Perform on a major portion methodology for Jicarilla that varied from the 1988 MMS regulations, since the Department's "regulations themselves provide that the lease terms take precedence over the MMS regulations" where the two are inconsistent, *Bayless* at 5; *Merrion* at 5-6; *Dugan* at 5 (Att. 1-3). This finding was consistent with the explicit language of the regulations, as discussed in section II above. *See also Burlington IBLA,* 151 IBLA at 153, 157 (Att. 8) (the 1988 MMS regulations "used a volume-weighted mean").

> 2.    **The *Bayless* decisions correctly upheld the use of Jicarilla sales data to calculate major portion prices.**

In the *Bayless* decisions the Department also upheld the use of sales data different from the MMS Auditing and Financial System ("AFS") data to calculate major portion prices for Jicarilla gas. Specifically, the Department upheld the use of data derived from Jicarilla's royalty-in-kind ("RIK") sales (Att. 1-3).[10] Jicarilla sold its RIK gas to El Paso Natural Gas Company and Northwest Pipeline Corporation (two of the three major pipeline companies operating on the Reservation) pursuant to a 20-year contract, at maximum lawful prices, and under an arrangement whereby the pipelines

---

[10] Tribes may receive their royalties in value (cash) or in kind, that is, as a portion of the gas, which the tribe then can sell.

committed to purchase every month all of Jicarilla's RIK gas in excess of the amount that Jicarilla requested be delivered for its own use. Royalty Gas Gathering and Exchange Agreement, September 4, 1975 ("Jicarilla RIK contract"), Art. III, §§ 3-4, 6, Art. XVI, JIC002295-2315.[11] These RIK sales represented 2/3 of Jicarilla's royalties. *Bayless* at 3, n.2; *Merrion* at 4; *Dugan* at 4; *see also Bayless* and *Merrion* field reports (Att. 4-5). The Department found that this sales data met the Lease requirement of representing value based on "the highest price paid or offered . . . for the major portion of the . . . gas." *Bayless* at 4; *Merrion* at 4; *Dugan* at 4 (Att. 1-3).

### a.    The Jicarilla RIK sales were arm's-length sales.

The Department found, first of all, that these RIK sales were made at arm's length, as required by the 1988 MMS regulations.[12] The Department explained that, pursuant to its regulations, "a transaction is considered to be arm's-length if it has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests." *Bayless* at 6, *Merrion* at 7, *Dugan* at 6 (Att. 1-3). The Department found nothing in the record indicating that Jicarilla was selling its gas to affiliated entities, and therefore the RIK sales satisfied the arm's-length requirement. *Id.*; *see also Bayless* at 4, *Merrion* at 4-5, *Dugan* at 4-5 (Att. 1-3).[13]

### b.    The Jicarilla RIK sales were a "major" portion of sales from the Reservation.

---

[11] In fact, Jicarilla sold all of its RIK gas, and did not retain any for its own use.

[12] The arm's-length requirement exists in the 1988 MMS regulations but not in the Jicarilla leases. However, there is nothing in the leases inconsistent with this requirement.

[13] The Department prohibited MMS from using its AFS database to calculate major portion prices precisely because of its failure to distinguish between arm's-length and non-arm's length sales. *Burlington IBLA*, 151 IBLA at 158-59; *see also Phillips,* 152 IBLA at 117 (finding a similar database that included non-arm's length transactions to be invalid for the same reason). In *Vastar*, the Department did not contest the fact that the Jicarilla RIK sales were made at arm's length. *See Vastar* at 6-7 (SUPP006-007).

The Department found next that the Jicarilla RIK sales represented approximately 25% of all arm's length sales from the Reservation, *Bayless* at 4, *Merrion* at 4, *Dugan* at 5 (Att.1-3), and held that 25% constituted a "major" portion of arm's-length sales, *id*. This is a reasonable interpretation of the word "major,"[14] and is consistent, as the Department noted, with MMS's current gas valuation rule, which defines 25% as a major portion. *Bayless* at 4 n.3, *Merrion* at 5 n.3, *Dugan* at 5 n.3 (citing 64 Fed. Reg. 43506); *see also* 61 Fed. Reg. at 49899.[15]

### c. The Jicarilla RIK sales identified different categories of gas.

Further, the Department found that the Jicarilla sales data distinguished between categories of gas as established by the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301-3432 (2000). *See Bayless* at 3, *Merrion* at 3-4, *Dugan* at 3 (Att. 1-3). As MMS explained in its Field Report, the 1988 MMS regulations require major portion prices to be calculated "using 'like-quality' lease products from the same field/area. Like quality means lease products which have similar chemical, physical, and legal characteristics. Legal characteristics include the NGPA category of gas." *Bayless* Field Report at 6 (Att. 4 at 6); *Merrion* Field Report at 6 (Att. 5 at 6); *see also Dugan* at 11 (Att. 3 at 11).

Lease ¶ 3(c) does not require major portion prices to be based on like-quality gas. Rather, it requires them to be based on "the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where

---

[14] Jicarilla is unaware of any case law defining the meaning of the word "major" in the term "major portion."

[15] Indian leases refer to a "major" portion, as opposed to federal leases, which refer to a "majority" portion. *Compare* 25 C.F.R. § 211.13(a) (1982-1996); § 171.13(a) (1957-1982) (discussing calculation of value using "major portion" for Indian leases) *with* 30 C.F.R. § 206.103 (1984-1987) (discussing calculation of value using a "majority of production" for federal leases).

the leased lands are situated." Nevertheless, the Jicarilla RIK sales distinguished between NGPA categories.[16]

### d. The Jicarilla RIK sales were representative of other sales on the Reservation.

There is no requirement in either Lease ¶ 3(c) or the 1988 MMS regulations that the sales data used to calculate major portion prices be representative of other prices received by oil and gas producers in the same field or area. On the contrary, the Lease provides that prices be calculated on the "*highest* price paid or *offered*," which may very well not be representative for sales other than the "major portion" of sales to which it pertains. Nevertheless, the Department responded to the lessee's contention that the Jicarilla RIK sales were not representative, and found in the *Bayless* decisions that not only was there no such evidence in the record, but also "to the extent that many of these prices were NGPA-regulated ceiling prices, it was not unreasonable for MMS to have concluded that the price received by the Tribe and by the Tribe's lessees for the same NGPA-category gas was, in fact, the same. Indeed, it could hardly have been otherwise." *Bayless* at 4, *Merrion* at 5, *see also Dugan* at 3 (Att. 1-3). This statement is based on the history of the gas

---

[16] In *Vastar*, the Department found that the Jicarilla RIK sales were not sales of like-quality gas because they did not reflect differences in Btu content or carbon dioxide levels and did not distinguish between processed and unprocessed gas. *Vastar* at 8-9, SUPP008-009. This conclusion completely ignores the provisions of the Jicarilla RIK contract, however, which dictated all terms regarding the sale of Jicarilla gas. The Jicarilla RIK contract provided a price adjustment for Btu content, *id*. at Art. III(5)(a), (c), JIC002296-97 (prices calculated per mmBtu); specified that the gas must be of a uniform quality, with not more than 5% by volume of carbon dioxide, *id*. at Art. IX, JIC002308; and provided that all gas would be sold at the wellhead, *i.e.*, it all was unprocessed gas, *Id*. at Art. I, JIC002292-93. The Jicarilla RIK sales therefore reflected differences in Btu content and consisted of sales of unprocessed gas of uniform quality. *See Dugan* at 11 (Att. 3 at 11) (difference in quality of gas was small and adjustments were made for Btu content). In *Vastar*, the Department also found that major portion prices should have been calculated on a monthly rather than an annual basis. *Id*. at 11, SUPP011. In fact, the prices were calculated monthly, *see, e.g.,* JIC000972, although that was not required because there is no monthly requirement in the Lease and the Jicarilla RIK contract provided for *annual* adjustments of the sales price, *id*. at Art. III(5)(a).

31

industry during the relevant period, as explained in the case law, and is best understood with reference to that history.

During the mid- to late 1970s, a period of natural gas shortages, pipelines entered into long-term gas purchase agreements with producers to ensure a steady supply of natural gas. *See United Distribution Cos. v. FERC,* 88 F.3d 1105, 1123 (D.C. Cir.1996) (citing Richard J. Pierce, Jr., *Reconstituting the Natural Gas Industry from Wellhead to Burnertip,* 9 ENERGY L.J. 1, 11-16 (1988)); *see also* Pierce, *Natural Gas Regulation*, 68 Va. L. Rev. 63, 77-78 (1982); *Prenalta Corp. v. Colo. Interstate Gas*, 944 F.2d 677, 679-80 (10th Cir. 1991) ("long-term contracts further assured pipelines a continuous delivery of gas during a time of shortage") (citing Pierce, *Natural Gas Regulation,* at 77-79). Most natural gas production in the United States was sold under such long-term contracts, typically for 20-year terms, like the Jicarilla RIK contract. Pierce, *Natural Gas Regulation* at 77; *United Distribution Cos.*, 88 F.3d at 1138; *Prenalta*, 944 F.2d at 680.

In large part, the gas shortages of the 1970s resulted from price controls imposed pursuant to the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717-717w (2000). Pierce, *Reconstituting*, at 54; *Prenalta*, 944 F.2d at 680; *see also United Distribution Cos.*, 88 F.3d at 1123. As pipelines became accustomed to regulatory price ceilings below the market price, many pipelines entered into long-term contracts under which they agreed to pay the maximum lawful price for gas (regulated ceiling prices), just as the El Paso and Northwest pipelines did with Jicarilla. *See* Pierce, *Reconstituting*, at 28; *Piney Woods,* 539 F. Supp. at 965.

In addition, because of the shortage of natural gas, pipelines agreed to "take-or-pay" or "take-and-pay" clauses in these long-term contracts, committing to take minimum quantities of gas at the regulated ceiling prices and, in the case of take-or-pay contracts, to pay for that gas whether or not it was taken. *Prenalta,* 944 F.2d at 680 (citing *generally* Pierce, *Natural Gas Regulation,*

*supra,* at 77-82); *United Distribution Cos.*, 88 F.3d at 1123 (citing Pierce, *Reconstituting*, 9 ENERGY L.J. at 11-16). As explained in *Prenalta*, 944 F.2d at 680, "[b]ecause the present allocation of the risk of future events is endemic to long-term contracts, producers negotiated price-substitute benefits which shifted the risk of a decline in market demand for natural gas to the pipelines through the contract inclusion of take-and-pay or take-or-pay clauses" (citing *generally* Pierce, *Natural Gas Regulation*, 68 Va. L. Rev. 63, 77-78 (1982)); *see also Transcontinental Gas Pipe Line v. State O&G Bd. of Miss.,* 474 U.S. 409, 412, 423 (1986) (such clauses were "prevailing industry practice" and standard industry-wide) (citing Pierce, *Natural Gas*, 68 Va.L.Rev. at 77-79); H.R. Rep. No. 98-814, pp. 23-25, 133-134 (1984).

The severe gas shortage in the 1970s ultimately led Congress to enact the Natural Gas Policy Act of 1978. *United Distribution Cos.,* 88 F.3d at 1123; *see Mobil Oil Exploration & Prod. S.E., Inc. v. United Distribution Co.,* 498 U.S. 211, 217 (1991). The NGPA provided for gradual deregulation of gas prices by establishing a price ceiling for "new gas" that would increase at the rate of inflation plus four percent each year. Pierce, *Reconstituting*, at 11, 13-14. Eventually, there was an increase in gas supplies, and the market price began to go down until, by 1988, the ceiling price was more than double the market price. *Prenalta*, 944 F.2d at 680 (citing *Maryland People's Counsel v. FERC,* 761 F.2d 768, 771 (D.C. Cir. 1985), and Arbaugh, *Take or Pay Clauses: Pandora's Box Reopened?,* 5 E. Min. L. Inst. 11-1, 11-3 (1984)); *Mobil Oil Exploration & Prod.,* 498 U.S. at 218; Pierce, *Reconstituting*, at 54. Despite the drop in market price, pipelines found themselves obligated to purchase gas at the continually escalating NGPA ceiling prices, pursuant to their long-term take-or-pay and take-and-pay contracts. Pierce, *Reconstituting*, 9 Energy L.J. at 15.

33

Accordingly, pipelines renegotiated their agreements with gas producers wherever possible, substituting more manageable pricing terms in exchange for lump-sum payments to terminate the existing contracts before the end of their 20-year terms.  *Prenalta,* 944 F.2d at 680.  In fact, the Federal Energy Regulatory Commission recognized the widespread nature of these settlements; encouraged them as a solution to the pipelines' problems, *see American Gas Assoc. v. FERC*, 912 F.2d 1496, 1508-09 (D.C. Cir. 1990), *cert. denied sub nom. City of Willcox v. FERC,* 498 U.S. 1084 (1991); and even allowed pipelines to pass on some of the costs of the settlements to their customers, *see* Order No. 528, Mechanism for Passthrough of Pipeline Take-or-Pay Buyout and Buydown Costs, 53 FERC ¶ 61,163 (1990), *order on reh'g*, 54 FERC ¶ 61,095, *reh'g denied*, 55 FERC ¶ 61,372 (1991).

The Jicarilla RIK sales were based on a long-term contract just like others in the industry. The contract contained a take-and-pay provision to purchase at maximum lawful prices which, for most of the audit period at issue, were NGPA prices.  The contract ultimately was renegotiated in exchange for a lump-sum payment, just as occurred throughout the industry.  Thus, Jicarilla RIK sales prices were representative of sales prices generally on the Reservation and elsewhere.[17]

---

[17] The March 25, 1998 MMS Methodology for Major Portion and Dual Accounting Analysis for Jicarilla Apache Tribal Leases, JIC000970-88, explains how MMS used the Jicarilla RIK sales as the basis for its major portion analysis for gas from the Jicarilla Apache Reservation. Specifically, for the period January 1984 through December 1986 and July 1988 through December 1988, when the Jicarilla RIK Agreement was in effect, MMS based the major portion prices on the maximum lawful price for each category of gas, which effectively were the NGPA prices.  For the period January 1987 through June 1988, when Jicarilla agreed to a temporary reduction of the RIK prices, MMS based the major portion prices on these reduced prices.  For the period January 1989 (when the Jicarilla RIK contract was renegotiated) through June 1995 (the end of the audit period), MMS based the major portion prices on the renegotiated contract prices plus an adjustment to account for the contract settlement amounts, as explained at JIC000974-75 (March 25, 1998 Methodology Report at 5-6, Enclosure 2 with Field Report).  MMS also added Jicarilla's tax reimbursements to the prices for all four periods. *See, e.g.,* JIC000972.

3. **The *Bayless* decisions correctly upheld the designation of the Reservation as the "field" or "area."**

Finally, the Department in the *Bayless* decisions upheld the use of the Jicarilla Apache Reservation as the "field" or "area" for which gas sales were to be considered. *Bayless* at 7-8; *Merrion* at 8-9; *Dugan* at 9-11 (Att. 1-3). *See* Lease ¶ 3(c) (value for royalty purposes to be based on "the highest price paid or offered at the time of production for the major portion of . . . gas . . . produced and sold from the field where the leased lands are situated"); 30 C.F.R. § 206.152(a)(3)(ii) (requiring consideration of gas "from the same field (or, if necessary to obtain a reasonable sample, from the same area)").

The Department explained first that MMS regulations at 30 C.F.R. § 206.151 (1992) define "field" as:

> a geographical region situated over one or more subsurface oil and gas reservoirs encompassing at least the outermost boundaries of all oil and gas accumulations known to be within these reservoirs vertically projected to the land surface. Onshore fields are usually given names and their official boundaries are often designated by oil and gas regulatory agencies in the respective States in which the fields are located.

*Bayless* at 7; *Merrion* at 8; *Dugan* at 9 (Att. 1-3). The Department went on to explain that New Mexico, where the Jicarilla Apache Reservation is located, does not refer to natural gas resources as fields but rather as pools, and MMS found that 30 pools overlay or are within the Reservation boundaries, some of which overlap each other and some of which extend outside the Reservation. *Bayless* at 7; *Merrion* at 8; *Dugan* at 10 (Att. 1-3). Since the regulations provide that a field may include one or more reservoirs, the Department concluded that, by designating the Reservation as the field, MMS included more than one reservoir, taking into account the state definition, and so complied with the regulations.[18] The Department also noted that MMS price records do not

_____

[18] More precisely, New Mexico statutes and regulations define "field" as "the general area

(continued...)

distinguish by "field" for Reservation gas. *Bayless* at 7 n.4, *Merrion* at 9 n.4, *Dugan* at 10 n.5 (Att. 1-3).[19]

In addition, the Department noted that the MMS regulations at 30 C.F.R. § 206.151 (1999) define "area" as the "geographic region at least as large as the defined limits of an oil and/or gas field, in which oil and/or gas lease products have similar quality, economic, and legal characteristics." *Bayless* at 7, *Merrion* at 8, *Dugan* at 11 (Att. 1-3). The Department further explained that, according to MMS's stated policy, "for royalty computation purposes, the definition of "area" must remain flexible so that it may be applied to diverse situations. The size of the area may vary with each specific royalty valuation determination for gas." *Bayless* at 7-8, *Merrion* at 9, *Dugan* at 11, citing Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed.

---

[18](...continued)
which is underlaid or appears to be underlaid by at least one pool." NMSA 1978, § 70-2-33(c) (1986); *see also* N.M. Admin. Code tit. 19.15.1.7 F(2) (2003) (same). The state definition adds that "[t]he words field and pool mean the same thing when only one underground reservoir is involved; however, field, unlike pool, may relate to two or more pools." NMSA 1978, § 70-2-33(c). Here, more than one underground reservoir is involved, and so "field," not "pool," would be the proper term to describe, collectively, the reservoirs from which Jicarilla RIK gas was drawn. *See also Railroad Comm'n v. Rio Grande Valley Gas Co.*, 405 S.W.2d 304, 309 (Tex. 1966) ("The word 'field' as used in the oil industry has a meaning which is usually determined from the context in which it is used. It may refer to a certain geographical area from which oil is produced or it may be restricted to a particular reservoir."); *Railroad Comm'n v. Graford Oil Corp.*, 557 S.W. 2d 946, 950 (Tex. 1977) ("an entire gas-producing area may often be loosely referred to as a 'field'"); *Seagull Energy E & P, Inc. v. Railroad Com'n of Texas*, 99 S.W.3d 232, 236 n.4 (Tex. App. 2003) ("The definition of the word "field" is variable; in some instances it refers to a particular reservoir, and sometimes to an entire geographical area from which oil or gas is produced.") (citing *Railroad Commission v. Rio Grande Valley,* 405 S.W.2d at 309).

[19] In the *Bayless* decisions, the Department also noted that the companies claimed that the Reservation is a political boundary rather than a geographic one. *Bayless* at 7, *Merrion* at 8 (Att. 1-2). Indian reservations, however, like states, have geographical delineations, even though Tribes, like States, are political entities as well. *See, e.g.*, Convention with the Jicarilla Apache, December 10, 1873, Art. I, in 1 Vine Deloria, Documents of American Indian Diplomacy 510 (1999) (dedicating for the Tribe an area defined by the San Juan River and the boundaries of the Territory of Colorado and the Navajo Reservation).

Reg. 1230, 1238 (January 15, 1988). The Department thus upheld the MMS designation of the Reservation as the "field/area," finding it consistent with MMS's express policy and explaining that "[b]ecause the purpose of the subject major portion analysis was to derive a major portion value for all gas produced from the Jicarilla Apache Reservation, the MMS included in that analysis all of the formations that were situated within the Reservation, in whole or in part." *Id.*[20]

In sum, in the *Bayless* decisions the Department showed that the Jicarilla major portion methodology was a reasonable interpretation of the relevant facts, regulations, and statutes, and that "application of that methodology constituted a reasonable and proper exercise of the Secretary's power, acting on behalf of the Jicarilla Apache Tribe." *Bayless* at 9 (Att. 1 at 9). *See Marathon Oil Co. v. United States*, 604 F. Supp. 1375, 1382 (D. Alaska 1985), *aff'd*, 807 F.2d 759 (9th Cir. 1986), *cert. denied*, 107 S. Ct. 1593 (1987) (the major portion regulation "vests considerable discretion in the Associate Director [for Royalty Management] to decide what the 'reasonable value' for royalty purposes shall be."); *California Co. v. Udall*, 296 F.2d 384, 386, 388 (D.C. Cir. 1961) (affirming the Secretary's authority to establish reasonable values for royalty purposes); *Anadarko,* 122 IBLA 147, 148 (1992) ("The Department has the authority and responsibility to establish the reasonable value of production for royalty purposes, and possesses considerable discretion in determining that value"). It is therefore appropriate for the Court to direct the Department to apply this methodology to the Jicarilla Apache Reservation, through enforcement of the MMS major portion Orders to Perform underlying *Vastar.*

## V.  ALTERNATIVELY, THIS COURT SHOULD DIRECT THE DEPARTMENT TO DEVELOP A NEW MAJOR PORTION METHODOLOGY FOR THE JICARILLA APACHE RESERVATION.

---

[20] This designation is also consistent with the MMS definition of "area" in the revised major portion regulation. 30 C.F.R. § 206.171 (2000); 64 Fed. Reg. at 43515( "An area may be all lands within the boundaries of an Indian reservation.").

The Department concluded its *Vastar* decision by stating:

> this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with necessary information can be merged with other available dat[a] to meet the regulatory requirements that MMS has established.

*Id*. at 12 (citing *Phillips Petroleum Co.*, 152 IBLA at 117); *see also Burlington IBLA,* 151 IBLA at 159. The Department has yet to develop such databases, despite its fiduciary obligation to calculate major portion prices in order to maximize tribal revenues.

In light of the trust obligation, it is not an option for MMS to say that the necessary information is not available, or that major portion prices will be calculated only "if" and when the proper data can be found. The Department is duty-bound to calculate major portion prices for the Jicarilla Apache Reservation in order to "aggressively carry out [its] trust responsibility in the administration of Indian oil and gas" FOGRMA, 30 U.S.C. § 1701(a)(4), and to ensure that Jicarilla receives the royalties to which it is entitled under its leases. *See also Shoshone*, 56 Fed. Cl. at 649, in which the court found that the Department has an *obligation* to perform a major portion analysis.[21]

In addition, this supposed future right to have major portion prices calculated when and "if other MMS databases with necessary information can be merged with other available data" is completely illusory: MMS has not attempted to develop new databases or new major portion methodologies–other than the Jicarilla major portion methodology–since *Burlington IBLA* (Att. 8) and *Phillips* (Att. 9) were decided in 1999 and 2000.

---

[21] The court in *Shoshone* distinguished *Pawnee v. United States,* 830 F.2d 87 (Fed. Cir. 1987), *cert. denied,* 486 U.S. 1032 (1988), where the tribe claimed that it had a right to have royalties based upon the average of the three highest prices for gas (thus neglecting the "major portion" requirement), because there the tribe's claim was "'contrary to and [went] beyond the regulations and the leases,'" *Shoshone,* 56 Fed. Cl. at 648 (quoting *Pawnee,* 830 F.2d at 191). In *Shoshone*, in contrast, the tribes' claim that "'[the] government failed to collect royalties based on the proper value of oil and gas,'" *id*. at 648 (quoting the tribes' brief) was "a cognizable claim." *Id*. at 649.

In *Burlington IBLA* and *Phillips*, the IBLA overturned major portion methodologies for the Southern Ute Tribe and for Indian allottees in Oklahoma, respectively. The IBLA invalidated MMS's major portion methodologies in both cases because the databases that MMS employed in those cases did not distinguish between arm's length and non-arm's length sales, as required by the 1988 MMS major portion regulations. *Burlington IBLA,* 151 IBLA at 158-59; *Phillips,* 152 IBLA at 117. In *Burlington IBLA*, MMS employed the AFS database of gas sales, *see* Statement of Facts at 8, as the database for determining major portion prices for the Southern Ute Tribe. MMS used a somewhat different database in *Phillips*, comprised of sales data from the Oklahoma Tax Commission, but it shared the same problem.

The IBLA pointed out in both *Burlington IBLA* and *Phillips* that MMS controls the royalty reporting system and dictates the information that is collected. The information collected, therefore, "could have been enhanced at MMS' will." 151 IBLA at 158; 152 IBLA at 116. Unfortunately, MMS has made no effort to do so. *See Burlington IBLA,* 151 IBLA at 158 ("MMS did not do so, and there is no indication that it is doing so now."); *Phillips*, 152 IBLA at 117 (same). On the contrary, MMS has if anything relaxed its reporting requirements, collecting even less information than before.

At the end of 2001, MMS implemented a "major reengineering of MMS's financial system and other legal requirements" that resulted in "changes to, or elimination of, some forms and requirements." 71 Fed. Reg. 38545 (July 7, 2006). Just as an example, MMS used to require companies to report the details of each sale of oil and gas made under each type of contract to which the company was a party. This information was reported on separate lines on Form MMS-2014, the form used to report sales and other information "to determine the correct royalty amount due, reconcile or audit data, and distribute payments to appropriate accounts." 30 C.F.R. § 210(c)(1)

(1997). Since October 1, 2001, MMS has allowed oil and gas companies to "roll-up" all their sales information onto one line per lease, thus eliminating a major source of information on gas sales. 71 Fed. Reg. at 38546. Similarly, information regarding companies' processing and transportation costs is no longer collected in a usable manner. *Id.*

Indeed, according to one report, "the Interior Department has scaled back on full audits, pushed out a couple of its more aggressive auditors and been criticized by its own inspector general for the audits that it did pursue." Edmund L. Andrews, *As Profits Soar, Companies Pay U.S. Less for Gas Rights*, New York Times, January 23, 2006, at A-1; *see also* Final Report on an Audit of the Minerals Management Service Audit Offices, OIG 2003-I-0023 (March 31, 2003), available at http://www.doioig.gov. This and other articles led to an investigation of the MMS by the Department's Office of Inspector General ("IG"). *See* IG Audit Report No. C-IN-MMS-0006-2006 (December 2006), at 2. The IG Report specifically considered the compliance review process, called the MMS "Compliance and Asset Management (CAM)" program, that MMS established as a result of its "reengineering" efforts. The IG Report explained that the CAM process was "less intensive than an audit" and did not obtain "detailed source documentation." *Id.* at i. It found that CAM reviews "do not obtain and review company source records," *id.* at 2, and that MMS "could not provide accurate royalty collection data from its CAM Program activities," *id.* at 5. In addition, the IG Report found that "MMS has reduced the number of auditor positions since 2000" by 15.7% overall, *id.* at 32, and that the "overall number of audits initiated by MMS . . . decreased" by 22%, *id.* at 33.

It would therefore be an inadequate remedy to leave MMS with an open-ended obligation to develop a new major portion methodology for the Jicarilla Apache Nation. Nothing in MMS's recent behavior indicates that MMS would carry out such an order, and certainly not with any

promptness.[22]  Thus, if this Court orders MMS to develop a new methodology rather than to enforce

the existing one, the Court should set a reasonable deadline for MMS to comply.  There is a danger

that such a remedy would still be incomplete, however.  As more time passes it becomes harder to

obtain sales data from old periods–if, in fact, the information can still be obtained at all–so that even

though the inadequate databases were due to MMS's negligence in the first instance, it is a

negligence that MMS may no longer be able to rectify.  This problem makes MMS's promise at the

end of the *Vastar* decision even emptier, and argues all the more strongly in favor of enforcement

of the original major portion Orders to Perform consistent with the Department's *Bayless* decisions.

## CONCLUSION

For the reasons stated above, Jicarilla respectfully requests that this Court enter a declaratory

judgment setting aside the decision of the Department in *Vastar* as arbitrary, capricious, an abuse

of discretion, contrary to law, and in breach of the Department's trust responsibility to the Jicarilla

Apache Nation.  Because the Department's decision in *Vastar* improperly set aside the underlying

---

[22] MMS's past behavior does not provide any assurance either.  About 25 years ago, the Department established the Linowes Commission to investigate "serious allegations of massive irregularities in royalty payments due the Federal government, Indian tribes, and States." Report of the Commission, Fiscal Accountability of the Nation's Energy Resources (Jan. 1982) (Letter from David Linowes to Secretary James G. Watt (January 21, 1982)) (selected portions of the Report are included as Att. 10).  After an extensive investigation, the Linowes Commission concluded:

> Management of royalties for the nation's energy resources has been a failure for more than 20 years.  Because the Federal government has not adequately managed this multibillion dollar enterprise, the oil and gas industry is not paying all the royalties it rightly owes. . . . The results of individual audits, which have often uncovered large underpayments, suggest that hundreds of millions of dollars due the U.S. Treasury, the States, and Indian tribes are going uncollected every year.

*Id*. at xv.  The Commission found generally that "[t]he government's royalty recordkeeping for Federal and Indian oil and gas leases is in disarray."  *Id*. at xv.  *See also OXY USA, Inc v. Babbit*, 268 F.3d 1001, 1013 (10 Cir. 2001) (Briscoe, J., dissenting) (Congress enacted FOGRMA because of serious problems with royalty accounting practices).

MMS Orders to Perform, Jicarilla seeks a further order from this Court directing the Department to enforce those Orders. Alternatively, the Department should explain why such Orders should be treated differently from the virtually identical Orders at issue in the *Bayless* decisions, and should develop a new major portion methodology for the Jicarilla Apache Reservation that is consistent with the Jicarilla leases and ensures that Jicarilla will receive the royalties it is owed.

## REQUEST FOR ORAL ARGUMENT

Oral argument is requested on this motion. Due to the complexity of the facts, counsel believes that the decisional process would be aided by oral argument.

Respectfully submitted,


/s/ Jill Elise Grant

Jill Elise Grant (D.C. Bar No. 358306)
Jenny J. Dumas
NORDHAUS LAW FIRM, LLP
1401 K Street, NW, Suite 801
Washington, DC 20005
telephone: (202) 530-1270
facsimile: (202) 530-1920
Dated: January 22, 2008          *Counsel for the Jicarilla Apache Nation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| JICARILLA APACHE NATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-cv803 (RJL) |
| | ) | |
| | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| | ) | |
| Defendant. | ) | |

---

**[PROPOSED] ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Plaintiff's Motion for Summary Judgment. The Court has considered the motion and the relevant facts and law, and finds that there is good cause for granting the motion.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that the decision of the Department of the Interior in *Vastar Resources, Inc.*, MMS-98-01310IND, et al. (March 28, 2007), is set aside as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

IT IS FURTHER ORDERED that because the Department's decision in *Vastar* improperly set aside eight Orders to Perform issued by the Minerals Management Service ("MMS") the Department is directed to enforce those orders, namely, orders issued in *Vastar Resources, Inc.*, MMS-RVD-OG:98-0230 (May 27, 1998), *Exxon Co., U.S.A.*, MMS-RVD-OG:98-0229 (May 27,

1998); *Burlington Resources Oil & Gas Co. L.P.*, MMS-RVD-OG:98-0275 (June 10, 1998); *Union Texas Petroleum Corp.*, MMS-RVD-OG:99-0050 (Feb. 19, 1999); *Unicon Producing Co.*, 99-0091 (March 25, 1999); *Southern Exploration Co.*, MMS-RVD-OG:99-0049 (Feb.19, 1999); *Williams Production Co.*, MMS-RVD-OG:99-052 (Feb. 23, 1999); and *Mobil Exploration & Producing U.S. Inc.*, MMS-RVD-OG:99:0092 (April 16, 1999).

Dated:_____, 2008.

_____

Judge

Notice was mailed or delivered on the date of filing to the following parties:

Jill Elise Grant (D.C. Bar No. 358306)
Jenny J. Dumas
Nordhaus Law Firm, LLP
1401 K Street, NW, Suite 801
Washington, DC 20005
telephone:  (202) 530-1270
facsimile:   (202) 530-1920
*Counsel for Plaintiff Jicarilla Apache Nation*

Ruth Ann Storey
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, DC 20044-0663
telephone:  (202) 305-0493
facsimile:   (202) 305-0506
*Counsel for Defendant Department of the Interior*



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240



<u>CERTIFIED MAIL</u>                          DEC 2 2 2000
<u>RETURN RECEIPT REQUESTED</u>

Mr. Tommy Roberts                    Re: MMS-98-0132-IND
Roberts & Strother, P.C.                  Robert L. Bayless
101 South Orchard, Suite B
Post Office Box 129
Farmington, New Mexico  87499              Appeal Denied

Dear Mr. Roberts:

Robert L. Bayless (Bayless) appealed under 30 CFR Part 290 (1999) from a Minerals
Management Service (MMS) order dated May 27, 1998, which directed Bayless to calculate,
report, and pay additional royalties for certain Jicarilla Apache Tribal oil and gas leases for the
period January 1984 through June 1995 using dual accounting and major portion calculations.

<u>Statement of Facts:</u>

Bayless is, or was during the time period at issue, the royalty payor for Jicarilla Apache Tribal oil
and gas leases which contain a provision requiring that the value of production for royalty
purposed be based upon the greater of  (1) the price received by the lessee, or (2) the highest
price paid for a major portion of like-quality production.  The leases also require the lessee to
perform a dual accounting, i.e., calculate and pay royalties on the greater of the unprocessed gas
value, the processed gas value, or the lessee's gross proceeds.

On May 27, 1998, MMS issued an order directing Bayless to:  (1) calculate the value of its
unprocessed gas using its gross proceeds (if an arm's-length sale at the wellhead), or the higher
of the appropriate benchmark or gross proceeds (if a non-arm's-length sale at the wellhead),
compare that value with the value based on the major portion price provided by MMS, and use
the higher value;  (2) perform a dual accounting, i.e., determine the value of lease production for
royalty purposes based on the higher of the processed gas value, the unprocessed gas value, or its
gross proceeds;  (3) compare the values it reported to MMS on its Report of Sales and Royalty
Remittance (Form MMS-2014) to the values determined under the MMS order, and (4) pay any
additional royalty amount due.  Bayless filed a timely appeal of that order.

Tommy Roberts

2

Issues:

1. Did MMS erroneously assume that the prices received by the Tribe for its royalty-in-kind (RIK) gas were representative of the prices received by all oil and gas operators on the Reservation? Did MMS err by disregarding other sales of gas between gas operators on the Reservation and third party purchasers?

2. Did MMS err by failing to determine whether the sales of natural gas that it used in establishing major portion prices were, in fact, arm's-length transactions?

3. Did MMS err by defining the "field" in a way that may have excluded pertinent sales data from leases and wells lying outside the boundaries of the Reservation?

4. Is the MMS order to perform a dual accounting premature in view of the Appellant's pending appeal of this issue to the Interior Board of Land Appeals (IBLA Docket No. 97-0526)?

5. Does MMS' implementation of the subject major portion methodology constitute an unlawful and unenforceable amendment of the tribal leases and/or the regulations?

6. Should the Appellant be required to pay late payment interest under the circumstances that are present in this case?

7. Is enforcement of the MMS order barred by the Federal Statute of Limitations, 28 U.S.C. 2415 and 2416, with respect to royalties that accrued more than six years and ninety days prior to the date of the MMS demand for payment?

Calculation of Major Portion Prices

The Jicarilla Apache tribal oil and gas leases provide in section (c), Rental and Royalty, that value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leased lands are situated. Similar language appears in the regulations at 25 CFR 211.13(a) (1987).

The regulations at 30 CFR 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to

Tommy Roberts

be used in determining the value of production for royalty purposes shall be the higher of these two values. [Emphasis added.]

The regulations at 30 CFR 206.152(a)(3)(ii) and 30 CFR 206.153(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest price offered at the time of production for the major portion of gas production from the same field or for residue gas or gas plant products from the same processing plant, as applicable. The major portion will be calculated using like-quality lease products sold under arm's-length contracts from the same field or processing plant (or, if necessary to obtain a reasonable sample, from the same area or nearby processing plants) for each month. All such sales will be arrayed from the highest price to the lowest price (at the bottom). The major portion is that price at which 50 percent (by volume) plus 1 mcf of gas (starting from the bottom) is sold, or for gas plant products, 50 percent by volume plus 1 unit. [Emphasis added.]

Here, the MMS researched sources and found that no usable databases existed that contained 100 percent of the gas sales for leases located in the Jicarilla Apache Reservation. Nor did any available databases contain reliable information regarding Natural Gas Policy Act (NGPA) categories of wells, or whether sales were arm's-length or non-arm's-length. See Burlington Resources Oil & Gas Co., 151 IBLA 144 (1999). Further, available databases had never been adjusted to reflect corrections in prices and volumes resulting from the Tribe's audits. The Tribe's RIK sales, however, represent actual arm's-length sales for leases located within the Reservation and distinguish between NGPA categories. MMS therefore determined that the RIK sales provided the best available data to calculate monthly major portion values for leases on the Jicarilla Apache Reservation.

The price that the Tribe received for the RIK portion of the lease production represents the Tribe's one-eighth or one-sixth royalty share. In evaluating the RIK data, MMS extrapolated the Tribe's royalty share to the entire eight-eighths and/or six-sixths of the sales volume and assumed that the value of the royalty share was representative of the prices received for the other portion of gas sold from the Reservation.[1] Using the prices paid under RIK contracts and RIK renegotiated agreements, the MMS calculated the major portion by NGPA category for all gas production in the Reservation for the period January 1984 through June 1995.[2] MMS

---

[1] The record indicates that the extrapolated RIK sales volumes represent 67 percent of the total sales volumes on the Reservation for the audit period in question. MMS verified this percentage for the February 1988 sales month.

[2] In addition, MMS combined the RIK data with the MMS database (the AFS data), performed the 50 percent calculation in the regulations, and arrived at the same major portion price, indicating the validity of the major portion price figure under the methodology in the major

Tommy Roberts                                                                                                4

determined that this method of calculating the major portion price for gas sales for Jicarilla Apache Tribal leases best met the requirement in the leases that value be calculated based on the "highest price paid or offered . . . for the major portion of the . . . gas."

The Appellant contends that MMS' method for determining major portion prices is contrary to the applicable regulations. In support of this contention, the Appellant argues, among other things, that MMS unreasonably restricted the number and scope of sales that it examined in determining major portion prices; that it assumed, without evidence, that the prices received by the Tribe for its RIK gas were representative of the prices received by all oil and gas operators on the Reservation; that it failed to consider other sales of gas between gas operators on the Reservation and third party purchasers; and that it should have created an array, from the highest price to the lowest price, of all comparable sales in the field as required by the regulations.

I disagree. The record shows that the vast majority of gas produced from the Jicarilla Apache Reservation is sold, or disposed of, pursuant to non-arm's-length transactions. Since the regulations require MMS to look solely to arm's-length transactions, it was obliged to limit its review to a smaller universe of sales. "Major portion" is based on the major portion of arm's-length sales, not the major portion of all sales without regard to whether those sales were arm's-length or non-arm's-length. It appears from the record that the RIK volumes constitute approximately 25 percent of arm's-length sales from the Reservation, which MMS found to be a "major portion."[3]

With regard to the Appellant's argument that the Tribe's RIK sales may not have been representative of prices received by all oil and gas operators on the Reservation, it may be true that the prices received by the Tribe for its RIK gas differ from prices received by oil and gas lease operators under non-arm's-length transactions. However, the Appellant has neither alleged nor shown that the prices the Tribe received for its RIK gas were inconsistent with other arm's-length sales of production from the Reservation. Moreover, to the extent that many of these prices were NGPA-regulated ceiling prices, it was not unreasonable for MMS to have concluded that the price received by the Tribe and by the Tribe's lessees for the same NGPA-category gas was, in fact, the same. Indeed, it could hardly have been otherwise.

It is clear from the regulations that a major portion analysis is to be performed whenever the availability of the requisite data makes it practicable for MMS to do so. Common sense and good faith are leading characteristics of all constructions of contracts, statutes and regulations. The construction of a rule or agreement shall depend less on artificial rules than on the application of good sense and sound equity to the object and spirit of the matter at hand. A particular statute or regulation should be given such construction as would render the statutory or regulatory

---

portion price regulations.
[3] This 25 percent figure is consistent with the new gas valuation rule, which also defines 25 percent as a major portion. 64 Federal Register 43506 (August 10, 1999).

Tommy Roberts

5

provision practicable, or as practicable as possible. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436 (1912).

Here, the Appellant and the Tribe agreed in the subject leases that in valuing production for royalty purposes, consideration would be given to the highest price paid for a major portion of production from the field or area. Under the leases, the Secretary has the discretion to determine the appropriate method in each situation for arriving at the major portion price. Moreover, where, as here, the method in the regulations does not arrive at the highest price paid or offered but rather at a volume-weighted median price based on data that are not appropriate for the Reservation (see discussion above), the regulations themselves provide that the lease terms take precedence over the MMS regulations. 30 CFR 206.150(b) (1995); 30 CFR 206.170(b) (1999).

As Judge Seymour noted in his dissent in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555 (10th Cir. 1984), which was adopted by the Tenth Circuit in its en banc rehearing, 782 F.2d 855 (10th Cir. 1986):

> [T]he purpose of the Indian Mineral Leasing Act is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their own lands, and we should construe regulations enacted under this Act in light of this purpose.

728 F.2d at 1568.

This holding was recently reaffirmed in Burlington Resources Oil & Gas Co. v. U.S. Dept. of Interior, 21 F. Supp. 2d 1 (D.D.C. 1998). The court there distinguished Independent Petroleum Ass'n of America v. Babbitt, 92 F.3d 1248 (D.C. Cir. 1996), which rejected an attempt to collect royalties on certain contract settlement payments even for Indian tribes, by announcing that "IPAA is completely compatible with Supron II's holding that when the Secretary is faced with more that one 'reasonable' choice as to the meaning of a leave provision when acting in a fiduciary capacity, i.e., when more than one choice would satisfy the 'arbitrary and capricious' standard, he must choose the alternative that is in the best interests of the Indian tribe. In other words, under Supron II, just as under IPAA, the Secretary's decision must be both 'reasonable,' i.e., not 'arbitrary and capricious,' and 'to optimum advantage of the trust beneficiary." 21 F.Supp. at 5.

The Government has been called upon to render a judgment as to whether, with the available data, it can, as a practical matter, make a fair and reasonable determination of major portion value. Based on my review of the subject database, the available sales, and the methodology used by MMS, I conclude that it has done so here, and that despite the inherent limitations relating to the availability of data, it has substantially complied with the requirements of the regulations, keeping in mind that the regulations were intended to be flexible so that they could be applied to a variety of situations.

6

Tommy Roberts

<u>Arm's-Length Sales</u>

Effective March 1, 1988, the regulations provided that major portion would be calculated using arm's-length sales of gas. <u>See</u> 30 CFR 206.152(a)(3)(i) and 206.153(a)(3)(i) (1988). The Appellant states that "[I]t appears from the Methodology Report that major portion prices were calculated by MMS without any analysis as to whether sales of natural gas occurred under arm's-length contracts."

Under the regulations at 30 CFR 206.171 (1999), a transaction is considered to be arm's-length if it has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests. The MMS reviewed the Tribe's RIK sales to third parties. There is nothing in the record that would suggest that the Tribe was selling its RIK gas to affiliated entities, and the Appellant has neither alleged nor shown that this occurred.

The Appellant contends that had MMS examined other sales it might have found that the Tribe's sales of RIK production to third party purchasers under long-term gas purchase contracts calling for the payment of NGPA prices resulted in sales prices that were considerably higher than the prices being received by third-party purchasers by private oil and gas operators on the Reservation.

The Appellant's argument is speculative, self-serving, and is not supported on the record. Under the regulations at 30 CFR 206.151 (1995), a transaction is considered to be arm's-length if it has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests. There is nothing in the record to suggest that the Tribe was selling its RIK to affiliated entities, and the Appellant has neither alleged nor shown that this occurred. Although the Appellant suggests that the price of the Tribe's RIK sales might have been affected by factors other than the value of the RIK gas, the Appellant has provided no evidence of the existence of such factors. Nor has the Appellant offered an explanation as to what those alleged factors might have been. "It is the obligation of the Appellant to show error. Therefore, when a statement of reasons does not with some particularity show adequate reasons for the appeal and support the allegations with evidence showing error, the appeal cannot be afforded favorable consideration." <u>United States v. Connor</u>, 72 IBLA 254, 256 (1983).

<u>MMS' Designation of the Field or Area</u>

The standard Jicarilla Apache Tribal lease form states that royalties may be based on prices received for gas produced and sold from the field in which the leased lands are located. The MMS regulations provide that the major portion price will be calculated using like-quality gas "from the same field (or, if necessary to obtain a reasonable sample, from the same area)." 30 CFR 206.172(a)(3)(ii) (1999). The term "field" is defined at 30 CFR 206.151 (1992) as follows:

> field – a geographic region situated over one or more subsurface
> oil and gas reservoirs encompassing at least the outermost boundaries
> of all oil and gas accumulations known to be within these reservoirs
> vertically projected to the land surface.  Onshore fields are usually
> given names and their official boundaries are often designated by oil
> and gas regulatory agencies in the respective States in which the fields
> are located.  Outer Continental Shelf (OCS) fields are named and their
> boundaries are designated by MMS.  [Emphasis added.]

The Appellant contends that MMS improperly defined the "field" in terms of a political
boundary (the Reservation) rather than as a geographic region situated over one or more
subsurface gas reservoirs.  The Appellant suggests that MMS' definition of the field may have
had the effect of excluding pertinent sales data from common sources of supply lying outside the
boundaries of the Reservation.

Most of the Jicarilla Apache Reservation is located in Rio Arriba County, New Mexico.  A small
portion of the Reservation extends into Sandoval County, New Mexico.  The Reservation lies
along the eastern edge of the San Juan Basin; and natural gas produced on Reservation comes
from the Pictured Cliffs Formation, the Mesaverde Group, the Gallup, Tocito, and fractured
Mancos Formations, and the Dakota and Dakota-Morrison Formations.  Coalbed methane is
produced from the Fruitland Formation.

While the regulations referenced above state that, for major portion purposes, the "field" may be
designated by the State oil and gas regulatory agency, the State of New Mexico defines natural
gas resources in terms of pools rather than fields.  A pool is a "common source of supply" and is
generally based on a geologic horizon.  The State of New Mexico Oil and Gas Commission has
identified 30 pools that overlay or are within the boundaries of the Reservation.

The MMS Royalty Management Program (RMP) states that in several cases, multiple pools
overlay one another and/or extend outside the Reservation boundary.  See the MMS report
entitled "Methodology for Major Portion and Dual Accounting Analysis, Jicarilla Apache Tribal
Leases" at page 4.  For purposes of the subject major portion analysis, the MMS defined the
"field" as the Reservation boundary, thereby encompassing and aggregating all of the above-
referenced formations (and associated pools).[4]  Since the regulations state that a field may
encompass one or more reservoirs, it would appear that MMS' designation comports with the
regulations.

The term "area" is defined at 30 CFR 206.151 (1999) as "geographic region at least as large as
the defined limits of an oil and/or gas field, in which oil and/or gas lease products have similar
quality, economic, and legal characteristics."  As MMS explained in the Preamble to Revision of
Gas Royalty Valuation Regulations, 53 F.R. 1230, 1238 (January 15, 1988): "[F]or royalty

---

[4] It is also noteworthy that MMS price records do not distinguish by "field" for Reservation gas.

Tommy Roberts                                                                     8

computation purposes, the definition of "area" must remain flexible so that it may be applied to
diverse situations. The size of the area may vary with each specific royalty valuation
determination for gas." The MMS definition of the field/area in the instant case was fully
consistent with that policy. Because the purpose of the subject major portion analysis was to
derive a major portion value for all gas produced from the Jicarilla Apache Reservation, the
MMS included in that analysis all of the formations that were situated within the Reservation, in
whole or in part.

Dual Accounting

As its basis challenging the MMS requirement for dual accounting, the Appellant incorporates by
reference its pleadings in a prior appeal, which was docketed MMS-93-0094-IND.   On
July 10, 1997, the Deputy Commissioner of Indian Affairs rejected those arguments, stating:

> The lease and the regulations expressly require that royalty be valued
> on the greater of the value of the unprocessed gas or the combined value
> of the residue gas and products derived from processing (less the appropriate
> allowance). Both values, in turn, must be compared to Bayless' gross
> proceeds. Consequently, Bayless must perform the dual accounting value
> comparison for his Indian leases for the audit period and thereafter. Bayless'
> claims with respect to not having to perform dual accounting are rejected
> and this portion of his appeal is denied.

See Robert L. Bayless, MMS-93-0094-IND (July 10, 1997), 15 Gower Federal Service, Royalty
Valuation and Management, Rocky Mountain Mineral Law Foundation (Gower).

The Interior Board of Land Appeals (IBLA) affirmed the Deputy Commission's decision on this
issue, stating:

> It is now established that, as a general matter, lessees of Jicarilla Apache
> Tribal leases must participate in dual accounting, and, moreover, that
> dual accounting had always been required of those leases. Amoco
> Production Co. (On Reconsideration), 143 IBLA 54A, 54E (citing
> Burlington Resources Oil and Gas Co. v. U.S. Dep't of the Interior, 21
> F. Supp.2d 1, 6 (D. D.C. 1998).
>
>                        *    *    *
>
> This interpretation is consistent with the language of 30 CFR 206.152(a)(1)
> governing valuation standards for unprocessed gas, which notes that it
> 'applies to processed gas that must be valued prior to processing in
> accordance with 205.155.' It is thus reasonable to interpret these
> regulations to mean that casinghead gas must be valued (even if

> processed instead of being sold at the wellhead), and that royalty
> computed on that value must be paid, if higher than royalty computed
> on the value of the products of the gas or casinghead gas. Thus, under
> principles governing interpretation of law in keeping with the
> Department's Indian trust responsibility, we conclude that dual
> accounting was properly required here.

See Robert L. Bayless, 149 IBLA 140, 150 (1999).

Since this issue has been decided previously and has been fully addressed in the decisions
referenced above, it will not be addressed further herein.

MMS' Implementation of Major Portion

The Appellant contends that MMS' implementation of the major portion methodology set forth
in its Methodology Report constitutes an unlawful and unenforceable amendment of the Tribal
leases. The Appellant reasons as follows: The MMS methodology is contrary to existing
regulations, and the effect of its implementation is to revise the existing regulations. This
unilateral revision effectively revises the terms, conditions and provisions of the Appellant's
leases. The terms, conditions, and provisions of the leases cannot be altered without the
agreement and consent of the Appellant. The Appellant received no advance notice of these
alterations and has not consented to them. Therefore, MMS' major portion methodology is
unlawful and unenforceable.

The Appellant's entire line of argument rests upon the question of whether the major portion
methodology adopted by MMS is consistent with, or contrary to, the applicable regulations. As
stated previously herein, I have concluded that MMS' major portion methodology was consistent
with the regulations, and that the application of that methodology constituted a reasonable and
proper exercise of the Secretary's power, acting on behalf of the Jicarilla Apache Tribe.

Late Payment Charges

The Appellant contends that since the delay in payment of the additional royalties due under
major portion and/or dual accounting was not the Appellant's fault, it would be inequitable for
MMS to require the Appellant to pay late payment interest.

I cannot accept this argument. It is the legal obligation of MMS to assess late payment interest
on all debts not received by the due date. The Federal Oil and Gas Royalty Management Act of
1982 (FOGRMA), 30 U.S.C. 1721 (1994), and the regulations at 30 CFR 218.54 and 218.150
(1988), require MMS to make such an assessment in connection with monies due from activities
covered by the regulations. Burlington Resources Oil & Gas Co. v. U.S. Department of the
Interior, 21 F. Supp. 2d 1 (1998); Sun Exploration and Production Co., 104 IBLA 178 (1988).
In addition, the courts have held consistently that duly promulgated regulations have the force of

Tommy Roberts                                                                  10

law; are binding on all departmental officials, including the Secretary and may not be waived. Vitarelli v. Seaton, 359 U.S. 535 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954); Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621 (1950); McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); 515 Assocs. v. City of Newark, 424 F. Supp. 984 (D.N.J. 1977); Wisenak Inc., 87 IBLA 67 (1985); Wilfred Plomis, 34 IBLA 222 (1978).

The regulation dealing with payment of royalties for oil and gas leases, 30 CFR 218.50(a) (1999), specifically provides that "[r]oyalty payments are due at the end of the month following the month during which the oil and gas are sold * * *." The late payment interest referred to by the Appellant is simply compensation to the lessor for the time value of funds not paid on a timely basis; it is not a penalty." See, e.g., Burlington Resources, supra; Cities Service Oil & Gas Corp., 104 IBLA 291, 295 (1988); Cities Service Oil & Gas Corp., 104 IBLA 291, 295 (1988); Coastal Oil and Gas Corp., 108 IBLA 62, 67 (1989). The Tribe is entitled to that compensation, regardless of the reasons for the delay in payment.

Statute of Limitations

The Appellant contends that MMS should be deemed barred by the Federal statute of limitations, 28 U.S.C. 2415 and 2416 (1994), from collecting royalties that accrued more than six years and ninety days prior to final agency action in any civil suit to collect royalties brought more than one year after final agency action.

Statutes of limitation operate only on the remedies available to a claimant and do not affect the merits of the dispute or the underlying right of recovery. United States v. Studivant, 529 F.2d 673 (3d Cir. 1976). Because the purpose of this proceeding is merely to determine the validity of an MMS order that concerns the underlying obligation for royalty, the alleged applicability of a statute of limitations does not limit administrative proceedings within the Department of the Interior. Since this proceeding is an administrative appeal, not a court action, the statutory bar is inapplicable. Anadarko Petroleum Corp., 122 IBLA 141 (1992); BHP Petroleum (Americas) Inc., 124 IBLA 185 (1992).

Conclusions and Order

For the reasons stated above, the appeal is denied. Unless otherwise extended in writing by the Associate Director for Royalty Management, the Appellant shall comply with this decision not later than 30 days after receipt of this decision.

Tommy Roberts                                                                                   11

Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is
not subject to appeal to the Interior Board of Land Appeals and is the final action of the
Department. Blue Star, Inc., 41 IBLA 333 (1979); Marathon Oil Co., 108 IBLA 177 (1989).

                              Sincerely,

                              Kevin Gover
                              Assistant Secretary , Indian Affairs



## United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240



DEC 22 2000

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Tommy Roberts                     Re:  MMS-98-0228-IND
Roberts & Strother, P.C.                   Merrion Oil & Gas Corporation
101 South Orchard, Suite B
Post Office Box 129
Farmington, New Mexico 87499               Appeal Denied

Dear Mr. Roberts:

Merrion Oil & Gas Corporation (Merrion) appealed under 30 CFR Part 290 (1999)
from a Minerals Management Service (MMS) order dated September 15, 1998, which
directed Merrion to perform dual accounting and major portion calculations for
its Jicarilla Apache Tribal oil and gas leases for the period January 1984
through June 1995, and report and pay additional royalties found to be due.

Statement of Facts:

Merrion is, or was during the time period at issue, the royalty payor for
Jicarilla Apache Tribal oil and gas leases which contain a provision requiring
that the value of production for royalty purposed be based upon the greater of
(1) the price received by the lessee, or (2) the highest price paid for a
major portion of like-quality production.  The leases also require the lessee
to perform a dual accounting, i.e., calculate and pay royalties on the greater
of the unprocessed gas value, the processed gas value, or the lessee's gross
proceeds.

On September 15, 1998, MMS issued an order directing Merrion to:  (1)
calculate the value of its unprocessed gas using its gross proceeds (if an
arm's-length sale at the wellhead), or the higher of the appropriate benchmark
or gross proceeds (if a non-arm's-length sale at the wellhead), compare that
value with the value based on the major portion price provided by MMS, and use
the higher value;  (2) perform a dual accounting, i.e., determine the value of
lease production for royalty purposes based on the higher of the processed gas
value, the unprocessed gas value, or its gross proceeds;  (3) compare the
values it reported to MMS on its Report of Sales and Royalty Remittance (Form

Mr. Tommy Roberts                                                              2

MMS-2014) to the values determined under the MMS order. and (4) pay any additional royalty amount due.

Merrion file a timely appeal of that order.

Issues:

1. In calculating major portion prices. did MMS fail to observe the existing. applicable Federal regulations by unreasonably restricting the number and scope of sales that it examined?  Should MMS have created an array of sales as called for by the regulations?

2. Did MMS err by failing to determine whether the sales of natural gas that it used in establishing major portion prices were. in fact. arm's-length. transactions? Did MMS err in assuming that the prices received by the Tribe for its royalty-in-kind (RIK) gas were representative of the prices received by all oil and gas operators on the Reservation and/or by disregarding other available sales data?

3. Did MMS err by designating the Reservation boundaries as the "field" for purposes of major portion pricing?

4. Is the requirement to perform dual accounting appropriate in all cases and circumstances?

5. Does MMS' implementation of the subject major portion methodology constitute an unlawful and unenforceable amendment of the tribal leases?

6. Should the Appellant be required to pay late payment interest under the circumstances that are present in this case?

7. Is enforcement of the MMS order barred by the Federal Statute of Limitations. 28 U.S.C. 2415 and 2416 (1994), with respect to royalties that accrued more than six years and ninety days prior to the date of the MMS demand for payment?

Calculation of Major Portion Prices

The Jicarilla Apache tribal oil and gas leases provide in section (c). Rental and Royalty. that value for royalty purposes may. in the discretion of the Secretary. be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where

Mr. Tommy Roberts                                                                3

the leased lands are situated.  Similar language appears in the regulations
at 25 CFR 211.13(a) (1987). The regulations at 30 CFR 206.152(a)(3)(i) (1991),
which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary
> may consider the highest  price paid or offered for a
> major portion of production (major portion) in determining
> value of production for royalty purposes, if data are
> available to compute a major portion <u>MMS will, where
> practicable, compare the value determined in accordance
> with this section with the major portion</u>. The value to be
> used in determining the value of production for royalty
> purposes shall be the higher of these two values.
> [Emphasis added.]

The regulations at 30 CFR 206.152(a)(3)(ii) and 30 CFR 206.153(a)(3)(ii)
(1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest
> price offered at the time of production for the major portion of
> gas production from the same field or for residue gas or gas plant
> products from the same processing plant, as applicable.  <u>The major
> portion will be calculated using like-quality lease products sold
> under arm's-length contracts</u> from the same field or processing
> plant (or, if necessary to obtain a reasonable sample, from the
> same area or nearby processing plants) <u>for each month</u>.  All such
> sales will be arrayed from the highest price to the lowest price
> (at the bottom).  The major portion is that price at which 50
> percent (by volume) plus 1 mcf of gas (starting from the bottom)
> is sold, or for gas plant products, 50 percent by volume plus
> 1 unit.   [Emphasis added.]

In the instant case, the MMS researched sources and found that no usable
databases existed that contained 100 percent of the gas sales for Indian,
State, and fee leases located in the Jicarilla Apache Reservation.  Nor did
any available databases contain reliable information regarding Natural Gas
Policy Act (NGPA) categories of wells, or whether sales were arm's-length or
non-arm's-length.  See Burlington Resources Oil & Gas Co., 151 IBLA 144
(1999).  Further, the available databases had never been adjusted to reflect
corrections in prices and volumes resulting from the Tribe's audits.  The
Tribe's RIK sales, however, represent actual arm's-length sales for leases

Mr. Tommy Roberts                                                                    4

located within the Reservation and distinguish between NGPA categories. MMS
therefore determined that the RIK sales provided the best available data to
calculate monthly major portion values for leases on the Jicarilla Apache
Reservation.

The price that the Tribe received for the RIK portion of the lease production
represents the Tribe's one-eighth or one-sixth royalty share. In evaluating
the RIK data, MMS extrapolated the Tribe's royalty share to the entire eight-
eighths and/or six-sixths of the sales volume and assumed that the value of
the royalty share was representative of the prices received for the other
portion of gas sold from the Reservation.[1]  Using the prices paid under RIK
contracts and RIK renegotiated agreements, the MMS calculated the major
portion by NGPA category for all gas production in the Reservation for the
period January 1984 through June 1995.[2] MMS determined that this method of
calculating the major portion price for gas sales for Jicarilla Apache Tribal
leases best met the requirement in the leases that value be calculated based
on the highest price paid or offered . . . for the major portion of the . . .
gas."

The Appellant contends that MMS' method for determining major portion prices
is contrary to the applicable regulations.  In support of this contention, the
Appellant argues, among other things, that MMS unreasonably restricted the
number and scope of lease sales that it examined in determining major portion
prices, and that it should have created an array, from the highest price to
the lowest price, of all comparable sales in the field as required by the
regulations.

I disagree.  As stated above, it appears from the record that the vast
majority of gas produced from the Jicarilla Apache Reservation is sold, or
disposed of, pursuant to non-arm's-length transactions.  Since the regulations
require MMS to look solely to arm's-length transactions, it was obliged to
limit its review to a smaller universe of sales.  "Major portion" is based on
the major portion of arm's-length sales, not the major portion of all sales
without regard to whether those sales were arm's-length or non-arm's-length.
It appears from the record that the RIK volumes constitute approximately

---

[1]The record indicates that the extrapolated RIK sales volumes represent 67 percent of the total
sales volumes on the Reservation for the audit period in question.  MMS verified this percentage for the
February 1988 sales month.

[2] In addition, MMS combined the RIK data with the MMS database (the AFS data), performed the 50
percent calculation in the regulations, and arrived at the same major portion price, indicating the
validity of the major portion price figure under the methodology in the major portion price regulations.

Mr. Tommy Roberts                                                                          5

25 percent of arm's-length sales from the Reservation, which MMS found to be a "major portion."[3]

With regard to the Appellant's argument that the Tribe's RIK sales may not have been representative of prices received by all oil and gas operators on the Reservation, it may be true that the prices received by the Tribe for its RIK gas differ from prices received by oil and gas lease operators under non-arm's-length transactions. However, the Appellant has neither alleged nor shown that the prices the Tribe received for its RIK gas were inconsistent with other arm's-length sales of production from the Reservation. Moreover, to the extent that many of these prices were NGPA-regulated ceiling prices, it was not unreasonable for MMS to have concluded that the price received by the Tribe and by the Tribe's lessees for the same NGPA-category gas was, in fact, the same. Indeed, it could hardly have been otherwise.

It is clear from the regulations that a major portion analysis is to be performed whenever the availability of the requisite data makes it practicable for MMS to do so. Common sense and good faith are leading characteristics of all constructions of contracts, statutes and regulations. The construction of a rule or agreement shall depend less on artificial rules than on the application of good sense and sound equity to the object and spirit of the matter at hand. A particular statute or regulation should be given such construction as would render the statutory or regulatory provision practicable, or as practicable as possible. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436 (1912).

Here, the Appellant and the Tribe agreed in the subject leases that in valuing production for royalty purposes, consideration would be given to the highest price paid for a major portion of production from the field or area. Under the leases, the Secretary has the discretion to determine the appropriate method in each situation for arriving at the major portion price. Moreover, where, as here, the method in the regulations does not arrive at the highest price paid or offered but rather at a volume-weighted median price based on data that are not appropriate for the Reservation (see discussion above), the

---

[3] This 25 percent figure is consistent with the new gas valuation rule, which also defines 25 percent as a major portion. 64 Federal Register 43506 (August 10, 1999).

Mr. Tommy Roberts                                                                6

regulations themselves provide that the lease terms take precedence over the MMS regulations. 30 CFR 206.150(b) (1995); 30 CFR 206.170(b) (1999).

As Judge Seymour noted in his dissent in <u>Jicarilla Apache Tribe v. Supron Energy Corp.</u>, 728 F.2d 1555 (10th Cir. 1984), which was adopted by the Tenth Circuit in its <u>en banc</u> rehearing, 782 F.2d 855 (10th Cir. 1986): 728 F.2nd at 1568.

> [T]he purpose of the Indian Mineral Leasing Act is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their own lands, and we should construe regulations enacted under this Act in light of this purpose.

This holding was recently reaffirmed in <u>Burlington Resources Oil & Gas Co. v. U.S. Dept. of Interior</u>, 21 F. Supp. 2d 1 (D.D.C. 1998). The court there distinguished <u>Independent Petroleum Ass'n of America v. Babbitt</u>, 92 F.3d 1248 (D.C. Cir. 1996), which rejected an attempt to collect royalties on certain contract settlement payments even for Indian tribes, by announcing that "IPAA is completely compatible with Supron II's holding that when the Secretary is faced with more than one "reasonable" choice as to the meaning of a lease provision when acting in a fiduciary capacity, i.e., when more than one choice would satisfy the "arbitrary and capricious" standard, he must choose the alternative that is in the best interests of the Indian tribe. "In other words, under Supron II, just as under IPAA, the Secretary's decision must be both "reasonable," i.e., not "arbitrary and capricious," and "to optimum advantage of the trust beneficiary." 21 F.Supp. at 5.

Here, the Government has been called upon to render a judgment as to whether, with the available data, it can, as a practical matter, make a fair and reasonable determination of major portion value. Based on my review of the subject database, the available sales, and the methodology used by MMS, I conclude that it has done so here, and that despite the inherent limitations relating to the availability of data, it has substantially complied with the requirements of the regulations, keeping in mind that the regulations were intended to be flexible so that they could be applied to a variety of situations.

<u>Arm's-Length Sales</u>

Effective March 1, 1988, the regulations provided that major portion would be

Mr. Tommy Roberts                                                                    7

calculated using arm's-length sales of gas.  See 30 CFR 206.152(a)(3)(i) and
206.153(a)(3)(i) (1988).  The Appellant states that "[I]t appears from the
Methodology Report that major portion prices were calculated by MMS without
any analysis as to whether sales of natural gas occurred under arm's-length
contracts."

Under the regulations at 30 CFR 206.171 (1999), a transaction is considered to
be arm's-length if it has been arrived at in the marketplace between
independent, nonaffiliated persons with opposing economic interests.  The MMS
reviewed the Tribe's RIK sales to third parties. There is nothing in the
record that would suggest that the Tribe was selling its RIK gas to affiliated
entities, and the Appellant has neither alleged nor shown that this occurred.

The Appellant contends that had MMS examined other sales, it might have found
that the Tribe's sales of RIK production to third party purchasers under long-
term gas purchase contracts calling for the payment of NGPA prices resulted in
sales prices that were considerably higher than the prices being received from
third-party purchasers by private oil and gas operators on the Reservation.

The Appellant's argument is speculative, self-serving, and is not supported on
the record.  Under the regulations at 30 CFR 206.151 (1995), a transaction is
considered to be arm's-length if it has been arrived at in the marketplace
between independent, nonaffiliated persons with opposing economic interests.
There is nothing in the record to suggest that the Tribe was selling its RIK
to affiliated entities, and the Appellant has neither alleged nor shown that
this occurred.  Although the Appellant suggests that the price of the Tribe's
RIK sales might have been affected by factors other than the value of the RIK
gas, the Appellant has provided no evidence of the existence of such factors.
Nor has the Appellant offered an explanation as to what those alleged factors
might have been. "It is the obligation of the Appellant to show error.
Therefore, when a statement of reasons does not with some particularity show
adequate reasons for appeal and support the allegations with evidence showing
error, the appeal cannot be afforded favorable consideration."  United States
v. Connor, 72 IBLA 254, 256 (1983).

MMS Definition of the "Field"

The standard Jicarilla Apache Tribal lease form states that royalties may be
based on prices received for gas produced and sold from the field in which the
leased lands are located.  The MMS regulations provide that the major portion
price will be calculated using like-quality gas "from the same field (or, if
necessary to obtain a reasonable sample, from the same area)."

Mr. Tommy Roberts                                                                     8

30 CFR 206.172(a)(3)(ii) (1999). The term "field" is defined at 30 CFR
206.151 (1992) as follows:

> field -- a geographic region situated over one or more subsurface
> oil and gas reservoirs encompassing at least the outermost boundaries
> of all oil and gas accumulations known to be within those reservoirs
> vertically projected to the land surface. Onshore fields are usually
> given names and their official boundaries are often designated by oil
> and gas regulatory agencies in the respective States in which the field
> are located. Outer Continental Shelf (OCS) fields are named and
> their boundaries are designated by MMS. [Emphasis added.]

The Appellant contends that MMS improperly defined the "field" in terms of a
political boundary (the Reservation) rather than as a geographic region
situated over one or more subsurface gas reservoirs. The Appellant suggests
that MMS' definition of the field may have had the effect of excluding
pertinent sales data from common sources of supply lying outside the
boundaries of the Reservation.

Most of the Jicarilla Apache Reservation is located in Rio Arriba County, New
Mexico. A small portion of the Reservation extends into Sandoval County, New
Mexico. The Reservation lies along the eastern edge of the San Juan Basin;
and natural gas produced on the Reservation comes from the Pictured Cliffs
Formation, the Mesaverde Group, the Gallup, Tocito, and fractured Mancos
Formations, and the Dakota and Dakota-Morrison Formations. Coalbed methane is
produced from the Fruitland Formation.

While the regulations referenced above state that, for major portion purposes,
the "field" may be designated by the State oil and gas regulatory agency, the
State of New Mexico defines natural gas resources in terms of pools rather
than fields. A pool is a "common source of supply" and is generally based on
a geologic horizon. The State of New Mexico Oil and Gas Commission has
identified 30 pools that overlay or are within the boundaries of the
Reservation.

The MMS Royalty Management Program (RMP) states that in several cases,
multiple pools overlay one another and/or extend outside the Reservation
boundary. See the MMS report entitled "Methodology for Major Portion and Dual
Accounting Analysis, Jicarilla Apache Tribal Leases" at page 4. The RMP
states that because of this overlap, it was unable to define distinct field
boundaries for the Jicarilla Apache Tribe gas production. Therefore, for
purposes of the subject major portion analysis, the MMS defined the "field" as

Mr. Tommy Roberts                                                                         9

the Reservation boundary, thereby encompassing and aggregating all of the above-referenced formations (and associated pools).[4]

The term "area" is defined at 30 CFR 206.151 (1999) as "a geographic region at least as large as the defined limits of an oil and/or gas field, in which oil and/or gas lease products have similar quality, economic, and legal characteristics." As MMS explained in the A Preamble to Revision of Gas Royalty Valuation Regulations, 53 F.R. 1230, 1238 (January 15, 1988): "[F]or royalty computation purposes, the definition of 'area' must remain flexible so that it may be applied to diverse situations. The size of an area may vary with each specific royalty valuation determination for gas." The MMS definition of the field/area in the instant case was fully consistent with that policy. Because the purpose of the subject major portion analysis was to derive a major portion value for all gas produced from the Jicarilla Apache Reservation, the MMS included in that analysis all of the pools that were situated within the Reservation, in whole or in part.

Dual Accounting

The Appellant argues that the requirement to perform dual accounting may not be appropriate under all circumstances (and implies that it is not appropriate here). As its basis challenging the MMS requirement for dual accounting, the Appellant incorporates by reference the pleadings in appeal filed by Robert L. Bayless which was docketed MMS-93-0094-IND. On July 10, 1997, the Deputy Commissioner of Indian Affairs rejected those arguments, stating:

> The lease and the regulations expressly require than royalty be valued on the greater of the value of the unprocessed gas or the combined value of the residue gas and products derived from processing (less the appropriate allowance). Both values, in turn, must be compared to Bayless' gross proceeds. Consequently, Bayless must perform the dual accounting value comparison for his Indian leases for the audit period and thereafter. Bayless' claims with respect to not having to perform dual accounting are rejected and this portion of his appeal is denied.

---

[4] It is also noteworthy that MMS price records do not distinguish by "field" for reservation gas.

Mr. Tommy Roberts                                                          10

See Robert L. Bayless, MMS-93-0094-IND (July 10, 1997), 15 Gower Federal
Service, Royalty Valuation and Management, Rocky Mountain Mineral Law
Foundation (Gower).

The Interior Board of Land Appeals (IBLA) affirmed the Deputy Commission's
decision on this issue, stating:

> It is now established that, as a general matter, lessees of Jicarilla
> Apache Tribal leases must participate in dual accounting, and,
> moreover, that dual accounting had always been required of those
> leases. Amoco Production Co. (On Reconsideration), 143 IBLA 54A, 54E
> (citing Burlington Resources Oil and Gas Co. v. U.S. Dep't of the
> Interior, 21 F. Supp.2d 1, 6 (D. D.C. 1998).

                          *       *       *

> This interpretation is consistent with the language of 30 CFR
> 206.152(a)(1) governing valuation standards for unprocessed gas, which
> notes that it 'applies to processed gas that must be valued prior to
> processing in accordance with 205.155.' It is thus reasonable to
> interpret these regulations to mean that casinghead gas must be valued
> (even if processed instead of being sold at the wellhead), and that
> royalty computed on that value must be paid, if higher than royalty
> computed on the value of the products of the gas or casinghead gas.
> Thus, under principles governing interpretation of law in keeping with
> the Department's Indian trust responsibility, we conclude that dual
> accounting was properly required here.

See Robert L. Bayless, 149 IBLA 140, 150 (1999).

Since this issue has been decided previously and has been fully addressed in
the decisions referenced above, it will not be addressed further herein.

Amendment of Tribal Leases

The Appellant contends that MMS' implementation of the major portion
methodology set forth in its Methodology Report constitutes an unlawful and
unenforceable amendment of the Tribal leases. The Appellant reasons as
follows: The MMS methodology is contrary to existing regulations, and the
effect of its implementation is to revise the existing regulations. This
unilateral revision effectively revises the terms, conditions and provisions
of the Appellant's leases. The terms, conditions, and provisions of the

Mr. Tommy Roberts                                                          11

leases cannot be altered without the agreement and consent of the Appellant. The Appellant received no advance notice of these alterations and has not consented to them. Therefore, MMS' major portion methodology is unlawful and unenforceable.

The Appellant's entire line of argument rests upon the question of whether the major portion methodology adopted by MMS is consistent with, or contrary to, the applicable regulations. As stated previously herein, I have concluded that MMS' major portion methodology was consistent with the regulations, and that the application of that methodology constituted a reasonable and proper exercise of the Secretary's power, acting on behalf of the Jicarilla Apache Tribe.

Late Payment Charges

The Appellant contends that since the delay in payment of the additional royalties due under major portion and/or dual accounting was not the Appellant's fault, it would be inequitable for MMS to require the Appellant to pay late payment interest.

I cannot accept this argument. It is the legal obligation of MMS to assess late payment interest on all debts not received by the due date. The Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), 30 U.S.C. 1721 (1994), and the regulations at 30 CFR 218.54 and 218.150 (1988), require MMS to make such an assessment in connection with monies due from activities' covered by the regulations. Burlington Resources Oil & Gas Co. v. U.S. Department of the Interior, 21 F. Supp. 2d 1 (1998); Sun Exploration and Production Co., 104 IBLA 178 (1988). In addition, the courts have consistently held that duly promulgated regulations have the force of law; are binding on all departmental officials, including the Secretary, and may not be waived. Vitarelli v. Seaton, 359 U.S. 535 (1959); United States ex. Rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954); Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621 (1950); McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); 515 Assocs. v. City of Newark, 424 F.Supp. 984 (D.N.J. 1997); Wisenak, Inc., 87 IBLA 67 (1985); Wilfred Plomis, 34 IBLA 222 (1978).

The regulation dealing with payment of royalties for oil and gas leases, 30 CFR 218.50(a) (1999), specifically provides that "[r]oyalty payments are due at the end of the month following the month during which the oil and gas are sold * * *." The late payment interest referred to by the Appellant is simply compensation to the lessor for the time value of funds not paid on a timely basis; it is not a penalty. See, e.g., Burlington Resources, supra;

Mr. Tommy Roberts                                                           12

Cities Service Oil & Gas Corp., 104 IBLA 291, 295 (1988); Cities Service Oil & Gas Corp., 104 IBLA 291, 295 (1988); Coastal Oil and Gas Corp., 108 IBLA 62, 67 (1989). The Tribe is entitled to that compensation, regardless of the reasons for the delay in payment.

## Statute of Limitations

The Appellant contends that MMS should be deemed barred by the Federal statute of limitations, 28 U.S.C. 2415 and 2416 (1994), from collecting royalties that accrued more than six years and ninety days prior to final agency action in any civil suit to collect royalties brought more than one year after final agency action.

Statutes of limitation operate only on the remedies available to a claimant and do not affect the merits of the dispute or the underlying right of recovery. United States v. Studivant, 529 F.2d 673 (3d Cir. 1976). Because the purpose of this proceeding is merely to determine the validity of an MMS order that concerns the underlying obligation for royalty, the alleged applicability of a statute of limitations does not limit administrative proceedings within the Department of the Interior. Since this proceeding is an administrative appeal, not a court action, the statutory bar is inapplicable. Anadarko Petroleum Corp., 122 IBLA 141 (1992); BHP Petroleum (Americas) Inc., 124 IBLA 185 (1992).

## Conclusions and Order

For the reasons stated above, the appeal is denied. Unless otherwise extended in writing by the Associate Director for Royalty Management, the Appellant shall comply with this decision not later than 30 days after receipt of this decision.

Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department. Blue Star, Inc., 41 IBLA 333 (1979); Marathon Oil Co., 108 IBLA 177 (1989).

Sincerely,

Kevin Gover
Assistant Secretary, Indian Affairs



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240



DEC 22 2000

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. John A. Dean, Jr.                          Re:  MMS-98-0130-IND
Curtis & Dean                                        Dugan Production Corp.
Attorneys at Law
506 West Arrington, P.O. Drawer 1259
Farmington, New Mexico  87499                  Appeal Denied

Dear Mr. Dean:

Dugan Production Corp. (Dugan) appealed under 30 CFR Part 290 (1999) from a
Minerals Management Service (MMS) order dated May 27, 1998, which directed
Dugan to calculate, report and pay additional royalties using dual accounting
and major portion calculations for natural gas produced from Jicarilla Apache
Tribal leases for which Dugan was the payor during the period January 1984
through June 1995.

<u>Statement of Facts</u>:

Dugan is, or was during the time period at issue, the lessee of record for
Jicarilla Apache Tribal oil and gas leases which contain a provision requiring
that the value of production for royalty purposed be based upon the greater
of: (1) the price received by the lessee, or (2) the highest price paid for a
major portion of like-quality production.

By letters dated June 23, 1992, and April 10, 1996, MMS notified Dugan of MMS'
audit findings for the Jicarilla Apache Tribal oil and gas leases for the
periods March 1985 through February 1990 and April 1990 through December 1994,
respectively.  Those letters placed Dugan on notice that a major portion
analysis was in progress, and that MMS was in the process of gathering pricing
information.

On May 27, 1998, MMS issued an order directing Dugan to report and pay
additional royalties, as appropriate, using major portion prices derived by
MMS.  The order also directed Dugan to perform a dual accounting.  Dugan filed

Mr. John A. Dean, Jr.

2

a timely appeal of that order. The focal point of Dugan's appeal was major portion. It does not appear that Dugan is appealing the requirement to perform a dual accounting.

Issues:

1. Was MMS' use of the royalty-in-kind (RIK) prices received by the Jicarilla Apache Tribe in calculating major portion prices contrary to the applicable regulations?

2. Were the RIK prices received by the Jicarilla Apache Tribe the product of arm's-length transactions?

3. Was the statutory purpose of the major portion pricing clause in the Jicarilla leases solely to protect the Tribe from artificially low prices due to collusion between the lessee and its purchaser?

4. Did MMS err in treating the Jicarilla Apache Reservation as the field or area for purposes of performing a major portion analysis?

5. Is enforcement of the MMS order barred by the Federal statute of limitations and/or the doctrine of laches?

6. Does the MMS order erroneously assert the right to assess interest for delays in payment that were not caused by Dugan?

Analysis

MMS Major Portion Methodology

The Jicarilla Apache Tribal oil and gas leases provide in section 3(c), Rental and Royalty, that value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of oil and gas produced and sold from the field where the leased lands are situated. Similar language appears in the regulations at 25 CFR 211.13(a) (1987).

The regulations at 30 CFR 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

3

Mr. John A. Dean, Jr.

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion <u>MMS will, where practicable, compare the value determined in accordance with this section with the major portion</u>. The value to be used in determining the value of production for royalty purposes shall be the higher of these two values. [Emphasis added.]

The regulations at 30 CFR 206.152(a)(3)(ii) and 30 CFR 206.153(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest price offered at the time of production for the major portion of gas production from the same field or for residue gas or gas plant products from the same processing plant, as applicable. <u>The major portion will be calculated using like-quality products sold under arms-length contracts</u> from the same field or processing plant (or, if necessary to obtain a reasonable sample, from the same area or nearby processing plants) <u>for each month</u>. All such sales will be arrayed from the highest price to the lowest price (at the bottom). The major portion is that price at which 50 percent (by volume) plus 1 mcf of gas (starting from the bottom) is sold, or for gas plant products, 50 percent by volume plus 1 unit. [Emphasis added.]

Here, MMS researched sources and found that no usable databases existed that contained 100 percent of the gas sales for leases located in the Jicarilla Apache Reservation. Nor did any available databases contain reliable information regarding Natural Gas Policy Act (NGPA) categories of wells, or whether sales were arm's-length or non-arm's-length. See <u>Burlington Resources Oil & Gas Co.</u>, 151 IBLA 144 (1999). Further, the available databases had never been adjusted to reflect corrections in prices and volumes resulting from the Tribe's audits. The Tribe's RIK sales, however, represent actual arm's-length sales for leases located within the Reservation and distinguish between NGPA categories. The MMS therefore determined that the RIK sales provided the best available data to calculate monthly major portion values for leases on the Jicarilla Apache Reservation.

The price that the Tribe received for the RIK portion of the lease production represents the Tribe's one-eighth or one-sixth royalty share. In evaluating

Mr. John A. Dean, Jr.

the RIK data, MMS extrapolated the Tribe's royalty share to the entire eight-eighths and/or six-sixths of the sales volume and assumed that the value of the royalty share was representative of the prices received for the other portion of the gas sold from the Reservation.[1] Using the prices paid under RIK contracts and RIK renegotiated agreements, the MMS calculated the major portion by NGPA category for all gas production in the Reservation for the period January 1984 through June 1995.[2]  The MMS determined that this method of calculating the major portion price for gas sales for Jicarilla Apache Tribal leases best met the requirement in the leases that value be calculated based on the "highest price paid or offered . . . for the major portion of the . . . gas."

The Appellant contends that use of the prices the Jicarilla Apache Tribe received under its RIK contracts does not meet the MMS' definition of major portion pricing and should not be used to recalculate royalty owed by the Appellant.  The Appellant argues, in essence, that the Jicarilla's RIK sales constituted only a small fraction of the total sales in the field/area and could not, therefore, constitute or represent the "major portion" of production in that field/area.

The Appellant states that, as of April 1, 1999, there were 37 different fields the lie in whole or in part within the boundaries of the Jicarilla Apache Reservation.  According to the Appellant, those 37 fields contain a total of 18,047 wells of which only 2,945 (16.3%) lie within the boundaries of the Reservation.  The Appellant further states that during February 1988, a total of 32,127,813 MCF was produced from those 37 fields, of which only 2,977,049 MCF (9.3%) came from wells on the Jicarilla Apache Reservation and only 260,056 MCF (0.8%) was sold as Jicarilla Apache RIK gas.  Based on the foregoing, the Appellant concludes that the sales examined by MMS constituted only a small fraction of the total sales in the "field."

In fact, however, the record shows that even when limited to the 16.3 percent of the wells that are within the Reservation, which MMS defined as the relevant "field" or "area" (see discussion on pages 7-9 below), the vast majority of the gas produced from those wells is sold pursuant to non-arm's-length transactions.  Since MMS focused on arm's-length transactions, as the

---

[1] The record indicates that the extrapolated RIK sales volumes represent 67 percent of the total sales volumes on the Reservation for the audit period in question.  MMS verified this percentage for the February 1988 sales month

[2] In addition, MMS combined the RIK data with the MMS database (the AFS data), performed the 50 percent calculation in the regulations, and arrived at the same major portion price, indicating the validity of the major portion price figure under the methodology in the major portion price regulations.

Mr. John A. Dean, Jr.                                                                    5

regulations required it to do, it was examining and dealing with a smaller
universe of sales than was the Appellant who included all transactions,
regardless of whether they were arm's-length or non-arm's-length, in
calculating production and sales. And since the regulations state that "[t]he
major portion will be calculated using like-quality lease products sold under
arm's-length contracts" [emphasis added], I conclude that MMS was correct.
"Major portion" is based on the major portion of arm's-length sales, not the
major portion of all sales without regard to whether they were arm's-length or
non-arm's-length. It appears from the record that the RIK volumes constitute
approximately 25 percent of arm's-length sales from the Reservation, which MMS
found to be a "major portion."[3]

Common sense and good faith are leading characteristics of all constructions
of contracts, statutes and regulations. The construction of a rule or
agreement shall depend less on artificial rules than on the application of
good sense and sound equity to the object and spirit of the matter at hand. A
particular statute or regulation should be given such construction as would
render the statutory or regulatory provision practicable, or as practicable as
possible. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S.
194, 32 S.Ct. 436 (1912).

Here, the Appellant and the Tribe agreed in the subject leases that in valuing
production for royalty purposes, consideration would be given to the highest
price paid for a major portion of production from the field or area. Under
the leases, the Secretary has the discretion to determine the appropriate
method in each situation for arriving at the major portion price. Moreover,
where, as here, the method in the regulations does not arrive at the highest
price paid or offered but rather at a volume-weighted median price based on
data that are not appropriate for the Reservation (see discussion above), the
regulations themselves provide that the lease terms shall take precedence over
the MMS regulations. 30 CFR 206.150(b) (1995); 30 CFR 206.170(b) (1999).

The Government has been called upon to render a judgment as to whether, with
the available data, it can, as a practical matter, make a fair and reasonable
determination of major portion value. Based on my review of the subject

_____

[3]This 25 percent figure is consistent with the new gas valuation rule, which also defines
25 percent as a major portion. 64 Federal Register 43506 (August 10, 1999).

Mr. John A. Dean, Jr.

6

database, the available sales, and the methodology used by MMS, I conclude that it has done so here, and that despite the inherent limitations relating to the availability of data, it has substantially complied with the requirements of the regulations, keeping in mind that the regulations were intended to be flexible so that they could be applied to a variety of situations.

<u>MMS' Use of the Tribe's RIK Prices</u>

Effective March 1, 1988, the regulations provided that major portion would be calculated using arm's-length sales of gas.  <u>See</u> 30 CFR 206.152(a)(3)(i) and 206.153(a)(3)(i) (1991).  The Appellant contends that the Jicarillia RIK prices MMS used for purposes of the subject major portion analysis were, by their nature, non-arm's-length and, thus, their use did not comply with the regulations.  In support of its contention that the Jicarilla's RIK sales were non-arm's-length, the Appellant argues that the price the Jicarilla received was influenced and affected by the purchasers' desire to resolve other issues unrelated to the economic value of the RIK gas.  The Appellant does not state what those issues might have been.

The Appellant's argument is speculative, self-serving, and is not supported on the record.  Under the regulations at 30 CFR 206.171 (1999), a transaction is considered to be arm's-length if it has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests.  There is nothing in the record to suggest that the Tribe was selling its RIK gas to affiliated entities, and the Appellant has neither alleged nor shown that this occurred.  Although the Appellant suggests that the price of the Tribe's RIK sales might have been affected by factors other than the value of its RIK gas, the Appellant has provided no evidence of the existence of such factors.  Nor has the Appellant explained with any degree of clarity what those alleged factors might have been.[4]

"It is the obligation of the Appellant to show error.  Therefore, when a statement of reasons does not with some particularity show adequate reasons for appeal and support the allegations with evidence showing error, the appeal cannot be afforded favorable consideration."  <u>United States v. Connor</u>, 72 IBLA 254, 256 (1983).

---

[4]In fact, the price the Tribe received under the RIK contracts was essentially the same as prices under other long-term contracts during the same period: all were tied to the NGPA regulated prices.

7

Mr. John A. Dean, Jr.

Statutory Purpose

The Appellant argues that the statutory purpose of the major portion provision is to protect the Tribe from negligence by the lessee/producer in the negotiation of sales of the resource and from possible collusion between the lessee/producer and the purchaser(s). The Appellant contends that it has always endeavored to obtain the highest price possible for the natural gas it produces on Indian lands; that it believes it did, in fact, obtain the highest price possible; and that it has, therefore, paid the appropriate royalties.

The Appellant is arguing, in essence, that the major portion price is not an alternate valuation method to be used pursuant to the discretion of MMS, as constrained by applicable law, but rather is a safeguard to be employed only in those instances where there is substantial evidence that the prices being reported by the lessee for royalty purposes are less than market value.

For the following reasons, I cannot accept the Appellant's argument:

1. Section 3(c) of the Jicarilla Tribal oil and gas lease form states that "value" for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas produced and sold from the same field where the leased lands are situated. Although the Appellant contends that the Secretary's exercise of this discretion was intended to be limited to those situations in which there is clear evidence that the price received by the lessee was, as a result of negligence or collusion, less than market value, there is absolutely nothing in the lease language to support such a contention. Simply stated, the Appellant is alleging a qualification or limitation where none exists. Indeed, as Judge Seymour noted in his dissent in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555 (10th Cir. 1984), which was adopted by the Tenth Circuit in its en banc rehearing, 782 F.2d 855 (10th Cir. 1986):

> [T]he purpose of the Indian Mineral Leasing Act is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands, and we should construe regulations enacted under this Act in light of this purpose." 728 F.2d at 1568.

This holding was recently reaffirmed in Burlington Resources Oil & Gas Co. v. U.S. Dept. of Interior, 21 F. Supp. 2d (D.D.C. 1998). The court there distinguished Independent Petroleum Ass'n of America v. Babbitt, 92 F.3d 1248 (D.C. Cir. 1996), which rejected an attempt to collect royalties on certain

Mr. John A. Dean, Jr.                                          8

contract settlement payments even for Indian tribes, by announcing that "IPAA is completely compatible with Supron II's holding that when the Secretary is faced with more than one "reasonable" choice as to the meaning of a lease provision when acting in its fiduciary capacity, i.e., when more than one choice would satisfy the "arbitrary and capricious" standard, he must choose the alternative that is in the best interests of the Indian tribe.   In other words, under Supron II, just as under IPAA, the Secretary's decision must be both "reasonable," i.e., not "arbitrary and capricious," and to optimum advantage of the trust beneficiary." 21 F. Supp. at 5.

2. The major portion valuation regulations at 30 CFR 206.152(a)(3)(i) (1999), state:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion.   The value to be used in determining the value of production for royalty purposes shall be the higher of these two values.   [Emphasis added.]

Thus, it is clear from the regulations that a major portion analysis will be performed whenever the availability of the requisite data makes it practicable for MMS to do so. As explained above, the requirement that the Secretary consider, when valuing lease production for royalty purposes, the highest price offered or paid for the majority of like-quality gas produced or sold from the same field or area is embodied in the terms of the leases themselves.

3. The Appellant cites language from section 2.5.1 of the MMS Payor Handbook (Handbook) which states that "[T]he cornerstone of valuation for royalty purposes is the arm's-length contract."  However, neither the Government nor the Tribe is bound by the arm's-length price received by the lessee. Section 3(c) of the Jicarilla lease expressly states that: "[T]he actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of * * * such value."  In any event, the RIK price applied here was an arm's-length price.

4. The Appellant infers from the language in section 2.5.1 of the Handbook that the intent of the Law concerning major portion pricing was that it

Mr. John A. Dean, Jr.                                              9

would only be invoked when non-arm's-length prices are used to
intentionally lessen the amount of royalty paid on Indian leases. However,
there is nothing to support this broad inference drawn by the Appellant;
and the Appellant has presented no arguments or citations to connect the
above-cited section of the Handbook to major portion pricing, which is
dealt with in a separate section of the Handbook.

5. Section 4.5 of the MMS Payor Handbook, which specifically addresses major
   portion analysis for Indian leases, clearly states that major portion
   analysis is an additional, supplemental royalty valuation method. This
   section, like the lease itself, is totally devoid of any suggestion that
   the application of the major portion analysis would, or should, be limited
   to the narrow set of circumstances urged by the Appellant.

MMS' Definition of the Field or Area

As noted previously herein, the standard Jicarilla Apache Tribal lease form
states that royalties may be based on prices received for gas produced and
sold from the field in which the leased lands are located. The MMS
regulations provide that the major portion price will be calculated using
like-quality gas "from the same field (or, if necessary to obtain a reasonable
sample, from the same area)," 30 CFR 206.152(a)(3)(ii) and 206.153(a)(3)(ii)
(1992); 30 CFR 206.172(a)(3)(ii) (1999). The term "field" is defined at 30 CFR
206.151 (1992) as follows:

> field -- a geographic region situated over one or more
> subsurface oil and gas reservoirs encompassing at least the
> outermost boundaries of all oil and gas accumulations known
> to be within those reservoirs vertically projected to the
> land surface. Onshore fields are usually given names and
> their official boundaries are often designated by oil and gas
> regulatory agencies in the respective States in which the
> fields are located. Outer Continental Shelf (OCS)
> fields are named and their boundaries are designated by MMS.
> [Emphasis added.]

Most of the Jicarilla Apache Reservation is located in Rio Arriba County, New
Mexico. A small portion of the Reservation extends into Sandoval County, New
Mexico. The Reservation lies along the eastern edge of the San Juan Basin;
and natural gas produced on the Reservation comes from the Pictured Cliffs
Formation, the Mesaverde Group, the Gallup, Tocito, and fractured Mancos
Formations, and the Dakota and Dakota-Morrison Formations.

Mr. John A. Dean, Jr.                                                              10

While the regulations referenced above state that, for major portion purposes, the "field" may be designated by the State oil and gas regulatory agency, the State of New Mexico defines natural gas resources in terms of pools rather than fields. A pool is a "common source of supply" and is generally based on a geologic horizon.

The State of New Mexico Oil and Gas Commission has identified 30 pools that overlay or are within the boundaries of the Reservation. The MMS Royalty Management Program (RMP) states that in several cases, multiple pools overlay one another and/or extend outside the Reservation boundary. See the MMS report entitled "Methodology for Major Portion and Dual Accounting Analysis, Jicarilla Apache Tribal Leases" at page 4. The RMP states that because of this overlap, it was unable to define distinct field boundaries for the Jicarilla Apache Tribe gas production. Therefore, for purposes of the subject major portion analysis, the MMS defined the "field" as the Reservation boundary, thereby encompassing and aggregating all five of the above-referenced formations (and associated pools).[5]

The Appellant contends that MMS erred in defining the Jicarilla Apache Reservation as the "field" for purposes of its major portion calculations. In support of this contention, the Appellant states that there are 37 fields that include Jicarilla Apache lands, and of those 37 fields, the Appellant has wells in only eight. The Appellant argues that the lands that make up the entire acreage of the Jicarilla Apache Reservation do not meet the definition of "field" found in the regulations, or the definition used by the New Mexico Oil Conservation Division.

For the following reasons, I cannot accept the Appellant's arguments:

1. A field is defined in the regulations as "[a] geographic region situated over one or more subsurface oil and gas reservoirs * * *." Here, MMS defined the field in such a way as to include the specific formations or reservoirs that lie in whole or in part within the Reservation boundaries. Since the regulations state that a field may encompass one or more reservoirs, it would appear that MMS' designation comports with the regulations. The Appellant has not explained why it believes MMS' designation fails to meet the definition of "field."

---

[5] It is also noteworthy that MMS price records do not distinguish by "field" for reservation gas.

Mr. John A. Dean, Jr.                                                                        11

2. Since the New Mexico Oil Conservation Division defines natural gas
   resources in terms of pools rather than fields, the Appellant's argument
   regarding the State's definition of field would not appear to be relevant
   or germane to the matter at hand.

The term "area" is defined at 30 CFR 206.151 (1999) as "a geographic region at
least as large as the defined limits of an oil and/or gas field, in which oil
and/or gas lease products have similar quality, economic, and legal
characteristics." As MMS explained in the Preamble to Revision of Gas Royalty
Valuation Regulations, 53 F.R. 1230, 1238 (January 15, 1988): ."[F]or royalty
computation purposes, the definition of 'area' must remain flexible so that it
may be applied to diverse situations. The size of an area may vary with each
specific royalty valuation determination for gas." The MMS definition of the
field/area in the instant case was fully consistent with that policy. Because
the purpose of the subject major portion analysis was to derive a major
portion value for all gas produced from the Jicarilla Apache Reservation, the
MMS included in that analysis all of the formations that were situated within
the Reservation, in whole or in part.

The Appellant argues that MMS' decision to define the field, for major portion
purposes, as encompassing the entire Reservation, and to use the prices
received for natural gas throughout all of those lands, raises a question as
to whether the MMS is basing its major portion values on like-quality lease
products, since the quality of gas may vary widely from field to field and the
Appellant's production comes from some, but not all, of those fields.

In response, the MMS Royalty Management Program (RMP) explains that:

1. The quality differences in gas produced from various pools within the
   Reservation boundaries are relatively small, i.e., the gas is uniformly low
   sulfur and differences in Btu content are not great;

2. To the extent that there are differences in Btu content, those differences
   are resolved via a conversion/normalization process in which the Btu
   content of the gas is multiplied by the volume of production to derive an,
   average MMBTU value; and

3. With regard to the issue of like legal quality, the RMP identified and
   separated gas by NGPA price category and performed separate major portion
   analyses for each price category.

Mr. John A. Dean, Jr.                                                              12

I have reviewed this methodology, which is explained in more detail in the MMS
field report at pages 4-8, and have concluded that it satisfies the regulatory
requirement that MMS compare, for major portion purposes, production of like
quality.

Statute of Limitations and Laches

The Appellant argues that the assessment of additional royalties should be
deemed barred by section 4(b) of the Federal Oil and Gas Royalty
Simplification and Fairness Act of 1996 (FOGRSFA), 30 U.S.C. 1724, which
establishes a seven-year limitation period for the assertion of claims
relating to Federal oil and gas leases, and by the equitable doctrine of
laches.

The Appellant's reliance on section 4(b) of FOGRSFA, 30 U.S.C. 1724, is
misplaced.  Section 9 of FOGRSFA, 30 U.S.C. 1701, states, in pertinent part,
that "[T]he amendments made by this Act shall not apply with respect to Indian
lands."  Section 4 of FOGRSFA amended the Federal Oil and Gas Royalty
Management Act of 1982 (FOGRMA) by adding a new section (section 115).
Section 4(b) of FOGRSFA was part of that new section/amendment.  Thus, it is
not applicable to the Jicarilla Indian Tribal leases at issue herein.

Moreover, statutes of limitation operate directly on the remedies available to
a claimant but do not affect the merits of the dispute or the underlying right
of recovery.  United States v. Studivant, 529 F.2d 673 (3d. Cir. 1976).
Because the purpose of this proceeding is only to determine the underlying
obligation for royalty, the alleged applicability of a statute of limitations
does not limit administrative proceedings within the Department of the
Interior.  This proceeding is an administrative appeal, not a court action,
and the statutory bar is not applicable.

With regard to laches, estoppel, and similar legal doctrines, it is well
established that the authority of the United States to enforce a public right
or to protect a public interest is not vitiated or lost by acquiescence of its
officers or delays in the performance of their duties.  Alyson A. Allison,
72 IBLA 333 (1983); Warren L. Jacobs, 71 IBLA 385 (1983).  This recognizes the
realities of administering the collection of royalties.  When a lessee's
reports and payments are received, MMS cannot immediately know the correctness
of such material.  It must necessarily take time to assemble the necessary
data and then interpret it.  Delays are reasonable in view of the burden upon
it to perform this audit function for the many leases it must manage.  Royalty
payments are always subject to later audit.  Supron Energy Corp., 46 IBLA 181,

Mr. John A. Dean, Jr.                                                                13

189 (1980). In addition, various MMS orders issued prior to the May 27, 1998 order in question in this appeal indicated the intent of MMS to issue major portion price orders at a later date.

The fact that royalty may have been accepted in the past does not obviate MMS' duty to ensure proper payment or waive its authority to later subject the payments to audit. See Shoshone Indian Tribe v. Hodel, 903 F.2d 784, 788 (10th Cir. 1990); Cities Service Oil & Gas Corp., 117 IBLA 17, 44-45, 97 I.D. 243, 259-260 (1990).

Late Payment Interest

The Appellant contends that it is inequitable for MMS to assert the right to assess late payment interest for delays in payment caused by MMS, and that such an assessment constitutes the unfair imposition of a penalty. The Appellant argues, in essence, that since any delay in payment was not the Appellant's fault, the Appellant should not be subject to the assessment of penalties and interest.

I cannot accept this argument. It is the legal obligation of MMS to assess late payment interest on all debts not received by the due date. The Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), 30 U.S.C. 1721 (1994), and the regulations at 30 CFR 218.54 and 218.150 (1988), require MMS to make such an assessment in connection with monies due from activities covered by the regulations. Burlington Resources Oil and Gas Company v. U.S. Department of the Interior, 21 F.Supp.2nd 1, 6 (D.D.C. 1998); Sun Exploration and Production Co., 104 IBLA 178 (1988). The courts have held consistently that duly promulgated regulations have the force of law; are binding on all departmental officials, including the Secretary, and may not be waived. Vitarelli v. Seaton, 359 U.S. 535 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954); Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621 (1950); McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); 515 Assocs. v. City of Newark, 424 F.Supp. 984 (D.N.J. 1977); Wisenak, Inc., 87 IBLA 67 (1985); Wilfred Plomis, 34 IBLA 222 (1978).

The regulation dealing with payment of royalties for oil and gas leases, 30 CFR 218.50(a) (1999), specifically provides that "[r]oyalty payments are due at the end of the month following the month during which the oil and gas are sold * * *." The late payment interest referred to by the Appellant is not a penalty, but rather is simply compensation to the lessor for the time value of funds not paid on a timely basis. See, e.g., Burlington Resources, supra;

Mr. John A. Dean, Jr.                                                              14

<u>Cities Service Oil & Gas Corp.</u>, 104 IBLA 291, 295 (1988); <u>Coastal Oil and Gas Corp.</u>, 108 IBLA 62, 67 (1989).

<u>Conclusions and Order</u>

For the reasons stated above, the appeal is denied. Unless otherwise extended in writing by the Associate Director for Royalty Management, the Appellant shall comply with this decision not later 30 days after receipt of this decision. Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department. <u>Blue Star, Inc.</u>, 41 IBLA 333 (1979); <u>Marathon Oil Co.</u>, 108 IBLA 177 (1989).

Sincerely,

Kevin Gover
Assistant Secretary, Indian Affairs



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Royalty Management Program
P.O. Box 25165
Denver, Colorado 80225-0165

IN REPLY REFER TO:

MMS-RVD-OG:98-0232
Mail Stop 3152

MAY 27 1998

CERTIFIED MAIL--
RETURN RECEIPT REQUESTED

Mr. Robert Bayless
P.O. Box 168
Farmington, New Mexico  87499

Re: Payor Number 13190

## ORDER TO PERFORM

Dear Mr. Bayless:

In carrying out the trust responsibility of the United States in the administration of Indian oil and gas leases, the Minerals Management Service (MMS) has long recognized the primacy of the lease terms.  As a royalty payor on Jicarilla Apache Tribal leases, you are obligated to comply with Section 3(c) **Rental and royalty**, of the Indian lease terms.  More specifically, the regulations state that a major portion analysis for oil and gas and dual accounting for gas (accounting for comparison) must be performed in determining the value of production for royalty purposes.  (Where the specific provisions of a lease are inconsistent with these regulations, then the lease agreement shall govern to the extent of that inconsistency.)

For major portion, regulations (25 CFR § 211.13(a) (1996)) state:

> During the period of supervision, "value" for the purposes of the lease may, in the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the supervisor.

Mr. Robert Bayless                                                                                     2

This requirement is also embodied in the gas valuation regulations found at 30 CFR §§ 206.172 and 206.173 (1997).

Dual accounting requirements are specified by Indian lease terms and regulations found at 25 CFR § 211.13 (1996) which state:

> In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater. [Emphasis added.]

Dual accounting is defined as a valuation method that requires the lessee to compute royalties based on the greater of : (1) the value of the gas prior to processing (as determined under 30 CFR § 206.172), or (2) the combined value of the residue gas and gas plant products resulting from processing the gas (as determined under 30 CFR § 206.173), plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing (30 CFR § 206.52 (1997)). However, the value of production can never be less than the gross proceeds accruing to the lessee (30 CFR §§ 206.172(h) and 206.173(h) (1997)). After March 1, 1988, if royalties are paid pursuant to the processed gas valuation method, the requirements to submit appropriate allowance forms prior to claiming transportation and/or processing allowances must be met. (See 30 CFR §§ 206.176 through 206.179 (1997)).

## Major Portion

MMS has performed major portion analyses for natural gas production from Jicarilla Apache Tribal leases for the period **January 1984 through June 1995**. We have verified gas sales data reported by the Jicarilla Apache Tribe under their Royalty-in-Kind (RIK) program and used this data to determine major portion prices for the Jicarilla Apache Tribe Reservation (Reservation) by production month. We have determined that the Jicarilla Apache Tribe sold all of their RIK production based on the prices as set by the Natural Gas Policy Act (NGPA) in the following categories:

| | |
|---|---|
| 102 New natural gas | 103 New onshore production |
| 104 Post-1974 gas | 104 1973-1974 Biennium gas |
| 104 Replacement gas | 104 Flowing gas |
| 104 Rocky Mountain gas | 105 Existing intrastate gas |
| 108 Stripper gas | 109 Other gas |

Mr. Robert Bayless                                                                           3

Enclosure 1 lists major portion prices. These prices are based on the prices received under the Jicarilla Apache Tribal RIK contract and are shown by NGPA category by month/year. If you are not responsible for payment of royalties between January 1984 and June 1995, please identify the responsible party and the date your responsibility ended.

## Dual Accounting

By "Dear Payor" letters dated September 30, 1988; July 27, 1992; February 2, 1993; and February 10, 1995 (Enclosures 2-5), MMS emphasized the requirement to perform dual accounting with notice that failure to comply with Indian lease terms and the regulations applicable to dual accounting would subject payors to enforcement actions by MMS, including civil penalties as provided by 30 CFR § 241.51 (1997).

MMS issued an Order (September 29, 1995 (Enclosure 6)) to Robert L. Bayless (Bayless) to provide a declaration of policy on dual accounting. On your response, you stated that the company did not perform dual accounting on the Indian leases for which Bayless is a royalty payor. MMS has determined that the Jicarilla Apache Tribal lease terms require dual accounting (Section 3(c) entitled "Rental and Royalty"). As a result, additional royalties may be due.

## Order to Perform

In order to comply with the regulations and lease terms, **within 90 days of receipt** of this letter, Bayless is ordered to perform the following dual accounting and major portion calculations. Please identify all Jicarilla Apache Tribal leases and time periods for which Bayless was a payor between **January 1984 and June 1995** and follow the steps below to determine the value of the production for royalty purposes:

1. Calculate the **unprocessed gas value:**

   a. The value of your gross proceeds if your gas is sold at the wellhead under an arm's-length contract (30 CFR § 206.172).

   b. The value determined if your gas is sold at the wellhead under a non-arm's-length contract or a no sale situation (30 CFR § 206.172) using the **higher of the appropriate benchmark or gross proceeds.** The arm's-length sale, by the affiliate, may be considered in determining the gross proceeds value. MMS may examine sales by affiliates in order to determine gross proceeds or the appropriate benchmark value.

   c. The value of the unprocessed gas is the greater of:

   • The value calculated in a. or b. above, as applicable; or

   • The value based on the major portion price shown on Enclosure 1.

Mr. Robert Bayless                                                                    4

    2. Calculate the **processed gas value:**

      a. If your gas is processed under an <u>arm's-length contract,</u> the processed value is your gross proceeds for the combined value (determined under 30 CFR § 206.173 (1997)) of:

- The residue gas,

- The gas plant products, and

- The condensate recovered downstream of the point of royalty settlement without resorting to processing,

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if appropriate allowance forms have been previously filed with MMS.)

      b. If your gas is processed under a <u>non-arm's-length contract,</u> the processed value is the combined value (determined under 30 CFR § 206.173) for:

- The residue gas,

- The gas plant products, and

- The condensate recovered downstream of the point of royalty settlement without resorting to processing,

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if appropriate allowance forms have been previously filed with MMS.)

- (The arm's-length sale, by the affiliate, may be considered in determining the gross proceeds value. MMS may examine sales by affiliates in order to determine gross proceeds or the appropriate benchmark value.)

If Bayless is unable to obtain the necessary information to perform dual accounting as required by the lease terms, Bayless is directed to apply the theoretical dual accounting as explained in the MMS's "Dear Payor" letter dated July 27, 1992 (Enclosure 3). MMS has provided a worksheet for both actual and theoretical dual accounting calculations and a diskette (Enclosure 7) with a Microsoft Excel worksheet in order to assist Bayless in completing dual accounting calculations. An example of the dual accounting calculations is shown in Enclosure 8. If needed, MMS can provide assistance in completing these calculations.

Mr. Robert Bayless                                                                                          5

    c. The <u>value of the processed gas</u> is the greater of: the combined value of the processed gas calculated in a or b above, as applicable, or the combined value of:

- The residue gas using the major portion price in Enclosure 1,

- The gas plant products using the Mt. Belvieu, Texas, average spot price as shown in Enclosure 9 as the comparable contract price,

- The value of the condensate as determined under 30 CFR § 206.52,

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if an appropriate allowance form has been previously filed with MMS.)

3. To comply with the dual accounting requirement, the value for royalty purposes is the greater of:

- The unprocessed gas value (determined in Step No. 1),

- The processed gas value (determined in Step No. 2), or

- Your gross proceeds.

4. To determine the royalty due, compare the greater value in Step No. 3 above to the values Bayless reported to MMS on the Report of Sales and Royalty Remittance (Form MMS-2014) and pay any additional royalty amount due. Please document all such redeterminations in a format similar to those shown in Enclosure 7. Please identify and clearly document with copies of contracts or lease settlement statements, any differences you feel are not valid such as a major portion price that is greater than the maximum lawful price you received under an arm's-length contract.

<u>Payment Instructions</u>

Please be aware of the following when paying the additional royalties pertaining to major portion and dual accounting:

Mr. Robert Bayless                                                                 6

- Your payments should be made in accordance with the regulations at 30 CFR § 218.51 (1997), and accompanied by an appropriately completed green Form MMS-2014 (Enclosure 10). You will be in compliance with this Order only if your payment and a copy of a properly completed green Form MMS-2014 is mailed to:

  > Jicarilla Apache Tribe
  > P.O. Box 2053
  > Albuquerque, New Mexico  87103

- The completed original green Form MMS-2014 and a copy of your payment should be mailed to:

  > Minerals Management Service
  > Royalty Valuation Division, MS-3152
  > P.O. Box 5810
  > Denver, Colorado 80127-5810

- If you have questions on the completion of the Form MMS-2014, please contact your Reports Branch representative at (800) 525-0309 or (303) 231-3288. If you are not currently a royalty payor to MMS please contact Joseph Cornellisson at (303) 275-7239 for further instructions.

- You must use adjustment reason code 49 when you report your additional royalties on Form MMS-2014. This adjustment reason code must be used for both the reversal line and the re-entry line.

- Appropriate late payment charges pursuant to 30 CFR § 218.102 (1997) will be computed and billed to Bayless upon receipt of payment of any additional royalties due.

All documentation supporting your compliance with this Order should be retained until MMS completes its follow-up compliance testing. Section 109 of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), promulgated in 30 CFR § 241.51, authorizes MMS to assess civil penalties for failure or refusal to comply with the requirements of FOGRMA or any statute, regulation, rule, order, lease, or permit. Consequently, your failure to comply with the terms of this Order may be considered a violation pursuant to 30 CFR § 241.51 and could subject you to appropriate penalties as provided therein. Furthermore, failure to comply can also result in lease cancellation as provided for in 30 CFR § 241.20 (b) (1997) and 25 CFR § 211.22 (1996). The regulation at 30 CFR § 241.20 (b) states:

> Failure by the lessee, operator, revenue payor, or other authorized person, or party to complete the necessary remedial action within the time and in the manner prescribed by the notice may subject the lease to cancellation proceedings pursuant to . . . or provisions of 25 CFR for Indian leases.

Mr. Robert Bayless                                                    7

The regulation at 25 CFR § 211.22 states:

> Failure of the lessee to comply with any provision of the lease, of the operating regulations, of the regulations in this part, order of the superintendent or his representative, or of the orders of the supervisor or his representative, shall subject the lease to cancellation by the Secretary of the Interior or the lessee to a penalty of not more than $500 per day for each and every day the terms of the lease, the regulations, or such orders are violated; or to both such penalty and cancellation.

Appeal Rights

You have the right to appeal in accordance with the provisions of 30 CFR 290 (1997). A copy of the Appeals Procedures and Bonding Requirements is attached (Enclosure 11).

In accordance with the provisions of 30 CFR § 243.2 (1997), compliance with this Order will be suspended by reason of an appeal having been taken.

If you received a previous Order to perform dual accounting on Jicarilla leases, this Order modifies the previous Order regarding the prices used in the dual accounting calculations and/or the time period involved. However, if you have previously appealed the requirement of dual accounting, you cannot appeal the issue of dual accounting again to MMS.

If you have any comments or questions concerning this request, contact Joseph Cornellisson at (303) 275-7239.

Sincerely,

Deborah Gibbs Tschudy
Chief, Royalty Valuation Division

Enclosures

cc:  David Wong
     Jicarilla Apache Tribe
     Revenue & Taxation
     P.O. Box 950
     Dulce, New Mexico  87528



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Royalty Management Program
P.O. Box 25165
Denver, Colorado 80225-0165

IN REPLY REFER TO:

MMS-RVD-OG:98-0378
Mail Stop 3152

SEP 15 1998

CERTIFIED MAIL--
RETURN RECEIPT REQUESTED

Ms. Earleen Baird
Merrion Oil & Gas Corporation
610 Reilly Avenue
Farmington, New Mexico 87401-2634

Re: Payor Number 38100

## ORDER TO PERFORM

Dear Ms. Baird:

In carrying out the trust responsibility of the United States in the administration of Indian oil and gas leases, the Minerals Management Service (MMS) has long recognized the primacy of the lease terms. As a royalty payor on Jicarilla Apache Tribal leases, you are obligated to comply with Section 3(c) **Rental and royalty,** of the Indian lease terms. More specifically, the regulations state that a major portion analysis for oil and gas and dual accounting for gas (accounting for comparison) must be performed in determining the value of production for royalty purposes. (Where the specific provisions of a lease are inconsistent with these regulations, then the lease agreement shall govern to the extent of that inconsistency.)

For major portion, regulations (25 CFR § 211.13(a) (1996)) state:

> During the period of supervision, "value" for the purposes of the lease may, in the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the supervisor.

Ms. Earleen Baird                                                                                          2

This requirement is also embodied in the gas valuation regulations found at 30 CFR §§ 206.172 and 206.173 (1997).

Dual accounting requirements are specified by Indian lease terms and regulations found at 25 CFR § 211.13 (1996) which state:

> In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater. [Emphasis added.]

Dual accounting is defined as a valuation method that requires the lessee to compute royalties based on the greater of : (1) the value of the gas prior to processing (as determined under 30 CFR § 206.172), or (2) the combined value of the residue gas and gas plant products resulting from processing the gas (as determined under 30 CFR § 206.173), plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing (30 CFR § 206.52 (1997)). However, the value of production can never be less than the gross proceeds accruing to the lessee (30 CFR §§ 206.172(h) and 206.173(h) (1997)). After March 1, 1988, if royalties are paid pursuant to the processed gas valuation method, the requirements to submit appropriate allowance forms prior to claiming transportation and/or processing allowances must be met. (See 30 CFR §§ 206.176 through 206.179 (1997)).

Major Portion

MMS has performed major portion analyses for natural gas production from Jicarilla Apache Tribal leases for the period **January 1984 through June 1995**. We have verified gas sales data reported by the Jicarilla Apache Tribe under their royalty-in-kind (RIK) program and used this data to determine major portion prices for the Jicarilla Apache Tribe Reservation (Reservation) by production month. We have determined that the Jicarilla Apache Tribe sold all of their RIK production based on the prices as set by the Natural Gas Policy Act (NGPA) in the following categories:

|  |  |
|---|---|
| 102 New natural gas | 103 New onshore production |
| 104 Post-1974 gas | 104 1973-1974 Biennium gas |
| 104 Replacement gas | 104 Flowing gas |
| 104 Rocky Mountain gas | 105 Existing intrastate gas |
| 108 Stripper gas | 109 Other gas |

Ms. Earleen Baird                                                                                    3

Enclosure 1 lists major portion prices. These prices are based on the prices received under the Jicarilla Apache Tribal RIK contract and are shown by NGPA category by month/year. If you are not responsible for payment of royalties between January 1984 and June 1995, please identify the responsible party and the date your responsibility ended.

<u>Dual Accounting</u>

By "Dear Payor" letters dated September 30, 1988; July 27, 1992; February 2, 1993; and February 10, 1995 (Enclosures 2-5). MMS emphasized the requirement to perform dual accounting with notice that failure to comply with Indian lease terms and the regulations applicable to dual accounting would subject payors to enforcement actions by MMS, including civil penalties as provided by 30 CFR § 241.51 (1997).

MMS has determined that the Jicarilla Apache Tribal lease terms require dual accounting (Section 3(c) entitled "Rental and Royalty"). MMS issued an Order (September 29, 1995 (Enclosure 6)) to Merrion Oil & Gas Corporation (Merrion) to provide a declaration of policy on dual accounting. In your response you stated that the company did perform dual accounting on the Indian leases for which Merrion is a royalty payor. A review of sample months show that your dual accounting calculations were based on prices less than major portion prices shown in Enclosure 1. As a result, additional royalties may be due.

<u>Order to Perform</u>

In order to comply with the regulations and lease terms, **within <u>90 days of receipt</u>** of this letter, Merrion is ordered to perform the following dual accounting and major portion calculations. Please identify all Jicarilla Apache Tribal leases and time periods for which Merrion was a payor between **January 1984 and June 1995** and follow the steps below to determine the value of the production for royalty purposes:

1. Calculate the **unprocessed gas value:**

   a. The value of your gross proceeds if your gas is sold at the wellhead under an <u>arm's-length contract</u> (30 CFR § 206.172).

   b. The value determined if your gas is sold at the wellhead under a <u>non-arm's-length contract</u> or a no sale situation (30 CFR § 206.172) using **the higher of the appropriate benchmark or gross proceeds.** The arm's-length sale, by the affiliate, may be considered in determining the gross proceeds value. MMS may examine sales by affiliates in order to determine gross proceeds or the appropriate benchmark value.

Ms. Earleen Baird                                                                          4

    c. The <u>value of the unprocessed gas</u> is the greater of:

- The value calculated in a. or b. above, as applicable; or

- The value based on the major portion price shown on Enclosure 1.

2. Calculate the **processed gas value:**

    a. If your gas is processed under an <u>arm's-length contract</u>, the processed value is your gross proceeds for the combined value (determined under 30 CFR § 206.173 (1997)) of:

- The residue gas;

- The gas plant products; and

- The condensate recovered downstream of the point of royalty settlement without resorting to processing;

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if appropriate allowance forms have been previously filed with MMS.)

    b. If your gas is processed under a <u>non-arm's-length contract</u>, the processed value is the combined value (determined under 30 CFR § 206.173) for:

- The residue gas;

- The gas plant products; and

- The condensate recovered downstream of the point of royalty settlement without resorting to processing;

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if appropriate allowance forms have been previously filed with MMS.)

- (The arm's-length sale by the affiliate, may be considered in determining the gross proceeds value. MMS may examine sales by affiliates in order to determine gross proceeds or the appropriate benchmark value.)

    c. The <u>value of the processed gas</u> is the greater of:  the combined value of the processed gas calculated in a or b above, as applicable, or the combined value of:

- The residue gas using the major portion price in Enclosure 1;

Ms. Earleen Baird                                                                                              5

- The gas plant products using the Mt. Belvieu, Texas, average spot price as shown in Enclosure 7 as the comparable contract price;

- The value of the condensate as determined under 30 CFR § 206.52;

- Less a deduction for the reasonable actual costs incurred for transportation and/or processing. (After March 1, 1988, allowances can only be claimed if an appropriate allowance form has been previously filed with MMS.)

3. To comply with the dual accounting requirement, the value for royalty purposes is the greater of:

- The unprocessed gas value (determined in Step No. 1);

- The processed gas value (determined in Step No. 2); or

- Your gross proceeds.

4. To determine the royalty due, compare the greater value in Step No. 3 above to the values Merrion reported to MMS on the Report of Sales and Royalty Remittance (Form MMS-2014) and pay any additional royalty amount due. Please document all such redeterminations in a format similar to those shown in Enclosure 8. Please identify and clearly document with copies of contracts or lease settlement statements, any differences you feel are not valid such as a major portion price that is greater than the maximum lawful price you received under an arm's-length contract.

If Merrion is unable to obtain the necessary information to perform dual accounting as required by the lease terms, Merrion is directed to apply the theoretical dual accounting as explained in the MMS's "Dear Payor" letter dated July 27, 1992 (Enclosure 3). MMS has provided a worksheet for both actual and theoretical dual accounting calculations and a diskette (Enclosure 9) with a Microsoft Excel worksheet in order to assist Merrion in completing dual accounting calculations. An example of the dual accounting calculations is shown in Enclosure 8. If needed, MMS can provide assistance in completing these calculations.

Payment Instructions

Please be aware of the following when paying the additional royalties pertaining to major portion and dual accounting:

Ms. Earleen Baird                                                                                           6

- Your payments should be made in accordance with the regulations at 30 CFR § 218.51 (1997), and accompanied by an appropriately completed green Form MMS-2014 (Enclosure 10). You will be in compliance with this Order only if your payment and a copy of a properly completed green Form MMS-2014 is mailed to:

     Jicarilla Apache Tribe
     P.O. Box 2053
     Albuquerque, New Mexico  87103

- The completed original green Form MMS-2014 and a copy of your payment should be mailed to:

     Minerals Management Service
     Royalty Valuation Division, MS-3152
     P.O. Box 5810
     Denver, Colorado 80127-5810

- If you have questions on the completion of the Form MMS-2014, please contact your Reports Branch representative at (800) 525-0309 or (303) 231-3288. If you are not currently a royalty payor to MMS please contact Joseph Cornellisson at (303) 275-7239 for further instructions.

- You must use adjustment reason code 49 when you report your additional royalties on Form MMS-2014. This adjustment reason code must be used for both the reversal line and the re-entry line.

- Appropriate late payment charges pursuant to 30 CFR § 218.102 (1997) will be computed and billed to Merrion upon receipt of payment of any additional royalties due.

All documentation supporting your compliance with this Order should be retained until MMS completes its follow-up compliance testing. Section 109 of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) promulgated in 30 CFR § 241.51, authorizes MMS to assess civil penalties for failure or refusal to comply with the requirements of FOGRMA or any statute, regulation, rule, order, lease, or permit. Consequently, your failure to comply with the terms of this Order may be considered a violation pursuant to 30 CFR § 241.51 and could subject you to appropriate penalties as provided therein. Furthermore, failure to comply can also result in lease cancellation as provided for in 30 CFR § 241.20 (b) (1997) and 25 CFR § 211.22 (1996). The regulation at 30 CFR § 241.20 (b) states:

     Failure by the lessee, operator, revenue payor, or other authorized person, or party
     to complete the necessary remedial action within the time and in the manner
     prescribed by the notice may subject the lease to cancellation proceedings
     pursuant to . . . or provisions of 25 CFR for Indian leases.

Ms. Earleen Baird                                                                                    7

The regulation at 25 CFR § 211.22 states:

> Failure of the lessee to comply with any provision of the lease, of the operating
> regulations, of the regulations in this part, order of the superintendent or his
> representative, or of the orders of the supervisor or his representative, shall subject
> the lease to cancellation by the Secretary of the Interior or the lessee to a penalty
> of not more than $500 per day for each and every day the terms of the lease, the
> regulations, or such orders are violated; or to both such penalty and cancellation.

## Appeal Rights

You have the right to appeal in accordance with the provisions of 30 CFR 290 (1997). A copy of
the Appeals Procedures and Bonding Requirements is attached (Enclosure 11).

In accordance with the provisions of 30 CFR § 243.2 (1997), compliance with this Order will be
suspended by reason of an appeal having been taken.

If you received a previous Order to perform dual accounting on Jicarilla leases, this Order
modifies the previous Order regarding the prices used in the dual accounting calculations and/or
the time period involved. However if you have previously appealed the requirement of dual
accounting, you cannot appeal the issue of dual accounting again to MMS.

If you have any comments or questions concerning this request, contact Joseph Cornellisson at
(303) 275-7239.

Sincerely,

Deborah Gibbs Tschudy
Chief, Royalty Valuation Division

Enclosures

cc:  Mr. David Wong
     Jicarilla Apache Tribe
     Revenue & Taxation
     P.O. Box 950
     Dulce, New Mexico  87528



## United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Royalty Management Program
P.O. Box 25165
Denver, Colorado 80225-0165

IN REPLY REFER TO:

RECEIVED
AUG 26 1999
APPEALS DIVISION

MMS-RVD-OG: 98-0296
Mail Stop 3152

AUG 23

Memorandum

To:     Chief, Appeals Division
        Policy and Management Improvement

From:   Chief, Royalty Valuation Division  *Deborah Gibbs Tschudy*

Subject: Appeal Field Report for Appeal dated June 25, 1998, from Robert L. Bayless
         (Bayless), Concerning Major Portion Analysis and Dual Accounting Calculation on
         Jicarilla Apache Tribal (Tribal) Leases. Docket No. MMS-98-0132-IND

Bayless appealed Minerals Management Service's (MMS) Order to Perform (Order) dated
May 27, 1998 (Attachment 6), which Bayless received on May 29, 1998. Bayless timely filed its
Notice of Appeal (Attachment 7) with MMS on June 26, 1998. Bayless had 60 days from the
receipt date of the Order to provide a Statement of Reasons (SOR) in support of the appeal.
Bayless requested and received an extension of time to file the SOR until September 26, 1998.
The SOR (Attachment 11) was timely received on September 25, 1998.

### RECOMMENDATION

We recommend denying the appeal by Bayless and affirming the MMS Order. Based on a
review of Bayless' SOR (Attachment 11), the appeal arguments submitted by Bayless are without
merit because Bayless did not prove that MMS followed inappropriate procedures or that MMS
followed unreasonable methods when calculating the major portion prices or providing
instructions on performing dual accounting.

### ISSUES

Bayless provided a response to the May 27, 1998, Order in its September 25, 1998, SOR as
follows:

1. Has MMS ignored and abandoned the regulations by improperly calculating major portion
   prices using a methodology that is contrary to existing Federal regulations?

2. Did MMS fail to create the major portion array of sales referred to in the regulations?

3. Did MMS arbitrarily assume that the Natural Gas Policy Act (NGPA) prices received under Jicarilla Apache Indian Tribe (Jicarilla Apache Tribe) royalty-in-kind (RIK) contracts were representative of the prices received by all oil and gas operators on the Jicarilla Apache Reservation (Reservation)?

4. Did MMS ignore data that was and still is available to calculate major portion prices in accordance with the applicable regulations?

5. Did MMS base its major portion pricing analysis on limited data that does not fully and accurately reflect actual sales values for production on the Reservation during the applicable time periods?

6. Did MMS calculate Jicarilla Apache Tribe major portion prices without any analysis of whether sales of natural gas occurred under arm's-length contracts?

7. Did MMS err by designating the Reservation boundaries as the major portion pricing area?

8. Is the requirement to perform dual accounting appropriate under all circumstances?

9. Is the methodology report an unlawful and unenforceable amendment of the Tribal leases?

10. Can Bayless be forced to pay late payment interest when any delay in paying the allegedly correct amount was attributable entirely to MMS's delay in calculating the major portion and dual accounting prices?

11. Is MMS's demand letter barred by the statute of limitations contained in 28 U.S.C. §§ 2415 and 2416?

12. Can Bayless incorporate, by reference, any and all arguments presented in any appeal by any party who has received an Order to Perform major portion pricing and dual accounting calculations on Tribal leases?

## BACKGROUND

MMS notified Bayless of potential underpaid royalties on Tribal leases to uphold MMS's Indian trust responsibility and enforce the major portion and dual accounting requirements under the terms of their Indian leases.

The Royalty Valuation Division (RVD) used verified gas sales information reported by the Jicarilla Apache Tribe under their RIK Program and used this data to determine major portion prices for the Reservation by production month.

3

The following correspondence relates to the appeal:

| Date | Letter |
|------|--------|
| September 30, 1988 | Dear Payor letter (Attachment 1) emphasizing the requirement to perform dual accounting and major portion calculations. |
| July 27, 1992 | Dear Payor letter (Attachment 2) emphasizing the requirement to perform dual accounting and major portion calculations. |
| February 2, 1993 | Dear Payor letter (Attachment 3) emphasizing the requirement to perform dual accounting and major portion calculations. |
| February 10, 1995 | Dear Payor letter (Attachment 4) emphasizing the requirement to perform dual accounting and major portion calculations. |
| September 29, 1995 | Order to Bayless (Attachment 5) to provide a declaration of policy on dual accounting. |
| May 27, 1998 | Certified letter (Attachment 6) from MMS ordering Bayless to perform major portion and dual accounting calculations. |
| June 25, 1998 | Letter (Attachment 7) from Bayless appealing MMS's Order to Perform and requesting an extension of time until August 27, 1998, to file a SOR. |
| July 6, 1998 | Letter (Attachment 8) from MMS granting Bayless an extension of time until August 27, 1998, to file a SOR. |
| August 14, 1998 | Letter (Attachment 9) from Bayless requesting an additional extension of time, until September 26, 1998, in which to file a SOR. |
| August 21, 1998 | Letter (Attachment 10) from MMS granting Bayless an extension of time until September 26, 1998, to file a SOR. |

4

September 25, 1998

Letter (Attachment 11) from Bayless submitting its SOR in response to the May 27, 1998, Order requiring Bayless to perform major portion and dual accounting calculations.

## ARGUMENTS

1. The major portion price calculation is consistent with lease terms and applicable regulations and satisfies MMS's major portion analysis requirement because MMS has sufficient valuation discretion.

Bayless' Position

The METHODOLOGY FOR MAJOR PORTION AND DUAL ACCOUNTING ANALYSIS JICARILLA APACHE TRIBAL LEASES (Methodology Report - Attachment 12) establishes a methodology for the determination of major portion prices, for royalty valuation purposes, which is contrary to existing Federal regulations.

MMS's Position

Bayless argues that because MMS did not follow the major portion regulations under 30 CFR §§ 206.152 and 206.153 (1995), its valuation methodology is invalid. However, MMS has discretion under the leases as to how it will value oil and gas for royalty purposes. The method described in the regulations may be one, but is by no means the exclusive alternative for conducting this valuation. *See, e.g.* The Shoshone Tribe v. Hodel, No. C 81-131K (D.Wyo.) (Order ruling on motion for reconsideration, January 7, 1987) in which the court held that the Secretary should consider all "reasonable" valuation methods having a basis in the lease provisions or regulations when deciding the value of Indian production. The Order used a reasonable method to decide the price paid for a major portion of like-quality production.

In addition, the regulations (30 CFR § 206.100(b) (1995)) themselves provide that "If the specific provisions of any . . . oil and gas lease subject to the requirements of this subpart are inconsistent with any regulation in this subpart, then the . . . lease provision . . . shall govern to the extent of that inconsistency." Moreover, Bayless' objections to the valuation alternative used to satisfy the major portion requirements in Bayless' Indian lease terms fail to override the higher fiduciary standard established for Indian tribes. The United States Court of Appeals for the Tenth Circuit, ruling *en banc* in Jicarilla Apache Tribe v. Supron Energy Corp., 782 F.2d 855 (10th Cir. 1986) held that the Secretary's trust responsibility requires that his actions be held to a much higher fiduciary standard, rather than merely meeting the minimal requirements of administrative law. In acting as a fiduciary, the Secretary, when faced with a decision " . . . for which there is more than one 'reasonable choice', as that term is used in administrative law, . . . must choose the alternative that is in the best interest of the Indian Tribe." The best interest of the Tribe, as the Tenth Circuit

5

makes clear in Supron, requires the selection of the method that maximizes the monetary return to the Tribe by, *inter alia*, maximizing the determination of value.

To determine the value of production, MMS used a method that was both reasonable and consistent with the Secretary's fiduciary obligation to the Jicarilla Apache Tribe. MMS explains the methodology in the Methodology Report (Attachment 12). The methodology is a well-reasoned analysis using the best available data to enforce the terms of the Indian leases. The methodology used all RIK gas sales from the Jicarilla Apache Tribe. MMS verified the use of Jicarilla Apache Tribe RIK volumes by calculating a major portion array using the Auditing and Financial System (AFS) data and Jicarilla Apache Tribe RIK volumes as shown on Attachment 13 for the month of February 1988. Attachment 13 shows that the RIK volumes are the controlling volumes (67 percent) for the major portion array.

MMS applies this methodology consistently to all sales months and Tribal leases on the Reservation. Our review of the major portion prices calculated shows that they are a reasonable approximation of the price paid for a major portion of like-quality production sold from within the Reservation boundary. The use of these values to enforce the major portion requirements found in the lease terms is consistent with the lease terms and applicable statutes, regulations, and court decisions and upholds our trust responsibility to the Jicarilla Apache Tribe. *See, e.g.*, Supron; Burlington Resources Oil & Gas Co. Inc. v. U.S. Dept. of the Interior, Civ. No. 96-1936 (D.D.C. July 16, 1998).

2. As required by the regulations, MMS used like-quality production; i.e., meaning legal characteristics, NGPA category, from the Reservation to calculate major portion for the Tribal leases. In addition, MMS did not fail to create a major portion array because MMS verified that the RIK sales volumes represented 67 percent of the total sales in the AFS major portion array of prices for February 1988.

Bayless' Position

Bayless asserts that it is clear from the Methodology Report that MMS made no effort whatsoever to create the array of sales referred to in the regulations. Bayless further asserts that MMS restricted its review of sales to only those sales of RIK production from the Tribe to third-party purchasers under long-term contracts requiring the payment of NGPA prices. Bayless concludes that absolutely no consideration in this process was given to the multitude of sales of production from lands covered by Tribal leases under gas purchase contracts between oil and gas operators on the Reservation and third-party purchasers providing for market sensitive prices.

MMS's Position

The methodology identifies the prices paid under RIK contracts and RIK settlement agreements and calculates the major portion prices by NGPA category for all gas production in the

6

Reservation utilizing RIK data for the time period January 1984 through June 1995. Key elements of this methodology are as follows:

- RVD determined that the Reservation is the "area" for calculating the major portion pricing.
- The price received for the RIK portion of the gas represents the one-eighth or one-sixth royalty share.

- RVD extrapolated the one-eighth or one-sixth royalty share to the entire eight-eighths or six-sixths sales volume and assumed the value for the one-eighth or one-sixth royalty share was representative of the prices received for the other portion of the gas sold from the Reservation.

- RVD analyzed samples of the Jicarilla Apache Tribe settlement statements and certified that the Jicarilla Apache Tribe received the proper NGPA prices.

The NGPA Category

The regulations at 30 CFR §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1995) state that the major portion will be calculated using "like quality" lease products from the same field/area. Like quality means lease products which have similar chemical, physical, and legal characteristics. Legal characteristics include the NGPA category of gas. The MMS methodology calculates the major portion prices by NGPA category.

In addition to the regulations, the precedent for using NGPA maximum lawful prices for major portion prices arises from information gathered from interstate pipeline companies by MMS during the early 1980's. From MMS's survey of pricing information, MMS determined that the market value of gas produced during the 1980-1983 production period remained at the NGPA maximum lawful price for all categories of gas except section 107. Therefore, MMS used NGPA maximum lawful prices as value for royalty purposes in all audits of production prior to 1984. (See Attachment 14).

We divided the major portion calculation for the Jicarilla Apache Tribe into four time periods:

- Period 1:.. NGPA pricing was in effect for the sales contracts.

- Period 2:   The purchasers negotiated temporary price reductions from the NGPA prices.

- Period 3:   NGPA pricing was in effect for the sales contracts.

- Period 4:   Companies negotiated buyouts and buydowns of the sales contracts for RIK production. Due to different effective dates, NGPA pricing was also in effect for several months.

7

Table 1 shows the time periods and effective prices.

**TABLE 1**
**Natural Gas Pricing Variations**

| Period | Time Period | Price |
|--------|-------------|-------|
| 1 | January 1984 - December 1986 | NGPA & Tax Reimbursement |
| 2 | January 1987 - June 1988 | NGPA & Tax Reimbursement; Temporary Price Reduction |
| 3 | July 1988 - December 1988 | NGPA & Tax Reimbursement |
| 4 | January 1989 - June 1995 | NGPA & Tax Reimbursement; Renegotiated Prices |

RVD calculated the major portion prices using the prices received under the Jicarilla Apache Tribe RIK contracts. For periods 1 and 3, the major portion prices are the sum of the published NGPA prices and the tax reimbursements. We calculated the prices received by the Jicarilla Apache Tribe during Period 2 (the temporary price reduction period) and Period 4 (the renegotiated price period) as discussed below.

RVD obtained tax reimbursement information from the Jicarilla Apache Tribe tax manual as shown in Table 2.

**TABLE 2**
**Jicarilla Apache Tribe Tax Rates**

| Date | Severance Tax (Per MMBtu) | Privilege Tax (87.5% of Value) |
|------|---------------------------|--------------------------------|
| 1/1/84 through 5/30/85 | $0.05 | |
| 6/1/85 through 1/31/86 | $0.05 | 5.00% |
| 2/1/86 through 1/31/87 | $0.05 | 5.18% |
| 2/1/87 through 1/31/88 | $0.05 | 5.28% |
| 2/1/88 through 12/31/88 | $0.05 | 5.47% |

8

During the temporary price reduction period (Period 2), RVD calculated a weighted-average price received for each NGPA category by multiplying the contract price times the RIK reserve volume estimate and dividing the total contract values by the total volume estimate. The actual reserve estimates and contract prices cannot be released to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers.

During the renegotiated price period (Period 4), RVD calculated the major portion prices by allocating the sales proceeds by NGPA category to the actual prices received under the modified contracts to determine the total consideration received under the RIK contract for each NGPA category. Documents submitted by the Jicarilla Apache Tribe in support of the RIK contract settlement proceeds provided detailed information on the monies received for each NGPA category. We used this information to calculate the major portion prices by NGPA category.

The companies based the monies due to the Jicarilla Apache Tribe for the renegotiated contracts on volumetric decline curve analysis of the estimated reserves of the wells. The companies based the contract adjustments on the difference between the projected NGPA prices due under the original contract and the renegotiated prices. The actual reserve estimates and contract prices cannot be released in order to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers. Based on the projected NGPA prices and volumetric analysis, the companies calculated an annual present value estimate of the remaining reserves and then discounted this value using a 10-percent discount rate. This settlement value was further reduced during negotiations between the Jicarilla Apache Tribe and the companies. We calculated a settlement factor by dividing the total actual settlement amount by the estimated settlement value. This factor was then applied to the discounted amounts to determine a total annual settlement value. The annual settlement value was then divided by the annual present value estimate to generate a settlement discount factor. We calculated a price differential between the projected NGPA price and the renegotiated price. This differential represents the difference between the original contract price minus the renegotiated price. The undiscounted value was then discounted using the settlement discount factor discussed above to generate a settled price differential. RVD then added this differential to the renegotiated price to determine the major portion price by category.

RVD then calculated a weighted-average price. We calculated this price by multiplying the appropriate renegotiated contract price received for each NGPA category by the appropriate reserve volume, and dividing both calculated values by the total volume.

Analysis of Major Portion Volumes

RVD conducted an analysis to determine what percentage the extrapolated RIK sales volumes represented when compared to the total sales volumes reported by the in-value payors on the Report of Sales and Royalty Remittance (Form MMS-2014). RVD downloaded all Form MMS-2014 data from AFS for Fund Code 550 (Jicarilla Apache Tribe). We then totaled the sales volumes by payor for February 1988. This data contained company proprietary data that

was not releasable under the Freedom of Information Act. From settlement statements, RVD determined the RIK volumes purchased. We then calculated the extrapolated RIK sales volume by dividing the one-sixth or one-eighth RIK volume by the royalty rates. To determine the total sales for the Reservation, RVD added the extrapolated RIK sales volumes to the Form MMS-2014 in-value sales volumes. We then divided the extrapolated RIK sales volume by the total sales volume for the Reservation. From this analysis, RVD concluded that the extrapolated RIK sales volumes represent approximately 67 percent of the total sales volumes on the Reservation for the February 1988 sales month.

To check the reasonableness of the major portion price, MMS combined the AFS royalty lines with the RIK sales lines in a major portion array from highest price to lowest price. We totaled the RIK sales volumes and placed a weighted average RIK sales price in the array with the AFS royalty lines for the month of February 1988 (Attachment 13). The weighted average RIK price represented 67 percent of the cumulative production volumes in the major portion array as shown in Attachment 13. This array is representative of RIK sales volumes in other months.

The results of the above analyses further support that the data used to perform the major portion analysis were sufficient for that purpose, and the values derived by RVD from the Jicarilla Apache Tribe RIK data were reasonable.

3. MMS did not arbitrarily assume that the NGPA prices received under Jicarilla Apache Tribe RIK contracts were representative of the prices received by all oil and gas operators on the Reservation. Because the regulations require that the major portion be calculated using like-quality production; i.e. legal characteristics meaning NGPA category, MMS was consistent with the regulations.

Bayless' Position

Bayless asserts that MMS arbitrarily assumed in the Methodology Report that the NGPA prices received by the Tribe for the sale of its RIK production were representative of the prices received by all oil and gas operators on the Reservation for their portion of gas sold from lands covered by Tribal leases.

MMS's Position

This issue is addressed in Argument No. 2 above.

MMS | MMSFOI0140
pg. 10 of 121

10

4.  MMS considered all RIK sales data which was and still is available to MMS to calculate major portion prices in accordance with the applicable regulations.

Bayless' Position

Bayless asserts that all of the data necessary for MMS to calculate major portion prices in accordance with the applicable regulations was, and still is available.

MMS's Position

This issue was addressed in Argument No. 2 above and Argument No. 5 below.

5.  The RIK sales data accurately reflects actual sales values for production on the Reservation. In addition, the Secretary of the Interior has the discretion, and therefore the authority to determine the value for royalty purposes, if this discretion does not result in a value that is unreasonable, arbitrary, or capricious.

Bayless' Position

Bayless asserts that there is absolutely no justification for MMS to ignore AFS data and base its major portion pricing analysis on limited data that does not fully and accurately reflect actual sales values for production on the Reservation during the applicable time periods.

MMS's Position

The valuation regulations for Indian leases prior to March 1, 1988, allowed us to use a part of the production rather than a majority of production, if necessary, to compute the major portion price. These regulations (30 CFR § 206.103 (1987)) state that the major portion price is the ". . . estimated reasonable value determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like-quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters." [Emphasis added.]

The valuation regulations for Indian leases under 30 CFR § 206.152(a)(3)(i) (1995) state that:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production for royalty purposes shall be the higher of these two values.

11

The RIK sales data fully and accurately reflects the actual sales because the RIK sales values reflect prices paid under RIK contracts and RIK renegotiated agreements. The price received for the RIK portion represents the one-eighth and/or one-sixth royalty share. The royalty share is representative of the prices received for the in-value portion of the gas sold from the Reservation.

The only available data was AFS sales data, Jicarilla Apache Tribe RIK sales data, and proprietary settlement agreements used to value the Jicarilla Apache Tribe RIK sales volumes. MMS utilized all three sources of data for the month of February 1988 to show that the Jicarilla Apache Tribe RIK sales volumes are the controlling volumes for a major portion array (Attachment 13).

This issue is also addressed in Argument No. 2 above.

6. The Jicarilla Apache Tribe sold all Jicarilla Apache Tribe RIK volumes under arm's-length conditions to third-party purchasers.

Bayless' Position

Bayless asserts that major portion prices were calculated by MMS without any analysis as to whether sales of natural gas occurred under arm's-length contracts.

MMS's Position

Jicarilla Apache Tribe sold all Jicarilla Apache Tribe RIK volumes under arm's-length conditions to third-party purchasers. The monies received were only for the sales of natural gas and not for compensation for other issues.

7. MMS followed the lease terms and the regulations when defining the field/area as the Reservation boundary and determined that the State of New Mexico Oil & Gas Commission defined the 30 pools that overlay or are within the Reservation boundary.

Bayless' Position

Bayless states that the Methodology Report did not utilize gas sales data from the "same field" in accordance with 30 CFR § 206.151 (1995) that provides that a field is "a geographic region situated over one or more subsurface oil and gas reservoirs encompassing at least the outermost boundaries of all oil and gas accumulations known to be within those reservoirs" and is "often designated by oil and gas regulatory agencies in the respective states." Bayless asserts that rather than using gas sales data obtained from a geographic region designated by the New Mexico Oil Conservation Division as encompassing one or more reservoirs to calculate the major portion prices, MMS decided to designate the Reservation boundary as the major portion area. Bayless further asserts that such a designation necessarily limits gas sales data to Tribal oil and gas leases and may exclude pertinent sales data from common sources of supply lying outside the boundary

12

of the Reservation. Bayless concludes that the use of a political boundary is inconsistent with the requirements of applicable regulations and may circumvent the underlying rationale and intent of those regulations.

<u>MMS's Position</u>

The Secretary of Interior has the discretion, and therefore the authority, to determine the value for royalty purposes where the value is based on a methodology that is reasonable, consistent with the statutes and lease terms, and is not arbitrary or capricious.

The valuation regulations for Indian leases prior to March 1, 1988, allowed us to use a <u>part</u> of the production rather than a majority of production, if necessary, to compute the major portion price. These regulations (30 CFR § 206.103 (1987)) state that the major portion price is the ". . . estimated reasonable value determined by the Associate Director due consideration being given to the highest price paid <u>for a part</u> or for a majority of production of like-quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters." [Emphasis added.]

The majority of the Reservation is within Rio Arriba County, New Mexico, with a small portion extending into Sandoval County, New Mexico. The Reservation lies along the eastern edge of the San Juan Basin. Gas production is from the Pictured Cliffs Formation, Mesaverde Group, Gallup, Tocito, and fractured Mancos Formations, and the Dakota and Dakota-Morrison Formations. The Fruitland Formation produces methane primarily from coals (Fruitland Coal).

The regulations at 30 CFR §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1995) state that major portion will be calculated on "like-quality gas sold under arm's-length contracts from the same field (or, if necessary, to obtain a reasonable sample, from the same area)."

However, the State of New Mexico does not define "fields" for royalty valuation purposes. The State defines 30 pools that overlay or are within the Reservation boundary, but each pool is comprised of gas that may come from many different formations. Moreover, in several cases, several pools overlay one another and/or extend well outside the Reservation boundary. As a result, gas from a pool cannot be presumed to be "like-quality" gas, as required by the regulations, and so a State-defined "pool" cannot be used as the equivalent for the "field" or "area" required by the lease terms and regulations. The regulations (30 CFR § 206.151) allow MMS to define an area at least as large as the defined field and thus we expanded it to include the entire Reservation. MMS selected the Reservation boundary as a reasonable parameter for defining the field or area for purposes of valuing Tribal gas production.

8. The requirement to perform dual accounting is appropriate because the lease terms require it.

Bayless' Position

Bayless incorporates by reference the arguments as set forth in its SOR filed in conjunction with a previous appeal, Docket No. MMS-93-0094-IND. A decision was rendered in that case on July 10, 1997, and Bayless subsequently appealed to the Interior Board of Land Appeals (IBLA) (Docket No. IBLA 97-526), which is still pending. Bayless contends that dual accounting is not required when there is no market for Bayless' gas prior to processing, and the applicable authorities contemplate dual accounting only if Bayless had a choice of selling the gas before or after processing.

MMS's Position

Dual accounting requirements are specified by Indian lease terms and regulation found at 25 CFR § 211.13 (1995) which state:

> In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater. [Emphasis added.]

Dual accounting is defined as a valuation method that requires the lessee to compute royalties based on the greater of: (1) the value of the gas prior to processing (as determined under 30 CFR § 206.152 (1995)), or (2) the combined value of the residue gas and gas plant products resulting from processing the gas (as determined under 30 CFR § 206.153 (1995)), plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing (30 CFR § 206.102 (1995)). However, the value of production can never be less than the gross proceeds accruing to the lessee (30 CFR §§ 206.152(h) and 206.153(h) (1995)).

After March 1, 1988, if royalties are paid pursuant to the processed gas valuation method, the requirements to submit appropriate allowance forms prior to claiming transportation and/or processing allowances must be met. (See 30 CFR §§ 206.156 through 206.159 (1995).) Both the lease terms and applicable regulations require dual accounting. See 30 CFR § 206.155 (1995), and 25 CFR § 211.13 (1995). The requirement for dual accounting has also been upheld by the courts in Jicarilla Apache Tribe v. Supron Energy Corporation et al., 782 F.2d 855 (10th Cir. 1986). In Supron, the Tenth Circuit sitting en banc reversed its earlier decision at 728 F.2d 1555 (10th Cir. 1984) and adopted the dissenting opinion from that ruling, and affirmed

the decision of the District of New Mexico (479 F. Supp. 536 (D.N.M. 1979)). The District Court had held that dual accounting was required under Indian leases in all cases. The District Court held similarly in Jicarilla Apache Tribe v. Continental Oil Company. No. CIV-76-430-C (D.N.M. 1988). Bayless reads the Supron decision as requiring dual accounting only when a market for both unprocessed wet gas and processed gas exists. Neither the regulations, the lease terms, nor the Supron decision is so limited, and there is nothing stated in any of those authorities that would support Bayless' accounting provisions in the way Bayless now urges.

The lease and the regulations expressly require that royalty be valued on the greater of the value of the unprocessed gas or the combined value of the residue gas and products derived from processing (less the appropriate allowance). Both values in turn, must be compared to Bayless' gross proceeds. Bayless must perform the dual accounting value comparison for their Indian leases. If Bayless has previously appealed the requirement of dual accounting on their Tribal leases, Bayless cannot appeal the issue of dual accounting again to MMS.

9.  The major portion price calculation outlined in the methodology report satisfies MMS's major portion analysis requirement because MMS has sufficient valuation discretion.

Bayless' Position

Bayless asserts that the Methodology Report is an unlawful and unenforceable amendment of the Tribal leases.

MMS's Position

Bayless has not substantiated why the Methodology Report is an unlawful and unenforceable amendment of the Tribal leases.

10. MMS cannot waive late payment charges.

Bayless' Position

Bayless states that the MMS Order advised Bayless that upon payment by Bayless of the alleged royalty underpayment, MMS will compute and bill Bayless with late payment charges. Bayless asserts that until his receipt of the Order, he had no access to, and could not have obtained the information necessary to enable him to perform dual accounting and major portion analysis in a timely manner. Bayless concludes that for MMS to assess late payment charges under circumstances in which the system does not facilitate timely payment is unjustifiable.

MMS's Position

The data collection and calculations involved in generating the major portion prices prevent MMS from providing these prices before the royalties are due. However, this fact does not

override the trust responsibility MMS has to the Jicarilla Apache Tribe to properly account for and collect royalties consistent with the terms of their leases.

MMS has no statutory authority to waive late payment charges. Section 111(a) of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) 30 U.S.C. 1721(a) requires MMS to charge interest on all late payments, regardless of the payor's belief that the original payment was correct.

These charges are not imposed for penalty purposes, but rather to compensate for the lost value of the money over time; since the payor has had the use of this money, the interest charges should impose no hardship, and the fact that the payor may not have known that the original royalty payment was insufficient is irrelevant.

11. MMS Order is not barred by the statute of limitations.

Bayless' Position

Bayless argues that any attempt to collect royalties accruing more than six (6) years and ninety (90) days prior to final agency action in any civil suit to collect royalties brought more than one year after final agency action is barred by 28 U.S.C. §§ 2415 and 2416.

MMS's Position

Statutes of limitation operate only on the remedies available to a claimant. They do not affect the merits of the dispute or the underlying right of recovery. United States v. Studivant, F2.d 673 (3rd Cir. 1976). Because the purpose of this proceeding is only to determine the validity of an MMS Order that concerns the underlying obligation for royalty, the alleged applicability of a statute of limitations does not limit administrative proceedings within the Department of the Interior. Because this proceeding is an administrative appeal, not a court action, the statutory bar is inapplicable. Foote Mineral Co., 34 IBLA 285, 306 (1978); Anadarko Petroleum Corp., 22 IBLA 141 (1992); BHP Petroleum (Americas) Inc., 124 IBLA 185 (1992).

12. MMS will not incorporate by reference any and all arguments presented in any appeal by any party who has received an Order to Perform major portion pricing and dual accounting calculations on Tribal leases.

Bayless' Position

Bayless states that it wishes to adopt all arguments regarding issues raised by the Methodology Report offered by other appellants in similar appeals, and asks that these arguments be incorporated in the subject appeal by reference.

16

<u>MMS's Position</u>

The appellant's request for incorporation by reference does not specifically identify the arguments it seeks to incorporate. Nor does it identify the appellants who submitted those arguments or the appeals in which they appear. Nor has the appellant submitted copies of those arguments for inclusion in the case record. It is not the province of the MMS Royalty Management Program to search pending appeals for arguments and/or to make assumptions (or engage in speculation) regarding which arguments the appellant might wish to adopt with respect to its own appeal. Moreover, to the best of our knowledge, virtually all of the generalized arguments submitted by other appellants that might conceivably be applicable to the instant case have been rejected previously. For these reasons, such arguments will not be addressed herein.

Attachments

Copy to:    David Wong (w Attachments)
Jicarilla Apache Indian Tribe
Revenue & Taxation
P.O. Box 950
Dulce, New Mexico 87528

APPEAL OF ROBERT L. BAYLESS
DOCKET NO. MMS-98-0132-IND

ATTACHMENTS TO MMS FIELD REPORT

#1 -- Dear Payor letter dated 9/30/88
#2 -- Dear Payor letter dated 7/27/92
#3 -- Dear Payor letter dated 2/2/93
#4 -- Dear Payor letter dated 2/10/95
#5 -- Order to Perform (data req'd on dual accting) dated 9/29/95
#6 -- Order to Perform (dual accting & major portion) 5/27/98
#7 -- Notice of Appeal dated 6/25/98
#8 -- 60-Day Extension of Time for SOR Granted 7/6/98
#9 -- Request for Additl Ext of Time to file SOR dated 8/14/98
#10 -- Request of Additl Ext of Time approved 8/21/98
#11 -- Statement of Reasons dated 9/25/98  -
#12 -- Methodology for Major Portion/Dual Accting
#13 -- Major Portion Calculation, February 1988
#14 -- "Valuation of Production Occurring Prior to 1984"

MMS | MMSFOI0140
p. 18 of 121

MAJOR PORTION CALCULATION FEBRUARY 1988

| PAYOR | SALES MONTH/ YEAR | ROYALTY MCF | ROYALTY VALUE | AVG. REVISED BTU | ROYALTY MMBTU | PRICE PER MMBTU | TOTAL VOLUME | |
|---|---|---|---|---|---|---|---|---|
| | 198802 | 248.00 | 1778.98 | 1200 | 297.60 | 5.980 | 297.60 | |
| | 198802 | 292.00 | 818.42 | 1200 | 350.40 | 2.340 | 648.00 | |
| | 198802 | 21530.78 | 58590.34 | 1196 | 25750.81 | 2.280 | 26398.81 | |
| RIK | 198802 | 260055.75 | 685669.21 | 1214 | 315707.68 | 2.170 | 342106.49 | 51% |
| | 198802 | 53534.16 | 133938.14 | 1182 | 63277.38 | 2.120 | 405383.87 | |
| | 198802 | 233.50 | 550.28 | 1200 | 280.20 | 1.960 | 405664.07 | |
| | 198802 | 13108.64 | 29496.14 | 1197 | 15691.04 | 1.880 | 421355.11 | |
| | 198802 | 12960.00 | 26517.55 | 1118 | 14489.28 | 1.830 | 435844.39 | |
| | 198802 | 1276.04 | 2727.82 | 1193 | 1522.32 | 1.790 | 437366.71 | |
| | 198802 | 7509.44 | 15763.18 | 1180 | 8861.14 | 1.780 | 446227.85 | |
| | 198802 | 3808.72 | 7933.18 | 1205 | 4589.51 | 1.730 | 450817.36 | |
| | 198802 | 2118.88 | 4377.40 | 1200 | 2542.66 | 1.720 | 453360.02 | |
| | 198802 | 2120.00 | 4196.69 | 1169 | 2478.28 | 1.690 | 455838.30 | |
| | 198802 | 951.00 | 1915.24 | 1200 | 1141.20 | 1.680 | 456979.50 | |
| | 198802 | 268.38 | 570.25 | 1285 | 344.87 | 1.650 | 457324.37 | |
| | 198802 | 18266.86 | 36639.15 | 1214 | 22175.97 | 1.650 | 479500.34 | |
| | 198802 | 35921.11 | 65040.14 | 1109 | 39836.51 | 1.630 | 519336.85 | |
| | 198802 | 1661.88 | 2651.50 | 1100 | 1828.07 | 1.450 | 521164.92 | |

50% ROYALTY VOLUME          260582.46

RIK PORTION

| | ROYALTY VOLUME | ROYALTY VALUE | AVERAGE BTU |
|---|---|---|---|
| | 27007.00 | 108661.74 | |
| | 98979.00 | 362915.21 | |
| | 125986.00 | 471576.95 | 1.215 |
| | 134069.75 | 214092.26 | 1.215 |
| TOTAL RIK | 260055.75 | 685669.21 | 1.215 |

| PAYOR | SALES VOLUME (4) | COMPANY | |
|---|---|---|---|
| | 66,128 | | *ATTACHMENT 13.* |
| | 146,140 | | |
| | 27,948 | | |
| | 60,075 | | |
| | 104,868 | | |
| | 1,868 | | |
| | 2,147 | | |
| | 2,336 | | |
| | 7,612 | | |
| | 12,192 | | |
| | 13,295 | | |
| | 16,951 | | |
| | 16,960 | | |
| | 78,260 | | |
| | 154,422 | | |
| | 266,421 | | |
| TOTAL NON RIK | 977,624 | | |
| | | | |
| TOTAL NON RIK A/L | 765,356 | 26% (3) | |
| TOTAL NON RIK NAL | 212,267 | 7% (2) | |
| | | | |
| RIK VOLUME | 926,867 | | |
| RIK VOLUME | 1,072,558 | | |
| TOTAL RIK VOLUME (5) | 1,999,425 | | |
| | | | |
| AL RESERVATION VOLUME | 2,977,049 | 67% (1) | |

(1) THE CALCULATED 8/8THS RIK SALES VOLUME REPRESENTS 67% OF THE TOTAL SALES VOLUME
ON THE RESERVATION.

TOTAL RIK VOLUME          1,999,425  DIVIDED BY  TOTAL VOLUME       2,977,049  EQUALS          67%

(2) 7% OF THE SALES VOLUME ON THE RESERVATION WAS SOLD NON-ARMS LENGTH.

(3) 25% OF THE TOTAL SALES VOLUME ON THE RESERVATION REPORTED WAS IN VALUE AND ARMS LENGTH.

(4) SALES VOLUMES FROM THE FORM MMS-2014 BY PAYOR.

(5) RIK VOLUMES FROM THE                      PURCHASE STATEMENTS
FOR 2/88.  RIK VOLUMES SOLD WERE DIVIDED BY THE ROYALTY RATE TO DETERMINE
THE 8/8TH'S VOLUME.



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
ROYALTY MANAGEMENT PROGRAM
P.O. BOX 25165
DENVER, COLORADO 80225

IN REPLY
REFER TO:

MMS-RVS-OG

Mail Stop 653

RECEIVED
SEP 27

Memorandum

To:        Chief, Royalty Compliance Division

Through:   Deputy Associate Director for Valuation and Audit

From:      Chief, Royalty Valuation and Standards Division        SEP 2 3 1989

Subject:   Valuation of Production Occurring Prior to 1984

On June 12, 1989, a project team was established to determine the feasibility of performing major portion analyses for valuation of natural gas production for the period 1980 to the present. The initial efforts of the team were directed at supporting the expedited audits for the 1980-1983 production period.

Since the project was initiated, many potential sources of the necessary data have been contacted. The various contacts that were made through mid-August are outlined in a draft status report (copy attached). We concluded that the best source of information to conduct major portion analyses is the major interstate pipeline companies.

Since mid-August, further discussions with 19 interstate pipeline companies have been held regarding obtaining access to their gas purchase data, and requests for information have been formalized and sent to the companies. While it is unknown at this time whether the information from the pipeline companies will be sufficient for MMS to perform major portion analyses for the 1980-1983 production period, the discussions to date have consistently indicated that the market value of gas produced during the 1980-1983 production period remained at the Natural Gas Policy Act (NGPA) maximum lawful prices for all categories of gas except section 107. Therefore, we recommend that NGPA maximum lawful prices be used as value for royalty purposes in your audits of production occurring prior to 1984. Majority prices are still necessary for section 107 gas produced during this period, and we will provide those values, or alternate values, after receipt of the information responses from the pipeline companies.

Milton K. Dial

Attachment

### Extension Agreement for MMS Appeal

Appellant: _____Robert  L. Bayless_____

Docket No. MMS-__98_.__0132_IND___ [Execute separate agreement for each docket no.]

I hereby request an extension of time to file a:

        _____ Statement of Reasons
        _XXX__ Response to the Field Report  (47 days)
        _____ Supplemental Statement of Reasons

for the appeal listed above filed under 30 CFR 290. This extension starts on __09/16/99__ and ends on
__11/02/99__. The extension will be measured from the date the document was due.

I agree to extend for the same number of days the 33-month time frame for processing appeals as set out in 30 U.S.C.
1724(h)(1) and any time frame that MMS may provide for by regulation.

The Appellant's representative and the Secretary's Designee executing this agreement, warrant that they are duly
authorized to represent and bind the parties hereto. The MMS Appeals Division concurrence is required to validate
this agreement.

Appellant: _____Robert L. Bayless_____

        By: _Tommy Roberts_____

        Title: _attorney__ Date: _8-30-99__

        FAX Number: _505-325-6167_____

Approved by:

Secretary's Designee: _Rojita Compton_____
        Authorized Royalty Management Program Official (prior to issuance of the field report) or
        Chief, MMS Appeals Division (after issuance of field report)
        FAX Number: _202-219-5673  or  219-5565__

Concurrence: _____
        Chief, MMS Appeals Division

Forms may be filed by fax with the appropriate Royalty Management Program office (pre-field report) or with the
MMS Appeals Division (post-field report, Fax no. 202-219-5565). After concurring, the Appeals Division will fax
copies back to the appellant and the appropriate Royalty Management Program official.

May 1999



United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Royalty Management Program
P.O. Box 25165
Denver, Colorado 80225-0165

IN REPLY REFER TO:

MMS-RVD-OG: 98-0587
Mail Stop 3152

AUG 2 0 1999

Memorandum

To:         Chief, Appeals Division
            Policy and Management Improvement

From:       Chief, Royalty Valuation Division   *Deborah Gibb Schudy*

Subject:    Appeal Field Report for Appeal dated October 15, 1998, from Merrion Oil & Gas
            Corporation (Merrion), Concerning Major Portion Analysis and Dual Accounting
            Calculation on Jicarilla Apache Tribal (Tribal) Leases. Docket No.
            MMS-98-0228-IND

Merrion appealed the Minerals Management Service's (MMS) Order to Perform (Order) dated
September 15, 1998 (Attachment 5), which Merrion received on September 17, 1998. Merrion
timely filed its Notice of Appeal (Attachment 6) with MMS on October 15, 1998. Merrion had
60 days from the receipt date of the Order to provide a Statement of Reasons (SOR) in support of
the appeal. Merrion requested and received extensions of time to file the SOR until
December 14, 1998. The SOR (Attachment 8) was timely received on December 15, 1998.

### RECOMMENDATION

We recommend denying the appeal by Merrion and affirming the MMS Order. Based on a
review of Merrion's SOR (Attachment 8), the appeal arguments submitted by Merrion are
without merit because Merrion did not prove that MMS followed inappropriate procedures, or
that MMS followed unreasonable methods when calculating the major portion prices or
providing instructions on performing dual accounting.

### ISSUES

Merrion provided a response to the September 15, 1998, Order in its December 14, 1998, SOR as
follows:

1.  Has MMS ignored and abandoned the regulations by improperly calculating major portion
    prices using a methodology that is contrary to existing Federal regulations?

MMS | MMSFOI0451
Page 1 of 157

2.  Did MMS fail to create the major portion array of sales referred to in the regulations?

3.  Did MMS arbitrarily assume that the Natural Gas Policy Act (NGPA) prices received under Jicarilla Apache Indian Tribe (Jicarilla Apache Tribe) Royalty-in-Kind (RIK) contracts were representative of the prices received by all oil and gas operators on the Jicarilla Apache Reservation (Reservation)?

4.  Did MMS ignore data that was and still is available to calculate major portion prices in accordance with the applicable regulations?

5.  Did MMS base its major portion pricing analysis on limited data that does not fully and accurately reflect actual sales values for production on the Reservation during the applicable time periods?

6.  Did MMS calculate Jicarilla Apache Tribe major portion prices without any analysis of whether sales of natural gas occurred under arm's-length contracts?

7.  Did MMS err by designating the Reservation boundaries as the major portion pricing area?

8.  Is the requirement to perform dual accounting appropriate under all circumstances?

9.  Is the methodology report an unlawful and unenforceable amendment of the Tribal leases?

10. Can Merrion be forced to pay late payment interest when any delay in paying the allegedly correct amount was attributable entirely to MMS's delay in calculating the major portion and dual accounting prices?

11. Is MMS's demand letter barred by the statute of limitations contained in 28 U.S.C. §§ 2415 and 2416?

12. Can Merrion incorporate, by reference, any and all arguments presented in any appeal by any party who has received an Order to Perform major portion pricing and dual accounting calculations on Tribal leases?

## BACKGROUND

MMS notified Merrion of potential underpaid royalties on Tribal leases to uphold MMS's Indian trust responsibility and enforce the major portion and dual accounting requirements under the terms of their Indian leases.

The Royalty Valuation Division (RVD) used verified gas sales information reported by the Jicarilla Apache Tribe under their RIK Program and used this data to determine major portion prices for the Reservation by production month.

The following correspondence relates to the appeal:

| <u>Date</u> | <u>Letter</u> |
|---|---|
| September 30, 1988 | Dear Payor letter (Attachment 1) emphasizing the requirement to perform dual accounting and major portion calculations. |
| July 27, 1992 | Dear Payor letter (Attachment 2) emphasizing the requirement to perform dual accounting and major portion calculations. |
| February 2, 1993 | Dear Payor letter (Attachment 3) emphasizing the requirement to perform dual accounting and major portion calculations. |
| February 10, 1995 | Dear Payor letter (Attachment 4) emphasizing the requirement to perform dual accounting and major portion calculations. |
| September 15, 1998 | Certified letter (Attachment 5) from MMS ordering Merrion to perform major portion and dual accounting calculations. |
| October 15, 1998 | Letter (Attachment 6) from Merrion appealing MMS's Order and requesting an extension of time until December 16, 1998, to file a SOR. |
| October 28, 1998 | Letter (Attachment 7) from MMS granting Merrion an extension of time until December 16, 1998, to file a SOR. |
| December 14, 1998 | Letter (Attachment 8) from Merrion submitting its SOR in response to the September 15, 1998, Order requiring Merrion to perform major portion and dual accounting calculations. |

**ARGUMENTS**

1.  <u>The major portion price calculation is consistent with lease terms and applicable regulations and satisfies MMS's major portion analysis requirement because MMS has sufficient valuation discretion.</u>

Merrion's Position

The <u>METHODOLOGY FOR MAJOR PORTION AND DUAL ACCOUNTING ANALYSIS JICARILLA APACHE TRIBAL LEASES</u> (Methodology Report - Attachment 9) establishes a methodology for the determination of major portion prices, for royalty valuation purposes, which is contrary to existing Federal regulations.

MMS's Position

Merrion argues that because MMS did not follow the major portion regulations under 30 CFR §§ 206.152 and 206.153 (1995), its valuation methodology is invalid. However, MMS has discretion under the leases as to how it will value oil and gas for royalty purposes. The method described in the regulations may be one, but is by no means the exclusive alternative for conducting this valuation. *See, e.g.* <u>The Shoshone Tribe v. Hodel</u>, No. C 81-131K (D.Wyo.) (Order ruling on motion for reconsideration, January 7, 1987) in which the court held that the Secretary should consider all "reasonable" valuation methods having a basis in the lease provisions or regulations when deciding the value of Indian production. The Order used a reasonable method to decide the price paid for a major portion of like-quality production.

In addition, the regulations (30 CFR § 206.100(b) (1995)) themselves provide that "If the specific provisions of any . . . oil and gas lease subject to the requirements of this subpart are inconsistent with any regulation in this subpart, then the . . . lease provision . . . shall govern to the extent of that inconsistency." Moreover, Merrion's objections to the valuation alternative used to satisfy the major portion requirements in Merrion's Indian lease terms fail to override the higher fiduciary standard established for Indian tribes. The United States Court of Appeals for the Tenth Circuit, ruling *en banc* in <u>Jicarilla Apache Tribe v. Supron Energy Corp.</u>, 782 F.2d 855 (10th Cir. 1986) held that the Secretary's trust responsibility requires that his actions be held to a much higher fiduciary standard, rather than merely meeting the minimal requirements of administrative law. In acting as a fiduciary, the Secretary, when faced with a decision ". . . for which there is more than one 'reasonable choice,' as that term is used in administrative law, . . . must choose the alternative that is in the best interest of the Indian Tribe." The best interest of the Tribe, as the Tenth Circuit makes clear in <u>Supron</u>, requires the selection of the method that maximizes the monetary return to the Tribe by, *inter alia*, maximizing the determination of value.

To determine the value of production, MMS used a method that was both reasonable and consistent with the Secretary's fiduciary obligation to the Jicarilla Apache Tribe. RVD explains the methodology in the Methodology Report (Attachment 9). The methodology is a well-reasoned analysis using the best available data to enforce the terms of the Indian leases. The methodology used all RIK gas sales from the Jicarilla Apache Tribe. MMS verified the use of Jicarilla Apache Tribe RIK volumes by calculating a major portion array using the Auditing and Financial System (AFS) data and Jicarilla Apache Tribe RIK volumes as shown on

Attachment 10 for the month of February 1988. Attachment 10 shows that the RIK volumes are the controlling volumes (67 percent) for the major portion array.

MMS applies this methodology consistently to all sales months and Tribal leases on the Reservation. Our review of the major portion prices calculated shows that they are a reasonable approximation of the price paid for a major portion of like-quality production sold from within the Reservation boundary. The use of these values to enforce the major portion requirements found in the lease terms is consistent with the lease terms and applicable statutes, regulations, and court decisions and upholds our trust responsibility to the Jicarilla Apache Tribe. *See, e.g.,* Supron; Burlington Resources Oil & Gas Co. Inc. v. U.S. Dept. of the Interior, Civ. No. 96-1936 (D.D.C. July 16, 1998).

2. As required by the regulations, MMS used like-quality production; i.e., meaning legal characteristics, NGPA category, from the Reservation to calculate major portion for the Tribal leases. In addition, MMS did not fail to create a major portion array because MMS verified that the RIK sales volumes represented 67 percent of the total sales in the AFS major portion array of prices for February 1988.

## Merrion's Position

Merrion asserts that it is clear from the Methodology Report that MMS made no effort whatsoever to create the array of sales referred to in the regulations. Merrion further asserts that MMS restricted its review of sales to only those sales of RIK production from the Tribe to third-party purchasers under long-term contracts requiring the payment of NGPA prices. Merrion concludes that absolutely no consideration in this process was given to the multitude of sales of production from lands covered by Tribal leases under gas purchase contracts between oil and gas operators on the Reservation and third-party purchasers providing for market sensitive prices.

## MMS's Position

The methodology identifies the prices paid under RIK contracts and RIK settlement agreements and calculates the major portion prices by NGPA category for all gas production in the Reservation utilizing RIK data for the time period January 1984 through June 1995. Key elements of this methodology are as follows:

- RVD determined that the Reservation is the "area" for calculating the major portion pricing.

- The price received for the RIK portion of the gas represents the one-eighth or one-sixth royalty share.

- RVD extrapolated the one-eighth or one-sixth royalty share to the entire eight-eighths or six-sixths sales volume and assumed the value for the one-eighth or one-sixth royalty share was representative of the prices received for the other portion of the gas sold from the Reservation.

- RVD analyzed samples of the Jicarilla Apache Tribe settlement statements and certified that the Jicarilla Apache Tribe received the proper NGPA prices.

The NGPA Category

The regulations at 30 CFR §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1995) state that the major portion will be calculated using "like quality" lease products from the same field/area. Like quality means lease products which have similar chemical, physical, and legal characteristics. Legal characteristics include the NGPA category of gas. The MMS methodology calculates the major portion prices by NGPA category.

In addition to the regulations, the precedent for using NGPA maximum lawful prices for major portion prices arises from information gathered from interstate pipeline companies by MMS during the early 1980's. From MMS's survey of pricing information, MMS determined that the market value of gas produced during the 1980-1983 production period remained at the NGPA maximum lawful price for all categories of gas except section 107. Therefore, MMS used NGPA maximum lawful prices as value for royalty purposes in all audits of production prior to 1984 (See Attachment 11).

We divided the major portion calculation for the Jicarilla Apache Tribe into four time periods:

- Period 1: NGPA pricing was in effect for the sales contracts.

- Period 2: The purchasers negotiated temporary price reductions from the NGPA prices.

- Period 3: NGPA pricing was in effect for the sales contracts.

- Period 4: Companies negotiated buyouts and buydowns of the sales contracts for RIK production. Due to different effective dates, NGPA pricing was also in effect for several months.

Table 1 shows the time periods and effective prices.

### TABLE 1
#### Natural Gas Pricing Variations

| Period | Time Period | Price |
|--------|-------------|-------|
| 1 | January 1984 - December 1986 | NGPA & Tax Reimbursement |
| 2 | January 1987 - June 1988 | NGPA & Tax Reimbursement; Temporary Price Reduction |
| 3 | July 1988 - December 1988 | NGPA & Tax Reimbursement |
| 4 | January 1989 - June 1995 | NGPA & Tax Reimbursement; Renegotiated Prices |

RVD calculated major portion prices using the prices received under the Jicarilla Apache Tribe RIK contracts. For periods 1 and 3, the major portion prices are the sum of the published NGPA prices and the tax reimbursements. We calculated the prices received by the Jicarilla Apache Tribe during Period 2 (the temporary price reduction period) and Period 4 (the renegotiated price period) as discussed below.

RVD obtained tax reimbursement information from the Jicarilla Apache Tribe tax manual as shown in Table 2.

### TABLE 2
#### Jicarilla Apache Tribe Tax Rates

| Date | Severance Tax (Per MMBtu) | Privilege Tax (87.5% of Value) |
|------|---------------------------|--------------------------------|
| 1/1/84 through 5/30/85 | $0.05 | |
| 6/1/85 through 1/31/86 | $0.05 | 5.00% |
| 2/1/86 through 1/31/87 | $0.05 | 5.18% |
| 2/1/87 through 1/31/88 | $0.05 | 5.28% |
| 2/1/88 through 12/31/88 | $0.05 | 5.47% |

During the temporary price reduction period (Period 2), RVD calculated a weighted-average price received for each NGPA category by multiplying the contract price times the RIK reserve volume estimate and dividing the total contract values by the total volume estimate. The actual reserve

estimates and contract prices cannot be released to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers.

During the renegotiated price period (Period 4), RVD calculated major portion prices by allocating the sales proceeds by NGPA category to the actual prices received under the modified contracts to determine the total consideration received under the RIK contract for each NGPA category. Documents submitted by the Jicarilla Apache Tribe in support of the RIK contract settlement proceeds provided detailed information on the monies received for each NGPA category. We used this information to calculate the major portion prices by NGPA category. The monies due to the Jicarilla Apache Tribe for the renegotiated contracts were based on volumetric decline curve analysis of the estimated reserves of the wells.

The companies based contract adjustments on the difference between the projected NGPA prices due under the original contract and the renegotiated prices. The actual reserve estimates and contract prices cannot be released in order to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers. Based on the projected NGPA prices and volumetric analysis, the companies calculated an annual present value estimate of the remaining reserves and then discounted this value using a 10-percent discount rate. This settlement value was further reduced during negotiations between the Jicarilla Apache Tribe and the companies. We calculated a settlement factor by dividing the total actual settlement amount by the estimated settlement value. This factor was then applied to the discounted amounts to determine a total annual settlement value. The annual settlement value was then divided by the annual present value estimate to generate a settlement discount factor. We calculated a price differential between the projected NGPA price and the renegotiated price. This differential represents the difference between the original contract price minus the renegotiated price. The undiscounted value was then discounted using the settlement discount factor discussed above to generate a settled price differential. RVD then added this differential to the renegotiated price to determine the major portion price by category.

RVD then calculated a weighted-average price. We calculated this price by multiplying the appropriate renegotiated contract price received for each NGPA category by the appropriate reserve volume and dividing both calculated values by the total volume.

Analysis of Major Portion Volumes

RVD conducted an analysis to determine what percentage the extrapolated RIK sales volumes represented when compared to the total sales volumes reported by the in-value payors on the Report of Sales and Royalty Remittance (Form MMS-2014). RVD downloaded all Form MMS-2014 data from AFS for Fund Code 550 (Jicarilla Apache Tribe). We then totaled the sales volumes by payor for February 1988. This data contained company proprietary data that was not releasable under the Freedom of Information Act. From settlement statements, RVD determined the RIK volumes purchased. We then calculated the extrapolated RIK sales volume by dividing the one-sixth or one-eighth RIK volume by the royalty rates. To determine

the total sales for the Reservation, RVD added the extrapolated RIK sales volumes to the Form MMS-2014 in-value sales volumes. We then divided the extrapolated RIK sales volume by the total sales volume for the Reservation. From this analysis, RVD concluded that the extrapolated RIK sales volumes represent approximately 67 percent of the total sales volumes on the Reservation for the February 1988 sales month.

To check the reasonableness of the major portion price, MMS combined the AFS royalty lines with the RIK sales lines in a major portion array from highest price to lowest price. We totaled the RIK sales volumes and placed a weighted average RIK sales price in the array with the AFS royalty lines for the month of February 1988 (Attachment 10). The weighted average RIK price represents 67 percent of the cumulative production volumes in the major portion array as shown in Attachment 10. This array is representative of RIK sales volumes in other months.

The results of the above analyses further support that the data used to perform the major portion analysis were sufficient for that purpose, and the values derived by RVD from the Jicarilla Apache Tribe RIK data were reasonable.

3. <u>MMS did not arbitrarily assume that the NGPA prices received under Jicarilla Apache Tribe RIK contracts were representative of the prices received by all oil and gas operators on the Reservation. Because the regulations require that the major portion be calculated using like-quality production; i.e., legal characteristics meaning NGPA category, MMS was consistent with the regulations.</u>

<u>Merrion's Position</u>

Merrion asserts that MMS arbitrarily assumed in the Methodology Report that the NGPA prices received by the Tribe for the sale of its RIK production were representative of the prices received by all oil and gas operators on the Reservation for their portion of gas sold from lands covered by Tribal leases.

<u>MMS's Position</u>

MMS addressed this issue in Argument No. 2 above.

4. <u>MMS considered all RIK sales data which was and still is available to MMS to calculate major portion prices in accordance with the applicable regulations.</u>

<u>Merrion's Position</u>

Merrion asserts that all of the data necessary for MMS to calculate major portion prices in accordance with the applicable regulations was and still is available.

MMS's Position

MMS addressed this issue in Argument No. 2 above and Argument No. 5 below.

5. The RIK sales data accurately reflects actual sales values for production on the Reservation.
   In addition, the Secretary of the Interior has the discretion, and therefore, the authority, to
   determine the value for royalty purposes, if this discretion does not result in a value that is
   unreasonable, arbitrary, or capricious.

Merrion's Position

Merrion asserts that there is absolutely no justification for MMS to ignore AFS data and base its
major portion pricing analysis on limited data that does not fully and accurately reflect actual
sales values for production on the Reservation during the applicable time periods.

MMS's Position

The valuation regulations for Indian leases prior to March 1, 1988, allowed us to use a part of the
production rather than a majority of production, if necessary, to compute the major portion price.
These regulations (30 CFR § 206.103 (1987)) state that the major portion price is the ". . .
estimated reasonable value determined by the Associate Director due consideration being given
to the highest price paid for a part or for a majority of production of like-quality in the same
field, to the price received by the lessee, to posted prices, and to other relevant matters."
[Emphasis added.]

The valuation regulations for Indian leases under 30 CFR § 206.152(a)(3)(i) (1995) state that:

> "For any Indian leases which provide that the Secretary may consider the highest
> price paid or offered for a major portion of production (major portion) in
> determining value of production for royalty purposes, if data are available to
> compute a major portion MMS will, where practicable, compare the value
> determined in accordance with this section with the major portion. The value to be
> used in determining the value of production for royalty purposes shall be the higher
> of these two values."

The RIK sales data fully and accurately reflects the actual sales because the RIK sales values
reflect prices paid under RIK contracts and RIK renegotiated agreements. The price received for
the RIK portion represents the one-eighth and/or one-sixth royalty share. The royalty share is
representative of the prices received for the in-value portion of the gas sold from the Reservation.

The only available data was AFS sales data, Jicarilla Apache Tribe RIK sales data, and
proprietary settlement agreements used to value the Jicarilla Apache Tribe RIK sales volumes.

MMS utilized all three sources of data for the month of February 1988 to show that the Jicarilla Apache Tribe RIK sales volumes are the controlling volumes for a major portion array (Attachment 10).

MMS also addressed this issue in Argument No. 2 above.

6. Jicarilla Apache Tribe sold all Jicarilla Apache Tribe RIK volumes under arm's-length conditions to third-party purchasers.

Merrion's Position

Merrion asserts that major portion prices were calculated by MMS without any analysis as to whether sales of natural gas occurred under arm's-length contracts.

MMS's Position

Jicarilla Apache Tribe sold all Jicarilla Apache Tribe RIK volumes under arm's-length conditions to third-party purchasers. The monies received were only for the sales of natural gas and not for compensation for other issues.

7. MMS followed the lease terms and the regulations when defining the field/area as the Reservation boundary and determined that the State of New Mexico Oil & Gas Commission defined the 30 pools that overlay or are within the Reservation boundary.

Merrion's Position

Merrion states that the Methodology Report did not utilize gas sales data from the "same field" in accordance with 30 CFR § 206.151 (1995) that provides that a field is ". . . a geographic region situated over one or more subsurface oil and gas reservoirs encompassing at least the outermost boundaries of all oil and gas accumulations known to be within those reservoirs" and is "often designated by oil and gas regulatory agencies in the respective states." Merrion asserts that rather than using gas sales data obtained from a geographic region designated by the New Mexico Oil Conservation Division as encompassing one or more reservoirs to calculate the major portion prices, MMS decided to designate the Reservation boundary as the major portion area. Merrion further asserts that such a designation necessarily limits gas sales data to Tribal oil and gas leases and may exclude pertinent sales data from common sources of supply lying outside the boundary of the Reservation. Merrion concludes that the use of a political boundary is inconsistent with the requirements of applicable regulations and may circumvent the underlying rationale and intent of those regulations.

MMS's Position

The Secretary of Interior has the discretion, and therefore the authority, to determine the value for royalty purposes where the value is based on a methodology that is reasonable, consistent with the statutes and lease terms, and is not arbitrary or capricious.

The valuation regulations for Indian leases prior to March 1, 1988, allowed us to use a part of the production rather than a majority of production, if necessary, to compute the major portion price. These regulations (30 CFR § 206.103 (1987)) states that the major portion price is the ". . . estimated reasonable value determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like-quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. . ." [Emphasis added.]

The majority of the Reservation is within Rio Arriba County, New Mexico, with a small portion extending into Sandoval County, New Mexico. The Reservation lies along the eastern edge of the San Juan Basin. Gas production is from the Pictured Cliffs Formation, Mesaverde Group, Gallup, Tocito, and fractured Mancos Formations, and the Dakota and Dakota-Morrison Formations. The Fruitland Formation produces methane primarily from coals (Fruitland Coal).

The regulations at 30 CFR §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1995) state that major portion will be calculated on "like-quality gas sold under arm's-length contracts from the same field (or, if necessary, to obtain a reasonable sample, from the same area)."

However, the State of New Mexico does not define "fields" for royalty valuation purposes. The State defines 30 pools that overlay or are within the Reservation boundary, but each pool is comprised of gas that may come from many different formations. Moreover, in several cases, several pools overlay one another and/or extend well outside the Reservation boundary. As a result, gas from a pool cannot be presumed to be "like-quality" gas, as required by the regulations, and so a State-defined "pool" cannot be used as the equivalent for the "field" or "area" required by the lease terms and regulations. The regulations (30 CFR § 206.151) allow MMS to define an area at least as large as the defined field and thus we expanded it to include the entire Reservation. MMS selected the Reservation boundary as a reasonable parameter for defining the field or area for purposes of valuing Tribal gas production.

8.  The requirement to perform dual accounting is appropriate because the lease terms require it.

Merrion's Position

Merrion incorporates by reference the arguments as set forth in its SOR filed in conjunction with a previous appeal for Robert L. Bayless (Bayless), Docket No. MMS-93-0094-IND. A decision was rendered in that case on July 10, 1997, and Bayless subsequently appealed to the Interior Board of Land Appeals (IBLA) (Docket No. IBLA 97-526), which is still pending. . . . .

Bayless contends that dual accounting is not required when there is no market for the gas prior to processing, and the applicable authorities contemplate dual accounting only if Bayless had a choice of selling the gas before or after processing. Merrion adopted and incorporated Bayless' arguments in support of its appeal.

MMS's Position

Dual accounting requirements are specified by Indian lease terms and regulation found at 25 CFR § 211.13 (1995) which state:

> In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater. [Emphasis added.]

Dual accounting is defined as a valuation method that requires the lessee to compute royalties based on the greater of: (1) the value of the gas prior to processing (as determined under 30 CFR § 206.152 (1995)), or (2) the combined value of the residue gas and gas plant products resulting from processing the gas (as determined under 30 CFR § 206.153), plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing (30 CFR § 206.102 (1995)). However, the value of production can never be less than the gross proceeds accruing to the lessee (30 CFR §§ 206.152(h) and 206.153(h)).

After March 1, 1988, if royalties are paid pursuant to the processed gas valuation method, the requirements to submit appropriate allowance forms prior to claiming transportation and/or processing allowances must be met. (See 30 CFR §§ 206.156 through 206.159 (1995).)

Both the lease terms and applicable regulations require dual accounting. See 30 CFR § 206.155 (1995), and 25 CFR § 211.13 (1995). The requirement for dual accounting has also been upheld by the courts in Jicarilla Apache Tribe v. Supron Energy Corporation et al., 782 F.2d 855 (10th Cir. 1986). In Supron, the Tenth Circuit sitting en banc reversed its earlier decision at 728 F.2d 1555 (10th Cir. 1984) and adopted the dissenting opinion from that ruling, and affirmed the decision of the District of New Mexico. (479 F. Supp. 536 (D.N.M. 1979).) The District Court had held that dual accounting was required under Indian leases in all cases. The District Court held similarly in Jicarilla Apache Tribe v. Continental Oil Company. No. CIV-76-430-C (D.N.M. 1988). Merrion reads the Supron decision as requiring dual accounting only when a market for both unprocessed wet gas and processed gas exists. Neither the regulations, the lease terms, nor the Supron decision is so limited, and there is nothing stated in any of those authorities that would support Merrion's accounting provisions in the way Merrion now urges.

The lease and the regulations expressly require that royalty be valued on the greater of the value of the unprocessed gas or the combined value of the residue gas and products derived from processing (less the appropriate allowance). Both values in turn, must be compared to Merrion's gross proceeds. Merrion must perform the dual accounting value comparison for their Indian leases. If Merrion has previously appealed the requirement of dual accounting on their Tribal leases, Merrion cannot appeal the issue of dual accounting again to MMS.

9.   The major portion price calculation outlined in the methodology report satisfies MMS's major portion analysis requirement because MMS has sufficient valuation discretion.

Merrion's Position

Merrion asserts that the Methodology Report is an unlawful and unenforceable amendment of the Tribal leases.

MMS's Position

Merrion has not substantiated why the Methodology Report is an unlawful and unenforceable amendment of the Tribal leases.

10. MMS cannot waive late payment charges.

Merrion's Position

Merrion states that the MMS Order advised Merrion that upon payment by Merrion of the alleged royalty underpayment, MMS will compute and bill Merrion with late payment charges. Merrion asserts that until his receipt of the Order, he had no access to, and could not have obtained the information necessary to enable him to perform dual accounting and major portion analysis in a timely manner. Merrion concludes that for MMS to assess late payment charges under circumstances in which the system does not facilitate timely payment is unjustifiable.

MMS's Position

The data collection and calculations involved in generating the major portion prices prevent MMS from providing these prices before the royalties are due. However, this fact does not override the trust responsibility MMS has to the Jicarilla Apache Tribe to properly account for and collect royalties consistent with the terms of their leases.

MMS has no statutory authority to waive late payment charges. Section 111(a) of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) 30 U.S.C. 1721(a) requires MMS to charge interest on all late payments, regardless of the payor's belief that the original payment was correct.

These charges are not imposed for penalty purposes, but rather to compensate for the lost value of the money over time; since the payor has had the use of this money, the interest charges should impose no hardship, and the fact that the payor may not have known that the original royalty payment was insufficient is irrelevant.

11. <u>MMS Order is not barred by the statute of limitations</u>.

Merrion's Position

Merrion argues that any attempt to collect royalties accruing more than six (6) years and ninety (90) days prior to final agency action in any civil suit to collect royalties brought more than one year after final agency action is barred by 28 U.S.C. §§ 2415 and 2416.

MMS's Position

Statutes of limitation operate only on the remedies available to a claimant. They do not affect the merits of the dispute or the underlying right of recovery. <u>United States v. Studivant</u>, F2.d 673 (3rd Cir. 1976). Because the purpose of this proceeding is only to determine the validity of an MMS Order that concerns the underlying obligation for royalty, the alleged applicability of a statute of limitations does not limit administrative proceedings within the Department of the Interior. Because this proceeding is an administrative appeal, not a court action, the statutory bar is inapplicable. <u>Foote Mineral Co.</u>, 34 IBLA 285, 306 (1978); <u>Anadarko Petroleum Corp.</u>, 22 IBLA 141 (1992); <u>BHP Petroleum (Americas) Inc.</u>, 124 IBLA 185 (1992).

12. <u>MMS will not incorporate by reference any and all arguments presented in any appeal by any party who has received an Order to Perform major portion pricing and dual accounting calculations on Tribal leases</u>.

Merrion's Position

Merrion states that it wishes to adopt all arguments regarding issues raised by the Methodology Report offered by other appellants in similar appeals, and asks that these arguments be incorporated in the subject appeal by reference.

MMS's Position

The appellant's request for incorporation by reference does not specifically identify the arguments it seeks to incorporate. Nor does it identify the appellants who submitted those arguments or the appeals in which they appear. Nor has the appellant submitted copies of those arguments for inclusion in the case record. It is not the province of the MMS Royalty Management Program to search pending appeals for arguments and/or to make assumptions

(or engage in speculation) regarding which arguments the appellant might wish to adopt with respect to its own appeal. Moreover, to the best of our knowledge, virtually all of the generalized arguments submitted by other appellants that might conceivably be applicable to the instant case have been rejected previously. For these reasons, such arguments will not be addressed herein.

Attachments

Copy to:     David Wong
             Jicarilla Apache Indian Tribe
             Revenue & Taxation
             P.O. Box 950
             Dulce, New Mexico 87528



# United States Department of the Interior

### OFFICE OF HEARINGS AND APPEALS
#### Interior Board of Land Appeals
#### 4015 Wilson Boulevard
#### Arlington, Virginia 22203

IN REPLY REFER TO:

BURLINGTON RESOURCES OIL AND GAS CO.

IBLA 98-476

Decided  November 30, 1999

Appeal from a decision of the Acting Deputy Commissioner of Indian Affairs, Bureau of Indian Affairs, affirming an order directing oil and gas lessee to pay additional royalties for certain Ute tribal and allotted gas leases in accordance with a major portion analysis on gas production. MMS-96-0139-IND.

Reversed.

1.  Oil and Gas Leases: Indians: Tribal Lands--Oil and
    Gas Leases: Royalties: Reasonable Value

    "Reasonable value" for the purpose of calculating royalties due to the United States is determined by the highest price paid for the major portion of like quality products produced or sold in arm's-length transactions from the same field or area or the gross proceeds actually received in sales by the lessee, whichever is higher.  Nonarm's-length transactions may not be included in base data for major portion analysis.

APPEARANCES:  Phillip R. Clark, Esq., and Peter O. Hansen, Esq., Denver, Colorado, for appellant; Stephen L. Simpson, Esq., Office of the Solicitor, Division of Indian Affairs, U.S. Department of the Interior, for the Minerals Management Service and Bureau of Indian Affairs.

## OPINION BY ADMINISTRATIVE JUDGE TERRY

Burlington Resources Oil and Gas Company (formerly known as Meridian Oil Inc.) (Burlington or appellant) has appealed from the June 16, 1998, decision of the Acting Deputy Commissioner of Indian Affairs (DCIA), Bureau of Indian Affairs, which granted appellant's appeal with respect to two leases (5190000220 and 5190000250) and denied its appeal with respect to other issues.  Principal among the issues for which appellant was not granted relief was the demand to pay additional royalties in the amount of $767,309.77 for the period January 1987-December 1991.

A brief historical review is necessary.  Through an Issue Letter dated June 10, 1993, Burlington was advised by the Chief, Valuation and Standards Division, Minerals Management Service (MMS), that it had potentially underpaid royalties on Southern Ute tribal and allotted leases in

| INDEX CODE: | |
|---|---|
| 25 CFR 211.13 (1995) | 30 CFR 206.152 (c) (3) (d) |
| 30 CFR 206.103 (1987) | 30 CFR 206.153 (a) (3) (1991) |
| 30 CFR 206.150 (b) (1988) | 151 IBLA 144 |
| 30 CFR 206.152 (a) (3) (1991) | 43 CFR 3106.7-2 (1996) |
| | 43 CFR 3162.1 (a) (1996) |

GFS (O&G)  4 (2000)

the amount of $615,015.50 for the period January 1987-December 1991, based on the MMS' calculation of the "major portion" price for the audit period. Subsequent to the Issue Letter, Burlington was advised that the "major portion" prices were being recalculated and that a new Issue Letter would be provided.  In a Demand Letter dated January 20, 1996, the Chief of the Valuation and Standards Division of the MMS ordered Burlington to report and pay additional royalties in the amount of $767,309.77 for the 1987-91 audit period.  An appeal of the Demand Letter to the DCIA followed.

In response to appellant's appeal of the Demand Letter, the DCIA, in her June 16, 1998, decision (Decision), addressed each of appellant's contentions.  In response to appellant's claim that the MMS calculation of major portion prices was contrary to the applicable regulations, the DCIA determined that MMS, using the best data available, had aggregated and analyzed a statistically significant number of sales and derived an estimate of major portion value that, under the principles of statistical analysis, is considered to be highly accurate.  (Decision at 5.)  She further concluded, based on her review of the database, the available sales, the methodology used by MMS, and considering the inherent limitations relating to the availability of data, that MMS "has substantially complied with the requirements of the regulations, keeping in mind that the regulations were intended to be flexible so that they could be applied to a variety of circumstances."  (Decision at 5-6.)

The DCIA next addressed appellant's assertion that in performing the major portion analysis, MMS failed to distinguish between arm's-length and nonarm's-length contracts as required by 30 C.F.R. §§ 206.152(a)(3)(i), 206.153(a)(i).  The DCIA explained that the MMS Royalty Management Program (RMP) acknowledged that the database it used to determine major portion does not distinguish between arm's-length and nonarm's-length contracts. However, she determined, as had the RMP, that appellant would in no way be prejudiced by the inclusion of nonarm's-length contracts in the analysis, as the intent of the regulation was to ensure that the major portion calculation would not be unreasonably biased downward as the result of possibly low nonarm's-length prices.  She stated:

> The regulation was not intended to prevent the performance
> of a major portion calculation in situations where there are
> a large number of sales and there is no way to separate the
> data for non-arm's-length sales from the data for arm's-length
> sales.  To the extent that the regulatory provision specifying
> the use of arm's-length prices in the major portion calculation
> is inconsistent with carrying out the intent of the lease term,
> then the lease term governs.  See 30 CFR 206.150(b) (1988).

(Decision at 6.)

The DCIA addressed directly appellant's contention that MMS' calculations were based solely on sales reported for Southern Ute tribal and allotted lands and not from the entire gas field in which Southern

Ute Indian leases are located.  Appellant contends that inclusion of the entire gas field is required.  In her decision, the DCIA stated that for purposes of the major portion analysis, the MMS defined the "field" as the five fields within the Reservation boundary of the Southern Ute Indian Reservation, as had the Colorado Oil and Gas Conservation Commission, and MMS simply used the State designations.  (Decision at 7.)  This designation was consistent, she asserted, with the language in the "Preamble to Revision of Gas Royalty Valuation Regulations" at 53 Fed. Reg. 1230, 1238 (Jan. 15, 1988), which provides:  "For royalty computation purposes, the definition of 'area' must remain flexible so that it may be applied to diverse situations.  The size of an area may vary with each specific royalty valuation determination for gas."  Id.  She stated that the MMS definition of the field/area in the instant case was fully consistent with that policy.  Id.

In response to appellant's claim that the major portion analysis did not use like-quality (legal, chemical and physical characteristics) lease products in its calculations, the DCIA found otherwise.  Responding to appellant's claim that the legal characteristics of products analyzed was flawed because the Auditing and Financial System (AFS) database failed to identify sales of gas that qualified for certain Natural Gas Policy Act (NGPA) regulated price categories and exclude these sales with different legal qualities, the DCIA found that the major portion prices that MMS calculated closely approximated the spot market prices for the area, and that there was no evidence that NGPA-regulated prices materially affected the outcome of its calculations.  (Decision at 8, citing Major Portion Analysis at 5.)  The DCIA stated that MMS had advised Burlington that it could use the maximum lawful price (MLP) for royalty valuation purposes in lieu of the major portion price in those instances where it could show that it did receive the MLP for production from the subject lease during any sales month.  Id.  Because appellant had provided no information in its appeal to the Deputy Commissioner of the existence of sales in the field that involved MLP, she found appellant had provided no evidence showing error.  Id.

Similarly, with regard to appellant's claim that MMS calculations ignore the like quality requirement concerning physical and chemical characteristics, the DCIA found otherwise.  She explained that the two main variables in the physical and chemical makeup of the gas produced from the various formations in the field were carbon dioxide content and British thermal unit (Btu) content, but that both were accounted for in the major portion price.  She determined that since the cost of removing carbon dioxide from the gas stream is not an allowable deduction from royalty value, it does not affect royalty value and is not pertinent to the discussion. Id.  With respect to Btu content, the DCIA found that RMP adjusts for Btu content by using a $/MMBtu major portion price.  Id.

In adjudicating appellant's claim that in addressing differences in Btu content, MMS based its calculations on assumptions rather than reliable data, the DCIA found that for those sales where an assumed gas

GFS (O&G)  4 (2000)

quality was used (when the reported quality of gas was outside the range of 700 Btu/cubic foot to 1,550 Btu/cubic foot) did not have a material effect on the calculated major portion prices.  (Decision at 9.)  The DCIA determined that the reasonableness of the MMS calculations was shown by the correlation between the published spot prices, a reasonable indicator of the natural gas market, and the estimated median values (major portion prices).  Id.  She found that the estimated median values and spot prices followed the same pricing trends during the audit period, the spot market prices being consistently higher in 1988, 1989, and 1990, and almost identical in 1987 and 1991.  Id.

Appellant also challenged the MMS failure to distinguish between processed and unprocessed gas in its major portion analysis.  The RMP calculated a single monthly major portion price for both residue (processed) gas and unprocessed gas.  The DCIA found that combining both did not materially affect that analysis because:

    1.  There was relatively little residue gas reported for the Southern Ute leases; and

    2.  Differences in physical characteristics between residue and unprocessed gas were accounted for by RMP's calculation of a $/MMBtu estimated median value.

(Decision at 10.)  Moreover, she found that the appellant had neither alleged nor shown that any of its gas was processed (and therefore had a lower Btu content) and/or that it was, or could have been, prejudiced thereby.  (Decision at 10.)

Appellant had also alleged that it could not understand how MMS accounted for transportation and processing costs, if at all.  The DCIA set out the methodology used by the RMP in her decision, and stated that appellant had been advised by MMS in the audit Issue Letter of June 10, 1993, that the allowance would be calculated as follows:

    Where the contract price received by the Appellant was reduced by a transportation factor and royalties were reported net of those costs on Form MMS-2014, the Appellant may provide a schedule of the transportation factors and MMS will adjust the imputed price and royalty liability schedules accordingly.

(Decision at 10.)  The DCIA noted in her decision that although appellant had been asked to provide data from arm's-length contracts related to the transportation factor during the audit period, the appellant had not provided MMS with documentation on any leases or sales months that contain transportation factors.  (Decision at 11.)

In response to appellant's contention that the price data reported on Form MMS-2014's and used by MMS to determine royalty was not reflective of actual prices offered or paid for gas in the field, the DCIA found that

the factors included, to which appellant objected--dual accounting, gas
contract settlement proceeds, settlement of royalty disputes, and use by
producers of the major portion price--had not been shown by appellant to
have made the prices used in the major portion analysis higher than the
prices actually paid for the gas.  Id.  Indeed, she stated, several factors
tended to mitigate any negative consequences that conceivably could have
resulted from inclusion of these elements.  She found:

> With respect to lump sum proceeds, standard MMS practice
> is to report the settlement as a lump sum payment on a single
> line attributable to 0.01 mcf of production.  This would make
> its effect too small to materially change the outcome, and
> indeed the Appellant has provided no evidence that such pay-
> ments actually did affect the result.  Furthermore, many
> settlement payments result from under reporting of value, in
> which case the settlement payment should be included in the
> value reported on Form MMS-2014 and should be used in the major
> portion analysis.

> With respect to gas contract settlement proceeds,
> the Appellant again has provided no evidence that these were
> included or that they affected the result.  In any case, MMS
> has maintained that contract settlement payments are part of
> the lessee's gross proceeds and, in effect, represent part
> of the price received by the lessee for the gas.  Thus, these
> arguably should be included in the major portion calculation.
> However, given that the prices reported on the Form MMS-2014
> closely track spot prices in the area [reference above], it
> is unlikely that any such proceeds that may have been included
> materially affected the result.

> With regard to major portion pricing, there is no evi-
> dence that any lessee in the area performed a major portion
> analysis or paid royalties based on major portion prior to the
> issuance by MMS of the current orders.  As for dual accounting,
> again the Appellant provided no evidence to indicate that any
> lessees, as a result of performing dual accounting, reported
> higher values on Form MMS-2014 than they would have reported
> based on the price they received for their gas, much less that
> any such reporting had a material affect on the result.  As
> stated above, the fact that the prices reported on Form MMS-
> 2014 closely track spot prices indicates that there was no
> such effect.

(Decision at 11-12.)

    The DCIA addressed directly appellant's claim that it was not pro-
vided sufficient information to be able to understand the underlying
rationale for MMS' order demanding additional royalty or to be able to
verify the accuracy and correctness of MMS' assumptions.  She determined

that appellant had been provided the relevant Major Portion Analysis
Report, all relevant correspondence between the parties on major portion
analysis, the dBASE IV computer program that identified the estimated
median values (major portion prices), the dBASE IV computer program that
processed and removed adjustments from the AFS database, and the dBASE IV
file structure for the files provided on eight attached diskettes that
contained the detailed AFS data.  (Decision at 12-13.)  She determined,
after review, that the information and data provided were sufficient
to fairly and adequately apprise appellant of the basis for the claim.
(Decision at 13.)

The DCIA further determined that appellant's claim that the major
portion analysis of the Southern Ute leases is arbitrary and caprici-
ous, because it is "unlawfully retroactive" and constitutes "a new and
revised position," which is not supported by the facts.  She found that
the requirement that the Secretary consider the highest price offered
or paid for the majority of like-quality gas produced or sold from the
same field or area when valuing lease production for royalty purposes is
embodied in the terms of the leases themselves.  (Decision at 13-14.)  With
respect to appellant's possible statute of limitations defense (reserved in
a footnote in appellant's Statement of Reasons (SOR)), the DCIA held that
because the purpose of the appeal was to determine the validity of an MMS
order that concerns the underlying obligation for royalty, "the alleged
applicability of a statute of limitations does not limit administrative
proceedings within the Department of the Interior."  (Decision at 14.)  She
stated that since this proceeding is an administrative appeal, not a court
action, the statutory bar is inapplicable.  Id., citing BHP Petroleum.
Inc., 124 IBLA 185 (1992)[b]; Anadarko Petroleum Corp., 122 IBLA 141 (1992)[b].

With respect to appellant's defenses of laches and estoppel (also
reserved by appellant in its SOR), the DCIA stated that it is well estab-
lished that the authority of the United States to enforce a public right
or protect a public interest is not vitiated or lost by the neglect of
its officers or the delay in their performance of duty.  (Decision at 14,
citing Alyson A. Allison, 72 IBLA 333 (1983)[c]; Warren L. Jacobs, 71 IBLA 385
(1983)[d].)  She determined that delays are reasonable in view of the burden
upon MMS to perform this audit function for the many leases it must manage.
Id.  She found that royalty payments are always subject to later audit.
Id.

In addressing appellant's contention that the assessment of late
payment interest is contrary to law because late payment was caused by
MMS, the DCIA held that under the Federal Oil and Gas Royalty Management
Act, 30 U.S.C. § 1721 (1994), and the regulations at 39 C.F.R. §§ 218.54
and 218.150, MMS has the responsibility to make such an assessment in
connection with monies due the United States from activities covered by
the regulations.  (Decision at 15, citing Sun Exploration and Production
Co., 104 IBLA 178 (1988)[e].)  She determined that the late payment interest
referred to by appellant is simply a reimbursement to the lessor of the
time value of funds not paid on a timely basis.  Id., citing Cities Service
Oil and Gas Corp., 104 IBLA 291, 295 (1988)[f].

a) GFS (O&G)  39 (1992)
b) GFS (O&G)  12 (1992)
c) GFS (O&G)  162 (1983)        151 IBLA 149
d) GFS (O&G)  141 (1983)
e) GFS (OCS)  115 (1988)        f) GFS (OCS)  116 (1988)

IBLA 98-476

Appellant had contended with regard to certain of the leases that
it was not the lessee and therefore not liable for royalties. MMS deter-
mined in its February 20, 1996, order that of the 20 Ute leases considered,
appellant was the lessee in 11 and the holder of the operating rights in
7 others. The DCIA found that Burlington had responsibility for additional
royalty payments for the 18 leases for which it either had operating rights
or was the lessee, as determined by the RMP. (Decision at 16, citing
30 U.S.C. § 187 (1994); 43 C.F.R. § 3106.7-2 (1996); 43 C.F.R. § 3162.1(a)
(1996).)

In its 1998 Statement of Reasons (1998 SOR) for appeal of the Deputy
Commissioner's decision, Burlington urges that the DCIA decision must be
reversed because the MMS' "major portion" calculations violate MMS' own
regulations. Citing the pre-1988 regulations and the 1988 regulations,
appellant states that a major portion price may only be determined "if data
are available to compute a major portion," and then calculations shall be
made using "like quality gas sold under arm's-length contracts from the
same field for each month." (1998 SOR at 3.) Claiming that the data was
not available for the major portion calculations, appellant further argues
that the data used contained nonarm's-length sales even though the 1988
regulations require that only arm's-length sales be used in the major
portion calculation. (1998 SOR at 4.) Moreover, appellant states, the
requirement that only like quality lease products be used to calculate
the major portion price was violated as the legal characteristics of the
gas were not considered in that NGPA categories of gas were not taken into
account in the analysis. Id.

Additionally, appellant claims, prices increased by dual accounting
and included within the data used do not reflect a price actually paid or
offered for gas and thus under the regulations cannot be included in a
major portion calculation. (1998 SOR at 7, citing 30 C.F.R. §§ 206.103
(1987), 206.152, 206.153 (1991).) Equally significant, appellant argues,
settlement proceeds, which may or may not be royalty bearing when received
by Burlington, may relate to periods prior to the audit period and thus
are not appropriately included within the major portion calculation, and,
even if they relate to the audit period, may or may not relate to a price
paid or offered for gas during that period. Id. Appellant claims that
MMS' assertion that settlement payments would have little effect on the MMS
calculations because lump sum settlement payments are generally reported on
a single line attributable to 0.01 mcf of production is plainly incorrect,
and that the inclusion of a high reported value for a corresponding minu-
scule volume would dramatically skew the estimated major portion price
upward. Id.

With regard to the requirement that sales of like quality gas be
calculated in the major portion analysis, appellant states that MMS' con-
tention in the Major Portion Analysis Report that "production within the
reservation boundary is fairly homogeneous" is not true. Id., citing
Major Portion Analysis Report at 2. Appellant asserts that production
from Southern Ute lands includes production from multiple conventional

formations (Dakota, Mesa Verde, Pictured Cliffs), as well as from the
Fruitland Coal Formation, where the coalbed gas is radically different.
Id. Appellant argues that the DCIA determination that differences in
carbon dioxide content is irrelevant because removal is not an allowable
deduction is without basis, as MMS has failed to analyze whether removal
is required to place the gas in marketable condition or is a deductible
transportation or processing cost. (1998 SOR at 8.) Further, appellant
maintains, MMS' calculations cannot be said to identify "majority price"
for a "certain geographical area" as required because MMS' use of 2014 data
exclusively does not distinguish between gas sold at the well in the local
market and gas sold at the city gate in Los Angeles. Id.

Appellant urges that the decision also fails to accord Burlington
credit for transportation allowances in the major portion price determined.
Citing 53 Fed. Reg. 1246 (Jan. 15, 1988) for the MMS position that "trans-
portation allowances generally are appropriate for most Indian leases,"
appellant states that nowhere does MMS justify its disregard of these
allowances in its major portion analysis. Id. Moreover, appellant argues,
MMS' claim that the calculated major portion prices "are reasonable" is
irrelevant to the validity of these prices due to MMS' failure to comply
with applicable regulations. (1998 SOR at 8-9.) Burlington urges that
the fact that the major portion prices "closely approximate the spot market
prices for the area" is irrelevant to prices at the lease, relevant here,
as the spot market prices are for sales at the mainline interconnect, down-
stream from the leases. Appellant claims the Major Portion Analysis Report
does not indicate that it made adjustments to the spot market prices to
calculate a relevant well head price. (1998 SOR at 9.)

Appellant argues that the DCIA decision erred in finding that
where the regulations and the intent of the lease terms differ with
regard to use of only arm's-length sales is calculating major portion
prices, the lease terms govern and allow consideration of both arm's-length
and nonarm's-length sales to be calculated. Id. Appellant states that
the provisions of each do not differ, although the lease is general and
the regulations specific, and MMS is required to use only arm's-length
transactions required by the regulations in its calculations. (1998 SOR
at 10.)

With regard to the 1996 Demand Letter, appellant argues that the
DCIA erred in approving it because it is contrary to law in holding
Burlington liable for the royalty obligations of other producers who are
also working interest owners of the leases. Id., citing Mesa Operating
Limited Partnership, 125 IBLA 28 (1992)g/ modified in part, 128 IBLA 174
(1994)h/; Phillips Petroleum Co. and Phillips 66, 121 IBLA 278 (1991).i/
Burlington also claims that the Demand Letter is unlawfully retroactive.
Appellant states that MMS violated the requirement that a major portion
calculation will not be performed if adequate data is not available or if
it is impractical to do so. Id., citing 30 C.F.R. § 206.152(a)(1) (1991).
That is precisely the case here, appellant claims, because Burlington is
being required to pay additional royalties in 1996 based on "approximate"

---

g) GFS (O&G) 2 (1993)
h) GFS (O&G) 6 (1994)
i) GFS (O&G) 1 (1992)                151 IBLA 151

calculations of major portion going back to 1984 but not made until 1993. Id. Appellant urges that Sun Exploration and Production Co., 112 IBLA 373 (1990) j is on point, and that MMS should be precluded from a claim against Burlington based, not on retroactive application of the regulations, but on retroactive application of admitted "departures" from the regulations. (1998 SOR at 11-12.)

Further, appellant claims, the Demand Letter and its approval are deficient for other reasons. Since the demand for additional payment is certainly not the fault of Burlington, assessment of interest on the late payment is not authorized. Citing 49 Fed. Reg. 37336, 37340 (Sept. 21, 1984), appellant claims that interest should be waived for an additional payment "that was not calculated by the MMS until nine years after the fact based on data exclusively within the possession of the MMS and using a methodology that the MMS admits departs from the regulations." (1998 SOR at 13.) Finally, Burlington argues, the MMS has failed, without articulating an adequate basis, to give effect to reversal entries identified by appellant in its March 18, 1996, letter to MMS. Id., citing Field Report at 5.

In its Answer, MMS states that it calculated major portion prices with respect to the Southern Ute leases in this case pursuant to the regulations, just as it has for all Tribes holding gas or oil leases when practicable. Respondent claims that, contrary to appellant's assertion, the MMS major portion calculation for the Southern Ute Reservation did comply with 30 C.F.R. §§ 206.152(a)(3)(i) and 206.153(a)(3)(i) (1991). (Answer at 3.) Respondent notes that the terms of the Southern Ute tribal leases specify:

> "Value" for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the lease lands are situated.

Id., citing 25 C.F.R. § 211.13 (1995). In meeting the Secretary's trust responsibility, respondent states, MMS used the median value method to establish a reasonable value for royalty purposes. (Answer at 4.) Respondent explains that after reviewing all available databases, MMS found that no usable databases existed that contained 100 percent of the gas sales for the Indian, State and fee leases, nor did any available databases contain reliable information regarding NGPA categories of wells or whether sales were arm's length or nonarm's length on the Reservation. Based on its research, respondent claims, MMS determined its AFS database, which contains information regarding the quality of gas (Btu content) and monthly royalty reports, was the best available database to calculate monthly major portion values for leases on the Southern Ute Reservation. Id.

---

j) GFS(O&G) 4(1990)

In addressing appellant's contention that the necessary data was not available for the required major portion calculations and that the calculations that were made did not involve sales of like-quality gas or include only arm's-length sales, respondent states that the "estimated calculations" that were made comply with the regulations.  (Answer at 4-5.)

In evaluating the data that was available, respondent argues, MMS used a volume-weighted mean that took into account the volumes of gas at each sales price.  (Answer at 5.)  Respondent states that MMS was able thereby to obtain statistically significant measures of the central location of price.  Id.  By using sample sizes in the hundreds of thousands of prices, respondent claims, "MMS was able to establish an interval estimate and to determine the probability of a true population parameter falling within the interval estimate, i.e., the probability that the interval contains the population mean."  Id.  Then, MMS claims, by calculating intervals for each monthly weighted average median value, it was able to establish a 99 percent confidence level that the sample major portion value represents the population major portion value within plus or minus $0.006/MMBtu (million Btus).  (Answer at 6.)

Respondent urges that the regulations do not restrict major portion calculations to those performed only when the necessary data from the same field is available.  MMS claims that it can also obtain a reasonable sample from the area to perform the calculations, and that in this case, it did just that in determining major portion prices for the Southern Utes as part of its fiduciary responsibility to the Tribe.  Id.  Respondent asserts that the major portion methodology employed is a well-reasoned analysis using the best available data.  (Answer at 7.)

Respondent next addresses appellant's contention that MMS did not consider all like-quality gas in the major portion calculation, as required, because NGPA (regulated) categories of natural gas were not differentiated in the Major Portion Analysis Report.  This occurred despite the fact that regulated gas is included in one such category created by the NGPA, which also created the MLP for almost all categories of gas, including regulated gas.  Appellant's concern relates to the fact that under 30 C.F.R. §§ 206.152(c)(3)(d)(1) and 206.153(c)(3)(d)(1), if the MLP is less than the value determined by major portion calculation, the MMS shall accept the MLP as the value, even if the MLP is higher than the actual sales price within a category.  Respondent answers that the inclusion of all available sales data in the major portion calculation has the effect of establishing median values for higher-priced categories under the NGPA at levels equal to or less than those which would have been established utilizing only the sales of a particular category of gas from that field.  Id.  According to respondent, use of the AFS database allowed MMS to determine the highest price paid or offered while, at the same time, limiting the royalty value at the MLP for any particular NGPA category of gas, thereby limiting the impact on the lessee.  (Answer at 8.)

151 IBLA 153

In response to appellant's claim that the gas considered by MMS includes a wide variance of Btu content, whereas the Btu content of appellant's gas is consistently below 1,000 Btus/cf, respondent states that appellant has not shown that MMS' assumptions regarding Btu quality materially affected the estimated median value or prejudiced the appellant in any way. Id. MMS explains that all the prices are calculated on a dollar per Btu basis, then adjusted to an average of 1,000,000 Btus. Under this adjustment, MMS claims, all gas is placed on a level playing field and this ensures MMS' calculations are for like-quality gas. Id.

With respect to appellant's contention that MMS failed to differentiate between unprocessed and processed gas (with lesser Btu content), respondent states that differences in physical characteristics between residue and unprocessed gas were accounted for by MMS' calculation of a $/MMBtu estimated median value. (Answer at 9.) With regard to appellant's claim that MMS failed to determine whether removal of carbon dioxide was required to place the gas in a marketable condition, respondent asserts that generally, processing costs are a deduction from the value of the natural gas liquids (NGL's) that are extracted by processing, but that MMS did not perform any major portion analysis on NGL's. Id. More significantly, MMS states, the cost of removing carbon dioxide is not an allowable deduction from the value of gas and Burlington would have to increase the royalties it pays to the extent that carbon dioxide treating costs are deducted from the contract price. (Answer at 10.)

In answer to appellant's claim that MMS violated 30 C.F.R. §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii), by including nonarm's-length contracts in its calculation of major portion price, and that this resulted in higher reported royalty prices, respondent claims that appellant has provided no documentation to show that the data used by MMS contained nonarm's-length contract prices. Moreover, respondent claims, the DCIA determined that the inclusion of nonarm's-length contracts would skew the values down, resulting in a lower portion price for appellant. Id., citing Decision at 6.

Appellant had urged that MMS erred in limiting the subject area of the major portion analysis to the Southern Ute Reservation and not the entire field. Respondent states, as noted by the DCIA in her decision, that the purpose of the MMS calculation was to arrive at a major portion value for all gas leases on the Reservation, so MMS included all five fields on the Reservation in the area it examined. Considering the purpose of the analysis, MMS claims, inclusion of the five fields to form an easily definable area is a reasonable exercise of its discretion. (Answer at 12, citing 53 Fed. Reg. 1230, 1238 (Jan. 15, 1988).)

In response to appellant's contention that the data used by MMS was not reflective of actual prices, respondent claims that appellant has offered no specific evidence in support of this allegation, and moreover, that "the factors speculated upon by Appellant are highly unlikely to have affected the calculations." Id. Respondent notes that lump sum payments

are reported on a single line of the Form MMS-2014 attributable to only 0.01 mcf of production and would therefore not materially affect the major portion calculation. Respondent further states that contract settlement payments would be part of lessee's gross proceeds, in any event, and thus represent part of the price received by the lessee for the gas and would be properly included in the calculations. (Answer at 13.) Similarly, MMS states, dual accounting is a calculation required under the regulations and lease terms and is therefore appropriate to be "used in determining the value of production for royalty purposes." Id., quoting 30 C.F.R. §§ 206.152(a)(3)(i) and 206.153(a)(3)(i) (1991). Finally, respondent argues, there is no evidence that any lessee operating on the Reservation performed a major portion accounting on their own during the subject period. Id.

In answer to appellant's assertion that the major portion analysis did not differentiate between sales with different pricing on the lease and at the city gate in Los Angeles, respondent explained that only BLM can approve the points of royalty settlement for leases on the Reservation, and no approval has been given for settlement at the city gate. (Answer at 14.)

Responding to appellant's assertion that allowances were not made for transportation costs in the major portion recalculation, MMS states that where the contract price was reduced by a transportation factor and royalties were reported net of those costs, appellant could provide a schedule of transportation factors and MMS would adjust accordingly. (Answer at 14, citing MMS Field Report at 9-10.) MMS notes that appellant has not provided it with documentation on any leases or sales months with transportation factors, nor has it alleged the existence of any such factors in this appeal. Id.

In answer to appellant's contention that MMS' reliance on spot market prices at the interconnect, versus wellhead prices paid to appellant, were inaccurate because they would reflect higher prices, respondent observed that published spot prices published by El Paso Natural Gas for sales in the San Juan Basin are one of the best indicators of prevailing market value in the area. Respondent states that a comparison of the spot prices and the major portion prices tended to reinforce the reasonableness of MMS' calculations. (Answer at 15.)

Appellant has contended that the major portion analysis process is based upon uncertainties and inaccuracies. In response thereto, MMS claims that major portion calculations are, by necessity, estimates of the actual market values, but, when checked against those values, are reasonable. (Answer at 16.) Moreover, MMS claims, all lessees are provided full opportunity to check and correct its calculation. Id. In that regard, respondent claims, as a result of reversal entries overlooked by MMS but pointed out by appellant, "MMS recalculated the major portion due on the subject leases to take account of corrections noted by Appellant." (Answer at 15.)

IBLA 98-476

Respondent answers directly appellant's allegation that MMS' current calculation of major portion values "using inadequate data" constitutes a change in interpretation of its regulations that cannot be applied retro-actively. (Answer at 17.) MMS states that this was not a new or different interpretation of an existing regulation, as in Sun Exploration and Produc-tion Co., supra, but represents "MMS' assumption of the responsibility for performing major portion calculations as specified in the regulations." (Answer at 18.)

Finally, in response to appellant's charge that interest should not be charged for underpayments resulting from the failure to perform calcu-lations based upon information exclusively within MMS' control, and that the claim and the interest thereon are barred by the statute of limita-tions, respondent states once again that "MMS has the authority to enforce a public right or protect a public interest, which is not lost by acqui-escence of its officers or by their laches, neglect of duty, failure to act, or delays in performance of their duties." (Answer at 18, citing Otav Mining Co., 62 IBLA 166, 168 (1982).[k])

[1] As an initial matter, we review the history of calculating roy-alty based on major portion analysis. 1/ In a December 1991 settlement agreement in Kauley v. Lujan, No. 84-3306T (W.D. Okla. 1991), MMS agreed to determine natural gas values on Indian lands based on the highest price offered at the time of production in arm's-length transactions for the major portion of gas produced from the same field for royalty management purposes. MMS indicates that it has since applied the same commitment to all Tribes, when practicable, performing major portion analysis for all oil and gas leases in an attempt to get the highest royalty for Indian oil and gas as required by the Federal Government's trust responsibility. See Seminole Nation v. United States, 316 U.S. 286, 297 (1942).

The regulations at 30 C.F.R. §§ 206.152(a)(3)(i) (unprocessed gas) and 206.153(a)(3)(i) (processed gas) (1991) contain identical language:

For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of produc-tion for royalty purposes, if data are available to compute a major portion, MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production for royalty purposes shall be the higher of these two values.

---

1/ IBLA 98-476 represents the first direct challenge before the Board to MMS' major portion analysis process.

k) GFS(MIN) 108(1982)

151 IBLA 156

"Major portion" is defined in 30 C.F.R. §§ 206.152(a)(3)(ii) (1991) as follows:

> For purposes of this paragraph, major portion means the highest price offered at the time of production for the major portion of gas production from the same field. The major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month. [2/]

The record reflects that, in determining the major portion price, MMS used a volume-weighted mean that took into account the volumes of gas at each sales price. By establishing the median (the value falling in the middle when the data items are arranged in ascending order) and the mode (the gas price that occurs with the greatest frequency), MMS claims to have been able to obtain statistically significant measures of the central location of price. (Decision at 4.)

The record reflects that MMS next measured the dispersion of the prices, i.e., their spread or variability. By measuring dispersion, MMS claims, it was able to derive what statisticians refer to as the "standard error of the mean or median," i.e., the standard deviation for the distribution of the sample means or medians. MMS observed that a distribution of sample means or medians that is less spread out (small standard error) is a better estimator of the population mean or median than a distribution of sample means or medians that is widely dispersed and has a larger standard error. Id.

MMS claims that by using a large sample size, it was able to establish an interval estimate and to determine the probability of a true population parameter falling within the interval estimate, i.e., the probability that the interval contains the population mean. By calculating intervals for each monthly weighted average median value, MMS asserts that it was able to establish a high confidence level that the sample major portion value represents the population major portion value.

We are satisfied that the statistical methodology used, a standard process used to determine a statistically significant measure of the central location of a group of values, was capable of finding the central location of value for the population examined. We note that appellant likewise did not challenge MMS' methodology, per se. Our concern relates to the population of sales prices examined. In the present case, MMS states in its decision that it did not separate nonarm's-length transactions and prices from prices obtained in arm's-length transactions in the population considered, despite the requirement in its own regulations that

---

2/ 1987 and 1988 major portion prices were calculated based on the regulations in effect at that time, 30 C.F.R. § 206.103 (1986), which had substantially the same requirements for the major portion analysis.

only arm's-length transaction prices shall be considered in the major portion analysis. MMS claims that the database selected (AFS) for calculation of major portion prices did not include this information. However, the AFS included the largest number of sales, monthly sales reports from producers, and most nearly met the information requirements for the major portion analysis in certain other respects.

From the data presented in the record in this case, we are unable to discern, or even estimate or guess, what percentage of the number of sales, and their values, what range of Btu values, and what volume were nonarm's-length transactions. While MMS would blandly assert that this would work to appellant's advantage, appellant argues otherwise and the Board can visualize those circumstances where nonarm's length transaction prices are set between affiliates at artificial levels, up, as well as down, for tax and profit-indexing purposes. If there are a significant number of sales at lesser value and the major portion is skewed downward, the MMS calculation of major portion prices defeats the interests of the Southern Ute Tribe, an interest MMS is lawfully obligated to properly represent in a fiduciary capacity. If inclusion of the nonarm's-length sales has resulted in a higher major portion price, as appellant alleges, there is no way to determine from MMS' calculations how much in excess of the major portion price for arm's-length transactions authorized by the MMS regulation the Demand Letter amount represents. As sales by other working interest operators were included in the sales made the leases on the Reservation, appellant would certainly not be in a position, itself, to calculate all the nonarm's-length transactions that occurred between 1987-1991, as implied by MMS. Nor does the record reflect whether these other producers have differentiated nonarm's-length sales for MMS-reporting purposes during this time period.

More importantly, the royalty reporting system for Federal oil and gas leases on Indian lands is one controlled completely by MMS. During the audit period in question, Burlington paid all royalties based on actual sales prices. There is no indication within the record that appellant failed in any way to meet the royalty demands of MMS during that time period. The regulations establishing the criteria for major portion analysis were MMS regulations. The information reflected on the MMS Form 2014's was that requested by MMS, and could have been enhanced at MMS' will to include a list of nonarm's-length transactions and sales from regulated wells (NGPA sales). MMS did not do so, and there is no indication that it is doing so now.

The major portion analysis system was first proposed in 1984, although it appears that data to implement the system of major portion pricing was only analyzed after the December 1991 settlement agreement in Kauley v. Lujan, supra. It is important to note that major portion analysis is required only if arm's-length sales data is available and if these calculations are practicable. See 30 C.F.R. §§ 206.152(a)(3)(i), 206.152(a)(3)(ii) (1991). The required sales information was not

available nor was the calculation of a median price for a population including only arm's-length transactions using the AFS database in the case of appellant's sales for the 1987-1991 time frame. We find that MMS' use of nonarm's-length sales data required by 30 C.F.R. § 206.152(a)(3) to be inconsistent with the plain language of the regulation.

MMS' position that a major portion price can be established without an adequate database is out of place in the regulatory scheme described above and would negate the very protection for producers and Tribes that the Department intended. Moreover, MMS' interpretation effectively takes away by decision that which it has granted by regulation. Nevertheless, if other existing MMS databases with the necessary information can be merged with the AFS database to meet the regulatory requirements MMS has established, MMS is not precluded from recalculating the major portion price correctly. We do not find it necessary to reach the other contentions of appellant in this case.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the June 16, 1998, decision of the Acting Deputy Commissioner of Indian Affairs is reversed as to the assessment of additional royalty and interest as set forth in the 1996 Demand Letter.

James P. Terry
Administrative Judge

I concur:

Gail M. Frazier
Administrative Judge



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
4015 Wilson Boulevard
Arlington, Virginia 22203

IN REPLY REFER TO:

PHILLIPS PETROLEUM CO.

IBLA 98-261                                    Decided  March 31, 2000

Appeal from a decision of the Acting Deputy Commissioner of Indian Affairs, Bureau of Indian Affairs, affirming an order directing oil and gas lessee to pay additional royalties for certain Oklahoma allotted Indian leases in accordance with a major portion analysis on gas production.  MMS-97-0085-IND.

Reversed.

1.   Oil and Gas Leases: Indians: Tribal Lands--Oil and
     Gas Leases: Royalties: Reasonable Value

     "Reasonable value" for the purpose of calculating
     royalties due to the United States is determined
     by the highest price paid for the major portion of
     like quality products produced or sold in arm's-
     length transactions from the same field or area or
     the gross proceeds actually received in sales by
     the lessee, whichever is higher.  Nonarm's-length
     transactions may not be included in the database
     used to establish the median value against which
     gross proceeds received by appellant in arm's-
     length transactions are compared for major portion
     analysis.  Where all sales, nonarm's-length and
     arm's-length, are combined to establish the data
     from which the median value is determined, that
     value may not establish the baseline majority price
     for comparison with appellant's arm's-length sales
     in major portion analysis computations.

APPEARANCES:  M. Julia Hook, Esq., Marily Nixon, Esq., Denver, Colorado, and Karen F. Brand, Esq., Bartlesville, Oklahoma, for appellant; Howard W. Chalker, Esq., and Geoffrey Heath, Esq., Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., for the Minerals Management Service and the Bureau of Indian Affairs.

OPINION BY ADMINISTRATIVE JUDGE TERRY

Phillips Petroleum Company (Phillips or appellant) has appealed from the February 10, 1998, decision (February 10 Decision) of the Acting Deputy Commissioner of Indian Affairs (DCIA), Bureau of Indian Affairs, which

INDEX CODE:
25 CFR 172.16(1978)
30 CFR 206.150(b)(1)
30 CFR 206.152(a)(3)(i)        152 IBLA 109          GFS(O&G)  14 (2000)
30 CFR 206.152(c)(1)-(3)
30 CFR 221.47(1979)

denied appellant's appeal of a February 24, 1997, Minerals Management Service (MMS or respondent) order with respect to additional royalties claimed owed in the amount of $11,996.29 as the result of major portion analysis on four leases 1/ for the period December 1, 1988, through December 31, 1990, and in the amount of $6,875.40 for five leases 2/ for the period January 1, 1991, through December 31, 1992.  Total additional royalties demanded for the two periods aggregated to $18,871.69.

A brief factual review will prove helpful.  The February 24, 1997, MMS order (February 24 Order) of the Chief, Royalty Valuation Section, directed appellant to compare median values calculated by MMS with the values reported by Phillips for gas produced from Phillips' allotted Indian oil and gas leases in Oklahoma for the designated periods, and to pay additional royalties for those gas sales in which the reported values were less than the median value, as calculated by MMS. 3/  Phillips' June 27, 1997, appeal (June 27 Appeal) of the February 24 Order asserted, inter alia, that (1) MMS had performed a totally inadequate major portion analysis and that it should not be upheld, (2) that the MMS February 24 Order improperly attempted to shift the burden of performing a proper major portion analysis onto Phillips, (3) that MMS is barred by the Federal statute of limitations in 28 U.S.C § 2415 (1994) from demanding payment of additional royalties in connection with transactions which took place more than 6 years prior to the date of the MMS demand for payment, and (4) that the order for additional royalty was barred by the equitable doctrines of laches and estoppel.  (June 27 Appeal at 5-18.)

In the February 10 Decision here under appeal, the DCIA upheld the February 24 Order in its entirety, rejecting each of appellant's claims, and ordering Phillips to comply with the February 24 Order within 30 days of receipt of the decision.  In affirming the Order of the Chief, Royalty Valuation Section, for additional royalties resulting from computations made possible by the major portion analysis, the DCIA stated:  "The Appellant's obligation to comply with such orders arises not from the Kauley Agreement, but rather by the terms of its own Allotted Indian leases and the pertinent statutes and regulations." (February 10 Decision at 5.)

In its Statement of Reasons for appeal (SOR), Phillips initially claims that the DCIA's February 10 Decision improperly attempts to shift

---

1/  The four leases are No. 607-022576-0, No. 607-027669-0, No. 607-060693-0, and No. 607-060694-0.
2/  The five leases are No. 607-022576-0, No. 607-025402-0, No. 607-027669-0, No. 607-060693-0 and No. 607-060694-0.
3/  In his Aug. 27, 1997, Memorandum to the Chief Appeals Division, Policy and Management Improvement, MMS, the Chief, Royalty Management Program (RMP), stated, in addressing Phillips' appeal of the Feb. 24, 1997, Order:  "Our major portion analysis used all gas sales data for the field designated by the Committee--the regulatory agency responsible for such determinations." (Aug. 27, 1997, Memorandum at 5.)

the burden of performing a proper major portion analysis onto appellant.
Citing 30 C.F.R. § 206.152(a)(3)(i), appellant states that this regulation
first requires the payor to determine the royalty valuation of gas pro-
duced from Indian leases and sold pursuant to arm's-length contracts.
(SOR at 6.)  Then, Phillips states, if MMS chooses to perform a major
portion analysis, the payor is to compare the royalty value as established
under 30 C.F.R. § 206.152(b) with the value as determined under the major
portion analysis, and pay royalties on the basis of the higher of these
two values.  (SOR at 7, citing 30 C.F.R. § 206.152(a)(3)(i).)  In this
case, appellant claims, since MMS failed to perform an adequate major
portion analysis, Phillips was entitled to calculate and pay royalties
based on gross proceeds, and was not required to value the gas production
under the benchmark system codified at 30 C.F.R. § 206.152(c)(1)-(3),
which applies to sales that are nonarm's-length.  Id.  Moreover, appel-
lant states, there is no basis for MMS to claim that the exceptions to the
standard methodology of royalty payment based on gross proceeds apply here
because there is no evidence that the gross proceeds do not reflect the
total consideration received by Phillips, and no evidence that the gross
proceeds do not reflect the reasonable value of the production because of
misconduct of seller or buyer or because of the breach of duty owed by the
lessee to the lessor.  (SOR at 7-8, citing 30 C.F.R. §§ 206.152(b)(1)(ii)
and (iii).)

Appellant next argues that while 30 C.F.R. § 206.152 grants MMS the
discretion to perform major portion analysis, any such analysis must be
adequately conducted.  This did not occur in the analysis of the subject
leases, appellant claims.  (SOR at 9.)  For example, Phillips states, the
data used in the calculation of the major portion analysis did not include
all like-quality production from leases within the same field or area.
Appellant then cites the example of the MMS' January 1986 major portion
analysis data that showed the agency's records to be incomplete in that
not all sales were included.  Id.  In that case, appellant states, "the
agency's failure to include such prices had a significant impact on the
MMS' previously-held position that GPM [Phillips' subsidiary] had underpaid
royalties for certain Indian leases located in the two fields for that
month."  Id., citing GPM Order at Exh. 3 to SOR.  Phillips claims that
another systemic flaw in the major portion analysis conducted here was
the failure to determine whether the natural gas production used in the
MMS analysis was in fact of a like-quality to that produced from the
leases during the audit periods involved.  Id. at 10.  In addition, appel-
lant contends, MMS' analysis included gross inconsistencies in the number
of records utilized from month to month, resulting in large variations in
volumes and prices, as well as the use of identical volumes and prices more
than twice in a given month.  Id.

Appellant further argues that the MMS cannot rely on the Kauley
Settlement Agreement to avoid performing an adequate major portion analy-
sis.  Phillips claims that MMS used a special methodology as a result of

this Agreement to perform its major portion analysis in this case, and
that this special methodology, set forth in MMS' Field Report concerning
the issues on appeal,

> required MMS to use gas sales information from the Oklahoma
> Tax Commission (OTC) to calculate statistical best estimates of
> major portion prices (estimated median values) for fields con-
> taining Anadarko Area Indian allotted leases and communicate
> these values to payors with the directive to recalculate and
> submit any additional royalties.

(SOR at 12, quoting Field Report, Exh. 4 to SOR at 2.)  Appellant objects
to this special methodology, which differs substantially from the require-
ments set forth in the regulations at Title 43 C.F.R., because:  (1) it was
not a party to the Kauley litigation; (2) MMS' trust responsibility cannot
and does not require MMS to ignore the applicable laws and regulations;
(3) the special methodology provides no guidance to MMS for the use of the
concepts "best available data" and "insufficient data," and no guidelines
for interpreting and applying these standards in a major portion analysis;
and (4) MMS' decision to implement the special major portion methodology
constitutes an abrupt departure from prior practice that would create a
significant burden on Phillips and, as such, should not be applied retro-
actively to any of the production at issue in this appeal.  (SOR at 13-15.)

Phillips also objects to the use of OTC information on gas sales for
analysis purposes because it claims that information is incomplete.  (SOR
at 15.)  Appellant states that it understands that OTC gathers price and
volume information but that it does not collect information on Btu content,
nor does it make adjustments for Btu content in the information it provides
MMS.  Id.  For this reason, appellant argues, MMS could not make a useful
comparison of "like quality" production in the field.  Id.  Phillips claims
the information being used by MMS is incomplete in another way.  It states
that MMS has failed to include all wells in a particular field because of
OTC's removal of well identification data from production information in
order to protect proprietary data related to gas sales.  Id. at 16.

Phillips similarly argues a number of procedural and equitable
bars to the MMS underpayment demands contained within the underlying
February 24 Order.  First, appellant states that MMS delayed commence-
ment of this enforcement action until more than 8 years after the start
of Audit Period 1 and more than 4 years after the end of Audit Period 2.
As a result, Phillips claims MMS is time-barred by the applicable statute
of limitations, 28 U.S.C. § 2415(a) (1994), from making its demand for
additional royalties on account of the pre-February 24, 1991, production
from the Audit Period 1 and 2 leases.  Id.  Second, appellant states
that MMS has had in its possession adequate information for performing
the critical valuation function since the end of each month of the
combined audit periods.  Because MMS has so delayed in bringing this

enforcement action, Phillips argues that it is entitled to consider its
royalties on account of its share of gas production from the leases for
both Audit Periods 1 and 2 as having been properly paid, and that MMS is
barred by laches from retroactively asserting that royalties were underpaid
on account of such production and for making the demand for additional
royalties. Id. at 19-20, citing United States v. Darken, No. 4: CV-89-
1681, 1990 U.S. Dist. LEXUS 10904, at 16-17 (M.D. Pa. Aug. 14, 1990);
United States v. Eaton Shale Co., 433 F. Supp. 1256, 1272 (D. Colo. 1977).

    Finally, appellant urges that MMS should be estopped from bringing
this action because if the gross proceeds approach used by Phillips to
calculate royalties is now considered an invalid approach, MMS' past
endorsement of this method of valuation rises to the level of "affirma-
tive misconduct" resulting in serious injustice. (SOR at 20.) Under
such circumstances, appellant argues, the imposition of estoppel against
the Government would be consistent with the public interest. Id., citing
Watkins v. United States Army, 875 F.2d 699, 707 (9th Cir. 1989)(en banc),
cert. denied, 498 U.S. 957 (1990); USA Petroleum Corp. v. United States,
821 F.2d 622, 625 (Fed. Cir. 1987). Phillips claims that MMS' delay in
advising it that it must use another valuation methodology prejudices
appellant severely because neither MMS nor Phillips now has complete
records for these audit periods, making it nearly impossible for appel-
lant "to defend against the MMS' royalty claims and the erroneous assump-
tions on which those claims are based." (SOR at 21-22.)

    In its Answer, MMS argues that Phillips' allegations must be dis-
missed because respondent properly conducted its major portion analysis.
(Answer at 7.) In response to appellant's claims, MMS asserts that under
the Kauley Agreement, MMS determines for each field or area by Natural
Gas Policy Act (NGPA) category, the statistical best estimate of majority
price using the best available data. (Answer at 2.) MMS claims, however,
that the gas from these fields did not sell at a price near the NGPA ceil-
ing, but rather sold at a price governed by the spot market. Consequently,
respondent states, the relative absence of data regarding NGPA price cate-
gories does not affect the like-quality analysis. (Answer at 9.)

    In response to appellant's assertion that because the OTC data did
not contain the Btu content, a like-quality analysis was not possible. MMS
states that the RMP performed an analysis to compare the results obtained
by adjusting the prices for Btu content with the results obtained by cal-
culating the price per mcf without adjustment for Btu content, and that
analysis showed that adjusting prices for Btu content had little effect
on majority price. (Answer at 10, citing Major Portion Analysis Report
Anadarko Area Leases.) For this reason, MMS claims, the absence of the
Btu data did not affect the validity of MMS' major portion analysis. Id.

    MMS responded to Phillips' argument that the major portion analysis
is flawed because there was insufficient data on each NGPA category to
determine a separate majority price by explaining that the RMP expanded
its definition of like-quality production to include all gas sold from the

field to determine a single majority price because the volumes of gas in each NGPA category declined over time. Id. Respondent asserts that the RMP's approach produces a more reasonable approximation of the majority price than would be the case if it had utilized a narrower definition of like-quality and restricted the amount of data and volumes that could be used. Id. at 11. MMS, respondent claims, used all of the records and volumes in a given field to calculate the majority price. Id. Phillips, respondent contends, has not shown that MMS' method does not produce accurate results or comply with the regulations. Id.

MMS likewise argues that the statute of limitations is not a bar to the Board upholding the decision below. (Answer at 4.) Respondent notes that the Board has held on numerous occasions that statutes of limitations do not apply to administrative actions. Id., citing Marathon Oil Co., 119 IBLA 345, 352 (1991)[a]; Forest Oil Corp., 111 IBLA 284, 287 (1989)[b] reconsideration denied, April 30, 1990, citing Foote Mineral Co., 34 IBLA 285, 306-08, 85 I.D. 171, 182-83 (1978)[c] Thus, respondent urges, the Board must reject appellant's argument that the statute of limitations bars the Board from upholding MMS' order to pay additional royalties. Id.

In response to appellant's claim that MMS' assessment is barred by laches, respondent states that the doctrine cannot be used to preclude the United States from enforcing a public right or protecting the public interest. (Answer at 12, citing United States v. State of California, 332 U.S. 19, 40 (1947); Santa Fe Minerals, Inc., 145 IBLA 317, 325 (1998)[d]; Marathon Oil Co., supra at 345; United States v. Wilson, 38 IBLA 305, 307-08 (1978)[e]) Respondent asserts that the authority of the United States to enforce a public right "is not vitiated or lost by acquiescence of its officers or their laches, neglect of duty, failure to act, or delays in the performance of their duties." Id., quoting 43 C.F.R. § 1810.3(a). In any event, MMS claims, it began its major portion analysis in this case in 1992, thus it did not fail to act or delay in the performance of its duties. Id.

Finally, with respect to appellant's charge that MMS' assessment is barred by the doctrine of estoppel because respondent accepted Phillips' gross proceeds as value, MMS urges that the acceptance of payment prior to audit does not approach the required standard of affirmative misconduct such as represented by a crucial misrepresentation in an official decision and/or concealment of material facts where the party alleging estoppel is ignorant of the true facts. Id. at 13-14. Respondent asserts that Phillips cannot claim ignorance of the true facts when both the lease and the relevant regulations in this case state that the Secretary determines value and that one of the valuation standards is the major portion price. Id. at 14, citing Lease, para. 3(c); 30 C.F.R. § 221.47 (1979); 25 C.F.R. § 172.16 (1978); 30 C.F.R. § 206.152(a)(3) (1995).

[1] As an initial matter, we review the history of calculating royalty based on major portion analysis. In a December 1991 settlement agreement in Kauley v. Lujan, No. 84-3306T (W.D. Okla. 1991), MMS agreed to determine natural gas values on Indian lands based on the highest price

a) GFS (O&G) 28 (1991)
b) GFS (O&G) 110 (1989)
c) GFS (MIN) 38 (1978)
d) GFS (O&G) 32 (1998)
e) GFS (MISC) 1 (1979)

offered at the time of production in arm's-length transactions for the major portion of gas produced from the same field for royalty management purposes. MMS indicates that it has since applied the same commitment to all Tribes, when practicable, performing major portion analysis for all oil and gas leases in an attempt to get the highest royalty for Indian oil and gas as required by the Federal Government's trust responsibility. See Seminole Nation v. United States, 316 U.S. 286, 297 (1942).

The regulations at 30 C.F.R. §§ 206.152(a)(3)(i) (unprocessed gas) and 206.153(a)(3)(i) (processed gas) (1991) contain identical language:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion, MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production for royalty purposes shall be the higher of these two values.

"Major portion" is defined in 30 C.F.R. § 206.152(a)(3)(ii) (1991) as follows:

> For purposes of this paragraph, major portion means the highest price offered at the time of production for the major portion of gas production from the same field. The major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month.

The record reflects that, in determining the major portion price, MMS established the median price (the value falling in the middle when the data items are arranged in ascending order) by using all sales contained in the OTC data base for the two fields in which the appellant's leases are located within the Anadarko Area. 4/ See February 24, 1995, Letter to Phillips from RMP at 1. MMS claims to have been able to obtain statistically significant measures of the central location of price.

We are satisfied, as we were in Burlington Resources Oil and Gas Co., 151 IBLA 144, 157 (1999),[f] that the statistical methodology used, a standard process used to determine a statistically significant measure of the central location of a group of values, was capable of finding the central

---

4/ The appellant's leases subject to the major portion analysis were in the Cement and Watonga-Chikasha Trend Fields within the Anadarko Area. In each case, the appellant's leases comprised a very small fraction of the total leases within the field. See Table 1 to Major Portion Analyses Report Anadarko Area Leases.

f) GFS(O&G) 4 (2000)

GFS(O&G) 14 (2000)

location of value for the population examined. We note that appellant
likewise did not challenge MMS' methodology, per se, although it did chal-
lenge application of that methodology to its leases, since it was not
party to the Kauley Settlement Agreement. Our concern, as in Burlington
Resources Oil and Gas Co., supra, relates to the population of sales prices
examined. In the present case, MMS considered all sales transactions in
the OTC databank for the two areas involved in establishing the majority
price, despite the requirement in its own regulations that only arm's-
length transaction prices shall be considered in the major portion analy-
sis. Moreover, nothing in the Kauley Settlement Agreement indicates that
this requirement is waived. MMS claims that the database selected (OTC)
for calculation of major portion prices was by agreement of the parties to
the Kauley Settlement. Phillips was not a party to that agreement. Even
if appellant had been, the agreement did not waive the requirement to seg-
regate out nonarm's-length transactions.

From the data presented in the record in this case, as in Burlington
Resources Oil and Gas Co., supra, we are unable to discern, or even esti-
mate or guess, what percentage of the number of sales, and their values,
what range of Btu values, and what volume were nonarm's-length transactions
within the OTC database for the areas encompassed by appellant's leases.
In this case, all sales recorded by the OTC for the fields in which the
subject leases are located were used in calculating the median. As we
noted in Burlington Resources Oil and Gas Co., supra at 158, the Board
can visualize those circumstances where nonarm's-length transaction prices
are set between affiliates at artificial levels, up, as well as down, for
tax and profit-indexing purposes. If there are a significant number of
sales at lesser value and the major portion is skewed downward, the MMS
calculation of major portion prices defeats the interests of the Tribe,
an interest MMS is lawfully obligated to properly represent in a fiduciary
capacity. Id. If inclusion of the nonarm's-length sales has resulted in
a higher major portion price, as is equally possible, there is no way to
determine from MMS' calculations how much in excess of the major portion
price for arm's-length transactions authorized by the MMS regulation the
February 24 Order amount represents. As sales by other working interest
operators were included in the sales made from the leases in the areas
addressed, appellant would certainly not be in a position, itself, to
calculate all the nonarm's-length transactions that occurred between 1988
and 1992. Nor does the record reflect whether these other producers have
differentiated nonarm's-length sales when reporting sales to the OTC data-
base during this time period.

More importantly, as we also noted in Burlington Resources Oil and
as Co., supra at 158, the royalty reporting system for Federal oil and
gas leases on Indian lands is one controlled completely by MMS. During
the audit period in question, Phillips paid all royalties based on actual
sales prices (gross proceeds). There is no indication within the record
that appellant failed in any way to meet the royalty demands of MMS dur-
ing that time period. The regulations establishing the criteria for major
portion analysis were MMS regulations. The information reflected on the

MMS Form 2014's submitted by Phillips was that requested by MMS, and could have been enhanced at MMS' will after implementation of the major portion analysis regulations in the Code of Federal Regulations to include a list of nonarm's-length transactions to be compared against the OTC sales figures. MMS did not do so, and there is no indication that it is doing so now.

The major portion analysis system was first proposed in 1984, although it appears that data to implement the system of major portion pricing was only analyzed after the December 1991 settlement agreement in Kauley v. Lujan, supra. It is important to note that major portion analysis is required only if arm's-length sales data is available and if calculations based upon major portion analysis are practicable. See 30 C.F.R. §§ 206.152(a)(3)(i), 206.152(a)(3)(ii) (1991). The required sales information was apparently not available nor was the calculation of a median price for a population including only arm's-length transactions using the OTC database in the case of appellant's sales for either the 1988-1991 time frame or 1991-1992 time period. We find that MMS' use of data from all sales, rather than solely arm's-length sales, as required by 30 C.F.R. § 206.152(a)(3), to be inconsistent with the plain language of the regulation. Nor has the language of the Kauley Settlement Agreement relaxed the requirement that only arm's length transactions be used in computing the median value. Quite to the contrary, the issue of arm's-length versus nonarm's-length sales was not even addressed in the 1991 Settlement, thus leaving the regulation cited above intact with regard to the parties. Even had the Kauley Settlement Agreement relaxed the requirement that only arm's-length sales be used, it would not have applied to Phillips, as the Settlement Agreement was extremely specific that its provisions applied only to the parties to the Agreement. 5/

MMS' position that a major portion price can be established without an adequate database is out of place in the regulatory scheme described above and would negate the very protection for producers and Tribes that the Department intended. Moreover, as we noted in Burlington Resources Oil and Gas Co., supra at 159, MMS' interpretation effectively takes away by decision that which it has granted by regulation. Nevertheless, if other existing MMS databases with the necessary information can be merged with the OTC database to meet the regulatory requirements MMS has established, MMS is not precluded from recalculating the major portion price correctly. We do not find it necessary to reach the other contentions of appellant in this case.

---

5/  Paragraph 28 of the Kauley Settlement Agreement states:
    "28.  The terms of this settlement agreement are to be binding on the parties to this suit only -- i.e., the named plaintiffs, the class represented by the named plaintiffs, and the defendants.  Said terms shall not include, affect, or be applicable to any person not a party to this suit."

IBLA 98-261

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the February 10, 1998, decision of the Acting Deputy Commissioner of Indian Affairs is reversed as to the assessment of additional royalty and interest as set forth in the February 24, 1997, Demand Letter.

James P. Terry
Administrative Judge

I concur:

Gail M. Frazier
Administrative Judge

Report of the Commission

# Fiscal Accountability
## of the
## Nation's
## Energy Resources



David F. Linowes
Chairman

Michel T. Halbouty
Mary Gardiner Jones
Charles J. Mankin
Elmer B. Staats
Commissioners

January 1982



Commission on Fiscal Accountability
of the Nation's Energy Resources
Suite 403
1111 18th St. N.W.
Washington, D.C. 20036
(202) 653-9051

David F. Linowes
Chairman

Michel T. Halbouty
Mary Gardiner Jones
Charles J. Mankin
Elmer B. Staats

January 21, 1982

The Honorable James G. Watt
Secretary of the Interior
Washington, D.C. 20240

Dear Mr. Secretary:

I am pleased to transmit to you the report of the Commission on Fiscal Accountability of the Nation's Energy Resources.

During the past six months, the Commission has investigated the serious allegations of massive irregularities in royalty payments due the Federal government, Indian tribes and States; and the allegations of theft of oil from Federal and Indian lands. From the outset and throughout our deliberations, we have sought and obtained the active participation of all those having particular interests in our findings: State officials, Indian tribes, oil and gas companies, United States Geological Survey and others within the Department of the Interior, General Accounting Office, and committees of Congress, among others.

In its work, the Commission has maintained a position of independence and objectivity, giving full and balanced consideration to all points of view. We believe our findings give a comprehensive and fair analysis of the conditions and relationships that now prevail within and among the institutions involved in royalty management. It is the unanimous judgment of the Commission that if the accompanying recommendations are adopted, a major step will have been taken to bring full and proper accountability to the management of Federal royalties.

Participation in the work of the Commission has been a challenging opportunity to serve our Nation, and to join in the President's attack on fraud, waste and inefficiency in the Federal government. We appreciate having this privilege.

Respectfully submitted,

David F. Linowes
Chairman

# COMMISSIONERS

**David F. Linowes (Chairman)**

Mr. Linowes is the Boeschenstein Professor of Political Economy and Public Policy at the University of Illinois, and was Chairman of the U.S. Privacy Protection Study Commission from 1975 to 1977. He is former Chairman of the Trial Board, American Institute of Certified Public Accountants, and has headed economic development missions to Turkey, India, Greece, Pakistan, and Iran on behalf of the U.S. Department of State and the United Nations.

**Michel T. Halbouty**

Mr. Halbouty is an independent oil producer and operator and holds advanced degrees in both geology and petroleum engineering. He has served as President of the American Association of Petroleum Geologists.

**Mary Gardiner Jones**

Ms. Jones is a former Federal Trade Commissioner and is President of the Consumer Interest Research Institute. Currently she is Vice-President for Consumer Affairs for Western Union Telegraph Co. Ms. Jones is a lawyer and has served with the Department of Justice in New York City.

**Charles J. Mankin**

Mr. Mankin is Director of the Oklahoma Geological Survey, Executive Director of the Energy Resources Center, and Professor of Geology at the University of Oklahoma. He was President of the American Geological Institute, and Chairman of the Board of Mineral and Energy Resources of the National Academy of Sciences.

**Elmer B. Staats**

Mr. Staats was Comptroller General of the United States from 1966 to 1981. Previously he served as Deputy Director of the Budget and Executive Director of the Operations Coordinating Board of the National Security Council.

viii

## COMMISSION STAFF

Charles L. Elkins, Executive Director
Mr. Elkins has served for more than ten years as
a senior manager in the federal government. He
has a degree from Yale Law School and is a member
of the District of Columbia Bar.

Daniel M. Rosenfelt, General Counsel[1]

Paul Jackson Anderson, Assistant Director

Mary Jane Markley, Assistant Director[2]

Angeline M. Holowka, Office Manager

Miriam T. Townsend, Secretary

Katherine Gillman, Consultant[3]

David A. Sheridan, Consultant[3]

William A. Butron, Consultant[4]

Glen L. Baughman, Consultant[5]

Michael W. McConnell, Assistant General Counsel[6]

Douglas L. Caldwell, Consultant[7]

--------

[1]On loan from the Solicitor's Office, U.S. Department
of the Interior
[2]On loan from the Office of Surface Mining, U.S.
Department of the Interior
[3]Part-time
[4]On loan part-time from the Office of Inspector
General, U.S. Department of the Interior
[5]On loan part-time from the U.S. General Accounting
Office
[6]On loan part-time from the U.S. Office of Management
and Budget
[7]On loan part-time from the National Park Service,
U.S. Department of the Interior

ix

# TABLE OF CONTENTS

Preface ............................................. xd

Summary ........................................... xv

CHAPTER

1   Introduction ................................... 3

2   The Problems .................................. 13

3   Internal Controls ............................. 43

4   Site Security ................................. 83

5   Enforcement ................................... 99

6   States and Indian Tribes ..................... 115

7   Organizational Issues ........................ 141

8   New Approaches to Royalty Management ......... 165

9   Summary of Recommendations ................... 237

APPENDICES:

A   Charter of the Commission .................... A-1

B   Witnesses Who Testified at
    Commission Hearings .......................... B-1

C   Congressional Hearings ....................... C-1

D   Selected Previous Studies of Royalty
    Management ................................... D-1

E   Selected Audits of Federal and
    Indian Leases ................................ E-1

F   Source and Disposition of Royalties ........ F-1

# TABLE OF CONTENTS (CONTINUED)

x

G   Responsibilities of the Conservation Division, USGS ..................... G-1

H   Responsibilities of the Bureau of Indian Affairs ........................ H-1

# PREFACE

The Commission on Fiscal Accountability of the Nation's Energy Resources has completed the tasks established for it in its Charter of July 8, 1981. Those tasks were:

° To examine the allegations of massive irregularities in royalties on the Nation's energy resources which are owed to the Federal government, Indian tribes, and States;

° To investigate the allegations of theft of oil from Federal and Indian lands; and

° To make recommendations for improving fiscal accountability of the Nation's energy resources.

The Commission's findings and recommendations are set forth in this report. Each of the recommendations was adopted unanimously by the Commission.

The Commission could not have completed its work on these complex and urgent matters in a timely fashion without the active cooperation of a great many people and institutions. Throughout the life of the Commission, our activities were coordinated with the President's Council on Integrity and Efficiency in Government. We received unstinting help from the Department of the Interior; from other government agencies, such as the General Accounting Office, the Internal Revenue Service, and the Office of Management and Budget; as well as, from Members of Congress and their staffs.

xii    FISCAL ACCOUNTABILITY: NATION'S ENERGY RESOURCES

The Commission was also aided immeasurably by States, Indian tribes, the oil and gas industry, and private citizens who appeared before the Commission at five sets of comprehensive public hearings. Many of those testifying provided followup assistance as well.

We are also indebted to scores of other individuals who gave their time and professional expertise. We particularly want to recognize the competent contributions and unfailing assistance of William L. Kendig, Director of Financial Management of the Department of the Interior, and Wiley W. Horsley, Jr. and Richard E. Powers of that office. Milton J. Socolar, John F. Simonette, Jeffrey C. Steinhoff, and Darby W. Smith of the General Accounting Office were most responsive to the Commission's needs. Dallas L. Peck, Doyle G. Frederick, R. Michael Gall, and J. Ronald Jones of the U. S. Geological Survey all cooperated generously and graciously.

Our staff, led by its Executive Director, Charles L. Elkins, performed with unusual devotion to our demanding schedule. Our sincere appreciation to each of them.

The Commission's charge broadly covers the Nation's energy resources, which include hard mineral energy resources such as coal and uranium as well as oil and gas. We are aware of problems in the management of coal and uranium royalties, and these are briefly addressed in Chapter Eight of this report. But for the present and the near future, oil and gas are dominant, providing 97 percent of the royalties from Federal and Indian energy resources. For this reason, this report essentially is focused on oil and gas.

Finally, the Commission wishes to acknowledge that much of its effort rests on a body of work on oil and gas royalty management completed over the last twenty years by the General Accounting Office, the Department of the Interior, and various Congressional committees.

---

Preface

The Commission has viewed its efforts as contributing to the prudent management of the country's energy resources, and to stopping any loss of revenues rightly due to the Federal government, the States, and Indians. Equally, we recognize that democratic institutions rest on a foundation of faith in the competence and accountability of government. We believe that the measures recommended by this Commission can help to strengthen that faith.

David F. Linowes
Chairman

xiii

# SUMMARY

Management of royalties for the Nation's energy re-
sources has been a failure for more than 20 years.
Because the Federal government has not adequately
managed this multibillion dollar enterprise, the oil
and gas industry is not paying all the royalties it
rightly owes.

The government's royalty recordkeeping for Federal
and Indian oil and gas leases is in disarray. For
this reason, the exact amount of underpayment is
unknown. The results of individual audits, which
have often uncovered large underpayments, suggest
that hundreds of millions of dollars due the U.S.
Treasury, the States, and Indian tribes are going
uncollected every year.

In addition, oil thefts are occurring on Federal and
Indian leases. The extent of theft and the amount
of royalty losses from theft are unknown, but it is
well-documented that security at many Federal and
Indian lease sites is lax and is an open invitation
to theft.

The Nation can no longer afford mismanagement of
royalties for its energy resources. The stakes are
too high. With the rapid escalation of energy prices,
oil and gas royalties have risen from less than $500
million in 1971 to more than $4 billion in 1981.

The government's royalty management system needs a
thorough overhaul. This report of the Commission on
Fiscal Accountability of the Nation's Energy Resources
details 60 specific recommendations (listed in Chapter
Nine of the report) for revising and rebuilding the
system. Underlying these recommendations are some
fundamental conclusions the Commission reached in
the course of its intensive inquiry: