IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JICARILLA APACHE NATION,                          :
                                                  :
          Plaintiff,                              :
                                                  :
v.                                                :
                                                  :
UNITED STATES DEPARTMENT OF THE                   :
INTERIOR,                                         :
                                                  :
          Defendant,                              :          Civil Action
                                                  :      No. 1:07-CV-00803-RJL
and                                               :
                                                  :
VASTAR RESOURCES, INC., UNION TEXAS               :
PETROLEUM, AND UNICON PRODUCING                   :
COMPANY,                                          :
                                                  :
          Intervenor-Defendants.                  :
                                                  :
                                                  :
                                                  :

---

## VASTAR'S MEMORANDUM IN OPPOSITION TO JICARILLA APACHE NATION'S MOTION FOR SUMMARY JUDGMENT

---

Charles L. Kaiser, D.C. Bar No. 309203
Charles A. Breer
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado  80202
Telephone:  303.892.9400
Facsimile:  303.893.1379
Attorneys for Intervenor-Defendants

TABLE OF CONTENTS

Page

SUMMARY ................................................................................................... 1

FACTS ......................................................................................................... 3

    A.    Lease Language ................................................................................ 3

    B.    Major Portion Regulations ................................................................ 3

          1.    The 1988 Regulations. ............................................................ 4

          2.    Pre-1988 Regulations .............................................................. 5

    C.    The Jicarilla Major Portion Price Methodology ................................. 5

          1.    Gas Volumes ............................................................................ 6

          2.    Sales Data ................................................................................ 8

          3.    Like Quality Gas ...................................................................... 8

          4.    Major Portion Field Or Area ................................................... 9

          5.    Settlement Values ................................................................... 10

          6.    MMS Demand ........................................................................ 11

    D.    Bayless Decision .............................................................................. 11

    E.    Vastar And Other Post-Bayless Decisions ......................................... 12

ARGUMENT ............................................................................................... 14

I.    THE VASTAR DECISION SHOULD BE AFFIRMED BECAUSE THE
    JICARILLA METHODOLOGY VIOLATES THE GOVERNING
    REGULATIONS ................................................................................... 14

    A.    Legal Standard ................................................................................. 14

    B.    The Vastar Decision Correctly Found That The Jicarilla Major Portion
        Price Is Contrary To The Governing Regulations ............................... 15

          1.    The Volumes Used Were Contrary To The Regulations ....................... 15

          2.    The Regulations Did Not Permit The Jicarillas To "Extrapolate"
             From The Jicarilla Sales ........................................................... 16

          3.    MMS Did Not Rely On Like Quality Gas As Required By The
             Regulations ............................................................................. 19

TABLE OF CONTENTS
(continued)

Page

4.    The Reservation Boundary Is Not Consistent With The Definition
Of "Field" Or "Area" Set Out In The Regulations ................................... 20

5.    Sales Were Not Calculated On A Monthly Basis As Required By
The Regulations ...................................................................................... 21

C.    The Lease Terms Do Not Allow The Jicarillas To Disregard The
Controlling Regulations ...................................................................................... 21

1.    The Leases Expressly Incorporate Interior's Regulations ...................... 22

2.    Interior Has Repeatedly Recognized Over Many Years That The
"Weighted-Average-Median" Or "50% Plus One Mcf" Volume Is
Consistent With The Lease Terms ........................................................... 24

a.    The 1988 Regulations ................................................... 24

b.    The Pre-1988 Regulations........................................... 25

c.    The Cases Demonstrate That There Is No Inconsistency
Between The Governing Regulations And The Lease
Terms ............................................................................ 25

II.    INTERIOR'S FIDUCIARY DUTY DOES NOT ALLOW IT TO DISREGARD
ITS REGULATIONS ..................................................................................................... 26

III.   THE BAYLESS DECISION IS CONTRARY TO INTERIOR'S ESTABLISHED
PRACTICE AND DOES NOT SUPPORT THE JICARILLAS' REQUEST TO
INVALIDATE THE REGULATIONS .......................................................................... 27

A.    The Vastar Decision Does Not Represent A Departure From Agency
Precedent........................................................................................................... 27

B.    The Bayless Decision Has No Basis In Law ....................................................... 28

IV.    THE JICARILLAS PROPER REMEDY IS AN ACTION FOR BREACH OF
TRUST WHICH THEY ARE ALREADY PURSUING IN THE COURT OF
FEDERAL CLAIMS ..................................................................................................... 28

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

Page

Cases

Amerada Hess,
MMS-02-0019-IND (Mar. 13, 2003) ..................................................................... 13

Amoco Production Co.,
MMS-02-0027-IND (Aug. 25, 2003) ..................................................................... 12

Arco Oil & Gas Co.,
MMS-02-0025-IND (Aug. 25, 2003) ..................................................................... 12

*Burlington Resources Oil and Gas Co.,
151 IBLA 144, 1999 WL 1297445 (1999) ................................................. 14, 25, 29

Burlington Resources,
99-0056-IND (Jan. 18, 2002) ......................................................................... 12, 13

Burlington Resources, Inc.,
MMS-02-0029-IND (Aug. 25, 2003) ..................................................................... 13

Cherokee Nation of Oklahoma v. Babbitt,
117 F.3d 1489 (D.C. Cir. 1997) ........................................................................... 14

Cotton Petroleum v. New Mexico,
490 U.S. 163 (1989) ........................................................................................... 20

Dugan Production Corp.,
MMS-98-0130-IND (Dec. 22, 2000) ....................................................................... 1

IMC Global Inc.,
MMS-02-0036-IND (June 19, 2003) ..................................................................... 13

IPAA v. Babbitt,
92 F.3d 1248 (D.C. Cir. 1996) ............................................................................ 17

L.E. Jones Company,
MMS-00-0016-IND (Mar. 13, 2003) ..................................................................... 13

Medallion Exploration,
MMS-98-0082-IND (Mar. 13, 2003) ................................................................ 12, 26

Merrion Oil and Gas Corp.,
MMS-98-0228-IND (Dec. 22, 2000) ....................................................................... 1

- iii -

Midgard Energy Company,
    MMS-02-0013-IND (July 21, 2003) ..................................................................... 13

National Wildlife Fed. v. Watt,
    571 F.Supp. 1145 (D.D.C. 1983) ....................................................................... 14

Pawnee v. United States,
    830 F.2d 187 (Fed. Cir. 1987) ...................................................................... 26, 27

*Phillips Petroleum Co.,
    152 IBLA 109, 2000 WL 1661373 (2000) ....................................................... 14, 25

Phillips Petroleum Company,
    MMS-98-0252-IND (Apr. 30, 2002) .................................................................... 13

Robert L. Bayless,
    MMS-98-0132-IND (Dec. 22, 2000) .............................................................. passim

*Shoshone Indian Tribe and Arapahoe Indian Tribe v. Hodel,
    No. C81-131-K (D. Wyo. 1988) ................................................. 15-16, 19, 25, 27

*Shoshone Indian Tribe of the Wind River Reservation v. United States,
    56 Fed. Cl. 639 (2003) ............................................................................... 23, 27

Tenneco Oil Co.,
    MMS-02-0028-IND (Aug. 25, 2003) .............................................................. 12-13

Uinta Oil and Gas, Inc.,
    MMS-98-0088-IND (March 13, 2003) .................................................................. 12

Unicon Producing Co.,
    MMS-02-0026-IND (Aug. 25, 2003) ................................................................... 12

Union Texas Petroleum,
    MMS-02-0030-IND (Aug. 25, 2003) ................................................................... 13

United States v. Mitchell,
    463 U.S. 206 (1983) ........................................................................................ 26

United States v. Nixon,
    418 U.S. 683 (1974) ........................................................................................ 14

Vastar Resources,
    MMS-99-207-IND (Aug. 25, 2003) .................................................................... 13

*Vastar Resources, Inc.,
    MMS-98-0131-IND (March 28, 2007) ........................................................... passim

Woods Petroleum Corp. v. Department of the Interior,
  47 F.3d 1032 (10th Cir. 1995) ................................................................ 26

Statutes, Rules, and Regulations

25 U.S.C. § 396a-g ................................................................................... 3

18 C.F.R. § 157.40 ................................................................................... 18

25 C.F.R. § 171.30 ................................................................................... 3

30 C.F.R. § 206.103 ................................................................................. 5

30 C.F.R. § 206.150(d) ............................................................................. 4

30 C.F.R. § 206.151 ...................................................................... 9, 19, 20

30 C.F.R. § 206.152(a)(3) .............................................................. passim

30 C.F.R. § 206.153(a)(3) ................................................................ 4, 19

30 C.F.R. § 206.155 ................................................................................. 11

30 C.F.R. § 212.50 ................................................................................... 29

30 C.F.R. Part 206.170 ............................................................................. 5

22 Fed. Reg. 10592 (Dec. 24, 1957) ....................................................... 3

53 Fed. Reg. 1230 (January 15, 1988) ........................................ 4, 20, 24

61 Fed. Reg. 49894 (Sept. 23, 1996) ....................................................... 24

64 Fed. Reg. 43506 (Aug. 10, 1999) ....................................................... 5

71 Fed. Reg. 7453 (Feb. 13, 2006) .......................................................... 24

72 Fed. Reg. 71231 (Dec. 17, 2007) ....................................................... 24

Pub. L. No. 100-234 (1988), 101 Stat. 1719 ........................................... 18

Other Authorities

Final Report and Legislative Recommendations,
  101st Cong., 1st Sess., S.Rept. 101-60 (1989) ..................................... 29

Hearings before the Special Committee on Investigations, Select Committee
  on Indian Affairs, United States Senate (May 12, 1989) ...................... 29

Marla J. Williams, Understanding the Strange New World of Federal Oil and
     Gas Royalty Valuation,
     33 Rocky Mtn. Min. L. Inst. 19-1 (1988) ............................................................... 18

MMS Payor Handbook, available at
     http://www.mrm.mms.gov/ReportingServices/PDFDocs/ogphb3.pdf ........................... 4, 9, 19

Pierce, Administrative Law Treatise, § 6.6 (4th ed. 2002) ........................................... 14

Tribal Resolution 99-R-042-01 (January 1, 1999) ...................................................... 6

Vastar Resources, Inc., Union Texas Petroleum Corporation, and Unicon Producing Company (collectively, "Vastar") respectfully submit this memorandum in opposition to Plaintiff Jicarilla Apache Nation's ("Jicarillas") motion for summary judgment.

SUMMARY

The Jicarillas challenge the Assistant Secretary of Indian Affairs' decision in Vastar Resources, Inc., MMS-98-0131-IND (March 28, 2007) ("Vastar"), appended as Exhibit A.  That decision rejected the Minerals Management Service's ("MMS") major portion price methodology for gas produced on Jicarilla leases from January 1984 through June 1995 because it was contrary to the governing regulations.  The Jicarillas concede (at least for the 1988-1995 time period) that the Jicarilla major portion methodology is contrary to the governing Department of the Interior ("Interior") regulations.  They challenge the Vastar decision, however, on grounds that (i) the Jicarilla major portion methodology was compelled by the lease terms and the terms of the Jicarilla leases control over the regulations; (ii) Interior's fiduciary duty to the Jicarillas required MMS to use the major portion methodology the Jicarillas advocate; and (iii) the Vastar decision is an arbitrary departure from the Bayless decision which upheld the Jicarilla major portion methodology on December 22, 2000.[1]  As a remedy the Jicarillas ask the Court to enforce the Jicarilla methodology or to direct Interior to calculate a new major portion price.

The Court should reject the Jicarillas' challenge to Interior's decision.  First, the Jicarillas' principal claim, made 20 years after the 1988 regulations were promulgated, is that the regulations are inconsistent with the lease terms.  There is no inconsistency between the lease

---

[1]  The "Bayless decision" consists of three nearly identical decisions issued on the same day.  See Robert L. Bayless, MMS-98-0132-IND (Dec. 22, 2000); Merrion Oil and Gas Corp., MMS-98-0228-IND (Dec. 22, 2000); and Dugan Production Corp., MMS-98-0130-IND (Dec. 22, 2000).

terms and the governing regulations. The leases themselves <u>expressly incorporate</u> Interior's regulations. Interior, sub-agencies within Interior, and federal courts across the United States have all considered and upheld the application of these same regulations to production for these same time frames against the backdrop of the same lease terms relied upon by the Jicarillas. <u>Second</u>, Interior's fiduciary duty to the Jicarillas does not allow Interior to disregard its regulations. It is settled law that the regulations define the contours of Interior's fiduciary duty. <u>Third</u>, the <u>Vastar</u> decision is not a departure from Interior precedent. The <u>Bayless</u> decision relied upon by the Jicarillas is the only departure from precedent. The major portion decisions rendered by Interior and the federal courts both before and after <u>Bayless</u> are consistent with <u>Vastar</u> and inconsistent with <u>Bayless</u>. No Interior decision has followed the <u>Bayless</u> analysis. Moreover, the circumstances surrounding <u>Bayless</u> are telling. The decision was issued with just a few days remaining in the Clinton Administration; was drafted with assistance of the Jicarilla attorneys; and relied on novel legal theories.

As a remedy the Jicarillas request the Court to enforce the orders to pay additional royalties or direct Interior to calculate a new major portion price. Enforcing the orders would not be a proper remedy because the major portion methodology used is clearly inconsistent with Interior regulations. Nor would it be proper for the Court to direct MMS to calculate a new major portion price because any such directive would be futile. The insurmountable problem is that MMS failed to obtain the data necessary to calculate a major portion price in a manner required by the regulations and it is impossible to now re-create the needed data given (i) the passage of time, (ii) the provision that lessees are required to retain documents for only six years, and (iii) the likely sale over time of the underlying lease properties to other companies. The Jicarillas are not, however, without a remedy. The Jicarillas currently have a breach of trust

action pending against the United States in the United States Court of Federal Claims for, among other things, failing to properly value oil and gas for royalty purposes.  That is their appropriate remedy; not forcing producers to pay additional royalties on a major portion price which is inconsistent with the regulations.

FACTS

A.   Lease Language.

The Jicarilla leases are identical to thousands of form 5-157 leases Interior has issued under the Indian Mineral Leasing Act of 1938 on millions of acres of Indian lands held in trust for dozens of oil and gas producing Indian Tribes.  25 U.S.C. § 396a-g; 25 C.F.R. § 171.30, 22 Fed. Reg. 10592 (Dec. 24, 1957) (Interior regulation prescribing lease form 5-157).  The major portion provision in those form leases provides that "'value' for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered … at the time of production for the major portion of … gas … produced and sold from the field where the leased lands are situated."  See Indian Lease, ¶ 3c (1947 version), JIC001373, Exhibit B.[2]  Also of significance to the present dispute is paragraph 3(g) of the same form leases.  Paragraph 3(g) expressly incorporates Interior's regulations, both those existing at the time the lease was entered into as well as those promulgated after lease issuance.  Id. at JIC001373 (parties agree "[t]o abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases").

B.   Major Portion Regulations.

Given that the focus of this litigation is gas produced from 1984 to 1995, the major portion provisions of two sets of Interior regulations are implicated.

---

[2]  The administrative record is cited as JIC[page no.], e.g., JIC000123.  Many of the cited administrative record pages are also attached to this opposition as exhibits.

1.    The 1988 Regulations.

MMS' 1988 oil and gas valuation regulations state that "[f]or any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, <u>if data are available</u> to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion."  <u>See</u> 30 C.F.R. §§ 206.152(a)(3)(i) (unprocessed gas), 206.153(a)(3)(i) (1988) (processed gas) ("1988 regulations") (emphasis added).  The regulations define "major portion" to mean

> the highest price <u>paid or offered</u> at the time of production for the <u>major portion</u> of gas <u>production</u> from the <u>same field</u>.  The major portion will be calculated using <u>like-quality</u> gas sold under arm's-length contracts from the <u>same field</u> (or, if necessary to obtain a reasonable sample, from the <u>same area</u>) for <u>each month</u>.  All such <u>sales</u> will be arrayed from highest price to lowest price (at the bottom).  The major portion is that price at which <u>50 percent (by volume) plus 1 mcf</u> of the gas (starting from the bottom) is <u>sold</u>.

<u>Id.</u> at 30 C.F.R. §§ 206.152(a)(3)(ii), 206.153(a)(3)(ii) (emphasis added).[3]  In the preamble to the 1988 regulations, Interior determined that the major portion provision of the new regulations was consistent with the Indian lease terms.  <u>See</u> 53 Fed. Reg. 1230, 1246 (January 15, 1988) (under the new major portion rule, "the Indians will be receiving royalties in accordance with their contract with the lessee"); <u>see also</u> 30 C.F.R. § 206.150(d) (1988) ("The regulations in this

---

[3]  An example of a major portion calculation, reproduced from the MMS Payor Handbook, is as follows.

| Price ($/Mcf) | Volume (Mcf) | Cumulative (%) |
|---|---|---|
| 4.00 | 200 | 100 |
| 2.50 | 100 | 80 |
| 2.00* | 350 | 70 |
| 1.75 | 200 | 35 |
| 1.50 | 50 | 15 |
| 1.00 | <u>100</u> | <u>10</u> |
|  | 1,000 | 100 |

\* The price at which 50 percent plus 1 Mcf of gas was sold is the major portion price.

The Payor Handbook is available at http://www.mrm.mms.gov/ReportingServices/PDFDocs/ogphb3.pdf. (The example assumes all sales are of like quality gas and arm's-length).  <u>Id.</u> at 4-5.

subpart are intended to ensure that the trust responsibilities of the United States with respect to

the administration of Indian oil and gas leases are discharged in accordance with the

requirements of the … lease terms.").[4]

          2.      Pre-1988 Regulations.

      Prior to March 1988 the regulations provided that "[t]he value of production, for the

purpose of computing royalty, shall be the estimated reasonable value of the product as

determined by the Associate Director due consideration being given to the highest price paid for

a part or for a majority of production of like quality in the same field, to the price received by the

lessee, to posted prices, and to other relevant matters."  See 30 C.F.R. § 206.103 (1987) ("pre-

1988 regulations").  "In the absence of good reason to the contrary, value computed on the basis

of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of

production in a fair and open market for the major portion of like-quality oil, gas, or other

products produced and sold from the field or area where the leased lands are situated will be

considered to be a reasonable value."[5]  Id.  MMS and USGS interpreted the pre-1988 regulations

to require a gas volume of more than 50% of the total production when calculating the major

portion price.  See infra at 15-16.

         C.      The Jicarilla Major Portion Price Methodology.

      Although MMS calculated the Jicarilla major portion price, the methodology used was

intended to accommodate the requests of the Jicarillas' Executive Director of Revenue and

Taxation, David Wong.  The record shows that Mr. Wong approved or disapproved various

---

[4]  The 1988 regulations were effective March 1, 1988.  They were recodified at 30 C.F.R. Part 206.170 in 1996 although the major portion language did not change.  Interior substantially re-wrote the Indian gas valuation regulations effective January 1, 2000.  See 64 Fed. Reg. 43506 (Aug. 10, 1999).

[5]  The oil and gas valuation regulations were administered by the United States Geological Survey ("USGS") until 1982 when MMS was created and assumed the USGS' valuation responsibilities.

aspects of how the Jicarilla major portion method price was calculated. <u>See</u>, <u>e.g.</u>, JIC000234 (internal MMS email describing what Mr. Wong would and would not agree to with respect to the methodology), Exhibit C.[6] Internal email messages demonstrate that MMS officials doubted the methodology agreed upon with Mr. Wong and doubted his data. Specifically, and over many months, those MMS officials stated that they had "some real concerns about using this pseudo major portion price," JIC000433; described the data as a "hodge podge," JIC000231; indicated they did "not have a high level of confidence in the data," JIC000431; and openly asked "would this methodology survive an appeal??" JIC000433 (all emails cited in this opposition are included in numerical order in Exhibit C).

      1.    <u>Gas Volumes</u>.

MMS was under considerable pressure from Mr. Wong to calculate the major portion price on a volume less than 50% of the gas produced from the same field or area as required by the governing regulations. MMS officials met with Mr. Wong and "[b]y far and away his highest priority and preference is to persuade MMS to change its calculation methodology to something different than the 50% calculation." <u>See</u> JIC000249-250, Exhibit C. Mr. Wong believed that MMS could disregard its regulations because the lease terms are in conflict with them or, "even if MMS cannot buy into that logic, it can choose to simply ignore and do something different from its published regulations." <u>Id.</u> at JIC000250 (Mr. Wong asked MMS "to consider … calculating [the major portion] on the royalty share only"). MMS initially resisted the request to use a lower volume because Interior regulations and MMS past practice required MMS to use a volume of 50% plus one. JIC000285 ("I agree … on following the 50%

---

[6] Based on an agreement with the Jicarillas, Mr. Wong received a percentage of additional monies he recovered. <u>See</u> Tribal Resolution 99-R-042-01 (January 1, 1999) (executive services contract with Jicarillas included bonus for Mr. Wong based on amount recovered), appended as Exhibit D.

methodology contained in the regulations.  That is the methodology we have used for all other tribes."), Exhibit C.  MMS, however, ultimately deferred to Mr. Wong's position and used substantially less than 50% of the volume of the gas produced to calculate the major portion price.  MMS relied on the price received by the Tribe for its volume of royalty gas taken in kind.[7]  See Jicarilla Methodology Report at 3, JIC000206, Exhibit E.  For most leases the Jicarillas' royalty volume taken in kind was 12.5% (1/8), although a few leases were 16.6% (1/6).  To claim that they met the threshold volume of 50%, MMS "extrapolate[d] the [Jicarillas'] royalty share to the entire eight-eighths and/or six-sixths sales volume and assume[d] the value for the royalty share is representative of the prices received for the other portion of the gas sold from the Reservation."  Id. at JIC000206 (emphasis added).  Stated another way, MMS took the price the Jicarillas received when the Jicarillas sold their 1/8 or 1/6 in kind volume of the gas and assumed that the producer who owned the remaining 7/8 or 5/6 received the identical value.[8]  Id.  Producers were of course selling their 7/8 or 5/6 of the gas volume under contracts entirely different from those of the Tribe to different purchasers and would have had different bargaining power when entering into those separate contracts.  Vastar, for example, as a "large producer" under the Natural Gas Pricing Act ("NGPA"), was legally precluded from selling its gas for the same price as the Tribe, who qualified as a "small producer."  See infra at 18.

---

[7]  An oil and gas lease usually provides that the lessor will receive some percentage, often 1/8 or 1/6, of the value received by the lessee for the produced oil or gas.  The form 5-157 leases allow tribes to choose to take their royalty share "in kind" or "RIK" rather than receiving a check for the royalty share.  JIC0001374, ¶4(c), Exhibit B.  A tribe might pursue that course if, for example, it believes it can sell the oil or gas at a higher price than the lessee can obtain.  The Jicarillas chose to take their production "in kind" and sell it themselves.

[8]  To say that 1/8 or 1/6 of the volume was sold under the RIK contracts is an overstatement.  According to MMS, only "[a]pproximately 2/3 of the 1/8 royalty share was sold under RIK contracts."  JIC000223, Exhibit F.

2.    <u>Sales Data</u>.

The 1988 regulations provide that MMS shall calculate the major portion price if adequate data is available.  MMS acceded to Mr. Wong's position and used the Tribe's sales data to calculate the major portion price.  However, the MMS official responsible for calculating the major portion price, Mr. Joseph Cornellisson, described the data in a memorandum to the Chief of the Royalty Valuation Division as "a hodge podge of manual postings, old computer printouts, pipeline statements, settlement statements etc."  <u>See</u> JIC000231, Exhibit C.  In that memorandum, Mr. Cornellisson quoted the regulations that "if data are available to compute a major portion MMS will, where practicable, compare the values" and stated "I would argue that the data are <u>not available</u> in a format we can use to calculate a major portion price nor is it practical for MMS to essentially computerize the Jicarilla's records."  <u>Id.</u> at JIC000232 (emphasis in original).  Mr. Cornellisson had significant doubts that a calculation relying on the data would be valid.  <u>Id.</u> ("The post settlement methodology may survive an appeal.  I wouldn't bet on the pre-settlement methodology.").  Nor were the Jicarillas willing to confirm the validity of the data.  Mr. Wong refused to sign an affidavit as to the nature of the Jicarillas' sales contracts and contract settlement agreements and he would not agree to "removing non-arm's-length [contracts]" from the data.  <u>See</u> JIC000234 ("David did not agree to an affidavit"), Exhibit C.

3.    <u>Like Quality Gas</u>.

The major portion regulations for all time periods required the major portion price to be calculated using "like quality" oil or gas.  MMS and its predecessor agency within Interior, the USGS, have always interpreted "like quality" to mean gas with similar physical, legal, and

chemical characteristics.[9]  See infra at 19-20.  The Jicarilla methodology lumped together gas of

different qualities.  The calculation included coalbed methane gas produced from the Fruitland

coal formation, which contains high levels of inert (no Btu) carbon dioxide ($CO_2$), and gas

produced from traditional non-coal formations such as the Pictured Cliffs, Chacra, Mesa Verde,

Gallup, and Dakota formations.  Even within the non-coal formations there were significant

differences in Btu contents.  See Vastar at 8 (describing Btu content ranges from an average low

of 1117 in the Pictured Cliffs formation to a high of 1212 in the Dakota formation).  MMS also

did not calculate separate major portion prices for processed and unprocessed gas.[10]  Id. at 9.

4.    Major Portion Field Or Area.

The lease terms and pre-1988 regulations required the major portion price to be

calculated on gas produced from the same "field."  The 1988 regulations provided that if

necessary an "area" could be used when a field produced an insufficient sample to calculate the

major portion price.  An "area," however, still had to contain gas with similar physical

characteristics.  30 C.F.R. § 206.151 (definition of "area").  The MMS auditor "determined that

the State has defined 33 fields within the Jicarilla Reservation Boundary."  See JIC000228,

Exhibit C.  MMS did not calculate the price based on individual fields or "pools," which in New

---

[9]  MMS defines like-quality gas in its Payor Handbook as "gas that has similar methane, NGL's [natural
gas liquids], and non-hydrocarbon gas content (sulfur dioxide, helium, nitrogen, $CO_2$, etc.) and is
classified under the same NGPA wellhead pricing category."  Payor Handbook at 2-26,
http://www.mrm.mms.gov/ReportingServices/PDFDocs/ogphb3.pdf.  The Handbook's reference to the
NGPA is to the Natural Gas Pricing Act of 1978.  That statute categorized gas wells as, for example,
section 102, 103, 104, 107, 108 and included various sub-categories within the sections.  The
classifications depended on factors such as when the well was drilled and the NGPA set maximum lawful
prices which could be obtained for each classification of wells.  To have the same "legal characteristics,"
different wells must have the same classification under the NGPA.

[10]  MMS' self-described "hodge podge" of data had many problems with respect to determining gas with
like legal characteristics under the NGPA.  JIC000231, Exhibit C.  MMS could not identify the correct
sub-category of section 103 gas, although "the Tribe generally used the higher price category"; "the
Jicarilla RIK gas did not have all the subcategories for NGPA 104"; some wells were not classified at all;
and some wells were declassified or reclassified.  Id. at JIC000232, JIC000286, Exhibit C.

Mexico are generally synonymous with "fields."  Instead, it used gas produced from the Reservation as the universe of sales for calculating the major portion price at the insistence of Mr. Wong.  Id. at 000228 ("David [Wong] would like us to use the reservation boundary.").  MMS recognized the tension between its use of the Reservation and the requirement in the regulations and leases that the major portion price be based on production from the same "field" or "area."  Accordingly, in order "to be able to defend that [use of the Reservation] upon appeal," the Chief of the Royalty Valuation Division instructed her personnel to "get from the State [of New Mexico] whatever data you need to defend using the reservation as the field or area."  Id.  The auditor later emailed back saying "[c]ould we sit down Thursday for a few minutes and discuss how to defend not using the state field definitions?"  See JIC000281, Exhibit C.  MMS claimed in its methodology report that it was "unable to define distinct field boundaries" and had to use the Reservation as the major portion area.  See Methodology Report at 4, JIC000207, Exhibit E.

        5.     Settlement Values.

For much of the demand period MMS relied upon and used in the major portion calculation amounts received by the Jicarillas under settlement agreements they entered into with the pipeline companies to whom the Jicarillas sold their gas taken in kind.  Those settlements created problems for calculating the major portion price.  First, the settlements included consideration for matters other than the sale of gas.  The Jicarillas' agreement with Northwest Pipeline Corporation, for example, states that the settlement includes consideration for the assignment of a contract.  See JIC000492, Exhibit G ("As part of this Settlement Agreement, and for the same consideration paid hereunder, the Tribe consents to such assignment").  Second, MMS used the lump sum one-time settlement payments in a complicated formula to calculate an

- 10 -

"annual settlement value" even though the regulations allow only sales payments made on a
monthly basis to be included in the major portion calculation. Methodology Report at 6,
JIC000209, Exhibit E. MMS again expressed its doubts whether proceeding in that manner was
lawful. JIC000434 (Mr. Cornellisson stated "I am in the process of trying to come up with a
pseudo MP [major portion] price that includes the settlement amounts."), Exhibit C.

   6. <u>MMS Demand</u>.

  After calculating the major portion price, MMS issued orders to 39 companies directing
them to pay on the higher of the major portion price as calculated, the gross proceeds received by
the producer (essentially the amount received under an arm's-length contract), or the value
determined by dual accounting for the period January 1984-June 1995.[11] <u>See</u> JIC000190-200.
Many companies, including Vastar, appealed from those orders.

   D. <u>Bayless Decision</u>.

  On December 22, 2000, with approximately 17 days left in the Clinton Administration,
then Assistant Secretary for Indian Affairs, Mr. Kevin Gover, issued three nearly identical
decisions affirming the Jicarilla major portion methodology. <u>Supra</u> at 1 n.1. Mr. Gover offered
various reasons for upholding the methodology. <u>First</u>, he rejected the regulatory requirement to
calculate the major portion price on "50% plus one mcf" as a "volume-weighted median price"
which was inconsistent with the lease terms. <u>See</u> <u>Bayless</u> decision at 5 ("where, as here, the
method in the regulations does not arrive at the highest price paid or offered but rather at a
volume-weighted median price based on data that are not appropriate for the Reservation … the
regulations themselves recognize that the lease terms take precedence over the MMS

---

[11]  Dual accounting compares the wellhead value of the gas before the liquids are extracted to the
combined value of the dry residue gas after it is processed plus liquids less any allowed processing or
transportation costs. <u>See</u> 30 C.F.R. § 206.155 (1988).

regulations"). Second, rather than relying on the plain language of the regulations and leases, Mr. Gover used his own rules of construction, including that (i) "[c]ommon sense and good faith are leading characteristics of all constructions of contracts, statutes and regulations," (ii) "[t]he construction of a rule or agreement shall depend less on artificial rules than on the application of good sense and sound equity to the object and spirit of the matter at hand," and (iii) "[a] particular statute or regulation should be given such construction as would render the statute or regulatory provision practicable, or as practicable as possible." Id. at 4-5. Third, relying on those rules of construction Mr. Gover concluded that the Jicarilla methodology "substantially complied with the requirements of the regulations." Id. at 5. Fourth, he upheld the use of the Reservation as the major portion "area" because the definition of area was intended to be flexible. Id. at 8. Fifth, he found it was reasonable to assume that the Tribe and lessees received the same value for gas because the gas was regulated under the NGPA -- "[i]ndeed, it could hardly have been otherwise." Id. at 4. Sixth, the administrative record in an earlier appeal of the Bayless decision before this Court contained correspondence between counsel for the Jicarillas and Interior demonstrating that the Jicarillas' counsel was allowed to comment on and help draft one of the virtually identical companion decisions. See Bayless v. U.S. Dept. of the Interior, No. 1:01CV00393 (RBW) (D.D.C.) (Document #96, Second Amended Complaint at pp. 17-18, citing draft administrative record), appended as Exhibit H.

E.    Vastar And Other Post-Bayless Decisions.

Interior has issued many major portion decisions after the Bayless decision.[12] Those decisions all consistently require MMS to adhere to the major portion regulations and follow pre-

---

[12] See, e.g., Uinta Oil and Gas, Inc., MMS-98-0088-IND (March 13, 2003); Burlington Resources, 99-0056-IND (Jan. 18, 2002); Medallion Exploration, MMS-98-0082-IND (Mar. 13, 2003); Arco Oil & Gas Co., MMS-02-0025-IND (Aug. 25, 2003); Unicon Producing Co., MMS-02-0026-IND (Aug. 25, 2003); Amoco Production Co., MMS-02-0027-IND (Aug. 25, 2003); Tenneco Oil Co., MMS-02-0028-IND

Bayless case law. See, e.g., Burlington Resources, 99-0056-IND at 6 (Jan. 18, 2002) ("the issue of compliance with the [major portion] regulations is deemed controlling"), Exhibit I. The most recent of those decisions is Vastar. In Vastar, Assistant Secretary Artman concluded that the Jicarilla methodology failed on numerous alternative, independent grounds. See Exhibit A. First, he recognized that "the Secretary must follow the regulations which have the force and effect of law, are binding on all officials of the Department, and may not be waived." Vastar at 6. Second, he determined that (i) by relying on the 1/8 or 1/6 volumes taken in kind by the Jicarillas the methodology relied on substantially less than 50% of arm's-length sales as required by the regulations; (ii) the regulations did not allow MMS to extrapolate the prices received by the Jicarillas for their limited portion of the gas; and (iii) even if the regulations did allow such an extrapolation, there was no evidence that the price received by the Tribe was representative of prices received by the lessees. Id. at 7. Rather, the only evidence was to the contrary -- some large producers, like Vastar, were legally precluded from obtaining the price obtained by the Jicarillas. Id. at 5. Third, Interior's trust responsibility did not justify a contrary result because the "trust responsibility is defined by statutes and regulations." Id. at 7-8. Fourth, the gas was not of "like quality" because (i) it included gas from different formations with different Btu contents, including gas from coal formations which contain high levels of carbon dioxide ($CO_2$) and (ii) failed to distinguish between processed and unprocessed gas as required by the regulations. Id. at 8-9. Fifth, the methodology improperly relied on production from the entire Reservation rather than a "field," and the Reservation could not properly qualify as an "area" because gas across the Reservation did not all have similar physical and other characteristics. Id.

(Aug. 25, 2003); Burlington Resources, Inc., MMS-02-0029-IND (Aug. 25, 2003); Union Texas Petroleum, MMS-02-0030-IND (Aug. 25, 2003); Vastar Resources, MMS-99-207-IND (Aug. 25, 2003); Phillips Petroleum Company, MMS-98-0252-IND (Apr. 30, 2002); L.E. Jones Company, MMS-00-0016-IND (Mar. 13, 2003); Midgard Energy Company, MMS-02-0013-IND (July 21, 2003); Amerada Hess, MMS-02-0019-IND (Mar. 13, 2003); IMC Global Inc., MMS-02-0036-IND (June 19, 2003).

at 9-10.  Sixth, the methodology improperly relied on annual settlement values rather than monthly sales as required by the regulations.  Id. at 10-11.

ARGUMENT

I.    THE VASTAR DECISION SHOULD BE AFFIRMED BECAUSE THE JICARILLA METHODOLOGY VIOLATES THE GOVERNING REGULATIONS.

A.    Legal Standard.

It is settled hornbook law that Interior's legislative regulations have the force and effect of law, are binding on Interior, and may not be waived.  See, e.g., Pierce, Administrative Law Treatise, § 6.6 (4th ed. 2002) ("Binding Effect of Legislative Rules"); United States v. Nixon, 418 U.S. 683, 695-96 (1974); Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1499 (D.C. Cir. 1997) (Interior "is required to follow its own regulations"); National Wildlife Fed. v. Watt, 571 F.Supp. 1145, 1158 (D.D.C. 1983) ("the APA obligated the Secretary [of the Interior] to follow his own regulation" until rescinded "irrespective of the validity of [the associated statute").  Interior's major portion regulations are no exception.  Interior has repeatedly rejected major portion price calculations which do not comply with the governing regulations.  See, e.g., Burlington Resources Oil and Gas Co., 151 IBLA 144, 159, 1999 WL 1297445 (1999) (finding data relied on by MMS to calculate major portion price were "inconsistent with the plain language of the [major portion] regulations"); Phillips Petroleum Co., 152 IBLA 109, 117, 2000 WL 1661373 (2000) (rejecting major portion calculation because "MMS' interpretation effectively takes away by decision that which it has granted by regulation").[13]

---

[13]  The major portion calculation in Burlington, 151 IBLA at 144, included the time "period January 1987-December 1991."  The Interior Board of Land Appeals concluded that the pre-1988 and 1988 regulations had "substantially the same requirements for the major portion analysis."  Id. at 157 n.2.

B.    The <u>Vastar</u> Decision Correctly Found That The Jicarilla Major Portion Price Is Contrary To The Governing Regulations.

Interior correctly determined in <u>Vastar</u> that the Jicarilla methodology violated the governing regulations in a handful of respects, each of which alone is sufficient grounds for the Court to affirm Interior's decision.

1.    The Volumes Used Were Contrary To The Regulations.

<u>1988 regulations</u>.  The Jicarilla methodology used the volume of the Jicarillas' royalty in kind gas -- either a 1/8 or 1/6 share of the total well volume.  There is no dispute that the volume used in the Jicarilla methodology is contrary to the 1988 regulations.[14]  The 1988 regulations state on their face that a "major portion" of gas is "50% (by volume) plus 1 mcf," 30 C.F.R. § 206.152(a)(3)(ii); the volume of gas MMS used in the Jicarilla methodology was substantially less than 50% plus one; and the Jicarillas concede that the methodology was inconsistent with the 1988 regulations, <u>see</u>, <u>e.g.</u>, Op. Br. at 8 ("the Jicarilla major portion methodology was not based on the 1988 regulations because … the regulations … were inconsistent with the Jicarilla leases").

<u>Pre-1988 regulations</u>.  MMS and its predecessor agency within Interior, USGS, have long interpreted the pre-1988 regulations to require a volume of 50% plus one as well.  USGS defined the highest price paid for a majority of like-quality production in its Conservation Division Manual during the 1970s as "[t]hat price at which more than 50 percent of the current production from the field or area is sold."  <u>See</u> <u>Shoshone Indian Tribe and Arapahoe Indian Tribe v. Hodel</u>,

---

[14]  There may be some uncertainty as to the precise volume used in the Jicarilla methodology.  In <u>Vastar</u> the Assistant Secretary recognized that the volume was the 1/8 or 1/6 taken in kind by the Jicarillas.  <u>Id.</u> at 6-7.  If MMS accurately represents that only "[a]pproximately 2/3 of the 1/8 royalty share was sold under RIK contracts," then the Jicarilla's volume is even less -- approximately 8.25% (66% x 12.5%).  <u>Supra</u> at 7 n.8.  Counsel for the Jicarillas were successful in having the <u>Bayless</u> decision cite a figure of 25%, although the decision does not offer any support for that figure.  <u>See</u> Exhibit H.  Regardless of the precise volume, all parties agree the percentage is substantially below the 50% plus one required by the regulations.

- 15 -

No. C81-131-K at 3 (D. Wyo. 1988) ("Shoshone"), appended as Exhibit J.  The USGS definition was ambiguous, however, as to whether the major portion should be calculated using a weighted average of the top 50% of sales or 50% plus one starting from the bottom.  Id.  In the course of litigating that issue in Shoshone, MMS' Chief of Royalty Valuation (and former Associate Deputy Director for Royalty Management in USGS) William Feldmiller testified that the "established precedent and practice of the MMS and its predecessor agency [the USGS]" is to use the "median base floor price method," which is the 50% plus one method.[15]  See Feldmiller Aff. at ¶¶10,11 (Sept. 8, 1987), JIC000467-468, Exhibit K.  Judge Kerr of the United States District Court for the District of Wyoming upheld that interpretation.  See Shoshone at 6, Exhibit J ("[t]he Secretary's interpretation of his regulation as requiring a median base floor calculation in conducting a major portion price analysis … [is] a reasonable exercise of his trust responsibility").  There is no basis to now claim more than 20 years later that the pre-1988 regulations required some other volume.

> 2.    The Regulations Did Not Permit The Jicarillas To "Extrapolate" From The Jicarilla Sales.

The regulations speak in terms of "sales."  See, e.g., 30 C.F.R. § 206.152(a)(3) (1988) ("[a]ll such sales will be arrayed").  There is nothing in the regulations which would permit MMS to "assume" that the producers received the same price as the Jicarillas and therefore to "extrapolate" the Jicarillas' sales price to the producers' remaining production.  Nor is there any basis to assume that the Jicarillas and producers received the same price.

---

[15]  Interior testified that under that method prices for gas "are listed in ascending order, together with the volume produced."  See Feldmiller Aff. at ¶11, JIC000468, Exhibit K.  "The incremental amounts of gas are then summed beginning with the amount associated with the lowest price and continuing until an incremental amount of gas causes the cumulative total to exceed 50 percent of the total production sold.  The price which is associated with the incremental amount of gas which caused the summation to exceed 50 percent is deemed to be the majority price or median."  Id.

First, it is counterintuitive to "assume" that 39 separate companies negotiated the same price as that negotiated by the Jicarillas. The Jicarillas and producers all entered into separate contracts with various purchasers of gas over different periods of time. Each producer would exert unique influences and extract contract terms different from the Jicarillas. The Jicarillas presumably only took their gas in kind because they thought they could sell it for more than the producers. If producers did receive the same price as the Jicarillas, then there would no major portion dispute because everyone would have received the same price.

Second, to assume as MMS did that amounts received under settlement agreements entered into by the Jicarillas reflect the same value received by producers is even more unlikely. Which producers even entered into settlement agreements is not known. However, it is certain that any settlement value negotiated by the Jicarillas would be a function of the Jicarillas' original contract terms (length of contract, price etc), litigation risk, and other unique issues between the Jicarillas and their purchaser. See supra at 10-11 (Jicarillas and Northwest settlement included consideration for separate assignment). It is virtually impossible that those producers who did settle with their purchasers settled for the same settlement value agreed upon by the Jicarillas.[16]

---

[16] MMS' reliance on settlement values fails for at least two additional reasons. First, the regulations state that "major portion means the highest price paid or offered at the time of production." 30 C.F.R. § 206.152(a)(3) (1988). MMS previously rejected the Jicarillas' attempt to rely on settlement values because they were not amounts "paid or offered." See JIC000285 (MMS rejected Jicarilla settlement value as major portion price because it "did not represent the highest price PAID or OFFERED for a major portion of production, it was just the price David [Wong] negotiated on the royalty share") (upper case in original), Exhibit C. Second, some of the Jicarillas' settlement agreement payments were likely not royalty bearing. The settlement with Northwest for example was a "buyout" -- an agreement in which one party is released from the contract for a lump sum. See JIC000506 (Northwest correspondence referring to settlement as a buyout); JIC000516 (MMS describing contract as buyout). "Buyouts" are not payments for the production of gas and therefore are not royalty bearing. See IPAA v. Babbitt, 92 F.3d 1248, 1252-53 (D.C. Cir. 1996) ("statute contemplates royalties on gas actually produced and taken"). MMS' auditor acknowledged that "[t]his language [in the Northwest agreement] might be interpreted as a representing a buyout of future gas purchase obligations" and expressed doubts over using those

Third, the evidence before the agency showed that the values received by producers were not identical to those values received by the Jicarillas. Many large companies were legally precluded from receiving the price for gas which the Jicarillas received. The Jicarillas qualified for the "small producer" price under the NGPA. See JIC000253, Exhibit L; 18 C.F.R. § 157.40 (1987) (defining small producer). Vastar, like many other large companies subject to MMS' orders, qualified for the lower "large producer" price based on its level of sales. Prices for large and small producers differed substantially. See JIC000255-256 (comparing prices), Exhibit L. MMS conceded that large producers and small producers were entitled to different prices under the NGPA. See JIC000411 ("MMS recognizes the fact that 'large producers' are not legally entitled to the same MLPs [maximum lawful prices] that 'small producers' are legally entitled to for the applicable NGPA category of gas."), Exhibit M. Nevertheless, the Jicarillas claim that because the gas was regulated under the NGPA everyone must have received the same price. See, e.g., Op. Br. at 31 ("Indeed, it could hardly have been otherwise."). That claim does not square with the evidence before MMS or the common sense reality that everyone would not receive identical prices.[17]

---

settlement values in the major portion calculation. JIC000433 ("[w]ould this methodology survive an appeal??"), Exhibit C.

[17] Producers were not all receiving the maximum lawful price permitted under the NGPA as Congress recognized in Pub. L. No. 100-234 (1988), 101 Stat. 1719 ("between 1982 and 1986 gas prices in many areas declined below the maximum lawful prices established under the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.)"). MMS recognized as well that "Actual market prices began to fall below [NGPA] ceiling prices as early as 1982 for some gas categories. By January 1985, most market prices were $3.00 or less per thousand cubic feet, while ceiling prices ranged up to $5.90. By July 1985, market prices were $2.50 per thousand cubic feet, while federal ceiling prices exceeded $6.00." See Marla J. Williams, Understanding the Strange New World of Federal Oil and Gas Royalty Valuation, 33 Rocky Mtn. Min. L. Inst. 19-1, 19-39 (1988) (quoting MMS press release).

3.    MMS Did Not Rely On Like Quality Gas As Required By The
Regulations.

The 1988 regulations require gas used in the major portion calculation to be of like

quality and define "like quality" as gas with the same legal, physical, and chemical

characteristics.  See 30 C.F.R. § 206.151 (1988) (defining like quality).  For the pre-1988 time

period MMS and USGS required the major portion calculation to be based on like quality gas

and used the same definition.  See Shoshone at 7 ("'like-quality' means lease products which

have similar chemical, physical and legal characteristics"), Exhibit J.  In the Jicarilla

methodology MMS used gas from all formations within the Reservation, notwithstanding

differences in that gas, including different Btu values and different levels of inert substances

such as carbon dioxide ($CO_2$) in coalbed methane (gas produced from coal formations).  Nor did

MMS distinguish between processed and unprocessed gas, even though the regulations and

MMS Payor Handbook make clear that separate major portion calculations must be prepared for

processed and unprocessed gas.  See 30 C.F.R. § 206.152(a)(3); 30 C.F.R. § 206.153(a)(3)

(separate major portion regulations for unprocessed and processed gas); Vastar at 9 (failure to

calculate separate major portion price for processed gas did "not comply with MMS's

established methodology as announced in its Payor Handbook" and did "not comply with

MMS's regulations for determining the major portion price for processed gas").

In a footnote to their brief the Jicarillas seek to absolve MMS' failure to use like quality

gas by claiming the Jicarillas' contract adjusted for different Btu levels, specified that gas be of a

certain quality with not more than 5% carbon dioxide, and sold gas at the wellhead meaning that

it was all valued as unprocessed gas for royalty purposes.  See Op. Br. at 31 n.16.  Even

assuming that all the Jicarillas say with respect to their contract is true, it is not controlling

because it only addresses the Jicarillas' portion of the gas.  Whatever the Jicarillas' contract

provided, it means nothing with respect to the terms under which the producers sold the remaining 5/6 or 7/8 volume of gas.  There is no evidence that the producers' contracts accounted for those issues in a way which would allow MMS to ignore differences in quality. Nor is there evidence that, for example, the lessees sold their gas at the wellhead such that it would be treated as unprocessed gas as the Jicarillas claim was the practice under their contract. MMS was required to use like quality gas under the regulations and failed to do so.

    4.  The Reservation Boundary Is Not Consistent With The Definition Of "Field" Or "Area" Set Out In The Regulations.

   The regulations require MMS to calculate the major portion price on production from the same field.  30 C.F.R. § 206.152(a)(3) (1988) ("major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field.").  "[I]f necessary to obtain a reasonable sample," id., MMS may look to an "area," which is defined as "a geographic region … in which oil and or gas lease products have similar quality, economic, and legal characteristics," 30 C.F.R. § 206.151 (1988).  The regulations permit MMS to look to an entire area only if there is an insufficient sample from the field.  Vastar at 10; 53 Fed. Reg. at 1246 ("Generally, it will not be necessary to look beyond the field.").  Here MMS used the Reservation boundary because Mr. Wong demanded it.  See supra at 9-10.  There is no relationship between the Reservation boundary and oil and gas fields or pools.  The Reservation was created through a series of Presidential Executive Orders in the late 1800s which had nothing to do with oil and gas reservoirs.  See, e.g., Cotton Petroleum v. New Mexico, 490 U.S. 163, 166 (1989) (describing creation of the Reservation).  Moreover, even if MMS could look to an "area" because the fields or pools provided insufficient information to calculate a major portion price and MMS could somehow geologically define the "area" as the Reservation, the

area still could not pass muster under the regulations because the Reservation includes gas produced from diverse formations with different qualities.  See Vastar at 10.

        5.      **Sales Were Not Calculated On A Monthly Basis As Required By The Regulations.**

The regulations require the major portion price to include gas sales from a field or area on a monthly basis.  See 30 C.F.R. § 206.152(a)(3) (1988) (major portion is based on sales "for each month").  The one time lump sum settlement values relied upon by MMS do not satisfy that regulatory requirement.  MMS then compounded the problem by using the one time settlement payments "to determine a total annual settlement value."  See Major Portion Methodology at 6, JIC000209, Exhibit E.  As the Vastar decision notes, Interior has in the past held it cannot even use quarterly, much less annual, information because such a course is not consistent with the regulatory requirement to use monthly sales.  Vastar at 11; JIC000284 (MMS found in major portion calculation for Southern Ute Tribe that "because the operators report sales information to the State on a quarterly basis, [MMS] could not use the State's database to calculate monthly major portion prices").  By relying on annual values MMS again failed to comply with Interior regulations.  The Jicarillas argue the problem is solved because their sales contracts called for monthly sales.  Op. Br. at 31 n.16.  Again, even assuming that the annual settlement values calculated by MMS can be characterized as a "sale," the Jicarillas claim fails because there is still no basis for relying upon an "annual settlement value" and even if there were it in no way accounts for the vast majority of gas which was not subject to the Jicarillas' settlement agreements.

        C.      **The Lease Terms Do Not Allow The Jicarillas To Disregard The Controlling Regulations.**

The Jicarillas concede that (i) the major portion methodology is not consistent with the regulations (at least for the 1988-1995 time period) and (ii) an agency is bound by its own

regulations.  <u>See</u> Op. Br. at 11-12.  In an effort to avoid the problem that their methodology is

inconsistent with Interior regulations, the Jicarillas argue that the regulations require the lease

terms to control with respect to any inconsistency and the 1988 regulations are inconsistent with

the Jicarilla lease terms.  The only "inconsistency" between the lease and regulations alleged by

the Jicarillas is that the "50% plus one mcf" method contained in the regulations is a "weighted-

average median" price which conflicts with the highest price paid or offered for a majority of

production as provided for under the lease.  <u>See</u> Op. Br. at 6, 8, 11, 12 ("[r]ather than basing the

value of production on the '<u>highest</u> price paid or offered' for the '<u>major portion</u>' of gas, the 1988

regulations based the value of production for royalty purposes on a volume-weighted <u>median</u>

price for the <u>majority</u> of gas sold" which is 50% plus one mcf) (emphasis in original).  The

Jicarilla leases are no different from thousands of other Indian leases issued by Interior under the

Indian Mineral Leasing Act, are fully consistent with Interior regulations, and do not now

suggest a means to disregard regulations promulgated 20 years ago.

      1.    <u>The Leases Expressly Incorporate Interior's Regulations</u>.

Rather than being inconsistent with the regulations, the Jicarilla leases expressly

<u>incorporate</u> the regulations into the leases.  Paragraph 3(g) of the Jicarilla leases provides that the

parties will "abide by and conform to any and all regulations of the Secretary of the Interior now

or hereafter in force relative to such leases."  <u>See</u> Lease ¶ 3(g), JIC001373, Exhibit B.  The lone

exception is "[t]hat no regulation hereafter approved shall effect a change in rate of royalty or

annual rental herein specified without the written consent of the parties to this lease."  <u>Id.</u>  Under

the terms of the leases, the pre-1988 and 1988 regulations are incorporated into the leases and the

Jicarillas are bound by the regulations under the terms of the leases, regardless of whether the

Jicarillas agree with the regulations or may have preferred some other regulation.

The courts have held that tribes may not disregard the 1988 regulations because paragraph 3(g) incorporates those regulations.  In Shoshone Indian Tribe of the Wind River Reservation v. United States, 56 Fed. Cl. 639, 650-51 (2003), the Tribe argued it was not bound by a provision in the 1988 regulations making certain types of payments non-royalty bearing because "the meaning of the lease language is determined by reference to the governing law and the contemporaneous construction of the parties when the leases were executed" rather than by reference to the 1988 regulations.  The court held the Tribe could not disregard the regulations. Under paragraph 3(g) the Tribe was bound by Interior's 1988 valuation regulations even if those regulations were ultimately detrimental to the Tribes.  Id. at 651.  "Even if the 1988 regulation in effect at the time of the settlement could be viewed as detrimental to the Tribes, however, the court finds that the government was entitled to rely on it" because "[t]he leases at issue state that the parties will 'abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases."  Id.  The court additionally held that the exception in paragraph 3(g) barring any regulation from changing the royalty rate goes only to the actual percentage royalty rate in the lease, not the manner in which gas is valued generally for royalty purposes.[18]  Id.  Accordingly, rather than somehow superseding the regulations, the leases themselves are compelling evidence that they are consistent with the regulations.

---

[18]  The Shoshone Indian Tribe case presented a more compelling argument than that presented by the Jicarillas because the regulations at issue in Shoshone Indian Tribe actually made a payment non-royalty bearing which had previously been treated as royalty bearing.  In contrast the 1988 regulations did not change the manner in which Interior calculated the major portion price.

2.    Interior Has Repeatedly Recognized Over Many Years That The "Weighted-Average-Median" Or "50% Plus One Mcf" Volume Is Consistent With The Lease Terms.

a.    The 1988 Regulations.

The 1988 regulations on their face apply the major portion methodology to "any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production."  30 C.F.R. § 152(a)(3) (1988).  In the preamble to those regulations Interior interpreted the 1988 major portion regulation as being consistent with the lease terms. See supra at 4.  "MMS believes that for these Indian leases, by comparing the major portion to values determined using arm's-length-contract prices or the benchmarks for non-arm's-length-contracts, and using the higher of the two, the Indians will be receiving royalties in accordance with their contract with the lessee."  53 Fed. Reg. at 1246.  Interior today continues to interpret the 50% plus one method as consistent with the lease terms.  MMS' recently proposed oil valuation rule (i) recognized that "[m]ost Indian leases include a major portion provision, under which value may … be calculated on the basis of the 'highest price paid or offered at the time of production for the major portion of oil production from the same field" and (ii) proposed to retain the "50th-percentile-plus-one-unit measure."  71 Fed. Reg. 7453, 7455-56 (Feb. 13, 2006). The Tribes want a lower percentage and MMS has now convened a negotiated rulemaking committee to attempt to reach a compromise.  72 Fed. Reg. 71231, 71237 (Dec. 17, 2007).[19]

---

[19]  The Jicarillas claim the amendments to the 2000 Indian gas valuation regulations support their position that there is an inconsistency between the regulations and lease terms.  Op. Br. at 7.  Interior can always promulgate new rules which adopt a different major portion methodology.  MMS did adopt a 25% volume for gas in the 2000 regulations.  The 2000 regulations were a function of a negotiated rulemaking committee's compromise; they do not suggest that leases were inconsistent with the 50% plus one volume.  61 Fed. Reg. 49894, 49899 (Sept. 23, 1996) ("[c]ommittee agreed that the price at which 25 percent or more of the gas is sold is a reasonable compromise").

b.    The Pre-1988 Regulations.

Prior to the 1988 regulations both MMS and USGS interpreted the 50% plus one

"median" price methodology to be consistent with the lease terms.  In Shoshone, MMS testified

that it was "responsible for assuring that the determination of value for royalty purposes is in

accordance with the … lease terms"; that the "lease terms [do not] describe the method to be

used in determining the price paid for the major portion of like-quality production from the same

field or area"; and that MMS and USGS used the "median base floor price method" because it

had been previously used in litigation involving the Jicarillas and therefore "had the advantage of

being a court-accepted interpretation of the Indian lease form and Indian regulations."

Feldmiller Aff. at ¶¶ 1,5,9, JIC000466-467, Exhibit K.  MMS testified that "[t]he 'median base

floor price method' … provides a reasonable value for royalty purposes, statistically represents

the price for a major portion of like-quality production sold from the same field or area, and

fulfills the intent of … the Indian leases and applicable regulations."  Id. at ¶10, JIC000467.

c.    The Cases Demonstrate That There Is No Inconsistency Between
The Governing Regulations And The Lease Terms.

Interior has decided many appeals challenging the manner in which MMS calculated the

major portion price.  Most all of the leases in those major portion calculations contained the

same paragraph 3(c) which the Jicarillas claim is inconsistent with the 50% plus one mcf

methodology.  Many of those cases involved highly sophisticated oil and gas producing tribes

such as the Southern and Northern Utes.  Yet Interior held that MMS was required to comply

with the regulations and did not find any conflict between the lease language of paragraph 3(c)

and the major portion regulations.  See, e.g., Burlington Resources, Inc., 151 IBLA at 152

(quoting major portion lease language), 159 (rejecting major portion methodology because it was

"inconsistent with the plain language of the regulation"); Phillips Petroleum, 152 IBLA at 114

(citing lease paragraph 3(c)), 117 (calculation failed to comply with regulations); Medallion

Exploration, MMS-98-0082-IND at 4-5 (March 13, 2003) (applying 1988 regulations to identical

lease language and finding methodology did not comply with regulations), appended as

Exhibit N.  For the Jicarillas to now claim 20 years after the regulations were promulgated that

the lease terms invalidate the major portion regulations rings hollow.

## II.    INTERIOR'S FIDUCIARY DUTY DOES NOT ALLOW IT TO DISREGARD ITS REGULATIONS.

The Jicarillas commit a substantial portion of their brief to arguing that Vastar is contrary

to Interior's fiduciary duty to act in the best interest of the Jicarillas.  See Op. Br. at 19-24.  That

fiduciary duty, according to the Jicarillas, required Interior to interpret the regulations and lease

terms in a way which maximized revenues to the Jicarillas.  Id.  Interior does have a fiduciary

duty to act in the best interests of the Jicarillas.  That fiduciary duty to the Tribe does not,

however, obviate the agency's obligation to comply with its regulations.  Rather, it is settled law

that the regulations define the contours of the fiduciary duty.  See, e.g., United States v. Mitchell,

463 U.S. 206, 224 (1983) ("the statutes and regulations … define the contours of the United

States' fiduciary responsibilities"); Woods Petroleum Corp. v. Department of the Interior,

47 F.3d 1032, 1038 (10th Cir. 1995) ("the Secretary's fiduciary duty to the Indians … is not

boundless and cannot be exercised in a manner that exceeds or flouts the … regulations").  That

rule is no less applicable when defining the scope of Interior's fiduciary duty with respect to

regulations governing major portion pricing.

In fact, the courts have rejected tribal claims that Interior's fiduciary duty allows it to

disregard the major portion provisions of Interior regulations.  See Pawnee v. United States,

830 F.2d 187, 191, 192 (Fed. Cir. 1987).  In Pawnee, the court rejected the Tribe's claim that it

was entitled to royalties on the average of the three highest prices in the county where the gas

was produced because "statutes and regulations define the contours of the United States' fiduciary responsibilities" and Interior may not "go contrary to and beyond the regulations and leases." Id.  The court in Shoshone Indian Tribe, 56 Fed. Cl. at 648-49, confirmed the holding in Pawnee that tribes could not "ask … the Secretary to go contrary to and beyond the [major portion] regulations and the leases in order to fulfill its alleged fiduciary obligation," but could "ask … that the Secretary comply with her own regulations."  The Jicarillas here are asking for a major portion methodology which they admit does not comply with the regulations.

Nor does Interior's fiduciary duty support the Jicarilla methodology under the pre-1988 regulations.  In Shoshone, the court upheld the 50% plus one method as consistent with Interior's trust responsibilities.  Id. at 6 ("[t]he Secretary's interpretation of his regulation as requiring a median base floor price calculation in conducting a major portion price analysis and the Secretary's consideration of the legal characteristics of the gas in comparing gas of like-quality are a reasonable exercise of his trust responsibility and not a breach of the fiduciary obligation owed by the Secretary to the plaintiff Indian Tribes"), Exhibit J.

III.    THE BAYLESS DECISION IS CONTRARY TO INTERIOR'S ESTABLISHED PRACTICE AND DOES NOT SUPPORT THE JICARILLAS' REQUEST TO INVALIDATE THE REGULATIONS.

A.    The Vastar Decision Does Not Represent A Departure From Agency Precedent.

The Jicarillas argue that the Bayless decision represents established precedent and Vastar is an arbitrary and capricious departure from that precedent.  See Op. Br. at 13-16.  The Bayless decision is the only departure from long-standing precedent.  Interior's precedent both before and after the Bayless decision was that MMS (and its predecessor, USGS) was required to comply with the major portion regulations and the failure to comply with them requires that the methodology be rejected.  See supra at 14 (before Bayless) and 12-14 and n.11 (after Bayless).

The Vastar decision is fully consistent with the decisions before and after <u>Bayless</u>.  No decision has followed the <u>Bayless</u> analysis.

       B.      <u>The Bayless Decision Has No Basis In Law</u>.

      The <u>Bayless</u> decision is not supported.  <u>First</u>, the decision was issued with just a few days left in the Clinton Administration and counsel for the Jicarillas were allowed to comment on and help draft at least one of the virtually identical draft decisions.  <u>Second</u>, the claim that the Jicarilla methodology is proper because the regulations result in a weighted median value rather than the highest price paid or offered as required under the leases ignores the agency's own precedent.  <u>Third</u>, the Assistant Secretary's "rules of interpretation" are questionable at best.  The <u>Bayless</u> decision's reference to "good sense and sound equity," "to the object and spirit of the matter at hand," and to "such construction as would render the statutory or regulatory provision practicable, or as practicable as possible" only serves to highlight the transparent deficiencies in the decision.  The relevant analysis is the plain language used in the controlling regulations which <u>Bayless</u> studiously avoided.  <u>Fourth</u>, the decision never acknowledges that the regulations are binding on the agency and never seeks to distinguish prior inconsistent precedents.  Rather, the decision concludes that the agency "substantially complied" with the regulations.  Agencies are bound by and may not waive their regulations.  <u>See</u> <u>supra</u> at 14.

IV.     THE JICARILLAS PROPER REMEDY IS AN ACTION FOR BREACH OF TRUST WHICH THEY ARE ALREADY PURSUING IN THE COURT OF FEDERAL CLAIMS.

      Appellants ask the Court to either enforce the Jicarilla methodology or direct Interior to calculate a new major portion price.  Neither remedy is appropriate.  The Jicarilla major portion price cannot stand as calculated.  Nor is there any value in directing MMS to calculate a new major portion price because the necessary information is not available and cannot now be made available.  Two decades ago the Senate Select Committee on Indian Affairs held hearings on

MMS' failure to calculate major portion prices and for otherwise not complying with royalty obligations under the Indian lease terms and regulations. One of the recommendations of that Committee was to "[e]nforce, by implementing penalties where appropriate, the performing of majority pricing"). See, e.g., Final Report and Legislative Recommendations, 101st Cong., 1st Sess., S.Rept. 101-60 at 220 (1989), Exhibit O. At that time MMS could have revised its Form 2014s (monthly payor information form royalty payors submit to MMS) and other records to require companies to provide the information necessary to prepare a major portion price consistent with the regulations. Indeed, MMS told the Senate Committee in 1989 it was in the process of obtaining the necessary data. Hearings before the Special Committee on Investigations, Select Committee on Indian Affairs, United States Senate at 145-47 (May 12, 1989) ("[w]e [MMS] are researching right now and looking at possible regulatory action that would permit us to get the data so that we could publish the majority price"), Exhibit P. However, as the Interior Board of Land Appeals concluded in Burlington, MMS chose not to do so.

> The regulations establishing the criteria for major portion analysis were MMS regulations. The information reflected on the MMS Form 2104s was that requested by MMS, and could have been enhanced at MMS' will to include a list of nonarm's-length transactions and sales from regulated wells (NGPA sales). MMS did not do so, and there is no indication that it is doing so now.

See Burlington, 151 IBLA at 158. MMS did not begin to obtain the necessary information until 2000. The result is that it is now impossible to calculate a major portion price consistent with the regulations. MMS never requested the necessary information from companies and the information is no longer obtainable. Companies are generally only required to keep documents for six years, 30 C.F.R. § 212.50 (1988), and, accordingly, may have destroyed records from the 1987-1995 time period or else transferred them to other companies when the underlying

properties were sold.  The fact that MMS cannot calculate a major portion price does not, however, mean that it can calculate a made-up price.  The proper remedy for the Jicarillas is, like other Tribes, to bring a breach of trust action against Interior.  The Jicarillas already have such an action pending.  See Jicarilla Apache Nation v. United States of America, No. 02-25L (Court of Federal Claims) (first amended complaint states that the Jicarillas "bring this action to obtain compensation for loss and damages due to Defendant's breaches of duties arising under … statutes and federal regulations and contractual documents such as oil and gas leases"), Exhibit Q.

CONCLUSION

For the foregoing reasons, Vastar Resources, Inc., Union Texas Petroleum Corporation, and Unicon Producing Company respectfully request the Court to deny the Jicarilla's motion for summary judgment.

Dated this 6th day of March, 2008.

DAVIS GRAHAM & STUBBS LLP


/s Charles A. Breer
Charles L. Kaiser, D.C. Bar No. 309203
Charles A. Breer
1550 Seventeenth Street, Suite 500
Denver, Colorado  80202
Telephone:  303-892-9400
Facsimile:  303-893-1379

Attorneys for Intervenor-Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JICARILLA APACHE NATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | : | |
| | : | Civil Action |
| Defendant, | : | No. 1:07-CV-00803-RJL |
| | : | |
| and | : | |
| | : | |
| VASTAR RESOURCES, INC., UNION TEXAS PETROLEUM, AND UNICON PRODUCING COMPANY, | : | |
| | : | |
| Intervenor-Defendants. | | |

---

[PROPOSED] ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

---

Upon consideration of Vastar Resources, Inc.'s, Union Texas Petroleum's, and Unicon

Producing Company's Memorandum in Opposition to Jicarilla Apache Nation's Motion for

Summary Judgment and the record in this case, the Court hereby Orders that Plaintiff's Motion

for Summary Judgment is denied.

SIGNED this _____ day of _____, 2008.

_____
United States District Court Judge

Notice was mailed or delivered on the date of filing to the following parties:

Charles L. Kaiser, (D.C. Bar No. 309203)
Charles A. Breer
1550 Seventeenth Street, Suite 500
Denver, Colorado  80202
Telephone:  303-892-9400
Facsimile:  303-893-1379
*Counsel for Intervenor-Defendants Vastar Resources*, *Inc., et al.*

Jill Elise Grant (D.C. Bar No. 35806)
Jenny J. Dumas
Nordhaus Law Firm, LLP
1401 K Street, NW, Suite 801
Washington, DC  20005
Telephone:  (202) 530-1270
Facsimile:  (202) 530-1920
*Counsel for Plaintiff Jicarilla Apache Nation*

Ruth Ann Storey
Natural Resources Section
Environmental & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, DC  20044-0663
Telephone:  (202) 305-0493
Facsmile:  (202) 305-0506
*Counsel for Defendant Department of the Interior*



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

**MAR 2 8 2007**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Charles A. Breer
Davis, Graham & Stubbs L.L.P.
370 Seventeenth St., Suite 4700
Post Office Box 185
Denver, Colorado 80202

Re: MMS-98-0131-IND
     Vastar Resources, Inc.

Mr. Jason E. Doughty, Attorney
Exxon Company, U.S.A.
P.O. Box 2180, Suite 1748
Houston, Texas  77252-2180

Re: MMS-98-0134-IND
     Exxon Company, U.S.A.

Ms. Constance L. Rogers
Holme Roberts & Owen, L.L.P.
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203

Re: MMS-98-0141-IND
     Burlington Resources Oil
     & Gas Company L.P.

Ms. Stevia M. Walther
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099

Re: MMS-99-0084-IND
     MMS-99-0106-IND
     Union Texas Petroleum Corporation
     Unicon Producing Company

Mr. Bill Burton
Baker Botts L.L.P.
98 San Jacinto Boulevard
1500 San Jacinto Center
Austin, Texas 78701

Re: MMS-99-0085-IND
     Southern Union Exploration
     Company

Ms. Katherine Ellsworth
Holland & Hart
P.O. Box 68
25 S. Willow Street, Suite 200
Jackson, Wyoming 83001-0068

Re: MMS-99-0088-IND
     Williams Production Company

SUPP001

2

Mr. D. W. Lomax, U.S. Royalty Unit
Exxon Mobil Corporation
Upstream Business Services
P.O. Box 2024
Houston, Texas  77252-2024

Re:  MMS-99-0125-IND
     MMS-99-0061-IND
     Mobil Exploration & Producing
     U.S. Inc.

### Appeals Granted; One Order Modified

By this decision, I am granting all of the above appeals with the exception of the appeal of Mobil Exploration & Producing U.S. Inc., MMS-99-0061-IND, wherein we are modifying the order being appealed.

The above-named parties appealed under 30 C.F.R. Part 290 from Minerals Management Service (MMS), Royalty Management Program, now Minerals Revenue Management (MRM), orders which directed each, as royalty payors, to calculate, report and pay additional royalties for all Jicarilla Apache Tribal (Tribe or Tribal) oil and gas leases for the period January 1984 through June 1995 using dual accounting and major portion calculations.

Because the above-docketed appeals involve the same issues and the same time period, they are consolidated herein.  By this decision, we are also disposing of the dual accounting issues that remain pending in the appeal of Mobil Exploration & Producing U.S. Inc. (Mobil) in MMS-99-0061-IND.

By order dated December 29, 1998, as amended on August 13, 1999, Mobil was directed to perform dual accounting on <u>all</u> of its Indian leases covering the period March 1988 through August 1996.  That order was appealed by Mobil and docketed as MMS-99-0061-IND.

The record next shows that MRM issued a second order dated April 19, 1999, directing Mobil to perform dual accounting as well as major portion calculations, specific to its Jicarilla Apache Tribal leases for the overlapping period of January 1984 through June 1995. That order was appealed and docketed as MMS-99-0125-IND.

By decision dated March 13, 2003, the Deputy Commissioner of Indian Affairs granted part of the appeal in MMS-99-0061-IND with respect to the other Indian leases, but directed that the portion of that order and appeal relating to the Jicarilla Apache Tribal leases be consolidated and reserved for decision in the Mobil appeal in MMS-99-0125-IND being addressed herein.

### Statement of Facts

During the time period at issue, the above-named parties were royalty payors for Jicarilla Apache Tribal oil and gas leases which contain a provision requiring that the value of production for royalty purposes be based upon the greater of  (1) the price received by the lessee, or (2) the highest price paid for a major portion of like-quality production.  The leases also require the

lessee to perform a dual accounting, i.e., calculate and pay royalties on the greater of the unprocessed gas value, the processed gas value, or the lessee's gross proceeds.

MRM directed the above-named parties to: (1) calculate the value of their unprocessed gas using their gross proceeds (if an arm's-length sale at the wellhead), or the higher of the appropriate benchmark (if a non-arm's-length sale at the wellhead), compare that value with the value based on the major portion price provided by MRM, and use the higher value; (2) perform a new dual accounting that would take into account the major portion price(s); (3) compare the values they reported to MRM on their Report of Sales and Royalty Remittance (Form MMS-2014) to the values determined under the MRM order; and (4) pay any additional royalty amount due. The above-named parties filed timely appeals of those orders.

<u>Background</u>

The Jicarilla Apache tribal oil and gas leases provide in section (c), Rental and Royalty, that value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leased lands are situated. Similar language appears in the regulations at 25 C.F.R. § 211.13(a) (1987) and at 30 C.F.R. § 206.152(a)(3)(i)(1991). Thus, the lease term and the regulations are consistent, and the provisions of 30 C.F.R. § 206.150(b), concerning the primacy of lease terms where they differ from regulations, is inapplicable.

The regulations at 30 C.F.R. § 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion <u>MMS will, where practicable, compare the value determined in accordance with this section with the major portion.</u> The value to be used in determining the value of production for royalty purposes shall be the higher of those two values. (Emphasis added.)

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest price paid or offered at the time of production for the major portion of gas production from the same field. <u>The major portion will be calculated using like-quality lease products sold under arm's-length contracts</u> from the same field (or, if necessary to obtain a reasonable sample, from the same area) <u>for each month.</u> All such sales will be arrayed from highest

4

price to lowest price (at the bottom). <u>The major portion is that price at which 50 percent (by volume) plus 1 mcf of the gas (starting from the bottom) is sold.</u> (Emphasis added.)[1]

Similar regulations for processed gas are at 30 C.F.R. §§ 206.153(a)(3)(i) and 206.153(a)(3)(ii) (1991).

Here, the MRM researched sources and found that no usable databases existed that contained 100 percent of the gas sales for leases located in the Jicarilla Apache Reservation (Reservation). Nor did any available databases contain reliable information regarding Natural Gas Policy Act (NGPA) categories of wells, or whether sales were arm's-length or non-arm's-length. Further, available databases could not be relied upon to reflect, on a monthly basis, all of the corrections in prices and volumes resulting from the agency's audits. Since the Tribe's royalty-in-kind (RIK) sales represented actual arm's-length sales for leases located within the Reservation and distinguished between NGPA categories, MRM determined that the RIK sales provided the best available data to calculate major portion values for leases on the Reservation.

The price that the Tribe received for the RIK portion of the lease production represented the Tribe's one-eighth or one-sixth royalty. In evaluating the RIK data, MRM extrapolated the price received for the Tribe's royalty to the entire eight-eighths and/or six-sixths of the sales volume and assumed that the value of the RIK was representative of the prices received for the other portion of gas sold from the Reservation. Using the prices paid under RIK contracts, the MRM calculated the major portion by the NGPA categories for all gas production in the Reservation for the applicable time periods. MRM concluded that this method of calculating the major portion price for gas sales for Jicarilla Apache Tribal leases best met the requirement in the leases that value be calculated based on the "highest price paid or offered . . . for the major portion of the . . . gas."

<u>Issues</u>

1. Is the MRM's major portion calculation contrary to the regulations and the lease terms?

2. May the Appellants be required to perform a new dual accounting for the subject leases based on the major portion prices calculated by MRM?

---

[1] There is no definition of "major portion" in the lease terms, so there can be no conflict between the lease terms and the regulations on this point.

Analysis

## I. MRM'S MAJOR PORTION METHODOLOGY IS CONTRARY TO MMS'S REGULATIONS

Summary

The MMS royalty valuation regulations, at 30 C.F.R. § 206.152(a)(3)(i) (1991), state that "MMS will, where practicable, compare the value determined in accordance with this section with the major portion." (Emphasis added.) The practicability of performing a major portion analysis depends, in a very large measure, upon the availability of data concerning arm's-length sales of lease production in the field or area. See Burlington Resources Oil and Gas Co., 151 IBLA 144, 159 (1999).

In the instant case, the Appellants argue that the sales data needed to perform a major portion analysis for the Appellants' lease production in a manner consistent with MMS's major portion regulations was not available and that, as a result, the MRM departed from established procedures in performing that analysis.

In support of this argument, the Appellants make the following points:

1. In the absence of information regarding third-party arm's-length sales in the field/area, MMS agreed to use the Tribe's sales data to calculate the major portion price. Those sales, which were of the Tribe's one-eighth or one-sixth royalty share of production from Tribal leases, represented far less than the required 50 percent (by volume) plus one mcf of production from the relevant field/area.

2. In an effort to overcome its inability to obtain sales data for an actual major portion of lease sales from the field/area, MMS inferred that the prices obtained by the Tribe for its RIK portion of the lease production were the same as the prices obtained by other producers/sellers for the remaining portion of the gas (seven-eighths or five-sixths) and extrapolated the Tribe's prices to that gas. However, the regulations call for the use of actual sales, not extrapolations.

3. MMS's methodology did not establish a major portion price for like-quality gas. MMS's attempt to extrapolate or attribute prices received by the Tribe to third party producers in the field/area is, in any case, fatally flawed because it fails to consider the fact that not all producers were legally entitled to the same NPGA maximum lawful prices, e.g., the difference in legal entitlement between "small producers" and "large producers." Also, MMS failed to consider the gas' physical differences.

4. In arbitrarily defining the relevant "area" for determining major portion as the boundaries of the Tribe's Reservation instead of using the field(s) where the Appellants' leases are located, MMS improperly disregarded the aforementioned regulations.

5. MMS also disregarded the regulations by failing to establish a major portion price on a monthly basis.

I agree with the Appellants.

While the Secretary has considerable discretion in establishing the value for royalty purposes of production from Federal and Indian oil and gas leases, see, e.g., United States v. Ohio Oil Co., 163 F.2d 633 (10th Cir. 1947), the Secretary must follow the regulations which have the force and effect of law, are binding on all officials of the Department, and may not be waived. Vitarelli v. Seaton, 359 U.S. 535 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954); Chapman v. Sheridan-Wyoming Coal Co., 338 U.S. 621 (1950); McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); 515 Assocs. v. City of Newark, 424 F. Supp. 984 (D.N.J. 1977); Wisenak, Inc., 87 IBLA 67 (1985); Wilfred Plomis, 34 IBLA 222 (1978).

Because MRM's major portion methodology does not comply with MMS's regulations, the decision in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555, 1567 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), adopted as majority opinion as modified en banc, 782 F.2d 855 (10th Cir. 1986), does not support that major portion methodology. The court stated:

> When the Secretary is acting in his [trustee] role rather than solely as a regulator and is faced with a decision for which there is more than one "reasonable" choice as that term is used in administrative law, he must choose the alternative that is in the best interests of the Indian tribe.

The court in Supron ruled that the Secretary's method of implementing MMS regulations was reasonable (and in the best interest of the Tribe) and upheld it. In this case, as shown below, the MRM "major portion" methodology for the Jicarilla Apache Reservation was not a reasonable method to use to implement the regulations.

Based on my review of the record, I agree that MRM did not have sufficient sales data to be able to perform a major portion analysis using this methodology for the Jicarilla Apache Tribal leases in a manner consistent with the regulations.

<u>MRM's Major Portion Methodology Relied on Less than 50 Percent of the Arm's-Length Sales and Improperly Extrapolated that Price to the Remaining Production</u>

The record shows that the vast majority of gas produced from the Jicarilla Apache Reservation was sold, or disposed of, pursuant to non-arm's-length transactions. Since the regulations require MRM to look solely to arm's-length transactions, MRM was, of necessity, forced to limit its review to a smaller universe of sales. The record indicates that the RIK volumes constituted substantially less than the 50 percent threshold of the arm's-length sales required by the

regulations. See 30 C.F.R. § 206.152 (1991). Insofar as this is so, MRM's methodology cannot be said to be in compliance with the requirements of the regulations.

The MRM attempted to resolve this problem by extrapolating the price received for the Tribe's RIK sales volumes to the remaining seven-eighths or five-sixths of the gas volumes that were retained by the lessees. However, MRM has produced no evidence to show that the Tribe's RIK sales were, in fact, representative of prices received by all oil and gas operators on the Reservation. And even if MRM's extrapolations were correct, the regulations do not authorize MRM to make such extrapolations as part of its major portion methodology.

Although MMS possesses considerable discretion in determining value for royalty purposes, such discretion is tempered by the standard of reasonableness. Anadarko Petroleum Corp., 122 IBLA 141, 149 (1992), citing Marathon Oil v. United States Petroleum Corp., 604 F. Supp. 1375, 1382 (D. Ark. 1985), aff'd, 807 F.2d 759 (8th Cir. 1986). MMS cannot ignore part of its regulations (e.g., the 50 percent threshold noted above). APWU v. Potter, 343 F.3d 619, 626 (2d Cir. 2003) ("[A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that [a text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") (quoting Silverman v. Eastrich Multiple Investor Fund, 51 F.3d 28, 31 (3d Cir. 1995)).

On the contrary, it is well established that an agency must follow its own regulations. McAlpine v. United States, 112 F.3d 1429, 1433 (10th Cir. 1997) (citing Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 642 (10th Cir. 1990) ("The failure of an agency to follow its own regulations is challengeable under the [Administrative Procedure Act (APA)].") (citing Service v. Dulles, 354 U.S. 363 (1957)); Community Action of Laramie v. Bowen, 866 F.2d 347, 352 (10th Cir. 1989) ("Because a valid legislative rule or substantive regulation is binding to the same extent as a statute [citation omitted], [the agency's] failure to follow its own regulations likewise may be challenged under the APA."); Sampson v. Chater, 103 F.3d 918, 922 (9th Cir. 1996) (suggesting that it is an abuse of discretion to find an agency's position substantially justified when the agency violates its own regulations); Cornella v. Schweiker, 728 F.2d 978, 985 (8th Cir. 1984) ("It was not reasonable for the Secretary to ignore her own regulations."). See also, Burlington Resources Oil and Gas Co., 151 IBLA 144 (1999), and Phillips Petroleum Co., 152 IBLA 109 (2000) (striking down MRM major portion methodologies for other Indian lands because they did not comply with the regulations).

The United States' trust responsibility does not require a different result. The trust responsibility is defined by statutes and regulations. Cobell v. Norton, 240 F.3d 1081, 1098-99 (D.C. Cir. 2000), citing, Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1482 (D.C. Cir. 1995) and United States v. Mitchell, 463 U.S. 206, 224 (1983) ("Mitchell II"). The Secretary is not required to ignore or to go beyond the major portion regulations in determining value for royalty purposes. Pawnee v. United States, 830 F.2d 187, 192 (Fed. Cir. 1987). In fact, the Supron court first found that the Secretary's dual accounting methodology complied with the regulations

8

(and was therefore reasonable) before it assessed whether that methodology was in the best interests of the tribe. Supron, 728 F.2d at 1568-69.[2]

Thus, while the Secretary, when acting in a fiduciary capacity (and when confronted with several alternatives), must choose the alternative that is in the best interests of the Indian tribe, the scope of that choice is necessarily limited to those alternatives that are "reasonable" and are consistent with the requirements of the regulations.

Based on the foregoing, I conclude that MRM's major portion methodology for the Tribal leases does not meet the requirements of the regulations and is therefore not a reasonable method to use to implement the regulations. As a result, the subject orders, as they relate to major portion, cannot be sustained.

Analysis – Like Quality

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) state, in pertinent part, that: "The major portion will be calculated using like-quality lease products sold under arm's-length contracts from the same field . . . for each month." (Emphasis added.) Like-quality means not only the same chemical and physical characteristics, but also the same legal characteristics, e.g., the same NGPA price category where the pricing is subject to Federal regulation. 30 C.F.R. § 206.151 (1991).

The Appellants contend that in performing this major portion analysis, MRM lumped together gas produced from many different formations without consideration of their physical differences, including coal bed gas containing high levels of carbon dioxide.

The available information supports a finding that MRM did, in fact, include in its analysis production of different qualities from different locations, e.g., the analysis included gas from different formations with Btu content ranging from an average low of 1117 in the Pictured Cliffs formation to a high of 1212 in the Dakota formation as well as coalbed gas produced from the Fruitland formation which has high levels of carbon dioxide. See, e.g., the June 18, 1999, statement of reasons filed by Union Texas Petroleum Company in MMS-99-0084-IND at page 23.

The MMS has not expressly denied that these differences were present. Insofar as this is so, the

---

[2] Furthermore, the statutory authority for these leases, the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-g, does not require use of the MRM major portion methodology. In Supron, the Tenth Circuit opined that certain portions of the legislative history of the IMLA led it to the conclusion that Congress intended Indian mineral owners to receive the greatest return from their property in the short term. Supron, 728 F.2d at 1565. The Supreme Court has cautioned that the language relied upon by the Tenth Circuit should not be given "talismanic effect." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 179 (1989), and, in an opinion in March 2003, stated that the purpose of the statute was to provide Indians with a profitable source of revenue and to remove obstacles to leasing Indian land for mineral development. United States v. Navajo Nation, 537 U.S. 488, 511, n. 16 (2003). Providing Indians with a profitable source of revenue does not require using an illegal methodology, which could also be an obstacle to leasing the land.

above allegations stand unchallenged on the record.

The Appellants also argue that MMS failed to distinguish between processed and unprocessed gas, noting that the MMS Payor Handbook states that the major portion price for processed residue gas and gas plant products must be calculated separately.

The MRM acknowledges in its October 17, 2001, field report that it did not perform a major portion price calculation for gas plant products. Rather, MMS adopted the Mt. Belvieu spot price as the major portion price for gas plant products based on two contracts in two months for production located somewhere in the San Juan Basin. See MMS field report dated October 17, 2001, at page 24. This does not comply with MMS's established methodology as announced in its Payor Handbook. More importantly, it does not comply with MMS's regulations for determining the major portion price for processed gas. 30 C.F.R. § 206.153(a)(3)(ii) (1991).

Based on the foregoing, I conclude that MRM did not, in every instance, rely on like qualities of gas when performing the subject major portion analysis, and did not, therefore, fully satisfy that requirement of the regulations. I further conclude that this deficiency was one that was likely to occur given MRM's decision to broaden the geographical scope of its major portion analysis by defining the relevant "area" as the entire Jicarilla Apache Reservation.

<u>Analysis – Definition of Field or Area</u>

The regulations at 30 C.F.R. § 206.152(a)(3)(ii) (1991) state that major portion shall be based on the arm's-length price received for a majority of like-quality lease products <u>from the same field or area</u>. (Emphasis added.)

The Appellants argue that in arbitrarily defining the relevant "area" for determining major portion as the boundaries of the Reservation instead of using the field where the Appellants' leases are located, MMS improperly disregarded the aforementioned regulation.

It is not disputed that most of the Jicarilla Apache Reservation is located in Rio Arriba County, New Mexico. A small portion of the Reservation extends into Sandoval County, New Mexico. The Reservation lies along the eastern edge of the San Juan Basin, and natural gas produced on the Reservation comes from the Pictured Cliffs Formation, the Mesaverde Group, the Gallup, Tocito, and fractured Mancos Formations, and the Dakota and Dakota-Morrison Formations. Coalbed methane is produced from the Fruitland Formation.

While the regulations at 30 C.F.R. § 206.151 (1991) state that, for major portion purposes, the "field" may be designated by the State oil and gas regulatory agency, the State of New Mexico defines natural gas resources in terms of pools rather than fields. The State of New Mexico Oil and Gas Commission has identified thirty pools that overlay or are within the boundaries of the Reservation.

MRM states that in several cases multiple pools overlay one another and/or extend outside the

Reservation boundary. <u>See</u> the MMS report entitled "Methodology for Major Portion and Dual Accounting Analysis, Jicarilla Apache Tribal Leases" at page 4. For purposes of the major portion analysis, the MRM defined the "field" as the Reservation boundary, thereby encompassing and aggregating all of the above-referenced formations (and associated pools).

Because the purpose of the major portion analysis was to derive a major portion value for all gas produced from the Jicarilla Apache Reservation (and perhaps because MRM price records do not distinguish by "field" for Reservation gas), the MRM included in its analysis all of the pools that were situated within the Reservation in whole or in part.

While it is understandable the MRM might, for reasons of administrative efficiency, prefer to derive a single major portion value for all the production from all of the leases on the entire Jicarilla Apache Reservation, it is not what the subject regulations contemplated.

Rather, a close reading of the regulations indicates that great emphasis was placed on fairness, i.e., to ensure that a major portion analysis – if it were to be conducted – would compare like-quality production that was similarly situated. Thus, the pertinent regulations stipulate that, whenever possible, the production to be compared shall come from the same field as the lease production at issue, and that MRM would disregard the field and consider production from a larger geographic unit, i.e., the "area," only where necessary to obtain a reasonable sample.

And even where MRM, within its discretion, elects to consider the broader "area," it is still bound by the regulatory definition of "area" found at 30 C.F.R. § 206.151 (1991) which states that an area is "a geographic region . . . in which oil and/or gas lease products have similar quality, economic, and physical characteristics."

Thus, even if we assume, arguendo, that the "field" did not provide a "reasonable sample" and that MRM was justified in considering the broader "area," it does not follow that MRM may expand the scope of its search to include thirty separate pools from many different formations, including coalbed methane, absent a showing of similarity of characteristics – something that is conspicuously absent here.

Based on the foregoing, I agree with the Appellants that MRM did not properly define the "field"/"area" in performing the subject major portion analysis.

<u>Analysis – Sales Values Calculated on a Monthly Basis</u>

The regulations at 30 C.F.R. § 206.152(a)(3) (1991) require that major portion be based on sales "for each month," i.e., calculated on a monthly basis. The Appellants argue that the one-time settlement values used by MMS do not satisfy that requirement. The Appellants further argue that MMS has compounded that problem by using the one-time settlement payments to calculate a "total <u>annual</u> settlement value" for the years 1989 through June 1995.

The Appellants observe that the reason that the regulations call for major portion to be calculated

on a monthly basis is that prices fluctuate seasonally, e.g., there is less demand for natural gas for home heating during the summer months, and states that it would be unfair to require lessees to pay royalties based on unrealistically high prices for summer months when prices are historically low due to reduced demand.

As an example, the Appellants further note that in considering the methodology for Southern Ute major portion, MMS had concluded that it could not use the State of Colorado's information data base because sales were reported on a quarterly rather than a monthly basis.

I agree with the Appellants that, consistent with the regulations, MRM should have calculated major portion values on a monthly, rather than annual, basis.

## II.    THE APPELLANTS ARE NOT REQUIRED TO DUAL ACCOUNT USING THE MAJOR PORTION PRICE IN MRM'S ORDER

It is not disputed that the Jicarilla Apache Tribal leases, by their terms, require dual accounting. See Section 3(c) of the lease form entitled "Rental and Royalty."

Based on a review of sample months, MRM concluded that the Appellants' dual accounting calculations were based on prices less than the major portion prices determined by MRM. As a result of this finding, MRM directed the Appellants, in the subject orders, to perform a new dual accounting using the major portion prices that MRM had established.

However, since I have determined, for the reasons stated herein, that MRM's major portion calculations are not sustainable, that portion of the MRM order which directs the Appellants to dual account based on the MRM-calculated major portion price cannot be sustained. But the fact that an Appellant is not required to use major portion prices in its dual accounting does not relieve it of its duty to otherwise perform dual accounting in accordance with the lease terms and the regulations.

In Mobil Exploration & Producing U.S. Inc., MMS-99-0061-IND (March 13, 2003), 25 Gower Federal Service, Royalty Valuation and Management, Rocky Mountain Mineral Law Foundation (Gower), Mobil argued that MMS's December 29, 1998, order to Mobil to perform dual accounting for all of Mobil's Indian leases did, with respect to Mobil's Jicarilla Apache Tribal leases, duplicate and/or significantly overlap MMS's subsequent April 16, 1999, order. (Note: Mobil's appeal of MMS's April 16, 1999, order was docketed as MMS-99-0125-IND.)

Upon review, MMS agreed with Mobil and concluded that the portion of Mobil's appeal docketed as MMS-99-0061-IND, which dealt with Mobil's Jicarilla Apache Tribal leases, should be merged with Mobil's appeal of MMS's April 16, 1999, order (MMS-99-0125-IND) and addressed in a separate, supplemental decision. As stated above, Mobil has a clear obligation under the terms of its Tribal lease(s) to perform dual accounting. See section 3(c) of the lease form entitled "Rental and Royalty." See also, Jicarilla Apache Tribe v. Supron Energy Corporation, 782 F.2d 855 (10th Cir. 1986), cert. denied, 479 U.S. 970 (1986).

## Conclusions and Order

For the reasons stated above, MMS's April 16, 1999, order (Mobil Exploration & Production U.S. Inc. (Mobil), Docket Number MMS-99-0125-IND as consolidated with MMS's order dated December 19, 1998, Docket Number MMS-99-0061-IND), is hereby modified to direct Mobil to perform dual accounting in a manner consistent with MMS regulations and directives, but without reference to the major portion price(s) referenced herein. See 30 C.F.R. § 206.155 (1994). See also, Amoco Production Company, 143 IBLA 45 (1998), and Jicarilla Apache Tribe v. Supron Energy Corp., 782 F.2d 855 (10th Cir. 1986), cert. denied, 479 U.S. 970 (1986).

The remaining appeals, including MMS-99-0125-IND, are hereby granted with respect to MMS's orders that the Appellants calculate and pay additional royalties based on the major portion price derived by MMS. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with necessary information can be merged with other available date to meet the regulatory requirements that MMS has established. See Phillips Petroleum Co., 152 IBLA 109, 117 (2000). Likewise, this decision is rendered without prejudice to MMS's right to require dual accounting using proper major portion prices.

Because this decision is issued by an Assistant Secretary of the Department of the Interior, it is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department. Blue Star, Inc., 41 IBLA 333 (1979); Marathon Oil Co., 108 IBLA 177 (1989).

Sincerely,

Carl J. Artman
Assistant Secretary - Indian Affairs

Form 5-157
November 1947

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS

## OIL AND GAS MINING LEASE—TRIBAL INDIAN LANDS

...JICARILLA APACHE........ TRIBE, STATE OF ...New Mexico...............

THIS INDENTURE OF LEASE, made and entered into in quintuplicate this __7th__ day of

__March_____, 19 52, by and between __Frank Vigil, Chairman of the__

__Jicarilla Apache Tribal Council__



of _____Dulce_____, State of __New Mexico__ and

on behalf of the ____Jicarilla Apache____ Tribe of Indians, designated herein as

lessor, and ____Magnolia Petroleum Company____

of ____Dallas 1____, State of __Texas__, herein designated as

_____ lessee:

### WITNESSETH

1. Lessor, in consideration of a cash bonus of $...59,520.00..., paid to the Treasurer of said Tribe where the tribe is organized under the act of June 18, 1934 (48 Stat. 984), or to the Superintendent of the Indian Agency having jurisdiction, hereinafter called the superintendent, where the tribe is not organized under said act of June 18, 1934, receipt of which is hereby acknowledged and in consideration of rents and royalties to be paid, and the covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and natural gas deposits in or under the following-described tracts of land situated in the county of

__Rio Arriba__............, State of ...New Mexico..................., and more particularly described as follows:

**Tract No. 183 – Township 27 North, Range 3 West, N.M.P.M.**
**Secs. 22, 23, 24 and 27 (All)**

containing ..2560.00... acres more or less, together with the right to construct and maintain thereupon all works, buildings, plants, waterways, roads, telegraph and telephone lines, pipe lines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment hereof for the term of 10 years from and after the approval hereof by the Secretary of the Interior and as much longer thereafter as oil and/or gas is produced in paying quantities from said land.

2. The term "oil and gas supervisor" as employed herein shall refer to such officer or officers as the Secretary of the Interior may designate to supervise oil and gas operations on Indian lands. The term "superintendent" as used herein shall refer to the superintendent or other official in charge of the Indian Agency having jurisdiction over the lands leased.

3. In consideration of the foregoing, the lessee hereby agrees:

(a) Bond.—To furnish such bond as may be required by the regulations of the Secretary of the Interior, with satisfactory surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease.

(1)

JIC001372

2

(b) Wells.—(1) To drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands not the property of the lessor, or in lieu thereof, to compensate the lessor in full each month for the estimated loss of royalty through drainage: *Provided*, That during the period of supervision by the Secretary of the Interior, the necessity for offset wells shall be determined by the oil and gas supervisor and payment in lieu of drilling and production shall be with the consent of, and in an amount determined by the Secretary of the Interior; (2) at the election of the lessee to drill and produce other wells: *Provided*, That the right to drill and produce such other wells shall be subject to any system of well spacing or production allotments authorized and approved under applicable law or regulations, approved by the Secretary of the Interior and affecting the field or area in which the leased lands are situated; and (3) if the lessee elects not to drill and produce such other wells for any period the Secretary of the Interior may, within 10 days after due notice in writing, either require the drilling and production of such wells or the number necessary, in his opinion, to insure reasonable diligence in the development and operation of the property, or may in lieu of such additional diligent drilling and production require the payment on and after the first anniversary date of this lease of not to exceed $1 per acre per annum, which sum shall be in addition to any rental or royalty hereinafter specified.

(c) Rental and royalty.—To pay, beginning with the date of approval of the lease by the Secretary of the Interior or his duly authorized representative, a rental of $1.25 per acre per annum in advance during the continuance hereof, the rental so paid for any one year to be credited on the royalty for that year, together with a royalty of 12½ percent of the value or amount of all oil, gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and saved from the land leased herein, save and except oil, and/or gas used by the lessee for development and operation purposes on said lease, which oil or gas shall be royalty free. During the period of supervision, "value" for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered (whether calculated on the basis of short or actual volume) at the time of production for the major portion of the oil of the same gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced and sold from the field where the leased lands are situated, and the actual volume of the marketable product less the content of foreign substances as determined by the oil and gas supervisor. The actual amount realized by the lessee from the sale of said products may, in the discretion of the Secretary, be deemed mere evidence of or conclusive evidence of such value. When paid in value, such royalties shall be due and payable monthly on the last day of the calendar month following the calendar month in which produced; when royalty on oil produced is paid in kind, such royalty oil shall be delivered in tanks provided by the lessee on the premises where produced without cost to the lessor unless otherwise agreed to by the parties thereto, at such time as may be required by the lessor: *Provided*, That the lessee shall not be required to hold such royalty oil in storage longer than 30 days after the end of the calendar month in which said oil is produced: *And provided further*, That the lessee shall be in no manner responsible or held liable for loss or destruction of such oil in storage caused by acts of God. All rental and royalty payments, except as provided in section 4 (c) shall be made by check or draft drawn on a solvent bank, open for the transaction of business on the day the check or draft is issued, to the order of the treasurer of said tribe or the superintendent. All such rental and royalty payments shall be mailed to the oil and gas supervisor for transmittal to the treasurer of said tribe or to the superintendent. It is understood that in determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee, or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater.

(d) Monthly statements.—To furnish the oil and gas supervisor monthly statements in detail, in such form, as may be prescribed by the Secretary of the Interior, showing the amount, quality, and value of all oil, gas, natural gasoline, or other hydrocarbon substances produced and saved during the preceding calendar month as a basis from which to compute, for the treasurer of said tribe or the superintendent, the royalty due the lessee. The leased premises and all wells, producing operations, improvements, machinery, and fixtures thereon and connected therewith and all books and accounts of the lessee shall be open at all times for the inspection of any duly authorized representative of the Secretary of the Interior.

(e) Log of well.—To keep a log in the form prescribed by the Secretary of the Interior of all the wells drilled by the lessee showing the strata and character of the formations passed through by the drill, which log or a copy thereof shall be furnished to the oil and gas supervisor.

(f) Diligence, prevention of waste.—To exercise reasonable diligence in drilling and operating wells for oil and gas on the lands covered hereby, while such products can be secured in paying quantities; to carry on all operations hereunder in a good and workmanlike manner in accordance with approved methods and practice, having due regard for the prevention of waste of oil or gas developed on the land, or the entrance of water through wells drilled by the lessee to the productive sands or oil or gas-bearing strata to the destruction or injury of the oil or gas deposits, the preservation and conservation of the property for future productive operations, and to the health and safety of workmen and employees; to plug securely all wells before abandoning the same and to effectually shut off all water from the oil or gas-bearing strata; not to drill any well within 200 feet of any house or barn now on the premises without the lessor's written consent; to carry out at the expense of the lessee all reasonable orders and requirements of the oil and gas supervisor relative to prevention of waste, and preservation of the property and the health and safety of workmen; to bury all pipe lines crossing tillable lands below low depth unless other arrangements therefor are made with the superintendent; to pay the lessor all damages to crops, buildings, and other improvements of the lessor, occasioned by the lessee's operations: *Provided*, That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(g) Regulations.—To abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases: *Provided*, That no regulation hereafter approved shall effect a change in rate of royalty or annual rental herein specified without the written consent of the parties to this lease.

*All payments under this lease shall be made to the superintendent where the tribe affected is not organized under the act of June 18, 1934 (48 t. 984).

B-5

3

(h) Assignment of lease.—Not to assign this lease or any interest therein by an operating agreement or otherwise nor to sublet any portion of the leased premises before restrictions are removed, except with the approval of the Secretary of the Interior. If this lease is divided by the assignment of an entire interest in any part of it, each part shall be considered a separate lease under all the terms and conditions of the original lease.

4. The lessor expressly reserves:

(a) Disposition of surface.—The right to lease, sell, or otherwise dispose of the surface of the lands embraced within this lease under existing law or laws hereafter enacted, such disposition to be subject at all times to the right of the lessee herein to the use of so much of said surface as is necessary in the extraction and removal of the oil and gas from the land herein described.

(b) Use of gas.—The right to use sufficient gas free of charge for any school or other buildings belonging to the tribe on said lands by making connection at its own expense with the well or wells thereon, the use of such gas to be at the lessor's risk at all times.

(c) Royalty in kind.—The right to elect on 30 days' written notice to take lessor's royalty in kind.

5. Surrender and termination.—The lessee shall have the right at any time during the term hereof to surrender and terminate this lease or any part thereof upon the payment of the sum of one dollar and all rentals, royalties, and other obligations due and payable to the lessor; and in the event restrictions have not been removed, upon a showing satisfactory to the Secretary of the Interior that full provision has been made for conservation and protection of the property and the proper abandonment of all wells drilled on the portion of the lease surrendered, the lease to continue in full force and effect as to the lands not so surrendered. If this lease has been recorded lessee shall file a recorded release with his application to the superintendent for termination of this lease.

6. Cancelation and forfeiture.—When, in the opinion of the Secretary of the Interior and the Tribal Council, there has been a violation of any of the terms and conditions of this lease, the Secretary of the Interior, shall have the right at any time after 30 days' notice to the lessee, specifying the terms and conditions violated, and after a hearing, if the lessee shall so request within 30 days of receipt of notice, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land; Provided, That after restrictions are removed the lessor shall have and be entitled to any available remedy in law or equity for breach of the contract by the lessee.

7. Removal of buildings, improvements, and equipment.—Lessee shall be the owner of and shall have the right to remove from the leased premises, within 90 days after termination of this lease, any and all buildings, structures, casing, material, and/or equipment placed thereon for the purpose of development and operation hereunder, save and except casing in wells and other material, equipment, and structures necessary for the continued operation of wells producing or capable of being produced in paying quantities as determined by the Secretary of the Interior, on said leased land at the time of surrender of this lease or termination thereof; and except as otherwise provided herein, all casing in wells, material, structures, and equipment shall be and become the property of the lessor.

8. Drilling and producing restrictions.—It is covenanted and agreed that the Secretary of the Interior may impose restrictions as to time or times for the drilling of wells and as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Indian lessor; and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

9. Unit operation.—The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision.

10. Helium—public emergency.—It is covenanted and agreed that helium gas, carbon dioxide gas, and all other natural gases are included under the term "gas" as used in this lease, and in the event gas is discovered containing helium the United States Government shall have the right to purchase, at reasonable prices, all or any part of the production and to regulate the amount and manner of production; and in time of war or other public emergency, the United States Government shall have the option to purchase all or any part of the products produced under this lease.

11. Conservation.—The lessee in consideration of the rights herein granted agrees to abide by the provisions of any act of Congress, or any order or regulation prescribed pursuant thereto, relating to the conservation, production, or marketing of oil, gas, or other hydrocarbon substances.

12. Heirs and successors in interest.—It is further covenanted and agreed that each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors of, or assigns of the respective parties hereto.

13. No lease, assignment thereof, or interest therein, will be approved to any employee or employees of the United States Government whether connected with the Indian Service or otherwise and no employee of the Interior Department shall be permitted to acquire any interest in any mineral lease covering restricted Indian lands by ownership of stock in corporations having such leases or in any other manner.

The attached Special Stipulations in one page and the Forest and ~~~ Stipulations in two ~~~, are hereby made a part of ~~~ lease.

IN WITNESS WHEREOF, the said parties have hereunto subscribed their names and affixed their seals on the day and year first above mentioned:

Two witnesses to execution by lessor:

P. O. ___

___ Jicarilla Apache Tribal Council

MACMILLAN PETROLEUM COMPANY

P. O. ___

___ Vice-President

___ Secretary

**ACKNOWLEDGMENT OF LESSOR**

Before me, a notary public, on this ___ day of ___ 19___ personally appeared

___

___ free and voluntary act and deed for the uses and purposes therein set forth.

UNITED STATES
DEPARTMENT OF THE INTERIOR

Washington, D. C., ___ 19___

___ M. Critchfield

Commissioner of Indian Affairs
Chief Branch of Land and ___

Filed for record this ___ day of ___ 19___ at ___ o'clock ___ m.

Approved under authority delegated
by Secretary ___

Rental received ___

```
Author:  Deborah Gibbs-Tscl   / at -mms-denver-gh-4
Date:    01/23/97  08:43 AM
Priority: Normal
TO: Martin Grieshaber
CC: Joseph Cornellisson
 ': Theresa Bayani
 .bject: Re: Jicarilla Update
```

David would like us to use the reservation boundary.  However, we need to be able to defend that upon appeal.  Please get from the State whatever data you need to defend using the reservation as the field or area.

———————————————————— Reply Separator ·. ————————————————————

```
Subject: Jicarilla Update
Author:  Theresa Bayani at -mms-denver-gh-4
Date:    1/22/97 5:18 PM
```

Debbie/Marty:

Joe has determined that the State has defined 33 fields within the Jicarilla Reservation Boundary.  However, the State defines each formation as a different field.  Thus, some fields may overlay each other.  Also, some other fields only fall slightly within the edge of the reservation boundary.

Do you want Joe to continue with this analysis on field definitions by the State or should he just use the reservation boundary as the area for the major portion calculations?  He will need to contact the State for production data which will involve a minimum cost for copying pages. Thanks. Theresa

JIC000228

# interoffice
## M E M O R A N D U M

| | | |
|---|---|---|
| **to:** | Deborah Gibbs-Tschudy | The date of the actual memorandum is |
| **through:** | Theresa Bayani | unknown. April 2, 1999 is the date Vastar |
| **from:** | Joseph Cornellisson | printed the memorandum from the diskette |
| **subject:** | Jicarilla Apache Data | provided by MMS pursuant to Vastar's |
| **date:** | April 2, 1999 | Freedom of Information Act request. |

*Project Recap/Review*

- From 7/75 to 7/95 the Jicarilla Tribe sold gas under RIK agreements. Until 1989, gas was sold to X-4 or X-4.
- In 1989 the Tribe entered into contract settlements to eliminate NGPA pricing.
- The Major Portion area will be the reservation.
- The major portion period would be from 1/84 to 12/95.
- The RIK portion usually represents 1/8 royalty share (in some leases 1/6). The 1/8 will be extrapolated to the entire 8/8 production
- In January 1997, RVD requested RIK volumes and values by well by month including API number, lease number, formation, Btu, and royalty rate in electronic format.
- The Tribe did not respond until May 1997 when it informed RVD that the data was not in digital form and that RVD would have to acquire the data from the paper reports. The Tribe faxed a very small sample of the data to RVD.
- I and David Wong discussed three approaches to processing the data:
    1. Acquire all the well settlement statements and enter the data.
    2. Acquire the check sheets for the leases and enter the data from the sheets
    3. Purchase the data from a third source and add NGPA categories and Btu values

MMS staff traveled to Dulce, NM in May 1997 to exam and acquire the data. After reviewing the records and determining that the summary data was unavailable for the time frame in question, I copied sample data for several months. Please note that the report titles may appear similar but the report format may vary dramatically. Included in this sample are:

- Sample of the well masterfile record (1990) This is not automated and the computer system it had been on has been shut down (Att. A)
- X-4 Feb 88 Report of Payments. This is a summary by lease and meter (Att. B)
- X-4 June 94 Report of Payments by lease and meter. This format began about mid 1991 (Att. C)
- X-4 Gas Accounting system report Sep 85 (Att D)

From the desk of:
Joseph Cornellisson
Petroleum Engineer
Minerals Management Service
Box 25165 MS 3150
Denver, CO 80225

303-275-7239
Fax: 303-275-7227
email: Joseph.Cornellisson@mms.gov

Deborah Gibbs-Tschudy
Page 2
April 2, 1999

▸   X-4 June 1991 Report of Payments. This is a summary by lease and meter (Att E)
▸   X-4 Feb 1984   Report of Payments. This is a summary by lease and meter (Att F)
▸   X-4 Feb 1988 Well Settlement Statements (Att G). This statement does show the NGPA category (400-500 pages)
▸   X-4 Feb 1985 Well Settlement Statements (Att H) (400-500 pages)
▸   X-4 Feb 1984 Well Settlement Statements (Att I) (400-500 pages)
▸   X-4 Feb 1989 Gas Settlement Summary (Att J-1) and Well statements (Att J-2) (400-500 pages)
▸   Exhibit A of the X-4 settlement agreement listing meters and wells. I was told this listing is not complete. (Att K). This listing does contain meter, well name, Forma, and lease number.

After examining the various data sources available the following conclusions can be made:

▸   The data formats and accessability  is much worse than I thought from the examination of a very small sampled faxed to me in early May.
▸   All the data is paper copies in numerous format.  Each pipeline has a different format. Some data could be scanned but as many pages have been annotated or are of poor quality,  scanning may be ineffective.
▸   The tribe does not appear to have a master list of leases or wells.  The master well list is several years out-of-date and no longer computerized. The system it was on has been shut down.
▸   The data is a hodge podge of manual postings, old computer printouts, pipeline statements, settlement statements, etc

Recommendations

These recommendations are based primarily on a preliminary examination of the data, the format of the data, and on the history of production, leasing and settlements.

1. Compile a master list of meters, wells, formations, NGPA category and leases.  Each lease can have multiple wells, each well can have multiple meters. In dual completion wells, each formation (pool) has a separate meter.

2.. Divide the period into a pre- and post-settlement project, i.e. prior to the settlements with X-4 and X-4. After the settlement, X-4 was the only participant in RIK purchases.  The provided the Tribe with a monthly statement that could possibly be scanned into digital form.  This would be approximately 60-72 months of records. I believe Btu could be added from the master record file.

JIC000231

Deborah Gibbs-Tschudy
Page 3
April 2, 1999

3. For the pre-settlement period, purchase volume data from a third party (PI) and add NGPA category. The vast majority of wells were in category 103 ( I was unable to determine if they were in 103a or 103b; the Tribe generally used the higher price category) or 108.

The post settlement methodology may survive an appeal. I wouldn't bet on the pre-settlement methodology.

Alternatively, have the Tribe incur the cost of computerizing the records as specified in the original methodology. They could then provide the data in a format suitable to processing.

This project will take 6 month to a year, depending on the amount of data compilation required. It will also acquire contract help for data entry and clean-up.

The cost-benefit for the project appear very low, at best. The regulations 206.173 state " if data are available to compute a major portion MMS will, where practicable, compare the values...I would argue that the data are *not available* in a format we can use to calculate a major portion price nor is it practical for MMS to essentially computerize the Jicarilla's records.

JIC000232

Author:  Deborah Gi_.s-Tschudy at ~mms-denver-gh-4
Date:     05/29/97  02:28 PM
Priority: Normal
TO: Joseph Cornellisson
Subject: Re: Dallas meeting - new info & problems

<u>David did not agree to an affidavit</u>.  He said he would give us the
sales contracts with $X-4$  and $X-4-$  as well as the contract
settlements.  W could then sample the "boxes" to verify that the tribe
received the contract prices, which were based on MLP.

He did agree to use MLP for the pre-settlement period for Jicarilla
Apache major portion and to the "discounted" MLP for the
post-settlement period.

David did not agree to any methodology for Navajo Allottee major
portion.  However, Lucy told me to proceed in accordance with the
consent decree as we proposed on Wednesday.

Let's meet with Theresa on Monday.  In the meantime, I will summarize
my understanding or what we agreed to and what needs to be done in an
e:mail message.


_____ Reply Separator _____
Subject: Dallas meeting - new info & problems
Author:  Joseph Cornellisson at ~mms-denver-gh-4
Date:     05/29/97 11:40 AM


Debbie

I just talked with Tom Schafer.  He had just finished a lengthy
discussion with David.  Tom indicated that there may not be the
agreements with David that we thought.

He said that David said

      <u>David was not buying off on an affidavit</u>

      David did not agree to use MLP

      David did not agree with any methodology to calculate MP
numbers - this was in reference to removing Non-arm's length and just
using arms-length


Do you still want to wait until Monday to talk about this?

Joe

JIC000234

A Message for Martin C. Grieshaber

Author: Deborah Gibbs-Tschudy at ˜mms-denver-gh-4
Date:   11/1/96  8:53 AM
Subject: Jicarilla Major Portion Values
----------------------------------- Message Contents -----------------------------------

    Here we go again.

_____ Forward Header _____
Subject: Jicarilla Major Portion Values
Author: Gary L Johnson at ˜MMS-Dallas-Audit
Date:   10/31/96 1:36 PM


    I'm not sure I have addressed this to everyone who was, is, or needs
    to be involved.  If not, please forward it to the missing.

    The last time this topic came up was at a meeting earlier this month
    in Wash DC.  The Jicarilla's expressed displeasure with MMS's major
    portion methodology and were told that MMS would listen to their
    suggestions for improvement.  Following that meeting, there was a
    flurry of cc:mail notes talking about exactly what was promised and
    how to get there.  I sort of ended those communications by stating
    that I would meet with the Jicarilla's and try to see what they had in
    mind before we proceeded any further.  I have met with the David Wong
    and want to summarize his position.

    By far and away his highest priority and preference is to persuade MMS
    to change it's calculation methodology to something different than the
    50% calculation.  The rationale for this goes back to the development of
    the 1988 regulations.  He believes they were promised, and that the
    preamble to the regulations reflects, that if provisions of the
    regulations are in conflict with lease terms then lease terms will
    override the regulations.  He believes the major portion provisions of
    the regulations, as interpreted by the Tribe as lessor, do not reflect
    the intent of the lease terms and are in conflict with the lease terms.
    He concludes this type of logic would allow MMS to deviate from it's
    published regulations.

    Further, he asserts that even if MMS cannot buy into that logic, it
    can choose to simply ignore and do something different from it's
    published regulations.  The rationale for this goes back to the
    allowance form filing issue.  He believes that MMS simply ignored a
    clear regulation that it didn't want to enforce and concludes that MMS
    cannot advance the position that it is strictly bound by it's
    regulations.

    The second, and a far lower priority, if MMS is unwilling to consider
    something different from the 50% methodology, is to persuade MMS to
    apply the 50% methodology to different data.  He cites examples such
    as audit, contract settlements, netted transportation, and overall
    data quality inaccuracies as examples of adjustments that are not
    currently factored into the major portion calculation.  He also notes
    that even with these adjustments, the overall result will not change
    much because MMS's methodology never provides for any adjustment to
    the non-royalty share and states no matter how much you adjust the
    1/8, or whatever the royalty portion is, it will not significantly

JIC000249

change the 8/8 total because the 1/8, or non-royalty portion, have.
changes.  He would like MMS to consider things like calculating on the
royalty share only or comparably adjusting both the royalty and
non-royalty share.

We need to decide what we are going to do.  Because RMP and the
Jicarilla's couldn't agree on this a few years ago, we adopted a
strategy of issuing orders and attempting to put the Jicarilla's in a
position to negotiate their desired results for major portion and dual
allottees.  Later, the Navajo allottees were included in this
strategy largely because of Alan Taradash's representation of them as
well as the Jicarilla's. .This strategy at least temporarily avoided a
showdown but it has had limited success as negotiations have proceeded
very slowly. Presently, we are confronted with another new problem in
that MMS wants to clean up it's appeals backlog.  This has resulted in
the resurfacing of these issues again.  I think John Russo will agree
that our recent experience with trying to finalize the Bayless and
Dugan decisions has been painful.  Our lack of having a definitive
position on major portion has resulted many arguments and discussions
over the appropriate pricing and we have prepared  a final decision
that the Jicarilla's do not fully agree with.  David thinks we should
use higher prices because he can identify higher prices in the area
and field and he is trying to get some part of major portion a piece
at a time.  Companies can identify lower prices and argue that we
cannot arbitrarily pick the higher prices.  We have this situation on
these two cases, other appeals cases that John is or will be working,
and with current audits.  It is going to get worse before it gets
better if we don't make a decision and implement it.  I don't think we
can continue on a case by case basis.

I recommend that we make one decision first.  We need to decide if we
are we going to strictly adhere to our previous position of the 50%
methodology or if we are willing to entertain other methodologies,
including changing the 50% methodology and various scenarios for data
adjustments.  If we are not going to change anything, we need to tell
the Jicarilla's and have Debbie perform the calculations for use.  If
we are willing to entertain changes, we need to create a team to
identify options for the policy board.  If we create a team, I think
it needs to include David Wong, Alan Taradash, me, John Russo, Debbie,
and representatives from our and BIA's SOL.  I think it imperative
that the BIA SOL be involved if we intent to completely address the
issue.

That's about the extent of my status report.  Others can feel free to
jump in with either opinions or questions.  Cynthia and Carolita,
please advise on what you think we should do next.  Thanks.

JIC000250

Author: Joseph Cornellisson at -mms-denver-gh-4
Date:      02/11/97  11:27 AM
Priority: Normal
Receipt Requested
TO: Deborah Gibbs-Tschudy
CC: Theresa Bayani
Subject: Jicarilla Methodology question

    Debbie

    I just got your comments back on the Jicarilla methodology. They looked
OK. I ran into Greg Smith and he indicated that both he and Gary
Johnson would like to drop the discussion of the field/area
definitions.  Could we sit down Thursday for a few minutes and discuss
how to defend not using the state field definitions?

    Thanks

    Joe

JIC000281

A Message for Martin C. Grieshaber

Author:  Deborah Gibbs-Tschudy at ~mms-denver-gh-4
Date:    11/1/96  8:53 AM
Subject: Re[2]: Jicarilla Major Portion Values
--------------------------------- Message Contents ---------------------------------

I agree with Hugh on following the 50% methodology contained in the
regulations.  That is the methodology we have used for all other
tribes and allottees.

With respect to the royalty share, as you know, Indian lease terms
state the highest price PAID or OFFERED for a major portion of
production in the field or area.  What David tried to argue 2 years
ago was that if he settled with enough of the major producers on the
reservation using the Conoco/Jicarilla formula and if we ran the
median value calculation on just the royalty share, then the formula
became the median value and we could bill everyone at the formula
price.  At that time we argued that the formula did not represent the
highest price PAID or OFFERED for a major portion of production, it
was just the price David negotiated on the royalty share.

To help facilitate this process, VSD can run the following
calculations so that we know the range of dollars involved:

1.  50 % median value with no uplift

2.  75% median value

3.  50% median value with uplift for audit and contract settlements.
Gary will work with David to come up with a % uplift for these two
factors.

4.  High Index less transportation

5.  Conoco/Jicarilla formula

6.  High Index with no transportation

_____ Reply Separator _____
Subject: Re: Jicarilla Major Portion Values
Author:  Hugh Hilliard at ~MMS-DOI

JIC000285

Discussion items for Jicarilla OTP

1. Condensate language - confusing on lines 56-61

2. Jicarilla letter calling for revnegotiation of prices after 1/1/93 ... need to be concerned?

3. If well declassified - recommend use last classification .....some wells were reclassified in '93 to 107 in order to get a tax credit.

4. Unclassified wells ... what 104 category to use??

5. Time period questions   84-86 was "standard" NGPA
                            87-6/88 NGPA holiday -how to weight X-4/X-4 share
                            7/88-6/89 standard NGPA
                            7/89 adjusted prices

6. explaining how the prices were calculated --in the methodology report or the letter, can we release the $X-4 amount??

7. 30 - 60 - 90 days are those the appropriate time periods?

8. What price for condensate??


9. 104 categories

For pre-1989 when we use the NGPA prices (plus tax reimbursements), the Jicarilla RIK gas did not have all of the subcategories for NGPA 104.  For example Jicarilla RIK gas had subcategories of NGPA 104  such as "Flowing gas-small producers", "Replacement contract gas-small producers", "Rocky Mountain large producers" etc.

My concern is that when the in value payors have another subcategory under NGPA 104 such as "Minimum Rate gas-30 cents per mcf" (the RIK gas did not have this type of subcategory under 104), we could either:

-require companies to pay on the weighted average of the all 104 prices (weighted average of all subcategories of 104.)  However, this would require companies to pay more than what they received under NGPA

or

-list all prices for all the subcategories under 104 even though the RIK gas was not sold under that specific sub category.

The issue is should we make a company pay for pre89 on what the RIK gas received for a category like 104 and not take into consideration the subcategories of 104??.

JIC000286

```
Author: Thomas Schafer at -MMS-Dallas-Audit
Date:    05/14/97  10:04 AM
Priority: Normal
TO: Joseph Cornellisson at -MMS-DENVER-GH-4
Subject: ngpa
-------------------------------- Message Contents --------------------------------
     I was going through some files and found the one attached which
     details the NGPA for each well.



  I also have:

       - a list of RIK leases (does not detail wells)

       - a list of NW Pipeline RIK wells.

   Let me know if they would be useful to you.



Because of whom I inherited this project from and not knowing sources
of the data, I do not have a high level of confidence in the data.
```

JIC000431

Subject: Jicarilla - Price Increase
Author: Joseph Cornellisson at -mms-denver-gh-4
Date:     08/13/97 02:58 PM

Debbie

I've calculated a "price bump" for the post-settlement gas (attached).

I've got some real concerns about using this psuedo-major portion price. Gary Johnson said that we should use the actual price the Tribe recieved during the NGPA "holiday". David Wong also agreed to this. Why would the post settlement prices be any different than the holiday prices?

I reviewed both the EP and NW agreements. Nowhere does the EP agreement say that the payment is for future gas sales - it only talks about using the prices.  The NW settlement states

E. whereas Northwest and the Tribe desire to terminate their respective obligations to each other under the Agreement and Northwest is willing to make a payment to the Tribe reflecting the value of the Agreement to the Tribe in exchange for the Tribe's release of Northwest from all obligations of Northwest under the Agreement for all periods of time.

This language might be interpreted as representing a buyout of future gas purchase obligations.

Would this methodology survive an appeal??

I would like to discuss this before I send it to David Wong.

JIC000433

Thanks.

_____ Reply Separator _____
Subject: Jicarilla Major Portion dual accounting order
Author: Deborah Gibbs-Tschudy at -mms-denver-gh-4
Date:   08/08/97 01:38 PM


   Gary,

   I would appreciate any comments you might have on the attached order.
   Thanks.


_____ Forward Header _____
Subject: Jicarilla Major Portion dual accounting order
Author: Joseph Cornellisson at -mms-denver-gh-4
Date:   08/08/97 01:42 PM



   Here is a draft copy (word perfect)of the Major portion dual
   accounting order for the Jicarilla.  Comments and questions?

   Several items need to be decided.  The discusions with David Wong
   talked about going through 12/95.  However, the RIK agreements expired
   in 6/95.  I think that would be a more appropriate date.

   Both NW and EP were granted a "price holiday" in 87/88 where they did
   not pay on NGPA.  Should we use the reduced price they actually
   recieved or the actual NGPA price for the MP price during this time?

   The post settlement price (90 -95) they recieved was set in the EP
   agreemet  I am in the process of trying to come up with a psuedo MP
   price that includes the settlement  amounts.


   Joe
   275-7239

JIC000434



# THE JICARILLA APACHE TRIBE

P.O. BOX 507 • DULCE, NEW MEXICO 87528-0507



## RESOLUTION OF THE TRIBAL COUNCIL

RE:   Approval of Performance Bonus Computation for Mr. David Wong, Executive Director, Department of Revenue and Taxation and Direction for Payment

RESOLUTION NO.   99 R-012-01

WHEREAS, pursuant to Mr. David Wong's Senior Executive Services Contract dated October 7, 1998, he is to submit for the Tribal Council review at the end of each calendar year, beginning with calendar year 1998, a listing and computation of all additional revenue collected by the Tribe during each calendar year as a result of Mr. Wong's audit work; and

WHEREAS, Mr. Wong has submitted the required listing and computation to the Tribal Council for its review, consideration, and approval (attached hereto as Exhibit A and incorporated herein by reference); and

WHEREAS, after review and consideration of the additional revenue received by the Tribe during calendar year 1998 as a result of Mr. Wong's audit work, the Tribal Council has determined that the performance bonus that is due to Mr. Wong under the terms of his Senior Executive Services Contract is $267,835.99.

NOW, THEREFORE, BE IT RESOLVED, by the Tribal Council of the Jicarilla Apache Tribe that the total additional revenue received by the Tribe during calendar year 1998 is $10,891,799.57, and therefore under the terms of Mr. Wong's Senior Executive Services Contract, the additional performance bonus due to Mr. Wong is $267,835.99, and such sum is hereby approved for immediate payment to Mr. Wong.

BE IT FURTHER RESOLVED that the Acting President and the Controller of the Tribe are hereby authorized and directed to disburse payment to Mr. Wong in the total amount of $267,835.99, such payment to be made on or before January 31, 1999, and such sum to be paid out of the Budget Operating Account.

_____
ACTING TRIBAL PRESIDENT



Enclosure 1

March 25, 1998

## METHODOLOGY FOR MAJOR PORTION
## AND DUAL ACCOUNTING ANALYSIS
## JICARILLA APACHE TRIBAL LEASES

### Purpose

The purpose of this report is to provide a background and to discuss the results of major portion and dual accounting analyses recently undertaken by the Royalty Valuation Division (RVD), Royalty Management Program (RMP), Minerals Management Service (MMS), for natural gas produced from Jicarilla Apache Tribal leases.

### Background

On December 6, 1996, representatives of the Jicarilla Apache Tribe and MMS met to discuss the implementation of major portion pricing for the natural gas produced from the Jicarilla Reservation (Reservation). From the mid-1970's to the mid-1990's, the Jicarilla Apache Tribe sold gas under royalty-in-kind (RIK) agreements. During most of this time the gas was purchased under long-term contracts. Before the expiration of the agreements, the Jicarilla Apache Tribe entered into contract renegotiations to allow the purchasing companies to pay market prices rather than the Natural Gas Policy Act (NGPA) maximum lawful prices.

On May 28, 1997, representatives of the Jicarilla Apache Tribe and MMS met in Dallas, Texas, to discuss the implementation of the major portion and dual accounting analyses. MMS presented a proposal to the Jicarilla Apache Tribe which recommended that MMS would issue orders to perform major portion analysis based on Jicarilla Apache Tribe RIK prices for each NGPA category. The Jicarilla Apache Tribe concurred with this approach. The Jicarilla Apache Tribe also concurred that the orders should also include dual accounting.

On June 17 and October 8, 1997, representatives of the Jicarilla Apache Tribe and MMS met to review the contracts, sources of data, pricing data, and the major portion/dual accounting order. On January 12, 1998, representatives of the Jicarilla Apache Tribe and MMS met to review the draft Methodology for Major Portion and Dual Accounting Analysis Jicarilla Apache Tribal Leases (Methodology Report) and the draft Order to Perform for Major Portion and Dual Accounting (Order to Perform).

### Regulatory Criteria

The oil and gas valuation regulations found at 30 CFR 206 (1987), have long required that the "estimated reasonable value" of production be used for the purposes of computing royalties.

JIC000204

Due consideration is given to the highest price paid for a part or for a major portion of gas of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. Title 25 CFR 211 (1995) (Indian Tribal) and the terms of the Jicarilla Apache Tribal leases also specify that the value may, at the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas and/or natural gasoline and/or all other hydrocarbon substances produced and sold from the field where the leased lands are located.

The amended valuation regulations at 30 CFR §§ 206.172(a)(3)(i) and 206.173(a)(3)(i) (1995) for Indian leases provide:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production for royalty purposes shall be the higher of those two values.

For natural gas, these regulations specify that a major portion price is calculated for like-quality gas in the same field (or, if necessary, to obtain a reasonable sample from the same area). Like-quality gas is gas of similar physical, chemical, and legal characteristics. Legal characteristics are generally the applicable NGPA category or subcategory.

Dual accounting requirements are specified by Indian lease terms, regulations, and MMS instructions. Dual accounting is defined as a valuation method that compares the value of the gas prior to processing, as determined under 30 CFR § 206.172 (1995), to the value of that same gas after processing (the combined values of the residue gas and gas plant products), as determined under 30 CFR § 206.173 (1995). Where the specific provisions of a lease are inconsistent with these regulations, the lease agreement shall govern to the extent of that inconsistency.

## Major Portion Methodology

Under the agreement reached between MMS and Jicarilla Apache Tribal representatives, the major portion methodology identifies the prices paid under RIK contracts and RIK renegotiated agreements and calculates the major portion by NGPA category for all gas production in the Reservation utilizing RIK data for the time period January 1984 through June 1995. RVD and the Jicarilla Apache Tribe agreed to the following key issues at the December 6, 1996, and June 17, 1997, meetings:

- RVD will consider the Reservation as the "area" for calculating the major portion pricing.

2

JIC000205

- The price received for the RIK portion of the gas represents the one-eighth and/or one-sixth royalty share. RVD will extrapolate the royalty share to the entire eight-eighths and/or six-sixths sales volume and assume the value for the royalty share is representative of the prices received for the other portion of the gas sold from the Reservation.

- RVD will analyze samples of Jicarilla Apache Tribe monthly settlement statements and certify that the Jicarilla Apache Tribe received the proper NGPA prices.

- RVD will send Orders to Perform to the non-RIK payors only.

## The NGPA Category

RVD identified gas values by NGPA category by month from January 1984 through June 1995. In the Orders to Perform sent to the non-RIK payors, RVD will provide major portion prices by NGPA category and request that the payor identify the NGPA category of their gas, the time periods, and the lease(s) for which the company was a payor between January 1984 and June 1995.

RVD based the January 1984 through December 1986 and July 1988 through December 1988 major portion prices on the published NGPA prices plus tax reimbursements received by the Jicarilla Apache Tribe. These prices are shown in Attachment 1 by NGPA category for each month/year. The NGPA categories identified are as follows:

| | |
|---|---|
| 102 New natural gas | 103 New onshore production |
| 104 Post - 1974 gas | 104 1973-1974 Biennium gas |
| 104 Replacement gas | 104 Flowing gas |
| 104 Rocky Mountain gas | 105 Existing intrastate gas |
| 108 Stripper gas | 109 Other gas |

RVD based the January 1987 through June 1988 major portion prices on a weighted-average price received by the Jicarilla Apache Tribe resulting from a negotiated temporary price reduction between the Jicarilla Apache Tribe and the gas purchasers. Starting in January 1989, the major portion prices are based on the prices received under the Jicarilla Apache Tribe RIK renegotiated contract and contract settlements. The prices are shown in Attachment 1 by NGPA category for each month/year.

## Definition of Field or Area

The majority of the Reservation is within Rio Arriba County, New Mexico, with a small portion extending into Sandoval County, New Mexico. The Reservation lies along the eastern edge of the San Juan Basin. Gas production is from the Pictured Cliffs Formation, Mesaverde Group,

3

Gallup, Tocito, and fractured Mancos Formations, and the Dakota and Dakota-Morrison Formations. The Fruitland Formation produces methane primarily from coals (Fruitland Coal). The regulations at 30 CFR §§ 206.172(a)(3)(ii) and 206.173(a)(3)(ii)(1995) state that major portion will be calculated on "like-quality gas sold under arm's-length contracts from the same field (or, if necessary, to obtain a reasonable sample, from the same area)." However, the State of New Mexico utilizes pools rather than field definitions. A pool is a "common source of supply" and is generally based on a geologic horizon. The State of New Mexico Oil and Gas Commission defines 30 pools that overlay or are within the Reservation boundary. In several cases, several pools overlay one another and/or extend well outside the Reservation boundary. Consequently, we are unable to define distinct field boundaries for Jicarilla Apache Tribe gas production. Therefore, for this study, the Reservation boundary will be defined as the area. During the June 17, 1996, meeting between MMS and the Jicarilla Apache Tribe, the Jicarilla Apache Tribal representative agreed to use the Reservation boundary as the major portion area.

## Calculation of Major Portion Values

The major portion calculation has been divided into four time periods :

- Period 1: NGPA pricing was in effect for the sales contracts.

- Period 2: The purchasers negotiated temporary price reductions from the NGPA prices.

- Period 3: NGPA pricing was in effect for the sales contracts.

- Period 4: The contracts were renegotiated. Due to different effective dates, NGPA pricing was also in effect for several months.

The time periods and effective prices are shown in Table 1. Tax reimbursement information was obtained from the Jicarilla Apache Tribe tax manual as shown in Table 2.

**TABLE 1**
**Natural Gas Pricing Variations**

| Period | Time Period | Price |
|--------|-------------|-------|
| 1 | January 1984 - December 1986 | NGPA & Tax Reimbursement |
| 2 | January 1987 - June 1988 | NGPA & Tax Reimbursement; Temporary Price Reduction |
| 3 | July 1988 - December 1988 | NGPA & Tax Reimbursement |
| 4 | January 1989 - June 1995 | NGPA & Tax Reimbursement; Renegotiated Prices |

4

JIC000207

Major portion prices were calculated using the prices received under the Jicarilla Apache Tribal RIK contracts and are shown in Attachment 1. For periods 1 and 3, the major portion prices are the sum of the published NGPA prices and the tax reimbursements. The prices received by the Jicarilla Apache Tribe during Period 2 (the price reduction period) and Period 4 (the renegotiated price period) are calculated as discussed below.

### TABLE 2
### Jicarilla Tax Rates

| Date | Severance Tax (Per MMBtu) | Privilege Tax (87.5% of Value) |
|---|---|---|
| 1/1/84 through 5/30/85 | $0.05 | |
| 6/1/85 through 1/31/86 | $0.05 | 5.00% |
| 2/1/86 through 1/31/87 | $0.05 | 5.18% |
| 2/1/87 through 1/31/88 | $0.05 | 5.28% |
| 2/1/88 through 12/31/88 | $0.05 | 5.47% |

During the temporary price reduction period (Period 2), RVD calculated a weighted-average price received for each NGPA category by multiplying the contract price times the RIK reserve volume estimate and dividing the total contract values by the total volume estimate (Attachment 2). Table 1 of Attachment 2 shows an example of this calculation using simulated values. The actual reserve estimates and contract prices cannot be released in order to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers. Table 2 of Attachment 2 shows the results of the actual calculations by NGPA category.

For Period 4, major portion prices were calculated by allocating the sales proceeds by NGPA category to the actual prices received under the modified contracts to determine the total consideration received under the RIK contract for each NGPA category. Documents submitted by the Jicarilla Apache Tribe in support of the RIK contract settlements proceeds provided detailed information on the monies received for each NGPA category. This information was used to calculate the major portion prices by NGPA category. The monies due to the Jicarilla Apache Tribe for the renegotiated contracts were based on volumetric decline curve analysis of the estimated reserves of the wells.

The contract adjustments were based on the difference between the projected NGPA prices due under the original contract and the renegotiated prices. Tables 1 and 2 of Attachment 3 show examples of this calculation using simulated values. The actual reserve estimates and contract prices cannot be released in order to protect the confidential commercial and financial information of the Jicarilla Apache Tribe and their purchasers. Based on the projected NGPA prices and volumetric analysis, an annual present value estimate of the remaining reserves was

5

JIC000208

calculated (Column B) as shown on Attachment 3, Tables 1 and 2.  This value was then discounted using a 10 percent discount rate (Column C).  This settlement value was further reduced during negotiations between the Jicarilla Apache Tribe and the companies.  A settlement factor was calculated by dividing the total actual settlement amount by the estimated settlement value.  This factor was then applied to the discounted amounts to determine a total annual settlement value (Column D).  The annual settlement value was then divided by the annual present value estimate to generate a settlement discount factor (Column E).  A price differential (Column H) was calculated between the projected NGPA price (Column G) and the renegotiated price (Column F).  This differential represents the difference between the original contract price minus the renegotiated price.  The undiscounted value was then discounted using the settlement discount factor discussed above to generate a settled price differential (Column I).  This differential was then added to the renegotiated price to determine the major portion price (Column J) by category.

RVD then calculated a weighted-average price.  This price was calculated by multiplying the appropriate renegotiated contract price received for each NGPA category by the appropriate reserve volume and dividing both calculated values by the total volume (Attachment 3, Table 3).

The major portion prices shown in Attachment 1 for 1989 through 1995 are calculated with this methodology and the actual reserve and contract prices.

### Dual Accounting Calculation

Dual accounting requirements are specified by Indian lease terms and regulations found at 25 CFR § 211.13(a) (1995) which state:

> In determining the value for royalty purposes of products, such as natural gasoline, that are derived from treatment of gas, a reasonable allowance for the cost of manufacture shall be made, such allowance to be two-thirds of the value of the marketable product unless otherwise determined by the Secretary of the Interior on application of the lessee or on his own initiative, and that royalty will be computed on the value of gas or casinghead gas, or on the products thereof (such as residue gas, natural gasoline, propane, butane, etc.), whichever is the greater.  [Emphasis added.]

Dual accounting is defined as a valuation method that requires the lessee to compute royalties based on the greater of: (1) the value of the gas prior to processing (as determined under 30 CFR § 206.172 (1995)), or (2) the combined value of the residue gas and gas plant products resulting from processing the gas (as determined under 30 CFR § 206.173 (1995)), plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing (30 CFR § 206.52 (1995)).  However, the value of production can never be less than the gross proceeds accruing to the lessee (30 CFR §§ 206.172(h) and 206.173(h) (1995)).  After

6

JIC000209

March 1, 1988, if royalties are paid pursuant to the processed gas valuation method, the requirements to submit appropriate allowance forms prior to claiming transportation and/or processing allowances must be met (30 CFR §§ 206.176 through 206.179 (1995)).

RVD reviewed the responses to the September 29, 1995, Dear Payor letter and will issue Orders to Perform.[1]  For those companies who stated that they performed dual accounting, RVD compared prices paid by the payors who paid in-value to the calculated major portion prices to determine whether Orders to Perform should be issued.  RVD will issue Orders to Perform to those payors who paid in value (Attachment 4) and will require payments on the higher of the gross proceeds or the major portion price.

The Order to Perform requires the calculations for natural gas liquids (NGL's) to be based on the higher of the gross proceeds received for the NGL's or comparable contract price.  RVD reviewed contracts for the sales of NGL's in the San Juan Basin to obtain comparable contract prices.  Under these contracts, the referenced prices for NGL's was the Mt. Belvieu, Texas, spot prices.  Thus, RVD determined that a comparable contract price for NGL's for the Reservation was the average Mt. Belvieu spot market price.  The Order to Perform will require the calculations for NGL's to be based on the higher of the gross proceeds received for the NGL's or the average Mt. Belvieu spot market price (Attachment 5).

## Conclusion

Our review of the major portion values calculated from the data reported to the Jicarilla Apache Tribe on the RIK purchase statements shows that they are reasonable prices paid for a major portion of like-quality production sold from the Reservation.  The use of these major portion values enforces the major portion price requirements found in the lease terms and upholds our trust responsibility to the Jicarilla Apache Tribe.

RVD will send Orders to Perform to 39 companies (Attachment 4)

---

[1]The Orders to Perform cite the requirement that royalty be based on the higher of the major portion value or gross proceeds accruing to the lessee as well as the requirement to perform dual accounting.  Sales by affiliates may provide information concerning gross proceeds to the lessee and the appropriate benchmark value and thus may be considered in determining royalty values.

7

JIC000210

P:\RVDSHA~1\OANDG\CORNELL\JICARILL\MPDAMR1G.JAT

List of Attachments

1. Major Portion Pricing.
2. Weighted average pricing calculation.
3. Major portion pricing calculations.
4. List of payors.
5. Average NGL Prices.

8

JIC000211

ment 1

# MAJOR PORTION PRICES JANUARY 1984 THROUGH DECEMBER 1988

(\$/MMBtu)

| Date | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-84 | $ 3.636 | $ 2.889 | $ 2.409 | $ 2.047 | $ 1.170 | $ 0.616 | $ 1.170 | $ 3.891 | 2.409 | (2) |
| Feb-84 | $ 3.659 | $ 2.909 | $ 2.417 | $ 2.054 | $ 1.174 | $ 0.618 | $ 1.174 | $ 3.916 | 2.417 | (2) |
| Mar-84 | $ 3.682 | $ 2.919 | $ 2.425 | $ 2.061 | $ 1.178 | $ 0.620 | $ 1.178 | $ 3.941 | 2.425 | (2) |
| Apr-84 | $ 3.708 | $ 2.929 | $ 2.433 | $ 2.068 | $ 1.182 | $ 0.622 | $ 1.182 | $ 3.966 | 2.433 | (2) |
| May-84 | $ 3.730 | $ 2.939 | $ 2.441 | $ 2.075 | $ 1.188 | $ 0.624 | $ 1.188 | $ 3.992 | 2.441 | (2) |
| Jun-84 | $ 3.755 | $ 2.949 | $ 2.449 | $ 2.082 | $ 1.190 | $ 0.626 | $ 1.190 | $ 4.018 | 2.449 | (2) |
| Jul-84 | $ 3.780 | $ 2.959 | $ 2.457 | $ 2.089 | $ 1.194 | $ 0.628 | $ 1.194 | $ 4.044 | 2.459 | (2) |
| Aug-84 | $ 3.602 | $ 2.967 | $ 2.464 | $ 2.095 | $ 1.197 | $ 0.630 | $ 1.197 | $ 4.068 | 2.464 | (2) |
| Sep-84 | $ 3.824 | $ 2.975 | $ 2.471 | $ 2.101 | $ 1.200 | $ 0.632 | $ 1.200 | $ 4.092 | 2.471 | (2) |
| Oct-84 | $ 3.847 | $ 2.983 | $ 2.478 | $ 2.107 | $ 1.203 | $ 0.634 | $ 1.203 | $ 4.116 | 2.478 | (2) |
| Nov-84 | $ 3.871 | $ 2.992 | $ 2.486 | $ 2.113 | $ 1.207 | $ 0.636 | $ 1.207 | $ 4.142 | 2.486 | (2) |
| Dec-84 | $ 3.895 | $ 3.001 | $ 2.494 | $ 2.119 | $ 1.211 | $ 0.638 | $ 1.211 | $ 4.168 | 2.494 | (2) |
| Jan-85 | $ 3.919 | $ 3.010 | $ 2.502 | $ 2.125 | $ 1.215 | $ 0.640 | $ 1.215 | $ 4.194 | 2.502 | (2) |
| Feb-85 | $ 3.940 | $ 3.016 | $ 2.507 | $ 2.129 | $ 1.217 | $ 0.641 | $ 1.217 | $ 4.216 | 2.507 | (2) |
| Mar-85 | $ 3.961 | $ 3.022 | $ 2.512 | $ 2.133 | $ 1.219 | $ 0.642 | $ 1.219 | $ 4.238 | 2.512 | (2) |
| Apr-85 | $ 3.982 | $ 3.028 | $ 2.517 | $ 2.137 | $ 1.222 | $ 0.643 | $ 1.222 | $ 4.260 | 2.517 | (2) |
| May-85 | $ 4.012 | $ 3.041 | $ 2.528 | $ 2.146 | $ 1.227 | $ 0.646 | $ 1.227 | $ 4.292 | 2.528 | (2) |
| Jun-85 | $ 4.217 | $ 3.185 | $ 2.648 | $ 2.247 | $ 1.264 | $ 0.675 | $ 1.264 | $ 4.511 | 2.564 | (2) |
| Jul-85 | $ 4.248 | $ 3.199 | $ 2.659 | $ 2.256 | $ 1.289 | $ 0.678 | $ 1.288 | $ 4.544 | 2.659 | (2) |
| Aug-85 | $ 4.272 | $ 3.206 | $ 2.668 | $ 2.262 | $ 1.292 | $ 0.679 | $ 1.292 | $ 4.569 | 2.666 | (2) |
| Sep-85 | $ 4.296 | $ 3.214 | $ 2.672 | $ 2.267 | $ 1.295 | $ 0.680 | $ 1.295 | $ 4.594 | 2.672 | (2) |
| Oct-85 | $ 4.320 | $ 3.221 | $ 2.678 | $ 2.272 | $ 1.298 | $ 0.681 | $ 1.298 | $ 4.621 | 2.678 | (2) |
| Nov-85 | $ 4.346 | $ 3.230 | $ 2.685 | $ 2.278 | $ 1.301 | $ 0.684 | $ 1.301 | $ 4.648 | 2.685 | (2) |
| Dec-85 | $ 4.372 | $ 3.240 | $ 2.693 | $ 2.285 | $ 1.305 | $ 0.688 | $ 1.305 | $ 4.676 | 2.693 | (2) |
| Jan-86 | $ 4.398 | $ 3.249 | $ 2.700 | $ 2.291 | $ 1.308 | $ 0.691 | $ 1.308 | $ 4.704 | 2.700 | (2) |
| Feb-86 | $ 4.431 | $ 3.263 | $ 2.685 | $ 2.301 | $ 1.313 | $ 0.693 | $ 1.313 | $ 4.739 | 2.711 | (2) |
| Mar-86 | $ 4.457 | $ 3.273 | $ 2.689 | $ 2.307 | $ 1.316 | $ 0.695 | $ 1.316 | $ 4.768 | 2.719 | (2) |
| Apr-86 | $ 4.483 | $ 3.282 | $ 2.691 | $ 2.313 | $ 1.319 | $ 0.696 | $ 1.319 | $ 4.796 | 2.726 | (2) |
| May-86 | $ 4.507 | $ 3.297 | $ 2.693 | $ 2.318 | $ 1.322 | $ 0.697 | $ 1.322 | $ 4.822 | 2.732 | (2) |
| Jun-86 | $ 4.531 | $ 3.304 | $ 2.704 | $ 2.324 | $ 1.325 | $ 0.698 | $ 1.325 | $ 4.846 | 2.739 | (2) |
| Jul-86 | $ 4.555 | $ 3.310 | $ 2.024 | $ 2.329 | $ 1.328 | $ 0.699 | $ 1.328 | $ 4.874 | 2.745 | (2) |
| Aug-86 | $ 4.578 | $ 3.310 | $ 2.578 | $ 2.333 | $ 1.331 | $ 0.700 | $ 1.331 | $ 4.899 | 2.750 | (2) |
| Sep-86 | $ 4.601 | $ 3.317 | $ 2.027 | $ 2.337 | $ 1.333 | $ 0.700 | $ 1.333 | $ 4.924 | 2.755 | (2) |

JIC000212

thment 1

| Date | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct-86 | $ 4,824 | $ 3,323 | $ 2,030 | $ 2,341 | $ 1,335 | 0.701 | 1,335 | $ 4,949 | $ 2,761 | (2) |
| Nov-86 | $ 4,653 | $ 3,333 | $ 2,034 | $ 2,349 | $ 1,339 | 0.703 | 1,339 | $ 4,980 | $ 2,769 | (2) |
| Dec-86 | $ 4,682 | $ 3,344 | $ 2,036 | $ 2,356 | $ 1,343 | 0.705 | 1,343 | $ 5,011 | $ 2,777 | (2) |
| Jan-87 | $ 3,933 | $ 3,054 | $ 2,685 | $ 2,411 | $ 1,753 | 1.338 | 1,753 | $ 5,148 | $ 2,685 | (2) |
| Feb-87 | $ 3,948 | $ 3,057 | $ 2,689 | $ 2,415 | $ 1,754 | 1.339 | 1,754 | $ 4,164 | $ 2,689 | (2) |
| Mar-87 | $ 3,961 | $ 3,059 | $ 2,691 | $ 2,415 | $ 1,755 | 1.340 | 1,755 | $ 4,177 | $ 1,755 | (2) |
| Apr-87 | $ 3,974 | $ 3,061 | $ 2,693 | $ 2,417 | $ 1,756 | 1.341 | 1,756 | $ 4,191 | $ 1,756 | (2) |
| May-87 | $ 3,993 | $ 3,068 | $ 2,698 | $ 2,421 | $ 1,758 | 1.342 | 1,758 | $ 4,211 | $ 1,758 | (2) |
| Jun-87 | $ 4,012 | $ 3,075 | $ 2,704 | $ 2,426 | $ 1,761 | 1.344 | 1,761 | $ 4,232 | $ 1,761 | (2) |
| Jul-87 | $ 2,742 | $ 2,226 | $ 2,024 | $ 1,873 | $ 1,384 | 0.717 | 1,384 | $ 2,862 | $ 2,024 | (2) |
| Aug-87 | $ 2,763 | $ 2,230 | $ 2,027 | $ 1,875 | $ 1,388 | 0.720 | 1,388 | $ 2,885 | $ 2,027 | (2) |
| Sep-87 | $ 2,784 | $ 2,234 | $ 2,030 | $ 1,878 | $ 1,372 | 0.722 | 1,372 | $ 2,897 | $ 2,030 | (2) |
| Oct-87 | $ 2,775 | $ 2,238 | $ 2,034 | $ 1,881 | $ 1,377 | 0.724 | 1,377 | $ 2,907 | $ 2,034 | (2) |
| Nov-87 | $ 2,784 | $ 2,240 | $ 2,036 | $ 1,882 | $ 1,380 | 0.725 | 1,380 | $ 2,817 | $ 2,036 | (2) |
| Dec-87 | $ 2,793 | $ 2,243 | $ 2,038 | $ 1,884 | $ 1,383 | 0.726 | 1,383 | $ 2,927 | $ 2,038 | (2) |
| Jan-88 | $ 2,803 | $ 2,245 | $ 2,040 | $ 1,886 | $ 1,386 | 0.727 | 1,386 | $ 2,879 | $ 2,040 | (3) |
| Feb-88 | $ 2,754 | $ 2,189 | $ 1,983 | $ 1,828 | $ 1,391 | 0.730 | 1,391 | $ 2,890 | $ 1,983 | (3) |
| Mar-88 | $ 2,784 | $ 2,192 | $ 1,985 | $ 1,830 | $ 1,394 | 0.732 | 1,394 | $ 2,736 | $ 1,985 | (3) |
| Apr-88 | $ 2,610 | $ 2,031 | $ 1,823 | $ 1,667 | $ 1,398 | 0.734 | 1,398 | $ 2,747 | $ 1,823 | (3) |
| May-88 | $ 2,619 | $ 2,033 | $ 1,825 | $ 1,689 | $ 1,401 | 0.735 | 1,401 | $ 2,757 | $ 1,825 | (3) |
| Jun-88 | $ 2,629 | $ 2,036 | $ 1,827 | $ 1,671 | $ 1,404 | 0.736 | 1,404 | $ 5,676 | $ 2,912 | (4) |
| Jul-88 | $ 5,210 | $ 3,517 | $ 2,912 | $ 2,475 | $ 1,407 | 0.737 | 1,407 | $ 5,612 | $ 2,922 | (4) |
| Aug-88 | $ 5,244 | $ 3,530 | $ 2,933 | $ 2,483 | $ 1,412 | 0.739 | 1,412 | $ 5,649 | $ 2,933 | (4) |
| Sep-88 | $ 5,279 | $ 3,543 | $ 2,943 | $ 2,492 | $ 1,417 | 0.742 | 1,417 | $ 5,686 | $ 2,943 | (4) |
| Oct-88 | $ 5,313 | $ 3,543 | $ 2,943 | $ 2,492 | $ 1,423 | 0.744 | 1,423 | $ 5,725 | $ 2,954 | (4) |
| Nov-88 | $ 5,350 | $ 3,555 | $ 2,954 | $ 2,501 | $ 1,428 | 0.746 | 1,428 | $ 5,725 | $ 2,954 | (4) |
| Dec-88 | $ 5,387 | $ 3,569 | $ 2,964 | $ 2,510 | $ 1,433 | 0.748 | 1,433 | $ 5,764 | $ 2,984 | (4) |



JIC000213

## MAJOR PORTION PRICES JANUARY 1989 THROUGH JUNE 1995
### ($/MMBtu)

| Date | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|-----|
| 1989 | $ 4.362 | $ 2.989 | $ 2.646 | $ 2.216 | $ 1.696 | $ 1.553 | $ 1.553 | $ 4.639 | 2.628 | (5) |
| 1990 | $ 4.437 | $ 2.975 | $ 2.552 | $ 2.240 | $ 1.667 | $ 1.629 | $ 1.629 | $ 4.712 | 2.551 | (5) |
| 1991 | $ 4.515 | $ 2.981 | $ 2.574 | $ 2.278 | $ 1.743 | $ 1.705 | $ 1.705 | $ 4.788 | 2.576 | (5) |
| 1992 | $ 4.596 | $ 2.996 | $ 2.603 | $ 2.324 | $ 1.826 | $ 1.788 | $ 1.788 | $ 4.863 | 2.609 | (5) |
| 1993 | $ 4.678 | $ 3.017 | $ 2.639 | $ 2.374 | $ 1.910 | $ 1.872 | $ 1.872 | $ 4.942 | 2.648 | (5) |
| 1994 | $ 4.764 | $ 3.047 | $ 2.684 | $ 2.432 | $ 2.001 | $ 1.984 | $ 1.984 | $ 5.025 | 2.694 | (5) |
| 1995 | $ 4.856 | $ 3.087 | $ 2.737 | $ 2.499 | $ 2.089 | $ 2.063 | $ 2.063 | $ 5.113 | 2.750 | (5) |

Page 3

JIC000214

hment 1

FOOTNOTES FOR MAJOR PORTION PRICES

(1) Also the price for Certain Rocky Mountain Gas - Large Producer

(2) January 1984 through December 1986 prices are Maximum Lawful Price plus Tax Reimbursements (See below).

(3) January 1987 through June 1988 Weighted Average of Maximum Lawful Prices plus Tax Reimbursements (See Below) and Contract Amendment Prices.

(4) July 1988 through December 1988 prices are Maximum Lawful Prices plus Tax Reimbursement (See Below).

(5) January 1989 through June 1995 prices are Jicarilla contract prices including settlement.

Tax Reimbursements are calculated as shown below:

| DATE | Severance Tax per MMBtu | Privilege Tax 87.5% of Value |
|---|---|---|
| 1/1/84 through 5/31/85 | $0.05 | |
| 6/1/85 through 1/31/86 | $0.05 | 5.000% |
| 2/1/86 through 1/31/87 | $0.05 | 5.180% |
| 2/1/87 through 1/31/88 | $0.05 | 5.280% |
| 2/1/88 through 12/31/88 | $0.05 | 5.470% |

Page 4

JIC000215

chment 3

Major Portion Pricing methodology  1989 - 1995
Example Calculation

NOTE: The Gas Production and Reserve Estimates are not the actual values. The actual values cannot be released in order to protect confidential commercial and financial data of the Jicarilla Apache Tribe and their purchaser.

TABLE 1 - Example Calculation
NET GAS PRODUCTION ESTIMATE
VOLUME ESTIMATE                    10,000,000
VOLUME ESTIMATE                    10,000,000
TOTAL RESERVE VOLUME ESTIMATE      20,000,000

|  | ESTIMATED PRICE | ESTIMATED PRICE | (1) ESTIMATED VALUE | (2) ESTIMATED VALUE | WEIGHTED AVERAGE PRICE (3) |
|---|---|---|---|---|---|
| 1989 | $4.040 | $4.000 | $46,404,040 | $72,170,074 | $4.236 |
| 1990 | $4.992 | $4.205 | $49,917,350 | $75,701,142 | $4.486 |
| 1991 | $4.845 | $4.495 | $48,448,050 | $80,909,835 | $4.620 |
| 1992 | $4.806 | $4.605 | $48,058,590 | $82,882,082 | $4.678 |
| 1993 | $4.876 | $4.925 | $46,761,690 | $88,672,260 | $4.908 |
| 1994 | $5.051 | $5.070 | $90,510,820 | $91,263,762 | $5.083 |
| 1995 | $4.949 | $5.208 | $49,488,080 | $93,736,078 | $5.116 |

(1)   PURCHASER A VOLUME TIMES PUCHASER A PRICE.
(2)   PURCHASER B VOLUME TIMES PURCHASER B PRICE.
(3)   PURCHASER A VALUE PLUS PURCHASE B VALUE DIVIDED BY TOTAL  VOLUME ESTIMATE.

Column
B   VALUE ESTIMATE OF RESERVES.

C   ESTIMATED VALUE OF THE RESERVES AT A 10% NET PRESENT VALUE DISCOUNT.

D   ESTIMATE FOR EACH YEAR AT THE 10% NET PRESENT VALUE DISCOUNT TIMES THE PERCENTAGE OF SETTLEMENT.

E   NET PRESENT VALUE DISCOUNT FACTOR. COLUMN D DIVIDED BY COLUMN B.

F   NEGOTIATED PRICE.

G   NGPA ESTIMATE PRICE FROM THE SUMMARY REPORT.

H   NGPA ESTIMATED PRICE MINUS THE NEGOTIATED PRICE.

I   ESTIMATED PRICE DIFFERENTIAL TIMES THE DISCOUNT FACTOR.

J   SETTLED PRICE DIFFERENTIAL PLUS THE NEGOTIATED PRICE.

JIC000216

Payor List                                                                      Attachment 4

## List of Jicarilla Apache Payor Numbers

| PAYOR NAME | PAYOR CODE |
|---|---|
| Amoco Production Company | 10860 |
| Apache Corporation | 11110 |
| Arco Oil & Gas Company, Vastar Resources | 11270, 11274 |
| Bayless, Robert L. | 13190 |
| BHP | 21910 |
| Chace Oil Company | 16480 |
| Dugan Production Company | 20150 |
| Exxon | 22201 |
| Enre Corporation | 21938 |
| Famcor | 23315 |
| Forcenergy Gas Exploration | 23708, 23710 |
| Gas Company of New Mexico | 25115 |
| General Minerals Corp. | 25435 |
| Geodyne Operating Company | 25495 |
| Giant Exploration & Prod. | 28450 |
| Graham Energy LTD. | 25964 |
| Great Western Resources | 26083 |
| Mallon Oil Company | 37193 |
| Marathon Oil Company | 37312 |
| Meridian Oil Inc. | 21625, 50210 |
| Merit Energy Company | 38083 |
| Merrion Oil & Gas Corp. | 38100 |
| Mobil Exploration & Production U.S. Inc. | 38554 |
| MW Petroluem Corp. | 29248 |
| Northwest Pipeline Corp. | 31070 |
| Okie Crude Company | 31398 |
| Oklahoma and Northwestern | 31405 |
| Oxy U.S.A. Inc. | 16922 |
| Petrocorp | 44445 |
| Phillips Petroleum Company | 44725 |
| Rife Oil Properties Inc. | 38175 |
| Samson Resources Company | 48800 |
| Snyder Oil Corporation | 40115 |
| Southern Union Exploration | 50150 |
| Tenneco Oil Co. C/O Amoco | 41352 |
| Texaco Exploration Company | 50405 |
| Unicon Producing Company | 73725 |
| Union Texas Petroleum Company | 73820 |
| Western Oil and Minerals | 77090 |

JIC000217

Average NGL Prices                                              Attachment 5

Mt. Belvieu
Average NGL Prices – $/gallon (1)

| Date | Ethane | Propane | N-Butane | Iso-Butane | Natural Gasoline |
|---|---|---|---|---|---|
| Jan-84 | 0.2713 | 0.4563 | 0.5700 | 0.5825 | 0.6588 |
| Feb-84 | 0.2725 | 0.4450 | 0.5538 | 0.5813 | 0.6838 |
| Mar-84 | 0.2650 | 0.4438 | 0.5538 | 0.5813 | 0.7125 |
| Apr-84 | 0.2688 | 0.4488 | 0.5475 | 0.5925 | 0.7088 |
| May-84 | 0.2650 | 0.4463 | 0.5375 | 0.5663 | 0.6875 |
| Jun-84 | 0.2638 | 0.4263 | 0.5100 | 0.5463 | 0.6550 |
| Jul-84 | 0.2563 | 0.4138 | 0.4975 | 0.5175 | 0.6225 |
| Aug-84 | 0.2588 | 0.4175 | 0.5213 | 0.5463 | 0.6225 |
| Sep-84 | 0.2475 | 0.4450 | 0.5700 | 0.6013 | 0.6400 |
| Oct-84 | 0.2388 | 0.4388 | 0.5913 | 0.6188 | 0.6275 |
| Nov-84 | 0.2363 | 0.4188 | 0.5800 | 0.5913 | 0.5963 |
| Dec-84 | 0.2063 | 0.3750 | 0.5638 | 0.5538 | 0.5600 |
| Jan-85 | 0.2013 | 0.3500 | 0.5250 | 0.5225 | 0.5613 |
| Feb-85 | 0.2038 | 0.3575 | 0.5388 | 0.5613 | 0.5900 |
| Mar-85 | 0.2126 | 0.3575 | 0.5400 | 0.5738 | 0.6138 |
| Apr-85 | 0.2238 | 0.3713 | 0.5263 | 0.5625 | 0.6325 |
| May-85 | 0.2338 | 0.3663 | 0.5038 | 0.5488 | 0.6375 |
| Jun-85 | 0.2250 | 0.3550 | 0.4950 | 0.5563 | 0.6263 |
| Jul-85 | 0.2150 | 0.3425 | 0.4850 | 0.5350 | 0.6000 |
| Aug-85 | 0.2188 | 0.3575 | 0.5138 | 0.5688 | 0.6013 |
| Sep-85 | 0.2300 | 0.3775 | 0.5475 | 0.6013 | 0.6175 |
| Oct-85 | 0.2600 | 0.4100 | 0.5938 | 0.6500 | 0.6500 |
| Nov-85 | 0.3138 | 0.4588 | 0.6638 | 0.7238 | 0.6850 |
| Dec-85 | 0.2925 | 0.4263 | 0.6463 | 0.6875 | 0.6225 |
| Jan-86 | 0.2375 | 0.3575 | 0.4925 | 0.5225 | 0.5188 |
| Feb-86 | 0.1775 | 0.2738 | 0.3650 | 0.3825 | 0.3838 |
| Mar-86 | 0.1563 | 0.2513 | 0.2838 | 0.3138 | 0.3275 |
| Apr-86 | 0.1650 | 0.2475 | 0.2875 | 0.3363 | 0.3575 |
| May-86 | 0.1888 | 0.2813 | 0.3375 | 0.3913 | 0.4038 |
| Jun-86 | 0.1700 | 0.2475 | 0.2988 | 0.3675 | 0.3463 |
| Jul-86 | 0.1563 | 0.2025 | 0.2250 | 0.2850 | 0.2500 |
| Aug-86 | 0.1613 | 0.2088 | 0.2425 | 0.2863 | 0.2863 |
| Sep-86 | 0.1700 | 0.2063 | 0.2638 | 0.3213 | 0.3100 |
| Oct-86 | 0.1675 | 0.1925 | 0.2350 | 0.2863 | 0.2975 |
| Nov-86 | 0.1700 | 0.1925 | 0.2550 | 0.2863 | 0.3150 |
| Dec-86 | 0.1688 | 0.2013 | 0.3000 | 0.3263 | 0.3375 |
| Jan-87 | 0.1763 | 0.2338 | 0.3625 | 0.3875 | 0.3813 |
| Feb-87 | 0.1700 | 0.2238 | 0.3788 | 0.3900 | 0.3800 |
| Mar-87 | 0.1638 | 0.2263 | 0.3738 | 0.4025 | 0.3963 |
| Apr-87 | 0.1588 | 0.2425 | 0.3725 | 0.4375 | 0.4188 |
| May-87 | 0.1488 | 0.2313 | 0.3413 | 0.4263 | 0.4275 |
| Jun-87 | 0.1438 | 0.2363 | 0.3438 | 0.4338 | 0.4400 |
| Jul-87 | 0.1500 | 0.2500 | 0.3738 | 0.4575 | 0.4488 |
| Aug-87 | 0.1550 | 0.2525 | 0.3763 | 0.4738 | 0.4275 |
| Sep-87 | 0.1488 | 0.2513 | 0.3750 | 0.4725 | 0.4100 |
| Oct-87 | 0.1475 | 0.2625 | 0.3913 | 0.4550 | 0.4213 |
| Nov-87 | 0.1450 | 0.2525 | 0.3788 | 0.4113 | 0.4150 |

JIC000218

Average NGL Prices

Mt. Belvieu
Average NGL Prices -- $/gallon (1)

| Date | Ethane | Propane | N. Butane | Iso-Butane | Natural Gasoline |
|------|--------|---------|-----------|------------|------------------|
| Dec-87 | 0.1450 | 0.2325 | 0.3275 | 0.3463 | 0.3675 |
| Jan-88 | 0.1563 | 0.2438 | 0.3513 | 0.3650 | 0.3700 |
| Feb-88 | 0.1575 | 0.2375 | 0.3388 | 0.3675 | 0.3763 |
| Mar-88 | 0.1550 | 0.2413 | 0.3350 | 0.3725 | 0.3825 |
| Apr-88 | 0.1550 | 0.2438 | 0.3275 | 0.3888 | 0.4088 |
| May-88 | 0.1663 | 0.2413 | 0.3313 | 0.3938 | 0.4075 |
| Jun-88 | 0.1700 | 0.2188 | 0.2913 | 0.3613 | 0.3763 |
| Jul-88 | 0.1675 | 0.1950 | 0.2613 | 0.3075 | 0.3550 |
| Aug-88 | 0.1988 | 0.2150 | 0.2775 | 0.3063 | 0.3450 |
| Sep-88 | 0.1975 | 0.2025 | 0.2408 | 0.2800 | 0.3163 |
| Oct-88 | 0.1938 | 0.1925 | 0.2325 | 0.2588 | 0.3025 |
| Nov-88 | 0.2088 | 0.1963 | 0.2513 | 0.2700 | 0.3275 |
| Dec-88 | 0.2175 | 0.2138 | 0.2925 | 0.3163 | 0.3525 |
| Jan-89 | 0.1900 | 0.2088 | 0.2913 | 0.3363 | 0.3725 |
| Feb-89 | 0.1638 | 0.1963 | 0.2513 | 0.3375 | 0.4000 |
| Mar-89 | 0.1613 | 0.2125 | 0.2700 | 0.3675 | 0.4650 |
| Apr-89 | 0.1550 | 0.2175 | 0.2813 | 0.3913 | 0.4963 |
| May-89 | 0.1400 | 0.2075 | 0.2500 | 0.3763 | 0.4488 |
| Jun-89 | 0.1363 | 0.1988 | 0.2550 | 0.3525 | 0.4225 |
| Jul-89 | 0.1313 | 0.2000 | 0.3100 | 0.3463 | 0.3988 |
| Aug-89 | 0.1388 | 0.2100 | 0.2863 | 0.3650 | 0.3650 |
| Sep-89 | 0.1338 | 0.2175 | 0.2988 | 0.3613 | 0.3963 |
| Oct-89 | 0.1313 | 0.2163 | 0.2963 | 0.3525 | 0.3938 |
| Nov-89 | 0.1313 | 0.2138 | 0.3063 | 0.3425 | 0.3750 |
| Dec-89 | 0.1900 | 0.4563 | 0.4288 | 0.4488 | 0.4563 |
| Jan-90 | 0.2050 | 0.5100 | 0.3575 | 0.4900 | 0.4725 |
| Feb-90 | 0.1488 | 0.2763 | 0.3450 | 0.4875 | 0.4425 |
| Mar-90 | 0.1375 | 0.2375 | 0.3100 | 0.4650 | 0.4275 |
| Apr-90 | 0.1338 | 0.2350 | 0.3000 | 0.4400 | 0.4150 |
| May-90 | 0.1300 | 0.2250 | 0.2825 | 0.3800 | 0.4038 |
| Jun-90 | 0.1400 | 0.2438 | 0.2963 | 0.3800 | 0.3788 |
| Jul-90 | 0.1638 | 0.2838 | 0.3238 | 0.3925 | 0.3888 |
| Aug-90 | 0.2275 | 0.3838 | 0.4688 | 0.5175 | 0.6538 |
| Sep-90 | 0.3150 | 0.4975 | 0.5713 | 0.6175 | 0.7800 |
| Oct-90 | 0.3275 | 0.4975 | 0.5800 | 0.6300 | 0.7688 |
| Nov-90 | 0.3613 | 0.4738 | 0.6350 | 0.6425 | 0.6575 |
| Dec-90 | 0.3163 | 0.4025 | 0.5438 | 0.5575 | 0.6550 |
| Jan-91 | 0.2325 | 0.3500 | 0.5000 | 0.5100 | 0.5825 |
| Feb-91 | 0.1713 | 0.3075 | 0.4250 | 0.4413 | 0.5025 |
| Mar-91 | 0.1775 | 0.3275 | 0.4188 | 0.4513 | 0.4940 |
| Apr-91 | 0.1925 | 0.3238 | 0.4188 | 0.4750 | 0.5075 |
| May-91 | 0.1888 | 0.3263 | 0.3875 | 0.5188 | 0.4925 |
| Jun-91 | 0.1563 | 0.2775 | 0.3475 | 0.4438 | 0.4375 |
| Jul-91 | 0.1638 | 0.2763 | 0.3575 | 0.4263 | 0.4350 |
| Aug-91 | 0.2038 | 0.3163 | 0.4100 | 0.4613 | 0.4800 |
| Sep-91 | 0.2638 | 0.3763 | 0.4525 | 0.4950 | 0.5063 |
| Oct-91 | 0.3163 | 0.4263 | 0.4750 | 0.4975 | 0.5275 |

JIC000219

Average NGL Prices                                    Attachment 6

Mt. Belvieu
Average NGL Prices — $/gallon (1)

| Date | Ethane | Propane | N Butane | Iso Butane | Natural Gasoline |
|------|--------|---------|----------|------------|------------------|
| Nov-91 | 0.2938 | 0.4325 | 0.4638 | 0.4925 | 0.5175 |
| Dec-91 | 0.2275 | 0.3450 | 0.4050 | 0.4438 | 0.4525 |
| Jan-92 | 0.1788 | 0.2713 | 0.3813 | 0.4250 | 0.4175 |
| Feb-92 | 0.1950 | 0.2888 | 0.3638 | 0.4313 | 0.4325 |
| Mar-92 | 0.2063 | 0.2900 | 0.3613 | 0.4463 | 0.4325 |
| Apr-92 | 0.1963 | 0.2913 | 0.3450 | 0.4438 | 0.4250 |
| May-92 | 0.2213 | 0.3163 | 0.3613 | 0.4350 | 0.4438 |
| Jun-92 | 0.2525 | 0.3338 | 0.3863 | 0.4463 | 0.4675 |
| Jul-92 | 0.2600 | 0.3400 | 0.4038 | 0.5313 | 0.4900 |
| Aug-92 | 0.2763 | 0.3583 | 0.4425 | 0.5775 | 0.4900 |
| Sep-92 | 0.2738 | 0.3738 | 0.4500 | 0.5263 | 0.4863 |
| Oct-92 | 0.2563 | 0.3525 | 0.4313 | 0.4688 | 0.4888 |
| Nov-92 | 0.2488 | 0.3275 | 0.4000 | 0.4263 | 0.4675 |
| Dec-92 | 0.2150 | 0.3188 | 0.3838 | 0.4213 | 0.4263 |
| Jan-93 | 0.2338 | 0.3438 | 0.4050 | 0.4350 | 0.4363 |
| Feb-93 | 0.2463 | 0.3338 | 0.4263 | 0.4513 | 0.4500 |
| Mar-93 | 0.2425 | 0.3388 | 0.4175 | 0.4528 | 0.4525 |
| Apr-93 | 0.2425 | 0.3450 | 0.3950 | 0.4750 | 0.4450 |
| May-93 | 0.2263 | 0.3275 | 0.3675 | 0.4450 | 0.4288 |
| Jun-93 | 0.2200 | 0.3263 | 0.3750 | 0.4188 | 0.4250 |
| Jul-93 | 0.2038 | 0.3150 | 0.3188 | 0.3963 | 0.4038 |
| Aug-93 | 0.2438 | 0.3050 | 0.3625 | 0.3850 | 0.3975 |
| Sep-93 | 0.2400 | 0.3000 | 0.3575 | 0.3738 | 0.3850 |
| Oct-93 | 0.1763 | 0.2913 | 0.3375 | 0.3463 | 0.3788 |
| Nov-93 | 0.1700 | 0.3138 | 0.3138 | 0.3288 | 0.3500 |
| Dec-93 | 0.1725 | 0.2913 | 0.2925 | 0.3175 | 0.3175 |
| Jan-94 | 0.1863 | 0.2663 | 0.3075 | 0.3363 | 0.3400 |
| Feb-94 | 0.1950 | 0.2975 | 0.3088 | 0.3400 | 0.3475 |
| Mar-94 | 0.1875 | 0.2838 | 0.3038 | 0.3325 | 0.3425 |
| Apr-94 | 0.1988 | 0.2900 | 0.3125 | 0.3400 | 0.3538 |
| May-94 | 0.2125 | 0.2950 | 0.3413 | 0.3550 | 0.3638 |
| Jun-94 | 0.2000 | 0.2888 | 0.3438 | 0.3613 | 0.3775 |
| Jul-94 | 0.1963 | 0.2938 | 0.3513 | 0.3738 | 0.3838 |
| Aug-94 | 0.2050 | 0.3000 | 0.3475 | 0.3838 | 0.3825 |
| Sep-94 | 0.2050 | 0.3013 | 0.3650 | 0.3863 | 0.3213 |
| Oct-94 | 0.2063 | 0.3213 | 0.3925 | 0.3925 | 0.3950 |
| Nov-94 | 0.2150 | 0.3450 | 0.4163 | 0.4063 | 0.4013 |
| Dec-94 | 0.1963 | 0.3338 | 0.3688 | 0.4075 | 0.3950 |
| Jan-95 | 0.1700 | 0.3238 | 0.4138 | 0.4225 | 0.4000 |
| Feb-95 | 0.1438 | 0.3200 | 0.4063 | 0.4063 | 0.4063 |
| Mar-95 | 0.1538 | 0.3300 | 0.4100 | 0.4188 | 0.4138 |
| Apr-95 | 0.1588 | 0.3250 | 0.4013 | 0.4300 | 0.4288 |
| May-95 | 0.1588 | 0.3263 | 0.4000 | 0.4300 | 0.4475 |
| Jun-95 | 0.1513 | 0.3175 | 0.3750 | 0.4050 | 0.4250 |

(1) Source: Platt's Oilgram Price Report

JIC000220

## PROPOSED MAJOR PORTION ANALYSIS METHODOLOGY
## JICARILLA APACHE TRIBAL LEASES

### Purpose

This report provides a background and describes the proposed methodology to be used in the major portion analyses that will be performed by the Royalty Valuation Division (RVD), Minerals Management Service (MMS), concerning natural gas produced from Jicarilla Apache Tribal leases.

### Background

On December 6, 1996, representatives of the Jicarilla Apache Tribe (Tribe) and RVD met to discuss the implementation of major portion pricing for the natural gas produced from the Jicarilla Reservation. From July 1, 1975, to June 30, 1995, the Tribe sold gas under royalty-in-kind (RIK) agreements. Until 1989, gas was bought by either the X-4 or the X-4 under long-term contracts. In 1989, the Tribe entered into contract settlements with X-4 and X-4, thus, allowing the companies to pay market prices rather than the Natural Gas Policy Act (NGPA) ceiling prices.

After discussing many different data sources available to perform major portion analysis, the Tribe and RVD concluded that RVD would use sales data provided by the Tribe. This sales data will consist of the MMS lease number, API well number, monthly RIK production volumes and values, Btu content, producing formation(s), the buyer, and pipeline. The RVD will use the Tribal data to calculate median prices for the Jicarilla Reservation.

The RVD will use the Auditing and Financial System (AFS) database to determine prices paid by those payors who paid in-value. The prices paid by the payors who paid in-value will be compared to Tribal data and RVD will bill those payors for any underpayments.

### Regulatory Criteria

The oil and gas valuation regulations found at 30 CFR 206 (1987), have long required that the "estimated reasonable value" of production be used for the purposes of computing royalties. Due consideration is given to the highest price paid for a part or for a major portion of gas of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. Title 25 CFR 211 (Indian tribal) and 212 (Indian allotted) and the terms of the Jicarilla leases also specify that the value may, at the discretion of the Secretary of the Interior, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas and/or natural gasoline and/or all other hydrocarbon substances produced and sold from the field where the leased lands are located.

The amended valuation regulations at 30 CFR §§ 206.172 and 206.173 (1996) address the issue of major portion for Indian lands. Specifically, the regulations provide:

For any Indian leases which provide that the Secretary may consider

the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production for royalty purposes shall be the higher of those two values. [Emphasis added.]

For natural gas, these regulations specify that a major portion price is determined by summing all individual sales volumes, listed in descending price order, of a particular quality of gas in the same field (or, if necessary, to obtain a reasonable sample from the same area). The price associated with the volume that causes the cumulative volume, summed beginning with the volume associated with the highest price (lowest price beginning March 1, 1988) to exceed 50 percent plus 1 Mcf of the total sales volume is deemed to be the major portion price. Like-quality gas is gas of similar physical, chemical, and legal characteristics. Legal characteristics are generally the applicable NGPA category or subcategory and the regulated or deregulated status of the gas.

## Major Portion Methodology

Under the agreement reached between the RVD and Jicarilla representatives, the major portion methodology will identify monthly estimated median values for all gas production in the Jicarilla Reservation utilizing Tribal RIK data for the time period January 1984 through December 1995. The following key issues were agreed to by RVD and the Tribe at the December 6 meeting:

- The RVD will consider the Reservation as the "area" for calculating the major portion pricing.[1]
- For the purpose of implementing the major portion pricing, RVD will assume that the production volumes equal the sales volumes from the Reservation.
- The price received for the RIK portion of the gas represents 1/8 royalty share. The RVD will extrapolate the 1/8 royalty share to the entire 8/8 production and assume that the value for the 1/8 royalty share is representative of the prices received for the other portion of the gas sold from the Reservation.[2]
- The RIK prices are wellhead values. Thus, RVD will compute a transportation-reduced major portion price (net major portion price) using the RIK Tribal data and compare these values to a transportation-reduced price (net price) for the non-RIK volumes obtained from the AFS.

---

[1]The RVD is analyzing the State production data and field (pool) definitions as determined by the New Mexico State Oil and Gas Commission to determine and support the Reservation as the area. Results of this analysis will be provided to the Tribe.

[2]Approximately 2/3 of the 1/8 royalty share was sold under RIK contracts.

JIC000223

Jicarilla Apache Tribe
Revenue and Taxation
CONFIDENTIAL
Do not duplicate
without permission

<u>SETTLEMENT AGREEMENT</u>

THIS SETTLEMENT AGREEMENT is entered into as of _____, by and between Northwest Pipeline Corporation, a Delaware Corporation ("Northwest") and the Jicarilla Apache Tribe, an Indian Tribe organized and incorporated under the laws of the United States of America (the "Tribe").

<u>RECITALS</u>:

A.  WHEREAS, Northwest, the Tribe and El Paso Natural Gas Company ("El Paso") are parties to the Royalty Gas Gathering and Exchange Agreement dated September 4, 1975, as amended, (the "Agreement"), which provides for the gathering of the Tribe's royalty gas into Northwest and El Paso pipeline gathering facilities on the Jicarilla Apache Tribe Reservation and for the sale of the excess royalty gas to El Paso and Northwest; and

B.  WHEREAS, the parties to the Agreement have previously entered into separate bi-party amendments to the Agreement respective to the rights and duties between those parties under the Agreement; and

C.  WHEREAS, bona fide disputes and controversies exist between Northwest and the Tribe as to the interpretation of the Agreement with respect to Northwest's obligation to purchase the royalty gas gathered by Northwest; and

D.  WHEREAS, Northwest and the Tribe desire to settle any and all claims, liabilities and obligations, and causes of action which have been or

JIC000490

may be asserted by either party against the other party that arise out of, under, or relate to the Agreement; and

E.  WHEREAS, Northwest and the Tribe desire to terminate their respective obligations to each other under the Agreement and Northwest is willing to make a payment to the Tribe reflecting the value of the Agreement to the Tribe in exchange for the Tribe's release of Northwest from all obligations of Northwest under the Agreement for all periods of time.

## ARTICLE I
### TERMINATION OF AGREEMENT AND SETTLEMENT

1.1  Subject to the terms and conditions of this Settlement Agreement, Northwest and the Tribe hereby agree to terminate the Agreement on the Effective Date with respect to all obligations of Northwest to the Tribe and all obligations of the Tribe to Northwest.  In connection with such termination of the Agreement, Northwest and the Tribe mutually release each other from any and all obligations under the Agreement after the Effective Date, specifically including the obligation of Northwest to gather, transport, exchange or deliver the Tribe's royalty gas and the obligation to purchase the Tribe's royalty gas known as excess royalty gas.

1.2  Subject to the terms and conditions of this Settlement Agreement, Northwest and the Tribe hereby settle, release, terminate, covenant not to sue, and forever discharge each other, their respective officers, directors,

-2-

JIC000491

agents, successors and assigns on any and all claims or causes of action, whether or not known or alleged, which may now exist or which may hereinafter arise and which relate to or arise under the Agreement.

1.3 The parties hereto acknowledge and agree that the payments made hereunder are being made as a full, final and complete compromise, adjustment and settlement of any and all transactions, agreements or courses of dealing which may have arisen or may arise and that the execution of this Settlement Agreement shall constitute a full and complete settlement of all issues between the parties.

1.4 Northwest has assigned a Gas Purchase Contract dated February 1, 1988 (Northwest GPK No. 10732) between Northwest and the Tribe to Williams Gas Supply Company effective October 1, 1988. As part of this Settlement Agreement, and for the same consideration paid hereunder, the Tribe consents to such assignment.

1.5 Northwest and the Tribe agree that this Settlement Agreement constitutes an agreement of the parties to terminate the Agreement as it pertains to the respective obligations of each to the other under the Agreement and shall constitute an agreement pursuant to Order No. 490 of the Federal Energy Regulatory Commission ("FERC") issued February 5, 1988 (18 C.F.R. §157.21 et seq.) to permanently abandon the purchase and sale of all gas dedicated under the Agreement to Northwest. Northwest agrees to file a report with FERC reflecting such permanent abandonment within thirty (30) days

-3-

following execution of the Settlement Agreement by the parties and approval by the Secretary of Interior or his authorized delegate (the "Secretary").

1.6  Following execution of this Settlement Agreement by both parties and approval by the Secretary, this Settlement Agreement shall be effective as of January 1, 1989 ("Effective Date").

1.7  The Tribe shall provide notice to producers that effective February 1, 1989, as applicable, or the date of release of the producer's working interest gas from its contract with Northwest, if earlier, that the Tribe will take its royalty in value rather than in kind until further notice.  Northwest shall notify producers whose gas was dedicated to Northwest on February 1, 1989 that Northwest ceased purchasing the Tribe's royalty gas effective February 1, 1989.  Additionally, Northwest shall notify any producer whose gas was released from its contract with Northwest prior to February 1, 1989 that Northwest ceased purchasing the Tribe's in kind royalty gas as of the date of the release.

## ARTICLE II
### PAYMENT TO THE TRIBE

2.1  Within ten (10) days following execution of this Settlement Agreement by the Tribe and Northwest, Northwest shall make a payment to the Tribe in the amount of Ten Million Four Hundred Fifty Thousand Dollars ($10,450,000) by depositing said amount in the Escrow Account described in

-4-

Article III of this Settlement Agreement. Said payment is final settlement and payment in full for any and all obligations of Northwest under the Agreement to purchase gas prior to December 31, 1988, and any and all obligations of Northwest under the Agreement to purchase any gas from and after the Effective Date, excluding the amounts to be paid pursuant to Section 2.2.

2.2 In addition to the amount set forth in Section 2.1, Northwest shall pay the Tribe on or before February 28, 1989, for royalty gas which is dedicated to Northwest and that is produced during the month of January, 1989 at a price which is the lesser of the price which the Tribe would have received for such gas under the Agreement or a price of $1.70 per MMBtu.

2.3 After execution of the Settlement Agreement by Northwest and the Tribe, Northwest and the Tribe shall have no further rights to make any adjustments to the payments made hereunder.

2.4 It is expressly understood between the parties that pursuant to the FERC's Order No. 500, the payment of all monies under this Agreement except for payments for gas taken during January, 1989, as described in Section 2.2 herein, represents the total settlement amount of any and all Northwest obligations under the Agreement to purchase any royalty gas.

-5-

JIC000494

# ARTICLE III

## ESCROW ACCOUNT

3.1  The parties acknowledge that the Settlement Agreement shall not be effective until it is approved by the Secretary of the Interior or his authorized delegate.  Consequently, the parties shall create an Escrow Account and all payments hereunder shall be paid to the Escrow Account.  Upon written approval of this Agreement by the Secretary, Northwest and the Tribe shall so notify the Escrow Agent and the Escrow Agent shall release all funds in the Escrow Account, including interest, to the Tribe.  In the event that the Secretary fails or refuses to approve this Settlement Agreement, Northwest and the Tribe shall so notify the Escrow Agent and all funds paid into the Escrow Account, including interest, shall be distributed to Northwest.

3.2  The parties shall appoint the First National Bank in Albuquerque as Escrow Agent, or such other escrow agent that is mutually acceptable to the parties.  At the time of execution of this Settlement Agreement, the parties shall enter into an Escrow Agreement, Letters of Instruction or such other documents as are necessary to effectuate the Escrow and attach such documents hereto as Exhibit "A".

3.3  The parties shall each pay one half of the escrow fees and other charges of the escrow agent.

-6-

JIC000495

## ARTICLE IV

### TRANSPORTATION, GATHERING AND CONDITIONING AGREEMENTS FOR ROYALTY GAS

4.1 Northwest, upon request by the Tribe, and to the extent permitted and consistent with all applicable laws, regulations, and orders of governmental bodies having jurisdiction, agrees to offer to the Tribe agreements to transport, gather and condition and, if available exchange any or all of the Tribe's royalty gas taken by the Tribe in kind which is connected to Northwest's facilities, and any discount of the maximum rates for transportation, gathering and conditioning will be subject to the discounts allowed under Northwest's then current tariff and in accordance with Northwest's then current discount policies. Northwest further agrees that, upon request by the Tribe, the Tribe will be eligible for any and all posted discounts for transportation, gathering and conditioning that Northwest may offer from time to time on a generic basis to all shippers. Pursuant to Northwest's tariff, Northwest and the Tribe may also agree upon a specific discount rate in a transportation or gathering or conditioning agreement.

## ARTICLE V

### WARRANTIES AND INDEMNITY

5.1 Northwest represents and warrants to the Tribe that Northwest has duly adopted this Settlement Agreement and authorized the execution, delivery and consummation of this Settlement Agreement in accordance with the terms and conditions herein set forth.

-7-

JIC000496

5.2  The Tribe represents and warrants to Northwest that the Tribe has duly adopted this Settlement Agreement and authorized the execution, delivery and consummation of this Settlement Agreement in accordance with its terms and with the governing laws and rules of the Tribe.  The Tribe further warrants that it has full power and authority to enter into this Settlement Agreement subject only to approval of this Settlement Agreement by the Secretary.

5.3  The Tribe shall not join, except as a nominal or indispensible party, Northwest in any claims and causes of action, whether or not known or alleged, arising from or relating to the Agreement, between the Tribe and El Paso or the Tribe and any other third party, and the Tribe shall indemnify and hold Northwest harmless against any claim for damages in any such action or claim brought by the Tribe against Northwest.

5.4  The Tribe acknowledges that when the settlement contemplated herein is effective, the Agreement will have no bearing on the value of any gas which is produced from acreage which is or was dedicated to Northwest, and the Tribe will not assess royalty from producers who are or have sold gas to Northwest based on the provisions of the Agreement, provided, however, that this Agreement shall in no way, manner or form waive the Tribe's rights against producers having sold the royalty share of production prior to January 1, 1989.  Specifically, the Tribe does not waive any right to receive royalties and pursue royalty payments from Mobil Oil Company.

-8-

JIC000497

## ARTICLE VI

## MISCELLANEOUS

6.1  Northwest, upon request from the Tribe, will assist the Tribe to the extent possible to receive payment from Mobil Oil Company on royalty amounts owed for the value of gas released from Northwest and sold by Mobil prior to the Effective Date.

6.2  This Settlement Agreement may only be changed or amended by an agreement in writing signed by both parties hereto.

6.3  This Settlement Agreement, including the exhibits attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no other agreements, representations, statements or commitments binding upon either party other than those contained herein.

6.4  This Settlement Agreement shall be governed by and in accordance with the laws of the State of New Mexico.

6.5  This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.6  The Tribe and Northwest, and their respective employees, agents, offices, directors, and attorneys shall use their best efforts to keep the

-9-

JIC000498

substance of this Settlement Agreement and the settlement negotiations confidential, to the extent the same is permissible or possible considering those instances or obligations which may from time to time require disclosure to financial institutions, members of the Tribe, consultants for evaluation purposes, escrow agent, the Secretary, approved agencies and regulatory bodies or as may be ordered by a court or governmental agency of competent jurisdiction. Under no circumstances shall any documents memorializing the substance of this Agreement be disclosed or released to any other third parties, including any newspaper, magazine or other publication, absent the mutual agreement of Northwest and the Tribe. Northwest and the Tribe agree that the Tribe may disclose the fact of the settlement to its tribal members and Northwest may disclose to El Paso and to producers who are or have sold gas to Northwest the fact that it is no longer purchasing any gas from the Tribe and that pursuant to this Settlement Agreement, the Tribe will not assess royalties from producers based upon the provisions of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be duly signed and sealed in multiple originals as of the day and year first written above.

ATTEST:                           NORTHWEST PIPELINE CORPORATION

_Kerrie G. Hummel_                By: _T C. Randolph_
Assistant Secretary               L.C. Randolph, Vice President


ATTEST:                           JICARILLA APACHE TRIBE

_Barbara Douglas_                 By: _Leonard Atole_
Secretary                         Leonard Atole, Vice President
3211g/12

-10-

JIC000499



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT L. BAYLESS                )
                                 )
                                 )
MERRION OIL AND GAS CORP.        )
                                 )
                                 )
    Plaintiffs,                  )
                                 )
    v.                           )
                                 )    No. 1:01CV00393 (RBW)
                                 )
THE UNITED STATES                )
DEPARTMENT OF THE INTERIOR,      )
                                 )
                                 )
JICARILLA APACHE NATION          )
                                 )
                                 )
    Defendants.                  )

FILED
DEC - 9 2002
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FILED
APR 2 9 2003
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

### SECOND AMENDED COMPLAINT
### FOR DECLARATORY AND INJUNCTIVE RELIEF,
### AND INTENTIONAL BREACH OF CONTRACT

---

For their second amended complaint, Plaintiffs Robert L. Bayless ("Bayless") and Merrion Oil and Gas Corporation ("Merrion") (collectively "Plaintiffs" or "Bayless and Merrion") allege the following:

## Additional Bad Faith Conduct and Unfair Dealing by the Jicarilla and Department

65.    The Jicarilla have obstructed Plaintiffs ability to enforce their rights under the Leases.    Pursuant to *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997), the Department was required by the Due Process Clause to provide Plaintiffs with "the audit calculations supporting the underpayment determinations along with the facts or records upon which those calculations rest." However, on April 2, 1998, soon after formulation of the Jicarilla Methodology, Gibbs-Tschudy of the Department and David Wong of the Jicarilla knowingly disregarded the *Fry* holding by entering into a letter agreement to prevent disclosure of the actual RIK sales prices utilized to calculate the major portion price under the Jicarilla Methodology. April 2, 1998 Letter, Document MMSFOIA010038. As a result, Plaintiffs have been deprived of information essential to enforcing their rights under the Leases.

66.    Jill Grant, outside counsel for the Jicarilla, helped draft the Assistant Secretary's decision denying the administrative appeal of Dugan Production Corporation ("Dugan") from the MMS order requiring major portion analysis under Jicarilla Apache Tribal leases. Jill Grant participated in the drafting process by providing an issues list and comments to Platte E. Clark, Acting Chief, MMS Appeals Division, regarding matters to be addressed in the Dugan decision, and subsequently providing Andy Anderson, a MMS Appeals Analyst, with her revisions to the text of the draft decision.    November 2000 correspondence between Jill Grant and the Department, Draft Administrative Record, MMSFOI0152.    The Dugan decision is nearly identical to the decisions issued to Bayless and Merrion.  Ms. Grant's communications were made without timely notice to the Plaintiffs.

-17-

67.    At Ms. Grant's request, in the final MMS decisions for Dugan, Bayless, and Merrion, the Department agreed to make three assertions to try to support the Jicarilla's effort to have the Department violate its regulations:

(i)    that "extrapolated RIK sales volumes represent 67 percent of the total sales volumes on the Reservation for the audit period in question;"

(ii)    that "the vast majority of gas produced from the Jicarilla Apache Reservation is sold, or disposed of, pursuant to non-arm's length transactions;"

(iii)    that "the RIK volumes constitute approximately 25 percent of arm's length sales from the Reservation."

Correspondence between Jill Grant and the Department, Draft Administrative Record Document MMSFOI0152. Plaintiffs are unable to find any support for these assertions in the administrative record.

68.    The Jicarilla knowingly inflated the price they received from RIK gas sales by adding to the actual price buyout payments it attributed to those sales, which is contrary to D.C. Circuit precedent and established Departmental policy, under *Independent Petroleum Ass'n of America v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).

69.    After extensive lobbying efforts with the Department, the Jicarilla successfully induced the Department to ignore the regulations applicable to the Leases at issue and also to erroneously rely upon data other than arm's-length sales data that was more favorable to the Tribe for royalty calculation purposes but known to be unlawful.

70.    As a result, the Jicarilla knowingly and willfully breached the Leases with Plaintiffs by unilaterally revising and substantially altering the terms and conditions of such leases and the Plaintiffs' royalty payment obligations thereunder.

-18-

45084158.4



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240



IN REPLY REFER TO:

JAN    2002
[JAN 18 2002]

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Phillip R. Clark                          Re: Burlington Resources
Holme Roberts & Owen LLP                          Oil & Gas Company
1700 Lincoln Street, Suite 4100                   MMS-99-0056-IND
Denver, Colorado  80203
                                                  Appeal Granted
Dear Mr. Clark:

Burlington Resources Oil & Gas Company (Burlington) appealed under 30 CFR Part 290 (1998) from a Minerals Management Service (MMS) order dated January 7, 1999, which directed Burlington to report and pay additional royalties in the amount of $632,885.31 for natural gas production from Ute Mountain Ute Tribal leases (Ute Tribal leases) for the period January 1984 through December 1996 (the audit period), based on MMS's "major portion analyses" for that period.

Background

By letter to payors, dated September 30, 1988, MMS reemphasized the requirement to perform major portion analysis and dual accounting (accounting for comparison) for determining and paying royalties on production from Indian leases.

MMS's Royalty Valuation Division (RVD) (now the Indian Oil and Gas CAM because of an agency reorganization) performed a major portion analysis for the period January 1984 through December 1996.  This major portion analysis covered the eastern area of the Ute Mountain Ute Indian reservation (Reservation).  RVD's methodology for the major portion analysis included using its Auditing and Financial System (AFS) database to calculate a major portion value for each month for all Ute Tribal leases in the eastern area of the Reservation.  The major portion values were based on the net price paid for either residue gas or unprocessed gas sales for all Ute Tribal leases and certain Federal leases.

By letter to the Ute Mountain Ute Tribe (Ute Tribe) dated May 5, 1998 (with the Methodology Report enclosed), MMS requested confirmation of Ute Tribe's

Mr. Phillip R. Clark                                                      2

agreement to the major portion methodology.  The Ute Tribe signed in
confirmation of this agreement.

By letter to Burlington, dated September 3, 1998, MMS informed Burlington of
potential royalty underpayments on its Ute Tribal leases based on MMS's major
portion analysis.  By letter to Burlington, dated January 7, 1999, MMS ordered
Burlington to report and pay additional royalties in the amount of
$632,885.31.

On February 16, 1999, Burlington filed a timely appeal.

Issue

Did MMS perform a legally sufficient major portion analysis?

Analysis

It is not disputed that Burlington's leases, by their terms, require the
Secretary to consider, when valuing lease production for royalty purposes, the
highest price paid or offered at the time of production for the majority of
like-quality gas produced and sold from the same field or area, and to compare
that price with the price received by the lessee.  The royalty valuation
regulations for unprocessed gas, effective March 1, 1988, provide at 30 CFR
206.152(a)(3) (1995) that:

> (i) For any Indian leases which provide that the Secretary may
> consider the highest price paid or offered for a major portion
> of production (major portion) in determining value of production
> for royalty purposes, if data are available to compute a major
> portion MMS will, where practicable, compare the value
> determined in accordance with this section with the major
> portion.  The value to be used in determining the value of
> production for royalty purposes shall be the higher of those two
> values.

> (ii) For the purposes of this paragraph, major portion means the
> highest price paid or offered at the time of production for the
> major portion of gas production from the same field.  The major
> portion will be calculated using like-quality gas sold under
> arm's-length contracts from the same field (or, if necessary to
> obtain a reasonable sample, from the same area) for each month.
> All such sales will be arrayed from the highest price to the

Mr. Phillip R. Clark                                                    3

>     lowest price (at the bottom).  The major portion is that price
>     at which 50 percent (by volume) plus 1 mcf of the gas (starting
>     from the bottom) is sold.

The valuation regulations for processed gas at 30 CFR 206.253(a)(3)(i) and
(ii) (1995) contain essentially the same provisions.  The regulations
governing the valuation of gas for periods prior to March 1, 1988, i.e.,
30 CFR 206.103 (1987), contained similar language, to wit:

>     In absence of good reason to the contrary, value computed on the
>     basis of the highest price per barrel, thousand cubic feet, or
>     gallon paid or offered at the time of production in a fair and
>     open market for the major portion of like-quality oil, gas, or
>     other products produced and sold from the field or area where
>     the leased lands are situated will be considered the reasonable
>     value.

Burlington acknowledges that MMS may, within its discretion, perform a major
portion analysis.  However, Burlington contends that the method adopted by MMS
for performing major portion analyses was, in the instant case, flawed and
inconsistent with the applicable regulations.

On pages 3 and 4 in the Statement of Reasons that Burlington submitted to MMS
on May 24, 2000, Burlington argues that:

"The MMS Letter Must be Reversed Because the MMS's "Major Portion"
Calculations Violate the MMS's Own Regulations."

Burlington states:

>     Effective March 1, 1988, the MMS promulgated new gas valuation
>     regulations (the "1988 Regulations") (the Pre-1988 Regulations and the
>     1988 Regulations are collectively referred to as the "Regulations").
>     The pertinent regulations were amended to read as follows:

>>     For any Indian lease which provides that the secretary may
>>     consider the highest price paid or offered for a major portion of
>>     production (major portion) in determining value of production for
>>     royalty purposes, if data are available to compute a major portion
>>     MMS will, where practicable, compare the value determined in
>>     accordance with this section with the major portion.

Mr. Phillip R. Clark                                                    4

> 30 C.F.R.§ 206.172(a)(3)(i) and § 206.173(a)(3)(i) (1997) (emphasis added).

The term "major portion" is defined in the 1988 Regulations as follows:

> For purposes of this paragraph, major portion means the highest price offered at the time of production for the major portion of gas production from the same field.  The major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month.

30 C.F.R.§ 206.172(a)(3)(ii) and §206.173(a)(3)(ii) (1997) (emphasis added).

As to the last seven years of the Audit Period, the 1988 Regulations specify *when* a major portion computation will be made (when the necessary data is available and it is practical to do so) and *how* the computation is to be made (using an array of all like-quality gas sold under arm's-length contracts from the same field).  The Pre-1988 Regulations did not contain the same level of detail as is found in the 1988 Regulations, but the MMS indicates in the Major Portion Analyses Report, Ute Mountain Ute Tribal Leases-Eastern Portion ("Major Portion Report"), a copy of which is attached hereto as Exhibit F, that the only significant difference between the 1988 Regulations and the Pre-1988 Regulations is the way in which a median price is chosen from the array. (Footnote omitted.)  See Major Portion Report, p.2.

On page 4 in the Statement of Reasons that Burlington submitted to MMS on May 24, 2000, Burlington argues that:

The MMS Demand Letter Violates the Pre-1988 Regulations and the 1988 Regulations Because the MMS Calculated a "Major Portion" Price When the Necessary Data was Unavailable.

Burlington states:

> As discussed above, the 1988 Regulations provide that the MMS will calculate a major portion price only if the data required to compute that price is available. 30 C.F.R.§ 206.172(a)(3)(i), and the Major

Mr. Phillip R. Clark                                                           5

Portion Report makes clear that the MMS does not interpret the Pre-1988
Regulations differently.  Major Portion Report, pp. 1-2.  Although the
Regulations require additional data, in the Major Portion Report the MMS
itself stated that such data would include both recognition of Natural
Gas Policy Act ("NGPA") categories and nature of sales (arm's-length
versus non-arm's-length).  Major Portion Report, pp.2-3.  Despite these
regulatory requirements, the MMS chose to calculate its estimated "major
portion" prices based not on the information required by its own
regulations but on the limited information contained in the MMS's
Auditing and Financial System ("AFS"), information that does not satisfy
the regulatory requirements for calculating a major portion price
because it does not identify the nature of sales.  Major Portion Report,
p. 3.

The MMS has not satisfied even the most basic requirement of the
Regulations, the requirement that the MMS will calculate a major portion
price only if the necessary data is available, 30 C.F.R. §
206.172(a)(3)(i)(1997), because the AFS database used by the MMS to make
its estimated "major portion" calculations is wholly inadequate for that
purpose.  The MMS's attempt to justify its noncompliance with the
regulations must fail.  Administrative agencies are not free to
disregard the law in pursuit of an alleged reasonable result.  On this
point the law is clear and unequivocal -- agencies are not above the law
and are not free to disregard their own regulations.  United States v.
Nixon, 418 U.S. 683, 695-96 (1974).

By letter dated May 18, 2001, from MMS's Manager, Indian Oil and Gas (CAM), to
MMS's Chief, Appeals Division, the following recommendation was given to the
Chief:

Because we used MMS's Automated (sic) Financial System (AFS)
database to calculate major portion and we can't identify
all non-arm's-length sales at this time, we recommend that
Burlington's appeal for the March 1988 through December 1996
time period covered by the MMS Order be granted without
prejudice.  Recent Interior Board of Land Appeals (IBLA)
decisions require MMS to use only arm's-length gas sales to
calculate major portion for sales periods after February 1988,
under the valuation regulations effective March 1, 1988.  IBLA
indicated that MMS is not precluded from billing Burlington
for major portion in the future if MMS can calculate major
portion prices using a database with all non-arm's-length

Mr. Phillip R. Clark                                                                6

> sales removed.  We didn't identify major portion liabilities
> for Burlington for the January 1984 through February 1988 time period.

The valuation regulations effective March 1, 1988, are applicable to this appeal.  The valuation regulations that were in effect prior to March 1, 1988, are not applicable to this appeal as there is no dispute between Burlington and MMS for this period.

In Burlington Resources Oil and Gas Co., 151 IBLA 144 (November 30, 1999)[a] IBLA reversed the Deputy Commissioner's decision in MMS-96-0139-IND, stating:

> The major portion analysis system was first proposed in 1984, although
> it appears that data to implement the system of major portion pricing
> was only analyzed after the December 1991 settlement agreement in
> Kauley v. Lujan, supra.  It is important to note that major portion
> analysis is required only if arm's-length sales data is available and if
> these calculations are practicable.  See 30 C.F.R. §§ 206.152(a)(3)(i),
> 206.152(a)(3)(ii) (1991).  The required sales information was not
> available nor was the calculation of a median price for a population
> including only arm's-length transactions using the AFS database in the
> case of appellant's sales for the 1987-1991 time frame.  We find that
> MMS' use of nonarm's-length sales data required by 30 C.F.R. §
> 206.152(a)(3) to be inconsistent with the plain language of the
> regulation.
>
> Burlington Resources Oil and Gas Co. at 158.

Since the subject appeal involves the same kind of leases and the same major portion methodology that was present in Burlington Resources Oil and Gas Co., supra, and since the time period at issue post-dates the promulgation of the subject major portion regulations, I conclude that the aforementioned IBLA decision is controlling and that the MMS order dated October 20, 1998, cannot be sustained.

Burlington has raised other arguments in its appeal.  However, since the issue of compliance with the regulations is deemed controlling, the other arguments will not be addressed herein.

---
a)GFS(O&G) 4(2000)

Mr. Phillip R. Clark                                                    7

Conclusions and Order

For the reasons stated above, the subject appeal is granted.  However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with the necessary information can be merged with the AFS database to meet the regulatory requirements that MMS has established.  See Burlington Resources Oil and Gas Co., supra at 158.

This decision may be appealed to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2000).  A copy of 43 CFR 4.411 and 4.413 (2000) is enclosed for reference.  Notice of such appeal must be transmitted to the Deputy Commissioner of Indian Affairs, Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240, within 30 days after the date of service of the decision.  Copies of any statement of reasons, written arguments, or briefs should also be served upon the Deputy Commissioner of Indian Affairs.  Copies of the notice of appeal and any statement of reasons, written arguments, or briefs should likewise be served upon the Associate Solicitor, Division of Mineral Resources (MS 6312), U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4230), Minerals Management Service, U.S. Department of the Interior, at the same address.

                              Sincerely,

                    **/S/M Sharon Blackwell**

                    Sharon Blackwell
                    Deputy Commissioner of
                       Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-99-0056-IND)
     RMMLF
     Reading File
LMS:PMI:Appeals:MS9200:CWeathersby:ad:10/19/01:(202)208-2622
G:\Appeals\share\appsdecsn\weatherc\99-0056

                                                    MMS-99-0056-IND

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

JAN 11 1985

| | |
|---|---|
| THE SHOSHONE INDIAN TRIBE AND THE ARAPAHOE INDIAN TRIBE OF THE WIND RIVER INDIAN RESERVATION, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. C81-131-K ) |
| DONALD P. HODEL, Secretary of the Interior, ATLANTIC RICHFIELD COMPANY, CHEVRON USA INC., CONTINENTAL OIL COMPANY, SHELL OIL COMPANY, | ) ) ) ) ) ) |
| Defendants, | ) ) |
| MONTANA-DAKOTA UTILITIES CO., | ) ) |
| Intervening Defendant. | ) ) |

ORDER DENYING MOTION TO COMPEL AND
REAFFIRMING SUMMARY JUDGMENT

The above-entitled matter having come on regularly for hearing on the filing by the Secretary of the Interior of the Decision on Remand and on the plaintiff Shoshone Indian Tribe's Motion to Compel Calculation of Weighted Average Values, which motion was supported by plaintiff Arapahoe Indian Tribe; plaintiff Shoshone Indian Tribe

appearing by and through its attorney, Susan M. Williams, plaintiff Arapahoe Indian Tribe appearing by and through its attorney, Robert S. Thompson, III; the defendant Secretary of the Interior appearing by and through his attorney, John Lindskold, United States Department of Justice; and the defendant oil companies appearing by and through their attorneys, Ernest Altgelt, III and Morris R. Massey; and the court having heard the arguments of counsel and having carefully reviewed and considered the motions, memoranda and supporting materials and being fully advised in the premises, FINDS:

1.   The findings contained in this Court's Order Ruling on Motions for Summary Judgment dated October 1, 1985 are incorporated by reference with the same force and effect as if set out herein at length.

2.   On January 7, 1987, this court entered its Order Ruling on Motion for Reconsideration. This cause was thereby remanded to the Secretary for further consideration of valuation methods for dry gas for royalty purposes.

3.   On September 8, 1987, the defendant Secretary of the Interior filed his report and decision pursuant to the court's order of January 7, 1987.

4.    Part 647.2.3B(4) of the Conservation Division
Manual definitions provides:

> "Highest price paid for a majority of
> like-quality production - That price at
> which more than 50 percent of the cur-
> rent production from the field or area
> is sold. When production and sales are
> diversified, this value will be estab-
> lished as the weighted average value
> obtained by taking a summation of per-
> centages, in descending price order,
> that totals more than 50 percent of the
> total production from the field or area.
> When used, this price establishes a min-
> imum value for royalty purposes."

5.    The quoted statement is merely a definition
of the highest price paid for a majority of like-quality
production, which is one of the valuation standards pre-
scribed by the governing regulation, 30 C.F.R. § 206.103,
quoted in part as follows:

> "The value of production, for the pur-
> pose of computing royalty, shall be the
> estimated reasonable value of the pro-
> duct as determined by the Associate
> Director due consideration being given
> to the highest price paid for a part or
> for a majority of production of like-
> quality in the same field . . . in the
> absence of good reason to the contrary,
> value computed on the basis of the
> highest price per barrel, thousand cubic
> feet, or gallon paid or offered at the
> time of production in a fair and open
> market for the major portion of like-
> quality oil, gas or other products pro-
> duced and sold from the field or area
> where the leased lands are situated will
> be considered to be a reasonable value."

6.  The Conservation Division Manual definition as advocated by the plaintiffs is inconsistent in that a calculation of the "weighted average" will result in a value which is in excess of that ". . . price at which more than 50 percent of the current production from the field or area is sold." The plaintiffs' interpretation would result in a value for royalty purposes being skewed toward the highest price paid, not the highest price for a majority of production.

7.  The Minerals Management Service has consistently used the "median base floor price" method of conducting a "major-portion" price analysis for determining the value of dry gas for royalty purposes. The "weighted average" calculation which is advocated by plaintiffs has never been used. An interpretation of the Conservation Division Manual definition as requiring a calculation of the weighted average of the top 50% of prices to calculate the value upon which royalties are to be paid is an unreasonable interpretation of the governing regulation and is contrary to the long standing administrative interpretation of the regulation.

8.  It has been the long standing practice of the Minerals Management Service and its predecessor agency to

interpret "like-quality" as including both the physical and legal characteristics of the gas. In performing a major-portion price analysis, the base prices are adjusted for BTU content to assure that the prices are for gas of like physical characteristics and only gas of the same price vintage or category is compared to insure that the gas has like legal characteristics. Prices applicable to wells of the same vintage or category must be grouped to determine a floor price applicable to the majority of gas under the same price classification.

9. It would be unreasonable to disregard price vintages and categories in conducting a major-portion price analysis.

10. For purposes of computing royalties payable on the dry unprocessed gas produced from the subject Wind River Reservation fields during the audit period, the Minerals Management Service valued the gas at the maximum price for which the gas could lawfully be sold under the applicable Natural Gas Act price vintage or Natural Gas Policy Act price category. Where gas is valued at the maximum lawful price for the vintage or category in which it falls, a "weighted average" calculation will yield the same result as the "median base floor price" calculation with

respect to gas of the same regulated price category. The dry unprocessed gas produced from the Wind River Reservation fields during the audit period may be valued at the gross proceeds accruing to the producers; at the maximum allowable federally regulated price; or at the highest price paid for a major portion of the gas produced in the field (calculated using either the "weighted average" method or the "median base floor price" method). The results will be the same during the audit period.

11. The Secretary's interpretation of his regulation as requiring a median base floor price calculation in conducting a major portion price analysis and the Secretary's consideration of the legal characteristics of the gas in comparing gas of like-quality are a reasonable exercise of his trust responsibility and not a breach of the fiduciary obligation owed by the Secretary to the plaintiff Indian Tribes.

## Conclusions

1. The Secretary's interpretation of the definition of the "highest price paid for a majority of like-quality production" set forth in Part 647.2.3B of the Conservation Division Manual is not plainly erroneous or in-

consistent with governing statutes and regulations. This interpretation is consistent with the fiduciary obligation owed by the Secretary to the plaintiff Indian tribes. Pawnee v. United States, 830 F.2d 187 (Fed. Cir. 1987).

2.    "Like-quality" lease products means lease products which have similar chemical, physical and legal characteristics. The Secretary's interpretation of "like-quality" to include legal characteristics of the gas as well as physical and chemical characteristics in determining value of the subject gas for royalty computation purposes is a valid and reasonable interpretation of the Department's regulations.  Davis v. CIG Exploration Inc., 789 F.2d 328 (5th Cir. 1986); Bower v. Phillips Petroleum Co., 692 F.2d 1015 (5th Cir. 1982); Flowers v. Diamond Shamrock Corporation, 639 F.2d 1146 (5th Cir. 1982); Kingery v. Continental Oil Co., 626 F.2d 1261 (5th Cir. 1980).

3.    Under 30 C.F.R. § 206.103 and § 647.2.3B(4) of the Conservation Division Manual, the highest price paid for a majority of production from the field must be calculated with reference to gas of the same price vintage or category.  The highest price paid or offered for the major portion of gas of the same price vintage or price category sold from the same fields will be its value for royalty purposes under the major-portion valuation technique.

4.    Abrogation of the Secretary's past interpretation of his valuation regulation as requiring consideration of legal characteristics would be unreasonable and is not required by the mandate of Jicarilla Apache Tribe v. Supron, 782 F.2d 855 (10th Cir. 1986).

5.    In view of the long standing administrative interpretation, the Secretary's construction of the department's own Conservation Division Manual definition, which is consistent with the statutes and regulations, is clearly reasonable and, as such, is entitled to great deference. Udall v. Tallman, 380 U.S. 1 (1965); Bowles v. Seminole Rock Co., 325 U.S. 410 (1945). Deference is especially appropriate where, as in this case, the agency's expertise or technical knowledge is involved. United Transportation Union v. Dole, 797 F.2d 823 (10th Cir. 1986). The same deference is to be afforded the Secretary's interpretation that legal characteristics of the gas must be considered in comparing gas of like-quality in computing royalty values.

NOW, THEREFORE, it is

ORDERED that the plaintiffs' Motion to Compel Calculation of Weighted Average Values be, and the same is, hereby denied; it is

HEREBY DETERMINED that there is no just reason for delay in the entry of final judgment on the dry gas valuation issues; and it is

THEREFORE ORDERED, that the partial summary judgment in favor of the Secretary of the Interior heretofore granted by the Order Ruling on Motions for Summary Judgment entered October 1, 1985 be, and the same is, hereby reconfirmed as a final judgment on the dry gas valuation issues.

DATED this 7th day of January, 1988.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

THE SHOSHONE INDIAN TRIBE AND    )
ARAPAHOE INDIAN TRIBE OF THE     )
WIND RIVER INDIAN RESERVATION    )
                                 )
                 Plaintiffs,     )
                                 )
    vs.                          )    No. C81-131-K
                                 )
DONALD P. HODEL, Secretary of    )
the Interior, ATLANTIC RICHFIELD )
COMPANY, CHEVRON OIL COMPANY,    )
CONOCO INC., SHELL OIL COMPANY   )
                                 )
                 Defendants,     )
                                 )
        and                      )
                                 )
MONTANA-DAKOTA UTILITIES CO.,    )
                                 )
                 Intervening     )
                 Defendant.      )

## DECLARATION OF WILLIAM H. FELDMILLER

Pursuant to 28 U.S.C. 1746, I, William H. Feldmiller, declare as follows:

1. I am the Chief, Royalty Valuation and Standards Division (RVSD), Minerals Management Service (MMS). In that position, which I have held from May 1982

JIC000465

2

to the present, I am responsible for assuring that the determination of value for royalty purposes is in accordance with the statutes, regulations, lease terms, and other controlling documents. From July 1979 to 1982, I held the position of Associate Deputy Director for Royalty Program Field Operations for the United States Geological Survey (USGS) and later, the MMS. I have also queried my subordinates as to whether this declaration accurately describes events, regulatory materials and practices of the MMS and its predecessor agency, the USGS. I am, therefore, qualified to state what calculation methods were prescribed by my Division and by its predecessor to assure the establishment of estimated reasonable value for royalty purposes for production from Federal and Indian leases.

2. The general regulation governing the valuation of onshore oil and gas production is at 30 CFR § 206.103 (previously 30 CFR § 221.47). In addition, 25 CFR §§ 211.13, 212.16, 213.24, and 227.17 are also considered, where applicable.

3. In order to arrive at a value for royalty purposes for the lands at issue in this case on the Wind River Reservation, Wyoming, the regulation at 25 CFR § 227.17 allows MMS the discretion of basing value either on the highest price paid or offered at the time of production for the major portion of gas production from the field or area where the leased lands are situated or the actual amount realized by the lessee (gross proceeds).

4. The regulation at 30 CFR § 206.103, which is applicable to Wind River Reservation lands by reference in 25 CFR §227, allows MMS the discretion to review a number of matters in establishing the estimated reasonable value of onshore gas for royalty purposes. The methodology we have been asked to review is the major-portion price analysis for like-quality gas. The regulation provides specifically that, in the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality gas from the same field or area will be considered to be a reasonable value.

5. Neither the laws, regulations, nor lease terms describe the method to be used in determining the price paid for the major portion of like-quality production from the same field or area. Likewise, the term "like-quality production" is not defined. Both these factors are central to the establishment of an estimated reasonable value for royalty purposes.

6. The practice of MMS and its predecessor agency has been to interpret "like quality" to include both the physical and legal characteristics of the gas; e.g., similar sulfur content and same regulated price category as set forth in the Natural Gas Policy Act of 1978.

JIC000466

7. The method of determining the price paid for the major portion of production was, to the best of my knowledge, first addressed in 1974 by USGS Conservation Division (CD) Manual, a procedural document written by the predecessor organization to MMS. The CD Manual was not issued pursuant to required rule-making procedures and, hence, is not a binding regulation. The major-portion price analysis method prescribed in the CD Manual was revised in 1977, again without the benefit of official rule-making. To the best of my knowledge, a "weighted average" method as proposed by the Tribes in this litigation has never been used by the MMS or its predecessor agency.

8. In 1978, the Albuquerque office of the USGS CD performed major-portion price analyses in connection with the lawsuit of Jicarilla Apache Tribe v. Supron (10th Cir. Feb. 24, 1984). The results of those analyses were accepted by the United States Federal District Court for the District of New Mexico, and subsequently affirmed by the 10th Circuit Court of Appeals. The method employed for those analyses is the "median base floor price method" described in paragraph 11 infra except that prices were listed in descending order. This is a procedural matter which would not change the base floor price selected except under rare circumstances. (See Carmichael Declaration.)

9. In 1983 for this case, RVSD considered whether to use the major-portion analysis method as used in Jicarilla Apache Tribe v. Supron and whether to attempt to interpret and apply the method described in the 1977 CD Manual revision. The MMS Associate Director For Royalty Management decided that:

   A. The method used in Jicarilla Apache Tribe v. Supron had the advantage of being a court-accepted interpretation of the Indian lease form and Indian regulations.

   B. It is unfair not to consider prices associated with all production from the field or area.

   C. If the method described in the 1977 CD Manual revision were interpreted to apply only to the upper 50-plus percent of prices, it would be biased toward the highest price, would not be fair, and, therefore it would not be reasonable to use it in establishing value for royalty purposes.

   D. The "median base floor price method" was the procedure that best fulfilled the dual requirements of establishing a "major portion" price and properly excercising the Secretary's discretion in establishing a reasonable value for royalty purposes.

10. It is established precedent and practice of the MMS and its predecessor agency that the "median base floor price" method should be the one used by MMS personnel when valuation requires a major-portion price analysis. The "median base floor price" method provides a reasonable value for royalty purposes, statistically represents the price for a major portion of like-quality production sold from the same field or area, and fulfills the intent of both the Federal and the Indian leases and applicable regulations.

JIC000467

4

11. This Division has consistently advised lessees, MMS auditors, and State and Tribal auditors that the "median base floor price" method is to be used when making a major-portion price analysis. Examples of such guidance are attached. That procedure is to be performed as follows:

> The base prices are adjusted for Btu content to assure that the prices are for gas of like physical characteristics, and only gas of the same Federal Energy Regulatory Commission price category is compared to assure that the gas has like legal characteristics. The base prices are listed in ascending order, together with the volume produced. The incremental amounts of gas are then summed beginning with the amount associated with the lowest price and continuing until an incremental amount of gas causes the cumulative total to exceed 50 percent of the total production sold. The price which is associated with the incremental amount of gas which caused the summation to exceed 50 percent is deemed to be the majority price or median.

I declare under penalty of perjury under the laws of the United States of America, that the answers are true and accurate to the best of my knowledge.

William H. Teckmiller
Date    Sept 8, 1987

JIC000468

Jemez Pueblo · Jicarilla Apache                                    New Mexico

## ECONOMY

### AGRICULTURE AND LIVESTOCK

Agriculture and livestock represent a major source of livelihood on the reservation. The Jemez people are particularly known for their corn and chili crops.

### CONSTRUCTION

The tribe recently undertook a traditional fieldhouse construction project, a replica of one of the base-camps traditionally used for hunting and agricultural activities. This project involved the construction of a full-sized fieldhouse, built with traditional tools and techniques by the Jemez Pueblo Summer Youth Program, under the leadership of the pueblo's Tribal Archaeologist and traditional leaders.

### FISHERIES

The reservation lands, composed largely of mountainous territory covered with streams and ponds, lend themselves to recreational fishing. This is a popular activity with both tribal members and the general public, particularly at the Dragonfly Recreation Area. The tribe realizes modest revenues selling permits to non-tribal members.

### FORESTRY

Timber resources on the reservation are valuable, both for saw timber and fuelwood. Tribal timber sales since 1957 have totaled nearly six million board feet of ponderosa pine and Douglas fir. The reservation is home to many high-risk, over-mature trees which the tribe would like to market. The tribe is also instituting a fuelwood permit system for sales of logging slash and pinon-juniper to the general public. Annual revenues from timber sales are significant.

### GOVERNMENT AS EMPLOYER

A large number of tribal members are employed by the tribal government's various departments, including law enforcement and the tribal court system, health, administration, and other operations. The BIA and the Forest Service also provide employment to a number of tribal members.

### MINING

In 1989, the pueblo entered into a lease agreement with Mobil Producing of Texas and New Mexico, Inc., to produce oil and gas within a 7,600-acre tract of the reservation. Other minerals available on the reservation include coal, uranium, and sand and gravel, along with geothermal energy resources. The tribe has an agreement with the P&M Construction Company to mine sand and gravel, which provides the pueblo with monthly royalty payments.

### SERVICES

A cottage industry for the production and sale of arts and crafts represents a major source of employment and income for the tribe. The Jemez are internationally known for their traditional polychrome pottery, woven cloths, stone sculptures, moccasins, jewelry, and basketry.

The pueblo also operates a convenience store/gas station at the village, along Route 4. A church was renovated to house the Walatowa Visitor's Center, offering information and arts and crafts. The visitor's center sponsors the annual Jemez Red Rock Arts and Crafts Show in the Red Rocks area, near the tribe's convenience store.

### TOURISM AND RECREATION

The reservation and surrounding areas offer an abundance of activities for the outdoor enthusiast. The scenic Red Rocks area is located about 3 miles north of Jemez Pueblo on Route 4. There are numerous hot springs on the reservation, excellent for soaking, with camping nearby. The hot springs and camping areas include Holy Ghost Springs and Dragonfly Recreation Area (also offering good fishing). In addition, there is an annual elk hunt for a limited number of non-tribal people, as well as a turkey bow hunt. Hiking, mountain climbing, and winter cross-country skiing are also quite popular. The Jemez State Monument at the tribal Visitor's Center offers a one-of-a-kind museum and guided tour, which includes 700-year-old pueblo ruins, a 17th century Spanish mission, and more. Finally, the pueblo celebrates a number of feast days and ceremonies throughout the year. Visitors are welcome at many of these events.

### INFRASTRUCTURE

State Highway 44 connects the reservation to Interstate 25 and Albuquerque to the southeast and to Farmington to the northwest. Highway 4 runs up the Jemez Canyon and then east to Los Alamos. Commercial bus service is available in San Ysidro, 15 miles from the pueblo. Commercial train lines serve Bernalillo, 35 miles away. Truck lines serve the reservation directly.

### COMMUNITY FACILITIES

Electricity is provided by the Jemez Mountain Cooperative. Water and sewer systems are provided by the tribe through IHS. The pueblo maintains its own health clinic that serves as the primary source of care for most tribal members. For more serious health problems, the Albuquerque Indian Hospital, the University of New Mexico Hospital, and traditional healers provide services and care. The pueblo hosts a BIA day school and a public school for elementary and secondary grades, as well as a Head Start program which utilizes teachers and teacher's aides from the community. High school students either go to public school in Jemez Springs or attend boarding school in Santa Fe.

## Jicarilla Apache Reservation

Federal reservation

Jicarilla Apache
Rio Arriba and Sandoval counties, New Mexico

Jicarilla Apache Tribe
P. O. Box 547
Dulce, New Mexico 87528
(505) 759-3242
Fax: 759-3005

| | |
|---|---|
| Total area | 870,580.24 acres |
| Tribally owned | 823,580.24 acres |
| Total labor force | 1,104 |
| High school graduate or higher | 70% |
| Bachelor's degree or higher | 5.5% |
| Per capita income | $5,719 |
| Unemployment rate | 17.2% |
| Total reservation population | 2,636 |
| Tribal enrollment | 3,136 |

### LOCATION AND LAND STATUS

The Jicarilla Apache Reservation spans 870,763 acres of scenic terrain in north-central New Mexico, on the eastern edge of the San Juan Basin. The reservation's geography varies from high desert at the south boundary, at about 6,400 feet in elevation, to

JIC000252

New Mexico                                                                    Jicarilla Apache

mountainous areas of over 10,600 feet in elevation in the north. Approximately in the center of New Mexico's east and west boundaries, the reservation's northern boundary borders on the Colorado line. The town of Dulce is the center of most community activity.

The Jicarilla Apache Reservation was created by executive order on February 11, 1887. Since the 1970s, the tribe has purchased an additional 80,000 acres, bringing the total to 870,000 acres.

## CULTURE AND HISTORY
The Apache people, including those on the Jicarilla Apache Reservation, are linguistically related to the greater Na-Dene language family. Linguistic experts believe that the Apache people descended from arctic regions of western Canada to the desert southwest of the United States between the late thirteenth and sixteenth centuries. The Jicarilla Apache people's traditional lands spanned more than 50 million acres and were bounded by four sacred rivers. The area's geography, with its variety of terrain and ecosystems, afforded the Jicarilla a life style of hunting, fishing, and agricultural development.

The Apaches vehemently resisted the encroachment upon their traditional lands by Spanish, Mexican, and American settlers and military. But by the mid-1880s, Apaches were consolidated on various Southwestern Indian reservations. The Jicarilla were sent to the Mescalero Apache Reservation in southeastern New Mexico.

The Jicarilla tribal leadership, stepping outside the bounds of traditional channels, sought to win the support of New Mexico Territorial Governor Ross in 1886, in an attempt to regain their northern reservation. Ross' influential coalition convinced the president to sign the 1887 Executive Order which created the permanent site of the Jicarilla Apache Reservation. In an effort to create self-sufficiency among the Jicarilla Apache, the U.S. government expanded the reservation in 1907 and encouraged the Jicarilla to raise livestock.

The reservation's ample natural resources have proven to be the tribe's greatest economic asset. Currently, fees from hunting and fishing, livestock production, and particularly the vast oil and gas reserves located in the San Juan Basin have provided valuable sources of tribal revenue. Protecting these assets continues to be the Jicarilla people's greatest challenge. Since the 1970s, considerable tribal funds have been spent in resolving legal issues relevant to natural resources.

The tribe brought suits against a number of oil companies and the secretary of the interior. While many of the oil companies were quick to settle, the U.S. government proved to be the most intractable. The secretary of the interior refused to sign any new agreements unless the tribe agreed to drop its case. For expediency's sake the tribe agreed, yet this action signaled a new relationship between the tribe and the Department of the Interior—with the tribe taking the initiative in forging increasingly sophisticated agreements with industry partners.

In addition to this shift in control over their natural reserves, the Jicarilla Apache won the right, in a decision by the Supreme Court in the early 1980s, to act as a sovereign entity and impose a severance tax on minerals extracted from tribal lands.

In 1976, the tribe entered into a joint contract with the Palmer Oil Company of Billings, Montana, for the development of oil and gas. The tribe bought out Palmer's interests in 1977 and became the first tribe in the country to own and operate oil and gas wells. The tribe also formed the Jicarilla Oil and Gas Administration, which successfully petitioned to withdraw its royalty gas from interstate commerce, acquired a small-producer's certificate in its own name, and began marketing its gas in New Mexico.

## GOVERNMENT
The Jicarilla Apache tribe is governed by an elected president, vice-president, and an eight-member tribal council. Tribal members are eligible to vote at age 18, and elections are held every four years. The Jicarilla Apache were organized in 1937 under the terms of the Indian Reorganization Act. The tribe funds and operates its own law enforcement program and tribal court. The BIA has a criminal investigator who provides technical and administrative assistance to the tribal program. The tribe also holds a corporate charter.

## ECONOMY
### AGRICULTURE AND LIVESTOCK
Ranching serves as the primary agricultural enterprise on the Jicarilla Apache Reservation and features many family operated cow-calf operations. The livestock industry has been a primary use of reservation land since 1890. Sheep raising dominated this industry until 1960, when cattle raising increased. Ranching enterprises on the reservation consist of range units of 1,460 acres to 24,841 acres, each capable of sustaining 11 to 376 animal units during the grazing season.

Although there are approximately 58,000 acres of irrigable land on the reservation, currently only 6,496 acres of dry farming land and 1,600 acres of irrigated land are in use. The 1990 crop production was valued at $365,000, and the tribe anticipates the expansion of its agricultural output.

### CONSTRUCTION
The Tribal Public Works Department supports construction on the reservation and focuses on community development projects.

### ECONOMIC DEVELOPMENT PROJECTS
The Jicarilla Apache have two development groups which advise the tribe on economic issues. The Integrated Resource Management Plan (IRMP) and Committee supply the tribe with a comprehensive assessment of the tribe's resources. The IRMP has been developed through a cooperative tribal/federal interdisciplinary planning team. Its goals are to ensure and develop a direction for sustainable growth and to protect the reservation's resources compatible with the traditional values of the tribe.

In addition, the Jicarilla Economic and Industrial Commission, formed in 1993, is charged with the task of developing and implementing a comprehensive economic development plan. The Commission identifies start-up businesses that will serve the needs of tribal members, as well as businesses that could be relocated to the reservation, and makes recommendations to the Tribal Council. The Commission comprises five tribal members and five outside business and economic development specialists. An economic planner serves as staff to the Commission.

### FORESTRY
Nearly 50 percent, or 404,837 acres, of the reservation is forested. This acreage comprises 184,282 acres of timberland and 270,857 acres of woodland. Ponderosa pine represents the majority (over 90 percent) of commercial tree species. Harvesting occurs on the northern half of the reservation. The tribe's timber harvest and management began in the early part of the century. Modern

444

JIC000253

| | Small 104 1973/1974 Biennium | Large 104 1973/1974 Biennium | Difference | Small 104 Replace-ment | Large 104 Replace-ment | Difference | Small 104 Flowing | Large 104 Flowing |
|---|---|---|---|---|---|---|---|---|
| Jan-84 | 2.047 | 1.575 | 0.472 | 1.170 | 0.908 | 0.262 | 0.616 | 0.528 |
| Feb-84 | 2.054 | 1.580 | 0.474 | 1.174 | 0.911 | 0.263 | 0.618 | 0.530 |
| Mar-84 | 2.061 | 1.585 | 0.476 | 1.178 | 0.914 | 0.264 | 0.620 | 0.532 |
| Apr-84 | 2.068 | 1.590 | 0.478 | 1.182 | 0.917 | 0.265 | 0.622 | 0.534 |
| May-84 | 2.075 | 1.595 | 0.480 | 1.186 | 0.920 | 0.266 | 0.624 | 0.536 |
| Jun-84 | 2.082 | 1.600 | 0.482 | 1.190 | 0.923 | 0.267 | 0.626 | 0.538 |
| Jul-84 | 2.089 | 1.605 | 0.484 | 1.194 | 0.926 | 0.268 | 0.628 | 0.540 |
| Aug-84 | 2.095 | 1.609 | 0.486 | 1.197 | 0.928 | 0.269 | 0.630 | 0.541 |
| Sep-84 | 2.101 | 1.613 | 0.488 | 1.200 | 0.930 | 0.270 | 0.632 | 0.542 |
| Oct-84 | 2.107 | 1.617 | 0.490 | 1.203 | 0.932 | 0.271 | 0.634 | 0.543 |
| Nov-84 | 2.113 | 1.622 | 0.491 | 1.207 | 0.935 | 0.272 | 0.636 | 0.545 |
| Dec-84 | 2.119 | 1.627 | 0.492 | 1.211 | 0.938 | 0.273 | 0.638 | 0.547 |
| Jan-85 | 2.125 | 1.632 | 0.493 | 1.215 | 0.941 | 0.274 | 0.640 | 0.549 |
| Feb-85 | 2.129 | 1.635 | 0.494 | 1.217 | 0.943 | 0.274 | 0.641 | 0.550 |
| Mar-85 | 2.133 | 1.638 | 0.495 | 1.219 | 0.945 | 0.274 | 0.642 | 0.551 |
| Apr-85 | 2.137 | 1.641 | 0.496 | 1.222 | 0.947 | 0.275 | 0.643 | 0.552 |
| May-85 | 2.146 | 1.648 | 0.498 | 1.227 | 0.951 | 0.276 | 0.646 | 0.554 |
| Jun-85 | 2.247 | 1.725 | 0.522 | 1.284 | 0.995 | 0.289 | 0.675 | 0.578 |
| Jul-85 | 2.256 | 1.733 | 0.524 | 1.289 | 0.999 | 0.290 | 0.677 | 0.580 |
| Aug-85 | 2.262 | 1.737 | 0.525 | 1.292 | 1.001 | 0.291 | 0.679 | 0.581 |
| Sep-85 | 2.267 | 1.741 | 0.526 | 1.295 | 1.003 | 0.292 | 0.680 | 0.582 |
| Oct-85 | 2.272 | 1.745 | 0.527 | 1.298 | 1.005 | 0.293 | 0.681 | 0.583 |
| Nov-85 | 2.278 | 1.750 | 0.528 | 1.301 | 1.008 | 0.293 | 0.684 | 0.584 |
| Dec-85 | 2.285 | 1.755 | 0.529 | 1.305 | 1.011 | 0.293 | 0.686 | 0.585 |
| Jan-86 | 2.291 | 1.761 | 0.530 | 1.308 | 1.014 | 0.293 | 0.688 | 0.586 |
| Feb-86 | 2.301 | 1.769 | 0.532 | 1.313 | 1.019 | 0.294 | 0.691 | 0.588 |
| Mar-86 | 2.307 | 1.774 | 0.533 | 1.316 | 1.022 | 0.294 | 0.693 | 0.589 |
| Apr-86 | 2.313 | 1.779 | 0.534 | 1.319 | 1.025 | 0.294 | 0.695 | 0.590 |
| May-86 | 2.318 | 1.783 | 0.535 | 1.322 | 1.027 | 0.295 | 0.696 | 0.591 |
| Jun-86 | 2.324 | 1.787 | 0.536 | 1.325 | 1.029 | 0.296 | 0.697 | 0.593 |
| Jul-86 | 2.329 | 1.792 | 0.537 | 1.328 | 1.032 | 0.297 | 0.698 | 0.594 |
| Aug-86 | 2.333 | 1.795 | 0.538 | 1.331 | 1.034 | 0.297 | 0.699 | 0.595 |
| Sep-86 | 2.337 | 1.798 | 0.539 | 1.333 | 1.036 | 0.297 | 0.700 | 0.596 |
| Oct-86 | 2.341 | 1.801 | 0.540 | 1.335 | 1.038 | 0.297 | 0.701 | 0.597 |
| Nov-86 | 2.349 | 1.806 | 0.543 | 1.339 | 1.041 | 0.298 | 0.703 | 0.599 |
| Dec-86 | 2.356 | 1.811 | 0.545 | 1.343 | 1.044 | 0.299 | 0.705 | 0.601 |
| Jan-87 | 2.363 | 1.817 | 0.547 | 1.347 | 1.047 | 0.300 | 0.708 | 0.603 |
| Feb-87 | 2.367 | 1.820 | 0.547 | 1.349 | 1.049 | 0.300 | 0.709 | 0.604 |
| Mar-87 | 2.369 | 1.822 | 0.547 | 1.350 | 1.050 | 0.300 | 0.710 | 0.606 |
| Apr-87 | 2.372 | 1.824 | 0.547 | 1.351 | 1.051 | 0.300 | 0.711 | 0.607 |
| May-87 | 2.379 | 1.830 | 0.549 | 1.356 | 1.054 | 0.301 | 0.713 | 0.609 |
| Jun-87 | 2.386 | 1.835 | 0.551 | 1.360 | 1.057 | 0.302 | 0.715 | 0.611 |
| Jul-87 | 2.393 | 1.840 | 0.553 | 1.364 | 1.061 | 0.303 | 0.717 | 0.613 |
| Aug-87 | 2.399 | 1.846 | 0.552 | 1.368 | 1.064 | 0.304 | 0.720 | 0.615 |
| Sep-87 | 2.407 | 1.853 | 0.554 | 1.372 | 1.067 | 0.305 | 0.722 | 0.617 |
| Oct-87 | 2.415 | 1.859 | 0.557 | 1.377 | 1.070 | 0.307 | 0.724 | 0.619 |
| Nov-87 | 2.421 | 1.863 | 0.558 | 1.380 | 1.072 | 0.308 | 0.725 | 0.620 |

JIC000255

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dec-87 | 2.426 | 1.867 | 0.559 | 1.383 | 1.074 | 0.309 | 0.726 | 0.621 |
| Jan-88 | 2.431 | 1.871 | 0.560 | 1.386 | 1.076 | 0.310 | 0.727 | 0.622 |
| Feb-88 | 2.440 | 1.879 | 0.562 | 1.391 | 1.080 | 0.311 | 0.730 | 0.624 |
| Mar-88 | 2.445 | 1.883 | 0.563 | 1.394 | 1.082 | 0.312 | 0.732 | 0.625 |
| Apr-88 | 2.451 | 1.887 | 0.564 | 1.398 | 1.084 | 0.313 | 0.734 | 0.626 |
| May-88 | 2.456 | 1.891 | 0.565 | 1.401 | 1.086 | 0.314 | 0.735 | 0.627 |
| Jun-88 | 2.461 | 1.895 | 0.566 | 1.404 | 1.088 | 0.315 | 0.738 | 0.628 |
| Jul-88 | 2.466 | 1.899 | 0.567 | 1.407 | 1.091 | 0.316 | 0.737 | 0.629 |
| Aug-88 | 2.475 | 1.906 | 0.569 | 1.412 | 1.094 | 0.318 | 0.739 | 0.631 |
| Sep-88 | 2.483 | 1.912 | 0.571 | 1.417 | 1.098 | 0.319 | 0.742 | 0.633 |
| Oct-88 | 2.492 | 1.919 | 0.573 | 1.423 | 1.103 | 0.320 | 0.744 | 0.635 |
| Nov-88 | 2.501 | 1.926 | 0.575 | 1.428 | 1.107 | 0.321 | 0.746 | 0.637 |
| Dec-88 | 2.510 | 1.933 | 0.577 | 1.433 | 1.111 | 0.322 | 0.748 | 0.639 |

JIC000256



# United States Department of the Interior

MINERALS MANAGEMENT SERVICE
Royalty Management Program
P.O. Box 25165
Denver, Colorado 80225-0165



IN REPLY REFER TO:

MMS-MRM-OFFCAM1
MS 382G2

OCT 1 7 2001

Memorandum

RECEIVED
NOV - 2 2001
DAVIS, GRAHAM, & STU!

To:     Chief, Appeals Division
        Policy and Management Improvement

From:   *Mary Ann Swilinger*
        Acting Manager, Offshore Compliance and Asset Management I

Subject:   Appeal Field Report for Appeal dated June 26, 1998, from Vastar Resources Inc.
           (Vastar), Concerning Major Portion Analysis and Dual Accounting Calculation on
           Jicarilla Apache Tribal (Tribal) Leases.  Docket No. MMS-98-0131-IND

Vastar appealed Minerals Management Service's (MMS) Order to Perform (Order) dated
May 27, 1998 (Attachment 6), which Vastar received on May 29, 1998.  Vastar timely filed their
Notice of Appeal (Attachment 8) with MMS on June 26, 1998.  Vastar had 60 days from the
receipt date of the Order to provide a Statement of Reasons (SOR) in support of the appeal.
In association with a Freedom of Information Act (FOIA) request (Attachment 7) received on
June 8, 1998, Vastar requested and received extensions of time to file the SOR until May 31,
1999.  We received the SOR (Attachment 13) on June 1, 1999.

## RECOMMENDATION

We recommend denying the appeal by Vastar and affirming the MMS Order.  Based on a review
of Vastar's SOR (Attachment 13), the appeal arguments submitted by Vastar are without merit
because Vastar did not prove that MMS followed inappropriate procedures or that MMS
followed unreasonable methods when calculating the major portion prices or providing
instructions on performing dual accounting.

## ISSUES

Vastar responded to the May 27, 1998, Order in its June 1, 1999, SOR as follows:

1. Does MMS's reliance on secret contracts violate Vastar's due process rights?

2. Is MMS's major portion methodology arbitrary, capricious and not in accordance with law
   because it is contrary to the Department's binding regulations?

JIC000398

14

**MMS's Position**

MMS recognizes the fact that "large producers" are not legally entitled to the same MLPs that "small producers" are legally entitled to for the applicable NGPA category of gas. Vastar should pay the MLP that they are legally entitled to plus tax reimbursements. Under 30 CFR § 206.152 (d) (1), if the maximum price permitted by Federal law at which gas may be sold is less than the value determined pursuant to this section, then MMS shall accept such maximum price as the value. Vastar will need to document the MLP classification. To date, Vastar has not provided MMS with documentation supporting the NGPA category for their wells.

6. **The RIK sales data accurately reflects actual sales values paid or offered for production on the Reservation. In addition, the Secretary of the Interior has the discretion, and therefore the authority to determine the value for royalty purposes, if this discretion does not result in a value that is unreasonable, arbitrary, or capricious.**

**Vastar's Position**

Vastar asserts that by allocating the Jicarilla Apache Tribe's contract price for gas to the producer's share, MMS assumes without foundation that the producer received the same contract price for the gas, as did the Jicarilla Apache Tribe. Vastar claims that assumption is arbitrary and capricious. Vastar's position is that the producers obviously did <u>not</u> receive the same price for gas, as did the Jicarilla Apache Tribe. Vastar states that MMS would not be issuing orders to 39 companies to calculate and pay additional royalties based on the MLP allegedly received by the Jicarilla Apache Tribe if the producers were also receiving this MLP for their share. Vastar claims that MMS is bootstrapping its calculation by assuming that the producers received the same price for production as did the Jicarilla Apache Tribe in order to reach the major portion threshold, but then claiming that the producers really owe additional royalties because they in fact did not receive the MLP. Vastar states that MMS cannot simultaneously (1) assume that the price received by the producers is identical to the Jicarilla Apache Tribe's price; and (2) claim that the producers paid royalties on an improperly low price. Vastar believes that if the producers received the same price as the Jicarilla Apache Tribe, there would be no major portion price claim because everyone received the same price. Vastar further claims that if the producers received a lower price, then MMS must include those values in the major portion price calculation. <u>See</u> 30 C.F.R. § 206.152(a)(3)("All such sales shall be arrayed…").

Vastar states that MMS's "assumption" that the contract prices are the same is counterintuitive. The Jicarilla Apache Tribe and the producers each entered into their own separate contracts with purchasers for gas. Vastar believes that it is unlikely that those contracts would be identical because the Jicarilla Apache Tribe would be able to exert influences and extract contract terms from purchasers that the typical producer could not extract. As a practical matter, Vastar states that the Jicarilla Apache Tribe would take its gas in kind only if it believed it could sell the gas for a price <u>higher</u> than the producer received. Vastar concludes that if the Jicarilla Apache Tribe could not market the gas at a price higher than the producer, then there would be no incentive for

JIC000411



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

MAR 1 3 2003

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Ms. RaSchelle Richens                    Re:  MMS-98-0082-IND
Medallion Exploration
6975 Union Park Center, Suite 310
Midvale, Utah 84047                         Appeal Granted

Dear Ms. Richens:

Medallion Exploration (Medallion) appealed under 30 CFR Part 290 (1998) from
a Minerals Management Service (MMS) order dated February 17, 1998, as
modified on March 16, 1998, which directed Medallion to report and pay
additional royalties for certain Northern Ute Tribal and Allotted Indian
leases for the period January 1987 through December 1995.

Background

Medallion is the royalty payor for 35 Indian oil and gas leases located in
the Altamont-Bluebell Area of the Uintah and Ouray Indian Reservation
(Reservation) and one Indian oil and gas lease located in the Cedar Rim Field
on the Reservation.  These leases provide in section c, Rental and Royalty,
that value for royalty purposes may, in the discretion of the Secretary, be
calculated on the basis of the highest price paid or offered at the time of
production for the major portion of gas sold from the field where the leased
lands are situated.

The MMS Minerals Revenue Management (MRM) performed a major portion analysis
for gas production from Northern Ute tribal and allotted leases for the
period January 1987 through December 1995.  Based on that analysis, the MRM
concluded that Medallion had underpaid royalties for the aforementioned
leases.  On August 11, 1997, MRM sent Medallion a letter advising Medallion
of those findings.  Medallion did not respond to that letter.

On February 17, 1998, MMS issued an order directing Medallion to report and
pay additional royalties for the above-referenced leases in the amount of

MMS-98-0082-IND

2

$74,221.02 for the period January 1987 through December 1995, consistent with MRM's major portion analysis. Medallion filed a timely appeal of that order.

On March 16, 1998, in response to information provided by Medallion, MMS modified its February 17, 1998, order, reducing the assessment of additional royalties from $74,221.02 to $59,632.04. Medallion continues to dispute the assessment.

Issues

1. Did the settlement agreement dated January 23, 1998, between Medallion and the Indian lessors resolve the above-referenced royalty issue?

2. May MMS assess royalties based on a higher price than the lessee receives or is able to receive?

3. Was MMS' major portion analysis performed in a manner consistent with applicable regulations?

Analysis - Settlement Agreement

On December 5, 1997, the Appellant executed a Settlement Agreement (Agreement) with MMS, the Bureau of Indian Affairs, the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, and the Ute Distribution Corporation. The Agreement was finalized by the Department of the Interior on January 23, 1998. The Appellant states that it believed the Agreement resolved all issues pertaining to the subject Indian leases.

However, Paragraph D of the Recitals section of the Agreement states:

> Medallion, Interior, the Tribe, the UDC, and Interior on behalf of the allottees desire to resolve all disputes they may have with respect to the calculation and payment of royalties due on dual accounting from Medallion with respect to the Leases during the Settlement Period, including any and all interest accrued thereon.  [Emphasis added.]

The Agreement section of the document states:

> In consideration of the mutual covenants contained herein, Medallion, Interior, the Tribe, the UDC,

3

and the Interior on behalf of the Allottees agree
as follows:

1. As full and complete settlement of <u>all dual
   accounting claims</u> for Leases during the
   Settlement Period, Medallion will pay
   $18,534.24 Directly to UDC and $36,365.76 to
   MMS * * *. [Emphasis added.]

           *         *         *

2. Each party agrees that it shall not hereafter
   institute any legal or other proceedings to
   litigate, arbitrate, appeal, or attach in any
   fashion <u>any claim or issue for dual accounting
   for the leases for the Settlement Period</u>.
   [Emphasis added.]

           *         *         *

3. It is specifically understood and agreed that
   this Agreement is executed for the sole
   purpose of settling <u>the issue described herein</u>.
   [Emphasis added.]

Based on the foregoing, I conclude that the express purpose of the Agreement
was to resolve a dispute between the parties over the requirement to perform
dual accounting, and that the scope of the Agreement did not extend to other
issues that might arise, such as major portion pricing.

<u>Analysis - Highest Available Price</u>

In its August 20, 1998, response to the MMS field report, the Appellant
states that it sold lease production to the gas plants that serviced the
fields where the production was located, getting the highest prices paid by
those plants. The Appellant contends that it should not be held accountable
for a higher price that it could not have received.

In support of this contention, the Appellant argues that major portion should
be viewed, not as an alternative valuation method to be used pursuant to the
discretion of MMS consistent with applicable law, but rather as a safeguard
to be employed only in those instances where there is substantial evidence
that prices being reported by the lessee for royalty purposes are less than
market value.

I disagree.  It is clear from the regulations that a major portion analysis is to be performed whenever the availability of the requisite data makes it practicable for MMS to do so.  As Judge Seymour noted in his dissent in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555 (10th Cir. 1984), which was adopted by the Tenth Circuit in its en banc rehearing, 782 F.2d 855 (10th Cir. 1986):

> [T]he purpose of the Indian Mineral Leasing Act
> is to ensure that Indian tribes receive the
> maximum benefit from mineral deposits on their
> own lands, and we should construe regulations
> enacted under this Act in light of this purpose.

It is firmly established that the royalty value of production from Federal and Indian leases may be greater than the sales price.  United States v. Ohio Oil Co., 163 F.2d 633 (10th Cir. 1947), cert. denied, 333 U.S. 833 (1948), rehearing denied, 333 U.S. 865 (1948), Supron Energy Corp., 46 IBLA 181, 188 (1980).a

It is also a well established principle that pursuant to the lease terms and regulations, the value for royalty purposes may exceed a lessee's proceeds from the disposition of the product.  California Co. v. Udall, 296 F.2d 384 (D.C. Cir. 1961), U.S. v. Oil Oil Co., supra, Amoco Production Co. v. Hodel, 627 F. Supp. 1375 (W.D. La. 1986).

Here, the lease terms provide for the use of major portion prices in determining value for royalty purposes.  The Appellant was, or should have been, aware of these lease provisions when it accepted the subject leases.

Analysis - Applicable Regulations

The Northern Ute tribal oil and gas leases provide in section (c), Rental and Royalty, that the value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leased lands are situated.  Similar language appears in the regulations at 25 CFR 211.13(a) (1987).

The regulations at 30 CFR 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may
> consider the highest price paid or offered for a major

a)GFS(O&G) 75(1980)

5

portion of production (major portion) in determining value
of production for royalty purposes, if data are available
to compute a major portion <u>MMS will, where practicable,
compare the value determined in accordance with this section
with the major portion</u>.  The value to be used in determining
the value of production for royalty purposes shall be the
higher of these two values.  [Emphasis added.]

The regulations at 30 CFR 206.153(a)(3)(ii) (1991) define major portion as
follows:

For purposes of this paragraph, major portion means the
highest price paid or offered at the time of production for
the major portion of gas production from the same field or
residue gas or gas plant products from the same processing
plant, as applicable.  <u>The major portion will be calculated
using like-quality lease products sold under arm's-length
contracts</u> from the same field or processing plant (or, if
necessary to obtain a reasonable sample, from the same area
or nearby processing plants) <u>for each month</u>.  All such sales
will be arrayed from the highest price to the lowest price
(at the bottom).  The major portion is that price at which
50 percent (by volume) plus 1 mcf of gas (starting from the
bottom) is sold, or for gas plant products, 50 percent (by
volume) plus 1 unit.  [Emphasis added.]

The record in this case contains a copy of MMS' "Northern Ute Tribe Major
Portion Analyses Report For The Period January 1, 1987, Through December 31,
1995." This report shows that MRM calculated the major portion prices using
the Auditing and Financial System (AFS) data base and that MRM used both
arm's-length sales and non-arm's-length sales contained in that data base.
Therefore, I conclude that Medallion's appeal should be granted with respect
to the period March 1988 through December 1996 based on the decisions of the
Interior Board of Land Appeals in <u>Phillips Petroleum Co.</u>, 152 IBLA 109
(2000),[b] and <u>Burlington Resources Oil and Gas Co.</u>, 151 IBLA 144 (1999),[c] which
held that non-arm's-length transactions may not be included in the data used
for major portion analyses.

The report ("Northern Ute Tribe Major Portion Analyses Report For The Period
January 1, 1987, Through December 31, 1995") also acknowledges that the AFS
data base does not identify or distinguish gas subject to the various Natural
<u>Gas Policy Act of 1978 (NGPA)</u> pricing categories.

b)GFS(O&G) 14(2000)
c)GFS(O&G) 4(2000)

6

In Shoshone Indian Tribe v. Hodel, CV No. C81-131K (D. Wyo. 1988), the
District Court found that:

> [I]t has been the long-standing practice of the Minerals
> Management Service and its predecessor agency to interpret
> "like-quality" as including both physical and legal
> characteristics of the gas. * * * [o]nly gas of the same
> price vintage or category is compared to insure that the
> gas has like legal characteristics. * * * It would be
> unreasonable to disregard price vintages and categories in
> conducting a major-portion price analysis.  [See pp. 4-5.]

Based on the foregoing, I conclude that MMS is obligated to consider NGPA
price categories in performing major portion analyses.  Since the data base
it used to calculate major portion prices did not identify those price
categories, the subject major portion calculations cannot be sustained.

The Appellant has offered other arguments in support of its appeal.  However,
since I have already decided this appeal in favor of the Appellant based on
the above-referenced arguments, the remaining arguments need not, and will
not, be addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted. However, this decision
is rendered without prejudice to the right of MMS to recalculate the major
portion price correctly if other MMS databases with the necessary information
can be merged with other available data to meet the regulatory requirements
that MMS has established.  See Phillips Petroleum Co., 152 IBLA 109, 117
(March 31, 2000).[d]

This decision may be appealed to the Interior Board of Land Appeals pursuant
to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001).  A copy of 43
CFR 4.411 and 4.413 (2001) is enclosed for reference.  Notice of such appeal
must be transmitted to the Deputy Commissioner of Indian Affairs, Bureau of
Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW.,
Washington, D.C. 20240, within 30 days after the date of service of the
decision.  Copies of any statement of reasons, written arguments, or briefs
should also be served upon the Deputy Commissioner of Indian Affairs.  Copies
of the notice of appeal and any statement of reasons, written arguments, or
briefs should likewise be served upon the Associate Solicitor, Division of
Energy and Resources, U.S. Department of the Interior, 1849 C Street, NW.,

d)GFS(O&G) 14(2000)

7

Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4230), Minerals Management Service, U.S. Department of the Interior, at the same address.

Sincerely,

Deputy Commissioner of
Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-98-0082-IND)
     RMMLF
     Reading
     MRM
     R.Compton
LMS:PMI:Appeals:MS9300:AndersonM:ad:7/15/02:208-2622
G:\Appeals\share\appdecsn\andersom\98-0082B.doc

MMS-98-0082-IND

101st Congress
1st Session

COMMITTEE PRINT

S. Prt
101-60

# FINAL REPORT AND LEGISLATIVE RECOMMENDATIONS

A REPORT

OF THE

SPECIAL COMMITTEE ON INVESTIGATIONS

OF THE

SELECT COMMITTEE ON INDIAN AFFAIRS
UNITED STATES SENATE

NOVEMBER 1989

220

with allottee representatives, should be the lead agency in this process;

(2) Create a special team within the existing Royalty Compliance Division which will audit exclusively tribal and allottee leases;

(3) Use the MMS Auditing and Financial Accounting System to flag tribal and allottee leases for audit;

(4) Expand the membership of the Royalty Management Advisory Committee (RMAC) to include additional Indian allottee representatives;

(5) Send notice and information to all mineral-producing tribes concerning the availability of "2002" and "non-funded" agreements;

(6) Implement accounting systems to monitor valuation problems and improper deductions;

(7) Enforce, by implementing penalties where appropriate, the performing of majority pricing and industry's compliance with lease provisions unique to Indian leases; and

(8) Take actions to expedite the MMS and Department of the Interior appeals process.

Based upon the Special Committee's recommendations, MMS has already approved in large part the internal actions described above.

In addition to the above legislative proposals, the Special Committee recommends passage of S. 1289, the "National Indian Forest and Woodland Enhancement Act," to provide proper protection of Indian timber and forest lands. S. 1289 will:

(1) Enumerate specific goals for developing, maintaining and enhancing Indian forest lands;

(2) Require the federal government and Indian tribes to set aside up to 10 percent of every timber sale on Indian lands, and use this money to develop, maintain and enhance tribal forests. The bill allows either the federal government or tribal governments to take on these responsibilities; and

(3) Provide educational assistance to promising Indian students who desire to be trained in a forestry-related curriculum, in return for which each student will be required to work with the BIA or a tribal government.

221

THE ARKANSAS RIVERBED

To finally resolve the problems pertaining to the Arkansas Riverbed, the Special Committee recommends that BLM survey the Riverbed as expeditiously as possible. In response to the Special Committee's investigation, Congress has already appropriated $550,000 for fiscal year 1990 to survey the Arkansas Riverbed and provide litigation support to the Arkansas Riverbed Authority. (See Public Law 101-121, signed by the President on October 23, 1989.)

LEGAL REPRESENTATION

To increase the responsiveness of the Secretary of the Interior ("Secretary") and the Solicitor of the Department of the Interior ("Solicitor") to Indian needs, and expedite the Solicitor's cases involving Indian matters, the Special Committee will propose legislation to make both the Secretary and the Solicitor subject to dual confirmation by the Senate Energy and Natural Resources Committee and the Select Committee on Indian Affairs.

The Special Committee further recommends that the Solicitor, in conjunction with BIA:

(1) Create guidelines to institute more timely methods of responding to tribal requests for litigation; and

(2) Implement training of BIA personnel so that the factual and technical bases for litigation reports are developed in an efficient and timely manner.

Moreover, to ensure proper legal representation of Indian interests, the Special Committee recommends the appointment of a Special Counsel for the Assistant Secretary for Indian Affairs to provide independent legal advice.

PROTECTING INDIAN GAMING FROM CRIMINAL INFLUENCE

To further protect Indian gaming from infiltration by organized crime, the Special Committee recommends amending Public Law 100-497, which established the Indian Gaming Commission, to provide the Commission with law enforcement authority and the ability to utilize information compiled by the Federal Bureau of Investigation.

STENOGRAPHIC MINUTES
UNREVISED AND UNEDITED
NOT FOR QUOTATION OR
DUPLICATION

# COPY

## HEARINGS

### Before The

## SPECIAL COMMITTEE ON INVESTIGATIONS

# SELECT COMMITTEE ON INDIAN AFFAIRS
# UNITED STATES SENATE

## INVESTIGATIVE HEARING ON NATURAL
## RESOURCES ON INDIAN LANDS

### FRIDAY, MAY 12, 1989

Court Reporting Services, Inc.
201 North Fairfax Street #21
Alexandria, Virginia 22314
(703) 548-3334

i

## Table of Contents

United States Senate                        Friday, May 12, 1989

Special Committee on Investigations,
  Select Committee on Indian Affairs        Washington, D.C.

TESTIMONY OF:                                   PAGE

STEVE MOORE, ATTORNEY, NATIVE AMERICAN RIGHTS FUND,
        BOULDER, COLORADO; MARY LIMPY, OWNER OF
        ALLOTTED LAND AND A MEMBER OF THE
        CHEYENNE-ARAPAHO TRIBE, OKLAHOMA; AND
        HOUSTON AND VELMA DECKER, OWNERS OF
        ALLOTTED LAND AND MEMBERS OF THE CADDO
        TRIBE, OKLAHOMA                    3

KENNETH YOUNG, EMPLOYEE, BIA OIL AND GAS DIVISION,
        UINTAH AND OURAY AGENCY, FT. DUCSHENE,
        UTAH, AND YVONNE AND RICHARD CURRY, OWNERS
        OF ALLOTTED LAND, NORTHERN UTE
        RESERVATION, ROOSEVELT, UTAH        40

JEFFREY P. SOUTHWICK, CONSULTANT TO OKLAHOMA INDIAN
        LEGAL SERVICES AND NATIVE AMERICAN RIGHTS
        FUND, AND BENJAMIN BINDER, CONSULTANT TO
        OKLAHOMA INDIAN LEGAL SERVICES AND NATIVE
        AMERICAN RIGHTS FUND             67

VERN INGRAHAM, DIRECTOR, OFFICE OF EXTERNAL AFFAIRS,
        MINERALS MANAGEMENT SERVICE        104

BARRY WILLIAMSON, DIRECTOR, MINERALS MANAGEMENT
        SERVICE

        ACCOMPANIED BY:

        JIMMY W. MAYBERRY, DEPUTY ASSOCIATE DIRECTOR

        DONALD T. SANT, DEPUTY ASSOCIATE DIRECTOR FOR
        VALUATION AND AUDIT             120

1    Mr. Williamson.  I think that's information that we'd be

2    interested in seeing.  I think, if that's happening, then we

3    need to be aware of it and we need to find a solution to it.

4    Mr. Klingenstein.  Well, some companies have told the

5    committee that it's difficult for them to perform major

6    portion analysis because the analysis depends on proprietary

7    information which is difficult for them to uncover.

8    Mr. Williamson.  The database is difficult in this area

9    when you're not dealing with all Federal lands.  When you're

10    dealing with private versus public lands, you don't have the

11    information available.

12    However, the Minerals Management Service is at this time

13    building a database, working with the State of Oklahoma and

14    New Mexico, to build information on pricing.

15    Mr. Klingenstein.  Doesn't MMS have an independent duty

16    to perform major portion analysis if companies can't for

17    practical reasons?  In other words, if companies have been

18    reporting that they cannot perform analysis, why hasn't MMS

19    been doing it for them since MMS has access to this

20    information?

21    Mr. Sant.  As Mr. Williamson said, we are trying to get

22    databases that the State of New Mexico and the State of

23    Oklahoma have so that we can calculate the majority pricing

24    analysis.  We are researching right now and looking at

25    possible regulatory action that would permit us to get the

1    data so that we could publish the majority price, but what is

2    required is that all volumes and all values of gas or oil sold

3    from a particular field be available.

4         Mr. Ballen.  But you haven't made this effort.  You say

5    you're doing it now, but it hasn't been done in the past, has

6    it?  This is required by statute, the NTL 5 Act as passed by

7    Congress several years ago; is that correct?  I see you're

8    shaking your head, Mr. Williamson.  Is that correct?

9         Mr. Williamson.  The statute, as I understand it,

10   requires major portion analysis to occur on Indian lands;

11   that's true.

12        Mr. Klingenstein.  And it hasn't been done --

13        Mr. Williamson.  In some instances you're correct.

14        Mr. Klingenstein.  This committee knows from testimony it

15   heard from at least one tribe that it is possible to do major

16   portion analysis because that tribe has done it.

17        Mr. Williamson.  Oh, yes, it is possible, and in some

18   areas it's a lot easier to do major portion analysis than

19   others.  When you have others that are all Indian or Federal

20   lands, it's a lot less difficult than when you have areas that

21   are not.  It occurs, and it occurs well in some areas.  Some

22   areas it's more difficult because of the database.

23        However, we do have benchmarks that we can go to to

24   determine price also.

25        Mr. Klingenstein.  This is a requirement of all Indian

1    leases whether arm's length or not?

2        Mr. Williamson.  That is true.

3        Mr. Klingenstein.  It's only a requirement on some

4    Federal leases?

5        Mr. Williamson.  Not arm's length.

6        Mr. Klingenstein.  Do you consider the failure to insure

7    the performance of major portion analysis another example of

8    the failure of the trust responsibility?

9        Mr. Williamson.  I think you have to consider that with

10   the ability and the systems that we're working with.  I'm not

11   the one to speak to that because I wasn't actually involved in

12   that process.

13       However, I'm aware of that process and I'm aware of our

14   capability now, and we'll do a better job in that area.

15       Mr. Klingenstein.  Mr. Williamson, let me ask you about

16   your audit cycle or period, and this is the period of time to

17   which your auditing relates.  Mr. Norman noted in his

18   testimony before the committee yesterday that, because the MMS

19   got such a late start in performing its audits, it's now

20   trying to catch up and it is still performing audits on back

21   periods; is that correct?

22       Mr. Williamson.  That's correct.

23       Mr. Klingenstein.  We understand the Department recently

24   committed itself to stop the auditing for the period 1980 to

25   1983; is that correct?

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

AUG 2 6 2002

U.S. COURT OF
FEDERAL CLAIMS

JICARILLA APACHE NATION, )
formerly JICARILLA APACHE TRIBE )
)
Plaintiff, )
)
v. )   No. 02-25L
)   Judge Francis M. Allegra
THE UNITED STATES OF AMERICA, )
)
Defendant. )

## FIRST AMENDED COMPLAINT

Plaintiff, by and through its undersigned attorney, for its complaint, hereby alleges as follows:

## INTRODUCTION

1.      Plaintiff the Jicarilla Apache Nation (formerly known as the Jicarilla Apache Tribe and hereinafter referred to as "Jicarilla"), a federally recognized Indian tribe situated within the State of New Mexico, brings this action to obtain compensation for loss and damages due to Defendant's breaches of duties arising under treaties, executive orders, statutes and federal regulations and contractual documents such as oil and gas leases authorized under such treaties, executive orders, statutes and federal regulations.

Theses duties include, *inter alia*, Defendant's failures in its exercise of supervision, control and management over Plaintiff's trust funds and other trust property.  The Defendant's fiduciary duties arise under federal law, and are components of the fiduciary relationship created by treaties, executive orders, statutes, regulations, and other documents that give rise to a trust relationship between the Defendant and the Plaintiff regarding specific trust property.

1

<u>THE SPECIAL TRUSTEE AND THE SECRETARY INTEND TO BRING THE UNITED
STATES' MISMANAGEMENT OF THE TRIBAL TRUST FUNDS TO CLOSURE
BASED UPON ANDERSEN'S FINDINGS IN THE RECONCILIATION PROJECT</u>

30.    On December 11, 1996, the Secretary informed the Chairmen of the House

Resources Committee and the Senate Committee on Indian Affairs that the Reconciliation Project

accounting activities were completed.

31.    On December 11, 1996, the Secretary submitted to the Chairmen of the House

Committee on Resources and the Senate Committee on Indian Affairs a report entitled "Department

of the Interior's Proposed Legislative Options in Response to the Tribal Trust Fund Reconciliation

Project Results." The proposed options are based upon the Andersen Report findings for Plaintiff

and all other tribes.

31.    In the report described in the previous paragraph, the Secretary stated that he intended

to present final tribal trust fund settlement options to Congress by April, 1997.

<u>FIRST CLAIM FOR RELIEF</u>

32.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 31,

above.

33.    Defendant's actions as alleged hereinabove establish that, throughout all time periods

relevant hereto, Defendant exercised (and continues to exercise) broad authority and control over

Plaintiff's trust funds and other trust property pursuant to treaties, executive orders, statutes,

regulatory structure and other federal law from which emanates the fiduciary role the Defendant has

demanded for itself vis à vis Plaintiff and Plaintiff's trust property.

34.    As alleged hereinabove, the Defendant's activities vis à vis Plaintiff and Plaintiff's

15

trust property at issue herein are subject to comprehensive statutory and regulatory structures of Defendant as executed by various branches and departments of the Executive Branch of the United States.

35.    Defendant's activities aforesaid are those of a fiduciary relative to Plaintiff and Plaintiff's trust property. Defendant routinely failed (and continues to fail) to fulfill these fiduciary obligations causing economic loss to Plaintiff, Plaintiff's trust funds, and other trust property of Plaintiff.

36.    Defendant's activities as alleged hereinabove are, in addition, those of a fiduciary, i.e., a trustee that controls and manages the Plaintiff's trust funds and trust resources pursuant to treaty, executive order, statute, regulation, and federal law. Defendant is possessed of, has exercised and continues to exercise, Congressionally mandated control, supervision, and management responsibilities as a fiduciary vis à vis Plaintiff and Plaintiff's trust funds and trust resources including all appurtenant duties thereto.

37.    The Defendant's breaches of the fiduciary obligations detailed hereinabove has resulted in (and continue to result in) losses to, as well as mismanagement of, Plaintiff's trust funds and other trust property.

38.    Due to Defendant's failure to fulfill its fiduciary duties to Plaintiff arising under treaty, executive orders, statutes, regulations, and federal law, all as alleged hereinabove, in the proper management of Plaintiff's trust assets and trust funds, on the basis of information made available to Plaintiff, Plaintiff has suffered damage caused by Defendant's breach of fiduciary obligations in the amount of Three Hundred Million ($300,000,000.00) Dollars.

16

## SECOND CLAIM FOR RELIEF

39.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 38, above.

40.    Because the Defendant has failed to provide an accounting consistent with the requirements of generally accepted accounting principles and auditing standards, the Plaintiff is entitled to an order of this Court compelling such an accounting to aid the Court in a final determination of damages that Plaintiff is entitled to.

41.    Ancillary to this demand for an accounting, Plaintiff is entitled to an order from this Court directing Defendant to assure the preservation of all records relating to Plaintiff's trust funds as well as all records pertaining to the underlying royalty income stream into the trust funds, namely, those relating to volume, quality and value of oil and gas, and timber severed and removed from Plaintiff's reservation.

42.    Under applicable federal law trust principles between the United States as trustee and an Indian tribal beneficiary, explicitly and implicitly under the federal statutes that require the Bureau to perform an audit, reconciliation and certification, Plaintiff is entitled to all information about its trust funds and income producing trust assets and the Bureau's execution of its trust funds for which Plaintiff has any reasonable use. This includes all relevant information about the terms of the trust, its present status, past acts of management or other incidents of the administration of the trust, including investments, which information is in the custody, possession or control of the United States or its agents. So long as these requests are made at a reasonable time and place, the trustee is obliged to give the tribal beneficiary the information which it has requested. Plaintiff requests that this Court enter an appropriate Order providing Plaintiff with this information.

## THIRD CLAIM FOR RELIEF

43.     Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 42, above.

44.     Congress directed the Bureau, Special Trustee, and Secretary to do a reconciliation, audit, and certification for the primary purpose of providing Plaintiff the most complete and accurate balances possible of its trust funds. Defendant failed to do so. Further, Defendant's actions as alleged constitute a breach of the Defendant's duty of loyalty and good faith owed to Plaintiff within the context of the trust relationship alleged hereinabove. Plaintiff is entitled to a fundamental duty of undivided loyalty from the United States to fulfill these Congressional mandates.

45.     Plaintiff is entitled to declaratory and injunctive relief against the Defendant, declaring that Defendant owes Plaintiff a fiduciary duty of loyalty to forbid its agent Andersen from imposing any restrictions or fee requirements on Plaintiff's right to review and photocopy any records in Andersen's possession, custody or control pertaining to Plaintiff's trust funds, including all Andersen work papers.

WHEREFORE, Plaintiff respectfully requests the Court award the following relief:

1.     To take jurisdiction of this action;

2.     To award Plaintiff Three Hundred Million ($300,000,000.00) Dollars in damages against Defendant;

3.     To order Defendant to perform a complete accounting for all trust funds and trust assets of Plaintiff in Defendant's care, custody, or control from August 14, 1946 to the present;

4.     To immediately order Defendant to preserve all records of any kind whatsoever pertaining to Plaintiff's trust funds as well as other trust assets during the pendency of this action,

18

until further order of this Court;

    5.      To grant Plaintiff prejudgment interest, costs and attorneys fees in this litigation as may be provided by law.

    6.      To grant such other and further relief as the Court deems proper and appropriate.

Dated: August 26, 2002                    Respectfully submitted,


                                          _____
                                          Alan R. Taradash
                                          *Attorney of Record for Plaintiff*
                                          Nordhaus, Haltom, Taylor, Taradash
                                          & Bladh, LLP
                                          500 Marquette Ave. NW
                                          Suite 1050
                                          Albuquerque, NM  87102
                                          (505) 243-4275

                                          *Of Counsel*:
                                          Thomas J. Peckham
                                          Daniel I.S.J. Rey-Bear
                                          Shane C. Youtz
                                          Deidre A. Lujan
                                          Nordhaus, Haltom, Taylor, Taradash
                                          & Bladh, LLP
                                          500 Marquette Ave. NW
                                          Suite 1050
                                          Albuquerque, NM  87102
                                          (505) 243-4275
                                                  *and*
                                          Donald H. Grove
                                          Nordhaus, Haltom, Taylor, Taradash
                                          & Bladh, LLP
                                          Suite 300
                                          816 Connecticut Avenue, NW
                                          Washington, D.C. 20006
                                          (202) 530-1270