# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| JICARILLA APACHE NATION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | Civil Action No. 07-cv-803 (RJL) |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| VASTAR RESOURCES, INC., *et al.*, ) | |
| ) | |
| Intervenor-Defendants. ) | |
| _____ ) | |

## PLAINTIFF JICARILLA APACHE NATION'S REPLY

Jill Elise Grant (D.C. Bar No. 358306)
Jenny J. Dumas
Justin J. Solimon
NORDHAUS LAW FIRM, LLP
1401 K Street, NW, Suite 801
Washington, DC 20005
telephone:  (202) 530-1270
facsimile:  (202) 530-1920
*Counsel for the Jicarilla Apache Nation*

Dated:  March 26, 2008

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     THE DEPARTMENT CAN NOT OVERCOME ITS FAILURE IN *VASTAR* TO EXPLAIN ITS DEPARTURE FROM PRECEDENT. . . . . . . . . . . . . . . . . . 2

    II.    THE DEPARTMENT CAN NOT OVERCOME ITS FAILURE IN *VASTAR* TO ACKNOWLEDGE THAT RELIANCE ON THE MAJOR PORTION REGULATION VIOLATES 30 C.F.R. § 206.150(b). . . . . . . . . . . . . . . . . . . . . 5

    III.   THE DEPARTMENT MAY NOT IGNORE ITS TRUST OBLIGATION TO ENFORCE THE MAJOR PORTION PROVISION OF LEASE ¶ 3(c). . . . . . . . . 9

    IV.   THE DEPARTMENT'S FAILURE TO COLLECT ARM'S LENGTH SALES DATA AND THE INDUSTRY'S FAILURE TO PROVIDE IT ARGUE FOR ENFORCEMENT OF THE UNDERLYING MMS ORDERS TO PERFORM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

# TABLE OF AUTHORITIES

*Cases and authorities chiefly relied upon are marked with an asterisk.

## CASES

*Austin v. United States*, 206 Ct. Cl. 719 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bayless v. Dep't of the Interior*, No. 1:01CV00393 (RBW) (D.D.C.)
(*dismissed with prejudice* Sept. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Burlington Resources Oil & Gas Co. v. Dep't of the Interior*, 21 F.Supp.2d 1 (D.D.C. 1998) . . 11

*Bush-Quayle '92 Primary Comm. v. Fed. Election Com'n*, 104 F.3d 448 (D.C. Cir. 1997) . . . . . 3

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

* *Columbia Broadcasting Sys. v. FCC*, 454 F.2d 1018 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . 2, 4

*Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970),
*cert. denied,* 403 U.S. 923 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hatch v. FERC*, 654 F.2d 825 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Jicarilla Apache Nation v. United States*, No. 02-25L (Ct. Fed. Cl. filed January 8, 2002) . . . . 12

* *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555 (Seymour, J., dissenting),
*adopted as opinion of en banc court,* 782 F.2d 855 (10th Cir.), *modified,* 793 F.2d 1171,
*cert. denied,* 479 U.S. 970 (1986) ("*Supron*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 11

*Murphy Exploration and Prod. Co. v. Dep't of the Interior*, 270 F.3d 957 (D.C. Cir. 2001) . . . 14

*National Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714 (Fed. Cir. 1998). . . . . . . 13

*National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007) . . . . . . . . . . 8

*Pawnee v. United States*, 830 F.2d 187 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

* *Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Russell v. United States*, 78 Fed. Cl. 281 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Shoshone Ind. Tribe v. Hodel*, No. C81-131-K (D. Wyo. 1988) . . . . . . . . . . . . . . . . . . . . 7, 9, 10

*Shoshone Ind. Tribe v. United States*, 56 Fed. Cl. 639 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. King*, 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mead*, 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Mitchell*, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Navajo Nation*, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*Voisin v. United States*, 80 Fed. Cl. 164 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006) . . . . . . . . . 7

**ADMINISTRATIVE DECISIONS**

*AMOCO Production Co.*, 123 IBLA 278 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*ARCO*, 131 IBLA 299 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Burlington Resources Oil & Gas Co.*, 151 IBLA 144 (1999) ("*Burlington IBLA*") . . . . . . . . 5, 14

* *Dugan Production Corp.*, MMS-98-0130-IND (December 22, 2000) ("*Dugan*") . . . . . . *passim*

*Marathon Oil Co.*, 149 IBLA 287 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

* *Merrion Oil & Gas Corp.*, MMS-98-0228-IND (December 22, 2000) ("*Merrion*") . . . . *passim*

*Robert L. Bayless*, 149 IBLA 140 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

* *Robert L. Bayless*, MMS-98-0132-IND (December 22, 2000) ("*Bayless*") . . . . . . . . . . . *passim*

*Union Texas Petroleum*, 153 IBLA 170 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Vastar Resources, Inc.*, MMS-98-0131-IND, *et al.* (March 28, 2007) ("*Vastar*") . . . . . . . *passim*

**STATUTES**

iii

28 U.S.C. § 1391(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1391(e)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1391(e)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

* 30 U.S.C. § 1701(a)(4)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

* 30 U.S.C. § 1701(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 703  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Administrative Disputes Resolution Act of 1996, 28 U.S.C. § 1491(b)(1)  . . . . . . . . . . . . . . . 13

Federal Courts Administration Act of 1992, 28 U.S.C. § 1491(a)(2)  . . . . . . . . . . . . . . . . . . . . 13

Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a-396g  . . . . . . . . . . . . . . . 10

Remand Act of 1972, 28 U.S.C. § 1491(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**REGULATIONS**

25 C.F.R. § 171.13(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

25 C.F.R. § 211.13(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

30 C.F.R. § 206.103  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

* 30 C.F.R. § 206.150(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 7, 9

* 30 C.F.R. § 206.170(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

30 C.F.R. § 206.150(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

30 C.F.R. § 206.170(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

30 C.F.R. § 206.170(e)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

30 C.F.R. Part 210  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

30 C.F.R. § 212.50  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**OTHER AUTHORITIES**

53 Fed. Reg. 1218 (Jan. 15, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

73 Fed. Reg. 15885 (March 26, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

E.O. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gregory C. Sisk, Litigation with the Federal Government (4th ed. ALI-ABA 2006) . . . . . . . . . 13

H.R. Rep. No. 97-859 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268 . . . . . . . . . . . . . . . . . . . . 15

U.S. Department of the Interior, Geological Survey, Conservation Division Manual, Release No. 35
(August 15, 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## PLAINTIFF JICARILLA APACHE NATION'S REPLY

## INTRODUCTION

In its opening brief in this appeal, the Jicarilla Apache Nation ("Jicarilla") set forth three major reasons why the decision of the Department of the Interior ("Department") in *Vastar Resources, Inc.*, MMS-98-0131-IND, *et al.* (March 28, 2007) ("*Vastar*") (SUPP001-012), should be vacated: (1) the Department failed to explain its departure from agency precedent; (2) the Department failed to adhere to the major portion provision in the Jicarilla leases ("Lease"), in violation of its own regulations; and (3) the Department breached its fiduciary duty to "aggressively carry out . . . the administration of Indian oil and gas," Federal Oil and Gas Royalty Management Act ("FOGRMA"), 30 U.S.C. § 1701(a)(4), by failing to properly value Jicarilla gas and by failing to choose the interpretation of the Lease and regulations that was in the Tribe's best interests. Neither the Department nor Intervenors Vastar Resources, Inc., Union Texas Petroleum, and Unicon Producing Company (collectively, "Intervenors") make any convincing argument overcoming these defects in the *Vastar* decision. Thus, the *Vastar* decision should be vacated. The only question remaining before this Court, therefore, should be whether to remand for the Department to enforce the MMS Orders to Perform that were reversed in *Vastar* or to remand for the Department to develop a new major portion methodology for valuing natural gas produced from the Jicarilla Apache Reservation. The Jicarilla Apache Nation argues that the Court should take the former course of action, as discussed in Section IV below.

1

**ARGUMENT**

I.   **THE DEPARTMENT CAN NOT OVERCOME ITS FAILURE IN *VASTAR* TO EXPLAIN ITS DEPARTURE FROM PRECEDENT.**

As discussed in Jicarilla's opening brief, MMS developed a major portion methodology for Jicarilla natural gas ("Jicarilla major portion methodology") in the 1990's; issued 39 Orders to Perform in 1998-99 based on that methodology to companies producing natural gas on the Jicarilla Apache Reservation; accepted payments and approved settlements paying additional royalties to Jicarilla based on that methodology; and upheld that methodology in three final decisions of the Department in 2000, *see Robert L. Bayless*, MMS-98-0132-IND ("*Bayless*"), *Dugan Production Corp.*, MMS-98-0130-IND ("*Dugan*"), and *Merrion Oil & Gas Corp.*, MMS-98-0228-IND ("*Merrion*") (collectively, the "*Bayless* decisions"). The *Bayless* decisions remained the Department's position on Jicarilla major portion until 2007, when the Department, in *Vastar*, overturned the decisions without even mentioning them.

Jicarilla cited extensive case law in its opening brief for the principle that an agency may not depart from established precedent without explanation. *E.g., Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003); *Columbia Broad. Sys. v. FCC*, 454 F.2d 1018 (D.C. Cir. 1971); and other cases cited in Pl. Br. at 13-16. Neither the Department nor Vastar addresses any of these cases in their opposition briefs, in effect conceding the point.

Instead, the Department argues that it actually did explain its departure from precedent in *Vastar* because it "did explain that the Jicarilla major portion methodology was unlawful under the regulations" and the *Bayless* decisions were based on that methodology. Def. Br. at 12. Explaining how the Jicarilla major portion methodology does not comport with the MMS major portion regulation is not, however, the same as explaining why the *Vastar* decision departed from the

2

*Bayless* decisions.  Under governing case law, the *Vastar* decision was required to "come to grips with conflicting precedent," *Ramaprakash*, 346 F.3d at 1125, to provide "explicit recognition . . . that the standard has changed," *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981), and to "forthrightly distinguish or outrightly reject apparently inconsistent precedent," *id*.

The Department's purported explanation also fails to address the reasoning of the *Bayless* decisions.  In the *Bayless* decisions the Department specifically explained that it was *not* relying on the MMS major portion regulation because the regulation is inconsistent with the Jicarilla leases and so does not apply:

> where, as here, the method in the regulations does not arrive at the highest price paid or offered [the requirement in the Jicarilla leases] but rather at a volume-weighted median price based on data that are not appropriate for the Reservation . . . , the regulations themselves provide that the lease terms take precedence over the MMS regulations.  30 C.F.R. 206.150(b) (1995); 30 C.F.R. 206.170(b) (1999).

*Bayless* at 5 (Pl Br. Att. 1 at 5); *Merrion* at 5-6 (Pl. Br. Att. 2 at 5-6); *Dugan* at 5 (Pl. Br. Att. 3 at 5).  This argument was central to the *Bayless* decisions because it was the reason that the Jicarilla major portion methodology was not based on the MMS major portion regulation, and the Department in *Vastar* failed to address it, as discussed in more detail in Part II below.

In addition, the Department argues that it is entitled to change its position and correct prior erroneous determinations.  Def. Br. at 12-13.  Jicarilla does not contest this point, but that does not absolve the Department from its obligation to explain precisely why it is changing course, as the case law clearly requires.  *See Ramaprakash*, 346 F.3d at 1124-25; Pl. Br. at 13.

The Department also argues that its decision in *Vastar* is entitled to deference.  Def. Br. at 10-13.  *Chevron* deference does not apply, however, when, as here, an agency fails to explain its departure from precedent.  *Bush-Quayle '92 Primary Comm. v. Fed. Election Com'n*, 104 F.3d 448, 453 (D.C. Cir. 1997); *United States v. Mead*, 533 U.S. 218, 228 (2001); Pl. Br. at 15-16.

3

Finally, the Department claims that there would be no purpose in the Court remanding to the Department for "further explanation" of its departure from precedent, Def. Br. at 13, but that is not what the D.C. Circuit has held. On the contrary, the D.C. Circuit has emphasized that it is essential for agencies to provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied,* 403 U.S. 923 (1971). Anything else is "an inexcusable departure from the essential requirement of reasoned decision making." *Columbia Broad.*, 454 F.2d at 1027.

Intervenors take a different tack, arguing that the *Bayless* decisions were not precedent after all, and so *Vastar* could not have been an unexplained departure from agency precedent. Int. Br. at 27-28. This contention simply is untrue. The *Bayless* decisions were final decisions of the Department. As the Department itself admits, they were the first decisions to consider the Jicarilla major portion methodology and they were the only decisions regarding that methodology before the Department issued its decision in *Vastar*. Def. Br. at 12 n.10. There is therefore no question that the *Bayless* decisions are precedent as to the Jicarilla methodology.

Intervenors cite a number of cases allegedly supporting their argument that the *Bayless* decisions, rather than *Vastar*, marked a departure from precedent. None of the cases that Intervenors cite, however, have anything to do with the Jicarilla major portion methodology. *See* Int. Br. at 27-28, citing cases at 12-14 and n.12.[1] None even involves gas from the Jicarilla Apache Reservation. None addresses Jicarilla's argument that under the MMS regulations the major portion provision in the Jicarilla lease takes precedence. Thus all of these cases are completely inapposite, although Intervenors represent otherwise. Furthermore, all point out the importance of using arm's length sales and NGPA prices when calculating major portion prices, which the Jicarilla methodology in

---

[1] These decisions are attached for the convenience of the Court as Attachment 11.

fact did, *see* Pl. Br. at 29-31, and the MMS methodology based on the MMS major portion

regulation did not, *see, e.g., Burlington Resources Oil & Gas Co.*, 151 IBLA 144, 157-58 (1999)

("*Burlington IBLA*"); cases cited at Int. Br. at 12-13 n.12.[2]

## II.    THE DEPARTMENT CAN NOT OVERCOME ITS FAILURE IN *VASTAR* TO ACKNOWLEDGE THAT RELIANCE ON THE MAJOR PORTION REGULATION VIOLATES 30 C.F.R. § 206.150(b).

The Department held in the *Bayless* decisions that *its own regulations* provide that the

Jicarilla lease terms take precedence over the MMS major portion regulations. *Bayless* at 5 (Pl. Br.

Att. 1 at 5); *Merrion* at 6 (Pl. Br. Att. 2 at 6); *Dugan* at 5 (Pl. Br. Att. 3 at 5). The *Bayless* decisions

found that the MMS major portion regulation is inconsistent with Lease ¶ 3(c), JIC001373, and 30

C.F.R. § 206.150(b) (recodified at § 206.170(b)) provides that in such situations the lease governs

to the extent of the inconsistency. The Department now suddenly states that "there is no

inconsistency between either the 1988 or earlier regulations and Lease ¶ 3(c)." Def. Br. at 14. Its

only apparent support for this statement, however, is the equally conclusory statement in the *Vastar*

decision that the language of the major portion regulations and the lease is "similar" and "[t]hus, the

lease term and the regulations are consistent." *Vastar* at 3. Simply stating, without more, that the

two are consistent does not make them so.[3]

---

[2] Intervenors also argue that the *Bayless* decisions are invalid because they were issued "with just a few days left in the Clinton administration." Int. Br. at 28; *see also id.* at 11. This point is completely irrelevant. More to the point is the fact that since the decisions were issued at the end of Assistant Secretary Gover's term, he had substantially more experience when he issued them than did Assistant Secretary Artman when he issued the *Vastar* decision, since Artman was confirmed as Assistant Secretary on March 5, 2007 and sworn in on March 8, 2007, "just a few days" before issuing the *Vastar* decision.

[3] The Department in *Vastar* failed to explain how a "volume-weighted mean," *Burlington IBLA*, 151 IBLA at 153, 157, can be the same thing as the "highest price" required under Lease ¶ 3(c), or how a price received for the majority of the gas sold (the 50% plus one mcf in the regulation) is necessarily the same as the price paid or offered for simply a "major" portion of the
(continued...)

The Department also argues that it has "consistently interpreted the 50% plus one method as conforming with the lease terms." Def. Br. at 15; *see also* Int. Br. at 22. This statement conveniently ignores the *Bayless* decisions, in which the Department reached the opposite conclusion. Even if the statement were true, that would not necessarily mean that the Department's interpretation, albeit consistent, was correct. Indeed, it is impossible to square the regulation with the language of Lease ¶ 3(c), as Jicarilla demonstrated in its opening brief. Pl. Br. at 18; *see also Bayless* decisions.

The Department's assertion that the *Vastar* decision is in any event a reasonable interpretation of the major portion regulation, argued in the remainder of its brief, Def. Br. at 17-20, is totally beside the point. First, deference is not accorded to the Department's interpretations when it has failed to explain contrary precedent, as noted above at 3.[4]  Second, the MMS major portion regulation is not in fact applicable, since it is inconsistent with the Lease. The "fundamental flaw" cited by the Department, Def. Br. at 18, is thus not in the Jicarilla methodology but in the *Vastar* decision, because in *Vastar* the Department "evaluated the Jicarilla major portion methodology only for conformity with" the major portion regulation and not for conformity with the Lease. *Cf. id.*

Intervenors argue that Lease ¶ 3(g), JIC001373, incorporates the MMS regulations, and so the MMS major portion regulation must apply. Int. Br. at 22. This argument also fails, for two reasons. First, it was not made in *Vastar*, and post-hoc rationalizations, even of agency counsel, are

---

[3](...continued)
gas, as required by the Lease, where the regulations distinguish "major" from "majority." *Compare* 25 C.F.R. § 211.13(a) (1982 - 1996); § 171.13(a) (1957 - 1982)  (discussing calculation of value using "major portion" for Indian leases) *with*  30 C.F.R. § 206.103 (1984-1987) (discussing calculation of value using a "majority of production" for federal leases).

[4] In contrast, the *Bayless* decisions are entitled to deference, as they do not share the defects of *Vastar*.

6

of no avail. *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006). Second, Lease ¶ 3(g) incorporates *all* the MMS regulations, not just the ones Intervenors or the Department choose to acknowledge. Thus, the Lease incorporates 30 C.F.R. § 206.150(b), which results in the MMS major portion regulation being largely inapplicable here.[5]

The major portion regulation applies here only to the extent that it is not inconsistent with the Lease and, as explained in Jicarilla's opening brief, Pl. Br. at 27-37, that includes only the requirements to base the major portion price on arm's length sales, arguably of like quality gas, from the same field or area. Jicarilla already explained how these requirements were satisfied by the Jicarilla methodology. *Id*. Intervenors' argument, Int. Br. at 7, that the Jicarilla methodology is invalid because it considers sales of only the 1/8 or 1/6 royalty volume and not the remainder of the gas sales from the reservation is also completely off the mark: sales of the royalty volumes were made by Jicarilla to the El Paso and Northwest pipeline companies at arm's length, whereas "the

_____

[5] Intervenors also argue that the pre-1988 MMS major portion regulation was interpreted in the same way as the 1988 regulation, Int. Br. at 15-16, 25; *see also* Def. Br. at 15. Even if this were the case, the interpretation was merely non-binding guidance, *see* Declaration of William H. Feldmiller, Int. Ex. K at 3. Moreover, this interpretation was used solely to determine the "base floor price," not the highest price as required by the Lease. *Id*.; *see also* Conservation Division Manual, Part 647.2.3.A, Release No. 35 (August 15, 1977) ("When used, this [median] price establishes a minimum value for royalty purposes"), attached as Att. 12. The Declaration also claims that the methodology was used and affirmed in *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555 (10th Cir. 1984), but this decision was subsequently reversed. *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567 (Seymour, J., dissenting), *adopted as opinion of en banc court,* 782 F.2d 855 (10th Cir.), *modified,* 793 F.2d 1171, *cert. denied,* 479 U.S. 970 (1986) ("*Supron*"). Contrary to the assertions in the Declaration, *Supron* actually held that "Interior's trust responsibilities require it to apply whichever accounting method . . . yields the Tribe the greatest royalties," *id*. at 1569, and in any event concerned dual accounting, not major portion.

Intervenors' reliance on *Shoshone Ind. Tribe v. Hodel*, No. C81-131-K (D. Wyo. 1988), Int. Ex. J, is similarly misplaced. In that case the tribes *advocated* using the definition in the Conservation Division Manual to interpret the pre-1988 MMS major portion regulation, so that its application was never in question. In addition, in that case the court considered only whether the regulation was "consistent with governing statutes and regulations," Ex. J at 7, and not whether it was consistent with the tribes' leases.

vast majority" of sales of the remaining volumes were not arm's length sales (they were sales from large companies to their affiliates) and so could not be considered in the major portion price calculation. *Bayless* at 4; *Merrion* at 4; *Dugan* at 4. Also, Intervenors' claim that other contracts were "entirely different" from the Jicarilla contracts, Int. Br. at 7, even if relevant, is contrary to the prevailing understanding that all contracts at the time were similar, as explained in Pl. Br. at 31-34. To the extent Intervenors may have received lower prices despite the prevailing market, this would be due to their selling to affiliated companies.[6]

---

[6] Intervenors make much in their brief of the fact that David Wong, Jicarilla's Director of Revenue and Taxation and the official in charge of gas valuation matters for the tribe, participated in the development of the Jicarilla major portion methodology. Int. Br. at 5-7. First of all, anyone is free to express opinions to the Department, as Intervenors themselves certainly have done. Moreover, the fact that some lower level staff may have disagreed as to what became the final position taken by the Department is irrelevant. *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2530 (2007) ("The federal courts ordinarily are empowered to review only an agency's *final* action, . . . , and the fact that a preliminary determination . . . is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious."). Further, the Department is Jicarilla's trustee, and has an obligation to consult with Jicarilla on royalty valuation matters. *See generally* E.O. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) Jicarilla also is a party to a Cooperative Agreement with MMS, pursuant to FOGRMA § 202 (codified at 30 U.S.C. § 1732), which authorizes the Secretary to enter into cooperative agreements with states and tribes "to share oil or gas royalty management information, to carry out inspection, auditing, investigation or enforcement . . . activities . . ., and to carry out any other activity described in section 1718 of this title [regarding inspections]." For example, under the Jicarilla Cooperative Agreement in effect from 1999 through 2005, the Tribe, through Mr. Wong, participated on the MMS audit team that addressed Jicarilla leases, including the planning and execution of MMS's audit and compliance strategy with respect to those leases. Coop. Ag. §§ C.1, C.3 (attached as Att. 13). Finally, Mr. Wong's salary is completely irrelevant to this case, and is certainly not the business of Intervenors. Intervenors' personal attacks against a tribal official do not alter the fact that the Department in *Vastar* ignored precedent, relied on an invalid regulation, and breached its fiduciary obligations.

The Cooperative Agreement also provides that "[i]n developing the Department's litigation strategy with respect to administrative and judicial litigation, the Secretary agrees, however, to fully consult and work cooperatively with the Tribe to assure appropriate Tribal input in the administration (including substantive positions and strategy) of all such appeals." Coop. Ag. § A.2.a.3 (Att. 13). Thus, Intervenors' claim (based on mere allegations made in the complaint in *Bayless v. Dep't of the Interior*, No. 1:01CV00393 (RBW) (D.D.C.) (*dismissed with prejudice* Sept.

(continued...)

## III.   THE DEPARTMENT MAY NOT IGNORE ITS TRUST OBLIGATION TO ENFORCE THE MAJOR PORTION PROVISION OF LEASE ¶ 3(c).

The Department does not, and indeed can not, dispute its trust responsibility in the administration of Indian oil and gas resources.  Instead, it argues that it did not have a fiduciary duty to adopt a major portion methodology that violates its major portion regulation.  Def. Br. at 16, *see also* Int. Br. at 26-27.  This argument completely ignores the fact that it is the MMS major portion regulation, not the Jicarilla methodology, that violates the superceding Department regulation at 30 C.F.R. § 206.150(b).

The Department and Intervenors rely on *Pawnee v. United States*, 830 F.2d 187, 192 (Fed. Cir. 1987), and *Shoshone Indian Tribe* (D. Wyo.), Int. Ex. J., to argue for compliance with the MMS major portion regulation.  *See* Def. Br. at 16, Int. Br. at 27.  Neither case, however, addressed the issue of whether the MMS major portion regulation was consistent with Lease ¶ 3(c). Also, neither case addressed the Jicarilla major portion methodology.  Rather, the court in *Pawnee* considered a methodology that relied not on the highest price paid for a major portion of gas but on an average of the three highest prices paid for any portion of gas.  *See* Pl.  Br. at 38 n.21.  In *Shoshone Indian*

---

[6](...continued)
29, 2004)) that the *Bayless* decisions are invalid because counsel for Jicarilla was "allowed to comment on and help draft at least one of the . . . draft decisions," Int. Br. at 28, is also groundless. Moreover, as noted above, there is no prohibition against parties advocating their positions before the Department in an informal adjudication such as the ones at issue here.  *United States v. Navajo Nation*, 537 U.S. 488, 513 (2003).  During the *Navajo Nation* oral argument, Justice Breyer, an expert in administrative law, commented that "[e]x parte communications take place all the time in those situations."  *United States v. Navajo Nation*, No. 01-1375, Tr. of Oral Arg. at 5 (December 2, 2002).  He concluded that the Secretary's private communications with a coal company in that case were clearly not *per se* unlawful. *Id.* at 9, 23.  With respect to a memorandum that the Secretary hand-delivered to the Assistant Secretary as a result of those communications, "every word of [which] was penned by [the coal company's] lawyers -- in the administrative appeal," Justice Breyer observed that "it's a very common thing for parties to submit proposed findings [in administrative proceedings]." *Id.* at 31.

*Tribe* (D. Wyo.), the plaintiffs sought to obtain a major portion calculation based on the "weighted average" of the top 50% of prices. Int. Ex. J at 4.

Moreover, even if the MMS major portion regulation were consistent with the Lease, so that the Department had a choice between it and the Jicarilla major portion methodology, the Department still would have a fiduciary obligation to choose the Jicarilla methodology as "the alternative that is in the best interests of the Indian tribe," *Supron*, 728 F.2d at 1567; Pl. Br. at 21-22. The Department failed to do so, as amply discussed in Jicarilla's main brief.

The decision in *Navajo Nation*, 537 U.S. 488 (2003), does not excuse the Department for this failure for several reasons, already discussed in Pl. Br. at 22-24. In addition, the *Navajo Nation* decision is distinguishable because it did not consider the Department's fiduciary obligations under FOGRMA, since FOGRMA did not apply to the coal leases at issue in that case. The Court's decision was specifically limited to the Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a-396g, and its implementing regulations, *see, e.g.*, 537 U.S. at 493 ("we hold that the Tribe's claim for compensation . . . fails, for it does not derive from any liability-imposing provision of the IMLA or its implementing regulations."). The Court found that, with regard to coal leases, "neither the IMLA nor any of its regulations establishes anything more than a bare minimum royalty." 537 U.S. at 511. All that the IMLA and its regulations require for coal leases, the Court continued, is "Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective." *Id*. at 507. Indeed, the Court found that "no provision of the IMLA or its regulations contains *any* trust language with respect to coal leasing." *Id*. at 491 (emphasis in original). It was for this reason alone that the Court held, again in the context of coal leases only, that "there is no

textual basis for concluding that the Secretary's approval function includes a duty, enforceable in an action for money damages, to ensure a higher rate of return for the Tribe." *Id*. at 511.[7]

The Court's decision in *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), which the Department also cited, Def. Br. at 17, was similarly confined to the IMLA. The *Cotton Petroleum* decision was even more circumscribed than the Court's decision in *Navajo Nation* because it considered only whether the intent in the IMLA to give the Indians " the greatest return from [their] property" preempted state taxation of non-Indian oil and gas lessees operating on an Indian reservation. *Id*. at 511 n.16.

FOGRMA, on the other hand, applies to the case before this Court, and FOGRMA clearly states the Department's "trust responsibility . . . for the administration of Indian oil and gas resources," 30 U.S.C. § 1701(b). Its implementing regulations likewise acknowledge "the trust responsibilities of the United States with respect to the administration of Indian oil and gas leases." 30 C.F.R. § 206.150(d) (1988-95), § 206.170(d) (1996-99), § 206.170(e) (2000 - present). *See* 53 Fed. Reg. 1218, 1272 (Jan. 15, 1988) (regulations promulgated pursuant to FOGRMA). Thus the Department has a fiduciary obligation to adopt the interpretation that is in Jicarilla's best interest, as required by *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001); *Supron*; and *Burlington Resources Oil & Gas Co. v. Dep't of the Interior*, 21 F.Supp.2d 1, 5 (D.D.C. 1998), and even as acknowledged in *Vastar*, SUPP008, although in word only.

The court in *Shoshone Indian Tribe v. United States*, 56 Fed. Cl. 639 (2003), which was decided subsequent to *Navajo Nation*, found specifically that the Department has a fiduciary

---

[7] The *Navajo Nation* Court notes that the IMLA contains "a number of discrete provisions" regarding oil and gas leases," 537 U.S. at 494, and that "[i]n line with the IMLA itself, the regulations treated oil and gas leases in more detail than coal leases," *Id*. This observation relates to the Court's distinction between the trust responsibility for coal leasing, on which it ruled, and that for oil and gas leasing, which it did not address, as discussed in Pl. Br. at 23.

obligation to perform a major portion analysis for Indian gas. *Id.* at 646, 648-49; Pl. Br. at 23-24. In *Vastar* the Department found on the one hand that the MMS major portion regulation could not be applied to gas sales from the Jicarilla Apache Reservation, and on the other that there was no alternative methodology available for performing a major portion analysis for Jicarilla gas. The Department's reservation of the right to re-calculate major portion prices "if" data becomes available was no more than an empty promise, as discussed in Pl. Br. at 38-41. The Department nevertheless overturned the Jicarilla major portion methodology, without properly explaining its reason for doing so, while virtually proclaiming that there was no replacement methodology, despite its fiduciary duty to provide one. This conduct was a blatant violation of the Department's trust responsibility.

Intervenors' argument that Jicarilla can obtain relief for this breach in the trust litigation pending in the Court of Federal Claims, *Jicarilla Apache Nation v. United States*, No. 02-25L (Ct. Fed. Cl. filed January 8, 2002), is incorrect. Int. Br. at 30; *see also* Def. Br. at 20 n.14. Contrary to Intervenors' assertion, an action in this Court is not only a proper remedy for Jicarilla, it is the only remedy, first because the APA requires Jicarilla to appeal administrative decisions in a federal district court, and second because the Court of Federal Claims cannot provide Jicarilla with the equitable relief it seeks here.

First, the proper procedure for challenging a final decision of the Department, like the one at issue here, is to file an appeal in district court in accordance with the provisions of the APA, 5 U.S.C. § 703, and 28 U.S.C. § 1391(b)(1), (e)(1), and (e)(2), which is precisely what Jicarilla did. *See* Complaint ¶ 1, 5; Pl. Br. at 1. The APA "confers jurisdiction for judicial review of final agency decisions on the United States district court and *not the Court of Federal Claims*." *Russell v. United States*, 78 Fed. Cl. 281, 288 (2007) (emphasis added). Thus, Jicarilla properly sought review of the Department's *Vastar* decision in this Court, rather than in the Court of Federal Claims.

Second, the relief Jicarilla seeks can not be obtained through an action in the Court of Federal Claims. Jicarilla requests immediate equitable and specific relief, not money damages. *See* Complaint ¶ 1; Pl. Br. at 1, 2. "It is well-established that the Court of Federal Claims generally does not have the authority to entertain declaratory judgment requests." *Voisin v. United States*, 80 Fed. Cl. 164, 177 (2008) (quoting *United States v. King*, 395 U.S. 1, 5 (1969)). The Court of Federal Claims has authority to grant equitable relief only if it is "tied and subordinate to a monetary award." *United States v. Mitchell*, 463 U.S. 206, 217 n.15 (1983) (quoting *Austin v. United States*, 206 Ct. Cl. 719, 723 (1975)). The relief Jicarilla requests is not "tied and subordinate to a monetary award" because, as the Federal Circuit has held, "[i]t is not enough that the court's decision may affect the disposition of a monetary claim pending elsewhere, or that the court's decision will ultimately enable the plaintiff to receive money from the government." *National Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998).[8]

Finally, Intervenors' implied argument that Jicarilla should have appealed the MMS major portion regulation in 1988, when it was promulgated, and that it is now too late to challenge its application to Jicarilla gas, is also incorrect. *See* Int. Br. at 1, 16; *see also* Def. Br. at 14 n.11. Since an administrative regulation has continuing application, a party who has been affected by a regulation can challenge it at any time. *E.g.*, *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958). As the D.C. Circuit explained, "limiting the right of review of the underlying rule

---

[8] There are a few statutes that provide the Court of Federal Claims with limited jurisdiction to grant equitable relief, but none of these statutes is applicable here. *See* Administrative Disputes Resolution Act of 1996, 28 U.S.C. § 1491(b)(1) (jurisdiction to grant injunctive and declaratory relief in bid protest actions); Federal Courts Administration Act of 1992, 28 U.S.C. § 1491(a)(2) (jurisdiction to resolve "non-monetary" disputes under the Contract Disputes Act); Remand Act of 1972, 28 U.S.C. § 1491(a)(2) (limited jurisdiction to provide equitable relief such as restoring an employee to a position or correcting personnel records when "incident of and collateral to" a money judgment). *See generally* Gregory C. Sisk, Litigation with the Federal Government, § 4.02(e), at 245-248 (4th ed. ALI-ABA 2006).

would effectively deny many parties ultimately affected by a rule an opportunity to question its validity." *Id.* Accordingly, in *Murphy Exploration and Prod. Co. v. Dep't of the Interior*, 270 F.3d 957 (D.C. Cir. 2001), the D.C. Circuit rejected Interior's argument that a party waived its challenge to the agency's interpretation of a statute by not challenging the interpretation during the rulemaking process. *Id.* at 958. Following *Functional Music*, the D.C. Circuit expressly held that nothing prevents a party "from pursuing its claim in a second forum, *i.e.*, apart from the original rulemaking, if such a forum is otherwise available," *Murphy Exploration*, 270 F.3d at 958, and that a forum exists "when a rule is 'brought before th[e] court for review of further [agency] action applying it.'" *Id.* (second alteration in original) (quoting *Functional Music*, 274 F.2d at 546).

## IV.    THE DEPARTMENT'S FAILURE TO COLLECT ARM'S LENGTH SALES DATA AND THE INDUSTRY'S FAILURE TO PROVIDE IT ARGUE FOR ENFORCEMENT OF THE UNDERLYING MMS ORDERS TO PERFORM

The Department concedes that it does not have a database with information necessary to perform a major portion analysis under the MMS major portion regulation and that it does not even require gas producers to provide such information to MMS. Def. Br. at 5 and n.4; *see* Pl. Br. at 38-41.[9] Intervenors state unabashedly that:

> MMS never requested the necessary information from companies and the information is no longer obtainable. Companies are generally only required to keep documents for six years, 30 C.F.R. § 212.50 (1988), and, accordingly, may have destroyed records from the 1987-1995 time period or else transferred them to other companies when the underlying properties were sold.

Int. Br. at 29-30. Thus, Intervenors proclaim, "Nor is there any value in directing MMS to calculate a new major portion price because the necessary information is not available and cannot now be

---

[9] In its opening brief Jicarilla cited a proposed rule demonstrating that, since the *Burlington IBLA* decision, MMS has been collecting less gas sales information rather than more. Pl. Br. at 39-40. That rule was just promulgated and relaxes the MMS reporting requirements even further than the proposal. 73 Fed. Reg. 15885 (March 26, 2008).

14

made available." Int. Br. at 28. The necessary information *is* available under the Jicarilla methodology, however. Under these circumstances, the solution is for the Court to require enforcement of the MMS Orders to Perform that were based on the Jicarilla methodology and issued in *Vastar*.

The Department has a trust obligation to aggressively enforce Indian leases and properly value Indian gas, including to perform a major portion analysis, as discussed in section III above and in Pl. Br. at 37-41. It would be particularly unjust to relieve the Department of this responsibility based on its failure to properly "carry out . . . the administration of Indian oil and gas." 30 C.F.R. § 206.170(e).

Excusing MMS from calculating a Jicarilla major portion value would also create a windfall for the gas producers, who would no longer be liable for paying royalties based on major portion. Gas valuation is based on a self-reporting honor system, *see* legislative history of FOGRMA, H.R. Rep. No. 97-859, at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268-4269; 30 C.F.R. Part 210 (2007) (royalty payments are made based on company reports of volume and value of production), and companies have been frequently under-reported gas volumes and values in the past. *See* Linowes Commission Report at xv, 64, attached as Pl. Att. 14. *See also* the following examples of instances of under-reporting by the industry: *Union Texas Petroleum*, 153 IBLA 170, 172 (2000) (failure to perform dual accounting; failure to use accurate volumes and Btu measurements; and undervaluation of gas by using contract price instead of maximum lawful NGPA price and by taking processing allowance greater than actual cost); *Marathon Oil Co.*, 149 IBLA 287, 292-93 (1999) (failure to dual account and systemic error leading to underpayment of royalty); *Robert L. Bayless*, 149 IBLA 140, 142 (1999) (failure to dual account); *Robert L. Bayless*, 138 IBLA 210, 221 (1997) (evidence of volume discrepancies); *ARCO*, 131 IBLA 299, 304 (1994) (undervalued production due to incorrect

categorization of gas); *AMOCO Production Co.*, 123 IBLA 278, 293 (1992) (repeated royalty underpayments caused by systemic deficiencies).

The Department should not be rewarded for its failure to carry out its administrative and trust obligations, nor should gas producers be rewarded for their failures to accurately report their sales. Since, by all accounts, ordering the Department to develop a new major portion methodology for Jicarilla gas would prove unavailing, the Department instead should enforce the Orders to Perform in *Vastar*. MMS issued those Orders to satisfy the Department's obligation to "aggressively carry out . . . the administration of Indian oil and gas" and ensure that the Jicarilla Apache Nation receives full value for its natural gas, and that obligation should be upheld. The Orders were based on a major portion methodology that the Department found reasonable in the *Bayless* decisions. *See also* Pl. Br. at 27-37. If the Court vacates *Vastar*, the *Bayless* decisions will remain the Department's position and the Orders to Perform issued in *Vastar* will be enforceable.

## CONCLUSION

For the reasons set forth above and in Plaintiff Jicarilla Apache Nation's opening brief, the Court should vacate *Vastar* as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and should require enforcement of the underlying Orders to Perform in that case.

Respectfully submitted,


/s/ Jill Elise Grant

Jill Elise Grant (D.C. Bar No. 358306)
Jenny J. Dumas
Justin J. Solimon
NORDHAUS LAW FIRM, LLP
1401 K Street, NW, Suite 801

16

Washington, DC 20005
telephone:  (202) 530-1270
facsimile:  (202) 530-1920

Dated:  March 26, 2008          *Counsel for the Jicarilla Apache Nation*



United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

JUN 1 9 2003

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. William F. Demarest, Jr.                Re:  MMS-02-0036-IND
Counsel for:
IMC Global, Inc.
600 14th Street, NW, Suite 800
Washington, DC  20005-2004                      Appeal Granted

Dear Mr. Demarest:

IMC Global, Inc. (Appellant), successor by merger to Freeport-McMoRan, Inc.
(Freeport-McMoRan), appealed under 30 CFR Part 290 (2001) a Minerals
Management Service (MMS) Order to Report and Pay Additional Royalties (Order)
dated September 20, 2001.  The order concerns production from Indian leases in
the Ft. Belknap Reservation for the period January 1984 through February 1988.
The Order requires Appellant to pay $4,923.00, which is the additional royalty
due as a result of the calculated "major portion" value for the gas produced
from these Indian leases.

### Background

Freeport-McMoRan and the MMS signed an agreement in late 1994 entitled:
Compromise and Settlement Agreement (Settlement Agreement).  For consideration
of $12,850,000 paid by Freeport-McMoRan, the MMS agreed to release certain
claims for royalty it had against Freeport-McMoRan for oil and gas produced
prior to October 31, 1993.

### Issues

1.  Whether MMS's claim for additional royalties is foreclosed by the
    Settlement Agreement;

2.  Whether MMS's calculation of major portion values is adequately documented
    and is supported by substantial evidence;

MMS-02-0036-IND

## Analysis

1. Whether MMS's claim for additional royalties is foreclosed by the Settlement Agreement.

The Appellant argues in this appeal that, for the leases and the time period covered by the Order, the Settlement Agreement resolved the matter of royalty payments. Conversely, it is MMS's position that the Settlement Agreement excluded Indian leases so the Order is allowable.

In reading the Settlement Agreement, it is not clear from the language of the document that the parties intended to include Indian leases in the settlement. The following portions of that Settlement Agreement under the Recitals section provide some indication as to the intention of the parties.

In paragraph A., the Settlement Agreement cited ten MMS administrative appeals and two Interior Board of Land Appeals (IBLA) appeal cases that were in process at that time. Appellant had filed the appeals after MMS had made certain claims for additional oil and gas royalty. A search of the files of those MMS appeals reveals that none of those cases involved <u>Indian</u> leases, and likewise, the IBLA cases did not involve Indian leases.

In paragraph G., the Settlement Agreement states that:"The Department has coordinated through the State of Montana and other states regarding the settlement of certain claims and disputes which are the subject of this Agreement." There is no mention made of any consultations occurring with any Indian tribes, individual allottees, or the Bureau of Indian Affairs, which consultation, traditionally, is required when Indian matters are settled.

More specifically, in Section Two, Release of Claims, paragraph A. states that the Agreement relates to oil and gas production and liabilities "related to Freeport's <u>Federal</u> Outer Continental Shelf (OCS) and onshore leases . . ." (emphasis added). While the sentence is somewhat awkward, the word 'Federal" would seem to be an adjective applying to "Outer Continental Shelf" and to "onshore". In the first case, the use of "Federal" is redundant since all OCS leases are, by definition, Federal. If its inclusion in the agreement by the parties is to make sense, if the word itself is to have any usefulness or value to the document, it must be because the parties intended "Federal" to describe certain <u>onshore</u> leases. To wit, in the case of Federal "onshore" leases, this usage would be meant to exclude "Indian" leases since they are not Federal.

Section Two. Paragraph B. then explains that any claims related to gas contract settlement payments received by Freeport and contained in Exhibit "A" related only to "Freeport's <u>Federal</u> onshore and OCS leases" are satisfied, released, discharged, and terminated by the Settlement Agreement.  (emphasis added).  Again, the parties made no mention that Indian claims are affected by or included in this settlement.

In Section Two, paragraph C., Freeport-McMoRan asserts that for gas contract Settlement Agreements identified in Exhibit "B", "no Federal or Indian lease interests were involved in these settlements."  By specifically identifying Federal and Indian leases in this paragraph, the parties demonstrate that in the drafting of the Settlement Agreement they recognize and are able to distinguish between the two types of property interests.  It appears that when they choose to include both types of leases, they clearly do so by specifically mentioning Federal and Indian.

Section Six of the Settlement Agreement states that: "The Department represents to Freeport that no other governmental authority is required for the execution, delivery, or performance by the Department of this Agreement." The MMS, through its experience in leasing, is well-aware regarding the need for Bureau of Indian Affairs and the Assistant Secretary - Indian Affairs approval and it has in-house signature processes in place to assure the assent of the necessary entities.

I therefore find that an analysis of the language of the Settlement Agreement clearly indicates that the parties did not intend to include Indian leases in the settlement.  Further, the Settlement Agreement cannot be construed as covering the liability at issue in this appeal absent the Indian lessor's signature and the signature of the Assistant Secretary for Indian Affairs.

2.  Whether MMS's calculation of major portion values adequately documented and is supported by substantial evidence.

The Appellant states: "The values originally reported by FMI for royalty calculation purposes were within the zone implicit in "major portion" valuation."  The Appellant also argues that major portion valuation is not an exact science, and that major portion valuation produces a range of values. The Appellant gave the following example:

> In some cases, the difference between the value used by MMS and that reported by FMI is as little as **$0.01 per MMBtu** and most likely results

from rounding differences. The dollar amounts of the increased royalties claimed for some **entire months** are as small as $0.08 - **that's cents!** For one lease, the entire royalty claim for **a period of more than three years is only - $9.00 for the entire period.** For some other leases, the entire claim is not significantly greater. In many instances, except for the threat of "late-payment charges" and/or interest, the amount in dispute is not worth contesting.

In MMS's Order to Report and Pay Additional Royalties, dated September 20, 2001, MMS states:

> We process the data reported on the Form MMS-2014's using a Minerals Revenue Management (MRM) designed computer program. * * * After processing all royalty lines for the period January 1984 through February 1988, we array the royalty lines from the highest to the lowest price by month to determine the monthly major portion price.

Enclosure 2 to MMS's Order titled "Major Portion Analysis Report, Fort Belknap Indian Leases for the Period January 1, 1984, through February 29, 1988," states:

> BACKGROUND. "The data sources available to perform the major portion analysis include the State of Montana database, which is based on State sales and production information, and RMP's Auditing and Financial System (AFS) database."

> REGULATORY CRITERIA. The oil and gas valuation regulations at Title 30 CFR 206 (1987) states that the value of production should be the estimated reasonable value, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. Like-quality gas is gas of similar physical, chemical, and legal characteristics. Legal characteristics are generally the applicable Natural Gas Policy Act (NGPA) category or subcategory and the regulated or deregulated statue of the gas.

The regulations at 30 CFR 206.103 (1986) require that MMS calculate major portion prices using "like quality" lease products, i.e., products that have similar chemical, physical, and legal characteristics. In <u>Shoshone Indian</u>

Tribe v. Hodel, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

> [I]t has been the long-standing practice of the Minerals
> Management Service and its predecessor agency to interpret
> "like-quality" as including both physical and legal
> characteristics of the gas. * * * [o]nly gas of the same
> price vintage or category is compared to insure that the
> gas has like legal characteristics. * * * It would be
> unreasonable to disregard price vintages and categories in
> conducting a major-portion price analysis. [See pp. 4-5.]

Thus, MMS is obligated to consider NGPA price categories in performing major portion analyses and distinguish (and exclude) gas having different legal characteristics, e.g., gas that was subject to NGPA price regulation

The record shows that the AFS data MMS used in its calculations does not identify or distinguish gas subject to NGPA price regulation. Since the data MMS used to calculate major portion prices did not identify those price categories, the subject major portion calculations cannot be sustained.

The Appellant has offered a number of other arguments in support of its appeal. However, since I have already decided this appeal in favor of the Appellant based on the above-referenced issue, those arguments need not, and will not, be addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with the necessary information can be merged with other available data to meet the regulatory requirements that MMS has established. See Phillips Petroleum Co., 152 IBLA 109, 117 (March 31, 2000).[a]

You may appeal this decision to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2002) and 43 CFR 4.411 and 4.413 (2001). Please find enclosed a copy of 43 CFR 4.411 and 4.413 for your reference. If you choose to appeal this decision, you must file your notice of such appeal and any statement of reasons, written arguments, or briefs within 30 days after the date of service of the decision at the following address: U.S. Department of the Interior, Bureau of Indian Affairs, Attention: Deputy Commissioner of

[a] GFS(O&G) 14(2000)

6

Indian Affairs (MS 4140), 1849 C Street, NW., Washington, D.C. 20240.  You also must file copies of the notice of appeal and any statement of reasons, written arguments, or briefs with the U.S. Department of the Interior, Associate Solicitor, Division of Mineral Resources (MS 6312), 1849 C Street, NW., Washington, D.C. 20240, and with the U.S. Department of the Interior, Chief, Appeals Division (MS 4230), 1849 C Street, NW., Washington, D.C. 20240.

Sincerely,


TERRANCE L. VIRDEN

Director
Bureau of Indian Affairs

Enclosure

bc:  Dir/IA
     Appeals (MMS-02-0036-IND)
     MRM
     RMMLF
     Reading
     R. Compton
LMS:PMI:Appeals:MS9300:CWeathersby:ad:09/20/02:(202)208-2622:**Retyped:02/05/03**
G:\Appeals\share\appsdecsn\weatherc\02-0036:REVISIONS/02/20/03



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

MAR 1 3 2003

RECEIVED
NOV 1 7 2003
DAVIS GRAHAM & STUBBS LLP

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. David M. Castro
General Attorney
Amerada Hess Corporation
500 Dallas Street
Houston, Texas 77002

RE:  MMS-02-0019-IND

Appeal Granted

Dear Mr. Castro:

Amerada Hess Corporation (Appellant) appealed under 30 CFR Part 290 (2001) from a Minerals Management Service (MMS) order dated October 23, 2001.  The order directed the Appellant to report and pay additional royalties in the amount of $724.80 for natural gas produced from Ute Tribal Indian Leases for the period January 1984 through December 1986.

## Background

MMS's Minerals Revenue Management (MRM) conducted a major portion analysis for natural gas production from fields containing Ute Tribal and Allotted leases for the period January 1984 through December 1986.  MRM processed data reported on Forms MMS-2014 for leases in the various fields using an MRM-designed computer program.  MRM determined that the Appellant failed to comply with the major portion requirements of its Indian lease(s), and this led to an underpayment of royalties in the amount of $724.80.

## Issues

1. Did MMS perform a legally sufficient major portion analysis?
2. Was the order barred by the Federal Statute of Limitations, 28 U.S.C. 2415?

## Analysis

MRM states that the foundation of its order to the Appellant is the oil and gas valuation regulation found at the former 30 CFR § 206.103 (1986), which states:

MMS-02-0019-IND

> The value of production shall be the estimated reasonable value
> of the product with due consideration being given to the highest
> price paid for a part or for a majority of production of
> like-quality in the same field, to the price received by the
> lessee, to posted price, and to other relevant matters.

<u>See</u> <u>also</u> former 25 CFR 211.13 (1986) and corresponding lease terms.

The Appellant argues that the order violates the Interior Board of Land
Appeals' (IBLA's) Directives, and the Federal Statute of Limitations,
28 U.S.C. 2415. The Appellant states:

> <u>The Order Violates IBLA Directives.</u>  In *Burlington Resources Oil and Gas
> Company*, 151 IBLA 144 (Nov. 30, 1999),[a] the Interior Board of Land Appeals
> clarified that the base data for a major portions [sic] analysis must be
> made up exclusively of arms-length transactions.  Notwithstanding the
> IBLA's clear directive, the major portions [sic] analysis sought to be
> enforced by the Order, as noted in Hess' Notice of Appeal and Request for
> Extension of Time incorporated herein, includes non-arms-length
> transactions.

> <u>The Order Violates 28 U.S.C. § 2415.</u>  Hess sold all the affected acreage
> on or before January 1, 1996 and has had at least three major computer
> system changes since December 1986.  In 1994, Hess moved the headquarters
> of its domestic exploration and production offices from Tulsa, Oklahoma
> to Houston, Texas.  Both the affected records and the personnel with
> first-hand knowledge needed to assess the validity of the Order without
> significant expense, are no longer available.

The Appellant also states:

> Hess received and paid a prior major portions [sic] analysis order (for
> the period of 1987-1988) approximately seven years ago.  Hess no longer
> has the affected records to verify the 1987-1988 dates but believes they
> are correct.  Hess sold its interest in the affected acreage effective
> January 1, 1996, or almost seven years ago.  The MMS elected <u>not</u> to issue
> an order going back to 1986 when it issued its prior noted order but over
> a decade later issued a second order going back over 18 years.  The MMS'
> delay is so significant that only a fraction of the Order is principal,
> while the large majority of it is interest.

a)GFS(O&G) 4(2000)

3

The regulations at 30 CFR 206.103 (1986) require that MMS calculate major portion prices using "like quality" lease products, i.e., products that have similar chemical, physical, and legal characteristics. In <u>Shoshone Indian Tribe v. Hodel</u>, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

> [I]t has been the long-standing practice of the Minerals Management Service and its predecessor agency to interpret "like-quality" as including both physical and legal characteristics of the gas. * * * [o]nly gas of the same price vintage or category is compared to insure that the gas has like legal characteristics. * * * It would be unreasonable to disregard price vintages and categories in conducting a major-portion price analysis. [See pp. 4-5.]

Thus, MMS is obligated to consider NGPA price categories in performing major portion analyses and distinguish (and exclude) gas having different legal characteristics, e.g., gas that was subject to NGPA price regulation

The record shows that the Auditing and Financial System data MMS used in its calculations does not identify or distinguish gas subject to NGPA price regulation. Since the data MMS used to calculate major portion prices did not identify those price categories, the subject major portion calculations cannot be sustained.

The Appellant has offered a number of other arguments in support of its appeal. However, since I have already decided this appeal in favor of the Appellant based on the above-referenced issue, those arguments need not, and will not, be addressed herein.

<u>Conclusions and Order</u>

For the reasons stated above, the appeal is granted. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with the necessary information can be merged with other available data to meet the regulatory requirements that MMS has established. See <u>Phillips Petroleum Co.</u>, 152 IBLA 109, 117 (March 31, 2000).[b]

You may appeal this decision to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001). Please find enclosed a copy of 43 CFR 4.411 and 4.413 for your reference. If you choose to appeal this decision, you must file your notice of such appeal and any

b)GFS(O&G) 14(2000)

4

statement of reasons, written arguments, or briefs within 30 days after the date of service of the decision at the following address: U.S. Department of the Interior, Bureau of Indian Affairs, Attention: Deputy Commissioner of Indian Affairs (MS 4140), 1849 C Street, NW., Washington, D.C. 20240. You also must file copies of the notice of appeal and any statement of reasons, written arguments, or briefs with the U.S. Department of the Interior, Associate Solicitor, Division of Mineral Resources (MS 6312), 1849 C Street, NW., Washington, D.C. 20240, and with the U.S. Department of the Interior, Chief, Appeals Division (MS 4230), 1849 C Street, NW., Washington, D.C. 20240.

Sincerely,

Deputy Commissioner of
Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-02-0019-IND)
     MRM
     RMMLF
     Reading File
     R. Compton
LMS:PMI:Appeals:MS9200:CWeathersby:ad:08/23/02:(202)208-2622:
**Revisions:10/16/02**
G:\Appeals\share\appsdecsn\weatherc\02-0019



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

**JUL 2 1 2003**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Michael J. Wozniak, Esq.                    Re:    Midgard Energy Company
Dorsey & Whitney                                   MMS-02-0013-IND
370 17th Street, Suite 4700
Denver, Colorado 80202                             Appeal Granted

Dear Mr. Wozniak:

Midgard Energy Company (Midgard) appealed under 30 CFR Part 290 (2001) from an
order dated October 23, 2001, (Order) issued by the Minerals Revenue
Management (MRM) within the Minerals Mangement Service (MMS). The Order
directed Midgard to report and pay additional royalties of $10,234.24 on the
gas produced from Midgard's Ute Tribal and allotted oil and gas leases for the
period January 1984 through December 1986.

## Background

MRM conducted a major portion analysis for natural gas production from the
fields containing Ute Indian tribal and allotted leases for the period January
1984 through December 1986. MRM processed data reported on Forms MMS-2014 for
leases in the various fields using an MRM designed computer program. MRM
determined that the Appellant failed to comply with the major portion
requirements of its Indian lease, and this led to an underpayment of royalties
in the amount of $10,234.24.

## Appellant's Arguments

The Appellant argue that the order is barred by the statute of limitation in
28 U.S.C. 2415(a) because the time period involved in the order ended in
December 1986, which was more than six years and ninety day days before the
October 10, 2001, order was issued. Also, the Appellant argues that a prior
audit closed in 1991 covered the same time period for three of the four leases
involved, which should have resolved all royalty payment issues for those
leases for that time period. In addition, the Appellant argues that a
clerical error by Midgard's predecessor in title, Maxus Energy Corporation,

2

resulted in an overpayment of royalties which would reduce the amount of the underpayment allegedly owed by Midgard.

Issue

Did MRM perform a legally sufficient major portion analysis?

Analysis

The Order pp. 1-2 states that:

> The oil and gas valuation regulations found at Title 30 CFR §
> 206.103 (1986) state that the value of production should be the
> estimated reasonable value of the product with due consideration
> being given to the highest price paid for a part or for a majority
> of production of like quality in the same field, to the price
> received by the lessee, to posted prices, and to other relevant
> matters. Like-quality gas is gas of similar physical, chemical
> and legal characteristics. Legal characteristics are generally
> the applicable Natural Gas Policy Act (NGPA) category or
> subcategory and the regulated or deregulated status of the gas.

The regulations at 30 CFR 206.103 (1986) require that MRM calculate major portion prices using "like quality" lease products. As MRM stated in the Order quoted above, like-quality gas is gas of similar legal characteristics, i.e., generally gas from the applicable Natural Gas Policy Act (NGPA) category or subcategory.

However, MRM prepared the major portion calculation for Midgard's production without sorting the gas sales by NGPA category. In the Order's Enclosure 3, p.2-3, MRM's Royalty Valuation Division (RVD) discussed the major portion methodology it prepared for Midgard using MRM's Auditing and Financial System (AFS) database as follows:

> The major portion prices that RVD calculated identify one value
> per month per field/area for all gas production from Ute tribal
> and allotted leases using AFS data for the time period January
> 1984 through December 1986.

> * * *

3

Beginning in the mid-1980's, changes in the natural gas market
substantially lessened the importance of NGPA category prices when
determining like-quality gas, when compared to past periods.

* * *

The AFS data does not contain NGPA categories.  In addition, we
determined that no reliable and usable databases exist that
contain NGPA categories.

However, in Shoshone Indian Tribe v. Hodel, No. C81-131-K (D. Wyo. 1988), the
United States District Court found at pp.4-5 that:

It has been the long-standing practice of the Minerals Management
Service and its predecessor agency to interpret "like-quality" as
including both physical and legal characteristics of the gas. * *
* [O]nly gas of the same price vintage or category is compared to
insure that the gas has like legal characteristics. * * *

It would be unreasonable to disregard price vintages and
categories in conducting a major-portion price analysis.

Based on the foregoing, I conclude that MRM is obligated to consider NGPA
price categories in performing a major portion analyses.  Since the data base
MRM used to calculate the major portion prices for Midgard did not identify
the NGPA price categories, that major portion calculation is not valid.
Consequently, the Order is not enforceable.

The Appellant argued that the Order was barred under 28 U.S.C. § 2415(a).
However, since I have already decided this appeal in favor of the Appellant
for the reasons stated above, that argument will not be addressed herein.

## Conclusions and Order

For the reasons stated above, the appeal is granted.  However, this decision
is rendered without prejudice to the right of MRM to recalculate the major
portion price correctly if additional MRM data can be merged with the data
previously used to calculate Midgard's major portion price, in order to meet
the regulatory requirements that MMS has established.  See Phillips Petroleum
Co., 152 IBLA 109, 117 (March 31, 2000).[a]

You may appeal this decision to the Interior Board of Land Appeals pursuant to
30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001).  Please find
a)GFS(O&G) 14(2000)

4

enclosed a copy of 43 CFR 4.411 and 4.413 for your reference.  If you choose
to appeal this decision, you must file your notice of such appeal and any
statement of reasons, written arguments, or briefs within 30 days after the
date of service of the decision at the following address:  U.S. Department of
the Interior, Bureau of Indian Affairs, Attention: Deputy Commissioner of
Indian Affairs (MS 4140), 1849 C Street, NW., Washington, D.C. 20240.  You
also must file copies of the notice of appeal and any statement of reasons,
written arguments, or briefs with the U.S. Department of the Interior,
Associate Solicitor, Division of Mineral Resources (MS 6312), 1849 C Street,
NW., Washington, D.C. 20240, and with the U.S. Department of the Interior,
Chief, Appeals Division (MS 4230), 1849 C Street, NW., Washington, D.C. 20240.

                    Sincerely,


                    GEORGE T. SKIBINE


              Acting Director
                    Bureau of Indian Affairs


bc:  Dir/IA
     Appeals (MMS-02-0013-IND
     MRM
     RMMLF
     Reading
LMS:PMI:Appeals:MS9300:ClarkP:ad:5/19/03:202/208-2622
G:\Appeals\shared\appsdecsn\ClarkP\02-0013 Midgard Energy Company major
portion1.doc



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

MAR 1 3 2003

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. Barry Duren, Comptroller           Re: MMS-00-0016-IND
L. E. Jones Production Company
Post Office Box 1185
Duncan, Oklahoma 73534                      Appeal Granted

Dear Mr. Duren:

L. E. Jones Production Company (Jones) appealed under 30 CFR Part 290 (2000)
from a Minerals Management Service (MMS) order dated October 13, 1999, which
directed Jones to report and pay additional royalties in the amount of
$13,248.58 for Allotted Indian Oil and Gas Leases located in the Anadarko
Area, Oklahoma for the periods of 1986 through 1990, 1991 through 1992, and
1993 through 1995 based on identified differences between values reported to
MMS and calculated median values.

<u>Background</u>

On December 14, 1984, a suit was filed against the Department of the Interior
by members of the Cheyenne-Arapaho Tribes of Oklahoma who, as allottees, owned
interests in oil and gas leases under the jurisdiction of the Anadarko Office
of the Bureau of Indian Affairs.

In December 1991, the Federal District Court for the Western District of
Oklahoma accepted an agreement that settled the aforementioned suit. Under
this agreement (referred to as the Kauley Settlement Agreement), the MMS
agreed to take certain actions relating to royalty accounting, including the
determination of natural gas values for royalty purposes taking into account
the highest price paid for a majority of like-quality gas in the same field
(major portion analysis).

On March 8, 1993, MMS issued an order (Bill No. FBIL 52930091) directing Jones
to report and pay additional royalties in the amount of $3,936.67 for the
period 1986 through 1990 based on the MMS major portion analysis performed for
Jones' allotted Indian oil and gas leases. Jones filed a timely appeal of that
order.

MMS-00-0016-IND

2

On January 18, 1996, MMS issued an order directing Jones to report and pay additional royalties in the amount of $7,453.68 for the period 1991 through 1992 based on the MMS major portion analysis performed for Jones' allotted Indian oil and gas leases.  Jones filed a timely appeal of that order.

On February 21, 1996, the Deputy Commissioner for Indian Affairs, acting on a request filed by the MMS Royalty Management Program (RMP), issued a decision remanding Jones' appeal to MMS for recalculation of the major portion price and the resulting royalties using more current gas sales information.

On October 13, 1999, MMS issued a revised/supplemental consolidated order to Jones to report and pay covering the periods of 1986 through 1990, 1991 through 1992, and 1993 through 1995.  That order, which is the subject matter of this appeal, superceded the MMS orders dated March 8, 1993, and January 18, 1996.

Issue

Did MMS determine the major portion price(s) applicable to the natural gas produced from Jones' leases in a manner consistent with regulations?

Analysis

The Oklahoma State Tax Commission (OTC) provided MMS, for major portion purposes, with data on natural gas production and sales in Oklahoma.

The regulations at 30 CFR 206.153(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the highest price paid or offered at the time of production for the major portion of gas production from the same field or residue gas or gas plant products from the same processing plant, as applicable.  The major portion will be calculated using like-quality lease products sold under arm's-length contracts from the same field or processing plant (or, if necessary to obtain a reasonable sample, from the same area or nearby processing plants) for each month.  All such sales will be arrayed from the highest price to the lowest price (at the bottom).  The major portion is that price at which 50 percent (by volume) plus 1 mcf of gas (starting from the bottom) is sold, or for gas plant products, 50 percent (by volume) plus 1 unit.  [Emphasis added.]

3

Upon review of this appeal, I find that the OTC data MMS used to determine
major portion did not distinguish between arm's-length contracts and non-
arm's-length contracts. Thus, I conclude that the subject appeal should be
granted based on the decisions of the Interior Board of Land Appeals in
Phillips Petroleum Co., 152 IBLA 109 (2000),[a] and Burlington Resources Oil and
Gas Co., 151 IBLA 144 (1999),[b] which held that non-arm's-length transactions
may not be included in the data used for major portion analyses.

The regulations at 30 CFR 206.103 (1986) also require that MMS calculate major
portion prices using "like quality" lease products, i.e., products that have
similar chemical, physical, and legal characteristics.  In Shoshone Indian
Tribe v. Hodel, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

> [I]t has been the long-standing practice of the Minerals
> Management Service and its predecessor agency to interpret
> "like-quality" as including both physical and legal
> characteristics of the gas. * * * [o]nly gas of the same
> price vintage or category is compared to insure that the
> gas has like legal characteristics. * * * It would be
> unreasonable to disregard price vintages and categories in
> conducting a major-portion price analysis.  [See pp. 4-5.]

Thus, MMS is obligated to consider NGPA price categories in performing major
portion analyses and distinguish (and exclude) gas having different legal
characteristics, e.g., gas that was subject to NGPA price regulation

The MMS has acknowledged that the OTC data it used in its calculations does
not identify or distinguish gas subject to NGPA price regulation.  Since the
data it used to calculate major portion prices did not identify those price
categories, the subject major portion calculations cannot be sustained.

The Appellant has offered a number of other arguments in support of its
appeal.  However, since I have already decided this appeal in favor of the
Appellant based on the above-referenced issues, those arguments need not, and
will not, be addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted.  However, this decision
is rendered without prejudice to the right of MMS to recalculate the major
portion price correctly if other MMS databases with the necessary information
can be merged with other available data to meet the regulatory requirements
that MMS has established.  See Phillips Petroleum Co., 152 IBLA 109, 117
(March 31, 2000).[c]

a) GFS(O&G) 14(2000)      c) GFS(O&G) 14(2000)
b) GFS(O&G) 4(2000)                                      MMS-00-0016-IND

4

You may appeal this decision to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001). Please find enclosed a copy of 43 CFR 4.411 and 4.413 for your reference. If you choose to appeal this decision, you must file your notice of such appeal and any statement of reasons, written arguments, or briefs within 30 days after the date of service of the decision at the following address: U.S. Department of the Interior, Bureau of Indian Affairs, Attention: Deputy Commissioner of Indian Affairs (MS 4140), 1849 C Street, NW., Washington, D.C. 20240. You also must file copies of the notice of appeal and any statement of reasons, written arguments, or briefs with the U.S. Department of the Interior, Associate Solicitor, Division of Mineral Resources (MS 6312), 1849 C Street, NW., Washington, D.C. 20240, and with the U.S. Department of the Interior, Chief, Appeals Division (MS 4230), 1849 C Street, NW., Washington, D.C. 20240.

Sincerely,

/s/ Terrance L Virden

Deputy Commissioner of
Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-00-0016-IND)
     RMMLF         MRM
     Reading
     R.Compton
LMS:PMI:Appeals:MS9300:Anderson:ad:8/21/02:202-208-2622
G:\Appeals\share\appdecsn\Andersom\00-0016A.doc



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

APR 3 0 2002    [APR 30 2002]

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Ms. M. Julia Hook                    Re: MMS-98-0252-IND
Dorsey & Whitney, LLP                    Phillips Petroleum Company
370 Seventeenth Street, Suite 4400
Denver, Colorado  80201                  Appeal Granted

Dear Ms. Hook:

Phillips Petroleum Company (Phillips) appealed under 30 CFR Part 290 (1998)
from a Minerals Management Service (MMS) order dated October 20, 1998, which
directed Phillips to pay additional royalties in the amount of $65,114.42 for
gas produced from Anadarko Oklahoma allotted leases during the period January
1993 through December 1995.

Background

On December 14, 1984, a suit was filed against the Department of the Interior
by members of the Cheyenne-Arapaho Tribes of Oklahoma who, as allottees, owned
interests in oil and gas leases under the jurisdiction of the Anadarko Office
of the Bureau of Indian Affairs.

In December 1991, the Federal District Court for the Western District of
Oklahoma accepted an agreement that settled the aforementioned suit.  Under
this agreement (referred to as the Kauley Settlement Agreement) the MMS
agreed to take certain actions relating to royalty accounting, including the
determination of natural gas values for royalty purposes taking into account
the highest price paid for a majority of like-quality gas in the same field
(major portion analysis).

To effectuate the aforementioned major portion analysis, it was agreed that
MMS would obtain gas sales information from the Oklahoma Tax Commission (OTC),
and use that information to derive statistical best estimates of majority
prices for fields containing Anadarko Area Indian allotted leases.  The
methodology for performing this major portion analysis may be summarized as
follows:

MMS-98-0252-IND

Ms. M. Julia Hook                                                                                      2

1. The MMS determines for each field or area by Natural Gas Policy Act (NGPA) category the statistical best estimate of majority price using the best available data. For each NGPA category, and each month, this value constitutes the minimum royalty value.

2. Where data on NGPA categories are insufficient to determine separate estimated majority prices for each category, data are aggregated and a single estimated majority price is established.

3. Value, for royalty purposes, is the higher of the single estimated majority price (to the extent it does not exceed the maximum lawful price for any gas production under the NGPA), or gross proceeds accruing to the lessee.

4. If data sufficient to establish majority prices under methods 1 or 2 above are not available, value will be calculated in accordance with applicable gas valuation rules, without regard to major portion analysis.

By letter dated October 15, 1992, MMS notified Phillips of potential royalty liability with respect to Phillips' Oklahoma allotted Indian leases based on the MMS major portion analysis performed for those leases. On February 24, 1997, MMS issued the subject order directing Phillips to pay additional royalties based on the median value calculated by MMS. Phillips appealed.

Issue

Did MMS perform a legally sufficient major portion analysis?

Analysis

It is not disputed that the subject Allotted leases, by their terms, require the Secretary to consider, when valuing lease production for royalty purposes, the highest price paid or offered at the time of production for the majority of like-quality gas produced and sold from the same field or area, and to compare that price with the price received by the lessee. The royalty valuation regulations for unprocessed gas, effective March 1, 1988, provide at 30 CFR 206.152(a)(3) (1995) that:

> (i) For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value of production for royalty purposes, if data are available to compute a major portion MMS will, where practicable, compare the value

Ms. M. Julia Hook                                                3

> determined in accordance with this section with the major
> portion.  The value to be used in determining the value of
> production for royalty purposes shall be the higher of those two
> values.
>
> (ii) For the purposes of this paragraph, major portion means the
> highest price paid or offered at the time of production for the
> major portion of gas production from the same field.  The major
> portion will be calculated using like-quality gas sold under
> arm's-length contracts from the same field (or, if necessary to
> obtain a reasonable sample, from the same area) for each month.
> All such sales will be arrayed from the highest price to the
> lowest price (at the bottom).  The major portion is that price
> at which 50 percent (by volume) plus 1 mcf of the gas (starting
> from the bottom) is sold.

The valuation regulations for processed gas at 30 CFR 206.253(a)(3)(i) and
(ii) (1995) contain essentially the same provisions.  The regulations
governing the valuation of gas for periods prior to March 1, 1988, i.e.,
30 CFR 206.103 (1987), contained similar language, to wit:

> In absence of good reason to the contrary, value computed on the
> basis of the highest price per barrel, thousand cubic feet, or
> gallon paid or offered at the time of production in a fair and
> open market for the major portion of like-quality oil, gas, or
> other products produced and sold from the field or area where
> the leased lands are situated will be considered the reasonable
> value.

The Appellant acknowledges that MMS may, within its discretion, perform a
major portion analysis.  However, the Appellant contends that the method
adopted by MMS for performing major portion analyses was, in the instant case,
flawed and inconsistent with the applicable regulations.  More specifically,
the Appellant argues that the data obtained from the Oklahoma Tax Commission
(OTC) was incomplete, that MMS failed to make adjustments for Btu content in
the information it received, and that MMS' use of "estimated median values"
does not satisfy the regulatory requirements of major portion.

The Appellant raised, and the Deputy Commissioner of Indian Affairs rejected,
these same arguments previously in <u>Phillips Petroleum Company</u>, MMS-97-0085-IND
(February 10, 1998), 19 Gower Federal Service, Royalty Valuation and
Management, Rocky Mountain Mineral Law Foundation.

MMS-98-0252-IND

Ms. M. Julia Hook                                                    4

However, in <u>Phillips Petroleum Co.</u>, 152 IBLA 109 (March 31, 2000),[a] the
Interior Board of Land Appeals (IBLA) reversed the Deputy Commissioner's
decision, stating:

> It is important to note that major portion analysis is required
> only if arm's-length sales data is available and if calculations
> based upon major portion analysis are practicable. <u>See</u> 30 CFR
> 206.152(a)(3)(i), 206.152(a)(3)(ii) (1991). The required sales
> information was apparently not available nor was the calculation
> of a median price for a population including only arm's-length
> transactions using the OTC database in the case of appellant's
> sales for either the 1988-1991 time frame or 1991-1992 time period.
> We find that MMS' use of data from all sales, rather than solely
> arm's-length sales, as required by the 30 CFR 206.152(a)(3), to be
> inconsistent with the plain language of the regulation.

<u>Phillips Petroleum Co.</u> at 117.

Since the subject appeal involves the same leases and the same major portion
methodology that was present in <u>Phillips Petroleum Co.</u>, <u>supra</u>, and since the
time period at issue post-dates the promulgation of the subject major portion
regulations, I conclude that the aforementioned IBLA decision is controlling
and that the MMS order dated October 20, 1998, cannot be sustained.

The Appellant has raised a number of other arguments in its appeal. However,
since the issue of compliance with the regulations is deemed controlling,
those other arguments will not be addressed herein.

<u>Conclusions and Order</u>

For the reasons stated above, the subject appeal is granted. However, this
decision is rendered without prejudice to the right of MMS to recalculate the
major portion price correctly if other MMS databases with the necessary
information can be merged with the OTC database to meet the regulatory
requirements that MMS has established. <u>See</u> <u>Phillips Petroleum Co.</u>, <u>supra</u>
at 117.

This decision may be appealed to the Interior Board of Land Appeals pursuant
to 30 CFR Part 290 (2000) and 43 CFR 4.411 and 4.413 (2000). A copy of 43 CFR
4.411 and 4.413 (2000) is enclosed for reference. Notice of such appeal must
<u>be transmitted to the Deputy</u> Commissioner of Indian Affairs, Bureau of Indian

a)GFS(O&G) 14(2000)

Ms. M. Julia Hook                                                                      5

Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C.
20240, within 30 days after the date of service of the decision.  Copies of
any statement of reasons, written arguments, or briefs should also be served
upon the Deputy Commissioner of Indian Affairs.  Copies of the notice of
appeal and any statement of reasons, written arguments, or briefs should
likewise be served upon the Associate Solicitor, Division of Mineral Resources
(MS 6312), U.S. Department of the Interior, 1849 C Street, NW., Washington,
D.C. 20240; and upon the Chief, Appeals Division (MS 4230), Minerals
Management Service, U.S. Department of the Interior, at the same address.

                                    Sincerely,

                                    Sharon Blackwell
                                    Deputy Commissioner of
                                    Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-97-0194-IND)
     RMMLF
     Reading File
LMS:PMI:Appeals:MS9200:AndersonM:ad:9/5/01:(202)208-2622
G:\Appeals\share\appsdecsn\andersom\98-0252A

                                                        MMS-98-0252-IND



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240
AUG 2 5 2003

IN REPLY REFER TO:

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. Charles A. Breer
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, Colorado 80201-0185

Re: MMS-02-0025-IND
Arco Oil & Gas Co.

MMS-02-0026-IND
Unicon Producing Co.

MMS-02-0027-IND
Amoco Production Co.

MMS-02-0028-IND
Tenneco Oil Co.

MMS-02-0029-IND
Burlington Resources,
Inc.

MMS-02-0030-IND
Union Texas Petroleum

Appeals Granted

Dear Mr. Breer:

The above named Appellants appealed under 30 CFR Part 290 (2001) from separate September 18, 2001, Orders to Report and Pay Additional Royalties (Order(s)) issued by the Minerals Management Service (MMS) directing the Appellants to report and pay the following listed amounts for alleged underpaid royalties for gas produced from various Navajo Allotted Indian Leases within the Greater San Juan Basin for the period January 1984 through February 1988.[1] The Appellants filed timely Notices of Appeal and Statements of Reasons with MMS. Since the appeals involve identical issues, the same regulations and legal

---

[1] Arco Oil & Gas Co., MMS-02-0025-IND, $3,323.24; Unicon Producing Co., MMS-02-0026-IND, $107,271.73; Amoco Production Co., MMS-02-0027-IND, $191,636.08; Tenneco Oil Co., MMS-02-0028-IND, $208,909.38; Burlington Resources, Inc, MMS-02-0029-IND, $39,555.05; and Union Texas Petroleum, MMS-02-0030-IND, $1,178.26

MMS-02-0025-IND

principles, and the same lands, counsel has requested consolidation of the appeals.

## Background

MMS performed major portion analyses on the leases at issue covering the period January 1984 through February 1988. In its separate September 18, 2001, Orders, MMS advised the Appellants of the results of the major portion analyses which resulted in computed royalty underpayments for natural gas production from said leases in the amounts listed in Footnote 1. The major portion analyses used gas sales data reported on the Report of Sales and Royalty Remittance (Form MMS-2014) to identify the median value for all gas sold in the Greater San Juan Basin, which include several counties in New Mexico and Colorado, and four different Indian reservations. Statement of Reasons at 3. MMS determined that the Appellants failed to comply with the major portion requirements of the Indian leases at issue, and each Appellant was directed to report and pay the additional royalties.

## Issues

1. Did MMS perform legally sufficient major portion analyses?

2. Were the Orders barred by the federal Statute of limitations found at 28 U.S.C. 2415?

3. Does MMS' Major Portion Methodology constitute improper rulemaking under the Administrative Procedure Act, 5 U.S.C. § 551?

## Analysis

MMS states that the foundation of its Orders to the Appellants is the standard Indian lease terms for Navajo allotted Indian leases. This requirement, referred to as major portion analysis, is contained in the oil and gas valuation regulation found at the former 30 CFR 206.103 (1987), which states in pertinent part:

> The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like quality (Emphasis added) in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. . . .

3

> In the absence of good reason to the contrary, value computed on the
> basis of the highest price per barrel, thousand cubic feet, or gallon
> paid or offered at the time of production in a fair and open market for
> the major portion of like-quality (Emphasis added) oil, gas, or other
> products produced and sold from the field or area where the leased lands
> are situated will be considered to be a reasonable value.

The Appellants argue that the MMS demands for additional royalty payments for
the period at issue rely upon major portion analyses that fail to distinguish
between different categories of Natural Gas Policy Act (NGPA) natural gas and
consequently, MMS fails to calculate a price using "like-quality" gas.  The
Appellants argue that since MMS' failure to categorize the gas contravenes the
NGPA's categorization of natural gas in effect during the period covered by
the major portion analyses and applicable case law (see Statement of Reasons
and citations contained therein), the justification proffered by MMS to
explain the rationale for its methodology fails to overcome the applicable
legal requirements for computing prices based upon "like-quality" gas.
Therefore, MMS' demand for additional royalties based upon a disregard of the
requirement to compare gas with like legal characteristics cannot be sustained
on appeal.

I agree with the Appellant.

The regulations at the former 30 CFR 206.103 (1987) require that MMS calculate
major portion prices using "like-quality" lease products, i.e., products that
have similar chemical, physical, and legal characteristics.  In Shoshone
Indian Tribe v. Hodel, CV No. C81-131K (D. Wyo. 1988), the District Court
found that:

> [I]t has been the long-standing practice of the Minerals Management
> Service and its predecessor agency to interpret "like-quality"
> as including both the physical and legal characteristics of the
> gas. * * * [o]nly gas of the same price vintage or category is compared
> to insure that the gas has like legal characteristics. * * * It would be
> unreasonable to disregard price vintages and categories in conducting a
> major-portion price analysis.

Thus, MMS is obligated to consider NGPA price categories in performing major
portion analyses and distinguish (and exclude) gas having different legal
characteristics, e.g., gas that was subject to NGPA price regulation.

The record shows that the data MMS used in its calculations does not identify
or distinguish gas subject to NGPA price regulation.  Since the data used by

4

MMS to calculate major portion prices did not identify those price
categories, the subject major portion calculations cannot be sustained.
Since I have decided this appeal in favor of the Appellants based upon the
major portion analysis argument, the other arguments offered by the Appellants
need not be addressed herein.

Conclusion and Order

For the reasons set forth above, the appeals are granted. However, this
decision is rendered without prejudice to the right of MMS to recalculate the
major portion price correctly if other MMS databases with the necessary
information can be merged with other available data to meet the regulatory
requirements that MMS has established. See Phillips Petroleum Co., 152 IBLA
109, 117 (March 31, 2000).[a]

You may appeal this decision to the Interior Board of Land Appeals (IBLA)
pursuant to 30 CFR Part 290 (2002) and 43 CFR 4.411 and 4.413 (2002). Please
find enclosed a copy of 43 CFR 4.411 and 4.413 for your reference. Notice of
such appeal must be transmitted to the U.S. Department of the Interior, Bureau
of Indian Affairs, Attention: Director (MS 4140), 1849 C Street, NW,
Washington, D.C. 20240, within 30 days after the date of service of the
decision. Copies of the notice of appeal and any statement of reasons,
written arguments, or briefs should be served upon the Associate Solicitor,
Division of Mineral Resources, U.S. Department of the Interior, 1849 C Street,
NW, Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4230),
Minerals Management Service, U.S. Department of the Interior, at the same
address.

Sincerely,

/sgd/ Terrance L. Virden

Director
Bureau of Indian Affairs

Enclosure
a)GFS(O&G) 14(2000)



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

MAR 1 3 2003

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Ms. RaSchelle Richens                    Re:  MMS-98-0082-IND
Medallion Exploration
6975 Union Park Center, Suite 310
Midvale, Utah 84047                      Appeal Granted

Dear Ms. Richens:

Medallion Exploration (Medallion) appealed under 30 CFR Part 290 (1998) from
a Minerals Management Service (MMS) order dated February 17, 1998, as
modified on March 16, 1998, which directed Medallion to report and pay
additional royalties for certain Northern Ute Tribal and Allotted Indian
leases for the period January 1987 through December 1995.

Background

Medallion is the royalty payor for 35 Indian oil and gas leases located in
the Altamont-Bluebell Area of the Uintah and Ouray Indian Reservation
(Reservation) and one Indian oil and gas lease located in the Cedar Rim Field
on the Reservation.  These leases provide in section c, Rental and Royalty,
that value for royalty purposes may, in the discretion of the Secretary, be
calculated on the basis of the highest price paid or offered at the time of
production for the major portion of gas sold from the field where the leased
lands are situated.

The MMS Minerals Revenue Management (MRM) performed a major portion analysis
for gas production from Northern Ute tribal and allotted leases for the
period January 1987 through December 1995.  Based on that analysis, the MRM
concluded that Medallion had underpaid royalties for the aforementioned
leases.  On August 11, 1997, MRM sent Medallion a letter advising Medallion
of those findings.  Medallion did not respond to that letter.

On February 17, 1998, MMS issued an order directing Medallion to report and
pay additional royalties for the above-referenced leases in the amount of

2

$74,221.02 for the period January 1987 through December 1995, consistent with MRM's major portion analysis.  Medallion filed a timely appeal of that order.

On March 16, 1998, in response to information provided by Medallion, MMS modified its February 17, 1998, order, reducing the assessment of additional royalties from $74,221.02 to $59,632.04.  Medallion continues to dispute the assessment.

Issues

1.  Did the settlement agreement dated January 23, 1998, between Medallion and the Indian lessors resolve the above-referenced royalty issue?

2.  May MMS assess royalties based on a higher price than the lessee receives or is able to receive?

3.  Was MMS' major portion analysis performed in a manner consistent with applicable regulations?

Analysis - Settlement Agreement

On December 5, 1997, the Appellant executed a Settlement Agreement (Agreement) with MMS, the Bureau of Indian Affairs, the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, and the Ute Distribution Corporation.  The Agreement was finalized by the Department of the Interior on January 23, 1998.  The Appellant states that it believed the Agreement resolved all issues pertaining to the subject Indian leases.

However, Paragraph D of the Recitals section of the Agreement states:

> Medallion, Interior, the Tribe, the UDC, and Interior on behalf of the allottees desire to resolve all disputes they may have with respect to the calculation and payment of royalties due on dual accounting from Medallion with respect to the Leases during the Settlement Period, including any and all interest accrued thereon.  [Emphasis added.]

The Agreement section of the document states:

> In consideration of the mutual covenants contained herein, Medallion, Interior, the Tribe, the UDC,

3

and the Interior on behalf of the Allottees agree
as follows:

1. As full and complete settlement of <u>all dual</u>
   <u>accounting claims</u> for Leases during the
   Settlement Period, Medallion will pay
   $18,534.24 Directly to UDC and $36,365.76 to
   MMS * * *. [Emphasis added.]

              *          *          *

2. Each party agrees that it shall not hereafter
   institute any legal or other proceedings to
   litigate, arbitrate, appeal, or attach in any
   fashion <u>any claim or issue for dual accounting</u>
   <u>for the leases for the Settlement Period.</u>
   [Emphasis added.]

              *          *          *

3. It is specifically understood and agreed that
   this Agreement is executed for the sole
   purpose of settling <u>the issue described herein.</u>
   [Emphasis added.]

Based on the foregoing, I conclude that the express purpose of the Agreement
was to resolve a dispute between the parties over the requirement to perform
dual accounting, and that the scope of the Agreement did not extend to other
issues that might arise, such as major portion pricing.

<u>Analysis - Highest Available Price</u>

In its August 20, 1998, response to the MMS field report, the Appellant
states that it sold lease production to the gas plants that serviced the
fields where the production was located, getting the highest prices paid by
those plants.  The Appellant contends that it should not be held accountable
for a higher price that it could not have received.

In support of this contention, the Appellant argues that major portion should
be viewed, not as an alternative valuation method to be used pursuant to the
discretion of MMS consistent with applicable law, but rather as a safeguard
to be employed only in those instances where there is substantial evidence
that prices being reported by the lessee for royalty purposes are less than
market value.

4

I disagree. It is clear from the regulations that a major portion analysis is to be performed whenever the availability of the requisite data makes it practicable for MMS to do so. As Judge Seymour noted in his dissent in Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555 (10th Cir. 1984), which was adopted by the Tenth Circuit in its en banc rehearing, 782 F.2d 855 (10th Cir. 1986):

> [T]he purpose of the Indian Mineral Leasing Act
> is to ensure that Indian tribes receive the
> maximum benefit from mineral deposits on their
> own lands, and we should construe regulations
> enacted under this Act in light of this purpose.

It is firmly established that the royalty value of production from Federal and Indian leases may be greater than the sales price. United States v. Ohio Oil Co., 163 F.2d 633 (10th Cir. 1947), cert. denied, 333 U.S. 833 (1948), rehearing denied, 333 U.S. 865 (1948), Supron Energy Corp., 46 IBLA 181, 188 (1980).a

It is also a well established principle that pursuant to the lease terms and regulations, the value for royalty purposes may exceed a lessee's proceeds from the disposition of the product. California Co. v. Udall, 296 F.2d 384 (D.C. Cir. 1961), U.S. v. Oil Oil Co., supra, Amoco Production Co. v. Hodel, 627 F. Supp. 1375 (W.D. La. 1986).

Here, the lease terms provide for the use of major portion prices in determining value for royalty purposes. The Appellant was, or should have been, aware of these lease provisions when it accepted the subject leases.

Analysis - Applicable Regulations

The Northern Ute tribal oil and gas leases provide in section (c), Rental and Royalty, that the value for royalty purposes may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered at the time of production for the major portion of gas sold from the field where the leased lands are situated. Similar language appears in the regulations at 25 CFR 211.13(a) (1987).

The regulations at 30 CFR 206.152(a)(3)(i) (1991), which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may
> consider the highest price paid or offered for a major

a)GFS(O&G) 75(1980)

5

> portion of production (major portion) in determining value
> of production for royalty purposes, if data are available
> to compute a major portion <u>MMS will, where practicable,
> compare the value determined in accordance with this section
> with the major portion</u>. The value to be used in determining
> the value of production for royalty purposes shall be the
> higher of these two values. [Emphasis added.]

The regulations at 30 CFR 206.153(a)(3)(ii) (1991) define major portion as follows:

> For purposes of this paragraph, major portion means the
> highest price paid or offered at the time of production for
> the major portion of gas production from the same field or
> residue gas or gas plant products from the same processing
> plant, as applicable. <u>The major portion will be calculated
> using like-quality lease products sold under arm's-length
> contracts</u> from the same field or processing plant (or, if
> necessary to obtain a reasonable sample, from the same area
> or nearby processing plants) <u>for each month</u>. All such sales
> will be arrayed from the highest price to the lowest price
> (at the bottom). The major portion is that price at which
> 50 percent (by volume) plus 1 mcf of gas (starting from the
> bottom) is sold, or for gas plant products, 50 percent (by
> volume) plus 1 unit. [Emphasis added.]

The record in this case contains a copy of MMS' "Northern Ute Tribe Major Portion Analyses Report For The Period January 1, 1987, Through December 31, 1995." This report shows that MRM calculated the major portion prices using the Auditing and Financial System (AFS) data base and that MRM used both arm's-length sales and non-arm's-length sales contained in that data base. Therefore, I conclude that Medallion's appeal should be granted with respect to the period March 1988 through December 1996 based on the decisions of the Interior Board of Land Appeals in <u>Phillips Petroleum Co.</u>, 152 IBLA 109 (2000),[b] and <u>Burlington Resources Oil and Gas Co.</u>, 151 IBLA 144 (1999),[c] which held that non-arm's-length transactions may not be included in the data used for major portion analyses.

The report ("Northern Ute Tribe Major Portion Analyses Report For The Period January 1, 1987, Through December 31, 1995") also acknowledges that the AFS data base does not identify or distinguish gas subject to the various Natural Gas Policy Act of 1978 (NGPA) pricing categories.

b) GFS(O&G) 14(2000)
c) GFS(O&G) 4(2000)

6

In <u>Shoshone Indian Tribe v. Hodel</u>, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

> [I]t has been the long-standing practice of the Minerals Management Service and its predecessor agency to interpret "like-quality" as including both physical and legal characteristics of the gas. * * * [o]nly gas of the same price vintage or category is compared to insure that the gas has like legal characteristics. * * * It would be unreasonable to disregard price vintages and categories in conducting a major-portion price analysis. [See pp. 4-5.]

Based on the foregoing, I conclude that MMS is obligated to consider NGPA price categories in performing major portion analyses. Since the data base it used to calculate major portion prices did not identify those price categories, the subject major portion calculations cannot be sustained.

The Appellant has offered other arguments in support of its appeal. However, since I have already decided this appeal in favor of the Appellant based on the above-referenced arguments, the remaining arguments need not, and will not, be addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with the necessary information can be merged with other available data to meet the regulatory requirements that MMS has established. See <u>Phillips Petroleum Co.</u>, 152 IBLA 109, 117 (March 31, 2000).[d]

This decision may be appealed to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001). A copy of 43 CFR 4.411 and 4.413 (2001) is enclosed for reference. Notice of such appeal must be transmitted to the Deputy Commissioner of Indian Affairs, Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240, within 30 days after the date of service of the decision. Copies of any statement of reasons, written arguments, or briefs should also be served upon the Deputy Commissioner of Indian Affairs. Copies of the notice of appeal and any statement of reasons, written arguments, or briefs should likewise be served upon the Associate Solicitor, Division of <u>Energy and Resources, U.S.</u> Department of the Interior, 1849 C Street, NW.,

d)GFS(O&G) 14(2000)

7

Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4230),
Minerals Management Service, U.S. Department of the Interior, at the same
address.

Sincerely,

Deputy Commissioner of
Indian Affairs

Enclosure

Bc:   DC/IA
      Appeals (MMS-98-0082-IND)
      RMMLF
      Reading
      MRM
      R.Compton
LMS:PMI:Appeals:MS9300:AndersonM:ad:7/15/02:208-2622
G:\Appeals\share\appdecsn\andersom\98-0082B.doc

MMS-98-0082-IND



IN REPLY REFER TO:

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

MAR 1 3 2003

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. Craig K. Phillips, President          Re:  MMS-98-0088-IND
Uinta Oil & Gas, Inc.
P.O. Box 1618
Roosevelt, Utah  84066                         Appeal Granted

Dear Mr. Phillips:

Uinta Oil & Gas, Inc. (Uinta) appealed under 30 CFR Part 290 (1997) from a
Minerals Management Service (MMS) order dated March 25, 1998, which directed
Uinta to report and pay additional royalties for certain Northern Ute Tribal
and Allotted Indian leases for the period January 1987 through December 1995.

<u>Background</u>

Uinta is the royalty payor for Indian Lease Nos. 509-0038600, 509-0038670,
509-0046010, 509-0046080, and 509-0046120 located in the Altamont-Bluebell
Area of the Uintah and Ouray Indian Reservation.

The MMS Minerals Revenue Management (MRM) performed a major portion analysis
for gas production from Northern Ute tribal and allotted leases for the
period January 1987 through December 1995. Based on that analysis, the MRM
concluded that Uinta had underpaid royalties for the above-referenced leases
by $9,463.19. On August 11, 1997, MRM sent Uinta a letter advising Uinta of
those findings. Uinta did not respond to that letter.

On March 25, 1998, MMS issued an order directing Uinta to report and pay
additional royalties for the above-referenced leases for the period January
1987 through December 1995, consistent with MRM's major portion analysis.
Uinta filed a timely appeal of that order.

<u>Issues</u>

1. May MMS assess royalties based on a price that is higher than that
   received by the Appellant?

MMS-98-0088-IND

2

2.  Was MMS' major portion analysis performed in a manner consistent
    with applicable regulations?

Analysis

The Appellant states that under its arm's-length contract it is paid the
prevailing price in the area. The Appellant argues that the use of major
portion prices for royalty purposes will, in effect, require the Appellant to
pay royalties based on a higher price (or prices) than it actually received.
The Appellant states that if it is required to pay royalties based on major
portion prices, it will suffer financial hardship and may have to plug and
abandon the subject gas wells.

I cannot accept this argument.  The Secretary is not limited by actual prices
received in establishing the royalty value of oil and gas produced from
Federal and Indian lands.  United States v. Ohio Oil Co., 163 F.2d 633 (10th
Cir. 1947), cert. denied, 333 U.S. 833 (1948), rehearing denied, 333 U.S. 865
(1948); Supron Energy Corporation, 46 IBLA 181, 188 (1980).[a] It is a well-
established principle that pursuant to the lease terms and regulations, the
value for royalty purposes may exceed a lessee's proceeds from the
disposition of the product.  California Co. v. Udall, 296 F.2d 384 (D.C. Cir.
1961); Amoco Production Co. v. Hodel, 627 F. Supp. 1375 (W.D. La. 1986).

It is clear from the regulations that a major portion analysis is to be
performed whenever the availability of the requisite data makes it
practicable to do so. The regulations at 30 CFR 206.152(a)(3)(i) (1991),
which became effective on March 1, 1988, state that:

> For any Indian leases which provide that the Secretary may
> consider the highest price paid or offered for a major
> portion of production (major portion) in determining value
> of production for royalty purposes, if data are available
> to compute a major portion MMS will, where practicable,
> compare the value determined in accordance with this section
> with the major portion.  The value to be used in determining
> the value of production for royalty purposes shall be the
> higher of these two values. [Emphasis added.]

The regulations at 30 CFR 206.153(a)(3)(ii) (1991) define major portion as
follows:

> For purposes of this paragraph, major portion means the
> highest price paid or offered at the time of production for
> the major portion of gas production from the same field or

a)GFS(O&G) 75(1980)

3

residue gas or gas plant products from the same processing plant, as applicable.  The major portion will be calculated using like-quality lease products sold under arm's-length contracts from the same field or processing plant (or, if necessary to obtain a reasonable sample, from the same area or nearby processing plants) for each month.  All such sales will be arrayed from the highest price to the lowest price (at the bottom).  The major portion is that price at which 50 percent (by volume) plus 1 mcf of gas (starting from the bottom) is sold, or for gas plant products, 50 percent (by volume) plus 1 unit. [Emphasis added.]

The record in this case contains a copy of MRM's "Northern Ute Tribe Major Portion Analyses Report For The Period January 1, 1987, Through December 31, 1995." This report shows that MRM calculated the major portion prices using the Auditing and Financial System (AFS) data base and that the MRM used both arm's-length and non-arm's-length sales contained in that data base. Therefore, I conclude that Uinta's appeal should be granted with respect to the period March 1988 through December 1996 based on the decisions of the Interior Board of Land Appeals in Phillips Petroleum Co., 152 IBLA 109 (2000),[b] and Burlington Resources Oil and Gas Co., 151 IBLA 144 (1999),[c] which held that non-arm's-length transactions may not be included in the data used for major portion analyses.

The report ("Northern Ute Tribe Major Portion Analyses Report For The Period January 1, 1987, through December 31, 1995") also acknowledges that the AFS data base does not identify or distinguish gas subject to the various Natural Gas Policy Act of 1978 (NGPA) price categories.

In Shoshone Indian Tribe v. Hodel, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

[I]t has been the long-standing practice of the Minerals Management Service and its predecessor agency to interpret "like-quality" as including both physical and legal characteristics of the gas. * * * [O]nly gas of the same price vintage or category is compared to insure that the gas has like legal characteristics. * * * It would be unreasonable to disregard price vintages and categories in conducting a major-portion price analysis.  [See pp. 4-5.]

Based on the foregoing, I conclude that MMS is obligated to consider NGPA price categories in performing major portion analyses.  Since the data base

b) GFS(O&G) 14(2000)
c) GFS(O&G) 4(2000)

4

it used to calculate major portion prices did not identify those price categories, the subject major portion calculations cannot be sustained.

The Appellant has offered other arguments in support of its appeal. However, since I have already decided this appeal in favor of the Appellant based on the above-referenced arguments, the remaining arguments need not, and will not, be addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS data bases with the necessary information can be merged with other available data to meet the regulatory requirements that MMS has established.  See Phillips Petroleum Co., 152 IBLA 109, 117 (March 31, 2000).[d]

This decision may be appealed to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2001). A copy of 43 CFR 4.411 and 4.413 (2001) is enclosed for reference. Notice of such appeal must be transmitted to the Deputy Commissioner of Indian Affairs (MS 4140), Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240, within 30 days after the date of service of the decision. Copies of any statement of reasons, written arguments, or briefs should also be served upon the Deputy Commissioner of Indian Affairs. Copies of the notice of appeal and any statement of reasons, written arguments, or briefs should likewise be served upon the Associate Solicitor, Division of Mineral Resources (MS 6312), U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4320), Minerals Management Service, U.S. Department of the Interior, at the same address.

Sincerely,

Deputy Commissioner of
Indian Affairs

Enclosure
d)GFS(O&G) 14(2000)



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

JAN    2002
[JAN 18 2002]

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Phillip R. Clark                    Re: Burlington Resources
Holme Roberts & Owen LLP                    Oil & Gas Company
1700 Lincoln Street, Suite 4100             MMS-99-0056-IND
Denver, Colorado  80203

                                        Appeal Granted

Dear Mr. Clark:

Burlington Resources Oil & Gas Company (Burlington) appealed under 30 CFR Part
290 (1998) from a Minerals Management Service (MMS) order dated January 7,
1999, which directed Burlington to report and pay additional royalties in the
amount of $632,885.31 for natural gas production from Ute Mountain Ute Tribal
leases (Ute Tribal leases) for the period January 1984 through December 1996
(the audit period), based on MMS's "major portion analyses" for that period.

## Background

By letter to payors, dated September 30, 1988, MMS reemphasized the
requirement to perform major portion analysis and dual accounting (accounting
for comparison) for determining and paying royalties on production from Indian
leases.

MMS's Royalty Valuation Division (RVD) (now the Indian Oil and Gas CAM because
of an agency reorganization) performed a major portion analysis for the period
January 1984 through December 1996.  This major portion analysis covered the
eastern area of the Ute Mountain Ute Indian reservation (Reservation).  RVD's
methodology for the major portion analysis included using its Auditing and
Financial System (AFS) database to calculate a major portion value for each
month for all Ute Tribal leases in the eastern area of the Reservation.  The
major portion values were based on the net price paid for either residue gas
or unprocessed gas sales for all Ute Tribal leases and certain Federal leases.

By letter to the Ute Mountain Ute Tribe (Ute Tribe) dated May 5, 1998 (with
the Methodology Report enclosed), MMS requested confirmation of Ute Tribe's

MMS-99-0056-IND

Mr. Phillip R. Clark                                                                    2

agreement to the major portion methodology.  The Ute Tribe signed in
confirmation of this agreement.

By letter to Burlington, dated September 3, 1998, MMS informed Burlington of
potential royalty underpayments on its Ute Tribal leases based on MMS's major
portion analysis.  By letter to Burlington, dated January 7, 1999, MMS ordered
Burlington to report and pay additional royalties in the amount of
$632,885.31.

On February 16, 1999, Burlington filed a timely appeal.

### Issue

Did MMS perform a legally sufficient major portion analysis?

### Analysis

It is not disputed that Burlington's leases, by their terms, require the
Secretary to consider, when valuing lease production for royalty purposes, the
highest price paid or offered at the time of production for the majority of
like-quality gas produced and sold from the same field or area, and to compare
that price with the price received by the lessee.  The royalty valuation
regulations for unprocessed gas, effective March 1, 1988, provide at 30 CFR
206.152(a)(3) (1995) that:

> (i) For any Indian leases which provide that the Secretary may
> consider the highest price paid or offered for a major portion
> of production (major portion) in determining value of production
> for royalty purposes, if data are available to compute a major
> portion MMS will, where practicable, compare the value
> determined in accordance with this section with the major
> portion.  The value to be used in determining the value of
> production for royalty purposes shall be the higher of those two
> values.

> (ii) For the purposes of this paragraph, major portion means the
> highest price paid or offered at the time of production for the
> major portion of gas production from the same field.  The major
> portion will be calculated using like-quality gas sold under
> arm's-length contracts from the same field (or, if necessary to
> obtain a reasonable sample, from the same area) for each month.
> All such sales will be arrayed from the highest price to the

Mr. Phillip R. Clark                                                                            3

> lowest price (at the bottom). The major portion is that price
> at which 50 percent (by volume) plus 1 mcf of the gas (starting
> from the bottom) is sold.

The valuation regulations for processed gas at 30 CFR 206.253(a)(3)(i) and
(ii) (1995) contain essentially the same provisions. The regulations
governing the valuation of gas for periods prior to March 1, 1988, i.e.,
30 CFR 206.103 (1987), contained similar language, to wit:

> In absence of good reason to the contrary, value computed on the
> basis of the highest price per barrel, thousand cubic feet, or
> gallon paid or offered at the time of production in a fair and
> open market for the major portion of like-quality oil, gas, or
> other products produced and sold from the field or area where
> the leased lands are situated will be considered the reasonable
> value.

Burlington acknowledges that MMS may, within its discretion, perform a major
portion analysis. However, Burlington contends that the method adopted by MMS
for performing major portion analyses was, in the instant case, flawed and
inconsistent with the applicable regulations.

On pages 3 and 4 in the Statement of Reasons that Burlington submitted to MMS
on May 24, 2000, Burlington argues that:

<u>"The MMS Letter Must be Reversed Because the MMS's "Major Portion"
Calculations Violate the MMS's Own Regulations."</u>

Burlington states:

> Effective March 1, 1988, the MMS promulgated new gas valuation
> regulations (the "<u>1988 Regulations</u>") (the Pre-1988 Regulations and the
> 1988 Regulations are collectively referred to as the "<u>Regulations</u>").
> The pertinent regulations were amended to read as follows:
>
>> For any Indian lease which provides that the secretary may
>> consider the highest price paid or offered for a major portion of
>> production (major portion) in determining value of production for
>> royalty purposes, if data are available to compute a major portion
>> MMS will, where practicable, compare the value determined in
>> accordance with this section with the major portion.

Mr. Phillip R. Clark                                                          4

> 30 C.F.R.§ 206.172(a)(3)(i) and § 206.173(a)(3)(i) (1997) (emphasis
> added).

The term "major portion" is defined in the 1988 Regulations as follows:

> For purposes of this paragraph, major portion means the highest
> price offered at the time of production for the major portion of
> gas production from the same field.  The major portion will be
> calculated using like-quality gas sold under arm's-length
> contracts from the same field (or, if necessary to obtain a
> reasonable sample, from the same area) for each month.

> 30 C.F.R.§ 206.172(a)(3)(ii) and §206.173(a)(3)(ii) (1997) (emphasis
> added).

> As to the last seven years of the Audit Period, the 1988 Regulations
> specify *when* a major portion computation will be made (when the
> necessary data is available and it is practical to do so) and *how* the
> computation is to be made (using an array of all like-quality gas sold
> under arm's-length contracts from the same field).  The Pre-1988
> Regulations did not contain the same level of detail as is found in the
> 1988 Regulations, but the MMS indicates in the Major Portion Analyses
> Report, Ute Mountain Ute Tribal Leases-Eastern Portion ("Major Portion
> Report"), a copy of which is attached hereto as Exhibit F, that the
> only significant difference between the 1988 Regulations and the Pre-
> 1988 Regulations is the way in which a median price is chosen from the
> array. (Footnote omitted.)  See Major Portion Report, p.2.

On page 4 in the Statement of Reasons that Burlington submitted to MMS on
May 24, 2000, Burlington argues that:

The MMS Demand Letter Violates the Pre-1988 Regulations and the 1988
Regulations Because the MMS Calculated a "Major Portion" Price When the
Necessary Data was Unavailable.

Burlington states:

> As discussed above, the 1988 Regulations provide that the MMS will
> calculate a major portion price only if the data required to compute
> that price is available, 30 C.F.R.§ 206.172(a)(3)(i), and the Major

Mr. Phillip R. Clark                                                          5

Portion Report makes clear that the MMS does not interpret the Pre-1988 Regulations differently. Major Portion Report, pp. 1-2. Although the Regulations require additional data, in the Major Portion Report the MMS itself stated that such data would include both recognition of Natural Gas Policy Act ("NGPA") categories and nature of sales (arm's-length versus non-arm's-length). Major Portion Report, pp.2-3. Despite these regulatory requirements, the MMS chose to calculate its estimated "major portion" prices based not on the information required by its own regulations but on the limited information contained in the MMS's Auditing and Financial System ("AFS"), information that does not satisfy the regulatory requirements for calculating a major portion price because it does not identify the nature of sales. Major Portion Report, p. 3.

The MMS has not satisfied even the most basic requirement of the Regulations, the requirement that the MMS will calculate a major portion price only if the necessary data is available, 30 C.F.R. § 206.172(a)(3)(i)(1997), because the AFS database used by the MMS to make its estimated "major portion" calculations is wholly inadequate for that purpose. The MMS's attempt to justify its noncompliance with the regulations must fail. Administrative agencies are not free to disregard the law in pursuit of an alleged reasonable result. On this point the law is clear and unequivocal -- agencies are not above the law and are not free to disregard their own regulations. United States v. Nixon, 418 U.S. 683, 695-96 (1974).

By letter dated May 18, 2001, from MMS's Manager, Indian Oil and Gas (CAM), to MMS's Chief, Appeals Division, the following recommendation was given to the Chief:

Because we used MMS's Automated (sic) Financial System (AFS) database to calculate major portion and we can't identify all non-arm's-length sales at this time, we recommend that Burlington's appeal for the March 1988 through December 1996 time period covered by the MMS Order be granted without prejudice. Recent Interior Board of Land Appeals (IBLA) decisions require MMS to use only arm's-length gas sales to calculate major portion for sales periods after February 1988, under the valuation regulations effective March 1, 1988. IBLA indicated that MMS is not precluded from billing Burlington for major portion in the future if MMS can calculate major portion prices using a database with all non-arm's-length

Mr. Phillip R. Clark                                                                6

> sales removed. We didn't identify major portion liabilities
> for Burlington for the January 1984 through February 1988 time period.

The valuation regulations effective March 1, 1988, are applicable to this
appeal. The valuation regulations that were in effect prior to March 1, 1988,
are not applicable to this appeal as there is no dispute between Burlington
and MMS for this period.

In Burlington Resources Oil and Gas Co., 151 IBLA 144 (November 30, 1999)[a] IBLA
reversed the Deputy Commissioner's decision in MMS-96-0139-IND, stating:

> The major portion analysis system was first proposed in 1984, although
> it appears that data to implement the system of major portion pricing
> was only analyzed after the December 1991 settlement agreement in
> Kauley v. Lujan, supra. It is important to note that major portion
> analysis is required only if arm's-length sales data is available and if
> these calculations are practicable. See 30 C.F.R. §§ 206.152(a)(3)(i),
> 206.152(a)(3)(ii) (1991). The required sales information was not
> available nor was the calculation of a median price for a population
> including only arm's-length transactions using the AFS database in the
> case of appellant's sales for the 1987-1991 time frame. We find that
> MMS' use of nonarm's-length sales data required by 30 C.F.R. §
> 206.152(a)(3) to be inconsistent with the plain language of the
> regulation.

> Burlington Resources Oil and Gas Co. at 158.

Since the subject appeal involves the same kind of leases and the same major
portion methodology that was present in Burlington Resources Oil and Gas Co.,
supra, and since the time period at issue post-dates the promulgation of the
subject major portion regulations, I conclude that the aforementioned IBLA
decision is controlling and that the MMS order dated October 20, 1998, cannot
be sustained.

Burlington has raised other arguments in its appeal. However, since the issue
of compliance with the regulations is deemed controlling, the other arguments
will not be addressed herein.

---

a) GFS(O&G) 4(2000)

Mr. Phillip R. Clark                                                                 7

Conclusions and Order

For the reasons stated above, the subject appeal is granted. However, this decision is rendered without prejudice to the right of MMS to recalculate the major portion price correctly if other MMS databases with the necessary information can be merged with the AFS database to meet the regulatory requirements that MMS has established. See Burlington Resources Oil and Gas Co., supra at 158.

This decision may be appealed to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (2001) and 43 CFR 4.411 and 4.413 (2000). A copy of 43 CFR 4.411 and 4.413 (2000) is enclosed for reference. Notice of such appeal must be transmitted to the Deputy Commissioner of Indian Affairs, Bureau of Indian Affairs, U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240, within 30 days after the date of service of the decision. Copies of any statement of reasons, written arguments, or briefs should also be served upon the Deputy Commissioner of Indian Affairs. Copies of the notice of appeal and any statement of reasons, written arguments, or briefs should likewise be served upon the Associate Solicitor, Division of Mineral Resources (MS 6312), U.S. Department of the Interior, 1849 C Street, NW., Washington, D.C. 20240; and upon the Chief, Appeals Division (MS 4230), Minerals Management Service, U.S. Department of the Interior, at the same address.

                            Sincerely,

                    **/S/M Sharon Blackwell**

                    Sharon Blackwell
                    Deputy Commissioner of
                        Indian Affairs

Enclosure

Bc:  DC/IA
     Appeals (MMS-99-0056-IND)
     RMMLF
     Reading File
LMS:PMI:Appeals:MS9200:CWeathersby:ad:10/19/01:(202)208-2622
G:\Appeals\share\appsdecsn\weatherc\99-0056

                                            MMS-99-0056-IND



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

AUG 2 5 2003

IN REPLY REFER TO:

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Charles A. Breer                           Re:   Vastar Resources, Inc.
Davis, Graham & Stubbs LLP                           MMS-99-0207-IND
Suite 4700
370 Seventeenth Street
Denver, Colorado 80201-0185                          Appeal Granted

Dear Mr. Breer:

Vastar Resources, Inc., (Vastar) appealed under 30 CFR Part 290 (1999) a
Minerals Management Service (MMS) order dated September 24, 1999.  The order
directed Vastar to report and pay additional royalties for natural gas
produced from Southern Ute Tribal and allotted Indian leases for Arco Oil &
Gas Company (Arco) (Payor No. 11270) and Vastar (Payor No. 11274) for the
period January 1984 through December 1986.

## Background

On April 17, 1992, representatives of the Southern Ute Indian Tribe (Southern
Ute) and MMS met to discuss conducting major portion analyses for the Southern
Ute Tribal and allotted leases. It was recognized that MMS's Auditing and
Financial System (AFS) data did not contain the information necessary to
identify "major portion prices" in the codified manner; i.e., recognition of
Natural Gas Policy Act categories and nature of sales (arm's-length versus
non-arm's-length).  This lack of detail led MMS to refer to the prices
calculated in the study as estimated median gas values.  MMS concluded that
the oil and gas valuation regulations, found at 30 CFR 206, had long required
that the "estimated reasonable value" of production be used for the purposes
of computing royalties (Appellant's July 21, 2000 Supplemental Statement of
Reasons, Exhibit B, 2nd paragraph).

MMS's Valuation and Standards Division (VSD), Royalty Management Program
(RMP), conducted a major portion analysis study concerning gas production from
Tribal and allotted Indian leases within the Southern Ute Indian Reservation
of Colorado for the period January 1984 through December 1986 and January 1992

MMS-99-0207-IND

2

to December 1994. VSD used the same methodology as previously used for the
time period 1987 through 1991. This methodology includes using the AFS
database to calculate a major portion value for each month for all Tribal and
allotted leases on the reservation. The estimated values are based on the
gross price (inclusive of transportation costs) paid for residue and
unprocessed gas sales from all Tribal and allotted leases (Id., Exhibit F).

On November 19, 1996, VSD notified Arco of potential royalty underpayments
because royalties were not paid at a value equal to the highest price paid for
the major portion of like-quality gas in the same field under the terms of the
Southern Ute Indian lease.

In a response letter dated February 25, 1997, Arco states that no additional
royalties are due for the following reasons:

1.  Neither Vastar nor Arco has any record of any royalty payments made to MMS
    on Lease No. 519-000033-0 for the period 1984 through 1986.

2.  The major portion price calculated by MMS exceeds the maximum lawful price
    received on Lease 614-002792-0.

3.  The time period involved in this request falls outside the 6-year statute
    of limitations.

In its September 24, 1999, order, MMS agreed with Arco on points 1 and 2. MMS
did not agree with Arco on any other point. Therefore, MMS ordered Arco to
report and pay the additional royalties that are the subject of this appeal.

<u>Issue</u>

Whether MMS performed a legally sufficient major portion analysis.

<u>Analysis</u>

The regulations at 30 CFR 206.103 (1986) require that MMS calculate major
portion prices using "like quality" lease products, i.e., products that have
similar chemical, physical, and legal characteristics. In <u>Shoshone Indian
Tribe v. Hodel</u>, CV No. C81-131K (D. Wyo. 1988), the District Court found that:

> [I]t has been the long-standing practice of the Minerals
> Management Service and its predecessor agency to interpret
> "like-quality" as including both physical and legal

3

> characteristics of the gas. * * * [o]nly gas of the same
> price vintage or category is compared to insure that the
> gas has like legal characteristics. * * * It would be
> unreasonable to disregard price vintages and categories in
> conducting a major-portion price analysis. [See pp. 4-5.]

Thus, MMS is obligated to consider NGPA price categories in performing major
portion analyses and distinguish (and exclude) gas having different legal
characteristics, e.g., gas that was subject to NGPA price regulation.

The record shows that the AFS data MMS used in its calculations does not
identify or distinguish gas subject to NGPA price regulation. Since the data
MMS used to calculate major portion prices did not identify those price
categories, the subject major portion calculations cannot be sustained.

Vastar has offered a number of other arguments in support of its appeal.
However, since I have already decided this appeal in favor of Vastar based on
the above-referenced issue, those arguments need not, and will not, be
addressed herein.

Conclusions and Order

For the reasons stated above, the appeal is granted. However, this decision
is rendered without prejudice to the right of MMS to recalculate the major
portion price correctly if other MMS databases with the necessary information
can be merged with other available data to meet the regulatory requirements
that MMS has established. See Phillips Petroleum Co., 152 IBLA 109, 117
(March 31, 2000).[a]

You may appeal this decision to the Interior Board of Land Appeals pursuant to
30 CFR Part 290 (2002) and 43 CFR 4.411 and 4.413 (2002). Please find
enclosed a copy of 43 CFR 4.411 and 4.413 for your reference. If you choose
to appeal this decision, you must file your notice of such appeal and any
statement of reasons, written arguments, or briefs within 30 days after the
date of service of the decision at the following address: U.S. Department of
the Interior, Bureau of Indian Affairs, Attention: Director (MS 4140), 1849 C
Street, NW., Washington, D.C. 20240. You also must file copies of the notice
of appeal and any statement of reasons, written arguments, or briefs with the
U.S. Department of the Interior, Associate Solicitor, Division of Mineral
Resources (MS 6312), 1849 C Street, NW., Washington, D.C. 20240, and with the

a)GFS(O&G) 14(2000)

4

U.S. Department of the Interior, Chief, Appeals Division (MS 4230), 1849 C
Street, NW., Washington, D.C. 20240.

Sincerely,

**/sgd/ Terrance L. Virden**

Director, Bureau of Indian Affairs

Enclosure

bc:  DC/IA
     Appeals (MMS-99-0207-IND)
     MRM
     RMMLF
     Reading File
     R. Compton
LMS:PMI:Appeals:MS9300:CWeathersby:ad:06/25/03:(202)208-2622
G:\Appeals\shared\appdecsn\weathersby\99-0207.doc

# U.S. DEPARTMENT OF THE INTERIOR
## GEOLOGICAL SURVEY
## CONSERVATION DIVISION MANUAL

## TABLE OF CONTENTS

TAB                     CONTENTS

A          CHECK LIST OF CURRENT CHAPTERS

B          PART 645-CONTRACTUAL AGREEMENTS & OBLIGATIONS
               -CHAPTER 7: TERMINATION OF LEASES (INCLUDES
                   INTERIM GUIDELINES)
               -CHAPTER 11: BONDS

C          PART 646-DEFAULT-RELIEF FROM REQUIREMENTS
               -CHAPTER 1: REDUCTION OF ROYALTY
               -CHAPTER 3: SUSPENSION OF OPERATIONS &
                   PRODUCTIONS

D          PART 647-ACCOUNTING
               -CHAPTER 2: PRODUCT VALUES: NATURAL GAS
               -CHAPTER 4-B: PRODUCT VALUE: TAKE-OR-PAY GAS

E          PART 647-ACCOUNTING
               -CHAPTER 5: TRANSPORTATION ALLOWANCES-PIPELINE
                   GENERAL
               -CHAPTER 6: TRANSPORTATION ALLOWANCES-
                   TRUCKING
               -CHAPTER 7: MANUFACTURING OR PROCESSING
                   ALLOWANCES

F          PART 647-ACCOUNTING
               -CHAPTER 11: MININUM ROYALTY

G          PART 647-ACCOUNTING
               -CHAPTER 15: ROYALTY ACCOUNTING PROCEDURES FOR
                   INDIAN LEASE ACCOUNTS

30020420.T01

No.1:01CV00393 (RBW)

Department of the Interior
GEOLOGICAL SURVEY
CONSERVATION DIVISION MANUAL

Onshore Oil and Gas Program Series                    Part 647 - Accounting

Chapter 2 - Product Values: Natural Gas                    647.2.3A

.3  Guidelines and Policy.

A.  General

In accordance with the regulations and the terms of the various
oil and gas leases issued pursuant to the Mineral Leasing Act of
1920 (30 U.S.C. 181-287), the Mineral Leasing Act for Acquired
Lands (30 U.S.C. 351-359), the implied authority of the Executive
Branch as defined in the Attorney General's Opinion of April 2,
1941, the Allotted Land Leasing Act of March 3, 1909 (25 U.S.C.
396), and the Unallotted Indian Leasing Act of May 11, 1938 (25
U.S.C. 396a), the Area Oil and Gas Supervisor (Supervisor) has the
authority to establish royalty values for gas produced from or for
the benefit of Federal and Indian (except Osage) leases.  This
royalty value is to be based on the value of marketable production
at the time of sale or other disposition at the wellhead, lease,
unit participating area or communitized area boundary, or other
location acceptable to the Supervisor, and not solely on the price
provisions of a long-term contract at which the lessee sells his
production.

The lessee is obligated to place lease production in marketable
condition without deduction of costs for measuring, compressing,
or otherwise conditioning the gas for market.  Under no circum-
stances will royalty be computed on less than the gross proceeds
accruing to the lessee from the sale of leasehold production.

The value of natural gas is based on the combined value of both
the residue gas and extractable liquid hydrocarbon portions.
Since activities beyond the point of sale, i.e., usually the lease
meter, are generally not under the jurisdiction of the Geological
Survey, the general policy of the Geological Survey is that,
effective June 1, 1977, royalty values will be based on the higher
of:

(1)  The volume, Btu content and value of the gas at the lease in
     accordance with the guidelines contained in this chapter; or

(2)  The gross proceeds accruing to the lessee from the sale or
     other disposition of the gas; or

(3)  13 cents per Mcf at 60°F. and 14.73 psia, subject to Btu and
     other appropriate adjustments described in this chapter.

Department of the Interior
GEOLOGICAL SURVEY
CONSERVATION DIVISION MANUAL

Onshore Oil and Gas Program Series                    Part 647 - Accounting

Chapter 2 - Product Values; Natural Gas                      647.2.3A

Where production prior to June 1, 1977, had been improperly valued
for royalty purposes, any retroactive adjustment of such royalty
values shall be made based on the guidelines which were effective
for such period, e.g., net realization, highest price paid for a
majority of production, etc., as appropriate. In other words,
based on the principle that corrected interpretations are to be
applied prospectively from the date of Notice, the guidelines
contained in NTL-5 are not applicable to production prior to June
1, 1977.

B.  Definitions

(1) Dry or residue gas - Hydrocarbon gas that either contains
minor amounts of liquefiable hydrocarbons in volumes too
small to be processed economically, or gas that has been
processed for the extraction of liquefiable hydrocarbons.
Residue gas refers to the condition of gas at the tailgate of
a gas processing plant, and the terms dry and wet gas refer
to the condition of the gas at the wellhead. For purposes of
this chapter, gas which contains 1050 Btu's or less at 14.73
psia and $60^\circ$F. may be considered as dry gas.

(2) Marketable condition - Gas of sufficient pressure and
quality to enter the marketing facilities for the field or
area.

(3) Field or Area - That geographic subdivision which can be
considered as representing a common source of production or
marketing facilities. A marketing area may include part of a
State or more than one State.

(4) Highest price paid for a majority of like quality production
- That price at which more than 50 percent of the current
production from the field or area is sold. When production
and sales are diversified, this value will be established as
the weighted average value obtained by taking a summation of
percentages, in descending price order, that totals more
than 50 percent of the total production from the field or
area. When used, this price establishes a minimum value for
royalty purposes.

(5) Arm's-length - A transaction between independent parties of
adverse economic interest, not involving considerations
other than the sale of the product; non-affiliated entities.

COPY

*Cooperative Agreement between The Minerals Management Service and The Jicarilla Apache Tribe, beginning January 1, 1999*

April

## *TABLE OF CONTENTS*

*PREAMBLE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 1 of 53*

*SECTION A*

    *COOPERATIVE AGREEMENT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 2 of 53*
    *A.1.*   *Cooperative Agreement with the Tribe* . . . . . . . . . . . . . . . . . . . . . *Page 2 of 53*
    *A.2.*   *MMS Authorities and Responsibilities* . . . . . . . . . . . . . . . . . . . . . . . *Page 2 of 53*
    *A.3.*   *Reports to Congress and Other Interested Parties* . . . . . . . . . . . . . *Page 3 of 53*

*SECTION B*

    *SUPPLIES/SERVICES AND PRICES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 4 of 53*

*SECTION C*

    *STATEMENT OF WORK* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 5 of 53*
    *C.1.*   *Overview* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 5 of 53*
    *C.2.*   *Legacy Issues* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 5 of 53*
    *C.4.*   *Planning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 6 of 53*
    *C.5.*   *Auditing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 7 of 53*
    *C.6.*   *Enforcement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 8 of 53*
    *C.7.*  *Appeals* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 9 of 53*
    *C.8.*  *Involvement Statement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 9 of 53*

*SECTION D*

    *PACKAGING AND MARKING* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 10 of 53*

*SECTION E*

    *INSPECTION AND ACCEPTANCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 11 of 53*

*SECTION F*

    *DELIVERIES OR PERFORMANCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 12 of 53*
    *F.1.* *Period of Performance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 12 of 53*
    *F.2.* *Place of Delivery: Destination* . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 12 of 53*
    *F.3.* *Deliverable Items* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Page 12 of 53*

F.4.  _Termination of Cooperative Agreement_  ...................... _Page 13 of 53_
F.5.  _Suspension of Agreement_ ................................. _Page 13 of 53_

## SECTION G

_COOPERATIVE AGREEMENT ADMINISTRATION_ ................. _Page 15 of 53_
G.1.  _Cooperative Agreement Administration_  ..................... _Page 15 of 53_
G.2.  _Consideration_ ........................................ _Page 15 of 53_
G.3.  _Availability of Funds for Each Performance Year_ .............. _Page 15 of 53_
G.4.  _Payment of Reimbursable Costs_ ........................... _Page 16 of 53_
G.5.  _Payment Policy_ ....................................... _Page 16 of 53_
G.6.  _Advance Cost Understandings_ ............................ _Page 17 of 53_
G.7.   _Payments_ ........................................... _Page 18 of 53_
G.8.  _Release of Claims_ ..................................... _Page 19 of 53_

## SECTION H

_SPECIAL PROVISIONS_ .................................... _Page 20 of 53_
H.1.  _Assurances_ .......................................... _Page 20 of 53_
H.2.  _Notice to the Government of Delays_ ........................ _Page 21 of 53_
H.3.  _Third Party Liability_ ................................... _Page 22 of 53_
H.4.  _Single Audit Act of 1984 (Public Law 98-502)_ ................ _Page 22 of 53_
H.5.   _Key Personnel_ ....................................... _Page 22 of 53_
H.6.  _Order of Precedence_ ................................... _Page 22 of 53_
H.7.  _Resolving Disagreements_ ................................ _Page 23 of 53_

## Section I

_ASSURANCES AND GENERAL PROVISIONS_ ................... _Page 24 of 53_
_ASSURANCES_ ........................................... _Page 24 of 53_
_INDEX OF GENERAL PROVISIONS_ .......................... _Page 26 of 53_
_GENERAL PROVISIONS_ ................................... _Page 27 of 53_
_NOTICE_

_CONTRACTING WITH SMALL AND MINORITY FIRMS, WOMEN'S
BUSINESS ENTERPRISES_ ............................... _Page 53 of 53_

## PREAMBLE

WHEREAS, the Secretary of the Interior is required pursuant to Section 101 of Federal Oil and Gas Royalty Management Act of 1982 (hereinafter "FOGRMA") as amended, to establish a comprehensive inspection, collection and fiscal and production accounting and auditing system to accurately determine oil and gas royalties, interest, and other payments owed and to collect and account for such amounts in a timely manner; and

WHEREAS, the Secretary of the Interior is authorized pursuant to Section 202 of the FOGRMA to enter into cooperative agreements with States and tribes; and,

WHEREAS, the Jicarilla Apache Tribe, a federally recognized sovereign Indian Tribe, (hereinafter the "Tribe"), has requested to enter into a cooperative agreement for royalty management and activities under the Act; and,

WHEREAS, the Secretary finds that:

1. The Tribe will provide adequate resources to achieve the purpose of the Act as detailed herein;

2. The Tribe has demonstrated that it will effectively and faithfully administer the statutes, lease terms, rules and regulations in accordance with the Act; and,

3. The agreement will not create an unreasonable burden on any lessee; and,

WHEREAS, the Secretary has promulgated regulations which are designed to avoid duplication of effort, which are designed to provide reasonable assurance that uniform and effective royalty management system will prevail consistent with applicable lease terms and the Secretary's statutory and trust responsibilities to the Tribe as a matter of federal law including relevant judicial decisions, and which insure that the Secretary will be able to monitor the performance of the States and tribes;

NOW, THEREFORE, the Secretary does hereby enter into this agreement with the Tribe. The Tribe has full authority and responsibility for carrying out the functions not reserved to the Secretary in this Agreement, subject to general periodic review by the Secretary.

SECTION A

COOPERATIVE AGREEMENT

A.1.    Cooperative Agreement with the Tribe

In accordance with Section 202 of FOGRMA, the Secretary of the Interior has authorized
the Minerals Management Service (hereinafter "MMS") to enter into a cooperative agreement
with the Tribe whereby the MMS and the Tribe will jointly plan and execute the annual audit
strategy. The MMS will execute the audit plan and take such enforcement actions as may be
appropriate and the Tribe will coordinate the settlement strategy including accounting reviews.
These actions will be related to oil and gas royalty payments made to the MMS, Bureau of Indian
Affairs (hereinafter the "BIA"), and the Tribe, which are attributable to leases on Indian lands
under the jurisdiction of the Tribe. The term for this Cooperative Agreement (Agreement) is
three (3) years, and may be extended for an additional three (3) years at the option of either party.
Nothing in this Agreement will serve to abrogate the rights of either party under FOGRMA, or
other applicable law.

A.2.    MMS Authorities and Responsibilities

a. The following authorities and responsibilities are specifically reserved to DOI:

1. The establishment and maintenance of any payment bonds or other form of
surety which may be required during the resolution process.

2. Enforcement actions to collect royalties, rentals, minimum royalties, civil
penalties and interest charges related to audit, inspection, and investigation
findings.

3. Administration of appeals including all actions by the Department of the
Interior (hereinafter "DOI") related to administrative and judicial litigation. In
developing the Department's litigation strategy with respect to administrative and
judicial litigation, the Secretary agrees, however, to fully consult and work
cooperatively with the Tribe to assure appropriate Tribal input in the
administration (including substantive positions and strategy) of all such appeals.

    4. Issuance of subpoenas or other types of enforcement actions as authorized by FOGRMA.

    5. Issuance of company closure letters and consolidated audit reports.

b. Notwithstanding the provisions of A.2.a., nothing in this Agreement is intended to preclude the Tribe from instituting legal or administrative action it might otherwise be able to commence in the absence of this Agreement.

A.3.   Reports to Congress and Other Interested Parties

MMS agrees that the Tribe will be notified of any reports prepared by MMS in compliance with statutory or regulatory requirements issued to Congress or other interested parties outside of MMS concerning the status of audit activities conducted by the MMS and the Tribe. Copies of all such reports will be provided to the Tribe by MMS for review while the report is in draft form. MMS agrees to work cooperatively with the Tribe to incorporate the Tribe's views or comments into final reports. In addition, the Tribe may append its comments to any such reports so that they will be included in the final version of such reports as issued or distributed.

MMS-Jicarilla Apache Tribe Cooperative Agreement                                    1999

## SECTION B

SUPPLIES/SERVICES AND PRICES
Description

| Item No. | Description | Amount |
|---|---|---|
| | The MMS will reimburse the Tribe up to 100 percent of allowable costs of Federal oil and gas leases in accordance with the Tribe's request, not to exceed the amount approved for each fiscal year of this Agreement. | |
| | Total estimated cost for performance for fiscal year 1999 | *$150,280 |
| | Total estimated cost for performance for fiscal year 2000 | * |
| | Total estimated cost for performance for fiscal year 2001 | * |

*Note: Funds will be added to the Agreement in accordance with the clause entitled, "Availability of Funds", subject to agreement on the annual work plan and budget for the Tribe. The balance of funds obligated ($37,570.00) by Modification 12 for performance through December 31, 1998, on the predecessor agreement (14-35-0002-40272) will be transferred to this agreement on January 1, 1999. The additional funds required to support the balance of the FY99 work plan and fully fund this agreement to the amount cited will be provided by modification to this agreement.

SECTION C

STATEMENT OF WORK

C.1.    Overview

Working cooperatively and in partnership, the MMS and Tribe will coordinate their efforts and resources to plan, execute and enforce an annual audit and compliance strategy for royalty payments from leases on Indian lands under the jurisdiction of the Tribe. In addition, those outstanding audit and non-audit related issues identified and mutually agreed to by both parties, not resolved under the terms of the cooperative agreement, will be handled as a separate but integral part of this new agreement (these issues will be referred to as "legacy" issues).

Under this Agreement the MMS and Tribe shall adhere to all Federal laws, Indian lease terms, applicable case law, the Code of Federal Regulations, Notices to Lessees, and other approved rules and regulations of Secretary of the Interior in the conduct of its audits and/or reviews of Indian leases. In making interpretations and guidance the Secretary shall liberally construe applicable lease terms, statues, regulations, and other applicable federal law for the maximum benefit to the Tribe, as required by federal court decisions articulating the rules of the construction of statutes passed for the benefit of Indian Tribes.

Workpapers, audit reports, and other work products will be in accordance with standards developed by the DOI for work performed under Section 202 of FOGRMA Cooperative Agreements. Workpapers, audit reports and other work products will be prepared in accordance with the MMS Audit Procedures Manual and Government Auditing Standards. In following and promulgating such standards, the Secretary shall assure that they assist the Secretary in aggressively carrying out the trust responsibility of the United States to the Tribe relative to the Tribe's oil and gas leases.

C.2.    Legacy Issues

During the first 60 days of this Agreement the Tribe and MMS representatives will identify, in specifics, those audit and non-audit related issues not resolved under the terms, provisions or period of the previous cooperative agreement delegation. A resolution strategy for the issues identified will be developed and agreed to by the Tribal representative and the COTR. A time line for each issue will be developed and appended to the 1st year audit plan. The status of legacy issues will be reviewed no less than quarterly and at the same time as the status of the annual audit plan activities should legacy issues not be resolved as originally planned, they will continue to be incorporated into subsequent annual audit plans.

C.3.    Audit Responsibilities and Activities

The MMS will provide audit staff to conduct audits, which includes requesting or demanding documents, reviewing documents, writing audit documents, and drafting issue letters and issuing

demands and orders. The MMS will conduct these in cooperation with the Tribe. The MMS will provide one audit supervisor at grade GS-13 or higher and approximately three journeymen auditors (at grade GS-11 or higher) to be devoted solely to this agreement (and principally to the resolution of the non-legacy issues). The MMS will provide office space for the Tribe located in the Dallas Compliance Division Office of MMS currently located at 8828 Stemmons Freeway, Suite 410, Dallas, Texas. The Tribe will share information, suggest audit targets (including lessees, leases, issues and samples). The Tribe will have the opportunity to edit issue letters and to issue the letters on its own stationery. The MMS will generally continue to issue orders, but the Tribe, at its option may issue orders and demands, which shall be subject to appeal to the Secretary. The principal duties and responsibilities for each party by major activity center are detailed in section C.4 through C.6.

C.4.    Planning

C.4.a.  The planning cycle for this agreement is the Federal fiscal year (FY). The workplan for audits will be scheduled on the basis of the calendar year (CY).

C.4.b.  During the period July 1st through September 30th of each calendar year the Tribe will:
- define the audit universe for the coming audit year (lessees, payors, leases).
- define the audit criteria of identifying audit candidates.
- define the audit sampling technique to be used.

During the same period the MMS will identify any legacy related and non-audit activities that should be considered for inclusion in the plan.

C.4.c.  The MMS will use the information provided by the Tribe to develop a draft workplan by October 31st that includes both the coming audit year activities and the legacy issues/non-audit activities that are to be undertaken during the coming audit year cycle (CY).

The draft workplan will include: a time line for audit and non-audit activities to be undertaken during the audit year; a resource allocation chart that outlines both the MMS staff and funds allocation to be made to support the audit strategy for the coming year; and those specific actions to be undertaken to resolve legacy issues during the same period.

For each audit proposed the workplan should identify the type of audit (e.g. company versus lease or areal), leases covered, payors and lessees and scheduled starting and completion dates for the audits. The type of work to be performed for accounting reviews (credit adjustments, recoupable balances, royalty rates, volume comparisons, allowance monitoring, calculation of major portion values, etc.) and the time period to be covered.

The draft workplan shall provide for no less than quarterly meetings between the MMS and

the Tribe to discuss that status of audit activities. More frequent telephonic contact is expected and presumed.

C.4.d.  By December 31st of each year the MMS and Tribe shall agree to the audit and non-audit activities to be undertaken during the coming CY. During the November/December period, both parties will seek and provide confirmation of approval required by their respective organization. During this time, as appropriate and required, Tribal and MMS approvals will be obtained; confirmation of such approvals will be provided to the other partner.

C.5.    Auditing

C.5.a.  The MMS will initiate audits as agreed in the approved workplan. The MMS and Tribal audit program managers will conduct monthly telephonic progress reviews and make adjustments to the workplan as needed. Changes to the workplan will be documented and a copy provided to the Administrative Contracting Officer. Minor changes to the plan that do not require significant changes or redirection of effort can be agreed to without changing the workplans.

C.5.b.  Both the MMS and Tribe will coordinate in advance the scheduling of all audit meetings with the other. No meetings will occur without the other party, if the non-scheduling party wishes to attend and is unable to do so. Both parties will make every reasonable effort to schedule and participate in meetings.

C.5.c.  MMS will issue engagement letters, scheduled entrance conferences according to the terms of the workplan. The MMS will brief JAT on results of entrance conference, it JAT does not attend.

C.5.d.  MMS will issue document requests, subpoenas, etc., after review by the Tribe.

C.5.e.  MMS auditors will review documents and will draft findings for review by JAT.

C.5.f.  Following review of draft findings by Tribe, but within sixty days of submission to JAT, the MMS will serve issue letters and orders to enforce findings after review and discussion with JAT.

        (1)     MMS will serve orders within six years of the beginning of the first month of production covered by the audit.

        (2)     MMS will review and discuss draft issue letters with JAT at least sixty days prior to the date of service of the issue letter.

        (3)     MMS will serve issue letters at least sixty days prior to the date that it serves an

order.

C.6.     Enforcement

C.6.a.   All enforcement actions shall be based upon sufficient information to justify a finding.

C.6.b   Enforcement documents will be prepared and processed as outlined below.

(1) Preliminary Issues Letters.  Determinations of additional royalties due as a result of audit activities under this Cooperative Agreement shall be formally communicated by an issue letter from the Tribe or MMS to the companies or other payors or lessees prior to any MMS enforcement action.  The company or payor shall generally be given at least thirty (30) calendar days from receipt of the issue letter to respond to MMS and the Tribe on the facts and preliminary findings set forth therein.  Issue letters shall be prepared in the format provided in the MMS Audit Manual.  Issue letters are to be issued in accordance with relevant statutes, lease terms, regulations and policies.  Issue letters shall be prepared by MMS or the Tribe on its own letterhead and transmitted to the company or payor by certified mail.  If the Tribe produces the issue letter, a copy of the issue letter shall be provided concurrently to the COTR.  Copies of the issue letter shall be distributed in accordance with the MMS Audit Manual.

(2) Orders for Payment.  After evaluating the payor's response to the preliminary issue letter or after the company fails to respond, MMS or the Tribe, depending upon which one produced the issue letter, shall draft an order for payment which shall be submitted with supporting documentation to the COTR for appropriate enforcement action in accordance with the provisions of C.7.  All draft orders for payment shall be rendered on a lease basis suitable for billing and collection by MMS.

(3) Orders for Performance.  Orders for performance are used in the auditor's judgment when the payor has been committing a systemic error in reporting and/or paying royalties.  The draft order shall be submitted, with supporting documentation, to the COTR for the appropriate enforcement action in accordance with the provisions of C.7.  All draft orders shall state the basis of the systemic error in accordance with MMS policy and the performance required by the payor to correct the error.

(4) Orders for Records.  After establishing that a company has not provided records that are essential to the performance of the audit, the Tribe shall request MMS to initiate action to issue a subpoena, or other appropriate enforcement document, for the records.  The request for action shall be submitted with supporting documentation, in accordance with the provisions of C.7. and shall be detailed as to the records required.

(5) Revisions.  MMS will discuss any substantive revisions with the Tribe prior to issuing

MMS-Jicarilla Apache Tribe Cooperative Agreement                                                    1999

any orders. Should the Tribe disagree with the revisions, it may request a written explanation supporting the revision. The MMS will provide copies of all enforcement action documents to the Tribe upon issuance to the company or payor.

C.7. <u>Appeals</u>

C.7.a.  The Tribe will take the lead in all settlements, unless it has otherwise, in writing, re-delegated the lead to the MMS.

C.7.b.  Appeals related to royalty management regulations or related to enforcement actions identified under a delegation of authority shall be submitted to the MMS for processing. The MMS shall provide the Tribe with copies of all appeals upon receipt. The Tribe shall prepare a report on the substance of the appeal.

C.7.c.  The MMS shall provide the Tribe copies of all pleadings and correspondence relating to cases under administrative or judicial appeal. To the extent possible, MMS will provide at least one week's prior notice to the Tribe of any meetings, conferences or additional audit work with the appellant companies and afford Tribal representatives the opportunity to attend said meetings or participate in the additional work.

C.8. <u>Involvement Statement</u>

Under this Agreement, the Tribe is delegated authority to conduct audits of Indian Tribal oil and gas producing properties as identified in the lease universe. The implementation, management and completion of this agreement project is the responsibility of the Tribe. The MMS agrees the Tribe is to have the authority necessary to carry out its delegated responsibilities

## SECTION D

## PACKAGING AND MARKING

D.1.  Preservation, packaging, and packing for all items to be delivered hereunder shall be in accordance with standard commercial practice and adequate to insure acceptance by common carrier and safe arrival at destination.  The Tribe shall place the Cooperative Agreement number on or adjacent to the exterior shipping label.  Unless required by this Agreement, or otherwise directed by the Contracting Officer, all reports shall be delivered by first class mail.

D.2.  All reports shall be prepared and packaged in a cost-effective manner.  Elaborate art work, expensive paper, and bindings are neither necessary nor desired.

## SECTION E

## INSPECTION AND ACCEPTANCE

E.1.  Inspection and acceptance of all items delivered under this Agreement shall occur at the destination set forth in Section G, Paragraph G.1.a.

E.2.  The inspection of all reports listed in Section F will be performed by the Contracting Officer's Technical Representative (COTR) who will assure that results conform to the general objectives and Cooperative Agreement requirements listed herein.  Recipients may assume that their reports have been accepted by the Government if they do not receive an adverse inspection report from the COTR.  If any deliverable items are rejected, the Tribe will have fifteen (15) calendar days after receipt of the rejection to submit corrections.

E.3.  Reinspections of corrected reports will be performed as stated in E.2 above.

MMS-Jicarilla Apache Tribe Cooperative Agreement                    1999

## SECTION F

## DELIVERIES OR PERFORMANCE

F.1.  Period of Performance

The period of performance for this Cooperative Agreement is three (3) years from the date of award.  Note:  Funds for performance are contingent upon appropriation by Congress.  The Cooperative Agreement may be extended by the Government for an additional three (3) years with the concurrence of both parties for a total Agreement performance time of six (6) years.

The Tribe's obligation for performance of this Agreement is contingent upon the availability of appropriated funds.

F.2.  Place of Delivery:  Destination

All items required by this Cooperative Agreement shall be delivered prepaid, F.O.B. destination, as indicated in Section G.1.b., marked to the attention of the Contracting Officer's Technical Representative.

F.3.  Deliverable Items

The following reports shall be submitted to, or by, the Government, as applicable,  in triplicate:

a. Audit reports will be submitted to the COTR in accordance with MMS guidance.

b.  The Tribe shall submit a quarterly or monthly status report and Standard Form 1034 which shall summarize delegated activities performed by the Tribe during the preceding reporting period. The status reports shall include:

(1)  A statistical summary of activities (e.g., number of settlements completed) and other actions taken in the format approved by the COTR.

(2)  A certified summary of costs incurred during the period for which the Tribe has requested reimbursement.

(3)  A cumulative total of costs incurred to date under the Agreement.

(4)  A schedule of changes the Tribe proposes to make in its approved audit plan, if applicable and explanations for those changes.

(5) Updates to the audit coordination plan as required by the COTR.
All reports shall be identified with the following information:

a. Cooperative Agreement Number;

b. Name and title of Tribal official submitting the report;

c. Title of the project; and,

d. Effective date and expiration date of the Cooperative Agreement.

## F.4. Termination of Cooperative Agreement

This agreement may be terminated at any time by mutual agreement and under any terms and conditions agreed to by the Tribe and MMS. Termination of this Cooperative Agreement shall not bar the Tribe from subsequently requesting to regain a Cooperative Agreement.

a. The Tribe may unilaterally terminate this Agreement by giving the Contracting Officer a written notice of intent to terminate one hundred and twenty (120) calendar days prior to the desired termination date.

b. The MMS may initiate termination by providing the Tribe a written notice of intent to terminate based upon noncompliance with the provisions of this Cooperative Agreement. The Tribe will be provided one hundred and twenty (120) calendar days to correct all deficiencies. If corrections have not been made to the satisfaction of the Government, the MMS may initiate formal hearing proceedings. If, subsequent to the opportunity for a hearing, the MMS determines that the Tribe has failed to substantially comply with the provisions of this Cooperative Agreement, the MMS may terminate the Agreement without penalty.

c. Disputes and Appeals of Contracting Officer decisions with respect to the administration and enforcement of this cooperative agreement will be resolved in accordance with the procedures specified in Section H, Special Provisions, Paragraph H.7, entitled "Resolving Disagreements".

## F.5. Suspension of Agreement

a. The Tribe shall have no obligation to provide service under this Agreement during any period when Federal funding is not authorized. However, in suspending its performance, the Tribe need not elect to terminate this Agreement, but rather may treat the Agreement as suspended pending the availability of funds. Costs incurred by the Tribe during the suspension period may be reimbursed pending a determination by the Contracting Officer that such costs are allocable and allowable under the essential terms of this Agreement. Nothing in this paragraph precludes the

MMS from invoking the "Suspension and Termination Procedures" clause of this Agreement.

   b.  Failure to comply with the terms and conditions of the Agreement may result in suspension and/or termination.  In such an event, the MMS may suspend the Agreement, withhold further payments, and prohibit the Recipient from incurring additional obligations of funds pending corrective action by the Recipient, or a decision to terminate in accordance with paragraph F.4 and/or the "Suspension and Termination Procedures" clause of this agreement.  The MMS shall allow all necessary and proper costs that the Tribe could not reasonably avoid during the period of suspension, provided that they meet the provisions of the applicable Federal cost principles.

MMS-Jicarilla Apache Tribe Cooperative Agreement                                    1999

## SECTION G

## COOPERATIVE AGREEMENT ADMINISTRATION

G.1.  Cooperative Agreement Administration

      a.  This Cooperative Agreement will be administered by:

        Contracting Officer - Todd Leneau
        Western Administrative Service Center
        Procurement Branch
        P.O. Box 25165, Mail Stop 2730
        Denver Federal Center
        Denver, Colorado  80225-0165
        Telephone: 303/275-7385

      b.  The designated Contracting Officer's Technical Representative (COTR) responsible for administering and participating in the technical aspects of this Agreement is:

        Chief, Office of Enforcement
        P.O. Box 25165, Mail Stop 3030
        Denver Federal Center
        Denver, Colorado  80225-0165
        Telephone:  303/231-3749

G.2.  Consideration

      Costs reimbursed hereunder shall not exceed the total annual amount obligated.  Funds not exceeding 10% of the approved annual budget amount may be moved between direct cost categories (does not include direct labor) without the prior written approval of the Contracting Officer; however, funds may not be transferred between indirect cost accounts and direct cost accounts or vice versa.  (See General Provision No. 11, REVISION OF FINANCIAL PLANS.)  Transfer of funds which exceed 10% of the approved annual budget amount require the prior written approval of the Contracting Officer.

The recipient agrees to promptly notify the Contracting Officer and the COTR, in writing, of any changes the recipient makes pursuant to this clause G.2.  (E-Mail is acceptable for this notification.)

G.3.  Availability of Funds for Each Performance Year

      Funds are presently available for FY 1999 performance under this Cooperative Agreement.

Future funding is contingent upon appropriation of funds by Congress. Additional funds, based on the negotiation of and agreement on costs associated with subsequent annual workplans, shall be added by the Contracting Officer in the form of a written modification to the Agreement when the funds are made available by Congress.

### G.4. Payment of Reimbursable Costs

a. Subject to the provisions of the clause entitled, "Allowable Costs," payment of costs reimbursable hereunder shall be made on a monthly or quarterly basis to the Tribe upon receipt in triplicate of properly completed vouchers.

b. MMS will reimburse the Tribe for approved costs incurred under this Agreement.

c. The Tribe agrees to maintain records of all costs incurred including vouchers, time sheets, and warrants, and to make these materials available for audit by any Government entity with statutory or delegated authority to perform performance or cost audits.

d. As provided in Section 206 of the Federal Oil and Gas Royalty Management Act of 1982, fifty (50) percent of any civil penalty collected as a result of activities conducted under this Cooperative Agreement will be shared with the Tribe; however, the amount of the civil penalty shared will be deducted from any Federal funding owed by the MMS under this Cooperative Agreement. The MMS will disclose records of civil penalties collected and distributed to Tribes involved in 30 U.S.C. 1735 delegations at the time such payments are made.

e. The cost of providing expert witnesses required to testify concerning an appeal or litigation resulting from an appeal is reimbursable under this Delegation. Expert witness travel costs and per diem are reimbursable in accordance with Federal travel regulations and per diem rates.

f. The costs of attending State and Tribal Royalty Auditing Committee (STRAC) quarterly meetings are directly related to the performance of this Agreement and are reimbursable provided that the meetings are not scheduled for the first 30 days of the Federal Government's fiscal year (October 1 through October 31).

### G.5. Payment Policy

a. Invoices shall be submitted in an original and three copies to the COTR within 60 days of the end of the payment period. To constitute a proper invoice, the invoice must include the following information and attached documentation:

(1) Name of the Tribe and invoice date;

(2)  Cooperative Agreement Number;

(3)  Description, price, and quantity of property and services actually delivered or rendered;

(4)  Shipping and payment terms;

(5)  Name (where applicable), title, telephone number, and complete mailing address of responsible official to whom payment is to be sent; and,

(6)  Summary schedules listing direct labor hours, hourly rates, travel costs, and training costs by employee; as well as fringe benefit rates, overhead rates, and other expenditures agreed upon by the Tribe and the Contracting Officer. Documentation is required for any change during the year of the fringe benefit or overhead rates. Copies of invoices for all equipment purchases shall be submitted and shall include description, serial number, and individual price of each equipment item.

b.  Payments under this Agreement will be made either by check or electronic funds transfer in accordance with the Section I clause entitled "Payment Requirements". The date of the check issued in payment or the date of payment by wire transfer through the Treasury Financial Communication System shall be considered to be the date payment is made.

c.  The Recipient shall furnish the information required in the Section I clause entitled "Payment Requirements" on Standard Form 3881 and forward the form to the Contracting Officer not later than seven (7) calendar days after receipt of notice of award, if not already accomplished.

G.6. <u>Advance Cost Understandings</u>

a.  Travel and Transportation

(1)  Travel and transportation expenses incurred in performance of this Agreement shall not exceed those amounts normally paid for individuals engaged by the Tribe in comparable functions, the cost of which is not reimbursable under Federal, State, or local government regulations.

(2)  The Tribe shall be reimbursed for actual transportation costs and travel allowances to employees in accordance with the Tribe's established practice for travel within the United States directly referable to the Agreement. Such transportation costs shall not be reimbursed in an amount greater than the cost of, and time required for, economy class (tourist) commercially scheduled air or ground travel by the most expeditious route, unless economy air or ground travel space is not available, and the Tribe certifies to this fact in the voucher or other documents retained as part of its Agreement records to support its claim or post-audit.

b. Salaries and Wages

(1) Compensation to personnel which is charged as a direct cost under this Agreement, like other costs, will be reimbursable in accordance with the Cooperative Agreement clause, entitled, "Allowable Costs," subject to the following additional understandings.

(2) Salaries and wages may not exceed the Tribe's established policy and practice including the established pay scale for equivalent classifications of employees whose salaries are financed from non-Federal sources, which will be certified by the Tribe, nor may any individual salary or wage exceed the employee's annual rate of compensation for similar functions performed immediately prior to employment hereunder. Merit or promotion increases of employees performing hereunder may not exceed those provided by the Tribe's established policy and practice.

(3) Salaries and wages paid while in travel status will not be reimbursed for a period greater than the time required for travel by the most cost effective means.

c. Fringe Benefits

Fringe benefits shall be allowed in accordance with the Tribe's established fiscal system.

d. Overhead Rates

Overhead rates shall be allowed in accordance with the Tribe's established audited fiscal system.

e. Equipment

All equipment purchases must be pre-approved by the COTR.

G.7.    Payments

a. Payments will be made by the finance office within 10 business days of receipt by the finance office of a properly certified invoice. For the purposes of this clause, payment shall be deemed to have been made when the check is mailed or when the payment is sent by electronic funds transfer (See Paragraph G.5, Payment Policy.)

b. Notwithstanding the terms of the General Provision Clause No. 3 entitled "Payment Requirements", invoices may be submitted using SF-1034.

c. Notwithstanding the terms of the General Provision Clause No. 3 entitled "Payment

Requirements", advance payments will <u>NOT</u> be authorized.

d. Recipients are advised that in accordance with subparagraph (f) of Clause No. 3 of the general provisions entitled "Payment Requirements," the Government is authorized to withhold payments when the recipient is not in compliance with the Status Reports paragraph of this agreement or any other project objectives or award conditions.

G.8.  <u>Release of Claims</u>

After completion of work, and prior to final payment, the Tribe shall furnish to the Contracting Officer a release of claims against the United States relating to this Cooperative Agreement, other than claims specifically excepted from the operation of the release.  Such release shall be submitted on Department of Interior Form DI-137, "Release of Claims."  Copies of the required form may be obtained from the Contracting Officer.

MMS-Jicarilla Apache Tribe Cooperative Agreement                                    1999

## SECTION H

## SPECIAL PROVISIONS

H.1. Assurances

The Tribe hereby assures and certifies that it will comply with applicable Federal regulations, policies, guidelines, and OMB Circulars as they relate to the application, acceptance and use of Federal funds for this Federally assisted project. The Tribe further assures and certifies that:

a. It possesses legal authority to request renewal for a Cooperative Agreement.

b. The Tribe will coordinate audit activities with the MMS.

c. Under this Cooperative Agreement, the Tribe shall adhere to all applicable Federal laws, Indian lease terms, the Code of Federal Regulations, Notices to Lessees, and approved rules and regulations of the Secretary of the Interior in the conduct of its audits of Indian leases under the jurisdiction of the Tribe.

d. It will comply, as applicable, with Title VI of the Civil Rights Act of 1964 (Public Law 88-352) and section 604 of the Outer Continental Shelf Lands Act Amendments of 1978, as amended. As applicable, it will immediately take any measures necessary to assure that no person, on the grounds of race, creed, color, national origin, age, or sex will be excluded from employment, participation in, be denied the benefit of, or be otherwise subjected to discrimination under any program or activity for which the Tribe receives Federal financial assistance.

e. It will comply with Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C 794), which prohibits discrimination on the basis of handicaps.

f. It will establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have family, business, or other ties.

g. It will insure that the facilities under its ownership, lease, or supervision which shall be utilized in the accomplishment of the project are not listed on the Environmental Protection Agency's (EPA) list of Violating Facilities and that it will notify the MMS of the receipt of any EPA communication indicating that a facility to be used in the project is under consideration for listing by the EPA.

h. The Tribe will be bound by the provisions of Section 203(b) and (c) of the Federal Oil and Gas Royalty Management Act of 1982.

i.  It will treat all reports delivered under this Agreement as the property of the Federal Government for which the Federal Government shall have unlimited rights to use, dispose of, or disclose such data contained therein as it determines to be in the public interest and consistent with the Federal Government's trust responsibility.  Should the Government decide to publish, reproduce, or use the technical data developed as a result of this Agreement, the item will carry the following notation:  "Information developed by the Jicarilla Apache Indian Tribe or its subcontractors."

j.  It shall maintain in a separate record or file maintenance system and in a safe and secure manner all records, work papers, documents, information, reports, and correspondence gained or developed as a consequence of audit or investigative activities conducted under the delegation.  All such records shall be made available for monitoring, review, and inspection upon request by the Comptroller General of the United States, and representatives of the Secretary of the Interior during and upon completion of the audit and at the locations where the records are created or maintained until such time as the provisions of subparagraph k are implemented.  Nothing in this assurance shall preclude the transfer or transmittal of such records to a duly recognized official in the event they are needed in support of administrative or judicial litigation.  Any review or inspection shall occur only at a mutually agreeable date and time so that interference with the Tribe's audit activities is minimized as much as possible.

k.  It will maintain all records for a 6-year period measured from the end of the calendar year in which the records were created.  All dispositions of records shall be with the written approval of the MMS.  Upon termination of a Cooperative Agreement, the Tribe shall, within ninety (90) working days from the date of termination, assemble all records, complete all working paper files in accordance with 30 CFR Part 229.124, and transfer such records to a place and location determined by the MMS.  All costs directly associated with the requirements of this provision are reimbursable under the terms of this Agreement.

l.  It will maintain complete cost records for the agreement period in accordance with generally accepted accounting principles.  Such records shall be in sufficient detail to clearly demonstrate the total actual costs associated with the project and to permit a determination by MMS whether delegation funds were used for their intended purposes.  All such records shall be made available at the location where the records are maintained during normal business hours for review and inspection upon request by the Comptroller General, representatives of the Secretary, and the Office of Inspector General.  Any review or inspection shall occur only at a mutually agreeable date and time so that interference with the Tribe's audit activities is minimized as much as possible.

H.2.  Notice to the Government of Delays

In the event the Tribe encounters difficulty in meeting performance requirements, or when it anticipates difficulty in complying with the Agreement delivery schedule or date, or whenever the Tribe has knowledge that any actual or potential situation is delaying or threatens to delay the timely

performance of this Agreement, the Tribe shall immediately notify the Contracting Officer and the Contracting Officer's Technical Representative. The Tribe will confirm oral communication with a written report.

H.3.  Third Party Liability

Liability of the United States Government for acts of its employees is governed by the Federal Tort Claims act and certain other Federal statutes.

H.4.  Single Audit Act of 1984 (Public Law 98-502)

Examination of Tribal activities under this Agreement shall be conducted in accordance with the Single Audit Act of 1984, which requires an annual fiscal audit to determine that costs incurred by the Tribe are allocable, allowable, and eligible for reimbursement by MMS. A periodic management review to determine that activities performed by the Tribe under this agreement meet the standards established by the DOI and the provisions of 30 U.S.C. 1735 may be performed by the DOI.

Recipient agrees to provide the Contracting Officer with one copy of the audit report issued as a result of the audit conducted in accordance with the Single Audit Act of 1984.

H.5.  Key Personnel

a.  The individual(s) identified in this Cooperative Agreement as Key Personnel are considered to be essential to the work being performed hereunder. If the Tribe anticipates changing any key personnel, the recipient shall notify the Contracting Officer reasonably in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the program. No diversion shall be made by the recipient without the written consent of the Contracting Officer.

b.  The Key Personnel for performance of this Cooperative Agreement are as follows:

| Name of Individual | Title/Position |
| --- | --- |
| David Wong | Principal Investigator |

H.6.  Order of Precedence

In the event there are any inconsistencies between the provisions of Sections A through H (The Schedule) and Section I (General Provisions), the provisions of the Schedule shall be controlling.

H.7. Resolving Disagreements

When entering into a cooperative agreement with a recipient, the Minerals Management Service (MMS) commits itself to working with the recipient in a harmonious manner to achieve the objectives of the project successfully. When disagreements arise between the parties, they shall be resolved according to the procedures discussed below:

    a. MMS shall attempt first to resolve disagreements with the recipient through informal discussion among the Contracting Officer, the Contracting Officer's Technical Representative (COTR), and the recipient's Principal Investigator (PI).

    b. If the disagreement cannot be resolved through informal discussion between these parties, the Contracting Officer and the COTR shall document the nature of the disagreement and bring it to the attention of the Chief, Procurement Branch, MMS, Western Administrative Service Center, Lakewood, CO 80225-0165.

    c. After reviewing the facts of the disagreement, as presented by the parties, the Chief, Procurement Branch will arrange a formal meeting. If agreement still cannot be reached, the parties will collectively decide on any varied approaches which might be used to resolve the disagreement. At this time, the parties shall be responsible for their individual expenses related to any approach utilized to resolve the disagreement and these expenses shall not be reimbursable under the terms of the cooperative agreement.

    d. Ultimately, if all other attempts at resolving the disagreement fails, a decision will be made by the Manager, Western Administrative Service Center, Minerals Management Service, Lakewood, CO 80225-0165, whose decision shall be final and conclusive.

Any post award issue will be open for resolution in accordance with the above procedures, with the exception of disagreements regarding continuation of the agreement (which shall be governed by the terms of General Provision No. 13, and/or Paragraph F.4 of this agreement), or other matters specifically addressed by the agreement itself.

## Section I

## ASSURANCES AND GENERAL PROVISIONS

### ASSURANCES

The Recipient hereby assures and certifies that it will comply with applicable Federal regulations, policies, guidelines, and OMB Circulars as they relate to the application, acceptance, and use of Federal funds for this Federally assisted project. The Recipient further assures and certifies that:

a. It possesses legal authority to apply for the Cooperative Agreement; that a resolution, motion or similar action has been duly adopted or passed as an official act of its governing body, authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing its official representative to act in connection with the application and to provide such additional information as may be required.

b. It will comply, as applicable, with Title VI of the Civil Rights Act of 1964 (Public Law 88-352) and Section 604 of the Outer Continental Shelf Lands Act Amendments of 1978, as amended. As applicable, it will immediately take any measures necessary to assure that no person, on the grounds of race, creed, color, national origin, or sex will be excluded from employment, participation in, be denied the benefit of, or be otherwise subjected to discrimination under any program or activity for which the Recipient receives Federal financial assistance.

c. It will comply, as applicable, with Title VI of the Civil Rights Act of 1964 (42 USC 2000d) prohibiting employment discrimination where (1) the primary purpose of a grant is to provide employment or (2) discriminatory employment practices will result in unequal treatment of persons who are or should be benefiting from the grant-aided activity.

d. It will comply with requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (P.L. 91-646) which provides for fair and equitable treatment of persons displaced as a result of Federal and Federally assisted programs.

e. It will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act, as they apply to hospital and educational institution employees of state and local governments.

f. It will establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have family, business, or other ties.

g. It will give the sponsoring agency or the Comptroller General through any authorized

Page 24 of 53

MMS-Jicarilla Apache Tribe Cooperative Agreement                                    1999

representative the access to and the rights to examine all records, books, papers, or documents related to the grant at all reasonable times.


h. It will comply with all requirements imposed by the Federal sponsoring agency concerning special requirements of law, program requirements, and other administrative requirements.

i. It will insure that the facilities under its ownership, lease, or supervision which shall be utilized in the accomplishment of the project are not listed on the Environmental Protection Agency's (EPA) list of Violating Facilities and that it will notify the MMS of the receipt of any EPA communication indicating that a facility to be used in the project is under consideration for listing by the EPA.

j. It will comply with the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.) as amended by the Civil Rights Restoration Act of 1988 (Public Law 100-259) and the general age discrimination regulations at 45 CFR Part 90, as implemented by Subpart C to 43 CFR Part 17 entitled "Nondiscrimination on the Basis of Age".

MMS-Jicarilla Apache Tribe Cooperative Agreement                    1999

## INDEX OF GENERAL PROVISIONS

Clause Title                                                        Page

1. Definitions ........................................................ 27

2. Allowable Costs ................................................... 28

3. Payment Requirements ............................................. 29

4. Cash Depositories ................................................. 31

5. Retention and Custodial Requirements for Records ................. 31

6. Program Income ................................................... 32

7. Cost Sharing and Matching ........................................ 33

8. Standards for Financial Management Systems ....................... 36

9. Financial Reporting Requirements ................................. 37

10. Monitoring and Reporting Program Performance .................... 39

11. Revisions of Financial Plans .................................... 41

12. Closeout Procedure .............................................. 42

13. Suspension and Termination Procedures .......................... 43

14. Property Management Standards ................................... 44

15. Procurement Standards ........................................... 49

16. Audit Requirements .............................................. 52

## GENERAL PROVISIONS

1.      DEFINITIONS. Throughout the assistance agreement, the following terms, in so far as they are used, shall have the meanings set forth below:

a. The term "Head of the Agency" or "Secretary" means the Secretary or any Assistant Secretary of the United States Department of the Interior; and the term "duly authorized representatives" means any person or persons or authorized to act for the head of the Agency or the Secretary.

b. The term "Department" means the United States Department of the Interior (USDI).

c. The terms "Bureau" or "Service" means the Minerals Management Service (MMS).

d. The term "Contracting Officer" or "CO" means any person authorized to execute the agreement on behalf of the MMS.

e. The term "Project Officer" means the Contracting Officer's authorized representative responsible for the technical administration of the agreement, the evaluation of performance under the agreement, the acceptance of technical administration of the agreement, the acceptance of technical reports, and for such other specific responsibilities as may be stipulated in various provisions of the agreement.

f. The term "Recipient" may include any of the following:

   (1)  States, local governments and Indian tribes, as further described in OMB Circular A-102;

   (2)  Nonprofit organizations including public and private institutions of higher education, public and private Hospitals and other quasi public and private nonprofit organizations as further described in OMB Circular A-110;

   (3)  Commercial organizations which are not otherwise included among those identified in OMB Circular A-102 or A-110; international organizations; and businesses organized for profit.

g. The term "Cooperative Agreement" means the legal instrument between the MMS and the recipient which provides for the transfer of Federal resources to the recipient to accomplish a public purpose activity for which substantial involvement between the parties is anticipated during performance. References to "agreement" have the same meaning as "cooperative agreement".

h. OMB means Office of Management and Budget.

i. FAR means Federal Acquisition Regulation.

MMS-Jicarilla Apache Tribe Cooperative Agreement                              1999

2.    ALLOWABLE COSTS.  (This clause is applicable to all assistance agreements involving the transfer of Federal Funds.)

a.  Payments up to the amount specified in the assistance agreement shall be made only for costs determined by the CO to be allowable, allocable and reasonable in conducting the work under the agreement in accordance with its terms and with the following cost principles:

(1)  OMB Circular A-21 is applicable to institutions of higher education.

(2)  OMB Circular A-87 is applicable to states and local governments and federally recognized Indian tribal governments.

(3)  OMB Circular A-122 is applicable to other non-profit organizations.

(4)  FAR 31.2 is applicable to all other recipients.

b.  Expenditures requiring prior written approval from the Contracting Officer are set forth below:

(1)  Purchase or rental of any item of general purpose equipment having a unit cost of $300 or more; and all items of office equipment regardless of cost, if not itemized in the approved budget.

(2)  Purchase or rental of any item of special purpose equipment having a unit cost of $1,000 or more if not itemized in the approved budget.

(3)  Insurance on Federal government-owned equipment unless required or approved and maintained under the terms of the agreement.

(4)  Personnel movement of a mass nature not itemized in the approved budget.

(5)  Foreign travel (each separate trip).

(6)  Domestic travel when not included in the approved budget and when the cumulative travel expenditures will exceed the approved travel budget by $500 or 25 percent, whichever is greater.

(7)  Expenditures for consultant services not itemized in the approved budget.

(8)  Subcontracts not itemized in the approved budget.

(9)  Expenditures for the purchase or lease of any interest in real property.

(10)  The Recipient shall not incur costs or obligate funds for any purposes pertaining to this

agreement beyond the expiration date stipulated. The only costs which are authorized for a period of up to 90 days following the agreement expiration date are those strictly associated with Agreement closing activities.

(11) Any extension of the Agreement period can only be authorized by the Contracting Officer. The MMS has no obligation to provide any additional prospective funding. Any renewal of the

Agreement to increase funding and to extend the period of performance is at the sole discretion of the MMS.

c. The MMS may provide in advance for scheduled apparent allowable costs to be incurred or will reimburse apparent allowable costs accrued by the recipient up to the maximum amount of the Federal assistance payable for the period of performance. However, such provision of any cost pursuant to the clause shall not constitute a final determination by MMS of the allowability of such cost and shall not constitute a waiver of any violation of the terms of the assistance agreement committed by the recipient. MMS shall make a final determination as to allowability only after final audit is completed, if required, or at the time of final payment.

3.    PAYMENT REQUIREMENTS

a. Payments can be made to recipients through an advance or reimbursement by Treasury check or by electronic fund transfer (see below for information relating to electronic funds transfer.)

b. The method of advancing funds by Treasury check shall be used in accordance with the provisions of Treasury Circular No. 1075 if:

(1) The recipient has established or demonstrated to MMS the willingness and ability to maintain procedures that will minimize the time elapsing between the transfer of funds and their disbursement by the recipient; and

(2) The recipient's financial management system meet the prescribed standards for fund control and accountability.

(3) Advances shall be limited to the minimum amounts necessary to met immediate disbursement needs. Advanced funds not disbursed in a timely manner will be promptly returned to the MMS. Advances shall be approved for periods not to exceed 60 days. The Contracting Officer shall determine the appropriate method of payment. If a Recipient demonstrates an unwillingness or inability to establish procedure which will minimize the time elapsing between the transfer of funds and disbursement, the Contracting Officer may change the method of payment to reimbursement only.

c. Unless otherwise specified, the method of payment for the Agreement shall be as follows:

The recipient shall submit a "Request for Advance or Reimbursement" (SF-270) no more frequently than quarterly to request payment. The SF-270 shall be submitted in triplicate (an original and two copies) to the Contracting Officer.

d. ELECTRONIC FUNDS TRANSFER PAYMENT METHODS

Payments under this agreement will be made by the Government either by check or electronic funds transfer (through the Treasury Fedline Payment System (FEDLINE) or the Automated Clearing House (ACH), at the option of the Government. After award, but no later than 14 days before an invoice or financing request is submitted, the Recipient shall designate a financial institution for receipt of electronic funds transfer payments, and shall submit this designation to the Contracting Officer or other Government official, as directed.

(1) For payment through FEDLINE, the Recipient shall provide the following information:

(a) Name, address, and telegraphic abbreviation of the financial institution receiving payment.

(b) The American Bankers Association 9-digit identifying number for wire transfers of the financial institution receiving payment if the institution has access to the Federal Reserve Communications System.

(c) Payee's account number at the financial institution where funds are to be transferred.

(d) If the financial institution does not have access to the Federal Reserve Communications System, name, address, and telegraphic abbreviation of the correspondent financial institution through which the financial institution receiving payment obtains wire transfer activity. Provide the telegraphic abbreviation and American Bankers Association identifying number for the correspondent institution.

(2) For payment through ACH, the Recipient shall provide the following information:

(a) Routing transit number of the financial institution receiving payment (same as American Bankers association identifying number used for FEDLINE).

(b) Number of account to which funds are to be deposited.

(c) Type of depositor account ("C" for checking, "S" for savings).

(d) If the Recipient is a new enrollee to the ACH system, a "Payment Information Form," SF 3881, must be completed before payment can be processed.

(3) In the event the Recipient, during the period of this agreement, elects to designate a different financial institution for the receipt of any payment made using electronic funds transfer procedures, notification of such change and the required information specified above must be received by the appropriate government official 30 days prior to the date such change is to become effective.

(4) The documents furnishing the information required in this clause must be dated and contain the signature, title, and telephone number of the Recipient's official authorized to provide it, as well as the Recipient's name and the agreement number.

(5) Recipient failure to properly designate a financial institution or to provide appropriate payee bank account information may delay payments of amounts otherwise properly due.

e. When the reimbursement method is used, MMS shall make payment within 30 days after receipt of the billing unless the billing is improper.

f. MMS shall not withhold payments for proper charges made by recipients at any time during the project period unless (a) a recipient has failed to comply with the project objectives, award conditions, or Federal reporting requirements; or (b) the recipient is indebted to the United States, and collection of the indebtedness will not impair accomplishment of the objectives of a project sponsored by the United States. Under such conditions, MMS may, upon reasonable notice, inform the recipient that payments will not be made for obligations incurred after a specified date until the conditions are corrected or the indebtedness to the Federal Government is liquidated.

g. Recipients shall maintain advances of Federal funds in interest bearing accounts. Interest earned on advances deposited in such accounts shall be remitted promptly, but at least quarterly, to the MMS. Interest amounts up to $100 per year may be retained by the recipient for administrative expense.

4.    CASH DEPOSITORIES

a. Any monies advanced to a recipient which are subject to the control or regulation of the United States or any of its officers, agents or employees (public monies as defined in Treasury Circular No. 176, as amended) must be deposited in a bank with Federal Deposit Insurance Corporation (FDIC) insurance coverage and the balance exceeding the FDIC coverage must be collaterally secured.

b. Consistent with the national goal of expanding the opportunities for minority business enterprises, recipients and subrecipients are encouraged to use minority banks (a bank which is owned at least 50 percent by minority group members).

5. RETENTION AND CUSTODIAL REQUIREMENT'S FOR RECORDS

a. Financial records, supporting documents, statistical records, and all other records pertinent to an

agreement shall be retained for a period of three years, with the following qualifications:

(1) If *any* litigation, claim or audit is started before the expiration of the 3-year period, the records shall be retained until all litigations, claims or audit findings involving the records have been resolved.

(2) Records for nonexpendable property acquired with Federal funds shall be retained for 3 years after its final disposition.

b. The retention period starts from the date of final payment under the agreement.

c. Recipient organizations may be authorized by MMS, to substitute microfilm copies in lieu of original records.

d. MMS shall request transfer of certain records to its custody from recipient organizations when it determines that the records possess long term retention value. However, in order to avoid duplicate record-keeping, MMS may make arrangements with recipient organizations to retain any records that are continuously needed for joint use.

e. The Director of the MMS and the Comptroller General of the United States, or any of their duly authorized representatives, shall until three years after final payment under the agreement have access to any pertinent books, documents, papers and records of the recipient organization and their subrecipients to make audits, examinations, excerpts and transcripts.

6.     PROGRAM INCOME.  (This clause is applicable to program income related to projects financed, in whole or in part, with Federal funds.)

a. Recipient organizations shall account for program income resulting from projects financed in whole or in part with Federal funds.  Program income represents gross income earned by the recipient from the federally supported activities.  Such earnings exclude interest earned on advances and may include, but is not limited to, income from service fees, sale of commodities, usage or rental fees and royalties on patents and copyrights.

b. Interest earned on advances of Federal funds shall be remitted to MMS except for interest earned on advances to States or instrumentalities of a State as provided by the Intergovernmental Cooperation Act of 1968 (Public Law 90-577) and tribal organizations pursuant to sections 102, 103, or 104 of the Indian Self Determination Act (Public Law 93-638).

c. Proceeds from the sale of real and personal property either provided by the Federal Government or purchased in   whole or in part with Federal funds, shall be handled in accordance with the clause entitled Property Management Standards.

d. Unless the agreement provides otherwise, recipients shall have no obligation to the Federal Government with respect to royalties received as a result of copyrights or patents produced under the cooperative agreement or other agreement.

e. All other program income earned during the project period shall be retained by the recipient and, in accordance with the grant or other agreement, shall be:

(1) Added to funds committed to the project by MMS and recipient organization and be used to further eligible program objectives;

(2) Used to finance the non-Federal share of the project when approved by MMS; or

(3) Deducted from the total project costs in determining the net costs on which the Federal share of costs will be based.

7.    COST SHARING AND MATCHING. This clause includes the criteria and procedures for the allowability of cash and in-kind contributions made by recipients and subrecipients or third parties, in satisfying cost sharing and matching requirements of the MMS.

a. The following definitions apply for the purpose of this clause:

(1) Project costs - Project costs are all allowable costs (as set forth in the applicable Federal cost principles) incurred by a recipient and the value of the in-kind contributions made by the recipient or third parties in accomplishing the objectives of the grant or other agreement during the project or program period.

(2) Cost sharing and matching - In general, cost sharing and matching represent that portion of project or program costs not borne by the Federal Government.

(3) Cash contributions - Cash contributions represent the recipient's cash outlay, including the outlay of money contributed to the recipient by non-Federal third parties.

(4) In-kind contributions - In-kind contributions represent the value of noncash contributions provided by the recipient and non-Federal third parties. Only when authorized by Federal legislation, may property purchased with Federal funds be considered as the recipient's in-kind contributions. In-kind contributions may be in the form of charges for real property and non-expendable personal property, and the value of goods and services directly benefiting and specifically identifiable to the project or program.

b. General guidelines for computing cost sharing or matching are as follows:

(1)  Cost sharing or matching may consist of:

(a)  Charges incurred by the recipient as project costs.  (Not all charges require cash outlays by the recipient during the project period; examples are depreciation and use charges for buildings and equipment);

(b)  Project costs financed with cash contributed or donated to the recipient by other non-federal public agencies and institutions, and private organizations and individuals, and

(c)  Project costs represented by services and real and personal property or use thereof, donated by other non-Federal public agencies and institutions, and private organizations and individual.

(2)  All contributions, both cash and in-kind shall be accepted as part of the recipient's cost sharing and matching when such contributions meet all of the following criteria:

(a)  Are verifiable from the recipient's records;

(b)  Are not included as contributions for any other Federally-assisted program;

(c)  Are necessary and reasonable for proper and efficient   accomplishment of project objectives;

(d)  Are types of charges that would be allowable under the applicable cost principles;

(e)  Are not paid by the Federal Government under another assistance agreement (unless the agreement is authorized by Federal law to be used for cost sharing or matching);

(f)  Are provided for in the approved budget when required by the MMS; and

(g)  Conform to other provisions of this clause.

c.  Values for recipient in-kind contributions will be established in accordance with the applicable cost principles.

d.  Specific procedures for the recipients in establishing the value of in-kind contributions from non-Federal third parties are set forth below.

(1)  Valuation of volunteer services - Volunteer services may be furnished by professional and technical personnel, consultants, and other skilled and unskilled labor.  Volunteer services may be counted as cost sharing or matching if the service is an integral and necessary part of an approved program.

(a) Rates for volunteer services - Rates for volunteers should be consistent with those paid for similar work in the recipient's organization. In those instances in which the required skills are not found in the recipient organization, rates should be consistent with those paid for similar work in the labor market in which the recipient competes for the kind of services involved.

(b) Volunteers employed by other organizations - When an employer other than the recipient furnishes the services of an employee, these services shall be valued at the employee's regular rate of pay (exclusive of fringe benefits and overhead costs) provided these services are in the same skill for which the employee is normally paid.

(2) Valuation of donated, expendable personal property - Donated, expendable personal property includes such items as expendable equipment, office supplies, laboratory supplies or workshop and classroom supplies. Value assessed to expendable personal property included in the cost or matching share should be reasonable and should not exceed the market value of the property at the time of the donation.

(3) Valuation of donated, nonexpendable personal property, buildings, and land or use thereof.

(a) The method used for charging cost sharing or matching for donated nonexpendable personal property, buildings and land may differ according to the purpose of the grant or other agreement as follows:

(i) If the purpose of the agreement is to assist the recipient in the acquisition of equipment, buildings or land, the total value of the donated property may be claimed as cost sharing or matching.

(ii) If the purpose of the agreement is to support activities that require the use of equipment, buildings or land, depreciation or use charges to charges for equipment and buildings may be made. The full value of equipment or other capital assets and fair rental charges for land may be allowed provided that the MMS has approved the charges.

(b) The value of donated property will be determined in accordance with the usual accounting policies of the recipient with the following qualifications:

(i) Land and buildings - The value of donated land and buildings may not exceed its fair market value at the time of donation to the recipient as established by an independent appraiser (e.g., certified real property appraiser or GSA representatives) and certified by a responsible official of the recipient.

(ii) Nonexpendable personal property - The value of donated nonexpendable personal property shall not exceed the fair market value of equipment and property of the same age and condition

at the time of donation.

      (iii) <u>Use of space</u> - The value of donated space shall not exceed the fair rental value of comparable space as established by independent appraisal or comparable space and facilities in a privately owned building in the same locality.

      (iv) <u>Loaned equipment</u> - The value of loaned equipment shall not exceed its fair rental value.

e. The following requirements pertain to the recipient's supporting records for in-kind contributions from non-Federal third parties.

    (1) Volunteer services must be documented and, to the extent feasible, supported by the same methods used by the recipient for its employees.

    (2) The basis for determining the valuation for personal services, materials, equipment, buildings and land must be documented.

8.    <u>STANDARDS FOR FINANCIAL MANAGEMENT SYSTEMS</u>

a. The recipient's financial management system shall provide for:

    (1) Accurate, current and complete disclosure of the financial results of each Federally sponsored project or program in accordance with the reporting requirements set forth in the clause entitled <u>Financial Reporting Requirements</u>. The recipient is not required to establish an accrual accounting system but shall develop such accrual data for its reports on the basis of an analysis of the documentation on hand.

    (2) Records that identify adequately the source and application of funds for Federally sponsored activities. These records shall contain information pertaining to Federal awards, authorizations, obligations, unobligated balances, assets, outlays and income.

    (3) Effective control over and accountability for all funds, property and other assets. Recipients shall adequately safeguard all such assets and shall assure that they are used solely for authorized purposes.

    (4) Comparison of actual outlays with budget amounts for each grant or other agreement.

    (5) Procedures to minimize the time elapsing between the transfer of funds from the U.S. Treasury and the disbursement by the recipient, whenever funds are advanced by MMS. Advances made by primary recipient organizations (those which receive payments directly from MMS) to

subrecipients shall conform substantially to the same standards of timing and amount as apply to advances by MMS to primary recipient organizations.

(6)  Procedures for determining the reasonableness, allowability and allocability of costs in accordance with the provisions of the applicable Federal cost principles and the terms of the grant or other agreement.

(7)  Accounting records that are supported by source documentation.

(8)  Examinations in the form of audits.  Such audits shall be made by qualified individuals who are sufficiently independent of those who authorize the expenditure of Federal funds, to produce unbiased opinions, conclusions or judgments.  They shall meet the independent criteria along the lines of Chapter 3, Part 3 of the U.S. General Accounting publication, <u>Standards for Audit of Governmental Organizations, Programs Activities, and Functions.</u>

(9)  A systematic method to assure timely and appropriate resolution of audit findings and recommendations.

b.  Primary recipients shall require subrecipients which are public and private institutions of higher education, public and private hospitals, and other public and private nonprofit organizations that perform substantive work under grants or cooperative agreements to adopt the standards in paragraph a. above except for the requirement in paragraph a(1) in the clause entitled <u>Financial Reporting Requirements</u> regarding reporting forms and frequencies prescribed.

9.     FINANCIAL REPORTING REQUIREMENTS.  This clause prescribes uniform reporting procedures for recipients to:  summarize expenditures made and Federal funds unexpended for each award, report the status of federal cash advanced, request advances and reimbursement, and promulgates standard forms thereto.

a.  The following definitions apply for purposes of this clause:

(1)  <u>Accrued expenditures</u> - Accrued expenditures are charges incurred by the recipient during a given period requiring the provision of funds for: (a) goods and other tangible property received; (b) services performed by employees, contractors, subrecipients, and other payees, and (c) other amounts becoming owed under programs for which no current services or performance is required.

(2)  <u>Accrued income</u> - Accrued income is the sum of:  (a) earnings during a given period from (i) services performed by the recipient and (ii) goods and other tangible property delivered to purchasers; and amounts becoming owed to the recipient.

(3)  <u>Federal funds authorized</u> - Federal funds authorized are the total amount of Federal funds

obligated by MMS for use by the recipient. This amount may include any authorized carryover of unobligated funds from prior years when permitted by law.

(4) In-kind contributions - In-kind contributions are defined in the clause entitled Cost Sharing and Matching.

(5) Obligations - Obligations are the amounts of orders placed, contracts and agreements awarded, services received, and similar transactions during a given period that will require payment by the recipient during the same or a future period.

(6) Outlays - Outlays or expenditures represent charges made to the project. They are to be reported on an accrual basis. Outlays are the sum of: actual cash disbursements for direct charges for goods and services; the amount of indirect expense incurred; the value of in-kind contributions applied; and the net increase (or decrease) in the amounts owed by the recipient for goods and other property received, for services performed by employees, contractors, subrecipients and other payees and other amounts becoming owed under programs for which no current services or performance are required.

(7) Program income - Program income is defined in the clause entitled Program Income. It is to be reported on an accrual basis.

(8) Unobligated balance - The unobligated balance is the portion of the funds authorized by MMS that has not been obligated by the recipient and is determined by deducting the cumulative obligations from the cumulative funds authorized.

(9) Unliquidated obligations - Unliquidated obligations represent the amount of obligations incurred by the recipient that have not been paid.

b. The recipient shall utilize the following forms for reporting financial information:

(1) Financial Status Report (SF-269) - For all nonconstruction projects, the recipient shall submit an original and two copies of this report 30 days after the completion of each quarter of the project with the exception that the final Financial Status Report shall be due 90 days after project completion.

Extensions to reporting due dates may be granted upon request. The report shall be on an accrual basis; however, if the recipient's accounting records are not normally kept on the accrual basis, the recipient shall not be required to convert its accounting system, but shall develop such information through best estimates based on an analysis of the documentation on hand.

(2) Federal Transactions Report (SF-272) - In the event funds are advanced to recipients, the recipient shall submit an original and two copies of a Federal Cash Transaction Report 15 days

following the end of each quarter. The MMS reserves the right to require, in the "Remarks" section of this form, forecasts of Federal cash requirements and/or receipts to report the amount of cash advances in excess

of three days' requirements in the hands of subrecipients and a short narrative explanation of actions taken by the recipients to reduce the excess balances.

c. The recipient shall utilize the following form for requesting advances and reimbursements:

(1) Request for Advance or Reimbursement (SF-270) - For all non-construction projects when predetermined advance methods are not used, the recipient shall submit an original and two copies of this form on a monthly basis.

d. When the MMS needs additional information in using these forms or more frequent reports, the following shall be observed:

(1) When additional information is needed to comply with legislative requirements, recipients are to submit such information under the "Remarks" section of the reports.

(2) When MMS has determined that a recipient's accounting system does not meet the requirements contained in the clause entitled Standards for Financial Management Systems, additional pertinent information to further monitor grants and other agreements may be requested in writing to the recipient until such time as the system is brought up to standard.

e. MMS shall accept the identical information from the recipients in machine usable format or computer printouts in lieu of prescribed formats.

f. MMS may provide computer outputs to recipients when it will expedite or contribute to the accuracy of reporting.

10.    MONITORING AND REPORTING PROGRAM PERFORMANCE

a. Recipients shall monitor the performance under agreements and, where appropriate, ensure that time schedules are being met, projected work units by time periods are being accomplished, and other performance goals are being achieved. This review shall be made for each program, function, or activity of each agreement as set forth in the approved application or award document. The Recipient shall not make any programmatic changes without prior written approval by the Contracting Officer. Any requests by the recipient for programmatic changes must be submitted to the Contracting Officer who shall make the final determination and notify the recipient in writing.

b. Recipients shall submit a performance report (technical report) for each agreement that briefly

presents the following information for each program, function, or activity involved:

(1) A comparison of actual accomplishments with the goals established for the period, the findings of the investigator, or both. If the output of projects can be readily quantified, such quantitative data should be related to cost data for computation of unit costs.

(2) Reasons why established goals were not met.

(3) Other pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

c. Recipients shall submit the performance or technical reports quarterly with the Financial Status Report (or Request for Advance, or Reimbursement if used in lieu of the Financial Status Report); the final technical or performance report shall be submitted 90 days after completion of the project.

(1) Use of the metric system of measurement in accordance with the Metric Conversion Act, as amended by the Omnibus Trade and Competitiveness Act (15 USC 205) declares that the metric system is the preferred measurement system for US trade and commerce. Pursuant to the above and the provisions of Executive Order 12770, "Metric Usage in Federal Government Programs," the following requirement is included in cooperative agreements:

"All progress and final reports, other reports or publications produced under this award shall employ the metric system of measurements to the maximum extent practicable. Both metric and inch-pound units (dual units) may be used if necessary during any transition period(s). However, the recipient may use non-metric measurements to the extent that the recipient has supporting documentation that the use of metric measurements is impracticable or is likely to cause significant inefficiencies or loss of markets to the recipient, such as when foreign competitors are producing competing products in non-metric units.

(2) Copies of all publications or reports printed with funds under this agreement and intended for public distribution will be furnished to the Government (one to the project officer and one to the Contracting Officer.) Reports shall bear the MMS logo on the cover or first page and identify the cooperative agreement number. In addition all information submitted for publication or other public releases of information regarding this project shall carry the following disclaimer: "The views and conclusions contained in this document are those of the authors and should not be interpreted as representing the opinions or policies of the U.S. Government. Mention of trade names or commercial products does not constitute their endorsement by the U. S. Government."

This requirement does not apply to reports submitted to MMS which are not intended for public distribution, such as progress reports and financial reports.

(3) The recipient must give prior notice to MMS for any public information releases concerning this agreement which refer to the Department of the Interior on any bureau or employees (by name and title). The specific text, layout photographs, etc. of the proposed release must be provided in advance of release.

(4) When issuing statements, press releases, requests for proposals, bids and other documents describing projects or programs funded in whole or in part with Federal money, the recipient shall clearly state (1) the percentage of the total costs of the program or project which will be finance with Federal money, (2) the dollar amount of Federal funds for the project or program, and (3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources (if applicable).

d. Between the required performance reporting dates, if any of the following events occur, the recipient shall inform the CO as soon as the conditions become known:

(1) Problems, delays, or adverse conditions that will materially affect the ability to attain program objectives, prevent the meeting of time schedules and goals, or preclude the attainment of project work units by established time periods. This disclosure shall be accompanied by a statement of the action taken or contemplated, and any Federal assistance needed to resolve the situation.

(2) Favorable developments or events that enable time schedules to be met sooner than anticipated or more work units to be produced than originally projected.

e. If any performance review conducted by the recipient discloses the need for change in the budget estimates, the recipient shall submit a request for budget revision.

11.    REVISION OF FINANCIAL PLANS.  This clause applies to all assistance agreements with recipients which involve the transfer of Federal funds.

a. For non-construction awards, recipients shall immediately request approval from MMS when there is reason to believe that a revision will be necessary for the following reasons:

(1) Changes in the scope or the objective of the project;

(2) The need for additional Federal funding;

(3) The transfer of amounts budgeted for indirect costs to absorb increases in direct costs or vice versa;

(4) The expenditures require approval in accordance with the applicable provisions of OMB Circular A-21, "Cost Principles for Educational Institutions"; OMB Circular A-87, "Cost Principles for

State and Local Governments"; OMB Circular A-122, "Cost Principles for NonProfit Organizations"; or Federal Acquisition Regulations (FAR) 31.2, "Cost Principles . . . with Commercial Organizations"

b. None of the substantive programmatic work under the agreement may be subcontracted or transferred without prior approval of MMS. This provision does not apply to the purchase of supplies, materials, equipment or general support services.

c. The recipient may not transfer funds among direct cost categories for awards in which the Federal share exceeds $100,000 when the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total budget as last approved. The same criteria shall apply to the cumulative amount of transfer among programs, functions, and activities when budgeted separately for an award. No transfer that would cause any Federal appropriation, or part thereof, may be used for purposes other than those intended. Requests for budget changes to the approved estimated budget beyond that set forth above must be submitted to the Contracting Officer who shall review the request. The Contracting Officer shall make the final determination on such requests and notify the Recipient in writing.

d. Recipients shall notify the MMS promptly whenever the amount of Federal authorized funds is expected to exceed the needs of the recipient by more than $5,000 or 5 percent of the Federal award, whichever is greater.

e. When requesting approval for budget revisions, recipients shall use either the budget forms that were used in the application or letter detailing the revisions.

f. The MMS shall review the request for budget revisions within 30 calendar days from the date of receipt and notify the recipient whether the budget revisions have been approved. If the revision is still under consideration the end of 30 calendar days, MMS will inform the recipient in writing of the date the recipient may expect the decision.

g. The MMS is not obligated to reimburse the recipient for outlays (costs) in excess of the Federally funded amount of the assistance agreement unless and until the CO executes a modification which increases the Federally funded amount. The Federally funded amount is the amount obligated under the agreement which may be less than or equal to the budgeted Federal share of the agreement.

12.    CLOSEOUT PROCEDURES

a. The following definitions apply for the purpose of this clause:

(1) Closeout - The closeout of an agreement is the process by which MMS determines that all applicable administrative actions and all required work under the agreement have been completed by the recipient and the MMS.

(2)  Date of completion - The date of completion is the date on which all work under the agreement is completed or the date on the award document, or any amendment thereto, on which MMS sponsorship ends.

(3)  Disallowed costs - Disallowed costs are those charges to an agreement that the MMS or its representative determines to be unallowable, in accordance with the applicable Federal cost principles or other conditions contained in the agreement.

b.  Assistance agreements shall be closed out in accordance with the following procedure:

(1)  Upon request, MMS shall make prompt payments to a recipient for allowable reimbursable costs.

(2)  The recipient shall immediately refund any balance of unobligated (unencumbered) cash that MMS advanced or paid and that is not authorized to be retained by the recipient.

(3)  The recipient shall submit all financial, performance, and other reports required as the condition of the agreement to the MMS within 90 calendar days after the date of completion of the agreement.  Extensions may be granted when requested by the recipient.

(4)  When authorized by the agreement, MMS shall make a settlement for any upward or downward adjustments to the Federal share of costs after these reports are received.

(5)  The recipient shall account for any property acquired with Federal funds, or received from the Government in accordance with the provisions of the clause entitled Property Management Standards.

(6)  In the event a final audit has not been performed prior to the closeout of the agreement, the MMS retains the right to recover an appropriate amount after fully considering the recommendations on disallowed costs resulting from the final audit.

13.    SUSPENSION AND TERMINATION PROCEDURES

a.  The following definitions shall apply for the purpose of this clause:

(1)   Termination -The termination of an agreement means the cancellation of Federal sponsorship, in whole or in part at any time prior to the date of completion.

(2)  Suspension - The suspension of an agreement is an action by the MMS that temporarily suspends Federal sponsorship under the agreement pending corrective action by the recipient or pending a decision to terminate the agreement by the MMS.

b. If the recipient fails to comply with the terms of the agreement, the CO may, on reasonable notice to the recipient, suspend the agreement and withhold further payments, prohibit the recipient from incurring additional obligations of funds, pending corrective action by the recipient; or decide to terminate in accordance with paragraph c. All necessary and proper costs that the recipient can not reasonably avoid during the period of suspension shall be allowed provided that they meet the provisions of the applicable cost principles.

c. This agreement may be terminated as follows:

(1) Termination for cause - The MMS reserves the right to terminate this agreement in whole or in part at any time before the date of completion, whenever it is determined that the recipient has failed to comply with the conditions of the agreement. The MMS will provide prompt written notification to the recipient of the determination and the reasons for the termination, together with the effective date consistent with the provisions of Section F.4 of the agreement. Payments made to recipients or recoveries by the MMS shall be in accordance with the legal rights and liabilities of the parties.

(2) Termination for convenience - The MMS and the recipient may terminate this agreement in whole or in part when both parties agree that the continuation of the project would not produce beneficial results commensurate with the further expenditure of funds consistent with the provisions of Section F.4 of the agreement. The two parties shall agree upon the termination conditions, including the effective date and, in the case of partial terminations, the portion to be terminated. In the event that both parties cannot agree, the MMS reserves the right to unilaterally terminate the assistance agreement for the Government's convenience. The recipient shall not incur new obligations for the terminated portion after the effective date, and shall cancel as many outstanding obligations as possible. The MMS shall allow full credit to the recipient for the Federal share of the noncancellable obligations, properly incurred by the recipient prior to termination.

d. The parties shall promptly settle the terminated agreement in accordance with the applicable requirements of the cause entitled Close Out Procedures. In addition, the parties shall execute a modification setting forth the terms and conditions of the final settlement as a result of the termination of the agreement.

14. PROPERTY MANAGEMENT STANDRDS. The clause prescribes uniform standards governing the management of property furnished by the Federal Government or whose cost was charged to a project supported by a Federal agreement. Recipients and subrecipients that are institutions of higher education, public and private hospitals, and other quasi-public and private nonprofit organizations performing substantive work under this agreement may use their own property management standards and procedures provided they observe the provisions of this clause.

a. The following definitions apply for the purpose of this clause:

(1) Real Property - Real property means land, including land improvements, structures and appurtenances thereto, but excluding movable machinery and equipment.

(2) Personal property - Personal property of any kind except real property. It may be tangible having physical existence, or intangible having no physical existence, such as patents, inventions and copyrights.

(3) Nonexpendable personal property - Nonexpendable personal property means tangible personal property having a useful life of more than 1 year and an acquisition cost of $300 or more per unit except that recipients subject to Cost Accounting Standards Board (CASB) regulations may use the CASB amount of $500 per unit and useful life of 2 years. A recipient may use its own definition of nonexpendable personal property provided that the definition would at least include all tangible personal property as defined in 1 above.

(4) Expendable personal property - Expendable personal property refers to all tangible property other than nonexpendable property.

(5) Excess property - Excess property means property of a Federal agency that, as determined by the head thereof, is no longer required for its needs or the discharge of its responsibilities.

(6) Acquisition cost of purchased nonexpendable personal - Acquisition cost of an item of purchased nonexpendable personal property means the net invoice unit price of the property including the cost of modifications, attachments, accessories, or auxiliary apparatus necessary to make the property useable for the purpose for which it was acquired. Other charges such as the cost of installation, transportation, taxes, duty or protective in-transit insurance, shall be included or excluded from the unit acquisition cost in accordance with the recipient's regular accounting practices.

(7) Exempt property - means tangible personal property acquired in whole or in part with Federal funds, and title to which is vested in the recipient without further obligation to the Federal Government except as provided in subparagraph d. below. Such unconditional vesting of title will be pursuant to any Federal legislation that provides MMS with adequate authority.

b. If real property is acquired as a requirement of this agreement, the following shall apply:

(1) Title to real property shall vest in the recipient subject to the condition that the recipient shall use the real property for the authorized purpose of the project as long is it is needed.

(2) The recipient shall obtain MMS approval for the use of real property in other projects when the recipient determines that the property is no longer needed for the purpose of the original project. Use in other projects shall be limited to those under other Federally sponsored projects (i.e., other agreements) or programs that have purposes consistent with those authorized for support by the MMS.

(3) When the real property is no longer needed as provided in (1) and (2) above, the recipient shall request disposition instructions from the MMS.

c. Federally-owned nonexpendable personal property - Title to Federally-owned property remains vested in the Federal government. Recipients shall submit annually an inventory listing of Federally-owned property in their custody to MMS. Upon completion of the agreement or when the property is no longer needed, the recipient shall report the property to MMS for further disposition.

d. Exempt property - When statutory authority exists, title to nonexpendable personal property acquired with project funds shall be vested in the recipient upon acquisition unless it is determined that to do so is not in furtherance of the objectives of the MMS. When title is vested in the recipient, the recipient shall have no other obligation or accountability to the Federal Government for its use or disposition except as provided in e. (1) below.

e. Other nonexpendable property - When other nonexpendable tangible personal properly is acquired by the recipient with project funds, title shall not be taken by the Federal government but shall vest in the recipient subject to the following conditions:

(1) Right to transfer title - For items of nonexpendable property having a unit acquisition cost of $1,000 or more, MMS reserves the right to transfer the title to the Federal government or to a third party. Such property will be identified in the agreement or otherwise made known to the recipient and will be subject to the provisions for federally-owned nonexpendable property discussed in paragraph c. above.

(2) Use of other tangible nonexpendable property for which the recipient has title.

(a) The recipient shall use the property in the project for which it was acquired as long as needed, whether or not the project continues to be supported by Federal funds. When no longer needed for the original project, the recipient shall use the property in connection with its other Federally

sponsored activities, in the following order of priority: (i) activities sponsored by the MMS; and (ii) activities sponsored by other Federal agencies.

(b) Shared use - During the time that nonexempt nonexpendable personal property is held for use on the project for which it was acquired, the recipient shall make it available for use on other projects if such other use will not interfere with the work on the project or program for which the property was originally acquired. First preference for such other use shall be given to other projects or programs sponsored by the MMS; second preference shall be given to projects sponsored by other Federal agencies. If the property is owned by the Federal government, use on other activities not sponsored by Federal government shall be permissible if authorized by MMS. User charges shall be considered if appropriate.

(3) <u>Disposition of other nonexpendable property</u> - When the recipient no longer needs the property as provided in e. (2) above, the property may be used for other activities in accordance with the following standards:

(a) <u>Nonexpendable property with a unit acquisition cost of less than $1,000</u> - The recipient may use the property for other activities without reimbursement to the Federal government or sell the property and retain the proceeds.

(b) <u>Nonexpendable personal property with a unit cost of $1,000 or more</u> - The recipient may retain the property for other uses provided that compensation is made to MMS. The amount of compensation shall be computed by applying the percentage of Federal participation in the cost of the original project or program to the current fair market value of the property. If the recipient has no need for the property and the property has further use value, the recipient shall request disposition instructions from MMS.

(4) <u>Property management standards for nonexpendable property</u> - The recipient's property management standards for nonexpendable personal property shall include the following procedural requirements:

(a) Property records shall be maintained accurately and shall include:

(i) A description of the property.

(ii) Manufacturer's serial number, model number, Federal stock number, national stock number, or other identification number.

(iii) Source of the property, including agreement number.

(iv) Whether title vests in the recipient or the MMS.

(v) Acquisition date (or date received, if the property was furnished by the MMS) and cost.

(vi) Percentage (at the end of the budget year) of Federal participation in the cost of the project for which the property was acquired. (Not applicable to property furnished by MMS).

(vii) Location, use and condition of the property and the date the information was reported.

(viii) Unit acquisition cost.

(ix) Ultimate disposition data, including date of disposal and sales price or the method used to determine current fair market value where a recipient compensates the MMS for its share.

(b) Property owned by the MMS must be marked to indicate Federal ownership.

(c) A physical inventory of property shall be taken and the results reconciled with the property records at least once every 2 years. Any differences between quantities determined by the physical inspection and those shown in the accounting records shall be investigated to determine the causes of the difference. The recipient shall, in connection with the inventory, verify the existence, current utilization and continued need for the property.

(d) A control system shall be in effect to insure adequate safeguards to prevent loss, damage, or theft of the property. Any loss, damage, or theft of nonexpendable property shall be investigated and fully documented; if the property was owned by the Federal government, the recipient shall promptly notify the MMS.

(e) Adequate maintenance procedures shall be implemented to keep the property in good condition.

(f) Where the recipient is authorized to sell the property, proper sales procedures shall be established which would provide for competition to the extent practicable and result in the highest possible return.

(g) Expendable personal property - Title to expendable personal property shall vest in the recipient upon acquisition. If there is a residual inventory of such property exceeding $1,000 in total aggregate fair market value, upon termination or completion of the agreement, and the property is not needed for any other federally sponsored project or program, the recipient shall retain the property for use on nonfederally sponsored activities, or sell it but must in either case, compensate MMS for its share. The amount of compensation shall be computed in the same manner as nonexpendable personal property.

(h) Intangible property.

(1) Inventions and patents - If any project produces patentable items, patent rights, processes, or inventions, in the course of work sponsored by the Federal Government, such fact shall be promptly and fully reported to MMS. Unless there is a prior agreement between the recipient and MMS on disposition of such items, the MMS shall determine whether protection on the invention or discovery shall be sought. MMS will also determine how the rights in the invention or discovery-including rights under any patent issued thereon-shall be allocated and administered in order to protect the public interest consistent with current Government patent policy.

(2) Copyrights - Except as otherwise provided in the terms and conditions of the agreement, the author or the recipient organization is free to copyright any books, publications, or other copyrightable materials developed in the course of or under a Federal agreement, but MMS shall reserve a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize other to use, the works for Government purposes.

(i) Excess Personal Property - When title to excess property is vested in recipients, such property shall be accounted for and disposed of in accordance with the disposition instructions from MMS.

15.   PROCUREMENT STANDARDS.   This clause provides standards for use by recipients subject to OMB Circular No. A-110 in establishing procedures for procurement of supplies, equipment, and other services with Federal funds.  These standards are furnished to ensure that such materials and services are obtained in an effective manner and in compliance with the provisions of applicable Federal law and executive orders.  The standards contained in this clause do not relieve the recipient of the contractual responsibilities arising under its contracts.

a. Responsibility - The recipient is the responsible authority, without recourse to the MMS regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered into, in support of an agreement.  These include disputes, claims, protests of award, source evaluation or other matters of a contractual nature.  Matters concerning violation of law are to be referred to such local, State or Federal authority as may have proper jurisdiction.

b. Adherence to standards - Recipients may use their own procurement policies and procedures. However, all recipients shall adhere to the standards set forth in this clause.

c. Code of conduct -The recipient shall maintain a code or standard of conduct that shall govern the performance of its officers, employees, or agents engaged in the awarding and administration of contracts using Federal funds.  No employee, officer, or agent shall participate in the selection, award or administration of a contract in which Federal funds are used where, to his knowledge, he or his immediate family, partner, or organization in which he or his immediate family or partner has a financial interest or with whom he is negotiating or has any agreement concerning prospective employment.  The recipients' officers, employees, or agents shall neither solicit nor accept gratuities, favors or anything of monetary value from contractors or potential contractors.  Such standards shall provide for disciplinary actions to be applied for violations of such standards by the recipients' officers, employees, or agents.

d. Procurement transactions - All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition.  The recipient should be alert to organizational conflicts of interest or noncompetitive practices among contractors that may restrict or

eliminate competition or otherwise restrain trade. In order to ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work, invitations for bids and/or requests for proposals should be excluded from competing for such procurements. Awards shall be made to the bidder/offeror whose bid/offer is responsive to the solicitation and is most advantageous to the recipient, price and other factors considered. Solicitations shall clearly set forth all requirements that the bidder/offer must fulfill in order for his bid/offer to be evaluated by recipient. Any and all bids/offers may be rejected when it is in the recipient's interest to do so.

e. Procurement procedures - All recipients shall establish procurement procedures that provide for, at a minimum, the following procedural requirements:

(1) Proposed procurement actions shall follow a procedure to assure the avoidance of purchasing unnecessary or duplicative item. Where appropriate, an analysis shall be made of lease and purchase, alternatives to determine which would be the most economical, practical procurement.

(2) Solicitations for goods and services shall be based on a clear and accurate description of the technical requirements for the material, product or service to be procured. Such a description shall not, in competitive procurements, contain features which unduly restrict competition. "Brand name or equal" descriptions may be used as a means to define the performance or other salient requirements of a procurement, and when so used the specific features of the named brand which must be met by bidder/offerors shall be clearly specified.

(3) Positive efforts shall be made by the recipients to utilize small and minority-owned business sources of supplies and services. Such efforts should allow the sources the maximum feasible opportunity to compete for contracts utilizing Federal funds.

(4) The type of procuring instruments used, e.g., fixed price contracts, cost reimbursable contracts, purchase orders, incentive contracts, shall be determined by the recipient but must be appropriate for the particular procurement and for promoting the best interest of the program involved. The "cost-plus-a-percentage-of-cost" method of contracting shall not be used.

(5) Contracts shall be made only with responsible contractors who possess the potential ability to perform successfully under the terms and conditions of a proposed procurement. Consideration shall be given to such matters as contractor integrity, record of past performance, financial and technical resources or accessibility to other necessary resources.

(6) All proposed sole source contracts or where only one bid or proposal is received in which the aggregate expenditure is expected to exceed $5,000 is subject to prior approval at the discretion of the MMS.

(7) Some form of price or cost analysis should be made in connection with every procurement action. Price analysis may be accomplished in various ways, including the comparison of price quotations submitted, market prices and similar indicia, together with discounts. Cost analysis is the review and evaluation of each element of cost to determine reasonableness, allocability, and allowability.

(8) Procurement records and files for purchases in excess of $10,000 shall include the following:

(a) Basis for contractor selection;

(b) Justification for lack of competition when competitive bids or offers are not obtained;

(c) Basis for award cost or price.

(9) A system for contract administration shall be maintained to ensure contractor conformance with terms, conditions, and specifications of the contract, and to ensure adequate and timely follow up of all purchases.

f. Contract Provisions - The recipient shall include, in addition to provisions to define a sound and complete agreement, the following provisions in all contracts. These provisions shall also be applied to subcontracts.

(1) Contracts in excess of $10,000 shall contain contractual provisions or conditions that will allow for administrative, contractual, or legal remedies in instances in which contractors violate or breach contract terms, and provide for such remedial actions as may be appropriate.

(2) All contracts in excess of $10,000 shall contain suitable provisions for termination by the recipient including the manner by which the termination will be effected and the basis for settlement. In addition, such contracts shall describe conditions under which the contract may be terminated for default as well as conditions where the contract may be terminated because of circumstances beyond the control of the contractor.

(3) All contracts awarded by recipients and their contractors or subrecipients having a value of more than $10,000, shall contain a provision, as applicable, requiring compliance with Executive Order 11246, entitled "Equal Employment Opportunity" as amended by Executive Order 11375, and as supplemented in Department of Labor regulations (41 CFR, Part 60).

(4) Contracts or agreements, the principal purpose of which is to create, develop or improve products, processes or methods; or for exploration into fields that directly concern public health, safety or welfare; or contracts in the field of science or technology in which there has been little significant

experience outside of work funded by Federal assistance, shall contain a notice to the effect that matters regarding rights to inventions and materials generated under the contract or agreement are subject to the terms and conditions agreed to by MMS and the recipient.

(5) All negotiated contracts (except those of $10,000 or less) awarded by recipients shall include a provision to the effect that the recipient, MMS, the Comptroller General of the United States, or any of their duly authorized representatives, shall have access to any books, document, papers and records of the contractor which are directly pertinent to a specific project for the purpose of making audits, examinations, excerpts and transcriptions. Recipients shall require contractors to maintain all required records for 3 years after the recipient makes final payment and all pending matters are closed.

(6) Contracts and subagreements of amounts in excess of $100,000 shall contain a provision that requires the recipient to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. 1857 et seq.) and the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.) as amended. Violations shall be reported to MMS and the regional office of the Environmental Protection Agency.

(7) Contracts shall recognize mandatory standards and policies to energy efficiency which are contained in the State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (P.L. 94.163).

16. AUDIT REQUIREMENTS

Primary responsibility for audits of federally assisted programs rests with recipient organizations. Audits are to be conducted in accordance with the following:

a. Universities and Other Nonprofit Institutions - OMB Circular A-133

b. State, Local and Indian Tribal Governments - OMB Circular A-128

MMS-Jicarilla Apache Tribe Cooperative Agreement                                    1999

## NOTICE

### CONTRACTING WITH SMALL AND MINORITY FIRMS, WOMEN'S BUSINESS ENTERPRISES

It is a national policy to place a fair share of purchases with small and minority business firms. The Department of Interior (DOI) is strongly committed to the objectives of this policy and encourages all recipients of its grants and cooperative agreements to take affirmative steps to ensure such fairness.

(1) Recipients and subrecipients shall take all necessary affirmative steps to assure that minority firms, and women's business enterprises are used when possible.

(2) Affirmative steps shall include:

(i) Placing qualified small and minority businesses, and women's business enterprises on solicitation lists;

(ii) Assuring that small and minority businesses, and women's business enterprises are solicited whenever they are potential sources.

(iii) Dividing total requirements, when economically feasible into smaller tasks or quantities to permit maximum participation by small and minority businesses, and women's business enterprises;

(iv) Establishing delivery schedules, where the requirement permits, which encourage participation by small and minority businesses, and women's business enterprises;

(v) Requiring the recipient, if subagreements are to be let, to take the affirmative steps listed in (2)(i) through (iv) above.

(12/22/94; revised by MMS 6/30/96)

# SECTION B

## SUPPLIES/SERVICES AND PRICES
### Description

| Item No. | Description | Amount |
|---|---|---|
| | The MMS will reimburse the Tribe up to 100 percent of allowable costs of Federal oil and gas leases in accordance with the Tribe's request, not to exceed the amount approved for each fiscal year of this Agreement. | |
| | Total estimated cost for performance for fiscal year 1999 | *$100,187 |
| | Total estimated cost for performance for fiscal year 2000 | * |
| | Total estimated cost for performance for fiscal year 2001 | * |

*Note: Funds will be added to the Agreement in accordance with the clause entitled, "Availability of Funds", subject to agreement on the annual work plan and budget for the Tribe.



COOPERATIVE AGREEMENT
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE
WESTERN ADMINISTRATIVE SERVICE CENTER
BOX 25165
DENVER, COLORADO 80225

| | | |
|---|---|---|
| 1. REQUISITION NUMBER: | 2. EFFECTIVE DATE:<br><br>April 1, 1999 | 3. AGREEMENT NUMBER:<br><br>1435-02-99-CA-40311 |
| 4. SUBMIT INVOICES TO:<br><br>See Section G.1.b | 5. CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE<br><br>Kenneth R. Vogel | 6. TOTAL AMOUNT:<br><br>$75,140.00 |

**7. RECIPIENT NAME AND ADDRESS:** The Jicarilla Apache Indian Tribe
P. O. Box 950
Dulce, New Mexico 87528

| | |
|---|---|
| 8. ADMINISTRATIVE OFFICE:<br>Minerals Management Service, WASC<br>Procurement Branch, MS 2730<br>Box 25165, Denver, Colorado 80225-0165 | 9. COGNIZANT MMS TECHNICAL OFFICE:<br>Minerals Management Service<br>Office of Enforcement, MS-3030<br>Lakewood, Colorado 80225-0165 |
| 10. ACCOUNTING AND APPROPRIATION DATA:<br>(Obligate $75,140.00)<br>9-23-3030-301   OC 252R | 11. PAYMENT WILL BE MADE BY:<br>Minerals Management Service<br>Financial Management Division |

| 12. AUTHORITY<br><br>30 USC 1735 | 13. STARTING DATE<br><br>April 1, 1999 | 14. DURATION<br>3 yrs with a<br>3 yr option | 15. PAYMENT SCHEDULE<br><br>See Section G |
|---|---|---|---|

**16. PRINCIPAL INVESTIGATOR(S):**
Mr. David Wong

**17. PROJECT DESCRIPTION:** Audit and related investigations of Indian oil and gas leases, administered by the Department of the Interior located on Indian lands under the jurisdiction of the Jicarilla Apache Indian Tribe in accordance with Section 202 of the Federal Oil and Gas Royalty Management Act of 1982.

**18. ORDER OF PRECEDENCE:** In the event of any inconsistency or conflict between the provisions contained in the documents listed below, the inconsistency shall be resolved by giving precedence in the following order: (a) the Delegation Agreement document, (b) the Agreement clauses, and (c) the recipient's approved workplan and budget.

**19. OFFER AND ACCEPTANCE:** The United States of America acting by and through the Department of the Interior, Minerals Management Service, hereby delegates authority to the Jicarilla Apache Indian Tribe to conduct activities in accordance with Block 17 for 100 percent of all approved costs up to and not exceeding $75,140.00 for the support of the approved budget period effort (April 1, 1999 through September 30, 1999) described herein.

| 20.     The Jicarilla Apache Indian Tribe<br>NAME OF RECIPIENT | 21. UNITED STATES OF AMERICA |
|---|---|
| BY   See Signature Page<br>SIGNATURE                    DATE | BY   See Signature Page<br>SIGNATURE OF CONTRACTING OFFICER |
| _____<br>TYPED NAME AND TITLE | _____<br>TYPED NAME        DATE |

Cooperative Agreement No. 1435-02-99-CA-40311
Page 2 of 58

TRIPARTITE AGREEMENT SIGNATURE PAGE

-Recipient:

The Jicarilla Apache Indian Tribe
P.O. Box 950
Dulce, New Mexico 87528

By: _____

Name: _____          Date: _3-18-99___

Title: _____


Program Office:

Minerals Management Service
Royalty Management Program
1849 C Street, NW, MS-4230
Washington, DC 20240

By: _____

Name:  _Lucv Querques-Denett_____          Date: _____

Title:   _Associate Director, Rovaltv Management_____


United States of America:

Minerals Management Service
Procurement and Support Services Division
381 Elden Street, MS-2500
Herndon, Virginia 20170-4817

By: _____

Name:  __Michael M. Del-Colle_____          Date: _____

Title:   __Contracting Officer_____

Cooperative Agreement No. 1435-02-99-CA-40311
Page 2 of 55

## TRIPARTITE AGREEMENT SIGNATURE PAGE

Recipient:

The Jicarilla Apache Indian Tribe
P.O. Box 950
Dulce, New Mexico 87528

By:    PRESIDENT ARNOLD CASSADOR

Name: _____        Date: _3- 26 -99_

Title: _____ JICARILLA APACHE TRIBE


Program Office:

Minerals Management Service
Royalty Management Program
1849 C Street, NW, MS-4230
Washington, DC 20240

By: _____

Name: _Lucy Querques-Denett_____        Date: _____

Title: _Associate Director, Royalty Management_


United States of America:

Minerals Management Service
Procurement and Support Services Division
381 Elden Street, MS-2500
Herndon, Virginia 20170-4817

By: _____

Name: _Michael M. Del-Colle_____        Date: _____

Title: _Contracting Officer_____

**Report of the Commission**

# Fiscal Accountability
## of the
## Nation's
## Energy Resources



David F. Linowes
Chairman

Michel T. Halbouty

Mary Gardiner Jones

Charles J. Mankin

Elmer B. Staats

Commissioners

**January 1982**

In another of the Wind River cases, observations by a field investigator triggered an examination of production sales and royalty records, which showed that a major oil company had produced 450,000 barrels of oil from certain Indian tribal wells over 9 years, without paying royalties to the tribes. (In this case, the company said it had paid royalties to the wrong parties.) The tribes were later offered $750,000 in compensation for lost royalties.

"Tribal investigators have uncovered literally hundreds of thousands of dollars of unpaid royalties simply by finding inconsistencies in the reports already on file with the USGS," said representatives of the Shoshone and Arapahoe Tribes. "This sort of reconciliation could and should be done by computer."

The payment discrepancies uncovered by audits and investigations point to inadequacies in the procedures of the oil companies, as well as that of the USGS. In particular, oil and gas companies seem to have difficulty in keeping abreast of changes in lease and royalty owners. In the case just mentioned, the company failed to observe, from 1972 to 1981, that the Shoshone and Arapahoe Tribes had withdrawn from an agreement to unitize the oil field in question (i.e., produce from several leases in one operation, and divide the proceeds among all the owners of interests in the several leases). Actually, the company had been told of the situation 11 years earlier, in 1970, when the USGS warned that the tribes had withdrawn from the unit arrangement and were failing to receive their royalties.

## Fair Market Value

In 11 major audits conducted by the Interior Department's Office of Inspector General, undervalu-

ation of natural gas was the largest factor in royalty underpayments. Because of the growing importance of natural gas as a source of royalty income, proper valuation of gas is especially important. In 1980, gas accounted for 56 percent of all energy mineral royalties on Federal and Indian lands. According to Interior Department projections, it will contribute approximately 75 percent by 1990.

Federal and Indian royalties on oil and gas are based on "fair market value," which cannot be less than the sales price and may be more. The complexities of establishing this value leave a wide latitude for differing interpretations. The USGS routinely accepts the oil and gas companies' valuation of the product on which royalties are paid.

A major problem in setting fair market value for oil and gas is that large, vertically integrated companies in effect sell to themselves. These companies produce crude oil or natural gas, transport it, process it, and sell it, often to the final customer. The USGS rules require that integrated companies calculate royalties on crude oil or gas sold within the company on the basis of "market value," equal at least to what an independent buyer would pay.

Government price controls and longterm contracts for natural gas add complications. Oil price controls were lifted by President Reagan in January 1981, but natural gas price controls for interstate sales still exist and are scheduled to last until 1985. The controlled prices differ greatly according to the date production began, with old prices far below current prices. Likewise, old prices are frozen into some longterm gas contracts even where price controls do not apply. There are currently 27 different controlled prices for interstate sales of natural gas, a situation which allows many differences in interpretations of value.

PROBLEM: DETERMINING THE VALUE OF PRODUCTION

Most major audits conducted so far have found under-valuation of gas produced from Federal and Indian leases to be the biggest cause of royalty under-payments. Eleven major natural gas royalty audits were conducted by the Department of the Interior's Office of the Inspector General (formerly the Office of Audit and Investigation) from 1977 through 1981. Ten of the audits showed underpayments, of which nine were mainly due to undervaluation of the product.* (One audit showed an overpayment; the underpayments ranged from $684 to more than $10 million.) Royalties for natural gas already account for 56 percent of total Federal and Indian oil and gas royalties; by 1990, they are expected to be approximately 75 percent of the total. Thus, it is especially important to give attention to valuation of natural gas.

For valuation of oil and gas, as for reporting of production volumes, sales, and royalties, USGS usually accepts industry data without verification. The Mineral Leasing Act of 1920 and the Indian Leasing Act of 1927 specify that royalties shall be based on the "value of the production." The Outer Continental Shelf Act says that "fair market value" shall be received for the "lands leased and the rights conveyed."

Under these laws, USGS regulations base royalties on "estimated reasonable value," which "in the absence of good reason to the contrary," is the "value computed on the basis of the highest price . . . paid

---

*In one of the nine cases the assessment of additional royalties was reversed on appeal by the Interior Department's Office of Hearing and Appeals. Three are currently on appeal.

or offered at the time of production in a fair and open market. . . ." The fair market value, according to these rules, cannot be less than the actual sales prices and may be more. In practice, however, the Geological Survey accepts the value of the product set by the industry--which is almost always the sales price--and relies on audits or lease analysis to correct any undervaluation.

Valuation problems occur especially with internal sales in vertically integrated companies, with longterm contracts, and with price-controlled products. Gas is especially subject to these problems since it is commonly sold by longterm contract, and some of it is price controlled. Other difficulties in valuation have to do with deductions allowed (from value of the product before the royalty is computed) for the costs of transporting oil or gas to a point of sale off the lease, and for the costs of processing natural gas (removing liquids).

Some examples of underpayment of royalties due to undervaluation are:

o  A vertically integrated company using in its own refineries gas it had produced was allowed by USGS to use longterm contract prices, rather than higher current market prices, as a basis for royalties. An audit by the Interior Department's Office of Audit and Investigation showed underpayment for a 10-year period of $2.2 million. The underpayment amounted to 31 percent of royalties actually paid ($6.9 million).

o  A review of offshore leases by the Office of the Audit and Investigation showed that offshore