UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JICARILLA APACHE NATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>U.S. DEPARTMENT OF THE )<br>INTERIOR, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>VASTAR RESOURCES, INC., *et al.*, )<br>)<br>Intervenor-Defendants. ) | Civil Case No. 07-803 (RJL) |

MEMORANDUM OPINION
(March __, 2009) [#15]

Plaintiff Jicarilla Apache Nation ("Jicarilla") brings this action against the Department of Interior ("Interior") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.* Jicarilla alleges that the rejection by the Assistant Secretary for Indian Affairs of a "major portion" analysis methodology developed by the Minerals Management Service ("MMS") to calculate natural gas royalties owed Jicarilla was an arbitrary and capricious departure from Interior's own precedent and violated the agency's regulations and fiduciary duties. Before the Court is Jicarilla's motion for summary judgment. Because the Assistant Secretary's decision was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law, Jicarilla's motion is DENIED.

## BACKGROUND

Jicarilla, a federally recognized Indian tribe, is a lessor of natural gas produced on its reservation in northwest New Mexico (the "Reservation") pursuant to standard leases issued by Interior in accordance with the Indian Mineral Leasing Act, 25 U.S.C. § 396a-g. Under the leases, lessees are required to pay royalties to Jicarilla equal to 1/6th or 1/8th the value of the natural gas produced and sold. (A.R. 1372-75, ¶ 3(c) (hereinafter the "Lease")). In some instances, the price paid for gas produced on the Reservation does not accurately reflect market value because the gas is sold under nonarm's-length contracts. To ensure that Jicarilla receives full royalties in such instances, the leases contain a standard provision defining how Interior may calculate an alternative "value" for royalty purposes. Referred to as the "major portion" provision, it provides:

> "value" for the purposes hereof may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered . . . at the time of production *for the major portion* of the oil of the same gravity, and gas, and/or natural gasoline, and/or other hydrocarbon substances produced and sold from the field where the leased lands are situated.

(Lease ¶ 3(c) (emphasis added).)

In 1988, MMS promulgated revised regulations related to the calculation of royalties pursuant to the major portion provision. Before 1988, the relevant regulations effectively mirrored the lease language, leaving unspecified what percentage of sales constituted a "major portion."[1] With the 1988 MMS regulations, however, MMS promulgated express requirements, providing:

---

[1] The pre-1988 regulations stated:

> The major portion will be calculated using like-quality gas sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month. All such sales will be arrayed from highest price to lowest price (at the bottom). The major portion is that price at which 50 percent (by volume) plus 1 mcf of the gas (starting from the bottom) is sold.

30 C.F.R §§ 206.152(a)(3)(ii) (unprocessed gas) and 206.153(a)(3)(ii) (processed gas) (1988-1995), *recodified at* 30 C.F.R. §§ 206.172(a)(3)(i) and 206.173(a)(3)(i) (1996-1999).[2] The 1988 MMS regulations also provided, however, that if the regulations were ever in conflict with any given lease terms, the lease terms would control. 30 C.F.R. § 206.150(b) (1988).

In 1996, MMS began working with Jicarilla to develop a major portion methodology for Jicarilla's gas leases. (A.R. 204.) After reviewing the available data sources, MMS determined that no existing database contained 100 percent of the arms-length, like-quality gas sales for the Reservation. (A.R. Supp. 4.) Rather than forgo a major portion analysis, however, MMS determined that Jicarilla's Royalty-in-Kind (RIK) program, under which Jicarilla received its 1/6th or 1/8th royalty share in kind and sold

---

> The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. . . . In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet for the major portion of like quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

30 C.F.R. § 206.103 (1987); *see also* 25 C.F.R. § 211.13(a) (1987).

[2]   In 1999, MMS again revised its major portion regulations, modifying the formula such that "[t]he major portion value is that price at which 25 percent (by volume) of the gas (starting from the highest) is sold." 30 C.F.R. § 206.174(a)(4)(iii) (2000). The revised regulation, however, was not in effect during the time period relevant in this case.

3

the gas at arm's-length itself, provided sufficient data. (A.R. Supp. 4; A.R. 135.) Based on the assumption that the RIK share prices were representative of the prices received for the remaining 5/6ths or 7/8ths of gas sold, MMS adopted a methodology under which MMS extrapolated monthly major portion prices from the price received for the RIK shares. (A.R. 134-35.) MMS also determined that New Mexico's demarcation of gas resources into overlapping "pools," rather than "fields," precluded MMS from defining distinct field boundaries within the Reservation, necessitating the use of the Reservation boundary itself as the relevant "area" for purposes of the methodology (the "Jicarilla methodology"). (A.R. 136.) MMS thereafter issued 39 virtually identical Orders to Perform in 1998 and 1999, directing lessee companies to pay any additional royalties owed Jicarilla for the period January 1984 through June 1995 based on the major portion prices MMS calculated using the Jicarilla methodology.[3] (*See, e.g.*, A.R. 63.)

Several lessee companies appealed the Orders to Perform within Interior pursuant to 30 C.F.R. Part 290, alleging that various aspects of the Jicarilla methodology violated the 1988 MMS regulations. In December 2000, the Assistant Secretary for Indian Affairs issued Interior's first three decisions, each upholding the Jicarilla methodology in virtually identical opinions. In the decisions Interior cited "good sense and sound equity" as guiding principles and relied on the discretion granted the agency under the lease terms to hold that "despite the inherent limitations relating to the availability of data, [MMS]

---

[3] The Orders to Perform ordered the companies to calculate royalties owed Jicarilla based on the higher of the major portion price, their actual gross proceeds, or the value determined after performing dual accounting. Dual accounting entails comparing the wellhead value of the gas before it is processed to extract heavier liquid hydrocarbons and the combined values of dry residue gas and separated liquid hydrocarbons after processing the gas, less allowed processing costs. *See* 30 C.F.R. § 206.155 (1988).

has substantially complied with the requirements of the regulations." *Robert L. Bayless*, MMS-98-0132-IND ("*Bayless*") at 5 (Dec. 22, 2000); *Dugan Prod. Corp.*, MMS-98-0130-IND at 6 (Dec. 22, 2000); *Merrion Oil & Gas Corp.*, MMS-98-0228-IND at 6 (Dec. 22, 2000) (collectively, the "*Bayless* decisions"). Critically, Interior determined that the Lease terms were inconsistent with the 1988 MMS regulations to the extent the regulations required calculating a "volume-weighted median price based on data that are not appropriate for the Reservation," holding that the lease terms, which did not formally define "major portion," therefore governed. *See, e.g.*, *Bayless* at 5. Interior accordingly held that MMS's extrapolation of major portion prices from the prices received for Jicarilla's RIK share, which constituted only approximately 25% of the total arm's-length sales for the Reservation, was permissible. *Id.* at 4. Interior buttressed its determination by noting that when faced with reasonable alternatives MMS had a fiduciary duty to choose the alternative that was in the tribe's best interests. *Id.* at 5.

Six years later, in March 2007, Interior again passed judgment on the Jicarilla methodology, this time in a consolidated decision on eight additional appeals from the 1998 and 1999 Orders to Perform. In *Vastar Resources, Inc., et al.*, MMS-98-0131-IND (Mar. 28, 2007) (A.R. Supp. 1-12) ("*Vastar*"), however, the Assistant Secretary for Indian Affairs, on Interior's behalf, rejected the Jicarilla methodology for failing to meet the requirements of the 1988 MMS regulations. *Vastar* at 9. Unlike Interior's determination in the *Bayless* decisions, in *Vastar* Interior determined that no inconsistency existed between the Lease terms and the 1988 MMS regulations. *Id.* at 3-4, & n.1. Reasoning that Interior is bound to follow its own regulations, fiduciary duties

5

notwithstanding, Interior determined that several aspects of the Jicarilla methodology violated the regulations. *Id.* at 6-11. Interior accordingly struck the major portion prices calculated using the Jicarilla methodology from the Orders to Perform. *Id.* at 12. Jicarilla subsequently filed the present suit in May 2007 seeking review of the *Vastar* decision.

## DISCUSSION

Under the APA, the Court is required to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is a highly deferential one. It presumes agency action to be valid." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976). Critical to the Court's review under this standard is whether the agency has examined the relevant information and "articulated a rational explanation for its action." *See Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 921 (D.C. Cir. 1985). In its motion for summary judgment, Jicarilla challenges the *Vastar* decision on three bases. For the following reasons, none of the three warrants a reversal of the agency's decision.

## I.    Fidelity to Agency Precedent

Jicarilla first argues that Interior's failure in *Vastar* to explicitly discuss and explain its departure from the *Bayless* decisions renders *Vastar* arbitrary and capricious. Interior and intervenor-defendants Vastar Resources, Inc., *et al.*, (collectively, "defendants") argue, not surprisingly, that Interior has inherent authority to reconsider prior decisions and *Vastar* provided sufficient reasoned explanation for its determination. I agree.

6

While agencies are generally under a duty to treat likes cases alike, *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), they are also "free to change course as their expertise and experience may suggest or require." *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003). Indeed, it is well settled that "[a]n agency is free to discard precedents or practices it no longer believes correct." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (citation omitted). Agencies may not, however, depart from past precedent without explanation. While this Court's review under the APA is a highly deferential one, "[w]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995); *see also Nat'l Fed'n of Fed. Employees, FD-1 v. Fed. Labor Relations Auth.*, 412 F.3d 119, 124 (D.C. Cir. 2005) (an agency "must either follow its own precedent or 'provide a reasoned explanation for' its decision to depart from that precedent" (citation omitted)); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (agencies departing from their own precedent must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").

In this case, while Interior did not mention the *Bayless* decisions by name in *Vastar*, neither did Interior sidestep or gloss over without discussion the key issues underlying the *Bayless* decisions. Rather, Interior faced them head on and provided a reasoned explanation for why and how it came to different conclusions. *Cf. Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971) (agency decision arbitrary and capricious where agency attempted to sidestep conflicting precedent without

7

explanation). At the outset, Interior assessed whether the Lease terms were in fact inconsistent with the 1988 MMS regulations, as the *Bayless* decisions had determined. *Vastar* at 3-4. Citing their similar language and the Lease's lack of a definition of "major portion," Interior explained its determination that no inconsistency existed that would require setting aside the 1988 MMS regulations. *Id.* at 3-4, & n.1. Interior then went on to explain in detail the myriad ways the Jicarilla methodology violated the 1988 MMS regulations, which included: relying on RIK sales data that constituted substantially less than 50 percent of arm's-length sales; improperly extrapolating major portion prices from the RIK sales data; relying on sales data for gas that was not like-quality in all instances; defining the relevant "area" to include thirty separate pools from many different formations without showing similarity of characteristics; and calculating major portion prices on an annual, rather than monthly, basis. *Id.* at 8-11. While a citation to the *Bayless* decisions may have made the agency's about-face more explicit, the *Vastar* decision's analysis left no uncertainty as to the reasoning underlying Interior's new determination. *Cf. Hatch v. FERC*, 654 F.2d 825, 834-35 (D.C. Cir. 1981) (agency's failure to adequately explain its new position left future interested parties "with no guideposts for determining the consistency of administrative action in similar cases, or for accurately predicting future action by the Commission"); *Philadelphia Gas Works v. FERC*, 989 F.2d 1246, 1250 (D.C. Cir. 1993) (noting the court's significant uncertainty as to what considerations the agency relied upon to adopt its new position and how those factors related to prior precedent).

In addition, the *Vastar* decision provided no hint of "ad hocery," arbitrariness, or indifference to the rule of law. *See Ramaprakash*, 346 F.3d at 1130 ("This court has observed that 'the core concern underlying the prohibition of arbitrary or capricious agency action' is that agency 'ad hocery' is impermissible." (citation omitted)); *Columbia Broad. Sys., Inc.*, 454 F.2d at 1027. Interior did not treat similarly-situated parties in an inconsistent manner without explanation, a hallmark of arbitrariness. *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988). Rather, Interior reconsidered its position on the legality of a methodology that applied to a single entity for the permissible purpose of ensuring that the agency complied with its own regulations. *See Saulque v. United States*, 663 F.2d 968, 975 (9th Cir. 1981) (previous erroneous finding by agency does not preclude agency from changing its position in order to comply with the law); *cf. Williams Gas Processing-Gulf Coast Co.*, 475 F.3d at 322 (vacating agency decision revisiting prior inconsistent agency case law as to the same entity where agency "neither explained its action as consistent with precedent *nor justified it as a reasoned and permissible shift in policy*" (emphasis added)). Accordingly, despite Interior's failure to mention or distinguish the *Bayless* decisions by name, the agency provided the requisite reasoned explanation for its determination in *Vastar* that the Jicarilla methodology upheld in the *Bayless* decisions violated Interior's regulations. Accordingly, *Vastar* cannot be overturned on these grounds.

## II. Consistency Between the Lease Terms and the 1988 MMS Regulations

Jicarilla next argues that Interior's determination in *Vastar* that the Lease terms and the 1988 MMS regulations were consistent was erroneous and therefore Interior's

9

failure to give primacy to the Lease terms violated Interior's own regulations. Defendants argue, conversely, that Interior correctly determined that no inconsistency existed and that Interior's determination must be afforded deference. For the following reasons, I again agree.

"An agency's interpretation of its own regulations is entitled to substantial deference." *S.A. Storer & Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1368 (D.C. Cir. 2004) (internal quotation marks omitted). Indeed, this Court's "task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). Here, the 1988 MMS regulations use as their starting point the major portion standard set forth in the Lease, namely that "major portion means the highest price paid or offered at the time of production for the major portion of gas production from the same field." 30 C.F.R §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1988-1995); *compare id.*, *with* (Lease ¶ 3(c) (value "calculated on the basis of the highest price paid or offered . . . at the time of production for the major portion of . . . gas . . . produced and sold from the field where the leases lands are situated.")). The regulations then go on to specify in detail how to calculate the "major portion," defining major portion price as "that price at which 50 percent (by volume) plus 1 mcf of the gas (starting from the bottom [of the array of prices]) is sold." 30 C.F.R §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1988-1995).

Jicarilla argues that this volume-weighted median price is inconsistent with the Lease terms, which require that the major portion price equal the "*highest* price paid or offered" for a "major portion." (Lease ¶ 3(c) (emphasis added).) Critically, however, the Lease does not define what constitutes a "major portion," and the Lease expressly incorporates Interior's regulations, including those promulgated after the Lease's issuance. (Lease ¶ 3(g) (stating that the parties agree "[t]o abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases").) While the imposition of a 50 percent threshold volume requirement may preclude MMS from calculating a major portion price for Jicarilla due to data limitations, such a requirement does not render the regulations inconsistent with the Lease terms where the Lease is silent as to the definition of "major portion."[4] In fact, Interior appears to have used a volume-weighted median analysis to calculate major portion prices even *prior* to Interior's promulgation of the 1988 MMS regulations. *See, e.g.*, *Shoshone Indian Tribe & Arapahoe Indian Tribe v. Hodel*, No. C81-131-K, slip op. at 6 (D. Wyo. Jan. 11, 1988) (affirming Interior's consistent interpretation of pre-1988 MMS regulations "as requiring a median base floor price calculation in conducting a major portion analysis"); *Burlington Res. Oil & Gas Co.*, 151 IBLA 144, 157, n.2 (Nov. 30, 1999) (noting that the pre-1988 regulations had "substantially the same requirements for the major portion analysis" as the 1988 MMS regulations). Accordingly, Interior's

---

[4]   Indeed, it is not unprecedented for major portion methodologies crafted by MMS to be struck down on the basis that the data used was insufficient under the regulations. In *Burlington Res. Oil & Gas Co.*, 151 IBLA 144, 158-59 (1999), for example, the Interior Board of Land Appeals precluded MMS from performing a major portion analysis based on nonarm's-length data.

determination in *Vastar* that the Lease terms and the 1988 MMS regulations were consistent is equally not reversable.

## III. Interior's Fiduciary Duty to Jicarilla

Finally, Jicarilla argues that even if Interior's consistency determination in *Vastar* was not erroneous, Interior's fiduciary duty to the tribe nevertheless required Interior to adhere to its prior determination in the *Bayless* decisions because that determination was reasonable and best served the tribe's interests. I disagree.

It is well-settled that "the Government in its dealings with Indian tribal property acts in a fiduciary capacity." *Cobell v. Norton*, 240 F.3d 1081, 1098 (D.C. Cir. 2001) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 194 (1993)). Agencies' fiduciary responsibilities, however, are defined by the contours of the relevant statutes and regulations. *See United States v. Mitchell*, 463 U.S. 206, 224 (1983). Accordingly, while Interior's fiduciary duty requires that it choose that option among several that is in the best interests of the tribe, Interior's choice of options is limited to those that are "reasonable," *i.e.*, not arbitrary and capricious. *See Cobell*, 240 F.3d at 1099; *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority opinion as modified en banc*, 782 F.2d 855 (10th Cir. 1986) ("[W]hen faced with a decision for which there is more than one 'reasonable' choice as that term is used in administrative law, [the Secretary] must choose the alternative that is in the best interests of the Indian tribe.").

Here, the Court agrees with Interior's determination in *Vastar* that the Jicarilla methodology did not conform to the 1988 MMS regulations and thus was not a "reasonable" option. *See Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1499 (D.C. Cir. 1997) ("An agency is required to follow its own regulations.") As explained above, the Jicarilla methodology entailed extrapolating major portion prices from the RIK sales prices, which constituted, at most, 25 percent of the arm's-length gas sales from the Reservation. (A.R. 134-35; *Bayless* at 4.) The 1988 MMS regulations are clear, however, that a major portion price is "that price at which *50 percent* (by volume) plus 1 mcf of the gas (starting from the bottom [of the array of prices]) is sold." 30 C.F.R §§ 206.152(a)(3)(ii) and 206.153(a)(3)(ii) (1988-1995) (emphasis added). In the *Bayless* decisions, Interior sidestepped this discrepancy by finding the 1988 MMS regulations inconsistent with the Lease terms in light of MMS's lack of sufficient data to perform the analysis as required under the regulations.[5] *Bayless* at 5. However, as discussed above, the Lease terms and the 1988 MMS regulations are not inconsistent on their face, and while MMS retains significant discretion and has a duty to develop a major portion methodology that is in the tribe's best interest, that discretion and duty does not permit MMS to outright violate its own regulations. *See Pawnee v. United States*, 830 F.2d 187, 191, 192 (Fed. Cir. 1987) (tribes cannot compel Interior "to go contrary to and beyond

---

[5] In the *Bayless* decisions, Interior determined:

> Where, as here, the method in the regulations does not arrive at the highest price paid or offered but rather at the a volume-weighted median price *based on data that are not appropriate for the Reservation* . . ., the regulations themselves provide that the lease terms take precedence over the MMS regulations.

*Bayless* at 5 (emphasis added).

the regulations and the leases in order to fulfill its alleged fiduciary obligation to appellants"). Accordingly, because the Jicarilla methodology violated the 1988 MMS regulations, and thus did not constitute a "reasonable" option, Interior did not violate its fiduciary duty to Jicarilla in its *Vastar* decision. In the final analysis, Interior's duty to follow its own regulations was, and is, an even higher obligation.

## CONCLUSION

Thus, for all of the above reasons, the Court DENIES plaintiff's Motion for Summary Judgment. While defendants in this matter have not filed a cross-motion for summary judgment, the Court finds that plaintiff was "on notice" that it needed to "come forward with all of [its] evidence," and therefore the Court can, and will, enter summary judgment, *sua sponte,* for defendants. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). An appropriate Order will issue with this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge